**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

The Sustainability Institute, Agrarian Trust,
Alliance for Agriculture, Alliance for the
Shenandoah Valley, Bronx River Alliance,
CleanAIRE NC, Conservation Innovation
Fund, Leadership Counsel for Justice and
Accountability, Marbleseed, Pennsylvania
Association for Sustainable Agriculture,
and Rural Advancement Foundation
International-USA,
and
Baltimore, Maryland; Columbus, Ohio;               Case No.  2:25-cv-02152-RMG
Madison, Wisconsin; Nashville, Tennessee;
New Haven, Connecticut; San Diego,
California,

                              Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity
as President of the United States;
KEVIN HASSETT, in his official capacity as         **COMPLAINT FOR DECLARATORY
Assistant to the President for Economic Policy      AND INJUNCTIVE RELIEF**
and Director of the National Economic Council;
UNITED STATES OFFICE OF MANAGEMENT
AND BUDGET; RUSSELL VOUGHT, in his
official capacity as Director of the United States
Office of Management and Budget; UNITED
STATES ENVIRONMENTAL PROTECTION
AGENCY; LEE ZELDIN, in his official capacity
as Administrator of the United States Environmental
Protection Agency; UNITED STATES DEPARTMENT
OF AGRICULTURE; BROOKE ROLLINS, in her
official capacity as Secretary of Agriculture; UNITED
STATES DEPARTMENT OF TRANSPORTATION;
SEAN DUFFY, in his official capacity as the Secretary
of the United States Department of Transportation;
UNITED STATES DEPARTMENT OF
GOVERNMENTAL EFFICIENCY SERVICE;
AMY GLEASON, in her official capacity as
Acting Administrator of the United States DOGE
Service; ELON MUSK, in his official capacity as
Senior Advisor of the United States DOGE Service.

                              Defendants.

## **INTRODUCTION**

1. This action seeks to ensure that programs and funding that Congress has lawfully enacted to improve lives, strengthen communities, and protect the environment throughout the nation reach their intended recipients and fulfill their intended purposes without unlawful interference by the executive branch of the federal government. Plaintiffs are nonprofit organizations and municipalities that have been awarded federal grant funds, either as direct recipients or as sub-grantees, to carry out specific programs enacted by Congress under the Inflation Reduction Act ("IRA") and Infrastructure Investment and Jobs Act ("IIJA), and other federal statutes.

2. Beginning the day he took office, the President issued multiple executive orders carrying out his intention to unlawfully defy Congressional mandates by freezing, disrupting, and terminating funds that Congress had directed and appropriated to specific grant programs to benefit the environment and support communities.

3. One order, *Unleashing American Energy*, directed federal agencies to "*Terminat[e]*," by which the President meant to "immediately" stop, the disbursement of all funds—totaling over $1 trillion—appropriated by Congress under the IRA and IIJA. Exec. Order No. 14154, 90 Fed. Reg. 8353, 8357 (Jan. 20, 2025) ("Energy EO") (emphasis added). The Energy EO prohibits agencies from disbursing *any* funds under the two statutes that are not "consistent" with a list of Presidential "polic[ies]," as determined by the President's political appointees. Energy EO §§ 2, 7.

4. Another, titled *Ending Radical and Wasteful Government DEI Programs and Preferencing*, mandates the termination of all 'equity-related' grants or contracts within 60 days. Exec. Order No. 14151, 90 Fed. Reg. 8339, 8339 (Jan. 20, 2025) ("Equity EO") (emphasis added).

5. A third, *Implementing the President's "Department of Government Efficiency" Cost Efficiency Initiative*, orders agencies to "terminate or modify" contracts and grants to "advance the policies of [the Trump] Administration." Exec. Order 14222, 90 Fed. Reg. 11095, 11096 (Feb. 26, 2025) ("DOGE EO") (together with the Energy EO and the Equity EO, the "Executive Orders").

6. These Executive Orders cite no legal authority for the President or his agencies to unilaterally freeze, let alone terminate, congressionally appropriated funds. Nor do the Orders cite authority which would allow the executive branch to condition the spending of congressionally appropriated funds on compliance with the President's policies and preferences—as distinct from Congress's. Because there is none. Defendants' freezes are not only wholly unsupported by law, but in fact directly contradict duly enacted statutes.

7. In the weeks since the Executive Orders, senior officials from federal agencies including the Office of Management and Budget ("OMB"), Environmental Protection Agency ("EPA"), Department of Agriculture ("USDA"), the Department of Transportation ("USDOT"), and Department of Government Efficiency ("DOGE"), have enforced these unconstitutional Executive Orders and taken other actions to interfere with the disbursement of congressionally mandated and awarded federal grants.

8. The officials have directed agency staff to freeze IRA and IIJA funding, Ex. A ("First OMB Memo"), Ex. B ("Second OMB Memo") Ex. C ("USDA Directive"), including funds "obligat[ed]" to specific recipients, Ex. D. ("EPA Memo"). They have required agency staff to certify that funding disbursements comply with the Executive Orders prior to releasing funds to recipients, Ex. E ("EPA Executive Order Compliance Review Requirement"). They have directed staff to identify projects for potential removal. Ex. F. ("DOT Memo") and they have prohibited

3

disbursements of funds over $50,000 without new approvals from DOGE. Ex. G ("EPA Notice of DOGE Approval Requirement").

9. EPA, USDA and USDOT staff have taken various actions that prevent Plaintiffs from accessing grant funds to proceed with the congressionally mandated programs entrusted to them. For example, EPA, USDA and USDOT have blocked Plaintiffs' access to the websites and portals needed to access funds, frozen or labeled as "suspended" the accounts containing the grant funds preventing Plaintiffs from drawing down funds, informed Plaintiffs orally that funds are frozen and cannot be drawn down, and communicated through state agencies that expenditures may not be reimbursed, usually with no explanation or justification. These actions by EPA, USDA and USDOT, together with those described in Paragraph 8 above, are collectively referred to in this complaint as the "Program Freezing Actions."

10. In addition, EPA, USDA and USDOT grant officers have become unavailable, and in many cases have failed to provide grantees with clear answers about the status of their grants or any explanation as to why they have been frozen.

11. Two federal courts have already issued temporary restraining orders and preliminary injunctions against aspects of the Administration's funding freezes, finding that they lack constitutional, statutory, and/or regulatory authority.

12. Despite these judicial orders, grants continue to be repeatedly frozen, unfrozen, and then frozen again with no notice or justification. This inflicts significant harm on Plaintiffs, preventing them from executing critical projects, carrying out their missions, planning for the future, paying their employees, contractors, or sub-awardees, and serving the communities where they are implementing these congressional priorities.

13. The Administration's unlawful and arbitrary freeze of congressionally mandated programs and funding appropriated and awarded to carry out those programs violates multiple statutory provisions, as well as fundamental constitutional and administrative safeguards. In this nation, Congress enacts laws, and the Executive Branch, whoever may be occupying it at any given time, must faithfully execute those laws. The Administration has simply refused to do so with respect to the programs at issue in this case and instead has seized control of federal spending to further its own aims, in the process undoing the spending decisions made by Congress.

14. For the reasons set forth herein, Plaintiffs respectfully request that the Court grant appropriate relief to remedy Plaintiffs' injuries and to enforce the Constitution and the Administrative Procedure Act ("APA").

## JURISDICTION AND VENUE

15. Plaintiffs bring this action under the U.S. Constitution and the APA, 5 U.S.C. §§ 702, 704. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and may issue declaratory and injunctive relief under 28 U.S.C. §§ 2201(a) and 2202, as well as vacatur under 5 U.S.C. § 706.

16. Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1)(C) because Defendants are "officer[s]," "employee[s]," and "agenc[ies]" of the United States, and because Plaintiff The Sustainability Institute is headquartered in North Charleston and resides in South Carolina. Venue is proper in the Charleston Division because "a substantial part of the events or omissions giving rise to the claim occurred" in this Division, Local Civ. Rule 3.01(A)(1)—for example, The Sustainability Institute's project to build and weatherize affordable homes in North

Charleston is funded by a congressionally authorized Community Change Grant, which is subject to the funding freeze challenged in this case.

## PARTIES

### I.    Plaintiffs

17. Plaintiffs are eleven Community Groups: The Sustainability Institute; Agrarian Trust; Alliance for Agriculture; Alliance for the Shenandoah Valley; Bronx River Alliance; CleanAIRE NC; Conservation Innovation Fund; Marbleseed; Leadership Counsel for Justice and Accountability; Pennsylvania Association for Sustainable Agriculture; and Rural Advancement Foundation International-USA; and six cities: Baltimore, Maryland; Columbus, Ohio; Madison, Wisconsin; Nashville, Tennessee; New Haven, Connecticut; and San Diego, California.

*Community Groups*

18. Plaintiff The Sustainability Institute is a 501(c)(3) nonprofit organization headquartered in North Charleston, South Carolina. Established in 1999, the Sustainability Institute's mission is to advance sustainable and resilient communities while building the next generation of conservation leaders. The Sustainability Institute applied for and was awarded a 3-year, $11.4 million "Community Change Grant" from EPA in 2024. This grant was authorized by Congress as part of the IRA.

19. The Sustainability Institute intends to use this grant to carry out specific projects approved by EPA to advance Congress's objectives for the grant program. Under terms of the grant, the Sustainability Institute will work with the City of North Charleston to develop energy-efficient affordable homes for disadvantaged people in the Union Heights neighborhood; reduce greenhouse gas emissions by weatherizing and retrofitting homes; and restore a historically black community fragmented by the construction of Highway 218, among other projects.

20. On January 29, 2025, the Sustainability Institute's Community Change Grant was first suspended. Later, on February 7, the organization was able to make a successful draw down of funds using the online portal grantees use to access funds. On February 10, the funds were frozen again. On February 19, funds were unfrozen again, only to be frozen again on March 9. Grant funds have remained frozen since March 9. Multiple inquiries by Sustainability Institute to its EPA grant officer have gone unanswered, and Sustainability Institute was notified by its former grant officer that she received a directive not to communicate with grantees.

21. The funding pause is causing widespread disruption to the Sustainability Institute's internal operations and its ability to implement programs that align with its mission. Most pressing, the freeze in funding is preventing the Sustainability Institute from work on the Union Heights redevelopment project because it requires significant investments in new equipment and hiring contractors. Without certainty that federal funding will be available to reimburse these major expenditures, Sustainability Institute is unable to advance the project. Sustainability Institute has also had to shift significant resources towards managing how to address the loss of funding and spend time and resources discussing how to manage projects in absence of support from the federal government. Sustainability Institute is also concerned about harm to the reputation it has built up after almost two decades working in the Charleston community if it fails to deliver the project it has committed to.

22. Plaintiff Agrarian Trust is a 501(c)(3) nonprofit organization incorporated in California and based in Oregon which focuses on securing land for sustainable farming and fostering a more just and equitable food system. The organization works to protect farmland from development and ensure that it remains accessible to farmers, particularly those from marginalized communities. Agrarian Trust promotes land access and stewardship through

community-driven solutions, offering tools and resources to help transition agricultural land into the hands of farmers committed to sustainable and equitable practices in 15 states. In 2024, Agrarian Trust was awarded a five-year, IRA-funded Increasing Land, Capital and Market Access grant ("Increasing Land Access Grant") by USDA totaling $12,966,593.00 to fund farmland acquisitions in Nebraska, Texas, and New York, as well as farmer-led initiatives and partnerships with community-based organizations in West Virginia, Virginia, Washington, Maine, and Montana.

23. Agrarian Trust has not been reimbursed for its work since the funding freeze began in January 2025. As a result, the organization has not been able to proceed with its land acquisition work for four farms and has been forced to start depleting its savings to sustain operations and programs. Agrarian Trust has been forced to put contracts on hold, alter workplans and consider reducing hours, furloughs, or staff layoffs, including for four staff hired as part of this grant. The funding freeze has caused distress to the organization's staff, as well as farmers and community partners across 15 states.

24. Plaintiff Alliance for Agriculture is a 501(c)(3) nonprofit organization based in Orocovis, Puerto Rico. Alliance for Agriculture's mission is to transform the way agriculture is done in Puerto Rico. The organization achieves this mission by amplifying the local agricultural sector and supporting small farmers and processors, farmers markets and community organizations, working with distribution channels to bring organic products to a wider market, and raising awareness about local food consumption.

25. Alliance for Agriculture is the subawardee under a cooperative agreement between Plaintiff Rural Advancement Foundation International ("RAFI-USA") and USDA Natural Resources Conservation Service Outreach and Advocacy Division through the Increasing Land

Access Grant program. This subaward agreement obligated $1,538,200 to Alliance for Agriculture. The purpose of this project is for Alliance for Agriculture to work with RAFI-USA to achieve the goal of improving farmland access and security by addressing core barriers to attaining land while also working to retain farmland by mitigating and preventing land loss. Alliance for Agriculture is also the subawardee under a separate Conservation Technical Assistance grant between RAFI-USA and USDA Natural Resources Conservation Service Outreach and Advocacy Division that obligated $129,316 to Alliance for Agriculture. The purpose of this project is for the Alliance for Agriculture to provide localized outreach, education, and hands-on technical assistance regarding Natural Resources Conservation Service programs. The primary focus is on assisting small-scale, farmers that are Black, Indigenous, or People of Color through the Natural Resources Conservation Service application process and conservation action plan preparation.

26. Alliance for Agriculture has not been able to access its federal grant funds since January 28, 2025. The funding freeze has had a severe impact on the Alliance as well as farmers and agricultural communities in Puerto Rico. Farmers expect to be able to receive this crucial support, including technical assistance, land access guidance, and financial resources, but are now left in limbo. Training programs, infrastructure investments, and local food system funding has been stalled. The interruption to funding from these awards and uncertainty about when funding will resume has negatively impacted the Alliance's ability to operate. Rather than focusing on its core mission of supporting farmworkers and agricultural communities in Puerto Rico, the Alliance has been forced to divert attention to navigating the federal funding freeze. If the federal funding freeze continues, the organization will have to lay personnel off. A continued

freeze will also undoubtedly damage Alliance for Agriculture's reputation. Farmers and partners trust the Alliance to deliver on promises, and stalled commitments risk eroding that trust.

27. Plaintiff Alliance for the Shenandoah Valley is a 501(c)(3) nonprofit organization that is headquartered in New Market, Virginia. Alliance for the Shenandoah Valley works to ensure the Valley's rural character, scenic beauty, clean water and vibrant communities are protected by providing accurate and timely information to community members and decision makers. It achieves this, in part, by informing and engaging people to protect the natural resources, cultural heritages, and rural character of its region. Alliance for the Shenandoah Valley is the recipient of several USDA grants that have been disrupted by the federal funding freeze.

28. Alliance for the Shenandoah Valley was awarded a subgrant from the National Fish and Wildlife Foundation for $1,531,595.72 on January 14, 2025 under the Innovative Nutrient and Sediment Reduction Grants Program. The purpose of this subaward is to accelerate the rate of implementation and increase the effectiveness of water quality best management practices in a high priority agricultural region of the Chesapeake Bay watershed. Alliance for the Shenandoah Valley was also awarded a subgrant from the Conservation Innovation Fund for $400,000 in October 2023, under the Partnerships for Climate-Smart Commodities Program grant program. Under the subaward, the Alliance will engage farmers in implementing climate-smart agriculture and forestry practices.

29. Alliance for the Shenandoah Valley has not been able to access federal funds for either federal grant since February 12, 2025. This pause has harmed the Alliance for the Shenandoah Valley's programs and the organization itself. The organization's relationship with farmers and landowners, which took years to build, are eroded by this disruption to Alliance's ability to provide support and assistance. In reliance on the availability of the Partnerships program,

farmers that the organization works with to join the partnership program have made investments to adopt sustainable practices expecting to be reimbursed, but now that funding is unavailable to them.

30. Plaintiff Bronx River Alliance is a 501(c)(3) nonprofit organization based in New York City which serves as a coordinated voice for the Bronx River and works with over 100 partners including the New York City Department of Parks and Recreation to protect and restore the Bronx River corridor and greenway so that it can be a healthy ecological, recreational, educational and economic resource for the communities through which the river flows. Bronx River Alliance was awarded a nearly $1 million EPA Community Change grant to enable communities in the Bronx to have a voice in decisions related to coastal adaptation, habitat restoration and infrastructure projects. The organization was also awarded a $500,000 Environmental Justice Collaborative Problem Solving Program grant ("Environmental Justice Problem Solving Grant") to improve water quality in four Bronx and Westchester County waterways by partnering with local communities to collect and use water quality data in advocating for policy and infrastructure improvements that address longstanding sources of water pollution.

