**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**
2:25-cv-2152

The Sustainability Institute, et al.,

                Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity
as President of the United States, et al.,

                Defendants.

**PLAINTIFFS' MEMORANDUM IN
SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION**

## INTRODUCTION

Plaintiffs[1] seek urgent injunctive relief to restore the federal grants awarded to Plaintiffs under congressionally mandated programs. Across the United States, nonprofit organizations and municipalities have been hiring staff, working with communities, and implementing work plans to advance policy decisions made by Congress and improve lives in their communities. In Charleston, for example, the nonprofit Sustainability Institute has been tasked with developing and upfitting affordable homes in the underserved, historically Black community of Union Heights that was fragmented by the construction of Highway 218. These groups work hard to serve the public. Their grants are the result of a complex, competitive process that required months of planning and community engagement. They are subject to rigorous reporting requirements and detailed program plans and deliverables.

All this work is now in jeopardy due to a slew of illegal actions taken by the executive branch: Executive Orders, memos, and other directives have repeatedly frozen federal grant funds, preventing Plaintiffs from doing the work Congress directed. The federal Government's interference with the grants is unlawful. It violates bedrock separation-of-powers principles and multiple federal statutes by impounding funds based on the President's disagreement with policies Congress duly enacted. It represents textbook arbitrary and capricious agency action by failing to consider the reliance interests of those impacted, not engaging in reasoned decisionmaking, relying on considerations Congress did not allow, and ignoring potential alternatives. These actions also violate the First Amendment by targeting and penalizing viewpoints disfavored by the Administration.

---

[1] Because the Mayor and City Council of Baltimore is a party to ongoing litigation relating to the EO 14151, Baltimore does not join claims as to EO 14151 and actions to implement that EO.

The irreparable harm to Plaintiffs[2] is substantial. Without the guarantee of funding and reimbursement, Plaintiffs are unable to finance programs they have launched, will be forced to lay off or furlough staff, and in some instances, cease operations.  Plaintiffs will thus lose environmental, economic, work-force development benefits Congress intended to support. The inability to deliver on promised services will further harm Plaintiffs as they lose goodwill, reputation, and relationships they cultivated over many years. Moreover, the imposition on Plaintiffs' constitutional rights is irreparable harm itself.

Plaintiffs seek a preliminary injunction to prevent these injuries and hold Defendants to their constitutional and statutory duties to implement the laws enacted by Congress without interruption, gamesmanship, or delay.[3]

## **BACKGROUND**

### I.    **Federal Grant Statutes**

Congress uses federal grant programs, many of which involve partnerships with nonprofit organizations and local governments, to efficiently improve lives and communities throughout the United States, without having to create new federal infrastructure to do so. Congress designs these programs with specific parameters and appropriates money to fund them. Following public funding opportunity announcements, federal agencies then award these grants through a competitive process, entering into grant agreements with recipients—such as nonprofits and

---

[2] Plaintiffs' irreparable harm is documented in declarations.  These declarations also incorporate documentation of Plaintiffs' grant awards.  Sustainability Institute decl., Ex. 1; Ag. Trust decl., Ex. 2; Alliance for Ag. decl., Ex. 3; Alliance for the Shenandoah Valley decl., Ex. 4; Bronx River Alliance decl., Ex. 5; CleanAIRE NC decl., Ex. 6; Cons. Innovation Fund decl., Ex. 7, Earth Island Institute decl., Ex. 8; Leadership Counsel for Justice and Accountability decl., Ex. 9; Marbleseed decl., Ex. 10; OAK decl., Ex. 11; Pasa decl., Ex. 12; RAFI decl., Ex. 13, Baltimore decl., Ex. 14; Columbus decl., Ex. 15; Madison decl., Ex. 16; Nashville decl., Ex. 17; New Haven decl., Ex. 18; San Diego decls., Exs 19 & 20.

cities—which must comply with strict requirements, including reporting, auditing, and other programmatic criteria.

### a. The Infrastructure Investment and Jobs Act and Inflation Reduction Act

The partnership between the federal government and groups on the ground has significantly expanded in recent years. In 2021, a bipartisan Congress passed and the President signed into law the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429 (Nov. 15, 2021) ("IIJA"), which directed investment in transportation, broadband, water systems, and energy infrastructure via federal grant programs for nonprofits and cities. In 2022, Congress passed, and the President signed into law, the Inflation Reduction Act, Pub. L. No. 117-169, 136 Stat. 1818 (Aug. 16, 2022) ("IRA"). Like the IIJA, the IRA was designed to achieve a significant portion of the congressional objectives through grants to nonprofits and cities.

The IRA and IIJA included a host of specific grant programs. Congress legislated in considerable detail how these grant programs should be administered, and appropriated funding for the particular programs.

For example, in the IRA, Congress created the "Environmental and Climate Justice Block Grants" program, instructing that EPA "shall" use $2.8 billion in appropriated funds "to award grants for periods of up to three years to eligible entities to carry out [specified environmental projects] that benefit disadvantaged communities." IRA § 60201, 136 Stat. at 2078–79 (codified at 42 U.S.C. § 7438). EPA has awarded grants under this statutory program through several sub-programs, including the Environmental Justice Community Change Grants Program, the Environmental Justice Collaborative Problem-Solving Cooperative Agreement Program, and the Environmental Justice Government-to Government Program. Ex. 21. Plaintiffs The Sustainability Institute, Bronx River Alliance, Leadership Counsel for Justice and Accountability,

CleanAIRE NC, New Haven, Madison, and Baltimore have all been awarded grants under one or more of these programs. *Id.*

Also In the IRA, Congress created a "Greenhouse Gas Air Pollution Plans and Implementation Grants" program, directing that EPA "shall" use $5 billion in appropriated funds to "competitively award grants" to municipalities and local governments to implement plans "for the reduction of greenhouse gas air pollution." IRA § 60114, 136 Stat. at 2076–77 (codified at 42 U.S.C. § 7437(a)–(d)). EPA has administered this program through Climate Pollution Reduction Grants. Ex. 21. Plaintiff New Haven has been awarded a grant under this program.

And in the IIJA, for example, Congress appropriated $1.95 billion to EPA for "Environmental Programs and Management," $238 million of which "shall be for" EPA's Chesapeake Bay Program. IIJA § 601, 135 Stat. at 1396. This Program is administered under the Clean Water Act "to achieve the goal of restoring and protecting the Chesapeake Bay ecosystem and the living resources of the Chesapeake Bay ecosystem," including through "assistance grants[] to nonprofit organizations." 33 U.S.C. § 1267(a)(2), (a)(4), (d)(1). EPA used these IIJA funds to award Innovative Nutrient and Sediment Reduction grants. Ex. 21 Plaintiff Alliance for the Shenandoah Valley is among the recipients of grants made under this program.

### b. *Other Statutory Grant Programs*

In addition to the IRA and IIJA, the American Rescue Plan Act of 2021 appropriated over $1 billion to the Secretary of Agriculture, directing that the Secretary "shall" use those funds on various agricultural projects that benefit "socially disadvantaged farmers, ranchers, or forest landowners, or other members of socially disadvantaged groups." Pub. L. 117-2, 135 Stat. 4, 13–14. Congress appropriated an additional $2.9 billion to USDA to fund grants through this program for various agricultural projects to benefit "underserved farmers, ranchers, or forest

4

landowners," and those who "experienced discrimination . . . in Department of Agriculture farm lending programs." IRA § 22007, 136 Stat. at 2021–23. USDA has used funds from these and other appropriations to fund grants through the Increasing Land, Capital and Market Access Program, the American Rescue Plan Technical Assistance Investment Program, and the Rural Development Policy Cooperative Agreement program. Ex. 21. Plaintiffs Agrarian Trust, RAFI-USA, and Alliance for Agriculture are all recipients or sub-recipients of grants awarded under these programs. *Id.*

The programs and grants at issue in this litigation are all thoroughly described in the Amended Complaint ¶¶ 18-75 and in Exhibit 21 attached to this memorandum.

## II.     <u>Plaintiffs' Grant Awards</u>

Before awarding a grant, federal agencies are required to give public notice of the funding opportunity, solicit applications, 2 C.F.R. § 200.204, conduct a "merit review process," and only select grant recipients "most likely to be successful in delivering results based on the program objectives," *id.* § 200.205. To ensure that taxpayer money is well spent, federal grants include lengthy and complex application procedures along with reporting and auditing requirements. *See, e.g.*, 2 C.F.R. §§ 200.500–200.521 (financial auditing requirements for federal award recipients), 200.328–200.330 (performance, financial monitoring, and reporting requirements for federal award recipients); *see also* Am. Compl. ¶¶ 173-84.

