IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| The Sustainability Institute, *et al.*, | ) | Civil Action Number: 2:25-cv-02152-RMG |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Donald J. Trump, in his official capacity | ) | |
| as President of the United States, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

## RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### INTRODUCTION

This is not a case where, for policy reasons, the President has definitely vowed to spend less than the full amount appropriated by Congress for a particular program. Rather, this is a case where the President, like any other President, is empowered to spend the full amount appropriated by Congress for programs that are consistent with the legislation but are simply different from the particular projects selected by the previous administration. By temporarily pausing funding, the Executive has not refused to spend funding. The Executive might later determine to continue funding the original recipient for the same amount. Or, in some cases, the Executive has decided that its priorities are better served by terminating a project in consideration of directing funding elsewhere.

Plaintiffs are nonprofits and city governments, some whom have entered into final grant agreements with federal agencies. In moving for a preliminary injunction, Plaintiffs seek immediate access to funds, even if those funds are being used in ways that conflict with the Executive's priorities. Yet there are obvious problems with this request for preliminary relief. On

a basic level, Plaintiffs seek to enforce grant agreements, which they refer to as "legally binding." ECF No. 23 at ¶¶ 174, 177. As the Supreme Court expressed last week, this argument sounds in contract and can be heard only in the Court of Federal Claims. Further, these programs are lump-sum appropriations, and, as such, Congress left it up to agencies to determine how to allocate funds and to whom. Also, several Plaintiffs have not entered into a final grant agreement with the government; others admit to receiving funds or having their programs recently approved. These and other factual irregularities create legal hurdles that Plaintiffs did not even attempt to surmount in moving for a preliminary injunction. That being the case, the Court lacks jurisdiction.

Even if the Court were to overlook the above defects, Plaintiffs' claims fail on the merits. The statutory grant programs afford Defendants with discretion to decide which recipients are entitled to funding. That discretion is what allows Defendants to temporarily pause funding pending further internal review. This same discretion, consistent with grant regulations and grant terms and conditions, allows for terminating grant awards when they no longer effectuate the program goals or agency priorities.

Finally, the preliminary injunction factors weigh against broad preliminary relief. Many of Plaintiffs' claimed harms are speculative and easily remedied by money damages. In contrast, Plaintiffs' requested relief risks intrusion into the Executive's lawful prerogatives and turning this Court into an overseer of grant administration at four federal agencies.

## BACKGROUND

## I.     In the Funding Statutes, Congress Committed Funding Decisions to Agencies.

Plaintiffs seek access to federal funding from 21 grant programs allegedly funded by the Inflation Reduction Act, Pub. L. No. 117-169, 136 Stat. 1818 (Aug. 16, 2022) ("IRA"), the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429 (Nov. 15, 2021)

("IIJA"), and/or the American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 4 (March 11, 2021) ("ARP"). *See* ECF No. 24-1 at 4–6 (describing IRA, IIJA, and ARP-funded programs).[1] Through these programs, Congress authorized federal agencies to distribute funding—typically through grants—to recipients, who, in turn, perform activities consistent with the programs' purposes. Take, for example, some of the programs cited in Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction, ECF No. 24-1 ("PI Memo"):

***Environmental and Climate Justice Block Grants, see id.* at 27**: In this IRA-funded program, the Administrator of the Environmental Protection Agency ("EPA") is empowered to make grants for activities that, *in their judgment*, benefit disadvantaged communities:

> The Administrator shall use amounts made available under subsection (a)(1) to award grants for periods of up to 3 years to eligible entities to carry out activities described in paragraph (2) that benefit disadvantaged communities, *as defined by the Administrator*. 42 U.S.C. § 7438(b)(1) (emphasis added).

***Climate Pollution Reduction Grant Program, see id.* 24-1 at 5**: In this IRA-funded program, the EPA Administrator is empowered to make funding decisions related to reducing air pollution:

> The Administrator shall make funds available to a grantee under this subsection in such amounts, upon such a schedule, and subject to such conditions based on its performance in implementing its plan submitted under this section and in achieving projected greenhouse gas air pollution reduction, *as determined by the Administrator*.

42 U.S.C. § 7437(c)(3) (emphasis added).

***Conservation Technical Assistance Fund, see id* 24-1 at 7**: In this IRA-funded program, the Secretary of the United States Department of Agriculture ("USDA") "is authorized, from time to time . . . [t]o cooperate and enter into agreements with, or to furnish financial or other aid to,

---

[1] Plaintiffs generally reference "other federal statutes" under which funding arises. *See* 24-1 at 15–16. But, in the PI Memo, Plaintiffs do not address any statute outside of the IRA, IIJA, and the ARP. See ECF No. 24-1 at 4–6.

any agency, governmental or otherwise, or any person, subject to such condition as he may deem necessary for the purposes of this chapter." 16 U.S.C. § 590a(3).

*Active Transportation Infrastructure Investment Program, see id* **24-1 at 28**: In this IIJA-funded program, Congress instructs the Secretary of the United States Department of Transportation ("DOT") to use appropriations to issue grants to eligible projects:

> (a) <<NOTE: Grants.>>   In General.--Subject to the availability of appropriations, the Secretary shall carry out an active transportation infrastructure investment program to make grants, on a competitive basis, to eligible organizations to construct eligible projects to provide safe and connected active transportation facilities in an active transportation network or active transportation spine.

§ 11529(a), 135 Stat. at 612.

*Chesapeake Bay Program, see id* **No. 24-1 at 5**: In this IIJA-funded program, the EPA Administrator "*may*" provide "assistance grants . . . *subject to such terms and conditions as the Administrator considers appropriate*." 33 U.S.C. § 1267(d)(1) (emphasis added).

*Food Supply Chain and Agriculture Pandemic Response, see id* **No. 24-1 at 28**: In this ARP-funded program, Congress authorized the Secretary of Agriculture to make grants to certain food industry groups for COVID-19 response activities or to "provide other assistance to maintain and improve food and agricultural supply chain resiliency." ARP, § 1001, 135 Stat. at 10.

Additionally, Plaintiffs do not mention the Commodity Credit Corporation Charter Act ("CCC Charter Act") in their PI Motion, but it is cited throughout the Amended Complaint. ECF No. 23 at ¶¶ 169-70; 15 U.S.C. § 714 *et seq*. The Congressional Research Service has stated "the CCC Charter Act [ ] grants the Secretary of Agriculture broad powers and discretion to use the CCC," while noting that this "discretionary authority in recent years is perhaps less controversial than the total amount authorized." Stubbs, Megan (January 14, 2021) The Commodity Credit Corporation (CCC), CRS Report R44606, https://www.congress.gov/crs-product/R44606. The

CRS also observed that OMB "plays a role in how CCC funds are administered . . ., which allows OMB to set a limit on the funds available . . . ." *Id.*

## II.    Executive Actions Regarding Funding

In the *Unleashing American Energy* EO, Exec. Order No. 14,154, 90 Fed. Reg. 8353 (Jan. 20, 2025), the President declared that it "is the policy of the United States" to, in part, ensure "that an abundant supply of reliable energy is readily accessible" and to "eliminate the 'electric vehicle (EV) mandate' and promote true consumer choice, which is essential for economic growth and innovation, by removing regulatory barriers to motor vehicle access[.]" *Id.* § 2(c), (e). The President further declared that the United States should "ensure that no Federal funding be employed in a manner contrary to the principles outlined in this section, unless required by law." *Id.* § 2(i). To accomplish these policies, the *Unleashing American Energy* EO directed that, to the extent permissible by law, agencies should pause disbursements for funds appropriated under the IRA and IIJA, pending a review process. *Id.* § 7(a).

In the *Ending Radical and Wasteful Government DEI Programs and Preferencing* EO, Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025), the President declared that "illegal and immoral discrimination programs" were implemented under the name "diversity, equity, and inclusion (DEI)." § 1. The President further declared that "Americans deserve a government committed to serving every person with equal dignity and respect, and to expending precious taxpayer resources only on making America great." *Id.* Relevant here, the President then directed agencies to "terminate, to the maximum extent allowed by law . . . 'equity-related' grants or contracts." *Id.* at § 2(i).