31. Bronx River Alliance has not been able to reliably access funds under both EPA grants since around January 29, 2025. The grants were accessible for a few days in early February but were both suspended again on February 12. The grants were last suspended on March 10. This disruption in funding has forced the organization to cover costs for water quality monitoring supplies, equipment and partner and subaward obligations. The funding freeze has also made it difficult to pay staff to coordinate volunteers for water sample collection, resulting in reduced data collection. The reduction in data will impede municipalities, advocates, and elected officials

from securing funding to upgrade aging sewage infrastructure, which directly harms public health and water quality. This will also result in increased health risks from recreational water activities, including paddling, fishing, and swimming in the river. The organization has not been able to proceed with hiring projected staff, causing existing staff members to continue working without pay. The freeze is affecting the organization's ability to cover at least three staff positions. The organization's Community Change subawards are directly tied to community engagement, with each partner committed to engaging 100 community members—work that has also been stalled. The nonprofit's inability to access the grant funds means that community members are prevented from having a voice in infrastructure and development projects to address flooding and heat impacts on vulnerable populations, including children, the elderly, and individuals with chronic illnesses. The inability to follow through on multi-year organizational commitments is also jeopardizing relationships years in the making with community partners, government agencies, and elected officials.

32. Plaintiff CleanAIRE NC is a 501(c)(3) nonprofit organization headquartered in Charlotte, North Carolina. CleanAIRE NC works to protect the health of all North Carolinians by pursuing equitable and collaborative strategies to address air pollution and fight climate change. CleanAIRE was awarded a $500,000 Environmental Justice Problem Solving Grant on June 2, 2024. With this grant, CleanAIRE NC will engage in air monitoring in four impacted communities across north Mecklenburg County to address health impacts associated with air pollution. CleanAIRE NC will also work with partners to train Community Health Workers as lead AirKeepers and conduct a Health Impact Assessment with Lake Norman Community Health Clinic, Mecklenburg County Health Department, Atrium Health, and North Carolina State University.

33. However, as of January 29, 2025, CleanAIRE NC has been unable to make drawdown requests for funding under its Environmental Justice Problem Solving Grant. If funds remain frozen, CleanAIRE NC may be forced to let go of key staff and stop important community air monitoring programs. Currently staff are being forced to shift away from programmatic priorities to manage the fallout from the funding freeze.

34. Plaintiff Conservation Innovation Fund is a 501(c)(3) nonprofit organization incorporated in Wyoming and headquartered in Washington, D.C. Across the country, Conservation Innovation Fund creates water, carbon, and biodiversity "environmental assets" to address the regulatory and voluntary needs of its municipal and corporate partners while supporting the sale of sustainably produced commodities. Conservation Innovation Fund is the recipient of a USDA Partnerships for Climate-Smart Commodities grant and award of $24,999,954 over five years. Conservation Innovation Fund was awarded this grant on June 8, 2023.

35. The purposes of this grant are to develop a private-sector mechanism within the U.S. economy for commodities such as milk, beef, and grain that are cultivated with sustainable practices; to create incremental markets for environmental assets tied to sustainable practices; and to invest in America's rural and agricultural communities. Conservation Innovation Fund works with farms to integrate agricultural best management practices such as cover crops, zero tillage production, nutrient management and manure management into dairy, beef and grain supply chains, with greenhouse gas reductions and water quality benefits that can be purchased by supply chain partners and other stakeholders. Farmers in Virginia, Maryland, Pennsylvania, Delaware, and West Virginia, as well as Maryland & Virginia Milk Producers Cooperative Association members in Ohio, North Carolina, South Carolina, Tennessee, New Jersey and New

York, are eligible for assistance through the grant. The grant agreement and award are the culmination of over 10 years of planning and preparation and coordination with USDA.

36. The reimbursement requests that Conservation Innovation Fund has submitted since January 20, 2025 have not been paid out. The disruption in funding has significantly delayed program implementation. Conservation Innovation Fund provides funding directly to farmers for implementation of best management practices. 29 farms await payment of $1,937,735.50, related to implementation of best management practices, which must be implemented in the springtime for the best outcomes. Due to the pause in USDA funding, farms have been forced to delay necessary purchases for equipment, seed and services related to the implementation of best management practices. Without access to this USDA funding, CIF has been forced to reduce staff, shutter business development opportunities, and seek alternative funding sources. Conservation Innovation Fund hired new employees to support implementation of the Climate-Smart Commodities Market Program over the five-year grant program period. Since the funding freeze, two full-time employees have left the organization. The pause also harms Conservation Innovation Fund's reputation with farmers, customers and funders. Farmers had begun to reach out directly to Conservation Innovation Fund and its partners, and to build momentum among their rural communities behind the economic opportunity presented by the program, which targets hundreds of small farmers. Now that the funding is paused, these calls have stopped. The pause in USDA funding also has caused efforts to expand capital for market-based conservation programs to come to a standstill, creating uncertainty and chaos for an entire emerging sector of the agricultural economy.

37. Plaintiff Leadership Counsel for Justice and Accountability is a 501(c)(3) nonprofit organization based in Fresno, California. Leadership Counsel's mission is to work alongside the

most impacted California communities to advocate for sound policy and eradicate injustice to secure equal access to opportunity regardless of wealth, race, income, and place.  Leadership Counsel was awarded a Community Change Grant of over $3 million from EPA in 2024.  With this funding, Leadership Counsel is carrying out an EPA-approved project to connect disadvantaged communities in California's San Joaquin Valley to public decision-making venues and better equip these communities to advocate for their interests on climate change issues.

38. Since early February, Leadership Counsel has not been able to reliably request reimbursements through the federal government's online portal for withdrawing grant funds called Automated Standard Application for Payments ("ASAP").  Leadership Counsel's inability to access funds, and the uncertainty about when these funds will become reliably available, has forced the organization to adjust its workplans and engagements with community members. Leadership Counsel and one subawardee have been forced to pay for staff time and other expenses for work done on this program themselves while this funding has been paused.

39. Plaintiff Marbleseed is a 501(c)(3) nonprofit organization headquartered in Spring Valley, Wisconsin.  Established in 1995, Marbleseed is committed to supporting farmers in their transition toward sustainable, organic farming systems that are ecologically sound, economically viable, and socially just.  Marbleseed works with small farms to support peer-to-peer learning with free and farmer-led programs, print and digital resources, and in-person events that support thriving regenerative and organic farms and food systems.

40. Marbleseed received a $4,517,254. 65 award under USDA's Partnerships for Climate-Smart Commodities.  Under this program, Marbleseed will provide rural and agricultural communities with the tools needed to build operational and environmental resiliency by implementing climate-smart production practices that reduce greenhouse gas emissions and

15

sequester carbon. Marbleseed was also awarded a $300,000 grant Organic Technical Staffing Assistance grant under USDA's Conservation Stewardship Program to improve conservation performance by installing and adopting additional activities and improving, maintaining, and managing existing activities on agricultural land and nonindustrial private forest land. Marbleseed's work will expand conservation planning assistance to organic agricultural producers and accelerate conservation practice implementation for farmers in their network. This grant has been frozen since January 31, 2025, and Marbleseed has not received reimbursement for its work.

41. Marbleseed's Climate-Smart grant has been frozen since March 7, 2025, causing significant harm to the farmers Marbleseed supports. The funding uncertainty has disrupted the trusting, supportive network Marbleseed has worked to build. Marbleseed is hesitant to take next steps in agreements with partners because the organization does not want to make promises they cannot deliver on. Marbleseed's programmatic work has slowed. The organization has imposed a hiring freeze, closed an open full-time staff position, reduced employee working hours as an alternative to layoffs, and redirected staff time to other program areas. During this time of the year, the Marbleseed team typically plans field days comprised of on-the-farm trainings and education events but has been unable to provide this opportunity to partners and communities due to the freeze. All of this has taken a significant toll on employees.

42. Plaintiff the Pennsylvania Association for Sustainable Agriculture, d/b/a Pasa Sustainable Agriculture ("Pasa"), is a 501(c)(3) nonprofit organization based in Harrisburg, Pennsylvania. Pasa's mission is to support farmers in creating economically viable, environmentally sound, and community-focused farms and food systems. In 2023, Pasa applied for and was awarded a five-year USDA grant of over $55 million through the IRA-funded Partnerships for Climate-Smart

Commodities program.  In 2024, USDA increased the award amount to just over $59. 5 million.
With this funding, Pasa plans to implement a USDA-approved project to support over 20,000
small to mid-scale underserved farmers from Maine to South Carolina to implement
scientifically validated conservation practices that increase efficiency and productivity and
reduce and sequester greenhouse gasses.  Funding under that grant is currently paused.

43. Pasa has a $32,380,331.30 USDA Agricultural Marketing Service Farm and Farmworker
Relief grant to provide financial relief to frontline farmworkers and meatpacking workers with
expenses related to the COVID-19 pandemic.  Pasa was advised it could only submit expenses
incurred before January 20, 2025, with no guidance from USDA about subsequent expenses
covering payments for farmers and food workers.  Pasa also has a $1,496,963 award from
USDA's Farm Service Agency for an Urban Agriculture and Innovative Production grant to
support urban agriculture efforts in Philadelphia.  After submitting an invoice on March 7, 2025,
Pasa was instructed to revise its January invoice to only include expenses before January 19,
2025, and has received no guidance for expenses incurred after January 20, 2025.

44. Pasa faces several financial challenges as a result of the funding pause.  First, Pasa will
potentially have to pay a large sum of unemployment claims for potentially 60 employees.
Second, Pasa has been forced to use rainy day funds to reimburse farmers and contractors for
completed work, as well as cover employee payroll for the month of March.  Finally, Pasa has
been unable to secure alternative funding because banks are hesitant to loan money to non-profits
when there are no assurances that government contracts will be honored.  The disruptions to
Pasa's operations frustrate the organization's mission and its ability to serve frontline
farmworkers.

45. Plaintiff Rural Advancement Foundation International – USA ("RAFI-USA") is a nonprofit organization dedicated to supporting family farmers, rural communities, and food systems across the country. Based in North Carolina, RAFI-USA works to advance sustainable agriculture and economic justice to promote equity and resilience in rural areas. RAFI-USA provides direct support to underserved farmers, particularly those who are Black, Indigenous, and People of Color, small-scale, or facing systemic barriers, through grant programs, technical assistance, and advocacy efforts. RAFI-USA is the recipient of several USDA grants that have been disrupted by the federal funding freeze.

46. RAFI-USA was awarded a cooperative agreement with USDA through the Increasing Land Access Program for $8,499,695 in May 2024. This grant funds the Gaining New Ground project, which improves land access and land security for underserved farmers of color in North Carolina, Florida, the U.S. Virgin Islands, and Puerto Rico. RAFI-USA was also awarded a cooperative agreement with the USDA Farm Service Agency through the Distressed Borrower Assistance Network Program for $2,389,182.72 in August 2024 to address the critical need for farm advocates and technical assistance providers by developing training and peer support resources and establishing a Distressed Borrower Assistance Network. RAFI-USA also has an American Rescue Plan Technical Assistance Investment Program grant from the USDA National Institute of Food and Agriculture for $425,000. Under the grant, RAFI-USA will work to increase familiarity with, and access to, USDA Farm Service Agency loan programs among farmers who are young and Black, Indigenous, and People of Color.

47. RAFI-USA was awarded a cooperative agreement with the USDA Natural Resources Conservation Service through the Partnerships for Climate-Smart Commodities Program for $2,073,301 in September 2023. The purpose of this project is to reduce barriers for small and

underserved farmers to implement climate-smart agriculture and forestry practices. RAFI-USA was also awarded a Rural Development Policy Cooperative Agreement with the USDA Farm Service Agency Outreach Office for $1,548,896.68 in September 2023 to help ensure that all farmers have equitable access to services. Another cooperative agreement through the Equity in Conservation Outreach Cooperative Agreement program for $696,664 is intended to help expand delivery of conservation services to historically underserved producers.

48. RAFI-USA has submitted several reimbursement requests through each of these grant programs since January 20, 2025. RAFI-USA only recently received a reimbursement for its agreement through the Equity in Conservation Outreach Cooperative Agreement program after unsuccessfully submitting reimbursement requests since January. RAFI-USA has not received payments for any of its reimbursement requests for the other grant programs. RAFI-USA's mission is being undercut because farmers and rural communities are being directly harmed due to their inability to access promised funds and RAFI-USA has been prevented from continuing to provide critical support and assistance to these communities. The pause has also harmed RAFI-USA financially. The organization has been forced to pause hiring for two positions and has taken out a line of credit to cover costs in the absence of federal reimbursements.

*Cities*

49. Plaintiff the City of Baltimore ("Baltimore")[1] is a municipal corporation, organized pursuant to Articles XI and XI-A of the Maryland Constitution, entrusted with all the powers of local self-government and home rule afforded by those articles. Baltimore is the largest city in

---

[1] Because Baltimore is a party to ongoing litigation relating to the Equity EO, Baltimore joins the claims asserted in this complaint only as to the Energy EO, Cost Efficiency EO, and agency actions to implement the Energy EO and Cost Efficiency EO. Baltimore does not join the asserted claims as to the Equity EO and agency actions to implement the Equity EO.

Maryland and the thirtieth largest city in the United States.  Over the past three years, Baltimore has been awarded more than 20 federal grants funded by the IRA and IIJA.  These grants include a $4 million grant under the EPA's Solid Waste Infrastructure for Recycling ("SWIFR") grant program to help develop a solar-powered composting facility, as well as two EPA Environmental Justice Government-to-Government ("EJG2G") awards, totaling over $500,000, for its YH2O+ Career Training Program, which prepares young adults for jobs in the water and solid waste industries.

50. The Solid Waste Infrastructure for Recycling Grant-funded composting facility is expected to benefit the City in several ways.  If completed, it will have the capacity to compost approximately 12,000 tons of organic materials per year, diverting those materials from landfills and incinerators and reducing greenhouse gas emissions by 6,000 tons.  It will also encourage renewable energy and reduce long-term energy costs, create four or five permanent full-time, higher-paying green energy jobs for local residents, provide Baltimore residents access to organics recycling, and benefit local food production.  On January 31, 2025, Baltimore received an email from an EPA official stating that "Funding has been paused for grants under the Infrastructure Investment and Jobs Act at this time," including "all funding on existing grants for the Solid Waste Infrastructure for Recycling (SWIFR) grant program." The funding pause applied to the City's $4 million Solid Waste Infrastructure for Recycling Grant.  Then, two weeks later, Baltimore received word on February 12, 2025, from the EPA that "you can return to work on the EPA SWIFR grant again." Although the grant is unfrozen as of the date of filing, such volatility in funding availability disrupts this project.  Baltimore expects to draw down the funds gradually over the three-year grant period, and it cannot predict possible future funding freezes.  Baltimore is faced with the catch-22 of deciding whether to expend resources on the

project given the risk that the funding will be suspended, and expenses will not be reimbursed or halting this important project.

51. The YH2O+ Career Training Program prepares young adults for full-time jobs in the water and solid waste industries. 158 young men and women have successfully completed the program since its inception in 2015. The YH2O+ program benefits the City by providing a better-trained workforce prepared for well-paying jobs. The EPA awarded Baltimore $524,000 through the Environmental Justice Government-to-Government Program (previously known as the State Environmental Justice Cooperative Agreement Program) for fiscal years 2021 through 2025, including a $324,000 award for fiscal year 2025. This 2025 award would allow Baltimore to expand the program by offering more slots and possibly operating two sessions a year, one in the spring and one in the fall. These awards were suspended following the President's issuance of the Energy EO. As of February 6, 2025, and February 18, 2025, the funds were unavailable to be drawn down from Baltimore's payment portal. The funds had been present in the portal consistently prior to January 23, 2025—it was not until recently that the funds started to disappear and reappear. The $200,000 award for fiscal years 2021 through 2024 subsequently reappeared in the portal and Baltimore was able to draw down the funds and close out on or about March 6, 2025. However, as of March 11, 2025, the $324,000 award for fiscal year 2025 is unavailable in Baltimore's funding portal, and none of it has been drawn down. Without these funds Baltimore will not be able to operate the program effectively, thus hindering its ability to train and hire young adults. The program is on hold and Baltimore is unsure if it will be able to have a spring 2025 or fall 2025 class.