Via grant agreements, federal agencies agree to provide funding up to a specified dollar amount, over a specified time period, for specified work advancing Congress's objectives. In exchange, grantees agree to use grant funds to complete their agency-approved project on an agency-approved timeline. *See, e.g.,* Leadership Counsel decl., Ex. 9 ¶ 5, (EPA awarded a three-year Community Change Grant to achieve Congressional goals like reducing pollution,

increasing community climate resilience, and building community capacity in disadvantaged communities); Conservation Innovation Fund Decl., Ex. 7 ¶ 4 (USDA awarded a five-year Climate-Smart Commodities grant to build markets for climate-smart commodities and invest in America's climate-smart producers to strengthen U.S. rural and agricultural communities); Grantees also agree to comply with lengthy terms and conditions, including statutory and regulatory requirements and reporting, recordkeeping, and auditing conditions. *See, e.g.,* Pasa decl., Ex. 12-A; Sustainability Institute decl., Ex. 1-A; Earth Island Institute, decl., Exs. 8-A and 8-C, Alliance for the Shenandoah Valley decl., Ex. 4-E; New Haven decl., Ex. 18-A–C.

While the grants take the form of agreements, Plaintiffs' Grant Agreements are not "contracts" in the sense that the Federal Government does not receive consideration in the form of direct, tangible benefits from the grantees' performance. *See* 31 U.S.C. § 6304. Instead, grant funds are provided to carry out U.S. policy interests as determined by Congress. *See id.*

After grants are awarded, Plaintiffs do not hold the funding in their own bank accounts. They are allowed to withdraw money only incrementally, on an as-needed basis, from Government-controlled accounts. *See, e.g.*, Sustainability Institute decl., Ex. 1 ¶¶ 21–25; Conservation Innovation Fund decl., Ex.7 ¶ 9. Many Plaintiffs incur expenses required by their grants and withdraw reimbursements from their Government-controlled accounts shortly after. *See, e.g.*, Alliance for Agriculture decl., Ex. 3 ¶ 7; Marbleseed decl., Ex. 10 ¶¶ 20–21; and Pasa Sustainable Agriculture decl., Ex. 12 ¶¶ 10–17. Agencies must provide reimbursement payments "within 30 calendar days after receipt of the payment request unless the Federal agency . . . reasonably believes the request to be improper." 2 C.F.R. § 200.305(b)(3).

III.     **Executive Actions to Stop Federal Grants**

Since taking office, the Executive branch has taken a number of actions to freeze grants.

### a. The Executive Orders

In January and February 2025, President Trump issued three Executive Orders that directed agencies to freeze or terminate federal grants: Executive Order 14154, titled "Unleashing American Energy," 90 Fed. Reg. 8353 (Jan. 29, 2025) ("Energy EO"); Executive Order 14151, titled "Ending Radical and Wasteful Government DEI [Diversity, Equity, and Inclusion] Programs and Preferencing," 90 Fed. Reg. 8339 (Jan. 29, 2025) ("Equity EO"); and Executive Order 14222, titled "Implementing the President's 'Department of Government Efficiency' Cost Efficiency Initiative," 90 Fed. Reg. 11095 (Mar. 3, 2025) ("DOGE EO").

Section 2(i) of the Energy EO forbids the disbursement of any funds that the Executive branch deems "contrary" to the policies set out in the Order. And Section 7 of the Energy EO, titled "Terminating the Green New Deal," provides that:

> [a]ll agencies shall immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022 (Public Law 117-169) or the Infrastructure Investment and Jobs Act (Public Law 117-58) . . . and shall review their processes, policies, and programs for issuing grants, loans, contracts, or any other financial disbursements of such appropriated funds *for consistency with* the law and *the policy outlined in section 2 of this order.*

Energy EO § 7 (emphases added). No end date is provided for this indefinite funding freeze. "No funds . . . shall be disbursed" except those the Director of OMB and Assistant to the President for Economic Policy determine "are consistent with any review recommendations they have chosen to adopt." *Id.*

The Equity EO directs agencies to "terminate . . . all . . . 'equity-related' grants or contracts" within sixty days, among other directives. Equity EO § 2(b). The Equity EO also purports to eliminate prior directives requiring agencies to consider equity in their federal funding decisions.

The DOGE EO instructs agencies, "in consultation with the agency's DOGE Team

Lead," to "review all existing covered contracts and grants" and to "terminate or modify" those contracts and grants to "advance the policies of [the Trump] Administration." DOGE EO § 3(b).

None of these orders cite any legal authority for their across-the-board freezes of federally awarded grant payments or the termination of awarded grants. The orders do not acknowledge or comply with any of the required procedures to pause or terminate grant funding. *See* 2 C.F.R. §§ 200.208, 200.339, 200.342.

### b. *Program Freezing Actions*

Since January 20, 2025, executive branch agencies have taken an ongoing series of actions that freeze federal funding based on the policies in the Executive Orders.

#### i. *DOE Memo*

On January 20, 2025, Acting Secretary of Energy, Ingrid Kolb ordered a broad review of Department of Energy ("DOE") actions, including "Funding Actions." The memo directed that "[a]ll funding and financial assistance activities including . . . grants . . . shall not be announced, approved, finalized, modified, or provided until a review of such takes place to ensure compliance with Congressional authorization and Administration policy." E.C.F. 23-9, Ex. I – DOE Memo.

#### ii. *The First OMB Memo*

On January 21, 2025, the Acting Director of OMB issued a memorandum to agency and department heads titled "Guidance Regarding Section 7 of the Executive Order *Unleashing American Energy*," No. M-25-11. E.C.F. 23-1, Ex. A at 2 ("First OMB Memo"). The First OMB Memo interprets the funding freeze in Section 7 of the Energy EO to apply only to funds supporting projects "that may be implicated by the policy" set out in Section 2 of the Order. *Id.*

### iii.  The USDA Directive

On January 22, 2025, USDA advised grantees that "[a]s of late yesterday, January 21, 2025, the administration placed a temporary suspension on all actions related to grants, including Partnerships for Climate-Smart Commodities grants." E.C.F. 23-7, Ex. C – USDA Directive, at 3. Later that same day, USDA notified grantees that "payments or claims may continue to be processed under existing awards, *provided that they are not funded using IRA and IIJA funding sources*. Additional guidance related to IIJA and IRA funds will be provided by [USDA officials] when available." *Id.* at 5 (emphasis added). On February 20, a USDA press release noted a funding "pause[] due to the review of funding in the Inflation Reduction Act (IRA)." *Id.* at 7. These and other actions by USDA freezing funds based on President Trump's policies are collectively referred to as the "USDA Directive."

### iv.  The Second OMB Memo

On January 27, the Acting Director of OMB issued a second memorandum to agency and department heads titled "Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Program," No. M-25-13. E.C.F. No. 1-2 at 2 ("Second OMB Memo"). The Second OMB Memo establishes the "duty" of Executive Branch officials "to align Federal spending and action with . . . *Presidential priorities*." *Id.* (emphasis added). The Memo states that "[f]inancial assistance should be dedicated to advancing Administration priorities." *Id.* To that end, the Second OMB Memo directs federal agencies to "complete a comprehensive analysis of all of their Federal financial assistance programs to identify programs, projects, and activities that may be implicated by any of the President's executive orders," including the Energy EO and Equity EO. *Id.* at 2–3. The Memo states that, "[i]n the interim, to the extent permissible under applicable law, Federal agencies **must temporarily pause** all activities related to obligation or

disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders, including, but not limited to, financial assistance for . . . nongovernmental organizations, DEI [diversity, equity, and inclusion] . . . and the green new deal." *Id.* at 3 (emphasis in original).

Following a court-ordered administrative stay, OMB rescinded this Memo on January 29 "in name only" to "evade[e] judicial review," while continuing to implement the underlying funding freeze. *Nat'l Council of Nonprofits v. Office of Mgmt. & Budget*, No. 25-cv-239, 2025 WL 368852, at *2, 7 (D.D.C. Feb. 3, 2025).