In the *Implementing the President's "Department of Government Efficiency" Cost Efficiency Initiative* EO, Exec. Order No. 14222, 90 Fed. Reg. 11095 (Feb. 26, 2025), the President

directed a review of "all existing covered contracts and grants and, where appropriate and consistent with applicable law, [directed agencies to] terminate or modify (including through renegotiation) such covered contracts and grants to reduce overall Federal spending or reallocate spending to promote efficiency and advance the policies of my Administration." *Id.* at § 3(b). "'Covered contracts and grants' means discretionary spending through Federal contracts, grants, loans, and related instruments, but excludes direct assistance to individuals . . . ; and other critical, acute, or emergency spending, as determined by the relevant Agency Head." *Id.* at § 2(d).

OMB issued guidance regarding the *Unleashing American Energy* EO. *See* OMB Memorandum M-25-11, *Guidance Regarding Section 7 of the Executive Order Unleashing American Energy* (Jan. 21, 2025), https://www.whitehouse.gov/briefings-statements/2025/01/omb-memo-m-25-11/ (filed at ECF No. 23-1). In particular, OMB stated that Section 7's pause on disbursement "only applies to funds supporting programs, projects, or activities that may be implicated by the policy established in Section 2 of the order." *Id.* Additionally, OMB stated that "[a]gency heads may disburse funds as they deem necessary after consulting with the Office of Management and Budget." *Id.*

OMB also issued Memorandum M-25-13, which directed agencies to analyze any programs "that may be implicated by any of the President's executive orders," and to pause funding on any activities that may be implicated by the EOs "[i]n the interim, to the extent permissible under applicable law." OMB Mem. M-25-13, *Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs*, at 2 (Jan. 27, 2025) (filed at ECF No. 23-2).

## III.    Historical Pauses in Funding

Other Presidents have directed agencies to temporarily pause funding to re-evaluate that funding, including for policy concerns. For example, President Biden directed agencies to "pause

work on each construction project on the southern border wall" and to "pause immediately the obligation of funds related to construction of the southern border wall," pending "consideration of terminating or repurposing contracts with private contractors engaged in wall construction" for other purposes. Procl. No. 10,142, *Termination of Emergency With Respect to the Southern Border of the United States and Redirection of Funds Diverted to Border Wall Construction*, 86 Fed. Reg. 7225 (Jan. 20, 2021), §§ 1(a)(i), (ii), 2.

Similarly, President Obama directed that certain Recovery Act funds should not be spent on particular purposes, and even "[w]here executive departments or agencies lack discretion under the Recovery Act to refuse funding" for those projects, the department or agency should nonetheless "delay funding of the project for 30 days[.]" *Ensuring Responsible Spending of Recovery Act Funds*, 74 Fed. Reg. 12531 (Mar. 20, 2009), § 2(d)(i). This direction of agencies' spending decisions, including to pause funding over which the President has policy concerns, is indistinguishable from the types of pauses that Plaintiffs seek to challenge here.

Finally, courts and other entities have noted that temporary pauses in obligations or payments of appropriations are common. *See City of New Haven v. United States*, 809 F.2d 900, 901 (D.C. Cir. 1987) (explaining how Congress has previously "acknowledged that 'the executive branch necessarily withholds funds on hundreds of occasions during the course of a fiscal year' and such delays may result from the 'normal and orderly operation of the government") (quoting H.R. Rep. No. 658, 93d Cong., 1st Sess. 41 (1971)). The Government Accountability Office, itself an entity within the Legislative Branch, has also approved of agencies "taking the steps it reasonably believes are necessary to implement a program efficiently and equitably, even if the result is that funds temporarily go unobligated." *In re James R. Jones*, *House of Representatives*, B-203057 L/M, 1981 WL 23385 (Comp. Gen. Sept. 15, 1981); *see also* GAO, *Principles of*

*Federal Appropriations Law*, § 2-50 (4th ed. 2016).

**IV.    The Supreme Court's Ruling in *Department of Education v. California***

In *Department of Education v. California,* No. 24A910, 2025 WL 1008354 (Apr. 4, 2025) *(per curiam)*, the plaintiffs sought preliminary relief enjoining the government from terminating grant awards under two programs administered by the United States Department of Education. The United States District Court for the District of Massachusetts entered injunctive relief against the government. *See California v. U.S. Dep't of Educ.*, No. 25-10548-MJJ, 2025 WL 760825 (D. Mass. Mar. 10, 2025). The First Circuit Court of Appeals affirmed. *See California v. U.S. Dep't of Educ.*, No. 25-1244, 2025 WL 878431, at *2 (1st Cir. Mar. 21, 2025).

On April 4, 2025, the Supreme Court stayed the orders entered by the Massachusetts District Court, explaining that the government is "likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." 2025 WL 1008354, at *1. The Court explained, suits seeking relief like that sought by the *California* plaintiffs likely are subject to the Tucker Act, and, thus, belong in the Court of Federal Claims. *Id*. In addition, the Court concluded that the remaining stay factors were met, because the government will be harmed if it is unable to "recover the grant funds once they are disbursed" while, conversely, grant recipients "can recover any wrongfully withheld funds through suit in an appropriate forum." *Id*.

In *New York v. Trump*, No. 25-cv-39—a case on which Plaintiffs rely in their Amended Complaint, *see, e.g.*, ECF No. 23 at ¶ 240, and their PI Memo, ECF No. 24-1 at 14—the District of Rhode Island granted an emergency motion to stay the order enforcing the preliminary injunction, in light of the Supreme Court's decision in *California*. *See New York v. Trump*, No. 1:25-cv-39 (JJM) (Text Order entered Apr. 7, 2025).

## LEGAL STANDARDS

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Both preliminary injunctions and temporary restraining orders "involv[e] the exercise of a very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola*, 245 F.3d 335, 339 (4th Cir. 2001) (citation omitted). Plaintiffs must "*by a clear showing*" establish that (1) they have a substantial likelihood of success on the merits; (2) they will suffer irreparable harm without an injunction; (3) the balance of equities tips in their favor; and (4) preliminary relief serves the public interest. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Plaintiffs must establish each of the four factors in order to qualify for injunctive relief. *See Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013) (acknowledging that the Fourth Circuit recalibrated its preliminary injunction balancing test in light of the Supreme Court's decision in *Winter*).

## ARGUMENT

### I.   Plaintiffs Have Not Established This Court Has Jurisdiction Over Grant Challenges.

Here, Plaintiffs bring claims under the Administrative Procedures Act ("APA"), 5 U.S.C. § 702, and the United States Constitution. But these sources do not confer jurisdiction for the three reasons explained below.

#### A.   The Court Lacks Jurisdiction to Compel Payments Pursuant to Grant Agreements.

The Tucker Act confers exclusive jurisdiction on the United States Court of Federal Claims to hear cases involving express or implied contracts with the United States, which exceed $10,000. 28 U.S.C. § 1491(a)(1). One the other hand, the Administrative Procedures Act ("APA") confers jurisdiction in district courts for claims "seeking relief *other than money damages*" for agency action alleged to be contrary to federal law. 5 U.S.C. § 702 (emphasis added).

Critically, though, APA review is available only for "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. "If a suit at its base is a claim for money, and the relief available in the CFC provides an adequate remedy, then the analysis is at an end." *South Carolina v. United States*, 221 F. Supp. 3d 684, 694 (D.S.C. 2016). Such a claim has no place in district court.