52. Plaintiff the City of Columbus ("Columbus") is a municipal corporation organized under Ohio law. *See* Ohio Constitution, Art. XVIII. Columbus prioritizes planting trees to improve

residents' health and quality of life, increase property values, and improve the environment.
Trees are particularly important in Columbus because they help to mitigate the city's severe
urban heat island effect. As a part of its plan to improve the City's tree canopy, Columbus,
through its Recreation and Parks Department, successfully applied for a $500,000 Urban and
Community Forestry Grant as a subgrantee of the Ohio Department of Natural Resources
("ODNR"). The grant is designed to "further expand [Columbus's] tree canopy through the
purchase and plantings of approximately 1,250 diverse, large-class street trees in disadvantaged
areas."

53. During the 2024 planting season, Columbus expended $393,930 of the awarded
$500,000. On February 18, 2025, the ODNR sent a letter to the Columbus Recreation and Parks
Department explaining that the State's reimbursement requests were not being processed by the
U.S. Forestry Service and suggesting that Columbus temporarily suspend expenses against their
grant, given the risk that expenses would not be reimbursed. On February 27, 2025, Columbus
nonetheless submitted a "Sub Awardee Request for Reimbursement(s)" to the ODNR requesting
reimbursement in the amount of $393,930. On March 13, 2025, ODNR sent an email reversing
course, stating that the grant was "approved for implementation." However, Columbus has not
yet been reimbursed for the $393,930 it has already spent and is concerned that the federal
government will continue to turn this grant on and off and may well not ultimately reimburse the
city for the full amount of eligible expenses. If Columbus does not receive the reimbursement it
is owed under this grant, it will be forced to cover this expense through money from its capital
budget.

54. Plaintiff the City of Madison ("Madison") is a municipal corporation organized and
existing under the laws of the State of Wisconsin. Madison has been awarded a $20 million grant

through EPA's Community Change Grants Program to lead a collaborative project to improve housing affordability through whole home energy upgrades, thereby saving residents money on energy bills, improving indoor air quality, and cutting climate pollution. The project—a partnership with four community organizations—aims to upgrade 825 units of housing in low-income census tracts. These homes tend to be least energy efficient, and the residents are forced to spend a disproportionate share of their income on home energy bills. Madison's project also aims to provide an additional 1,050 households with technology to reduce energy use by items plugged into outlets in the home and 60 early career workers with workforce training.

55.   On or around January 31, 2025, Madison's grant disappeared from the ASAP transaction page, making it impossible to draw down funds. The grant was then labeled as "Suspended" until around February 19, 2025, when that status changed to "Open." On or around March 10, 2025, the status changed back to "Suspended," and Madison remains unable to draw down funds. Two of Madison's partner organizations—Sustain Dane and Project Home—have already begun work to deliver their whole home upgrade programs, but they will not be able to continue if funding is not unfrozen. Freezing this grant creates several contractual problems for Madison: Madison cannot continue to honor its subrecipient agreements with Sustain Dane and Project Home, cannot execute expected subrecipient agreements with the remaining two local partners identified in the grant, and has an existing "Statutory Partnership Agreement" with one of these two partners, which the City will not be able to honor if the grant remains frozen. The Statutory Partnership Agreement required by EPA to apply for this grant established an expectation that the statutory partner will receive funds as a subrecipient and conduct the activities described in that Partnership Agreement. EPA's requiring of this partnership agreement and then unilaterally suspending the City's grant funds places Madison at risk of defending a breach of contract action

23

from the Statutory Partner. Finally, the grant terms require that the project be completed within three (3) years and do not allow extensions, so even a temporary delay may impede Madison's ability to achieve the project's goals as required by its grant agreement. And a permanent freeze of this funding would deprive thousands of Madison's most vulnerable residents of the opportunity to significantly reduce their monthly energy bills.

56. Plaintiff the Metropolitan Government of Nashville & Davidson County ("Nashville") is a combined municipal corporation and county government organized and existing under the laws of the State of Tennessee. In August of 2024, Nashville was awarded $4.7 million for their "Electrify Music City" project, which would upgrade, improve and expand their public electric vehicle charging infrastructure under the Charging and Fueling Infrastructure Grant program. A few months later in January 2025, Nashville also won a highly competitive $9.3 million grant for their "East Nashville Spokes" project under the Active Transportation Infrastructure Investment Program to help fund a multi-modal, safe transit connection project that includes protected bike lanes as well as ADA and pedestrian improvements.  This project, would connect neighborhoods in the city so residents can have safer, better transit access to their jobs, including connecting a Metropolitan Development and Housing Agency ("MDHA") redevelopment district with the downtown area.

57. Upon receiving notice of the Charging and Fueling Infrastructure award, Nashville immediately began the process to complete a grant agreement with the Federal Highway Administration ("FHWA") so that it could get started on the work for the EV charging stations. Over the next several weeks, Nashville and FHWA had a final grant agreement draft approved by the local FHWA office, which was sent to FHWA headquarters for final draft approval in

December of 2024. Nashville has not heard anything from their partners at FHWA since this last communication.

58. Defendant USDOT's failure and refusal to complete the grant agreement and make the promised funds available has thrown planning and implementation of the Electrify Music City project into disarray and uncertainty. Nashville started its procurement process for a vendor to install, repair and improve its electric vehicle charging stations. Nashville selected a vendor and entered into a contract with this vendor. Nashville now cannot guarantee that it has the federal funds to complete certain projects with this vendor. Further, Nashville incorporated the awarded funds in its Transportation Improvement Program budget for this fiscal year. With the funds frozen, Nashville cannot properly plan or fully implement its project plans. Nashville has operated free or affordable electric vehicle charging stations since 2017, and without fully implementing this program, residents will not have access to the new amenities or the benefits the project proposed. The accessibility of electric vehicle charging infrastructure not only improves the quality of life for residents who use electric vehicles, but also reduces pollution in the city that can cause medical issues for residents.

59. Similarly, after both a public press release and written notification by Defendant USDOT that Nashville won its award of $9.4 million, FHWA reached out to introduce their point of contact to execute the grant agreement process on January 15, 2025. This was the last communication that Nashville received from Defendants. Nashville residents expect and are excited about the East Nashville Spokes project. It is a multi-year project that could transform Nashville into a more walkable, bikeable city, and work on this project had already started when the city applied. For the past several years, Nashville has been conducting community engagement, planning, and designing to create a project plan for connecting several

neighborhoods in the city. To help them fund the next several phases of the project, Nashville incorporated this project into a city-wide Transit Referendum that anticipates leveraging federal funds to bring the project to completion. The Transit Referendum passed overwhelmingly in November 2024. However, with the funds frozen, this project has languished in uncertainty. The federal government reneging on its award means that better connections across the city and safer streets, including for connections between downtown and quickly developing areas in Nashville, are not fully funded.

60. Plaintiff the City of New Haven ("New Haven") is a municipal corporation organized and existing under the laws of the State of Connecticut. New Haven has received at least three EPA grants funded by the IRA. In July 2024, New Haven received a $1 million Environmental Justice Government-to-Government award to help city residents transition from burning heating oil to efficient heat pumps for home heating and from gas stoves to induction stoves in order to reduce heating costs and air pollution. The same month, New Haven was awarded a $9.5 million grant under the EPA's Climate Pollution Reduction Grant program to help fund an advanced geothermal heat pump system that will heat and cool the city's main train station, Union Train Station, and a planned 1000-unit New Haven Housing Authority housing development. In January 2025, New Haven was awarded a $20 million Community Change Grant to improve climate resiliency and quality of life for residents of 14 disadvantaged neighborhoods. New Haven plans to use this funding to lead a coalition of 20 partner organizations to improve the energy efficiency of affordable housing development, upgrade the energy efficiency of existing homes, improve bike infrastructure and green spaces, and improve food rescue (matching unused food from food businesses with people who need it), among other project components.

61. On or before Monday, February 3, 2025, New Haven's Government-to-Government funding became unavailable. Over the next several weeks, the funding's status in ASAP was change to "Suspended," then to "Open," then back to "Suspended." When the status is labeled as "Suspended" it is not possible to draw down funds. The project has already begun in partnership with several partner organizations, including the Community Action Agency of New Haven (CAANH), which has already hired one full-time staff person who will need to be laid off if the grant remains suspended. Other partner organizations have invoiced the City for staff time spent working on the project, but the City has been unable to obtain reimbursement and cannot afford to continue to pay partner organizations' invoices for work on this project unless the funding is unfrozen.

62. New Haven's $9. 5 million grant under the EPA's Climate Pollution Reduction Program is intended to provide approximately 60% of the funding required for its advanced geothermal heat pump project. In recent weeks, the project's status in ASAP has also toggled back and forth between "Suspended" and "Open." It is currently labeled as "Open." Next week, New Haven plans to release a Request for Proposals to design the new geothermal heating and cooling system. After 30 days, New Haven plans to select a firm to design the system, but without greater certainty about the availability of the grant funding the City will be unable to enter into a contract to design the complex system. The funding uncertainty may also chill qualified bidders for the project. An extended delay will likely prevent the project from ever getting started, depriving New Haven of an innovative geothermal system that would both reduce the city's energy expenses and help it to achieve its goal of completely electrifying city buildings by 2030.

63. On February 3, 2025, New Haven received formal notice of its $20 million Community Change award. Since the grant appeared in ASAP a few days later, it has also toggled back and

forth between "Suspended" and "Open." Its current status is "Suspended." The period of performance for the award begins on April 1, 2025, and New Haven is currently finalizing job descriptions for new hires to launch and manage the project, but the City will be unable move forward so long as the grant is frozen or at risk of being frozen. Without the grant, New Haven and its residents will be deprived of improved infrastructure and housing, and more residents will go hungry unless the City diverts funding from other priorities.

64. Plaintiff City of San Diego ("San Diego") is a municipal corporation and California charter city, duly organized and existing by virtue of the laws of the State of California. San Diego is the second largest city in California and the eighth largest city in the United States. In 2024, San Diego was awarded an approximately $10 million grant under the USDA's Urban and Community Forestry grant program for a project entitled "Ready, Set, Grow San Diego." The grant funds a five-year program to plant and maintain trees in local communities as part of an ongoing effort to grow and improve San Diego's urban forest. This grant is intended to increase equitable access to trees and nature, aid in combating extreme heat and climate change, and provide much-needed shade to San Diego residents. Trees also help to reduce air pollution levels, protect vulnerable residents, and increase stormwater absorption, leading to less runoff and decreased flood risk.

65. In February 2025, a program manager from USDA verbally notified a City Forester by phone that USDA's Budget and Finance Incident Finance Branch, Albuquerque Service Center (ASC) had paused payments for grant reimbursement requests, but recommended to continue submitting reimbursement requests. The City's Transportation Department (TD) then emailed the USDA program manager for written confirmation of the pause, but the USDA program manager would only verbally confirm the pause. To date, despite the City's request for clarity,

USDA has not confirmed whether the pause is in full effect. The City has thus far expended approximately $66,000, approximately $5,000 of which was reimbursed in December 2024, and the total remaining value of the awarded grant is $9,994,781. 69. Without this grant, San Diego would lose the many benefits associated with greater tree cover and would struggle to meet its climate action goals as outlined in its Climate Action Plan aiming to enhance green spaces that contribute to a healthier and more livable city.

## II.    **Defendants**

66. Defendant Donald J. Trump J. he President of the United States. He signed the Energy EO, Equity EO, and Cost Efficiency EO. Defendant Trump is sued in his official capacity as President of the United States.

67. Defendant Kevin Hassett is the Assistant to the President for Economic Policy and Director of the National Economic Council. In these roles, Defendant Hassett advises President Trump on various economic matters. *See* Exec. Order 12835, *Establishment of the National Economic Council*, 58 Fed. Reg. 6189 (Jan. 27, 1993).

68. Defendant Hassett is also responsible for determining whether IRA and IIJA funds are consistent with President Trump's policies and should be disbursed. Energy EO § 7. Defendant Hassett is sued in his official capacity as Assistant to the President for Economic Policy and Director of the National Economic Council.

69. Defendant Office of Management and Budget is a cabinet agency in the Executive branch that oversees the federal budget. *See* 31 U.S.C. §§ 501–07.

70. The Office of Management and Budget has issued multiple memoranda that have directed the freeze of federal grant funds.

71. Defendant Russell Vought is the Director and highest-ranking official of the Office of Management and Budget, *see id.* § 502, which is a cabinet agency in the Executive branch that oversees the federal budget. *See id.* §§ 501–07. Defendant Vought is sued in his official capacity as OMB Director.

72. Defendant Vought's predecessor, then-acting OMB Director Matthew J. Vaeth, authored the First OMB Memo challenged in this case freezing IRA and IIJA funds.

73. As current OMB Director, Defendant Vought is responsible for that Memo and ensuring its directives are implemented by agencies that administer the IRA and IIJA. *See id.* § 503(a) (granting Director authority to direct and approve "governmentwide financial management policies for executive agencies").

74. Under Section 7 of the Energy EO, Defendant Vought and the OMB are responsible for determining whether IRA and IIJA funds are consistent with President Trump's policies and should be disbursed.

75. Under Section 2(b) of the Equity EO, Vought is also responsible for consulting with federal agencies to "terminate . . . 'equity-related' grants or contracts."

76. Defendant EPA is an independent agency in the Executive branch responsible for enforcing the Nation's environmental laws, for overseeing congressionally mandated grants and programs related to environmental protection, and for distributing funds Congress specifically appropriated to those grants and programs.

77. Defendant Lee Zeldin is the Administrator of the U.S. Environmental Protection Agency. *See* Reorganization Plan No. 3 of 1970, 42 U.S.C. § 4321 note. Defendant Zeldin is sued in his official capacity as EPA Administrator.

78. Defendants Zeldin and the EPA are tasked with the implementation of the Energy EO and with implementing the Equity EO's directive to "terminate . . . 'equity-related' grants or contracts."

79. Defendant Zeldin is ultimately responsible for the EPA Memo challenged in this case freezing IRA and IIJA funds and ensuring that EPA staff implement its directives.

80. Defendant USDA is an executive branch agency responsible for providing leadership on food, agriculture, natural resources, rural development, nutrition, and related issues based on public policy, the best available science, and effective management.

81. Defendant USDA is tasked with administering various grant programs funded by Congress in the IRA and IIJA, including the Partnerships for Climate-Smart Commodities program.

82. Defendant Brooke Rollins is the Secretary of Agriculture.  Defendant Rollins serves as the head and highest-ranking official of the USDA.  *See* 7 U.S.C. § 2202. Defendant Rollins is sued in her official capacity.

83. Defendant Rollins is ultimately responsible for USDA's ongoing freeze of IRA funds challenged in this case. USDA is also tasked with implementing the Equity EO's directive to "terminate . . . 'equity-related' grants or contracts."

84. Defendant U.S. Department of Transportation is an executive branch agency responsible for ensuring a safe, efficient, and modern transportation system that serves the American people and economy, promoting the safe, efficient, sustainable, and equitable movement of people and goods.

85. Defendant USDOT is tasked with administering various grant programs funded by Congress in the IRA and IIJA.

86. Defendant Sean Duffy is the Secretary of the Department of Transportation. Defendant Duffy serves as the head and highest-ranking official of USDOT. Defendant Duffy is sued in his official capacity.

87. Secretary Duffy was responsible for the March 12, 2025 directive to interfere with federal grants administered by the Department of Transportation.

88. Defendant Duffy is ultimately responsible for USDOT's ongoing freeze of funds challenged in this case. USDOT is also tasked with implementing the Equity EO's directive to "terminate . . . 'equity-related' grants or contracts."

89. Defendant DOGE coordinates teams across multiple agencies with the goal of reconfiguring agency data, technology, and spending. Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025); Exec. Order No. 14222, 90 Fed. Reg. 11095 (Feb. 26, 2025). In performing this role, DOGE acts as an agency—and not merely an advisor to the President.

90. Defendant DOGE or United States DOGE Service is an entity established by President Trump within the Executive Office of the President "to implement the President's DOGE Agenda." Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 20, 2025). Executive Order 14158 also established a temporary organization known as the U.S. DOGE Service Temporary Organization within DOGE "dedicated to advancing the President's 18-month DOGE agenda." *Id.*

91. Defendant DOGE is integral to the implementation of the funding freeze. The DOGE EO instructs agencies to review existing grants "in consultation with the agency's DOGE Team Lead" and "terminate or modify" those grants to "advance the policies of [the Trump] Administration." Exec. Order 14222, 90 Fed. Reg. 11095 (Feb. 26, 2025). Further, on March 3,

2025, EPA announced a new policy that any assistance agreement or contract "$50,000 or greater must receive approval from an EPA DOGE Team member." Ex. G.