### v. The EPA Memo

On January 27, EPA's Acting Chief Financial Officer issued a memorandum to staff titled "Inflation Reduction Act and Infrastructure Investment and Jobs Act Funding Action Pause." ECF No. 23-8, Ex. D at 2 ("EPA Memo"). The EPA Memo was "provided . . . in accordance with the Executive Order *Unleashing American Energy*." *Id.* The EPA Memo orders an indefinite freeze of: (*i*) "unobligated funds appropriated by" the IRA and IIJA, and (*ii*) "disbursements for unliquidated obligations funded by any line of accounting including funds appropriated by the [IRA] and [IIJA]." *Id.* The freeze of IRA and IIJA funds would "allow for the review of processes, policies and programs as required by Section 7 of the [Energy EO]." *Id.*

The EPA Memo, unlike the First OMB Memo, extends the funding freeze to *all* IRA and IIJA funds, not only those deemed contrary to the policies set out in Section 2 of the Energy EO. The EPA Memo further specifies that the freeze applies even to "obligat[ed]" funds not yet paid out to recipients.

### vi. The DOT Directives

On January 29, 2025, Secretary of Transportation Sean Duffy issued a memorandum to

DOT staff stating that, pursuant to the Executive Orders, the agency must "identify and eliminate all . . . funding agreements . . . or portions thereof, which were authorized, adopted, or approved [during the Biden Administration] and which reference or relate in any way to climate change, 'greenhouse gas' emissions, racial equity, gender identity, 'diversity, equity, and inclusion' goals, environmental justice, or the Justice 40 Initiative." E.C.F. 23-7, Ex. C at 1 ("DOT Secretary's Directive"). The DOT Secretary's Directive gave staff 20 days (i.e., until February 18) to "initiate all lawful actions necessary to rescind, cancel, revoke, and terminate all DOT . . . funding agreements, programs, . . . or portions thereof, which are subject to the relevant executive orders and which are not required by clear and express statutory language." *Id.*

On March 12, 2025, Secretary Duffy, ordered a "review" of "projects announced from FY 2022 through FY 2025 . . . to identify project scope and activities that are allocating funding to advance climate, equity, and other priorities counter to the Administration's Executive Orders." E.C.F. No. 23-10, Ex. F at 2 ("DOT Memo").

Specifically, the DOT Memo directed the agency to identify award selections that include any of the following elements: "equity activities, Diversity, Equity, and Inclusion (DEI) activities, climate change activities, environmental justice (EJ) activities, gender-specific activities, when the primary purpose is bicycle infrastructure (i.e., recreational trails and shared-use paths, etc.), electric vehicles (EV), and EV charging infrastructure." *Id*. at 2–3. Further, the DOT Memo directed "project-by-project review" to identify "for potential removal" any programs that have "[s]tatutory language" that includes "equity requirements, climate considerations, or bicycle infrastructure" or "mandatory evaluation criteria" that include "equity and/or climate requirements." *Id*. at 3.

*vii.   The DOGE Initiative*

On March 3, 2025, EPA sent an email instructing all agency directors that "**any assistance agreement, contract, or interagency agreement transaction $50,000 or greater must receive approval from an EPA DOGE Team member.**" ECF No. 23-11, Ex. G at 2 ("EPA Notice of DOGE Approval Requirement") (emphasis in original).

None of these memos, directives, or initiatives identified any legal authority in any federal law, grant award, or the Constitution to freeze, terminate, or withhold funds based on presidential policies. And none of these memos, directives, or initiatives considered how much funding would be frozen or terminated, or which programs or recipients would be affected.

*viii.   Further Agency Actions to Freeze Program Funding*

Defendants have undertaken various other actions consistent with the Executive Orders to freeze the funding programs and prevent Plaintiffs from carrying out their grants and accessing their grant funds. For example, Defendants have sent notices of freezes; blocked Plaintiffs' access to the websites and portals needed to access funds; frozen or labeled as "suspended" the accounts containing the grant funds to prevent Plaintiffs from drawing down funds; informed Plaintiffs orally that funds are frozen and cannot be drawn down; and communicated through state agencies that expenditures may not be reimbursed, usually with no explanation or justification. *See, e.g.*, Leadership Counsel decl., Ex. 9 ¶ 11, 12 (ASAP account status changed to "suspended" without explanation or justification;) Conservation Innovation Fund decl., Ex.7 ¶ 9 (informed that grants administration team was instructed not to approve any reimbursement claims or process advance requests without explanation); Columbus decl., Ex. 15 ¶ 14 (informed by state agency that expenditures may not be reimbursed); San Diego – Widener decl., Ex. 20 ¶ 11 (verbally notified by program manager that all payments were paused). Plaintiffs seek

expedited discovery to clarify precisely which actions led to the freeze of their grants.

Defendants' actions to freeze the funding programs at issue in this case and prevent Plaintiffs from carrying out the congressional priorities included in their grants are collectively referred to as the "Program Freezing Actions."

## II. Injunctions Against the Funding Freeze and Agency Actions to Evade the Injunctions

Two federal courts have issued preliminary injunctions against aspects of the funding freeze effectuated by the now-rescinded Second OMB Memo, finding those plaintiffs have shown a likelihood of success on their separation-of-powers and APA claims, and a likelihood of irreparable harm. *Nat'l Council of Nonprofits v. Office of Mgmt. & Budget*, No. 25-cv-239, 2025 WL 597959, at *12–20 (D.D.C. Feb. 25, 2025); *New York v. Trump*, No. 25-cv-39, 2025 WL 715621, at *7–15 (D.R.I. Mar. 6, 2025), *appeal filed*, No. 25-1236 (1st Cir. Mar. 10, 2025).

Despite these orders, Defendants continue to engage in the freezing actions discussed above, and many of Plaintiffs' grants remain frozen. Because of the lack of both transparency and communication from federal agencies, it remains unclear which of an ongoing series of agency actions are responsible for the freeze at any given time. And agencies appear to be engaging in new actions either in an attempt to evade court orders or in an effort to create more impediments to the disbursement of funding or both.

For example, *PoliticoPro* reported on the Administration's position that a "spending pause" announced by EPA on February 7 that "applied to more than two dozen EPA climate and infrastructure programs" is a "new" freeze and "separate from President Donald Trump's broader spending freeze that has been blocked by the courts."[4]

---

[4] Alex Guillén, *EPA says spending halt for climate, infrastructure law programs is different from Trump freeze*, PoliticoPro (Feb. 11, 2025), https://perma.cc/G5MJ-5QD8.

Because Plaintiffs' funding remains frozen, it appears Defendants may be applying this same approach of inventing new ways to continue the blanket freeze of funding under the IRA and IIJA and other federal statutes, despite multiple court orders prohibiting them from doing so.

For example, EPA now appears to be using a flowchart to freeze or cancel "equity-related" grants based on the presence of certain arbitrary keywords in grant documents, such as "advocate," "diverse community," "equality," "equity," "inequality," "racism," or "socioeconomic," among others. E.C.F. 23-14, Ex. J at 2–3.  On March 3, EPA sent an email instructing staff that they "must complete and sign the attached [Executive Order] Compliance Review form for *all funding actions*." E.C.F. 23-11, Ex. G at 2 (emphasis added); *see also* E.C.F. 23-9, Ex. E at 2 ("EPA Executive Order Compliance Review Requirement"). This form requires relevant EPA staff, before funding may be disbursed, to "demonstrate[] that the signatory understands that the action and associated workplan or performance work statement complies with Executive Order requirements . . . at the time of signature." *Id.*

## STANDARD OF REVIEW

For preliminary injunctive relief, a movant must show: (1) a likelihood of success on the merits; (2) the movant is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## ARGUMENT

## I.    Plaintiffs Are Likely to Succeed on the Merits.

Plaintiffs are likely to prevail on their claims. The Executive's freeze of congressionally mandated federal grant programs violates the separation of powers, the First Amendment of the United States Constitution, and the Administrative Procedure Act.

### a. *The Executive Orders and Program Freezing Actions Violate the Separation of Powers*

The Constitution grants Congress, not the President, exclusive power over the Nation's purse and the power to legislate. U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); art. I, § 8, cl. 1 (Spending Clause); art. I, § 1 (legislative power). The President's duty to implement the laws enacted by Congress is at its apex on matters of federal funding, given Congress's "exclusive" and "absolute" power over the purse. *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992) (internal quotation omitted). When Congress appropriates funds for a specified purpose, the President has a duty to spend those funds on the terms set by Congress. *See* U.S. Const. art. II, § 3 (Take Care Clause). These are "settled, bedrock principles of constitutional law." *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.).