In *California*, the Supreme Court addressed this issue in the same context that Plaintiffs' claims arise, i.e., grant awards. 2025 WL 1008354. The Supreme Court explained that the government is "likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." Slip. Op. 1–2. Instead, according to the Supreme Court, suits seeking relief like that sought by the *California* plaintiffs likely belong in the Court of Federal Claims:

> The APA's waiver of sovereign immunity does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. §702. Nor does the waiver apply to claims seeking "money damages." *Ibid.* True, a district court's jurisdiction "is not barred by the possibility" that an order setting aside an agency's action may result in the disbursement of funds. *Bowen* v. *Massachusetts*, 487 U.S. 879, 910 (1988). But, as we have recognized, the APA's limited waiver of immunity does not extend to orders "to enforce a contractual obligation to pay money" along the lines of what the District Court ordered here. *Great-West Life & Annuity Ins. Co.* v. *Knudson*, 534 U.S. 204, 212 (2002). Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on "any express or implied contract with the United States." 28 U.S.C. §1491(a)(1).

*Id.* at 2.

This logic applies here. Plaintiffs assert that they have entered into "binding grant agreements" with the government. ECF No. 24-1 at 36; *see also* No. 23 at ¶¶ 174, 177. They assert that the government has "provided funding up to a specified dollar amount, over a specified time period, for specified work." ECF No. 24-1 at 6. And they assert that the government has not abided by the grant agreements and regulations. ECF No. 23 at ¶ 197. As a result, they seek an injunction

preventing the government from freezing or terminating access to "their funds." See ECF No. 24 at 4. Plaintiffs characterize this remedy, in part, as "simply requir[ing] the government to honor commitments it has already made to Plaintiffs in binding grant agreements" or, in other words, to abide by its contracts. ECF No. 24-1 at 36.

Accordingly, Plaintiffs' APA claim runs headlong into the jurisdictional problem implicated in *California*. Plaintiffs' Amended Complaint demonstrates that all of the allegations that are claimed to result in APA, constitutional, or other *ultra vires* violations are closely connected with Plaintiffs' status as grantees and arise directly out of what Plaintiffs collectively call the "Program Freezing Actions." *See* ECF No. 23 at ¶¶ 186-238.

Plaintiffs tie the "Program Freezing Actions" that are referenced in each and every cause of action directly to the monetary relief Plaintiffs seek.   *See*, *e.g.*, *id*. at ¶ 238 (asserting that "EPA, USDA, DOT and DOE have blocked Plaintiffs' access to the websites and portals needed to access funds, frozen or labeled as 'suspended' the accounts containing the grant funds to prevent Plaintiffs from drawing down funds, informed Plaintiff orally that funds are frozen and cannot be drawn down, and communicated through state agencies that expenditures may not be reimbursed, usually with no explanation or justification"). Plaintiffs' allegations include (a) pausing or terminating funding to grantees as described in Count I (*see*, *e.g.*, ECF No. 23 at ¶¶ 293, 300); (b) freezing or blocking funding to grantees as described in Count II (*see id*. at ¶ 307); (c) preventing Plaintiffs from accessing grant funds or freezing funds to grantees as described in Count III (*see id*. at ¶ 310); (d) freezing or blocking or delaying expenditure of funds as described in Count IV (*see id*. at ¶¶ 321, 325); (e) blocking, freezing, or cancelling grant funding as described in Count V (*see id*. at ¶ 337); (f) pausing or terminating obligated grant funds as described in Count VI (*see id*. at ¶¶ 342-344).

Plaintiffs, like the *California* plaintiffs, challenge the Government's grant decisions made in the wake of *Ending Radical and Wasteful Government DEI Programs and Proficiency EO*. *Compare* ECF No. 23 at 4 *with* Case 1:25-cv-10548-MJJ, ECF No. 1 (hereinafter "*California* Complaint") at ¶ 102. Plaintiffs in both cases seek to enjoin the Government from terminating federal grants. *Compare* ECF No. 23 at 90-91, ¶ F *with California* Complaint at 52 ¶ iv. Both sets of Plaintiffs seek relief in the form of an order effectively requiring "the Government to pay out past-due grant obligations and to continue paying obligations as they accrue." *Compare* ECF No. 23 at 91, ¶ G with *California*, 2025 WL 1008354, at * 1 and *California* Complaint at 51, ¶ iii.

It would be no answer for Plaintiffs that *California* did not involve constitutional claims. "The source of rights upon which [Plaintiffs] base [their] claims" and "the type of relief sought" establish that Plaintiffs' constitutional claims are, like their APA claims, essentially contract claims. *See U.S. Conference of Catholic Bishops*, 2025 WL 763738, at *4 (quoting *Albrecht v. Comm. on Emp. Benefits of Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 68 (D.C. Cir. 2004) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)); *see also Jackson v. United States*, 192 Ct. Cl. 765, 428 F.2d 844, 845-46 (1970) (First Amendment claim properly brought in Court of Claims because court's jurisdiction arose from pay legislation); *Swaaley v. United States*, 180 Ct. Cl. 1, 376 F.2d 857, 858 (1967) (same). Plaintiffs "may not, by the simple expedient of lumping [their] contract claims together and denominating them a constitutional violation, escape the procedural limitations of the Tucker Act." *Metadure Corp. v. United States*, 490 F. Supp 1368, 1373 (S.D.N.Y. 1980). Indeed, to permit this approach "would subvert the jurisdiction of the Court of Claims, and might enable [Plaintiffs] to gain duplicate relief for the same alleged wrong." *Id*. (internal citation omitted).

As shown above, Plaintiffs' allegations regarding constitutional violations are tied to Plaintiffs' status as grantees. Likewise, the relief sought is essentially for "the government to keep paying up." *U.S. Conference of Catholic Bishops*, 2025 WL 763738, at *5; *see also* ECF No. 23 at 89-91 (asking the Court to order the government to stop withholding grant funds). Consequently, adjudicating Plaintiffs' claims and considering the relief sought depend upon an interpretation of Plaintiffs' grants with the United States.

It is also no answer to assert that, despite the admitted exchange of federal money for specified work and *California*, section 6304 of the Federal Grant and Cooperative Agreement Act of 1977, 31 U.S.C. § 6301 et seq. ("the Grant Act") compels a finding that grant agreements are not contracts. The Grant Act, which distinguishes between procurement contracts, grant agreements, and cooperative agreements as legal instruments, "does not address even obliquely the scope of this court's Tucker Act contract jurisdiction." *Thermalon Indus., Ltd. v. United States*, 34 Fed. Cl. 411, 417 (1995).

Indeed, courts applying 28 U.S.C. § 1491(a)(1)—the statute that *does* govern Tucker Act jurisdiction—have held that grant agreements and cooperative agreements are contracts for jurisdictional purposes where "the standard conditions for a contract are satisfied." *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021); *see also U.S. Conf. of Catholic Bishops*, 2025 WL 763738, at *7 (request to grant plaintiffs access to federal funding under cooperative agreements was "founded upon a contract for purposes of the Tucker Act") (citations and quotations omitted); *Pa. Dep't of Pub. Welfare v. United States*, 48 Fed. Cl. 785, 790 (2001) (noting that it "is not this Court's position that grants can never be contracts within Tucker Act jurisdiction").

Plaintiffs' APA, separation of powers, and First Amendment arguments fail for lack of

subject matter jurisdiction. The only permissible reading of Plaintiffs' Complaint is that it "seeks essentially a monetary award." *South Carolina,* 221 F. Supp. 3d at 696–96*.* As such, Plaintiffs cannot demonstrate likelihood of success on the merits of their claims. *See California*, 2025 WL 1008354.

**B.     The Court Lacks Jurisdiction to Review the Agencies' Discretionary Decisions Regarding How to Allocate Funds.**

Even if Plaintiffs' claims are not contractual in nature, the APA itself would likely preclude review, as many funding decisions are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *see, e.g.*, *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) ("The allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion."); *Holbrook v. Tennessee Valley Auth.*, 48 F.4th 282 (4th Cir. 2022) (applying 5 U.S.C. § 701(a)(2) and affirming dismissal for lack of subject-matter jurisdiction).

In *Lincoln*, the Supreme Court held that the Indian Health Service's decision to discontinue a program it had previously funded and to instead reallocate those funds to other programs was not reviewable under the APA's reasoned-decision-making standards. 508 U.S. at 185–88. The Court explained that the "allocation of funds from a lump-sum appropriation is" committed to agency discretion." *Id.* at 192.