92. Defendant Amy Gleason is the acting administrator of DOGE and is sued in her official capacity.

93. Defendant Elon Musk is a federal officer, Senior Advisor to the President, and special government employee within the Executive Office of the President. Mr. Musk is also the de facto head of DOGE, sued here in his official capacity. While the Director of the Office of Administration recently stated that Mr. Musk is "not an employee of the U.S. DOGE Service or U.S. DOGE Temporary Organization,"[2] Mr. Musk is the de facto head of DOGE. As President Trump made clear in his March 4, 2025, speech to Congress, DOGE is "headed by Elon Musk, who is in the gallery tonight." *See Full Transcript of President Trump's Speech to Congress*, N. Y. Times (Mar. 4, 2025), https://www.nytimes.com/2025/03/04/us/politics/transcript-trump-speech-congress. html.

## BACKGROUND

94. In each of the applicable statutes governing the unstable or frozen funds, Congress has spoken clearly and unmistakably as to its mandates and intent. The Defendants have violated these mandates at each and every turn.

I.   **Federal Funding Obligations and Relevant Statutory Grant Programs**

   a.   *Federal Funding Obligations*

95. After Congress passes a bill appropriating funding and the President signs it into law, OMB apportions the funds to the appropriate agencies, which must "obligate" and pay the funds

---

[2] Decl. of Joshua Fisher, *New Mexico v. Elon Musk*, No. 1:25-cv-429 (D.D.C. Feb. 17, 2025), ECF No. 24-1.

in accordance with Congress's directives. *See* U.S. Gov't Accountability Office, Office of the General Counsel, *Principles of Federal Appropriations Law* at 2-3–2-4, GAO-16-464SP (4th ed. 2016), https://perma. cc/EBK3-7A5L (the "Red Book").

96. "Obligating" funds is a budgeting term of art: funds are "obligated" by the agency when there is "some action that creates a legal liability or definite commitment on the part of the government, or creates a legal duty that could mature into a legal liability by virtue of an action that is beyond the control of the government." Red Book at 7-3–7-4, GAO-06-382SP (3d ed. 2006), https://perma. cc/W2LU-P49R.

97. "[T]he 'obligational event' for a grant generally occurs at the time of grant award." Red Book at 10-107, GAO-06-382SP (3d ed. 2006).

**b.** *The Inflation Reduction Act*

98. In 2022, Congress passed and the President signed into law the Inflation Reduction Act, Pub. L. No. 117-169, 136 Stat. 1818 (Aug. 16, 2022) ("IRA").

99. The IRA created numerous new statutory programs and appropriated $433 billion for investments over ten years to support those programs, including $369 billion for climate change and energy programs.

*Environmental and Climate Justice Block Grants*

100. Among other programs, the IRA amended the Clean Air Act to create a new program for "Environmental and Climate Justice Block Grants." *Id.* § 138, 136 Stat. at 2078 (codified at 42 U.S.C. § 7438).

101. Congress appropriated $2. 8 billion to EPA to award grants under the program, and another $200 million to EPA to provide technical assistance to eligible entities related to the grants.

102. Congress instructed that the EPA Administrator "***shall***" use these funds "to award grants for periods of up to 3 years to eligible entities to carry out [certain specified] activities . . . that benefit disadvantaged communities," 42 U.S.C. § 7438(b)(1) (emphasis added), such as "community-led air and other pollution monitoring, prevention, and remediation," "mitigating climate and health risks from urban heat islands, extreme heat, wood heater emissions, and wildfire events," "climate resiliency and adaptation," "reducing indoor toxics and indoor air pollution," and "facilitating engagement of disadvantaged communities in State and Federal advisory groups, workshops, rulemakings, and other public processes." *Id.* § 7438(b)(2).

103. Congress defined "eligible entity" as "a community-based nonprofit organization," "a partnership of community-based nonprofit organizations," or a partnership between such nonprofits and "an Indian tribe, a local government, or an institution of higher education." *Id.* § 7438(b)(3).

104. EPA has awarded Environmental and Climate Justice Block Grants through several sub-programs, including the Environmental and Climate Justice Community Change Grants Program ("Community Change Grants"), the Environmental Justice Collaborative Problem-Solving Cooperative Agreement Program,[3] and Environmental Justice Government-to-Government Grants.

105. By December 2024, EPA had selected 105 recipients of Community Change Grants and awarded them nearly $1. 6 billion in a highly competitive process with approximately 2,700 applicants. Plaintiffs The Sustainability Institute, Bronx River Alliance, Leadership Counsel for

---

[3] EPA, *Biden-Harris Administration Announces Nearly $1.6 Billion in Environmental and Climate Justice Community Change Grants* (Dec. 12, 2024), https://perma.cc/2ETK-BDDM.

Justice and Accountability, New Haven and Madison are among the recipients of Community Change Grants.

106. EPA has selected 98 recipients of Environmental Justice Collaborative Problem-Solving Cooperative Agreements and awarded a total of $43.8 million in IRA funding through this program. Plaintiffs Bronx River Alliance and CleanAIRE NC are among the recipients of awards under this program.

107. For Fiscal Year 2023, EPA used IRA and annual appropriations to fund awards to governmental entities partnering with community-based organizations. In particular, EPA awarded $20 million from annual appropriations to states partnering with community-based organizations, and $10 million to "U.S. territories, freely associated states, Puerto Rico, and tribes in remote areas."[4] EPA awarded $20 million from IRA appropriations to local governments partnering with community-based organizations and $20 million to tribal governments partnering with community-based organizations.[5]

108. For Fiscal Year 2024, EPA awarded about $81.5 million in Environmental Justice Government-to-Government Grants. Of this, about $52.5 million came from the IRA appropriations, while about $29 million came from annual appropriations.[6] Plaintiffs Baltimore and New Haven are recipients of Government-to-Government Environmental Justice Grants.

---

[4] EPA, *Environmental Justice Government-to-Government Program* (Jan. 7, 2025), https://perma.cc/EV5P-N253.

[5] *Id.*

[6] System for Award Management (SAM.gov), *Environmental Justice Government-to-Government (EJG2G) Program*, https://perma.cc/FZ73-E47J (last visited Mar. 16, 2025).

*Partnerships for Climate-Smart Commodities Grants,*
*Equity in Conservation Outreach Cooperative Agreements*
*The Conservation Stewardship Program, and*
*Conservation Technical Assistance Cooperative Agreements*

109. The Partnerships for Climate-Smart Commodities Grant program was established under the Commodity Credit Corporation Charter Act, an arm of the USDA created to support farming. *See* 15 U.S.C. § 714. The program is intended to support climate-smart farmers, ranchers, and forest owners to strengthen U.S. rural agricultural communities.

110. In Section 21001 of the IRA, Congress made a significant investment in this program, appropriating over $18 billion to the Secretary of Agriculture to remain available until September 30, 2031, to fund specific programs to be facilitated by the Commodity Credit Corporation. IRA, § 21001, 136 Stat. at 2015–16.

111. Congress directed that that this funding "***shall***" be available to support certain agricultural practices that "directly improve soil carbon, reduce nitrogen losses, or reduce, capture, avoid, or sequester carbon dioxide, methane, or nitrous oxide emissions, associated with agricultural production." *Id.* (emphasis added). Carbon dioxide, methane, and nitrous oxide are common greenhouse gases that contribute to climate change.[7]

112. USDA invested over $3. 1 billion of this IRA funding in the "Partnerships for Climate-Smart Commodities" program and has already approved 141 projects for awards.[8] Plaintiffs Alliance for the Shenandoah Valley, Conservation Innovation Fund, Marbleseed, Pasa, and RAFI - USA are recipients of the Partnerships for Climate-Smart Commodities grants.

---

[7] EPA, *Overview of Greenhouse Gases*, https://perma.cc/TG2E-UT5X (last updated Jan. 16, 2025).

[8] USDA, *Biden-Harris Administration Announces New Investments to Improve Measurement, Monitoring, Reporting and Verification of Greenhouse Gas Emissions through President Biden's Investing in America Agenda* (July 12, 2023), https://perma.cc/MF4G-GYC3.

113. Similarly, the Equity in Conservation Outreach Cooperative Agreements are authorized in part by various provisions of the Farm Security Act, including the Environmental Quality Incentives Program (16 U.S.C. §§ 3839aa to 3839aa-8), the Conservation Stewardship Program (16 U.S.C. §§ 3839aa-21 to 3839aa-25), and the Agricultural Conservation Easement Program (16 U.S.C. §§ 3865 to 3865d).

114. Each of these programs is facilitated by the Commodity Credit Corporation. In addition, Equity in Conservation Outreach Cooperative Agreements are authorized by the Conservation Technical Assistance Program created by the Soil Conservation and Domestic Allotment Act of 1935. 16 U.S.C. §§ 590a to 590q-3.  The Conservation Technical Assistance Program is operated through the Natural Resources Conservation Service and funded through appropriations.

115. As discussed above, in Section 21001 of the IRA, Congress made a significant investment and appropriated over $18 billion to the Secretary of Agriculture to remain available until September 30, 2031, to fund specific programs including the Environmental Quality Incentives program, the Conservation Stewardship Program, and the Agricultural Conservation Easement Program to be facilitated by the Commodity Credit Corporation.  136 Stat. at 2015–17. Congress specified that the funds facilitated by the Commodity Credit Corporation "shall" be available for "agricultural conservation practices." *Id.* at 2016. In addition, in Section 21002 of the IRA, Congress appropriated $1 billion to the Natural Resources Conservation Service to provide conservation technical assistance. *Id.* at 2018.

116. Plaintiff RAFI-USA is a recipient of the Equity in Conservation Outreach Cooperative Agreements.

117. Plaintiff Marbleseed is a recipient of a Natural Resources Conservation Service, Organic Technical Staffing Assistance grant.

118. Plaintiff Alliance for Agriculture is a sub-awardee on a grant awarded to Plaintiff RAFI-USA through the Conservation Technical Assistance Program.

*Increasing Land Access Grants,*
*Rural Development Policy Cooperative Agreements, and*
*American Rescue Plan Technical Assistance Investment Program Grants*

119. Section 1006 of the American Rescue Plan Act of 2021 appropriated over $1 billion to the Secretary of Agriculture for fiscal year 2021 and directed that the Secretary "shall" use those funds on various agricultural programs that benefit "socially disadvantaged farmers, ranchers, or forest landowners, or other members of socially disadvantaged groups." Pub. L. 117-2, 135 Stat. 4, 13–14.

120. In Section 22007 of the IRA, Congress amended Section 1006 of the American Rescue Plan Act and appropriated an additional $2. 9 billion to the Secretary of Agriculture to fund various agricultural programs to benefit "underserved farmers, ranchers, or forest landowners," certain educational institutions that serve underserved communities, and "farmers, ranchers, or forest landowners determined to have experienced discrimination prior to January 1, 2021, in Department of Agriculture farm lending programs . . . ." IRA, § 22007, 136 Stat. at 2022–23.

121. Section 22007 of the IRA directs the Secretary to use these funds, among other purposes, "to provide outreach, mediation, financial training, capacity building training, cooperative development and agricultural credit training and support, and other technical assistance on issues concerning food, agriculture, agricultural credit, agricultural extension, rural development, or nutrition;" "to provide grants and loans to . . . improve land access (including heirs' property and fractionated land issues);" to "address racial equity issues within the Department of Agriculture and the programs of the Department of Agriculture;" "to support and supplement agricultural research, education, and extension, as well as scholarships and programs

39

that provide internships and pathways to agricultural sector or Federal employment;" and

"to provide financial assistance, including the cost of any financial assistance." *Id.*

122. USDA invested several hundred million dollars of these IRA funds to create the

"Increasing Land, Capital and Market Access Program" ("Increasing Land Access Grants"). [9]

Fifty recipients have been awarded approximately $300 million. Plaintiffs Agrarian Trust and

RAFI-USA are Increasing Land Access Grants recipients. [10] Plaintiff Alliance for Agriculture is

a subaward recipient of RAFI-USA's Increasing Land Access Grant.

123. USDA also invested funds appropriated under Section 22007 of the IRA into

American Rescue Plan Technical Assistance Investment Program grants, a program originally

authorized under Section 1006 of the American Rescue Plan Act of 2021. Plaintiff RAFI-USA is

among the recipients of American Rescue Plan Technical Assistance Investment Program grants.

124. Upon information and belief, USDA also invested funding appropriated under Section

22007 of the IRA into the Rural Development Policy Cooperative Agreement program.

Established by the Rural Development Act of 1972, the Rural Development Policy Cooperative

Agreement program authorizes USDA to enter into cooperative agreements "to improve the

coordination and effectiveness of Federal programs, services, and actions affecting rural areas,

including the establishment and financing of interagency groups, if the Secretary determines that

the objectives of the agreement will serve the mutual interest of the parties in rural development

---

[9] USDA, *USDA Announces Up to $550 Million in American Rescue Plan Funding for Projects Benefiting Underserved Producers and Minority Serving Institutions that Create Career Development Opportunities for Next Generation Leaders* (Aug. 24, 2022), https://perma.cc/AC6N-Y4PC.

[10] USDA, *Increasing Land, Capital, and Market Access Program*, https://perma.cc/8YBV-U6QC (last accessed Mar. 11, 2025).

activities." 7 U.S.C. § 2204b(b)(4)(A). Plaintiff RAFI-USA is among the recipients of Rural Development Policy Cooperative Agreement.

*Climate Pollution Reduction Grants*

125. In Section 60114 of the IRA, Congress amended the Clean Air Act to create a program for Climate Pollution Reduction Grants. Congress appropriated $250 million, to remain available until September 30, 2031, for greenhouse gas air pollution planning grants. IRA § 60114, 136 Stat. at 2076. Congress appropriated $4. 75 billion, to remain available until September 30, 2026, for greenhouse gas air pollution implementation grants. *Id.*

126. Section 60114(b) provides that the EPA Administrator "*shall* make a grant to at least one eligible entity in each State for the costs of developing a plan for the reduction of greenhouse gas air pollution." *Id.* (emphasis added). "Each such plan *shall* include programs, policies, measures, and projects that will achieve or facilitate the reduction of greenhouse gas air pollution." *Id.* (emphasis added). The Administrator "*shall* publish a funding opportunity announcement for" these grants no later than 270 days after the statute's enactment. *Id.* (emphasis added).

127. Section 60114(c) provides that the EPA Administrator "*shall* competitively award grants to eligible entities to implement plans developed under subsection (b)." *Id.* (emphasis added). Applications for these grants "*shall* include information regarding the degree to which greenhouse gas air pollution is projected to be reduced in total and with respect to low-income and disadvantaged communities," and the Administrator "*shall* make funds available to" grantees "based on [their] performance in implementing [their] plan[s] submitted under this section and in achieving projected greenhouse gas air pollution reduction." IRA § 60114, 136 Stat. at 2077 (emphasis added).

41

128. In 2024, 211 states, municipalities, tribes, and territories submitted their Priority Climate Action Plans to EPA. [11] EPA then awarded over $4.3 billion to 25 state, local, and tribal recipients under the Climate Pollution Reduction Grants Implementation Grants General Competition. These "grants will implement community-driven solutions to tackle the climate crisis, reduce air pollution, and accelerate the clean energy transition."[12] Plaintiff New Haven is a Climate Pollution Reduction Grants Implementation Grant recipient.

*Urban and Community Forestry Grants*

129. In Section 23003(a)(2) of the IRA, Congress appropriated $1.5 billion to USDA, to remain available until September 30, 2031, for multiyear, programmatic, competitive grants to local governments and other entities through the Urban and Community Forestry Assistance program established under section 9(c) of the Cooperative Forestry Assistance Act of 1978, 16 U.S.C. § 2105(c), for tree planting and related activities. These funds are administered through the U.S. Forest Service, an agency within USDA.

130. The purposes of the Urban and Community Forestry Assistance program, as laid out in 16 U.S.C. § 2105(b), include "implement[ing] tree planting program[s] to complement urban and community tree maintenance and open space programs and to reduce carbon dioxide emissions, conserve energy, and improve air quality in addition to providing other environmental benefits."

131. Following a competitive application process, the Forest Service announced more than $1 billion in grants to 385 community-based organizations, local and state governments, and

---

[11] EPA, *Climate Pollution Reduction Grants*, https://perma.cc/TFS4-V24L (last accessed Mar. 13, 2025).