In the IRA, IIJA, and other statutes, Congress established specific grant programs and appropriated funding to achieve its policy goals. For example, the IRA's Environmental and Climate Justice Block Grants program instructs that EPA "***shall***" use appropriated funds "to award grants for . . . [certain environmental projects] that benefit disadvantaged communities." 42 U.S.C. § 7438(b)(1) (emphasis added). Congress appropriated $2.8 billion for this purpose. *Id.* § 7438(a)(1). Similarly, Congress directed the creation of a Greenhouse Gas Air Pollution Plans and Implementation Grants program, which "***shall***" be used to "competitively award grants" to municipalities to implement plans "for the reduction of greenhouse gas air pollution." 42 U.S.C. § 7437(b)–(c) (emphasis added). Congress appropriated $5 billion to EPA for this purpose. *Id.* § 7437(a). These are two of many examples of statutory grant programs. Ex. 21.

The President has no constitutional power to withhold this funding appropriated by Congress. And he cannot condition the funding on policies that are at odds with Congress's spending directives. *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1231–35 (9th Cir. 2018); *City*

15

*of Chicago v. Sessions*, 888 F.3d 272, 283 (7th Cir. 2018), *vacated in part on other grounds*, No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018); *In re Aiken Cnty.*, 725 F.3d at 261 n.1. Although "Congress may attach conditions on the receipt of federal funds," *South Dakota v. Dole*, 483 U.S. 203, 206 (1987), the President may not. When the President attempts "to condition . . . federal grant funding on his policy preferences," it "is a clear violation of the Constitution," an "'improper attempt to wield Congress's exclusive spending power[,] and is a violation of the Constitution's separation of powers principles.'" *PFLAG, Inc. v. Trump*, No. 25-cv-337, 2025 WL 510050, at \*13 (D. Md. Feb. 14, 2025) (quoting *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 531–32 (N.D. Cal. 2017)); *accord PFLAG, Inc. v. Trump*, No. 25-cv-337, 2025 WL 685124, at \*19–20 (D. Md. Mar. 4, 2025) (withholding of funds to advance executive policy "unconstitutionally intrude[s] on the congressional prerogative to control the public fisc").

Yet that is precisely what Defendants have done. Each of the Executive Orders and Program Freezing Actions conditioned receipt of congressionally appropriated funds on adherence to the President's policies, disregarding the priorities mandated by Congress.

For example, in the Energy EO, President Trump "[t]erminat[ed]" grants created under the IRA and IIJA, and ordered all agencies to "immediately pause the disbursement of funds appropriated through" those statutes while agencies review those funds "for consistency with . . . the [President's] policy." Energy EO § 7. Likewise, the Equity EO directed agencies to "terminate . . . all . . . 'equity-related' grants or contracts" within sixty days, Equity EO § 2(b), despite the fact that Congress has mandated many equity-related grant programs, including those to benefit "disadvantaged communities," 42 U.S.C. § 7438(b)(1), "low income . . . communities," 42 U.S.C. § 7437(c)(2), "distressed borrowers" with farm loans, IRA § 22006, 136 Stat. at 2021, "underserved farmers, ranchers, or forest landowners," those who

"experienced discrimination . . . in Department of Agriculture farm lending programs," or are "living in high poverty areas," and to "address racial equity issues" within agencies. IRA, § 22007, 136 Stat. at 2021–23; *see also* American Rescue Plan Act of 2021, § 1006(b)(3), 135 Stat. at 13 (appropriating funds that USDA "shall" use to "address racial equity issues within the Department of Agriculture and its programs"). The DOGE EO directed federal agencies, "in consultation with the agency's DOGE Team Lead," to "terminate or modify . . . contracts and grants to . . . advance the policies of [the Trump] Administration." DOGE EO § 3(b).

The agencies followed suit with their Program Freezing Actions, including the First OMB Memo; Second OMB Memo; EPA Memo; USDA Directive; EPA Notice of DOGE Approval Requirement; EPA Executive Order Compliance Review Requirement; DOT Secretary's Directive; DOT Memo; agency actions to block or prevent Plaintiffs from accessing the online portals needed to withdraw their awarded funds, and other agency actions that prevent Plaintiffs from accessing their awarded funds.

For example, the first OMB Memo "requires agencies to immediately pause disbursements of funds appropriated under the [IRA and IIJA] . . . that may be implicated by" President Trump's "policy" in the Energy EO. E.C.F. 23-5, Ex. A at 2. The Second OMB Memo orders that all "Federal agencies **must temporarily pause** . . . all financial assistance . . . that may be implicated by the executive orders, including, but not limited to, financial assistance for . . . nongovernmental organizations, DEI, . . .and the green new deal." E.C.F. 23-6, Ex. B at 3 (emphasis in original). The EPA Memo orders staff to pause all funds under the IRA and IIJA to "allow for the review of processes, policies and programs" for consistency with President Trump's policies. E.C.F. 23-8, Ex. D at 2. EPA has also ordered staff, for "all funding actions," to complete and sign a form attesting that the funds "compl[y] with Executive Order requirements."

17

E.C.F. 23-9, Ex. E at 1. The DOT Secretary's Directive notes President Trump's orders "to identify and eliminate all . . . funding agreements . . . which reference or relate in any way to climate change, 'greenhouse gas' emissions, racial equity, gender identity, 'diversity, equity, and inclusion' goals, [or] environmental justice," and instructs staff to "rescind, cancel, revoke, and terminate all DOT . . . funding agreements . . . which are subject to the relevant executive orders and which are not required by clear and express statutory language." E.C.F. 23-12, Ex. H at 1. And the DOE memo directs that "[a]ll funding and financial assistance activities including . . . grants . . . shall not be . . . provided" until a review takes place to ensure they are consistent with "Administration policy." E.C.F. 23-13, Ex. I.

Each of these Executive Orders and Program Freezing Actions disregards Congress's statutory directives and withholds congressionally appropriated funding based solely on the President's policy preferences. "But '[a]bsent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals.'" *New York*, 2025 WL 715621, at *11 (quoting *City & Cnty. of S.F.*, 897 F.3d at 1235). As then-Circuit Judge Kavanaugh explained, "a President sometimes has policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program. But in those circumstances, even the President does not have unilateral authority to refuse to spend the funds." *In re Aiken Cnty.*, 725 F.3d at 261 n.1.

Applying this black letter constitutional law, three federal courts have already concluded that President Trump's unilateral freeze of federal funds based on his policies—not Congress's— likely violates the separation of powers. *PFLAG, Inc.*, 2025 WL 685124, at *1 ("The challenged provisions of the Executive Orders place significant conditions on federal funding that Congress did not prescribe. This, the Constitution simply does not allow . . . ."); *Nat'l Council of*

*Nonprofits*, 2025 WL 368852, at *12 (noting potential for Defendants' actions to "run roughshod over a 'bulwark of the Constitution' by interfering with Congress's appropriation of federal funds."); *New York v. Trump*, No. 25-cv-39, 2025 WL 357368, at *2 (D.R.I. Jan. 31, 2025) ("Congress has not given the Executive limitless power to broadly and indefinitely pause all funds that it has expressly directed to specific recipients and purposes . . . .").

For the same reasons, the funding freeze effectuated by the Executive Orders and Program Freezing Actions violates the Constitution's separation of powers by infringing on Congress's power to spend, U.S. Const. art. I, § 8, cl. 1, appropriate, *id.* art. I, § 9, cl. 7, and legislate, *id.* art. I, § 1.

### b. *The Executive Orders and Program Freezing Actions Violate the First Amendment*[5]

The First Amendment prohibits the government from restricting speech based on its content or viewpoint. The Supreme Court has long recognized that government actions that target speech based on its subject matter or the viewpoint expressed are presumptively unconstitutional and subject to strict scrutiny. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828–29 (1995). Such viewpoint-based discrimination is a "blatant" and "egregious" form of government interference with free speech. *Id.* at 829. Government actions limiting speech must be the least restrictive means of achieving a compelling state interest. *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021). This protection extends to both individuals and organizations, including advocacy efforts. *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 429–30 (1963).

Furthermore, the government cannot condition benefits or financial assistance on the

---

[5] This claim is limited to the nonprofit Community Group plaintiffs.

suppression of protected speech, especially when such a denial of support is based on the viewpoint or content of the expression. *Speiser v. Randall*, 357 U.S. 513, 518 (1958). The Executive Orders and Program Freezing Actions plainly constitute viewpoint-based discrimination, and Defendants cannot show that their actions are "narrowly tailored" to serve "compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163–64 (2015).