Consistent with *Lincoln*, courts have held that funding decisions are "committed to agency discretion." *Holbrook*, 48 F.4th at 291 ("[D]ecisions that involve resource allocation and the need for flexibility to adapt to changing circumstances" are especially likely to fall beyond the APA's reach.) (quotations omitted); *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Donovan*, 746 F.2d 855, 861 (D.C. Cir. 1984) (Scalia, J.) ("A lump-sum appropriation leaves it to the recipient agency (as a matter of law, at least) to distribute the funds among some or all of the permissible objects as it sees fit."). This applies equally to an agency's decision to

pause funding for one recipient and potentially redirect that funding elsewhere. *See Pol'y & Rsch., LLC v. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 76 (D.D.C. 2018) (Brown Jackson, J.) ("[T]his Court has little doubt that HHS's decision to stop funding for Plaintiffs' projects, and to recompete the funds associated with those projects, is the type of agency action that is presumptively unreviewable."); *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002) ("Insofar as Congress has left to the Secretary's sole judgment the determination of the manner for providing assistance to dairy farmers, we hold that the district court lacked jurisdiction to review Milk Train's challenge[.]"); *Cmty. Action of Laramie Cnty., Inc. v. Bowen*, 866 F.2d 347, 354 (10th Cir. 1989) ("Funding determinations are notoriously unsuitable for judicial review, for they involve the inherently subjective weighing of the large number of varied priorities which combine to dictate the wisest dissemination of an agency's limited budget." (quotations omitted); *but see City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018) ("Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals.").

Rather than address this line of cases, Plaintiff relies on *San Francisco* for the proposition that any funding pause is reviewable and *per se* unlawful because it "withholds congressionally appropriated funding based on the President's policy preferences." *See* ECF No. 24-1 at 10; *see also New York*, 2025 WL 715621, at \*11 (relying on *San Francisco* for a similar conclusion). However, *San Francisco* addressed a different question: whether the Executive could categorically exclude cities or counties from all federal funding if it deems them to be a sanctuary jurisdiction. 897 F.3d at 1233. Plaintiffs' broad reading of *San Francisco*, which seems to be that the Executive can never invoke policy reasons in reallocating funding in specific grant programs, cannot be squared with the caselaw cited above nor with regulations that allow agencies to terminate grants

"if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4).

Also, in the relevant statutes, Congress authorized agencies to determine where to send federal funding based on the agency-determined priorities, payment schedules, and terms:

- 42 U.S.C. § 7438 (providing that Environmental and Climate justice block grants shall be awarded to "benefit disadvantaged communities, *as defined by the Administrator*") (emphasis added);

- 42 U.S.C. § 7437 (providing that funding to reduce greenhouse gas pollution will be available "in such amounts, upon such a schedule, and subject to such conditions . . . , *as determined by the Administrator*") (emphasis added); and

- 7 U.S.C. § 2279 (providing that financial assistance to farmers, ranchers, and foresters affected by discrimination "shall be administered through 1 or more qualified nongovernmental entities *selected by the Secretary subject to standards set and enforced by the Secretary*") (emphasis added)

True, a President cannot refuse to spend appropriations altogether, *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.). But these authorities show there is nothing unlawful about agencies exercising discretion to temporarily pause funding, evaluate whether that funding best promotes the President's agenda, and if not, then redirect that funding elsewhere.

Plaintiffs' only effort to engage with the relevant statutory language is to say that the word "shall" appears in some of the statutes at issue. ECF No. 24-1 at 4–6, 16, 27–28. However, according to the Fourth Circuit, a bare recitation like this does not identify a standard that permits judicial review. *See Holbrook*, 48 F.4th at 294, n.14 ("[The plaintiff] points out that this passage includes 'shall' twice, and that this word choice suggests a directive. 'Shall' does often mandate behavior. But here the shalls are attached to broad policy goals.").

The above discussion is sufficient to show that, for at least some grant programs, funding decisions are committed to agency discretion by law. At this opening stage of litigation, Plaintiffs have not carried their burden to establish jurisdiction.

### C.     Plaintiffs' Failure to Address Standing Issues Precludes Granting Injunctive Relief at this Opening Stage of Litigation.

As explained below, Plaintiffs have failed to assert facts sufficient to support standing for each Plaintiff.. As such, the Court should decline to issue the broad preliminary injunction that Plaintiffs seek and allowing the case to proceed in the normal course.

For one thing, Plaintiffs collectively refer to their "legally binding grant agreements," but fail to confront the fact that, in some cases, no finalized grant agreements are in place.. *See* ECF No. 24-15 at 68–71 (showing an Assistance Agreement with DOE, which is a "conditional award" under which "DOE will not release funding . . . until successful completion of negotiations"); ECF No. 24-18 at 13 (showing that DOT selected the Nashville for funding and that such selection "does not guarantee federal funding" and will be subject to "a signed, mutually agreed upon grant agreement"); ECF No. 24-18 at 15 (showing that DOT selected Nashville to receive funding in another program but stated funding is subject to the execution of a "Formal Grant Agreement . . . outlining the terms and conditions" and asking for patience because the process "may take months"). Plaintiffs identify no legal entitlement to immediate access to grant funding in this scenario. *Cf. SUWA*, 542 U.S. at 63 ("[T]he only agency action that can be compelled under the APA is action legally *required*.") (emphasis added). Thus, the agencies are legally free to re-evaluate or decline these announced projects.

For another, some Plaintiffs have access to money, or were recently informed that they would be receiving money, under specific grant awards. *See* ECF No. 23 at ¶ 54 (received reimbursement on March 17, 2025, and no allegation that funds are missing); *id.* at ¶ 57 (funds currently "unfrozen" as of March 26, 2025); *id.* at ¶ 63 (project "approved for implementation" as of March 13, 2025); *id.* at ¶ 72 (funding currently "open"); *id.* at ¶ 75 ("payments were being processed" as of March 20, 2025). Plaintiffs fail to address how having approved projects and

current access to funding is "actual or imminent harm" that is not "conjectural or hypothetical." *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

Finally, some Plaintiffs appear to be subrecipients of grants, not the prime recipient that was awarded the grant by the agency.. For example, the City of Columbus states that it is a subgrantee under a prime agreement between the Ohio Department of National Resources and a division of the USDA. ECF No. 24-16 at 5. Likewise, it appears Alliance for the Shenandoah Valley is a subgrantee of two prime agreements – one between the National Fish and Wildlife Foundation and EPA and one between the Conservation Innovation Fund and USDA. *See generally* ECF No. 24-5. For a final example, RAFI-USA seems to be a subrecipient under a prime agreement between A Greener World and USDA. ECF No. 24-14 at 265.

Plaintiffs do not address how subrecipients have rights enforceable against the government, as opposed to against the prime grant recipients with whom they have a direct relationship. *Cf. Citizens Health Corp. v. Sebelius*, 725 F.3d 687, 692-94 (7th Cir. 2013) (holding that co-applicant was not a grantee, did not have "a legitimate claim of entitlement to the grant," and their "entitlement to grant funds existed only by contract with" the prime grantee). And from an equitable perspective, in situations where the primary grant recipient is not suing over its funding, it is difficult to see why an agency should be compelled to fund the work of a subrecipient.

Suffice to say, these standing issues counsel against granting broad preliminary relief.

## II.    Plaintiffs are Unlikely to Succeed on the Merits.

Because the Supreme Court's ruling in *California* addresses and supports the government's position regarding subject matter jurisdiction, the Court should deny Plaintiffs' motion on that ground. In light of *California*, it would be legal error for the Court to conclude that Plaintiffs will likely succeed in demonstrating jurisdiction. However, in compliance with this Court's Order, ECF

No. 32, Defendants now further explain the legal authorities for grant pauses and terminations and demonstrate why Plaintiffs' claims would fail on the merits if the Court did have jurisdiction.