[12] *Id.*

other entities in all 50 states. The agency also allocated $250 million in funding directly to state and territory forestry agencies to administer grants. [13]

132. The awarded projects are dedicated to "tree planting and maintenance, workforce development, wood utilization, extreme heat mitigation, restoration and resilience strategies, and community planning. Most projects include multiple themes."[14] Plaintiffs Columbus and San Diego are Urban and Community Forestry Grant recipients.

*Distressed Borrower Assistance Network Cooperative Agreements*

133. In Section 22006 of the IRA, Congress appropriated $3. 1 billion to USDA, to remain available until September 30, 2031, "to provide payments to, for the cost of loans or loan modifications for, or to carry out section 331(b)(4) of the Consolidated Farm and Rural Development Act," 7 U.S.C. § 1981(b)(4), "with respect to distressed borrowers of direct or guaranteed loans administered by the Farm Service Agency under subtitle A, B, or C of that Act," 7 U.S.C. §§ 1922–1970. IRA, 136 Stat. at 2021.

134. Congress intended this funding to "provide relief to those borrowers whose agricultural operations are at financial risk as expeditiously as possible." IRA, § 22006, 136 Stat. at 2021.

135. The USDA launched the Distressed Borrowers Assistance Network in September 2024[15] to provide relief to distressed direct and guaranteed farm loans and implement Section 22206 of

---

[13] USDA, *Urban and Community Forestry Factsheet* (2023), https://perma.cc/2VG4-QBUL; USDA, *Urban Forests*, https://www.fs.usda.gov/managing-land/urban-forests (last visited Mar. 13, 2025).

[14] USDA, *Urban and Community Forestry Factsheet* (2023), https://perma.cc/2VG4-QBUL.

[15] USDA, *USDA Launches Assistance Network to Support Financially Distressed Farmers and Ranchers* (Sept. 21, 2024) https://perma.cc/5NKR-QN35.

the IRA.[16] This network was formed through "a series of Cooperative Agreements" with network partners including RAFI-USA. [17]

136. Plaintiff RAFI-USA is thus a recipient of a Distressed Borrower Assistance Network Cooperative Agreement.

### c. *The Infrastructure Investment and Jobs Act*

137. In 2021, Congress passed and the President signed into law the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429 (2021) ("IIJA").

138. The IIJA appropriated approximately $660 billion to fund a wide variety of programs to create jobs, lower energy costs, improve infrastructure, and help communities burdened by pollution.

*Solid Waste Infrastructure for Recycling Grants*

139. In section 601 of the IIJA, Congress appropriated $275 million for grants under section 302(a) of the Save Our Seas 2.0 Act of 2020.  IIJA, § 601, 135 Stat. at 1404. It provided that $55,000,000, to remain available until expended, "shall be made available" for fiscal year 2022, and the same for each subsequent fiscal year through 2026. *Id.*

140. Section 302(a) of the Save Our Seas 2. 0 Act created a recycle-ing grant program to "support improvements to local post-consumer materials management, including municipal recycling programs" and "to assist local waste management authorities in making improvements to local waste management systems." Pub. L. 116-224 § 302(a), 134 Stat. 1072, 1092 (2020).

---

[16] USDA, *USDA Announces Additional $250 Million in Financial Assistance for Distressed Farm Loan Borrowers* (Oct. 7, 2024) https://perma.cc/78X4-JYNV.

[17] USDA, *USDA Launches Assistance Network to Support Financially Distressed Farmers and Ranchers* (Sept. 21, 2024) https://perma.cc/5NKR-QN35.

Congress directed that in developing application requirements, the EPA Administrator "shall consider" requesting "a description of how the funds will support disadvantaged communities." *Id.* at 1091.

141. Section 302(a) of the Save Our Seas 2. 0 Act authorized the Solid Waste Infrastructure for Recycling Grants program while the IIJA appropriated significant funding for the program. [18]

142. In 2023, EPA selected 25 local governments to receive the first round of Solid Waste Infrastructure for Recycling Grants out of 311 total applications. Plaintiff Baltimore is a recipient of a Solid Waste Infrastructure for Recycling Grant.

*Innovative Nutrient and Sediment Reduction Grant Program*

143. In Section 601 of the IIJA, Congress appropriated $1. 959 billion for Environmental and Program Management at EPA. 135 Stat. at 1396. Of these funds, Congress directed that $238 million "shall be for" EPA's Chesapeake Bay Program. *Id.* The Chesapeake Bay Program was established by Section 117 of the Clean Water Act. 33 U.S.C. § 1267.

144. Of these IIJA funds directed to the Chesapeake Bay Program, EPA allocated $83 million to the National Fish and Wildlife Foundation to administer both Small Watershed Grants and the Innovative Nutrient and Sediment Reduction programs. [19] Innovative Nutrient and Sediment Reduction grants are awarded to support innovative, sustainable, and cost-effective approaches that reduce nutrient and sediment pollution to the Chesapeake Bay and its local waterways.

---

[18] EPA, *Solid Waste Infrastructure for Recycling Grant Program*, https://perma.cc/TA34-V755 (last accessed Mar. 13, 2025).

[19] Biden-Harris Administration announces $206 million to selectees to protect and restore Chesapeake Bay through community partnerships, https://perma.cc/R46D-UEB4.

145. In fiscal year 2024, the National Fish and Wildlife Foundation awarded $22. 4 million to 13 new or continuing Innovative Nutrient and Sediment Reduction Grant projects. Those 13 awards leveraged $35. 3 million in matching funds, providing a total conservation impact of $57. 7 million.

146. Plaintiff Alliance for the Shenandoah Valley is a recipient of an Innovative Nutrient and Sediment Reduction grant.

*Charging and Fueling Infrastructure Program Grant*

147. In Section 11401 of the IIJA, Congress established "a grant program to strategically deploy publicly accessible electric vehicle charging infrastructure, hydrogen fueling infrastructure, propane fueling infrastructure, and natural gas fueling infrastructure along designated alternative fuel corridors or in certain other locations that will be accessible to all drivers of electric vehicles, hydrogen vehicles, propane vehicles, and natural gas vehicles." Eligible entities include "units of municipal government." Pub. L. 117-58 § 11401(a), 135 Stat. 546, 547 (2021).

148. Congress appropriated $2. 5 billion for the Charging and Fueling Infrastructure Grant Program. *Id.* §§ 11101(a)(5)(b)(C)(i) –(v), 135 Stat. 445. Specifically, Congress appropriated $300,000,000 for fiscal year 2022, $400,000,000 for fiscal year 2023, $500,000,000 for fiscal year 2024, $600,000,000 for fiscal year 2025, and $700,000,000 for fiscal year 2026. *Id.*

149. Plaintiff Nashville has been awarded a Charging and Fueling Infrastructure Grant.

*Active Transportation Infrastructure Investment Grant Program.*

150. In Section 11529 of the IIJA, Congress directed the Secretary of Transportation to "carry out an active transportation infrastructure investment program to make grants, on a competitive basis, to eligible organizations to construct eligible projects to provide safe and

connected active transportation facilities in an active transportation network or active transportation spine." 135 Stat. 612.

151. Congress appropriated $200,000,000 for each of fiscal years 2022 through 2026 for the Active Transportation Infrastructure Investment Grant Program. 135 Stat. 615.

152. Plaintiff Nashville has been awarded an Active Transportation Infrastructure Investment Grant.

**d.  *Other Grants***

*Farm and Food Workers Grant Relief Program*

153. In Section 101 of the Specialty Crops Competitiveness Act of 2004, Congress established a Specialty Crop Block Grants program and appropriated $44. 5 million for each fiscal year from 2005 to 2009 for that purpose. 118 Stat. 3883. This program was later amended by the Agricultural Improvement Act of 2018, which extended the program through 2023 and authorized USDA to directly administer multistate programs. 132 Stat. 4905-06. The Consolidated Appropriations Act of 2021 appropriated an additional $100 million to this program "to remain available until expended." 134 Stat. 2108. In addition, the Consolidated Appropriations Act of 2021, provided $1. 5 billion "for grants and loans" for measures to protect food producers, among others, against COVID-19. 134 Stat. 2107.

154. In September 2021, USDA announced the creation of the Farm and Food Workers Relief grant program using funds from the Consolidated Appropriations Act of 2021.[20] The program was designed to provide relief to farmworkers, meatpacking workers, and front-line

---

[20] USDA, *USDA Invests $700 million in Grants to Provide Relief to Farm and Food Workers Impacted by COVID-19* (Sept. 7, 2021), https://perma.cc/4USW-PEL8.

grocery workers for expenses incurred due to the COVID-19 pandemic. *Id.* Plaintiff Pasa is a

recipient of a Farm and Food Workers grant.

*Office of Urban Agriculture and Innovative Production Grants*

155. Section 1001 of the American Rescue Plan Act of 2001 appropriated $4 billion to

USDA, directing that USDA "shall use" these funds to, among other things, "make loans and

grants" to "maintain and improve food and agricultural supply chain resiliency." 135 Stat. 11.

USDA used some of these funds for Urban Agriculture and Innovative Production Grants, a

competitive grant program designed to initiate or expand efforts of urban and suburban farmers

to give consumers more options to buy locally produced products and reduce the climate impact

of the food supply chain. [21] Plaintiff Pasa is a recipient of an Urban Agriculture and Innovative

Production Grant.

## II.    <u>Plaintiffs' Grant Agreements</u>

156. Each of Plaintiffs' grants is a legally binding agreement with the government.

157. Before awarding a grant under the programs enumerated above, EPA, USDA and

USDOT give public notice of the funding opportunity, solicit applications, 2 C. F. R. § 200. 204,

conduct a "merit review process," and only select grant "recipients most likely to be successful

in delivering results based on the program objectives," *id.* § 200. 205.[22]

158. To ensure that taxpayer money is well spent, federal grants involve lengthy and complex

application procedures and reporting and auditing requirements. *See, e. g.* , 2 C. F. R. §§ 200.

---

[21] USDA, *USDA Invests $14.2 Million in 52 Urban Agriculture and Innovative Production Efforts* (Oct. 26, 2022), https://perma.cc/XZ3N-GKJS.

[22] 2 C.F.R. Part 200 contains the OMB's Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, which have been adopted in relevant part by EPA,

500–200. 521 (financial auditing requirements for federal award recipients), 200. 328–200. 330 (performance, financial monitoring, and reporting requirements for federal award recipients).[23]

159. Recipients of EPA, USDA and USDOT grants, like Plaintiffs, are selected by the grantor agency in this competitive process and enter into legally binding "Grant Agreements" with the agency.

160. In Plaintiffs' Grant Agreements, EPA, USDA and USDOT agreed to provide funding up to a specified dollar amount, over a specified time period, for specified work advancing Congress's objectives for the grant program. In exchange, grantees have agreed to use grant funds to complete their agency-approved project on an agency-approved timeline. Grantees have also agreed to comply with lengthy terms and conditions of their award agreements, including statutory and regulatory requirements and reporting, recordkeeping, and auditing conditions.

161. The Grant Agreements, however, are not contracts in the sense that the Federal Government does not receive consideration in the form of direct, tangible benefits from the grantees' performance. The grant funds are provided to carry out U.S. policy interests as determined by Congress, not to provide direct, tangible benefits to the Federal Government such

_____

see 2 C.F.R. § 1500.2, and USDA, see 2 C.F.R. § 400.1, for grants and awards administered by those agencies.

[23] See also EPA, *Grantee Forms*, https://perma.cc/CHE7-HZGS (last updated Oct. 4, 2024) (listing dozens of forms, questionnaires, and certifications for EPA grant applicants and recipients); EPA, *General Terms and Conditions* (effective Oct. 1, 2024), https://perma.cc/3WG4-2ZLE (46-page general conditions governing EPA grant awards, including 15-pages of post-award financial reporting and auditing requirements); EPA, *Community Change Grants Terms and Conditions*, https://perma.cc/5A65-4NEX (last updated Dec. 5, 2024) (21-page conditions governing Community Change Grants, in addition to EPA's General Terms and Conditions); USDA, *General Terms and Conditions for Grants and Cooperative Agreements* (effective Oct. 2024), https://perma.cc/V2AT-CV5G (31-page general conditions governing USDA grant awards, including multiple pages of post-award financial reporting and auditing requirements).

as financial benefits. As the Supreme Court has noted, "[u]nlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy." *Bennett v. Ky. Dept. of Educ.*, 470 U.S. 656, 669 (1985).

162. The regulations incorporated in Plaintiffs' Grant Agreements provide that, after awarding a grant, agencies may only "[t]emporarily withhold payments" or "[s]uspend or terminate the Federal award in part or in its entirety" if: (*i*) "the recipient . . . fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the federal award," and (*ii*) "the Federal agency . . . determines that noncompliance cannot be remedied by imposing specific conditions." 2 C. F. R. § 200. 339.

163. "Specific conditions" are less drastic remedies for non-compliance that must be exhausted before a federal agency may suspend or terminate grant funds, such as "[r]equiring additional project monitoring" or "more detailed financial reports." *Id.* § 200. 208(c).

164. When specific conditions fail to remedy non-compliance, "[u]pon initiating" a more severe remedy such as suspension or termination of funding, "the Federal agency must provide the recipient with an opportunity to object and provide information challenging the action." *Id.* § 200. 342.

165. To date, no Plaintiffs have received notice that their grants are out of compliance.

166. After grants are awarded, Plaintiffs do not hold the funding in their own bank accounts. Rather, they are allowed to withdraw money only incrementally—on an as-needed basis—from Government-controlled accounts. Recipients generally "must be paid in advance" for their expenditures made in furtherance of their grant activities. 2 C. F. R. § 200. 305(b)(1). Many Plaintiffs also incur expenses required by their grants and withdraw reimbursements from their

Government-controlled accounts shortly after. Federal agencies generally must provide reimbursement payments "within 30 calendar days after receipt of the payment request unless the Federal agency . . . reasonably believes the request to be improper." *Id.* § 200.305(b)(3).

167. Given this incremental process for accessing funds, even short delays in payment can cause great harm.

### III. The Trump Administration's Actions to Freeze and "Terminat[e]" Grants

#### a. *The Executive Orders*

168. On January 20, 2025, President Trump issued an Executive Order titled "Unleashing American Energy." 90 Fed. Reg. at 8353.

169. Section 2 of the Energy EO declared several purported "polic[ies] of the United States," including "to ensure that ***no Federal funding be employed in a manner contrary to the principles outlined in this section***, unless required by law." *Id.* § 2 (emphasis added).

170. Section 7 of the Energy EO, titled "Terminating the Green New Deal," further provided that:

> [a]ll agencies shall immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022 (Public Law 117-169) or the Infrastructure Investment and Jobs Act (Public Law 117-58) . . . and shall review their processes, policies, and programs for issuing grants, loans, contracts, or any other financial disbursements of such appropriated funds *for consistency with* the law and *the policy outlined in section 2 of this order*.

Energy EO § 7 (emphases added). The Energy EO provides no end date for this indefinite funding freeze.

171. Section 7 further provides that within 90 days (*i. e.*, before April 20, 2025), all agency heads must submit a report detailing their review and recommendations to "enhance their alignment with the policy set forth in section 2." Critically, the Energy EO directs that "[n]o funds" blocked under the Order "shall be disbursed" unless the Director of OMB and Assistant to

the President for Economic Policy determine that such payments "are consistent with any review recommendations they have chosen to adopt." *Id.*

172. President Trump thus directed that over $1 trillion in funding appropriated by Congress for specific purposes under the IRA and IIJA, including billions of dollars in project awards that had already been obligated to specific recipients by executive agencies, should be immediately frozen. The Energy EO forbids the disbursement of any funds that the Executive branch deems "[in]consistent[t] with . . . the policy outlined in section 2" of the Order. *Id.* § 7.

173. The Energy EO cited no legal authority for its across-the-board freeze of congressionally appropriated funds.

174. The Energy EO did not distinguish between obligated and non-obligated funds appropriated under the IRA or IIJA, simply blocking all "disbursements" across the board. *Id*

175. Also on January 20, 2025, President Trump issued an Executive Order titled "Ending Radical and Wasteful Government DEI Programs and Preferencing." Exec. Order 14151, 90 Fed. Reg. 8339, 8339 (Jan. 20, 2025),

176. The Equity EO directed agencies to "*terminate* . . . all . . . 'equity-related' grants or contracts" within sixty days, i.e., by March 21, 2025, among other directives. *Id*. § 2(b) (emphasis added). The Equity EO also purported to eliminate prior directives requiring agencies to consider equity in their federal funding decisions.