The Equity EO mandated the termination of all "equity-related grants." Equity EO § 2(b)(i). Following the release of the Equity EO, the Administration has taken continuing actions to attack and penalize speech and viewpoints related to the Administration's disfavored notions of diversity, equity, and inclusion. The Second OMB Memo directed agencies to identify federal funding recipients advancing policies labeled by the Administration as "Marxist equity, transgenderism, and green new deal social engineering," "review currently pending Federal financial assistance announcements to ensure Administration priorities are addressed," and even "cancel awards already awarded that are in conflict with Administration priorities." E.C.F. 1-2 at 2–3. This broad directive targets federal funding recipients based on their viewpoints, blocking, freezing, or cancelling grants without a legitimate—let alone compelling—interest.

To implement the Equity EO, EPA is using a flowchart to identify which grants to freeze or cancel based on the presence of certain arbitrary keywords representing viewpoints disfavored by the Administration. E.C.F. 1-8. This unconstitutional viewpoint-based discrimination penalizes Community Group Plaintiffs for including terms and viewpoints in their grant materials that Congress prioritized for funding, even though the grantees were selected expressly to advance climate and environmental justice work central to their missions.

The Program Freezing Actions also violate the First Amendment by using direct and indirect means to chill speech and activities that advance equity, climate, and environmental

justice. The Supreme Court has repeatedly struck down actions that chill protected speech and held that "constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights," *Laird v. Tatum*, 408 U.S. 1, 11 (1972). Plaintiffs are concerned about potential retaliation or ability to secure future federal funding for even participating in this lawsuit. *E.g.*, Pasa decl., Ex. 12 ¶ 37; Earth Island Institute decl., Ex 8 ¶ 19; Bronx River Alliance decl., Ex. 5 ¶ 22. The Administration's actions create a widespread chilling effect that constitutes the kind of "present objective harm or . . . threat of specific future harm" prohibited under the First Amendment. *Laird*, 408 U.S. at 14.

### c. *The Program Freezing Actions Violate the APA*

#### i. *The Program Freezing Actions Are 'Final Agency Action'*[6]

The APA allows judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Agency action is "final" if it (*i*) "mark[s] the consummation of the agency's decisionmaking process," and (*ii*) is an action "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal citations omitted).

The Program Freezing Actions[7]—including the First OMB Memo; Second OMB Memo; EPA Memo; USDA Directive; EPA Notice of DOGE Approval Requirement; EPA Executive

---

[6] Although the Program Freezing Actions constitute "final agency action," this showing is not required for Plaintiffs' non-APA constitutional claims against these Actions. *See PFLAG, Inc.*, 2025 WL 685124, at *9 n.26 ("[F]inal agency action is only required for a claim under the APA, not for *ultra vires* claims for equitable relief." (citing *Trudeau v. FTC*, 456 F.3d 178, 187 (D.C. Cir. 2006))). However, the APA provides an additional vehicle for Plaintiffs' constitutional claims as the Program Freezing Actions are "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B). *Infra* at 28.

[7] By separate motion, Plaintiffs seek discovery to determine if additional final agency actions led to the freeze of their grants.

Order Compliance Review Requirement; DOT Secretary's Directive; DOT Memo; agency actions to block or prevent Plaintiffs from accessing the online portals needed to withdraw their awarded funds, and other agency actions that prevent Plaintiffs from accessing their awarded funds—constitute "final agency action" under the APA, 5 U.S.C. § 704. The Program Freezing Actions mark the consummation of each agency's decisionmaking process as to whether funds appropriated under the IRA, IIJA, and other statutes, and "equity-related" funding, are frozen or otherwise inaccessible to Plaintiffs. *See New York*, 2025 WL 715621, at *8–9.

The Program Freezing Actions also create legal consequences.  The funding freeze has led to massive disruptions on Plaintiffs' operations and programmatic work. For example, Baltimore has been forced to put its YH20+ program on hold, which results in lost job training opportunities for potential future city employees. Baltimore decl., Ex. 13 ¶ 7. Many Plaintiffs have been forced to adjust workplans. *E.g.,* CleanAIRE decl., Ex. 6 ¶ 11; Sustainability Institute decl., Ex. 1 ¶¶ 37, 39.  Plaintiffs are experiencing budgetary challenges, Agrarian Trust decl., Ex. 2 ¶ 17, including the ability to meet payroll and pay its staff, OAK decl., Ex.11 ¶¶ 19, 20. The freeze has impeded Plaintiffs from large purchases, including the purchase of farms, Agrarian Trust Agrarian Trust decl., Ex. 2; decl. ¶ 15; it has delayed the certification of farm products. RAFI-USA decl., Ex. 13 ¶ 12.  These and other effects of the funding freeze are "direct, appreciable legal consequences that [Plaintiffs] have suffered from . . . Defendants' actions implementing the funding pauses." *New York*, 2025 WL 715621, at *9.

### ii.  The Program Freezing Actions Are Arbitrary and Capricious

The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under this standard, courts "must ensure that the agency has examined the relevant

data and articulated a satisfactory explanation for its decision," *Def's of Wildlife v. U.S. Dep't of Interior*, 931 F.3d 339, 345 (4th Cir. 2019), "including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation omitted). Agency action is arbitrary and capricious when the agency "has relied on factors which Congress has not intended it to consider, [or] entirely failed to consider an important aspect of the problem . . . ." *Id.*

The Program Freezing Actions are arbitrary and capricious for at least three reasons.

***First***, these agency actions indefinitely froze funding without considering the "serious reliance interests" of recipients, including Plaintiffs, on those funds. *F.C.C. v. Fox Television Stations*, 556 U.S. 502, 515 (2009). Where, as here, federal agencies are "not writing on a blank slate," they must "assess whether there were reliance interests [on the prior policy], determine whether they were significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 33 (2020).

The Program Freezing Actions flout these requirements. Plaintiffs have made major decisions and invested significant resources in response to congressional direction and in reliance on appropriated and awarded grant funding. For example, Pasa has over $1 million in past-due, unreimbursed expenditures on its grants. Pasa decl., Ex. 12 ¶¶ 13, 16, 17. The Conservation Innovation Fund committed $1.9 million in grant funds to twenty-nine farms in February 2025 to purchase equipment, seed, and services; the farmers had planned their growing season around receiving these funds in February, but USDA has frozen these funds. Cons. Innovation decl., Ex. 7 ¶ 10. RAFI-USA invested over $90,000 in expenses and staff time in reliance on their Increasing Land Access Grant and Rural Development Policy Cooperative Agreement funding. RAFI-USA decl., Ex. 13 ¶ 14. New Haven already has people enrolled in its EJG2G program,

23

whose funding is suspended.  New Haven decl., Ex. 18 ¶¶ 13–15. There is no doubt Plaintiffs "legitimate[ly]" relied on their grant funds being available on the terms specified in their agreements and governing regulations. *See Regents of Univ. of Cal.*, 591 U.S. at 30; *see also Massachusetts v. Nat'l Institutes of Health*, No. 25-CV-10338, 2025 WL 702163, at *19 (D. Mass. Mar. 5, 2025) ("Even if the reasons provided had been more thorough and sufficient, the [decision] fails in its entirety to recognize or consider the substantial reliance interests at issue.").

In ordering this "immediate[]" freeze, ECF No. 1-1 at 2, the Program Freezing Actions "cut the fuel supply to a vast, complicated, nationwide machine—seemingly without any consideration for the consequences of that decision." *Nat'l Council of Nonprofits*, 2025 WL 368852, at *11. "Defendants essentially adopted a 'freeze first, ask questions later' approach that 'entirely failed to consider [multiple] important aspect[s] of the problem.'" *Nat'l Council of Nonprofits*, 2025 WL 597959, at *14 (quoting *State Farm*, 463 U.S. at 43); *see also California v. U.S. Dep't of Educ.*, No. 25-1244, 2025 WL 878431, at *4 (1st Cir. Mar. 21, 2025) (noting that, in terminating supposed "DEI" education grants, "it does not appear that the [government] properly considered the reliance interests of grant recipients and program participants or that it accounted for all relevant impacts of cutting off funding to programs already in place").