### a. The Agencies' Discretion Over Grant Programs Provides Ample Authority to Temporarily Pause Funding.

Plaintiffs argue that the Executive's decisions to pause or terminate funding in light of a change in policies violates federal grant statutes; the Constitution; and the Impoundment Control Act. ECF No. 24-1 at 26–29.For the reasons explained below, all these arguments fail. **i.   Defendants have authority to select recipients for funding under Applicable Law.**

Plaintiffs' statutory claims are premised on the idea that pausing or terminating grants contravenes "the IRA, IIJA, and other federal statutes . . . ." *See* ECF No. 24-1 at 27–28. But Plaintiffs' statutory analysis ignores the discretion that Congress gave the Defendant agencies to administer these programs. To start, in the absence of specific Congressional direction, the Executive has discretion to determine how best to allocate grant funding. *See generally Lincoln*, 508 U.S. at 193 (explaining that Congress may have "circumscribe[d] agency discretion to allocate resources by putting restrictions in the operative statutes," but in the absence of such directives agencies may "allocate[] funds . . . to meet permissible statutory objectives").

Here, the funding frameworks demonstrate that Defendants have ample discretion to decide whether to fund particular grant recipients. Plaintiffs highlight, as representative of their case, the IRA-funded Environmental and Climate Justice Block Grant program. *See* ECF No. 24-1 at 4. There, Congress authorized the EPA administrator "to award grants for periods of up to 3 years to eligible entities to carry out activities described in paragraph (2) that benefit disadvantaged communities, as defined by the Administrator." 42 U.S.C. § 7438(1); *see* ECF No. 24-1 at 4 (Plaintiffs quoting this provision but omitting the language that the Administrator defines what activities benefit disadvantaged communities).

As another representative example, Plaintiffs invoke the Climate Pollution Reduction

Grant Program, under which the City of New Haven is a grant recipient. *See* ECF No. 24-1 at 5. Setting aside that this award is not paused or terminated, *see* ECF No. 23 at ¶ 72, there would be no statutory violation even if it was because the EPA Administrator has discretion over funding decisions related to the program's purposes:

> The Administrator shall make funds available to a grantee under this subsection in such amounts, upon such a schedule, and subject to such conditions based on its performance in implementing its plan submitted under this section and in achieving projected greenhouse gas air pollution reduction, as determined by the Administrator.

42 U.S.C. § 7437(c)(3). Plaintiffs do not address this provision and merely point out that the EPA "shall" use appropriated funds for grants. ECF No. 24-1 at 5. However, nothing in that broad command demonstrates that a specific grant recipient is entitled to funding, or that the EPA Administrator would violate any statutory command in the hypothetical situation where this project was terminated.

Next, consider the IRA-funded Conservation Technical Assistance Fund administered by the USDA. *See* ECF No. 23 at ¶ 25. There, Congress authorized the Secretary of Agriculture "[t]o cooperate and enter into agreements with, or to furnish financial or other aid to, any agency, governmental or otherwise, or any person, subject to such conditions as he may deem necessary for the purposes of this chapter." 16 U.S.C. § 590a(3). Indeed, this fund is "to be administered by the Secretary." 16 U.S.C. § 590f(b)(1).

As to IIJA programs, Plaintiffs invoke the Chesapeake Bay Program as an example of where the Executive has contravened federal law. ECF No. 24-1 at 27. While noting only that the law says EPA "shall" use funds to protect the Chesapeake Bay, Plaintiffs did not discuss language from the "Technical Assistance and Assistance Grants" section of the law, which reads:

> In cooperation with the Chesapeake Executive Council, the Administrator *may* provide technical assistance, and assistance grants, to nonprofit organizations, State and local governments, colleges, universities, and interstate

agencies to carry out this section, *subject to such terms and conditions as the Administrator considers appropriate*. 33 U.S.C. § 1267(d)(1) (emphasis added).

As to the CCC Charter Act, 15 U.S.C. § 714 *et seq*., "the Secretary of Agriculture [is granted] broad powers and discretion to use the CCC." OMB also "plays a role in how CCC funds are administered . . ., which allows OMB to set a limit on the funds available . . . ." *Id.* As such, the suggestion that USDA violated the law by following Presidential and OMB directives is wrong.

There is no need for a statute specifically authorizing Defendants to pause funding and redirect it. That authority is implicit in the grant programs and appropriations laws themselves, because they direct the agencies to administer the grant programs in a manner that accomplishes certain broad objectives but otherwise leaves the agencies with discretion over how to allocate the funding. In such circumstances, the agencies have statutory authority to pause funding and evaluate whether that funding is being put to the best use.

Grant regulations do not alter this analysis; instead, they generally allow agencies to terminate grants "if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4); *see also* ECF No. 35-1, 35-2, 35-3, 35-4 (EPA citing this regulation in terminating grants that conflict with agency priorities). Plaintiffs do not address this provision, instead focusing on irrelevant regulations, such as grant applications, *id.* at § 200.204, reports, *id.* at §§ 200.500–200.521, audits, *id.* at §§ 200.328–200.330, and penalties for when a grantee "fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award," *id.* § at 200.339. *See* ECF No. 24-1 at 6. The pauses and terminations here are not based on grantee compliance; they are based on the agency's review of whether federal funds are being spent in a manner that best promotes the Executive's agenda. Nothing in the regulations forecloses such a pause or termination.

### ii. Defendants may rely on the Executive's priorities in making funding

**decisions.**

To further address the Court's Order, ECF No. 32, Defendants rely on the grant awards and their terms and conditions to show that agencies have discretion to adjust funding decisions and cancel projects consistent with the priorities of the Executive. For example, the Amended Complaint mentions one award through which the City of Nashville seeks access to a program administered by the Federal Highway Administration (FHWA), an administration of DOT. *See* ECF No. 23 at ¶ 67. In the statutes governing that program, Congress provided lump-sum appropriations but did not require that any specific project or grantee receive funding. 23 U.S.C. § 151. In support of their demand for immediate access to these funds, Plaintiffs attach the Notice of Selection for CFI Grant Award. ECF No. 24-18 at 11–14. Yet the Notice of Selection states: "This email is not authorization to begin work, and it does not guarantee Federal funding." *Id.* at 11. Given this language and the lack of a fully executed grant agreement, Plaintiffs have no legal right to a "guarantee of funding and reimbursement." ECF No. 24-1 at 3.

Even if Nashville had a completed grant agreement in place, which it does not, it would fare no better. FHWA's terms and conditions, which are linked in the Notice of Selection, provide for termination where "circumstances cause changes to the Project that the FHWA determines are inconsistent with the FHWA's basis for selecting the Project to receive a Grant" or the agency "determines that termination of the project-specific agreement is in the public interest." FHWA, General          Terms          and          Conditions,          §          10.1(a), https://www.fhwa.dot.gov/environment/cfi/resources/fy2022-2023-cfi-terms-conditions.pdf. Thus, this particular grant's governing statute, appropriations, and terms and conditions show DOT has authority to pause or terminate funding.

A similar analysis applies with respect to the award to the Bronx River Alliance for the

"Partnership for Urban Waterways in Bronx and Lower Westchester Counties, New York." This grant award is under the Environmental and Climate Justice Block Grant administered by the EPA. *See* 42 U.S.C. § 7438. The EPA's general terms and conditions, which are a part of the grant award agreement, ECF No. 24-6, likewise embrace authority to, "[c]onsistent with 2 C.F.R. § 200.340, . . . unilaterally terminate this award." EPA, General Terms and Conditions § 3, https://www.epa.gov/system/files/documents/2023-09/fy_2023_epa_general_terms_and_conditions_effective_october_1_2023_or_later.pdf.    EPA identified 2 C.F.R. 200.340 as the basis for terminating this project and three others. *See* ECF No. 35-3 at 2; ECF No. 35-1, 35-2, 35-4.

Moreover, as explained in Argument Section I.C., *supra*, Plaintiffs do not allege that they have entered into a finalized grant agreement with Defendants DOE and DOT. And they do not identify any command that DOE and DOT must finalize grant agreements with those entities initially selected for an award. *Cf.* SUWA, 542 U.S. at 63 ("[T]he only agency action that can be compelled under the APA is action legally required."). Thus, Plaintiffs have not established that re-evaluating, pausing, or declining to continue with these grant awards is contrary to any law.