177. The Equity EO did not define "equity-related" grants or environmental justice.

178. The Equity EO cited no legal authority to categorically terminate all "equity-related" grants and contracts.

179. The Equity EO did not follow the procedures required by EPA's grant agreements and regulations prior to suspending or terminating funding.

180. The DOGE EO, issued on February 26, 2025, instructed agencies, "in consultation with the agency's DOGE Team Lead," to "review all existing covered contracts and grants" and to "terminate or modify" those contracts and grants to "advance the policies of [the Trump] Administration." 90 Fed. Reg. 11095 § 3(b).

181. On March 3, 2025, EPA sent an email instructing all agency directors that "any assistance agreement, contract, or interagency agreement transaction $50,000 or greater must receive approval from an EPA DOGE Team member." Ex. G ("EPA Notice of DOGE Approval Requirement").

182. The DOGE EO and EPA Notice of DOGE Approval Requirement did not identify or consider how much funding would be frozen, terminated, or subject to this approval requirement nor which programs or recipients would be affected.

183. The DOGE EO and EPA Notice of DOGE Approval Requirement did not identify any legal authority in any federal law, grant award, or the Constitution to freeze, terminate, or withhold funds based on Presidential policies or pending DOGE review.

**b.  *The Program Freezing Directives***

184. Since January 20, 2025, executive branch agencies have taken multiple unlawful actions to effectuate the Executive Orders.

*i.  The First OMB Memo*

185. On January 21, 2025, the Acting Director of the OMB issued a memorandum to agency and department heads numbered M-25-11 and titled "Guidance Regarding Section 7 of the Executive Order *Unleashing American Energy*." Ex.  A.

186. The First OMB Memo notifies agency and department heads of the "directive in Section 7 of the [Energy EO]," which "requires agencies to immediately pause disbursements of funds appropriated under the [IRA and IIJA]." *Id.*

187. The Memo interprets the IRA and IIJA funding freeze in Section 7 of the Energy EO to apply "only . . . to funds supporting programs, projects, or activities that may be implicated by the policy established in Section 2 of the order," which "is consistent with Section 7's heading ('Terminating the Green New Deal') and its reference to the 'law and policy outlined in section 2 of the order. '" *Id.*

188. The Memo states that the funds to be blocked are "*any appropriations for objectives that contravene the policies established in section 2." Id.* (emphasis added). "Agency heads may disburse funds as they deem necessary after consulting with the Office of Management and Budget." *Id.*

189. The First OMB Memo thus directs agencies to freeze all IRA and IIJA funds that they deem to contravene President Trump's policies.

190. The Memo does not identify or consider how much funding would be frozen or which programs or recipients would be affected.

191. The Memo does not identify any legal authority in any federal law, grant award, or the Constitution to block funds on this basis.

*ii. The Second OMB Memo*

192. On January 27, the Acting Director of the OMB issued a second memorandum to agency and department heads numbered M-25-13 and titled "Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Program." Ex. B.

193. The Second OMB Memo asserted that President Trump's election "gave him a mandate" to "align Federal spending and action with the will of the American people *as expressed through Presidential priorities*." *Id.* at 1 (emphasis added).

194. The Memo stated that "[f]inancial assistance should be dedicated to advancing Administration priorities," including "unleashing American energy and manufacturing, ending 'wokeness' and the weaponization of government," and halting "[t]he use of Federal resources to advance Marxist equity, transgenderism, and new green deal social engineering policies." *Id.*

195. To that end, the Second OMB Memo directed federal agencies to "complete a comprehensive analysis of all of their Federal financial assistance programs to identify programs, projects, and activities that may be implicated by any of the President's executive orders," citing seven such orders[24] issued by the Trump Administration, including the Energy EO and Equity EO. *Id.* at 1–2.

196. The Memo stated that, "[i]n the interim, to the extent permissible under applicable law, Federal agencies **must temporarily pause** all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders, including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal." *Id.* at 2 (emphasis in original).

---

[24] Specifically, the Second OMB Memo cites: *Protecting the American People Against Invasion* (Jan. 20, 2025); *Reevaluating and Realigning United States Foreign Aid* (Jan. 20, 2025); *Putting America First in International Environmental Agreements* (Jan. 20, 2025); *Unleashing American Energy* (Jan. 20, 2025); *Ending Radical and Wasteful Government DEI Programs and Preferencing* (Jan. 20, 2025), *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (Jan. 20, 2025), and *Enforcing the Hyde Amendment* (Jan. 24, 2025).

197. After a federal district court issued an administrative stay of the Second OMB Memo, OMB retracted the Memo "in name only" to "evade[e] judicial review" while continuing to implement the underlying funding federal funding freeze. *Nat'l Council of Nonprofits v. Office of Mgmt. & Budget*, No. 25-cv-239, 2025 WL 368852, at *7 (D. D. C.  Feb. 3, 2025).

   iii.   *The EPA Memo*

198. Also on January 27, EPA's Acting Chief Financial Officer issued a memorandum to staff titled "Inflation Reduction Act and Infrastructure Investment and Jobs Act Funding Action Pause." Ex. B.

199. The EPA Memo was "provided based on instructions from OMB" and "[i]n accordance with the Executive Order *Unleashing American Energy*." *Id.*

200. The EPA Memo ordered an indefinite freeze of: (*i*) "unobligated funds appropriated by the [IRA and IIJA]," and (*ii*) "disbursements for unliquidated obligations funded by any line of accounting including funds appropriated by the [IRA and IIJA]." *Id.* The freeze of IRA and IIJA funds would "allow for the review of processes, policies and programs as required by Section 7 of the [Energy EO]." *Id.*

201. The EPA Memo, unlike the First OMB Memo, extended the funding freeze to all IRA and IIJA funds, not only those deemed contrary to the policies set out in Section 2 of the Energy EO.

202. The EPA memo further specified that the freeze applied even to "obligat[ed]" funds not yet paid out to recipients.

203. Like the preceding memos and Executive Orders, the EPA Memo did not clarify which programs or recipients would be affected and cited no legal authority for the freeze.

*iv.  The USDA Directive*

204. On January 22, 2025, USDA advised grantees that "[a]s of late yesterday, January 21, 2025, the administration placed a temporary suspension on all actions related to grants, including Partnerships for Climate-Smart Commodities grants." Ex. C at 2.

205. Later that same day, USDA notified grantees of "additional guidance from the USDA Office of the Chief Financial Officer's office on the temporary suspension of all USDA actions related to grants, including Partnerships for Climate-Smart Commodities grants." Ex. C at 4. USDA stated that "payments or claims may continue to be processed under existing awards, *provided that they are not funded using IRA and IIJA funding sources*.  Additional guidance related to IIJA and IRA funds will be provided by [USDA officials] when available." *Id.* at 4 (emphasis added).

206. In a February 20, 2025 press release, USDA referred to a funding "pause[] due to the review of funding in the Inflation Reduction Act (IRA)." The press release stated that $20 million—out of the billions of dollars in IRA funding administered by USDA—would be unfrozen "as USDA continues to review IRA funding" for consistency with the priorities of the Administration. Ex. C at 6–7.

*v.  The USDOT Directive*

207. On March 12, 2025, the United States Department of Transportation Secretary, Sean Duffy, ordered a "review" of "projects announced from FY 2022 through FY 2025" to "identify project scope and activities that are allocating funding to advance climate, equity, and other priorities counter to the Administration's Executive Orders." Ex. F at 1.

208. Specifically, the USDOT Memo directed the agency to identify award selections that include any of the following elements: "equity activities, Diversity, Equity, and Inclusion (DEI)

activities, climate change activities, environmental justice (EJ) activities, gender-specific

activities, when the primary purpose is bicycle infrastructure (i.e., recreational trails and shared-

use paths, etc.), electric vehicles (EV), and EV charging infrastructure." *Id.*

209. Further, the USDOT Memo directed "project-by-project" review to identify "for

potential removal" any Programs that have "[s]tatutory language" that includes equity

requirements, climate considerations, or bicycle infrastructure or "mandatory evaluation criteria"

that includes "equity and/or climate requirements." *Id.*

210. Upon review, the memo instructs that USDOT would identify which project selections

should either continue, be revised with a reduced or modified scope, or be cancelled entirely.

The USDOT Memo contemplates that project sponsors may propose alternative elements as

substitutes, as long as hose elements "align with current Administration EOs." *Id.*

211. The USDOT Memo did not identify or consider how much funding would be frozen,

terminated, or subject to this approval requirement nor which programs or recipients would be

affected.

212. The USDOT Memo did not identify any legal authority in any federal law, grant award,

or the Constitution to freeze, terminate, or withhold funds based on Presidential policies.

   vi.  *Further Agency Actions to Freeze Program Funding*

213.  EPA, USDA and USDOT have undertaken various actions consistent with the

Executive Orders, the First OMB Memo, the EPA Memo, and the USDA Directive to freeze the

funding programs at issue in this case and prevent Plaintiffs from carrying out their grants and

accessing their grant funds.

214. For example, EPA, USDA and USDOT have blocked Plaintiffs' access to the websites

and portals needed to access funds, frozen or labeled as "suspended" the accounts containing the

grant funds to prevent Plaintiffs from drawing down funds, informed Plaintiffs orally that funds are frozen and cannot be drawn down, and communicated through state agencies that expenditures may not be reimbursed, usually with no explanation or justification.

## IV.    Court Orders Against the Funding Freeze and Subsequent Agency Actions

215. Despite clear court orders to stop action, Defendants have defied the rule of law and continued to freeze funding.

216. Two federal courts have issued temporary restraining orders and preliminary injunctions against the across-the-board funding freeze effectuated by the now-rescinded Second OMB Memo, finding that plaintiffs have shown a likelihood of success on their separation-of-powers and APA claims, and a likelihood of irreparable harm in the absence of preliminary relief. *See New York v. Trump*, No. 25-cv-39, 2025 WL 357368, at *5 (D. R. I. Jan. 31, 2025) (temporary restraining order), *appeal filed*, No. 25-1138 (1st Cir. Feb. 10, 2025); *Nat'l Council of Nonprofits*, No. 25-cv-239, 2025 WL 368852, at *14 (D. D. C. Feb. 3, 2025) (temporary restraining order); *Nat'l Council of Nonprofits v. Office of Mgmt. & Budget*, No. 25-cv-239, 2025 WL 597959, at *19–20 (D. D. C. Feb. 25, 2025) (preliminary injunction); *New York v. Trump*, No. 25-cv-39-JJM-PAS, 2025 WL 715621 at *1 (D. R. I. Mar. 6. 2025) (preliminary injunction), *appeal filed*, No. 25-1236 (1st Cir. Mar. 10, 2025).

217. Despite these orders, Defendants continue to engage in the freezing actions discussed above in paragraph 9.

218. In court and within agencies, the Administration has relied on an ever-shifting set of funding freeze directives and communications to evade complying with court orders. The Government has also taken the position that injunctions are limited to named defendants and the

grants held by named plaintiffs, leaving large swaths of the unlawful freeze in place and grantees unprotected.

219. For example, *PoliticoPro* reported on the Administration's position that a "spending pause" announced by EPA on February 7 that "applied to more than two dozen EPA climate and infrastructure programs" is a "new" freeze and "*separate* from President Donald Trump's broader spending freeze that has been blocked by the courts."[25]

220. On February 19, the *New York Times* reported that USDA budget officers received an email with a "halt spending flowchart" which "flatly declared that certain spending Congress had approved, including through the Biden-era Inflation Reduction Act and the bipartisan Infrastructure Investment and Jobs Act, should be frozen . . . . '***Do not obligate or outlay***,' the flowchart said, citing no specific legal authorities."[26]

221. Upon information and belief, EPA may also be using a flowchart (reproduced below) to freeze or cancel "equity-related" grants based on the presence of certain arbitrary keywords in grant documents, such as "advocate," "diverse community," "equality," "equity," "inequality," "racism," or "socioeconomic," among others. Ex. H ("EPA Flowchart for 'Equity-Related' Grants").

---

[25] Alex Guillén, *EPA says spending halt for climate, infrastructure law programs is different from Trump freeze*, *PoliticoPro* (Feb. 11, 2025) (emphasis added), https://perma.cc/G5MJ-5QD8.

[26] Charlie Savage, *Trump Team Finds Loophole to Defy Spirit of Court Orders Blocking Spending Freezes*, *New York Times* (Feb. 19, 2025) (emphasis added), https://perma.cc/7GRD-PSY7.



222. On March 3, EPA sent an email instructing staff that they "must complete and sign the attached [Executive Order] Compliance Review form for ***all funding actions***." Ex. I ("EPA Executive Order Compliance Review Requirement") (emphasis added).  This form requires relevant EPA staff, before funding may be disbursed, to "demonstrate[] the signer understands and confirms the action and associated workplan or performance work statement ***complies with [Executive Order requirements]*** at the time of signature." Ex.  I (emphasis added).

223. Upon information and belief OMB, EPA, USDA, USDOT, DOGE, and other agencies are continuing to freeze IRA, IIJA, and "equity-related" funding despite these court orders.

## LEGAL FRAMEWORK

### I. Congress's Legislative Authority, Including the Power of the Purse, and the Separation of Powers

224. The United States Constitution grants Congress the power to make the laws of this nation. The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives." Art. I, § 1.

225. Congress's lawmaking powers are at their apex on matters of federal funding. The Constitution grants the power of the purse to Congress, not the President. *See, e.g.*, *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am. Ltd.*, 601 U.S. 416, 420 (2024); *see also* Mem. from John G. Roberts, Jr. to Fred F. Fielding (Aug. 15, 1985), https://perma.cc/G5AA-GJAU ("[N]o area seems more clearly the province of Congress than the power of the purse.").

226. In our system of governance, this power is "exclusive" to Congress, which "has absolute control of the moneys of the United States" under our Constitution. *Rochester Pure Waters Dist. v. EPA*, 960 F. 2d 180, 185 (D. C. Cir. 1992) (internal citation and quotations omitted). "Any exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 425 (1990).

227. Congress's power over the purse is rooted in two constitutional provisions. The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." Art. I, § 9, cl. 7. The Appropriations Clause expressly "was intended as a restriction upon the disbursing authority of the Executive department." *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937).

228. The Spending Clause provides that "Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defense and general Welfare of the United States." Art. I, § 8, cl. 1.

229. Through these multiple grants of authority, the Constitution gives Congress broad power to legislate spending and to decide how and when its appropriations are spent. *South Dakota v. Dole*, 483 U.S. 203, 206 (1987).

230. When Congress passes a law appropriating money for a particular purpose, it is the President's job to spend that money for that purpose. This duty stems from the Take Care Clause, which states that the President "shall take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3; *Utility Air Reg. Grp. v. Env't Prot. Agency*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes laws and the President . . . 'faithfully execute[s]' them.").

231. "[A] President sometimes has policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program. But in those circumstances, even the President does not have unilateral authority to refuse to spend the funds." *In re Aiken Cnty.*, 725 F. 3d 255, 261 n. 1 (D.C. Cir. 2013) (Kavanaugh, J.).

232. Nor does the President "have the inherent authority . . . to condition the payment of [] federal funds on adherence to its political priorities." *City of Chicago v. Sessions*, 888 F. 3d 272, 283 (7th Cir. 2018), *vacated in part on other grounds*, No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018). Where the Executive withholds funding "to effectuate its own policy goals" without authorization from Congress, it violates the Constitution. *City & Cnty. of S. F. v. Trump*, 897 F. 3d 1225, 1235 (9th Cir. 2018).

233. If a President disagrees with Congress's spending decision, he can veto the legislation; but once a spending law has passed, the President has a simple duty to spend the money on the terms Congress has provided. *See Train v. City of New York*, 420 U.S. 35, 40–44 (1975).

234. The President has no constitutional power to amend or repeal statutes, *Clinton v. City of N. Y.,* 524 U.S. 417, 438 (1998), and doubly lacks the power to supplant Congress's spending directives with his own.

235. When a President intrudes on Congress's power over the purse, he violates the separation of powers. "Congress's power of the purse is the ultimate check on the otherwise unbounded power of the Executive," *U.S. House of Reps. v. Burwell*, 130 F. Supp. 3d 53, 76 (D. D. C. 2015), and acts as a "bulwark of the Constitution's separation of powers." *U.S. Dep't of Navy v. Fed. Labor Rel. Auth.* , 665 F. 3d 1339, 1347 (D. C. Cir. 2012). Allowing the President to usurp this power "would be clothing the President with a power entirely to control the legislation of congress, and paralyze the administration of justice." *Kendall v. U.S. ex rel. Stokes*, 37 U.S. 524, 613 (1838).