**Second**, the Program Freezing Actions rely "on factors which Congress has not intended [them] to consider." *State Farm*, 463 U.S. at 43. Specifically, the Program Freezing Actions indefinitely froze funds based on the stated policies of President Trump contrary to Congress's purposes and directives for appropriating funds in these and other statutes. *See California*, 2025 WL 878431, at *4 (finding agency relied on factors Congress did not intend it to consider in freezing DEI-related grants). The Program Freezing Actions disregard the purposes, factors, and directives legislated by Congress to guide executive branch spending of Congressional

appropriations. *See* Ex. 21. Instead, the agencies froze funding based on the policies of President Trump, which are entirely different from and, in many cases, directly conflict with Congress's express policies in the IRA, IIJA, and other statutes. *See supra* at 3–5, 7–12; *infra* at 26–27.

"Congress has instructed the Executive to provide funding to [Plaintiffs] based on stated statutory factors," yet the Program Freezing Actions "unilaterally suspend[] the payment of federal funds . . . simply by choosing to do so, no matter the authorizing or appropriating statute, regulatory regime, or the terms of the grant itself." *New York*, 2025 WL 357368, at *2. In freezing the grants of Plaintiffs and others, the Program Freezing Actions plainly rely on Presidential policies "Congress has not intended [them] to consider." *State Farm*, 463 U.S. at 43.

**Third**, the Program Freezing Actions fail to articulate a reasoned analysis for their reversal of executive policy, or to consider obvious alternatives that would serve their stated aim of reviewing funding programs. *See Regents of Univ. of Cal.*, 591 U.S. at 30 ("[W]hen an agency rescinds a prior policy its reasoned analysis must [also] consider the alternatives that are within the ambit of the existing policy."). The Program Freezing Actions reverse the prior administration's actions to administer grant programs mandated by Congress without any articulation of the reasoning behind the reversal or any consideration of alternative paths—including conducting their review of federal funding programs *without* freezing funds. *See Nat'l Council of Nonprofits*, 2025 WL 368852, at *11.

In sum, the freeze of funds epitomizes agency action by "whim and caprice of the bureaucracy." *N.C. Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 772 (4th Cir. 2012) (Wilkinson, J., concurring).

### iii.   The Program Freezing Actions Substantively Violate the APA

The APA requires courts to hold unlawful and set aside agency actions "not in accordance

with law," "contrary to constitutional right, power, privilege, or immunity," "in excess of statutory jurisdiction, authority, or limitations," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)–(D). The Program Freezing Actions substantively violate the APA for at least four reasons.

**First**, neither the Constitution nor any federal law gives the executive branch the power to unilaterally freeze funding appropriated by Congress and obligated by executive agencies. *See F.E.C. v. Cruz*, 596 U.S. 289, 301 (2022).

**Second**, the Program Freezing Actions are contrary to the IRA, IIJA, and other federal statutes where Congress created grant programs and appropriated funds to the agencies to operationalize those programs. For example:

- Congress created the "Environmental and Climate Justice Block Grants" program to "benefit disadvantaged communities," appropriated more than $2 billion for the program, and directed that EPA "***shall***" use the funds on grants to carry out this program. IRA § 60201, 136 Stat. at 2078–79 (codified at 42 U.S.C. § 7438) (emphasis added).

- Congress established the "Greenhouse Gas Air Pollution Plans and Implementation Grants" program, appropriated more than $5 billion for the program, and directed that EPA "***shall***" use to those funds to award grants to projects for "the reduction of greenhouse gas air pollution." IRA § 60114, 136 Stat. at 2076–77 (codified at 42 U.S.C. § 7437 (emphasis added).

- Congress appropriated $2.9 billion to USDA for a grant program for agricultural projects to benefit "underserved farmers" and those who have "experienced discrimination" in USDA programs. IRA § 22007, 136 Stat. at 2021–23.

- Congress appropriated $3.1 billion that USDA "***shall***" use to relieve "distressed borrowers" with farm loans. IRA § 22006, 136 Stat. at 2021 (emphasis added).

- Congress appropriated over $18 billion to USDA and directed that it "***shall***" use these funds to support agricultural projects that "directly improve soil carbon, reduce nitrogen losses, or reduce, capture, avoid, or sequester carbon dioxide, methane, or nitrous oxide emissions, associated with agricultural production." IRA § 21001, 136 Stat. at 2015–16.

- Congress appropriated $238 million in funds that EPA "***shall***" use to protect and restore Chesapeake Bay. IIJA § 601, 135 Stat. at 1396 (emphasis added))

26

- Congress appropriated $200 million annually and mandated that DOT "***shall obligate***" certain portions of those funds for specified transportation projects. IIJA § 11529(a)–(j), 135 Stat. at 612–15 (emphasis added).

- Congress appropriated $2.5 billion for "Charging and Fueling Infrastructure Grants," IIJA § 11101(b)(1)(C)(i)–(v), 135 Stat. at 445, for projects to "deploy publicly accessible electric vehicle charging infrastructure," among other purposes. *Id.* § 11401(a), 135 Stat. at 546.

- Congress appropriated funds that USDA "***shall***" use for grants for "agricultural supply chain resiliency." American Rescue Plan Act of 2021, Pub. L. 117-2, § 1001, 135 Stat. 4, 10 (emphasis added).

Spending the funds that Congress appropriated for these programs is not optional. It is the law. "Certainly, given these statutory mandates, the [government] could not [suspend] a grant merely because a recipient program attempts to [benefit] traditionally underserved communities" or "diverse populations," *California*, 2025 WL 878431, at *3, or to address "climate change," reduce "greenhouse gas emissions," or undertake any other environmental or agricultural projects disfavored by the President. Yet that is precisely what the Defendants have done in the Executive Orders and Program Freezing Actions. *See, e.g.*, ECF No. 23-5, Ex. B – Second OMB Memo at 3 (ordering federal agencies to freeze all financial assistance implicated by the Executive Orders, including for "DEI" and "the green new deal"); Ex. 23-12, Ex. H - DOT Directive, at 1 (ordering DOT to "rescind, cancel, revoke, and terminate" all funds implicated by the Executive Orders, including those "which reference or relate in any way to climate change, 'greenhouse gas' emissions, racial equity, . . . 'diversity, equity, and inclusion' goals [or] environmental justice").

***Third,*** the Program Freezing Actions violate the Impoundment Control Act ("ICA"), which sets forth an exclusive, narrow set of circumstances when the President may "defer" the spending of funds appropriated by Congress. Any agency "withholding or delaying the . . . expenditure of [funds] provided for projects or activities," or "any other type of

27

Executive action or inaction which effectively precludes the . . . expenditure of" federal funds, constitutes a "deferral" under the ICA. 2 U.S.C. § 682(1). The Executive Branch may "defer" funds only for one of three permissible reasons, *id.* § 684(b), which do *not* include the President's policy prerogatives. GAO, *Office of Management and Budget—Withholding of Ukraine Security Assistance*, B-331564, at 6 (Jan. 16, 2020), https://perma.cc/6TMT-3CH2 ("GAO, B-331564").

The Program Freezing Actions plainly are "deferrals"—Defendants are directly withholding and delaying the expenditure of appropriated funds by blocking grant funds to Plaintiffs. Defendants indisputably have not followed the ICA's requirements for notifying Congress of these deferrals, *id.* § 684(a), and the deferrals indisputably are not for one of the three permissible reasons under the ICA, *id.* § 684(b). Rather, by Defendants' own admission, the withholdings and delays are to align expenditures with the President's policy preferences, and "[t]he ICA does not permit deferrals for policy reasons." GAO, B-331564, at 6. Every day that Defendants intentionally block the disbursement of Plaintiffs' grant funds perpetuates Defendants' unlawful deferral of funds under the ICA.

**Fourth**, the Program Freezing Actions violate the separation of powers and First Amendment of the Constitution for the reasons stated above. *Supra* at 15–21. The Program Freezing Actions are thus "contrary to constitutional right, power, privilege, or immunity" and "not in accordance with law." 5 U.S.C. § 706(2)(A)–(B).

## II.    <u>A Continuing Freeze of Grants Will Irreparably Harm Plaintiffs.</u>

Absent interim relief, Plaintiffs will continue to suffer irreparable harm. The same harm also demonstrates Plaintiffs' standing, as set out in the Amended Complaint ¶¶ 17-75.  ECF 23.

*First*, Defendants' funding freeze funds threatens the Community Group Plaintiffs' continued existence. For City Plaintiffs, the freeze threatens the existence of important programs. And for all Plaintiffs, the freeze frustrates their ability to provide services in their communities and to retain their workforces.