To be sure, the above examples contain *some* constraints on the purposes for which agencies can expend funds. Within those broad confines, however, these laws afford agencies with discretion to decide how the funding should be allocated among eligible recipients. And that discretion is what allows agencies to pause ongoing funding and decide whether to redirect the funds to a different eligible recipient.

In arguing to the contrary, Plaintiffs rely on the fact that the word "shall" appears in some language making lump-sum appropriations to agencies. As shown earlier, this approach proves nothing. And it is particularly unconvincing when compared to the discussion above regarding

agency discretion over grant administration specifically and 2 C.F.R. § 200.340(a)(4) generally.[2]

It matters not that requiring Plaintiffs to proceed on a program-by-program, grant-by-grant basis would make it more difficult for them to obtain comprehensive relief. "The case-by-case approach that this requires is understandably frustrating to an organization . . . . But this is the traditional, and remains the normal, mode of operation of the courts." *Nat'l Wildlife Fed'n*, 497 U.S. at 894. Indeed, one of the reasons for requiring Plaintiffs to proceed in this case-by-case manner is to avoid injecting courts into the day-to-day oversight and supervision of agencies' compliance:

> If courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved—which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management.

*SUWA*, 542 U.S. at 66-67. That concern applies here. Given that the Plaintiffs have brought a challenge to diverse agency operations, involving some Plaintiffs with grants currently being paid, others without final grant agreements, and still others with grants that are lawfully paused, their request for relief would require the Court to become an overseer of ongoing funding activities.

### iii. Impoundment Control Act

Plaintiffs also contend that Defendants' actions violate the APA because they violate the Impoundment Control Act ("ICA"). However, Plaintiffs do not plead a claim under the ICA, which is not enforceable through an APA suit. *See Gen. Land Off. v. Biden*, 722 F. Supp. 3d 710, 734-35 (S.D. Tex. 2024); *Pub. Citizen v. Stockman*, 528 F. Supp. 824, 830 n.1 (D.D.C. 1981); *cf. Trump*

---

[2] Plaintiffs also appear to rely on the district court's reasoning in *California* for the proposition that agencies can never "suspend" a grant award. *See* ECF No. 24-1 at 28. But, of course, the Supreme Court stayed the preliminary injunction issued in *California*; thus, the Court should not follow the approach set forth in that case, i.e., concluding that grant funding pauses and terminations are *per se* reviewable and unlawful.

*v. Sierra Club*, 140 S. Ct. 1 (2019). Indeed, the ICA provides for enforcement by the Comptroller General (an official in the Legislative Branch), not for private enforcement at all. 2 U.S.C. § 687 ("If, under this chapter, budget authority is required to be made available for obligation and such budget authority is not made available for obligation, the Comptroller General is hereby expressly empowered . . . to bring a civil action in the United States District Court for the District of Columbia to require such budget authority to be made available for obligation.").

Even if the ICA permitted a private right of action, which it does not, Plaintiffs still could not obtain the relief they seek. At most, Plaintiffs would have established that the OMB Memo or the Executive Orders constituted a deferral of budget authority for which the requisite "special message" was not communicated to Congress. *See* 2 U.S.C. § 684. In that scenario, the remedy would be a directive to communicate the special message—not a broad injunction against the Executive. And of course, transmission of the special message to Congress pursuant to section 684(a) would not redress Plaintiffs' injuries in any way. Thus, their Impoundment Control Act theory fails.

**b.      Plaintiffs Constitutional Claims are Not Likely to Succeed on the Merits.**

Plaintiffs invoke the Constitution in arguing that Defendants acted contrary to law under the APA and in asserting standalone claims. But however those arguments are framed, Plaintiffs cannot show that Defendants' actions ran afoul of any Constitutional provision.

### i. Separation of Powers

As background, Plaintiffs' Motion contends that the Executive Orders and so-called Program Freezing Actions violate the Appropriations Clause (U.S. Constitution art. I, § 9, cl. 7), the Spending Clause (art. I, § 8, cl. 1), legislative power (art. I, § 1), and the Take Care Clause (art. II, § 3). To support their arguments, Plaintiffs rely heavily on cases in which the government

attached conditions to funding that Congress did not include in the legislation. *See* ECF No. 24-1 at 15-18 (citing *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1234 (9th Cir. 2018) (withholding federal grant moneys from jurisdictions that do not agree with Administration's immigration strategies); *City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018) (same)). Unlike those cases, and contrary to Plaintiffs' assertion, ECF No. 24-1 at 17– 8, the government here has not tacked on new conditions that must be met to obtain funds. As discussed above, the government may choose to focus on different ways to achieve the conditions outlined by Congress. That does not constitute applying new conditions, seizure of the power of the purse, an improper attempt to legislate, or failure to take care that the laws are faithfully executed. *see also Lincoln*, 508 U.S. at 192-93 (agency's discretionary decision to discontinue funding program was as unreviewable as original decision to begin program). Thus, Plaintiffs' reliance on those cases is misplaced, and Plaintiffs are not likely to succeed on the merits of their claims that the Executive has improperly violated the constitutional principle of separation of powers.

Additionally, Plaintiffs are not likely to succeed on their separation of powers claims because this is not a case where the Executive has chosen, based on policy reasons, not to spend the full amount appropriated by Congress. *See*, *e.g.*, *In re Aiken Cnty.*, 725 F.3d at 259-260. Rather, here, the Executive paused expenditures to potentially make different choices from his predecessor about which projects best fulfill the mission of the appropriations. *See Lincoln*, 508 U.S. at 192-93; *Pol'y & Rsch., LLC*, 313 F. Supp. 3d at 76; *Milk Train, Inc.*, 310 F.3d at 751.

Because the Executive's actions have not disregarded congressional statutory directives, co-opted the power of the purse, or otherwise violated the separation of powers doctrine, Plaintiffs cannot demonstrate likelihood of success on the merits.

### ii. First Amendment

To support their First Amendment argument, Plaintiffs suggest that the government is conditioning the grants at issue on the suppression of constitutionally protected speech. *See* ECF No. 24-1 at 20. This is incorrect. As discussed above, the government is acting within the Executive's authority to fund its policy priorities. To that end,

> [t]he [g]overnment can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way. In so doing, the [g]overnment has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other.

*Rust v. Sullivan*, 500 U.S. 173, 193 (1991). That is precisely what has transpired here.

Additionally, the government's actions regarding the grants do not limit Plaintiffs' free speech by compelling or restricting their speech: they remain free to espouse any viewpoint they want.

Fundamentally, the government is permitted to have policy priorities and does not violate the First Amendment by terminating projects that are misaligned with those priorities. Indeed, "an indirect effect on the flow of ideas is not enough to trigger heightened scrutiny." *Alachua Co. Educ. Ass'n v. Carpenter*, 741 F. Supp. 3d 1202, 1245 (N.D.Fla. 2024) (discussing *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 360 n.2 (2009)). The government does not penalize, prohibit, restrict, or otherwise infringe on speech simply because it chooses not to pay for it. *See*, *e.g.*, *Ysursa*, 555 U.S. at 358 (government "is not required to assist others in funding the expression of particular ideas"); *Leathers v. Medlock*, 499 U.S. 439, 450 (1991) (government "is not required to subsidize First Amendment rights"). If Plaintiffs' argument is that losing grant funding will make it more difficult for Plaintiffs to exercise their right to free speech, that "practical consequence[], however, [is] simply not the same as directly limiting expression, and so heightened scrutiny does not apply." *Alachua Co. Educ. Ass'n*, 741 F. Supp. 3d at 1246 (citing *Ysursa*, 555 U.S. at 360 n.2)

(internal quotation marks omitted). Thus, the government's actions here do not amount to viewpoint discrimination and Plaintiff's challenge is not likely to succeed on the merits.