236. "Liberty is always at stake when one or more of the branches seek to transgress the separation of powers." *Clinton*, 524 U.S. at 450 (Kennedy, J., concurring). Nowhere is this more apparent than when a President attempts to unilaterally seize the Nation's purse strings to serve his policy goals.

## II.  **The Presentment Clauses**

237. The Presentment Clauses form equally "integral parts of the constitutional design for the separation of powers." *Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 946 (1983).

238. These Clauses provide that "[e]very Bill which shall have passed the House of Representatives and the Senate, shall, before it becomes a Law, be presented to the President of

the United States," and that "before [a law] shall take Effect, [it] shall be approved by [the President], or being disapproved by him, shall be repassed by two thirds of the Senate and House of Representatives, according to the Rules and Limitations prescribed in the Case of a Bill." U.S. Const. art. I, § 7, cl. 2–3.

239. The Presentment Clauses grant the President "a limited and qualified power to nullify proposed legislation by veto." *Chadha*, 462 U.S. at 947. This "finely wrought and exhaustively considered" constitutional procedure precludes by implication the President's power "to enact, to amend, or to repeal statutes" in any other way. *Clinton*, 524 U.S. at 438–40 (quoting *Chadha*, 462 U.S. at 951).

240. The Constitution's careful limitations on the President's role in lawmaking are designed to protect the people from tyranny. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 633 (1952) (Douglas, J., concurring) ("The Framers with memories of the tyrannies produced by a blending of executive and legislative power rejected that political arrangement.").

## III.  **The First Amendment**

241. The First Amendment provides that the Government "shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. This protection extends to both individual and organizational expression, and the government may not restrict speech based on its content or viewpoint. Laws or policies that target speech based on its subject matter or the viewpoint expressed are presumptively unconstitutional and subject to strict scrutiny. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828–29 (1995).

242. Government actions that limit speech must be the least restrictive means of achieving a compelling state interest. *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021).

243. Furthermore, the government cannot condition benefits or financial assistance on the suppression of constitutionally protected speech, especially when such a denial of support is based on the viewpoint or content of the expression. *Speiser v. Randall*, 357 U.S. 513, 518 (1958).

## IV. <u>The Impoundment Control Act</u>

244. The Impoundment Control Act of 1974 ("ICA") sets forth very limited circumstances in which the President or an agency may "defer" or "rescind" congressionally appropriated funds.

245. Under the ICA, a "deferral" encompasses any "withholding or delaying the obligation or expenditure of" appropriated funds, as well as "any other type of Executive action or inaction which effectively precludes the obligation or expenditure of" appropriated funds. 2 U.S.C. § 682(1). A deferral thus includes both delays in obligating funds and delays in disbursing funds that are already obligated.

246. When the Executive Branch wishes to defer funds, it must send a special message to Congress detailing the money to be deferred and must set forth one of only three permissible grounds for the deferral. The three permissible grounds for deferrals are: (1) "to provide for contingencies" (which generally means keeping a small cushion in case obligations end up costing more than anticipated); (2) "to achieve savings made possible by or through changes in requirements or greater efficiency of operations;" or (3) "as specifically provided by law." 2 U.S.C. § 684(b).

247. The Government Accountability Office ("GAO) has held that "policy reasons," including efforts to ensure funds are spent consistent with the President's policy preferences, are not a proper basis for deferrals. GAO, *Office of Management and Budget—Withholding of Ukraine Security Assistance,* B-331564, at 6 (Jan. 16, 2020).

248. Where the president seeks to have appropriated funds "rescinded," the ICA requires that the President send a special message to Congress specifying the funds he seeks to have *Congress* rescind and the reasons for his proposal.  2 U.S.C. § 683(a).  The Administration can withhold obligating the relevant funds for 45 session days after the President transmits his message, but if Congress does not rescind the funds in that time, the Administration must make the funds available for obligation.

249. There is an exception to the ICA for so-called "programmatic delays," which are not prohibited by the Act.  GAO has explained that "programmatic delays occur when an agency is taking necessary steps to implement a program, but because of factors external to the program, funds temporarily go unobligated." B-331564, at 7.  Programmatic delays are meant "to advance congressional budgetary policies by ensuring that congressional programs are administered efficiently." *City of New Haven v. United States*, 809 F. 2d 900, 901 (D.C. Cir. 1987).  Permissible programmatic delays do not include when the Executive Branch withholds money "on its own volition .  .  .  to ensure compliance with presidential policy prerogatives." B-331564, at 7.

250. Thus, in addition to requiring an agency to spend appropriated money before it expires, the ICA also prohibits delays in spending funds based on policy objections.

## V.    The Administrative Procedure Act

251. Congress enacted the APA to ensure stability in agency action by mandating reasoned decisionmaking, and to guard against agencies' pursuit of a political agenda without adherence to legal process. *See N. C. Growers' Ass'n, Inc. v. United Farm Workers*, 702 F. 3d 755, 772 (4th Cir. 2012) (Wilkinson, J., concurring) (noting the APA prohibits policy change based on "political winds and currents" without adherence to "law and legal process"); *U.S. v. Morton Salt*

*Co.*, 338 U.S. 632, 644 (1950) (describing the APA "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices").

252. To effectuate these goals, the APA imposes both substantive and procedural constraints on final agency action. *See Cent. Tex. Telephone Coop., Inc. v. Fed. Comms. Comm'n*, 402 F. 3d 205, 209 (D.C. Cir. 2005). As to the former, the APA requires courts to set aside agency action that is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A), (B), (C).

253. The APA tasks courts—not the Executive—with "deciding whether an agency has acted within its statutory authority," *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024), reflecting the duty of the judiciary "to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

254. As to process, "[t]he [APA] requires that the pivot from one administration's priorities to those of the next be accomplished with at least some fidelity to law and legal process. Otherwise, government becomes a matter of the whim and caprice of the bureaucracy . . . ." *N. C. Growers' Ass'n*, 702 F. 3d at 772 (Wilkinson, J. , concurring); *accord S. C. Coastal Conservation League v. Pruitt*, 318 F. Supp. 3d 959, 967 (D. S. C. 2018) (same) (quoting *id.* ).

255. To enforce these principles, the APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious," an abuse of discretion," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

256. An agency fails to engage in "reasoned decisionmaking," and its actions are arbitrary and capricious, when the agency "has relied on factors which Congress has not intended it to

consider, [or] entirely failed to consider an important aspect of the problem . . . .” *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Courts “must ensure that the agency has examined the relevant data and articulated a satisfactory explanation for its action,” *Def's of Wildlife v. U.S. Dep't of Interior*, 931 F. 3d 339, 345 (4th Cir. 2019) (internal quotation omitted), “including a rational connection between the facts found and the choice made.” *Dep't of Commerce v. New York*, 588 U.S. 752, 773 (2019) (quoting *State Farm*, 463 U.S. at 43).

257. When an agency is not writing on a “blank slate” but is “changing [its] position,” the agency must “provide a more detailed justification than what would suffice for a new policy” if, “for example, . . . its prior policy has engendered serious reliance interests that must be taken into account.” *F. C. C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

258. When changing policy, agencies must “assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy interests.” *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 33(2020). “[W]hen an agency rescinds a prior policy its reasoned analysis must [also] consider the alternatives that are within the ambit of the existing policy.” *Id.* at 30 (citation and quotations omitted). At bottom, an agency must give “good reasons for the new policy,” *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 223 (2016) (citation and quotations omitted), including “a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy.” *Fox*, 556 U.S. at 516.

259. Judicial review under the APA is limited to agency actions made reviewable by statute and “final agency action.” 5 U.S.C. § 704. Agency action, including agency memoranda, are “final agency action” when they “‘mark[]’ the ‘consummation’ of the agency's decisionmaking

process' and result[] in 'rights and obligations being determined. '" *Biden v. Texas*, 597 U.S. 785, 788 (2022) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (alterations omitted)).

260. In sum, "[t]he role of the reviewing court under the APA is . . . . fixing the boundaries of the delegated authority, and ensuring the agency has engaged in 'reasoned decisionmaking' within those boundaries." *Loper Bright Enters.*, 603 U.S. at 395 (citation and quotations omitted).

## VI.     Nonstatutory Review Claims and *Ultra Vires* Actions

261. Separate from the APA, "a plaintiff can obtain injunctive relief against an individual officer or agent of the United States in his official capacity for acts beyond his statutory or constitutional authority.'" *Strickland v. United States*, 32 F. 4th 311, 363 (4th Cir. 2022).

262. Such "nonstatutory review" or "*ultra vires*" claims arise when federal officials have acted "beyond the scope of their powers and/or in an unconstitutional manner." *Id.* at 366.

263. Sovereign immunity does not shield federal officials from such claims because actions beyond statutory or constitutional authority "are considered individual and not sovereign actions." *Id.* (quoting *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949)).

### CLAIMS FOR RELIEF

**—COUNT I—**
**THE ENERGY EO, EQUITY EO, DOGE EO,**
**AND PROGRAM FREEZING ACTIONS**
**VIOLATE THE SEPARATION OF POWERS**
**NONSTATUTORY REVIEW AND ULTRA VIRES ACTION**
**(All Plaintiffs[27])**

---

[27] Baltimore joins this claim only as to the Energy EO, Cost Efficiency EO, agency actions implementing those two EOs, and agency actions based on EPA's and USDA's independent authorities. *See supra* footnote 1.

264. The allegations in the preceding paragraphs are incorporated herein by reference.

265. "[W]henever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins v. Yellen*, 594 U.S. 220, 245 (2021).

266. The U.S. Constitution grants Congress, not the President, exclusive power over the nation's purse and the power to legislate. U.S. Const. art. I, § 9, cl. 7; art. I, § 8, cl. 1; art. I, § 1.

267. When Congress appropriates funds for a specified purpose, the President has a duty to spend those funds on the terms set by Congress. *See* U.S. Const. art. II, § 3 (Take Care Clause).

268. The President has no constitutional power to freeze funds appropriated by Congress, particularly when the freeze is based on Presidential policies rather than Congress's spending directives. *E.g.*, *City & Cnty. of S. F.*, 897 F. 3d at 1231–35.

269. Congress has enacted the federal grant programs at issue in this case under the IRA and the IIJA and has appropriated over $1 trillion in funding for those programs to serve enumerated purposes specified in these statutory programs.

270. Consistent with their constitutional and statutory duties, federal agencies obligated these funds to specific entities via a rigorous, regulated, and competitive grantmaking process.

271. Defendants are constitutionally required to carry out these congressionally mandated programs, and to obligate and distribute the funds that Congress appropriated for these programs.

272. But in the Energy EO, Equity EO, and DOGE EO President Trump directed that federal funding be paused or terminated if it was inconsistent with his own policies.

273. The President's Executive Orders, and the Program Freezing Actions implementing those Orders, directly contravene Congress's directives in the IRA, IIJA, and other statutes to carry out and fund the statutory programs at issue in this case. *See, e.g.*, 42 U.S.C. § 7438(b)(1) (IRA "Environmental and Climate Justice Block Grants" program, directing that EPA "shall"

award grants for certain activities "that benefit disadvantaged communities"); IRA, § 22007, 136 Stat. at 2022 (directing that USDA "shall" award grants for "USDA Assistance and Support for Underserved Farmers, Ranchers [and] Foresters" and those "determined to have experienced discrimination . . . in Department of Agriculture farm lending programs"); *see also* 33 U.S.C. § 1302f(c)(4)(A)(ii) (IIJA, requiring that EPA "shall" give priority to grant applications submitted on behalf of "a small, rural, or disadvantaged community").

274. None of the Executive Orders nor the Program Freezing Actions point to any statutory, regulatory, or constitutional authority to indefinitely freeze congressionally appropriated funds based on the President's policy preferences.

275. All the relevant constitutional powers here—the power to appropriate, spend, and legislate—belong solely to Congress. The President has no constitutional power to indefinitely freeze funds appropriated by Congress, much less based on policies that conflict with what Congress specified.

276. The Energy EO, Equity EO, DOGE EO, and Program Freezing Actions—including the First OMB Memo, Second OMB Memo, EPA Memo, USDA Directive, USDOT memo, EPA Notice of DOGE Approval Requirement, EPA Executive Order Compliance Review Requirement, and any other agency action to freeze or block IRA, IIJA, or "equity-related" funding based on President Trump's priorities—usurp Congress's spending power, *see* U.S. Const. art. I, § 8, cl. 1 (Spending Clause), art. I, § 9, cl. 7 (Appropriations Clause), and Congress's power to legislate, *see* U.S. Const. art. I, § 1 (Legislative Power), and thus violate the separation of powers.

—COUNT II—
**THE ENERGY EO, EQUITY EO, DOGE EO,**
**AND PROGRAM FREEZING ACTIONS**
**VIOLATE THE PRESENTMENT CLAUSES**
**NONSTATUTORY REVIEW AND ULTRA VIRES ACTION**
**(All Plaintiffs[28])**

277. The allegations in the preceding paragraphs are incorporated herein by reference.

278. The Presentment Clauses limit the President's role in lawmaking to vetoing an "entire bill . . . *before* the bill becomes law." *Clinton*, 524 U.S. at 439. "Presidential action that either repeals or amends *parts* of *duly enacted statutes*" violates the Presentment Clauses. *See id.* (emphasis added).

279. The Energy EO, Equity EO, and DOGE EO violate the Presentment Clauses to the extent they seek to "terminat[e]" or "modify" parts of the IRA or IIJA and other relevant statutes after they were passed by Congress and signed by the President. *See* Energy EO § 7; Equity EO § 2(b); DOGE EO § 3(b).

280. In purpose and in effect, the Energy EO, Equity EO, and DOGE EO amend the spending provisions of the IRA and the IIJA and other statutes, indefinitely suspending funding appropriated under these statutes, and unlawfully terminating the programs mandated by Congress, that the Executive Branch deems incompatible with *presidential* policies wholly different than *Congress's* directives for the funds and programs. *See supra* ¶¶ 168–223.

281. Like the "line item veto" in *Clinton*, the Energy EO, Equity EO, and DOGE EO "cancel" Congress's spending priorities expressed in duly enacted statutes and replace them with

---

[28] Baltimore joins this claim only as to the Energy EO, Cost Efficiency EO, agency actions implementing those two EOs, and agency actions based on EPA's and USDA's independent authorities. *See supra* footnote 1.

those of the President.  524 U.S. at 436.  The President lacks power to amend enacted law, as do his agencies.

282. By cancelling Congress's spending directives and replacing them with the President's policy preference to withhold appropriated funds, the Energy EO, Equity EO, and DOGE EO seek to repeal and amend the IRA and the IIJA in violation of the Presentment Clauses.  *See* U.S. Const. Art. I, § 7, cl. 2–3.

283. For these same reasons, the Program Freezing Actions—including the First OMB Memo, Second OMB Memo, EPA Memo, USDA Directive, EPA Notice of DOGE Approval Requirement, EPA Executive Order Compliance Review Requirement, and any other agency action implementing the Executive Orders to freeze or block IRA and the IIJA or "equity-related" funding based on President Trump's priorities—also violate the Presentment Clauses.

### —COUNT III—
### THE PROGRAM FREEZING ACTIONS ARE
### ARBITRARY AND CAPRICIOUS
### IN VIOLATION OF THE APA
### (All Plaintiffs[29])

284. The allegations of the preceding paragraphs are incorporated herein by reference.

285. The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

286. The Program Freezing Actions, including the First OMB Memo, Second OMB Memo, EPA Memo, USDA Directive, USDOT memo, EPA Notice of DOGE Approval Requirement, the

---

[29] Baltimore joins this claim only as to agency actions implementing the Energy EO and Cost Efficiency EO, and agency actions based on EPA's and USDA's independent authorities. *See supra* footnote 1.

EPA Executive Order Compliance Review Requirement, agency actions to block or prevent Plaintiffs from accessing the online portals needed to withdraw their grant funds, and other agency actions that prevent Plaintiffs from accessing their awarded grant funds, are arbitrary and capricious for multiple reasons.

287. First, these agency actions indefinitely froze over $1 trillion appropriated under the IRA and the IIJA without consideration of the "serious reliance interests" of recipients, including Plaintiffs, on those funds. *Fox Television Stations*, 556 U.S. at 515. "Defendants cut the fuel supply to a vast, complicated, nationwide machine—seemingly without any consideration for the consequences of that decision. To say that OMB 'failed to consider an important aspect of the problem' would be putting it mildly." *Nat'l Council of Nonprofits*, 2025 WL 368852, at *11.