Obstacles, such as a funding freeze, that make it more difficult for an organization to accomplish its primary mission constitute irreparable harm. *League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016); *accord Massachusetts*, 2025 WL 702163, at *30. This is particularly true when "the loss threatens the very existence of the movant's business" or would cause programs to "simply disappear." *Nat'l Council of Nonprofits*, 2025 WL 368852 at *12–13 (freeze on grants causing a loss of programs is an "existential injur[y]" for which "there can be no do over and no redress" (internal quotation omitted)); *see also Climate United Fund v. Citibank*, No. 25-cv-698, 2025 WL 842360, at *10 (D.D.C. Mar. 18, 2025) (inability to finance launched programs is irreparable harm); *Fed. Leasing, Inc. v. Underwriters at Lloyd's*, 650 F.2d 495, 500 (4th Cir. 1981) (harm to an organization's "existence and its business" is irreparable). "[L]oss of human capital and talent . . . poses yet another harm incapable of run-of-the-mill legal relief." *Massachusetts*, 2025 WL 702163, at *28 (D. Mass. Mar. 5, 2025). Notably, Plaintiffs need only show a likelihood of irreparable harm—"Damocles's sword does not have to actually fall" before an injunction issues. *Newby*, 838 F.3d at 9.

Here, if Plaintiffs' grants remain frozen, Plaintiffs will be unable to finance programs they have launched, will be required to lay off or furlough staff, and, in some instances, will be forced to cease operations. For example:

- **Sustainability Institute:** The freeze of an $11.4 million grant to build 10 energy efficient homes, and repair and weatherize 50 existing homes in Union Heights in North Charleston, has stopped work on the project and threatened its ability to

meet the grant agreement's deliverables. SI decl., Ex. 1 ¶¶ 8, 41–43.

- **The Agrarian Trust:** The freeze of a $13 million award has frustrated the purchase of four farms. Agrarian Trust decl., Ex. 2 ¶ 15. If funds are not promptly restored, Agrarian Trust may have to lay off four employees. *Id.* ¶ 18.

- **Pasa:** As a result of the freeze, Pasa is unable to make payroll for the month of March and will be forced to furlough 60 employees on April 2, 2025. Pasa decl., Ex. 12 ¶ 20. If the freeze continues, Pasa will be required to lay off 52 of these employees. *Id.* ¶¶ 21, 22. Covering unemployment benefits for these furloughed employees could bankrupt the organization. *Id.* ¶ 23. Pasa's bank has downgraded its credit rating due to the uncertainty of federal contracts. *Id.* ¶ 26.

- **RAFI-USA:** The freeze of over $14 million in grants has caused RAFI-USA to rescind a job offer and prevented hiring of additional staff. RAFI decl., Ex. 13 ¶ 14. If the freeze continues, RAFI-USA will have to lay off up to nine staff members. *Id.* ¶ 16.

- **Marbleseed:** The freeze has led the nonprofit to impose a hiring freeze, reduce employee hours and redirect staff time to other funded program areas. Marbleseed decl., Ex. 10 ¶ 27.

- **Conservation Innovation Fund:** Funding freeze on a nearly $25 million grant has critically delayed program implementation and caused a "cash crunch" that caused the departure of two full-time employees. CI decl., Ex. 7 ¶ 12. The frozen grant represents over 50% of the organization's budget. *Id.* ¶ 15.[8]

---

[8] *See also* CleanAIRE NC decl., Ex. 6 ¶¶ 4, 12 (freeze of grant for community air monitoring may result in layoffs); Alliance for Agriculture decl., Ex. 3 ¶¶ 4–5, 10 (freeze has stalled projects and may require laying off 10 contractors); Bronx River Alliance decl., Ex. 5 ¶¶ 18, 21 (freeze is causing nonprofit to adjust workplans, pay for water monitoring supply costs and equipment and hire a project coordinator) Leadership Counsel decl., Ex. 9 ¶¶ 13–14 (freeze of grants has slowed project and stopped plans to hire implementation staff); Earth Island decl., Ex. 8 ¶¶ 16, 18 (unable to implement projects and pay partners); OAK decl., Ex. 11 ¶¶ 19-21 (freeze has reduced services and put strain on cash flow, OAK plans to lay off staff,); New Haven decl., Ex. 18 ¶¶ 14, 27 (sub awardee will need to lay off staff if freeze continues; City and statutory partner have prepared job descriptions but cannot hire due to funding freeze); Madison decl., Ex. 16 ¶¶ 23, 30 (funding freeze interferes with ability to enter into agreements with subawardees and to comply with terms of existing contracts); Nashville decl., Ex. 17 ¶¶ 14, 22 (City unable to implement transit projects); San Diego decl. – Widener., Ex. 20 ¶¶ 10, 12 (City unable to plant and maintain trees);.Baltimore decl., Ex. 14 ¶ 23, 37. 45 (City unable to implement composting program, unable to run job training program and hire staff).

Just weeks ago, the court in *New York v. Trump* credited similar harms as irreparable. 2025 WL 715621, at *15. Days later, another district court found irreparable harm where the record showed that funding terminations "'upended months, if not years' of work required to implement programs that rel[ied] on the[] grants[.]" *California v. U.S. Dep't of Educ.*, No. CV 25-10548, 2025 WL 760825, at *4 (D. Mass. Mar. 10, 2025).

As the *New York v. Trump* court explained:

> It is so obvious that it almost need not be stated that when money is obligated and therefore expected (particularly money that has been spent and reimbursement is sought) and is not paid as promised, harm follows—debt is incurred, debt is unpaid, essential . . . services stop, and budgets are upended. And when there is no end in sight to the Defendants' funding freeze, that harm is amplified because those served by the expected but frozen funds have no idea when the promised monies will flow again.

*Id.* at *13. That is the challenge faced by every Plaintiff in this case. Even for those Plaintiffs whose very existence is not imminently threatened by Defendants' freezing actions, budgets have been disrupted, services have been halted, and without injunctive relief, it is impossible for Plaintiffs to plan because they "have no idea when the promised monies will flow again." *See e.g.*, , Madison decl., Ex. 16 ¶¶ 24–27, 33–34 (existing contracts are jeopardized and new contracts cannot be signed; grant term cannot be extended so delays may prevent project completion, resulting in higher energy bills and worse air quality for residents); New Haven decl., Ex. 18 ¶¶ 19 (uncertainty prevents city from making a major investment in the design of geothermal system); Baltimore decl., Ex. 14 ¶¶ 23, 37(uncertainty prevents city from investing in equipment for compost facility; frozen funding likely to prevent this year's training for careers in water and solid waste); San Diego Charvel decl., Ex. 19 ¶¶ [6, 8] (forced to develop 2026 budget based on likely loss of grant while already facing 258.2 million deficit).

*Second*, beyond the direct impacts of the funding freeze on Plaintiffs' operations, described above, "the loss of goodwill in the plaintiff's industry" including the "loss of customers, and loss of the ability to attract new customers" constitutes irreparable harm. *Salomon & Ludwin, LLC v. Winters,* 741 F. Supp. 3d. 398, 406–07 (E.D. Va. 2024) (citing *Signature Flight Supp. Corp. v. Landow Aviation Ltd. P'ship*, 442 F. App'x 776, 785 (4th Cir. 2011)). This loss of goodwill includes reputational harm caused by an interruption to the services an organization provided. *See, e.g.*, *Sogefi USA, Inc. v. Interplex Sunbelt, Inc.*, 535 F. Supp. 3d. 548, 554 (S.D.W. Va. 2021). Here, Defendents' conduct will result in lasting harm to Plaintiffs' goodwill, reputation, and relationships cultivated over many years:

- **Sustainability Institute:** The funding freeze has eroded trust with the North Charleston community, built over years of dedicated relationship-building. SI decl., Ex. 1 ¶ 45. It will impact future efforts to partner with this community. *Id.*

- **The Agrarian Trust:** The funding freeze has led to lost trust with farmers and partners regarding the ability to fulfill commitments. Agrarian Trust decl., Ex. 2 ¶ 21.

- **Pasa:** The funding freeze disrupts longstanding relationships with subrecipient groups who were anticipating financial support, breaking trust with hundreds of farmers that will be difficult to rebuild. Pasa decl.*,* Ex. 12 ¶¶ 29, 35.

- **Conservation Innovation Fund:** The organization has stopped receiving calls from farmers interested in participating in the program, and its negotiations regarding the sale of environmental benefits has been frustrated, undermining trust in the organization. CI decl., Ex. 7 ¶ 14.