Moreover, Plaintiffs' allegations of "chilled speech" are subjective and speculative. Specifically, Plaintiffs assert that they "are concerned about potential retaliation or ability to secure future funding for even participating in this lawsuit." ECF No. 24-1 at 21. While a plaintiff may rely on a chilling effect to establish Article III standing, "subjective or speculative accounts . . . of a chilling effect . . . are not sufficient." *Denham v. City of Charlotte, N.C.*, 635 F.3d 129, 135 (4th Cir. 2011) (internal quotations omitted).

Fundamentally, refusing to pay for certain speech generally does not inflict a First Amendment harm. *See Rust*, 500 U.S. at 193. In this case, the Executive is not restricting Plaintiffs' speech or "leverag[ing] funding to regulate speech outside the contours of the [funding] program itself." *Agency for Int' Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 215-15 (2013). Additionally, Plaintiffs cannot demonstrate that the government is unfreezing funds only to grantees expressing one view, but not to those expressing the opposite view. Indeed, several Plaintiffs have active or approved projects. *See Nat'l Council of Nonprofits v. Office of Mgmt. and Budget*, Civ. A. No. 25-239 (LLA), 2025 WL 597959, at *17 (D.D.C. Feb. 25, 2025). Therefore, Plaintiffs' First Amendment claims are not likely to succeed on the merits.

### c.    Plaintiffs' Allegations Do Not Show Arbitrary and Capricious Decision-Making.

#### i.    Arbitrary and Capricious Review is Inappropriate.

As a threshold matter, Plaintiffs' arguments appear to seek obtain arbitrary and capricious review of Presidential orders. But requiring a federal agency to articulate a rationale for its action—beyond simple compliance with the President's directives—would, in essence, subject the President's directive to arbitrary and capricious review, contrary to the principle that the President

is not an agency under the APA. *Franklin*, 505 U.S. at 800-01; *cf. Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*, 801 F. Supp. 2d 383, 403 (D. Md. 2011) ("the State Department and Assistant Secretary were acting on behalf of the President, and therefore their actions are not reviewable under the APA"), *aff'd*, 698 F.3d 171 (4th Cir. 2012).

### ii.    A Pause or Termination of Funding of Specific Projects for Policy Reasons is Rational.

In any event, the agencies' decisions to pause or terminate funding (where those decisions have in fact occurred) are not arbitrary and capricious. Given the finite amount of tax dollars allocated to these programs, it is perfectly rational to pause funding on projects pending a further determination whether to continue that funding in the same manner. The scope of review under the "arbitrary and capricious" standard, 5 U.S.C. § 706(2)(A), is "narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). This standard "deems the agency action presumptively valid provided the action meets a minimum rationality standard." *Sierra Club v. EPA*, 353 F.3d 976, 978 (D.C. Cir. 2004).

Fundamentally, Plaintiffs contend that the EOs cannot be reconciled with the IRA and IIJA, and, therefore, Defendants acted contrary to Congress' directives. ECF No. 24-1 at 25. Not so. For example, the *Unleashing American Energy* EO states the President's concern that funding decisions relating to electric vehicle programs have hindered "true consumer choice." § 2(e). To that end, the EO seeks to ensure "a level regulatory playing field" and directs proper consideration of eliminating other government subsidies that could render "other types of vehicles unaffordable." *Id.* This approach dovetails with the IIJA, which says that grants for charging and fueling infrastructure should not "significantly impair" existing alternate fuel infrastructure and should "support a long-term competitive market." 23 U.S.C. § 151(f)(5)(A)(iv).

Similarly, the *Ending Radical and Wasteful Government DEI Programs and Preferencing EO* expresses the President's concern that the Executive has funded discriminatory practices under the guise of DEI. The phrase DEI does not appear in the IRA, IIJA, or ARP. And Plaintiffs identify no Congressional policy preference for DEI programs. While the IRA and IIJA fund programs to remedy past discrimination, support disadvantaged groups, or serve other related purposes, Congress did not perpetually lock the Executive into one approach to these tasks. *See, e.g.,* 42 U.S.C. § 7438 (stating that the EPA Administrator defines which activities "benefit disadvantaged communities"); 42 U.S.C. § 7437(c)(3) (stating that the EPA Administrator determines which grant awards will achieve "projected greenhouse gas air pollution reduction").

In making this argument, Plaintiffs do not engage in any analysis of relevant statutory language. They simply declare it to be so, in reliance on *California* and *New York*, two cases in which preliminary relief has been stayed.

Defendants also challenge Defendants' decision-making for failing to account for grantees' reliance interests in their continued receipt of funding. *See, e.g.*, ECF No. 24-1 at 24. But again, those reliance interests are contrary to the objectives articulated by the President—*i.e.*, ensuring that grant funds achieve value for American taxpayers, consistent with the President's broader energy and diversity policies. *Unleashing American Energy EO*, at §§ 1, 2; *Ending Radical and Wasteful Government DEI Programs and Preferencing EO at* § 2*; DOGE EO* at § 1. To the extent Plaintiffs contend that agency guidance is subject to arbitrary and capricious review, these documents are reasonable because they are clearly efforts to give notice of and comply with policy goals outlined in Presidential orders. *See* ECF No. 23-5 through 23-14.

Finally, Plaintiffs claim the Executive has not explained the reason for the policy reversals or considered alternatives. *See* ECF No 24-1 at 26. Yet a cursory review of the EOs makes plain

that the President explained exactly why his administration's approach to grant funding would be different. *Cf. State Farm*, 463 U.S. at 59 (Rehnquist, J., concurring in part) ("A change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations."). And the agency decisions are plainly attributable to those EOs.

The implication of Plaintiffs' argument is that a review for compliance with the Executive's priorities must *precede* any funding pause, rather than be performed during that pause. But weighing the costs of a temporary pause in funding, versus the potential benefits of being able to more quickly and efficiently redirect funding to purposes that the Administration believes will better serve the public, is a judgment entrusted to the Executive. *Cf. Off. of Commc'n of United Church of Christ v. FCC*, 707 F.2d 1413, 1437 (D.C. Cir. 1983) (stating that "predictive conclusions about what would best be in the public interest" are "entitled to substantial judicial deference.").

Ultimately, Plaintiffs' arbitrary and capricious arguments fail. The question is not "whether a regulatory decision is the best one possible or even whether it is better than the alternatives." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016). Plaintiffs cannot subject an Executive Order to APA review, nor can Plaintiffs disregard the rationality of pausing spending, pending a determination about whether such funding could be redirected to a purpose more consistent with the President's policies.

## III.    Plaintiffs Do Not Face Irreparable Harm

Plaintiffs[3] have failed to make a "clear showing" that they will suffer irreparable harm

---

[3]    In considering whether Plaintiffs have met the "exceedingly high burden" of demonstrating that, absent the injunctive relief they seek, they are likely to suffer irreparable harm, the Court should not consider Plaintiffs in the collective. Instead, each Plaintiff must, on its own,

without an injunction. *See Mazurek*, 520 U.S. at 927.

First, Plaintiffs' allegations of irreparable harm are speculative. "A plaintiff seeking preliminary relief must 'demonstrate that irreparable injury is *likely* in the absence of an injunction.'" *Williams Ohio Valley Midstream, LLC v. Kittle*, No. 23-2185, 2024 WL 3325532, at *3 (4th Cir. July 8, 2024) (quoting *Roe v. Dep't of Def.*, 947 F.3d 207, 229 (4th Cir. 2020) (additional citations omitted) (emphasis supplied by *Kittle* court)); *see also Winter*, 555 U.S. at 22 (explaining that issuing a preliminary injunction "based only on a possibility of irreparable harm" would be "inconsistent" with treating a preliminary injunction as an "extraordinary remedy"). "A plaintiff must make a 'clear showing' it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Kittle*, 2024 WL 3325532, at *3 (quoting *Direx Israel, Ltd. V. Breakthrough Med. Corp.*, 952 F.2d 802, 912 (4th Cir. 1991)).