288. Second, these agency actions rely "on factors which Congress has not intended [them] to consider." *State Farm*, 463 U.S. at 43. Specifically, these actions indefinitely freeze funds based on the *President's* policies, contrary to Congress's specific directives and purposes for appropriating funds in the IRA and the IIJA and other federal statutes.

289. Third, these agency actions indefinitely froze *all* IRA and IIJA funding, as well as funding under other federal statutes without a consideration of alternative options. *See Regents of Univ. of Cal.*, 591 U.S. at 30 ("[W]hen an agency rescinds a prior policy its reasoned analysis must [also] consider the alternatives that are within the ambit of the existing policy.").

290. For example, Defendants could have engaged in a review of grant funding and how it relates to President Trump's priorities *without* freezing the funds.

291. The unexplained freeze of all IRA and IIJA funds and freezing of funds under various other federal statutes epitomizes agency action by "whim and caprice of the bureaucracy," *N. C. Growers' Ass'n*, 702 F. 3d at 772 (Wilkinson, J., concurring).

292. The Program Freezing Actions must be vacated as arbitrary and capricious under the APA.  5 U.S.C. § 706(2)(A).

### —COUNT IV—
### THE PROGRAM FREEZING ACTIONS
### ARE NOT IN ACCORDANCE WITH LAW,
### IN EXCESS OF STATUTORY AUTHORITY, AND
### WITHOUT OBSERVANCE OF PROCEDURE REQUIRED BY LAW
### IN VIOLATION OF THE APA
### (All Plaintiffs[30])

293. The allegations of the preceding paragraphs are incorporated herein by reference.

294. The APA requires courts to hold unlawful and set aside agency actions "contrary to constitutional right, power, privilege, or immunity," "in excess of statutory jurisdiction, authority, or limitations," "not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)–(D).

295. "Courts"—not the Executive— "must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters.*, 603 U.S. at 412. The APA reflects the judiciary's constitutional duty "to say what the law is." *Marbury*, 5 U.S. (1 Cranch) at 177.

296. For five reasons, the Program Freezing Actions are outside of the agencies' statutory authority, contrary to law, and without observance of procedure required by law.

297. First, no federal law or regulation gives the President, OMB, EPA, USDA, USDOT, or DOGE the power to freeze funding appropriated by Congress and obligated by executive agencies.  The Executive Branch has blocked these funds based on President Trump's policies, as

---

[30] Baltimore joins this claim only as to agency actions implementing the Energy EO and Cost Efficiency EO, and agency actions based on EPA's and USDA's independent authorities. *See supra* footnote 1.

articulated in the Energy EO, Equity EO, and DOGE EO—policies that are entirely different

than, and in many cases directly conflict with, the directives and purposes specified by Congress

for expending the funds.

298. By freezing funding based on the *President's* priorities rather than "stated statutory

factors," the "Executive has acted contrary to law and in violation of the APA." *New York*, 2025

WL 357368, at *2.

299. Second, these agency actions are unconstitutional on the grounds set forth in Counts I–II

and V, *see supra* ¶¶ 263–82, *infra*, ¶¶ 303–314, and are thus "not in accordance with law" and

"contrary to constitutional right, power, privilege, or immunity" under the APA, 5 U.S.C.

§ 706(2)(A), (B).

300. Third, these agency actions are contrary to the IRA, the IIJA and other statutes creating

and appropriated money to the programs for which Plaintiffs receive grants.  Defendants' actions

are not in accordance with the statutory requirements to create, fund, and carry out these

programs.

301. Fourth, these agency actions are contrary to the Impoundment Control Act of 1974.

Defendants have unlawfully delayed the expenditure of funds, resulting in deferrals that are for

impermissible policy reasons and that did not follow the ICA's requirements for notifying

Congress of deferrals.  The agency actions also represent unlawful rescissions of the funds in

violation of the ICA.

302. Fifth, these agency actions, which remain in effect, direct a freeze of IRA, IIJA, and

"equity-related" funding that violates agency regulations and the grant agreements that

incorporate these regulations. *See, e.g.*, *J.E.C.M. v. Lloyd*, 352 F. Supp. 3d 559, 583 (E.D. Va.

2018) ("[W]here an agency's decision does not comport with governing . . .  regulations, that

decision is 'not in accordance with law' and must be set aside."). To the extent subsequent agency actions have unilaterally frozen specific funding or programs, those freezes are unlawful for the same reasons.

303. These agency actions indefinitely freeze IRA, IIJA, and "equity-related" funding without identifying any permissible grounds for freezing funds, exhausting less drastic remedies, 2 C. F. R. §§ 200. 339, 200. 208(c), or affording any recipient notice and an opportunity to object. *Id.* § 200. 342. Both binding regulations and grant agreements require these award-specific findings and procedures before funding may be suspended.

304. The Program Freezing Actions, and any other agency action to freeze or block IRA, IIJA, or "equity-related" funding based on President Trump's priorities rather than Congress's are in excess of the agencies' statutory authority, unconstitutional, and not in accordance with law. 5 U.S.C. § 706(2)(A)–(C). These agency actions must be held unlawful and vacated under the APA. *Id.* § 706(2).

## —COUNT V —
### THE PROGRAM FREEZING ACTIONS VIOLATE THE FIRST AMENDMENT AND ARE NOT IN ACCORDANCE WITH LAW
#### (Community Group Plaintiffs)

305. The allegations of the preceding paragraphs are incorporated herein by reference as to the non-city plaintiffs.

306. Under the First Amendment, actions by the government targeting speech based on its subject matter or the viewpoint expressed are presumptively unconstitutional and subject to strict scrutiny. *Rosenberger*, 515 U.S. at 828–29. In particular, the government cannot condition benefits or financial assistance on the suppression of constitutionally protected speech, especially

when such a denial of support is based on the viewpoint or content of the expression. *Speiser*, 357 U.S. at 518.

307. In addition, under the APA, courts must "hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

308. The Second OMB Memo purported to block all disbursements of federal financial assistance pending a "review" to determine whether they are "consistent with the President's Policies," including those outlined in the Equity EO, which mandates the termination of all "equity-related grants."

309. The Equity EO directs government officials to eliminate "environmental justice" from government initiatives. Equity EO § 2(b)(i). It further instructs agencies to terminate all grants or contracts deemed "equity related" within 60 days. *Id.*

310. The Second OMB Memo further directs agencies to identify federal funding recipients that supposedly "advance Marxist equity, transgenderism, and green new deal social engineering policies."

311. While none of these terms are defined, the pejorative descriptions and context make clear that they are highly disfavored by the Administration.

312. The Second OMB Memo targets federal funding recipients who express or advocate for viewpoints or content disfavored by the Administration, discriminating against these entities for continued federal funding based on their viewpoint.

313. Upon information and belief, the Program Freezing Actions identify organizations based on their viewpoints for purposes of blocking, freezing, or cancelling grant funding.

314. For example, EPA is using a flowchart to identify which grants to freeze or cancel based on the presence of certain arbitrary keywords representing viewpoints disfavored by the Administration in grant applications or other grant materials.  This is unconstitutional viewpoint-based discrimination because it targets grantees like the nonprofit Community Group Plaintiffs and penalizes them based on their presence of certain words, concepts, and viewpoints in grant application or other grant materials—even though the words, concepts, and viewpoints were prioritized by Congress for federal funding, and the grantees were awarded funding on the basis of their grant materials, expressly to advance these policies that are central to their missions.

315. The Program Freezing Actions violate the First Amendment by restricting Plaintiffs' constitutionally protected speech based on its content.

**—COUNT VI—**
**THE ENERGY EO, EQUITY EO, DOGE EO,**
**AND PROGRAM FREEZING ACTIONS**
**VIOLATE THE IRA AND THE IIJA AND OTHER RELEVANT STATUTES**
**NONSTATUTORY REVIEW AND ULTRA VIRES ACTION**
**(All Plaintiffs[31])**

316. The allegations of the preceding paragraphs are incorporated herein by reference.

317. Congress has enacted the federal grant programs at issue in this case under the IRA, IIJA, and other relevant statutes and has appropriated over $1 trillion in funding for those programs to serve enumerated purposes specified in these statutory programs.

318. Defendants are statutorily required to carry out these congressionally mandated programs, and to obligate and distribute the funds that Congress appropriated for these programs.

---

[31] Baltimore joins this claim only as to the Energy EO, Cost Efficiency EO, agency actions implementing those two EOs, and agency actions based on EPA's and USDA's independent authorities. *See supra* footnote 1.

319. Consistent with their statutory duties, federal agencies obligated these funds to specific entities via a rigorous, regulated, and competitive grantmaking process.

320. But in the Energy EO, Equity EO, and DOGE EO President Trump directed that federal funding be paused or terminated if it was inconsistent with his own policies.

321. The President's Executive Orders and the Program Freezing Actions directly contravene the statutory requirements to carry out and fund the statutory programs under the IRA, IIJA, and other statutes under which Plaintiffs received grants. *See, e.g.*, 42 U.S.C. § 7438(b)(1) (IRA "Environmental and Climate Justice Block Grants" program, directing that EPA "shall" award grants for certain activities "that benefit disadvantaged communities"); IRA, § 22007, 136 Stat. at 2022 (directing that USDA "shall" award grants for "USDA Assistance and Support for Underserved Farmers, Ranchers [and] Foresters" and those "determined to have experienced discrimination . . . in Department of Agriculture farm lending programs"); *see also* 33 U.S.C. § 1302f(c)(4)(A)(2) (IIJA, requiring that EPA "shall" give priority to grant applications submitted on behalf of "a small, rural, or disadvantaged community"); Section 1001 of the American Rescue Plan Act of 2001, Technical Assistance Investment Program to support farmworkers, and Urban Agriculture and Innovative Production Grant to support urban agriculture efforts in underserved communities.

## PRAYER FOR RELIEF

For the reasons set forth above, Plaintiffs respectfully request that the Court grant the following relief:

A. Issue a declaratory judgment that Sections 2 and 7 of the Unleashing Energy EO that direct the freezing or termination of federal grants violate the United States Constitution and are therefore void;

B.  Issue a declaratory judgment that Section 2(b) of the Equity EO that directs the termination of "equity-related" grants or contracts violates the United States Constitution;

C.  Issue a declaratory judgment that Section 3(b) of the DOGE EO that directs the termination or modification of grants to advance the policies of the Trump Administration violates the United States Constitution;

D.   Issue a declaratory judgment that executive actions taken to freeze or terminate awarded federal grants under the Community Change Grants program; the Environmental Justice Collaborative Problem Solving Program; the Environmental Justice Government-to-Government Program; the Partnerships for Climate-Smart Commodities program; the Conservation Stewardship Program; the Equity in Conservation Outreach Cooperative Agreements program; the Conservation Technical Assistance Program; the Increasing Land, Capital and Market Access Program; the Rural Development Policy Cooperative Agreement program; the American Rescue Plan Technical Assistance Investment Program; the Climate Pollution Reduction Grants program; the Urban and Community Forestry Grant Program; the Distressed Borrower Assistance Network Cooperative Agreement Program; the Solid Waste Infrastructure for Recycling Grant Program; the Innovative Nutrient and Sediment Reduction Grant Program; the Charging and Fueling Infrastructure Program Grants; the Active Transportation Infrastructure Investment Grant Program; the Farm and Food Workers Grant Relief Program; and the Office of Urban Agriculture and Innovative Production Grants program, violate the United States Constitution, the statutory provisions enacting and appropriating funds to these programs, and the APA;

E.  Pursuant to 5 U.S.C. § 706, hold unlawful and set aside any actions taken by OMB, EPA, USDA, USDOT, or DOGE to freeze or terminate federal grants under the Community Change Grants program; the Environmental Justice Collaborative Problem Solving Program; the Environmental Justice Government-to-Government Program; the Partnerships for Climate-Smart Commodities program; the Conservation Stewardship Program; the Equity in Conservation Outreach Cooperative Agreements program; the Conservation Technical Assistance Program; the Increasing Land, Capital and Market Access Program; the Rural Development Policy Cooperative Agreement program; the American Rescue Plan Technical Assistance Investment Program; the Climate Pollution Reduction Grants program; the Urban and Community Forestry Grant Program; the Distressed Borrower Assistance Network Cooperative Agreement Program; the Solid Waste Infrastructure for Recycling Grant Program; the Innovative Nutrient and Sediment Reduction Grant Program; the Charging and Fueling Infrastructure Program Grants; the , Active Transportation Infrastructure Investment Grant Program; the Farm and Food Workers Grant Relief Program; and the Office of Urban Agriculture and Innovative Production Grants program;

F.  Preliminarily and permanently enjoin Defendants from continuing to freeze or terminating grants under the Community Change Grants program; the Environmental Justice Collaborative Problem Solving Program; the Environmental Justice Government-to-Government Program; the Partnerships for Climate-Smart Commodities program; the Conservation Stewardship Program; the Equity in Conservation Outreach Cooperative Agreements program; the Conservation Technical Assistance Program; the Increasing Land, Capital and Market Access Program; the Rural Development Policy Cooperative

Agreement program; the American Rescue Plan Technical Assistance Investment
Program; the Climate Pollution Reduction Grants program; the Urban and Community
Forestry Grant Program; the Distressed Borrower Assistance Network Cooperative
Agreement Program; the Solid Waste Infrastructure for Recycling Grant Program; the
Innovative Nutrient and Sediment Reduction Grant Program; the Charging and Fueling
Infrastructure Program Grants; the Active Transportation Infrastructure Investment Grant
Program; the Farm and Food Workers Grant Relief Program; and the Office of Urban
Agriculture and Innovative Production Grants program;

G. Prohibit Defendants from otherwise impeding, blocking, cancelling, or terminating
Plaintiffs' access to their funds awarded under such program(s);

H. Require Defendants to make grant program managers available to Plaintiffs to assist with
the administration of grant funds, and require that grant program managers respond to
questions from grantees in a timely manner;

I. Provide Plaintiffs and the Court with weekly status updates regarding grant
disbursements and grant program administration;

J. Retain jurisdiction over this matter to ensure compliance with the above relief;

K. Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees,
pursuant to 28 U.S.C. § 2412; and

L. Grant such other relief as this Court deems just and proper.

   Respectfully submitted this 19th day of March 2025.

       /s/ Carl T. Brzorad
       Carl T. Brzorad (S. C. Bar No. 105413)
       SOUTHERN ENVIRONMENTAL LAW CENTER
       525 East Bay Street, Suite 200
       Charleston, SC 29403
       Telephone: (843) 720-5270

Facsimile: (843) 414-7039
cbrzorad@selc.org

*/s/* Kimberley Hunter
Kimberley Hunter (N. C. Bar No. 41333)
(*Pro Hac Vice* pending)
Irena Como (N. C. Bar No. 51812)
(*Pro Hac Vice* pending)
Nicholas S. Torrey (N. C. Bar No. 43382)
(*Pro Hac Vice* pending)
SOUTHERN ENVIRONMENTAL LAW CENTER
136 East Rosemary Street, Suite 500
Chapel Hill, NC 27514
Telephone: (919) 967-1450
Facsimile: (919) 929-9421
kmeyer@selc.org
icomo@selc.org
ntorrey@selc.org

*Counsel for Plaintiffs The Sustainability Institute,
Agrarian Trust, Alliance for Agriculture, Alliance
for the Shenandoah Valley, Bronx River Alliance,
CleanAIRE NC, Conservation Innovation Fund,
Leadership Counsel for Justice and Accountability,
Marbleseed, Pennsylvania Association of
Sustainable Agriculture, and Rural Advancement
Foundation International - USA*

/s/ Graham Provost
Graham Provost (DC Bar No. 1780222)
(*Pro Hac Vice* pending)
Elaine Poon (VA Bar No. 91963)
(*Pro Hac Vice* pending)
Jon Miller (MA Bar No. 663012)
(*Pro Hac Vice* pending)
Public Rights Project

490 43rd Street, Unit #115
Oakland, CA 94609
Telephone: (510) 738-6788
graham@publicrightsproject. org

*Counsel for Plaintiffs Baltimore, Maryland,
Columbus, Ohio, Madison, Wisconsin, Nashville,
Tennessee, New Haven, Connecticut, and San
Diego, California*

_/s/_ Mark Ankcorn
Mark Ankcorn, Senior Chief Deputy City Attorney
(CA Bar No. 166871)
(_Pro Hac Vice_ pending)
1200 Third Avenue, Suite 1100
San Diego, California 92101-4100
(619) 533-5800
mankcorn@sandiego.gov

_Counsel for Plaintiff City of San Diego_