- **OAK**: OAK's inability to meet its financial commitments to farmers who have already invested in plants, equipment and conservation practices and fulfill contractual obligations with partners erodes the organization's credibility and undermines the trust it has built over the years. OAK decl., Ex. 11 ¶ 23

- **Nashville:** The East Nashville Spokes project is the product of extensive community engagement and was incorporated into a city-wide Transit Referendum, which passed overwhelmingly. Nashville decl., Ex. 17 ¶ 19. The funding freeze is making it impossible for the City of Nashville to deliver on the

express wishes of its voters, undoubtedly leading to distrust and disappointment in the city government.[9]

*Third*, the violation of Plaintiffs' constitutional rights here has irreparably harmed them. Plaintiffs' grant funding has been blocked as a result of the views they expressed in their grant materials and the projects they are attempting to implement, which the Administration has made clear it opposes notwithstanding Congress's decisions to fund them. The "threatened 'loss of First Amendment rights, even for minimal periods of time, unquestionably constitutes irreparable injury.'" *Thomas v. Andino*, 613 F. Supp. 3d. 926, 953–54 (D.S.C. 2020) (quoting *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 520–21 (4th Cir. 2002)); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976). The Administration's violations of the separation of powers also uniquely harm Plaintiffs by interfering Congress' decisions to fund Plaintiffs' grant programs. "Liberty is always at stake when one or more of the branches seek to transgress the separation of powers." *Clinton v. City of New York*, 524 U.S. 417, 450 (1998) (Kennedy, J. concurring); *accord New York*, 2025 WL 357368, at *4.

*Fourth*, the existence of other injunctions providing preliminary relief against these actions does not negate Plaintiffs' irreparable injuries or the need for preliminary relief here. Since the President began blocking funding appropriated by Congress in a wide range of statutes, multiple courts have issued preliminary relief against these actions. *Supra* at 13, 18–19.

---

[9] *See also* CleanAIRE NC decl., Ex. 6 ¶ 16 (pause harms relationship with partners); Alliance for Agriculture decl., Ex. 4 ¶ 11 (stalled commitments erode trust with farmers); Leadership Counsel decl. decl., Ex. 9 ¶¶ 14, 16 (unable to fulfill obligations to community); Marbleseed decl., Ex. 10 ¶ 29 (freeze damages long relationships with farmers); Earth Island decl., Ex. 8 ¶ 18 (loss of trust as external partner; New Haven decl., Ex. 18 ¶ 15 (unable to provide assistance to those already enrolled in the program); Columbus decl., Ex. 15 ¶ 22 (residents who participated in project will not see engagement honored); Madison decl., Ex. 16 ¶ 24 (unable to honor partnership agreements) .

However, those cases addressed a more limited set of actions, and the government appears to have interpreted these orders narrowly—and has continued to freeze Plaintiffs' grants regardless.

Even if there were injunctions in place in other courts providing Plaintiffs temporary relief, "courts routinely grant follow-on injunctions against the Government, even in instances when an earlier nationwide injunction has already provided plaintiffs in the later action with their desired relief." *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 60 (D.D.C. 2020) (collecting cases). This Court "has no control over the duration or scope of" another court's TRO or preliminary injunction, and "[f]ailing to grant [preliminary injunctive relief] here when Plaintiffs have met the requirements for [it] would leave them unprotected and vulnerable to further harm." *Nat'l Council of Nonprofits*, 2025 WL 368852, at *13 n.9; *accord Mayor & City Council of Balt. v. Azar*, 392 F. Supp. 3d 602, 618–19 (D. Md. 2019).

The existence of other injunctions in other circuits, which thus far have not afforded Plaintiffs any relief, and which could be overturned, limited, or violated at any time, does not negate Plaintiffs' irreparable harm and need for injunctive relief from this Court.

### III.     The Balance of Equities and Public Interest Factors Favor an Injunction.

A party seeking a preliminary injunction must demonstrate "that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. "These factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, these factors strongly favor preliminary injunctive relief.

As a threshold matter, "there is without a doubt public interest in keeping the President from slipping the boundaries of a statutory policy and acting based on irrelevant policy preferences." *HIAS, Inc. v. Trump*, 415 F. Supp. 3d 669, 687 (D. Md. 2020) (internal citation and quotations omitted). Congress enacted a host of specific grants programs in the IRA and the IIJA,

and other federal statutes, all in the public interest. From improving access to electric vehicle charging, to providing opportunities for farmers to engage in new markets while improving our environment, to ensuring more people have access to safe weatherized housing options, Congress set forth specific priorities and enlisted nonprofits and cities to help them become reality. Moreover, many of the plaintiffs are carrying out the direct will of their constituents – implementing programs created with significant input or even votes by residents in their communities. Ensuring those Congressional and local priorities are achieved is in the public interest. It is also "well-established that the public interest favors protecting constitutional rights," *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021), and "having governmental agencies abide by federal laws that govern their existence and operations." *HIAS*, 415 F. Supp. 3d at 686; *accord Guilford Coll. v. McAleenan*, 389 F. Supp. 3d 377, 395 (M.D.N.C. 2019).

As a corollary, the government "is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Leaders of a Beautiful Struggle*, 2 F.4th at 346 (internal citation and quotations omitted). An injunction would simply require the government to honor commitments it has already made to Plaintiffs in binding grant agreements and cease its unconstitutional assault on congressionally mandated programs.

In short, the balance of equities and public interest clearly favor preliminary relief.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their Motion for Preliminary Injunction.

Respectfully submitted, this 26th day of March 2025,

/s/ Carl T. Brzorad
Carl T. Brzorad (S.C. Bar No. 105413)
SOUTHERN ENVIRONMENTAL LAW CENTER
525 East Bay Street, Suite 200
Charleston, SC 29403
Telephone: (843) 720-5270
Facsimile: (843) 414-7039
cbrzorad@selc.org

/s/ Kimberley Hunter
Kimberley Hunter (N.C. Bar No. 41333)
(Pro Hac Vice pending)
Irena Como (N.C. Bar No. 51812)
(Pro Hac Vice pending)
Nicholas S. Torrey (N.C. Bar No. 43382)
(Pro Hac Vice pending)
SOUTHERN ENVIRONMENTAL LAW CENTER
136 East Rosemary Street, Suite 500
Chapel Hill, NC 27514
Telephone: (919) 967-1450
Facsimile: (919) 929-9421
kmeyer@selc.org
icomo@selc.org
ntorrey@selc.org

*Counsel for Plaintiffs The Sustainability Institute,
Agrarian Trust, Alliance for Agriculture, Alliance
for the Shenandoah Valley, Bronx River Alliance,
CleanAIRE NC, Conservation Innovation Fund,
Earth Island Institute, Leadership Counsel for
Justice and Accountability, Marbleseed, Organic
Association of Kentucky, Pennsylvania Association
of Sustainable Agriculture, and Rural Advancement
Foundation International - USA*

/s/ Graham Provost
Graham Provost (DC Bar No. 1780222)
(Pro Hac Vice pending)
Elaine Poon (VA Bar No. 91963)
(Pro Hac Vice pending)
Jon Miller (MA Bar No. 663012)
(Pro Hac Vice pending)
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609

36

Telephone: (510) 738-6788
graham@publicrightsproject. org

*Counsel for Plaintiffs Baltimore, Maryland,
Columbus, Ohio, Madison, Wisconsin, Nashville,
Tennessee, New Haven, Connecticut, and San Diego,
California*

<u>/s/ Mark Ankcorn</u>
Mark Ankcorn, Senior Chief Deputy City Attorney
(CA Bar No. 166871)
(Pro Hac Vice pending)
1200 Third Avenue, Suite 1100
San Diego, California 92101-4100
(619) 533-5800
mankcorn@sandiego.gov

*Counsel for Plaintiff City of San Diego*

## CERTIFICATE OF SERVICE

I certify that on March 26, 2025, I electronically filed the foregoing with the Clerk of the Court by using the Court's CM/ECF system.

I served the United States Department of Energy and Chris Wright in his official capacity as the Secretary of the United States Department of Energy via certified mail at the following address:

> Department of Energy
> 1000 Independence Avenue, SW
> Washington, DC 20585

> /s/ Carl T. Brzorad
> Carl T. Brzorad (S. C. Bar No. 105413)
> SOUTHERN ENVIRONMENTAL LAW CENTER
> 525 East Bay Street, Suite 200
> Charleston, SC 29403
> Telephone: (843) 720-5270
> Facsimile: (843) 414-7039
> cbrzorad@selc.org