Plaintiffs' affidavits belie their contention that irreparable harm is "actual and imminent." *Kittle*, 2024 WL 3325532, at *3. For example, The Sustainability Institute notes that it is "*concerned that if [it does] not meet grant deliverables*, it will cause irreparable harm to the life of the project" and that it is "*worried that the pause will undermine* the long-standing trust between the Sustainability Institute and the North Charleston Community." ECF No. 24-2 at 11-12, ¶¶ 42, 45 (emphasis added). Similarly, Bronx River Alliance alleges the "disruption in Environmental Justice Community Problem Solving funding has forced the organization to *face the possibility* of

---

make a clear showing of irreparable harm. *See*, *e.g.*, *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 485-86 (3d Cir. 2000) (partially vacating a preliminary injunction because "[i]nstead of making a case-by-case determination that each plaintiff demonstrated irreparable harm . . ., the court dealt with the plaintiffs as a unit and concluded that because several of them probably risked irreparable harm, that was sufficient to satisfy the prong of the preliminary injunction test."). Plaintiffs' circumstances vary significantly, and the Court should require each Plaintiff to meet this burden. By way of example, the City of Baltimore references a "$10 million grant agreement [for which] the City is *awaiting DOE's review and approval* of the Statement of Project Objectives [which] will specify what the funding will be spent on." ECF No. 24-15 at 11 (emphasis added).

having to cover costs for water quality monitoring supplies, equipment, and partner and subaward obligations in order to meet project goals." ECF No. 24-6 at 6-7, ¶ 17 (emphasis added). Marbleseed claims the funding freeze "*potentially* jeopardize[s] the life of [its community program]." ECF No. 24-11 at 6, ¶ 24. This is the language of possibility, not imminence, and potential future harm—however severe—is insufficient for Plaintiffs to meet their burden. *See*, *e.g.*, *Corbel Commc'ns Indus. LLC v. Lat Long Infrastructure LLC*, No. LA CV 21-8097 JAK, 2021 WL 6104231, at * (N.D. Cal. Oct. 29, 2021) (noting that "mere assertions that a plaintiff 'may' go out of business are insufficient").

Second, Plaintiffs have failed to establish that the harm they may suffer is irreparable, i.e., "cannot fully be rectified by the final judgment after trial." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (internal citation omitted). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (quoting *Sampson*, 415 U.S. at 90). "A plaintiff must overcome the presumption that a preliminary injunction will not issue when the harm suffered can be remedied by money damages at the time of judgment." *Di Biase*, 872 F.3d at 230 (citing *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994)).

Plaintiffs' affidavits contain the specific amounts of money they allege they are entitled to receive, making any eventual monetary award readily calculable. *See* ECF Nos. 24-2 through 24-21. And while different Plaintiffs are in different circumstances, Plaintiffs fail to articulate why

monetary awards at the conclusion of the litigation would be an insufficient remedy so as to justify the extreme measure of a preliminary injunction. For example, CleanAIRE NC "engage[s] in various forms of advocacy, including educating the public and collaborating with policymakers to ensure all North Carolinians have access to clean air." ECF No. 24-7 at 3, ¶ 2. CleanAIRE "was awarded a $500,000 Environmental Justice Collaborative Problem-Solving (EJCPS) grant on June 2, 2024." ECF No. 24-7 at 3, ¶ 4. And while CleanAIRE's Deputy Director describes the financial difficulties CleanAIRE will face without federal funding, the affidavit does not explain why a monetary remedy at the conclusion of the litigation would be inadequate to compensate CleanAIRE for financial harm.

Finally, Plaintiffs City of Baltimore, City of Columbus, City of Madison, City of Nashville, City of New Haven, and City of San Diego are relatively large, well-resourced cities that seek funding for discrete projects. Simply put, their projects are not the type of activities that establish irreparable harm to justify extraordinary relief. *See, e.g.* ECF No. 23 at ¶ 62 (efforts to plant 1,250 trees to improve Columbus' tree cover); *id.* at ¶ 64 (money to Madison residents to make "whole home energy upgrades"); *id.* at ¶ 69 (multi-year project to turn Nashville into a more walkable and bikeable city); *id* at. ¶ 72 (design of a "newgeothermal heating and cooling system" for New Haven); *id.* at ¶ 74 (efforts to "grow and improve San Diego's urban forest"). Further, in at least two cases, Plaintiffs seem to admit projects will proceed regardless of whether the federal government ultimately funds them. *See, e.g., id.* at ¶ 63 ("If Columbus does not receive the reimbursement it is owed under this grant, it will be forced to cover this expense through money from its capital budget."); *id.* at ¶ 69 (stating that Nashville has been working on making the city more walkable and bikeable for "several years" and intends to use federal funds to "*help* it fund the next several phases of the project") (emphasis added).

Plaintiffs have failed to make a clear showing that irreparable injury is likely in the absence of an injunction. Plaintiffs' claims of irreparable injury are speculative and fail to demonstrate why a monetary award would be inadequate to compensate Plaintiffs for any economic harm they may suffer. For this additional reason, Plaintiffs' motion should be denied.

## IV.     The Equities and Public Interest Weigh Against a Preliminary Injunction.

Lastly, Plaintiffs cannot establish that the balance of equities and the public interest favor granting the extraordinary remedy of a preliminary injunction. These final two factors "merge when the [g]overnment is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). These factors tilt decisively against granting a preliminary injunction here.

By statute, Congress has vested control of these grant programs has been vested by statute in the Defendant agencies, who in turn answer to the President and, thus, the public at large. Requiring the Executive to financially support specific projects that may be within the statutory parameters of a program but nevertheless at odds with the Executive's priorities negatively impacts the public interest.

Further, Plaintiffs seek to recover millions of taxpayer dollars. For instance, Plaintiff Pasa Sustainable Agriculture claims entitlement to a federal grant totaling $59,000,000. *See* ECF No. 24-13 at 5-6, ¶ 8. And like the grant recipients in *California*, Plaintiffs have not "promised to return withdrawn funds" if a court ultimately determines the agencies had no obligation to fund them. *Id.* at 2 (noting the United States is "unlikely to recover the grant funds once they are disbursed."). In the event a court finds the agencies' actions were contrary to law, Plaintiffs can be made whole with a monetary award. Conversely, if the United States must fund millions of dollars during the pendency of this litigation, and a court determines the agencies were authorized to freeze or terminate the grants, the money will be spent and Plaintiffs would likely resist recoupment efforts

in that scenario. The equities and the public interest, therefore, weigh in the United States' favor.

**V.    The Court should require Plaintiffs to post security.**

To the extent that the Court grants relief,[4] Defendants respectfully request that the Court require Plaintiffs to post security, pursuant to FED. R. CIV. PRO. 65(c), for any taxpayer funds distributed during the pendency of the Court's Order. *See* Presidential Memorandum, Ensuring the Enforcement of Federal Rule of Civil Procedure 65(c), available at https://www.whitehouse.gov/presidential-actions/2025/03/ensuring-the-enforcement-of-federal-rule-of-civil-procedure-65c/ (Mar. 11, 2025) ("[I]t is the policy of the United States to demand that parties seeking injunctions against the [government] must cover the costs and damages incurred if the [g]overnment is ultimately found to have been wrongfully enjoined or restrained.").

Respectfully submitted,

BROOK B. ANDREWS
ACTING UNITED STATES ATTORNEY

By:    *s/Todd Timmons*
Todd Timmons (#11254)
Assistant United States Attorney
1441 Main Street, Suite 500
Columbia, South Carolina 29201
Tel: (803) 237-9265
Todd.Timmons@usdoj.gov

Lee E. Berlinsky (#05443)
Assistant United States Attorney
151 Meeting Street, Suite 200
Charleston, SC 29401
Tel:   843-266-1679
Lee.Berlinsky@usdoj,gov

April 9, 2025

---

[4] At a minimum, any relief entered here should be limited to expressly preserve agencies' lawful authority to act under their own authorizing statutes, regulations, and grant terms and to only the grant awards that Plaintiffs have proven are paused or terminated. Any relief here should also be immediately stayed pending any appeal that is authorized. The proper course, however, is to deny Plaintiffs' motion for a preliminary injunction entirely.