**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

THE SUSTAINABILITY INSTITUTE, et al.,

                    Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity
as President of the United States, et al.,

                    Defendants.

Case No. 2:25-cv-02152

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION**

President Trump recently claimed he "terminated the ridiculous Green New Scam,"[1] a term he uses to refer to the Inflation Reduction Act ("IRA") and Infrastructure Investment and Jobs Act ("IIJA") that mandated many of the grant programs at issue in this litigation. In this speech, as in the challenged Executive Orders and subsequent agency actions, the executive branch has made clear that it has no intent to faithfully execute federal grant programs or to spend appropriations as directed by Congress. The administration has violated the Constitution, statutes, and the Administrative Procedure Act, and inflicted irreparable harm on Plaintiffs.

To evade the straightforward relief sought by Plaintiffs—the continuation of congressionally mandated programs—Defendants mis-cast this case as a mere contract dispute seeking damages for past harm. Defendants also attempt to portray the chaotic series of grant freezing actions as an orderly "temporary pause" on funding that will shortly resume precisely the way Congress intended.[2] Nothing in the record supports this narrative. Defendants' actions are arbitrary and capricious, beyond their statutory authority, and unconstitutional. This Court has jurisdiction to enjoin them and provide the relief Plaintiffs have requested.

Recently, another court granted a preliminary injunction against the freeze of IRA and IIJA grant funding across the country. *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, No. 1:25-cv-00097-MSM-PAS, 2025 WL 1116157 (D.R.I. Apr. 15, 2025). Plaintiffs still need an order from this Court because their claims are much broader, and another court's order may not last or be complied with. *See* Dkt. No. 24-1 at 33–34. But that order's analysis supports

---

[1] *See* The White House, *Remarks by President Trump in Joint Address to Congress* (Mar. 6, 2025), https://www.whitehouse.gov/remarks/2025/03/remarks-by-president-trump-in-joint-address-to-congress/.

[2] Defendants cite limited pauses of specific funding by other administrations, Dkt. No. 56 at 6–7, but those "targeted pauses of funding for specific projects" are not "at all comparable" to the broad, nationwide freeze of funding at issue here. *See Nat'l Council of Nonprofits v. Office of Mgmt. & Budget*, No. 25-239, 2025 WL 597959, at *14 n.10 (D.D.C. Feb. 25, 2025).

Plaintiffs' arguments that this Court has jurisdiction, *Woonasquatucket*, slip op. at 28–35; that the challenged agency actions are subject to APA review, *id*. at 38; that those actions were arbitrary and capricious, *id.* at 39–45; that the irreparable injuries set out here are valid, *id.* at 50–55, including for subrecipients, *id.* at 15–16; and that no bond is appropriate, *id.* at 56–57.

## I.    <u>Plaintiffs Are Likely to Succeed on the Merits of Their Claims</u>

### A.  *The Court Has Jurisdiction Over All of Plaintiffs' Claims*

This Court has jurisdiction over Plaintiffs' claims. Defendants cannot turn this into a contract dispute that divests this Court of jurisdiction. Plaintiffs seek equitable and declaratory relief, not money damages; they challenge agency policy directives and processes and assert claims under statutory and constitutional provisions over which the Court of Federal Claims lacks jurisdiction. Plaintiffs do not rely on a contractual relationship with the government, and there is "no other adequate remedy," 5 U.S.C. § 704, in the Court of Federal Claims.

### 1.  *This Court Has Jurisdiction Over Plaintiffs' Ultra Vires Claims*

The entire basis for the Supreme Court's order in *Department of Education v. California*, 145 S. Ct. 966 (U.S. Apr. 4, 2025)—sovereign immunity—does not apply to Plaintiffs' *ultra vires* claims for constitutional and statutory violations. The Court found that the federal government was likely to succeed on its argument that the sovereign immunity waiver under 5 U.S.C. § 702 for APA claims did not apply, because the Tucker Act "impliedly forbids" the APA claims there under § 702. *Id.* at 968.[3] That holding has no relevance to Plaintiffs' *ultra vires*

---

[3] *California* did not purport to displace the Court' prior cases addressing the issue, including *Bowen v. Massachusetts*, 487 U.S. 879, 882–87 (1988); *Great-West Life v. Knudson*, 534 U.S. 204, 212 (2002); and *Maine Community Health Options v. U.S.*, 590 U.S. 296, 327 (2020). Indeed, mere weeks before its *California* decision, the Supreme Court denied a request for a stay in *Dep't of State v. AIDS Vaccine Advoc. Coal.*, 145 S. Ct. 753 (2025), over a dissent that raised arguments similar to those raised here.

claims because "sovereign immunity does not apply when a plaintiff files suit seeking equitable relief against federal officials . . . alleging that those officials exceeded the scope of their authority and/or acted unconstitutionally." *Strickland v. United States*, 32 F.4th 311, 363 (4th Cir. 2022). Defendants know this, which is why they remarkably make *no mention* of sovereign immunity, despite that being the sole basis for the Supreme Court's decision.

Defendants instead argue the Tucker Act deprives district courts of "jurisdiction" to hear any claims with respect to the freezing of grants. But Defendants do not even attempt to argue the Tucker Act meets the criteria for such a proposition. *See Axon Enter., Inc. v. FTC*, 598 U.S. 175, 186–89 (2023) (discussing criteria). Nor could they establish that Plaintiffs' constitutional and statutory claims are "of the type Congress intended to be reviewed" by the Court of Federal Claims, *id.* at 186, given that the Court of Federal Claims lacks jurisdiction to hear such claims because the relevant provisions are not "money-mandating." *United States v. Mitchell*, 463 U.S. 206, 216–17 (1983).

Regarding the constitutional claims in particular, the Tucker Act does not provide the Claims Court with jurisdiction to address claims concerning the separation of powers and the First Amendment. *LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995) (collecting cases); *Jiron v. United States*, 118 Fed. Cl. 190, 199 (2014).[4] Defendants rely on *Jackson v. United States*, 192 Ct. Cl. 765 (1970) and *Swaaley v. United States*, 180 Ct. Cl. 1 (1967), *see* Dkt. No. 56 at 12, but the Federal Circuit has expressly determined that jurisdiction in *Jackson* and *Swaaley* was based solely on a statutory entitlement to pay provided in the basic pay statute at the time. *United States v. Connolly*, 716 F.2d 882, 887 (Fed. Cir. 1983).

---

[4] In addition, the Supreme Court has expressly rejected the notion that Tucker Act jurisdiction is "exclusive." *Bowen*, 487 U.S. at 910 n.48; *Kidwell v. Dep't of Army, Bd. for Correction of Mil. Recs.*, 56 F.3d 279, 283 (D.C. Cir. 1995).

Defendants' argument would leave Plaintiffs with no forum to bring their constitutional claims, but "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." *Webster v. Doe*, 486 U.S. 592, 603 (1988). Defendants do not maintain, nor could they, that the Tucker Act includes such a clear statement of congressional intent. Plaintiffs' *ultra vires* claims must have a forum for review, and that is this Court. *See also Tootle v. Sec'y of the Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006) ("categorically reject[ing] the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims").

   2.   *This Court Has Jurisdiction Over Plaintiffs' APA Claims*

This Court also has jurisdiction over Plaintiffs' APA claims. Plaintiffs seek injunctive and declaratory relief not tied to the terms of any grant agreement. Although Plaintiffs have already suffered harm as a result of Defendants' actions, they do not seek damages for past harm, but rather protection from future unlawful interference. Plaintiffs challenge high-level agency policy directives and, in Defendants' implementation of those directives, ongoing violations of the grant programs' respective authorizing statutes and the Constitution. Plaintiffs seek forward-looking equitable relief to remove unlawful interference with congressional grant programs. *See Roetenberg v. Sec'y of Air Force*, 73 F. Supp. 2d 631, 636 (E.D. Va. 1999) ("It is settled that where . . . the essence of a claim is the equitable relief sought, and any financial ramifications of a favorable decision are subordinate to the equitable relief, the Court of Federal Claims does *not* have exclusive jurisdiction over that claim."); *see also AIDS Vaccine Advoc. Coal. v. Dep't of State*, Nos. 25-00400, 25-00402, 2025 WL 752378, at *9 (D.D.C. Mar. 10, 2025) (finding no Tucker Act jurisdiction where APA claims "challenge whether the agency action . . . was unlawful, irrespective of any breach" of a grant agreement), *appeal filed*, No. 25-5098 (D.C.

4

Cir. Apr. 2, 2025). This is precisely the type of "specific relief" that the Supreme Court has confirmed is well within a District Court's jurisdiction under the APA. *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988) (upholding injunction to correct the method of calculating statutorily obligated payments going forward); *id.* at 918 (Scalia, J., dissenting) (agreeing that only suits to compensate for a plaintiff's past losses belong in the Court of Federal Claims and explaining that, at common law, suits that "did not seek to compensate the plaintiff for a past loss in the amount awarded, but rather to prevent future losses" were considered suits for "specific relief," not for "money damages"); *see also Great-West Life & Annuity Ins Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002) (distinguishing *Bowen*'s "going forward" relief (District Court) from an injunction solely to enforce a contractual obligation to pay money past due (Court of Federal Claims)); *National Center for Mfg. Sciences. v. United States*, 114 F.3d 196, 201 (Fed. Cir. 1997) (explaining that grant restrictions governing future disbursal of funds made money judgment inappropriate, and reversing district court's transfer order).

Plaintiffs' APA claims are significantly different than those resolved in *Department of Education*.[5] There, the District Court found procedural irregularities in the termination letters for specific grants, concluding that in those letters the government had failed to adequately explain the reasoning behind the terminations; it did not reach the plaintiffs' substantive APA claims. *Dep't of Educ.*, 2025 WL 760825, at *2–3 & n.3. Here, by contrast, Plaintiffs challenge the lawfulness of Executive Orders, agency decisions through memos and actions, and their further implementation through as-yet unknown means. Dkt. No. 23 at 60–66. APA challenges to

---

[5] After *California*, multiple district courts have confirmed they have jurisdiction over funding freeze challenges like this one that involve APA claims. *E.g.*, *Maine v. USDA*, No. 1:25-CV-00131-JAW, 2025 WL 1088946, at *18–20 (D. Me. Apr. 11, 2025); *New York v. Trump*, No. 25-cv-39-JJM-PAS, 2025 WL 1098966 (D.R.I. Apr. 14, 2025); *Woonasquatucket*, slip op. at 28–35.

"invalidate agency policy directives," and an agency's implementation of those policy directives, are classic APA claims. *AIDS Vaccine Advoc. Coal.*, 2025 WL 752378, at *9.

The United States, meanwhile, appears to want to eliminate judicial review entirely. In a recent brief to the Federal Circuit, it argued that the Court of Federal Claims lacks jurisdiction over claims that "seek to obtain money by having a court enforce [a] statutory mandate . . . to award grants," suggesting the Court of Federal Claims "is not . . . the proper venue to review agency decisions in the administration of Federal programs" and relying on cases that demonstrate this Court's jurisdiction, including *Bowen* and *Katz v. Cisneros*, 16 F.3d 1204 (Fed. Cir. 1994). Opening Brief, *112 Genesee Street, LLC v. United States*, No. 25-1373 (Fed. Cir. Mar. 14, 2025) (attached as Exhibit 1), at 1, 38–45. Plaintiffs' claims belong in this Court.

### B.  The Executive Orders and Program Freezing Actions Violate the Separation of Powers and the First Amendment

#### 1.  The Executive Orders and Program Freezing Actions Violate the Separation of Powers

Defendants' separation of powers rebuttal distorts the Executive Orders and Program Freezing Actions beyond recognition. Defendants claim that "the government here has not tacked on new conditions that must be met to obtain funds." Dkt. No. 56 at 26. Yet that is precisely what Defendants have done, prohibiting the disbursement of *any* IRA or IIJA funds that are not "consistent[]" with President Trump's policies, Energy EO § 7; *id.* § 2(i), and terminating all "'equity-related' grants or contracts," Equity EO § 2(b). Defendants do not point to a single grant program where Congress conditioned funding on any of the President's stated policies in the Executive Orders.[6] "Because the Executive Order directs Executive Branch administrative

---

[6] Even the President's "electric vehicle" policy cherrypicked by Defendants, *see* Dkt. No. 56 at 29, clearly disfavors "subsidies" for electric vehicles provided for by Congress. *Compare* Energy EO § 2(e) (directing agencies to consider eliminating "unfair subsidies . . . that favor EVs

agencies to withhold funding that Congress has not tied to compliance with [the President's policies], there is no reasonable argument that the President has not exceeded his authority" and "violate[d] the constitutional principle of the Separation of Powers." *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1234–35 (9th Cir. 2018).

Moreover, Defendants have provided no evidence that they are on a path to "spend the full amount appropriated by Congress for programs that are consistent with the legislation but are simply different from the particular projects selected by the previous administration," as they claim. Dkt No. 56 at 1. Public statements suggest the opposite is true. For example, Defendant EPA Administrator Zeldin recently announced that he had "identified and cancelled more than 400 additional grants across nine unnecessary programs totaling $1.7 billion in *savings for the American people*," including grants "related to DEI and environmental justice."[7]

Defendants' addition of conditions that directly conflict with the purposes of the statutory grant programs further underscores this point. For example, Congress created "Environmental and Climate Justice Block Grants" to "benefit disadvantaged communities," 42 U.S.C. § 7438, and "Greenhouse Gas Air Pollution Plans and Implementation Grants" to mitigate climate change through "the reduction of greenhouse gas air pollution." 42 U.S.C. § 7437. By contrast, the agencies froze and terminated grants "which reference or relate in any way to climate change, 'greenhouse gas' emissions, . . . [or] environmental justice," Dkt. No. 23-12 at 2, as well as "DEI

---

[electric vehicles] over other technologies"), *with* Infrastructure Investment and Jobs Act, Pub. L. No. 117-58 § 11401(a), 135 Stat. 429,546 (2021) ("Grants for Charging and Fueling Infrastructure," appropriating funds to subsidize "electric vehicle charging infrastructure").

[7] EPA, *EPA Administrator Lee Zeldin Cancels 400+ Grants in 4th Round of Cuts with DOGE, Saving Americans More than $1.7B* (Mar. 10, 2025) (emphasis added), https://www.epa.gov/newsreleases/epa-administrator-lee-zeldin-cancels-400-grants-4th-round-cuts-doge-saving-americans.

. . . [or] the green new deal," Dkt. No. 23-6 at 3, and targeted grants that contain terms *specifically used by Congress*,[8] such as "Environmental and Climate Justice," "disadvantaged," "greenhouse gas," "underserved," "discrimination," and even "IRA" and "IIJA." Dkt. No. 35-5. Defendants' retort that the mandatory "shall" language in many statutory grant programs is attached to "broad policy goals" that allow some discretion, Dkt. No. 56 at 16, does not leave Defendants free to freeze funds based on executive policies that conflict with Congress's.

The upshot is best summarized by President Trump himself, who ordered the agencies to "Terminat[e]" the IRA and IIJA, which he terms "the Green New Deal." Energy EO § 7. The Energy EO thus expressly targets for "terminat[ion]" Congress's decision to enact and fund legislation. Defendants' claim that they have simply "[chosen] to focus on different ways to achieve the conditions outlined by Congress," Dkt. No. 56 at 26, borders on the absurd.

### 2. The Executive Orders and Program Freezing Actions Violate the First Amendment

The First Amendment "prohibits the government from telling people what they must say," whether through coercion or threats to funding. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213–14 (2013) ["*USAID*"] (internal quotation omitted). That is exactly the situation here. The Equity EO, for example, is a sweeping directive that targets specific words and concepts for punitive funding freezes and cancellations; EPA's keyword flowchart further implements this unlawful approach. Dkt. No. 35-5 at 27–28. EPA's actions toward plaintiff Sustainability Institute bring this problem into even sharper focus. The Charleston-based affordable housing nonprofit was instructed by EPA to "sanitize" project materials to maintain

---

[8] *E.g.*, 42 U.S.C. §§ 7437–38; American Rescue Plan Act of 2021 § 1005, Pub. L. 117-2, 135 Stat. 4, at 13–14 (grants for "socially disadvantaged farmers [and] ranchers"); Inflation Reduction Act, Pub. L. 117-169, § 22007, 136 Stat. 1818, at 2021–23 (2022) (grants for "underserved farmers" and those who have experienced "discrimination" in USDA programs).

funding, and on March 5, 2025, received a copy of its workplan marked "Sanitized," with terms such as "disadvantaged," "predominantly Black community," and "greenhouse gas" highlighted for removal. Dkt. No. 35-5. As this example makes clear, the Freezing Actions fall far outside any permissible restrictions to "define the limits of the government spending program," *USAID*, 570 U.S. at 214, because the message was that the same work would receive the same funding, so long as disfavored viewpoints were excised. Indeed, Congress defined the "limits of the government spending programs" here to *promote* the concepts Defendants now seek to censor.

The government's reliance on *Rust v. Sullivan*, 500 U.S. 173 (1991), is misplaced because that case concerned government speech and permissible limits on the government's own messaging via contractors. As the Supreme Court later clarified, "[i]t does not follow . . . that viewpoint-based restrictions are proper when the [government] does not itself speak." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542 (2001) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 834 (1995)). Here, the speakers are private, nonprofit organizations implementing their own community programs, not contractors paid to deliver a government message. The government cannot penalize their funding based on their protected viewpoints.

Plaintiffs' concerns about chilling or retaliation against protected expression are based on the government's conduct and official statements, which have identified such language as grounds for canceling grants, targeted grantees who have previously advocated for disfavored causes (the Equity EO reaches back to 2021, Equity EO § 2), and subjected certain grantees to scrutiny and harassment.[9] Courts have recognized that the threat of funding loss and a reasonable

---

[9] *See, e.g.*, EPA, *EPA Administrator Lee Zeldin Cancels Nine More Contracts, Saving Nearly $60 Million* (Feb. 14, 2025), https://www.epa.gov/newsreleases/epa-administrator-lee-zeldin-cancels-nine-more-contracts-saving-nearly-60-million; USDA, *Secretary Rollins Takes Bold Action to Stop Wasteful Spending and Optimize USDA to Better Serve American Agriculture* (Feb. 14, 2025), https://www.usda.gov/about-usda/news/press-releases/2025/02/14/secretary-rollins-takes-

fear of adverse consequences can support a First Amendment claim. *See USAID*, 570 U.S. at 214. The Program Freezing Actions chill not only Plaintiffs' ongoing speech as grantees, but also future advocacy for work Congress intended to support.

### C. The Program Freezing Actions Violate the APA

#### 1. Agency Actions Implementing Executive Orders Are Reviewable Under the APA

Defendants are incorrect that their arbitrary freezing actions are "committed to agency discretion by law" under 5 U.S.C. § 701(a)(2). Dkt. No. 56 at 14–15. In fact, there is a longstanding "strong presumption" favoring judicial review of agency action. *See, e.g.*, *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018). Accordingly, Section 701(a)(2) applies only in "rare circumstances" where a court would have "no meaningful standard against which to" review an agency's discretionary action. *Dep't of Com. v. New York*, 588 U.S 752, 772 (2019). That is, circumstances where "there is no law to apply." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971).

The fact that a statute "confers broad authority" on an agency does not mean that the agency's "discretion [is] unbounded." *New York*, 588 U.S. at 771–72. So long as the "language and structure of the underlying statute" provide "judicially manageable standards," the agency's decision is reviewable. *Pol'y & Rsch., LLC v. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 73–74, 76 (D.D.C. 2018) (Jackson, J.) (noting agencies "frequently cabin" discretionary funding determinations by regulation).

Here, there is clearly "law to apply" with respect to each of Plaintiffs' claims. Whether

---

bold-action-stop-wasteful-spending-and-optimize-usda-better-serve-american; Lee Zeldin (@epaleezeldin), X (Mar. 9, 2025, 4:26 PM), https://x.com/epaleezeldin/status/1898832850843005435 (targeting the nonprofit Power Forward Communities).

the Executive Orders and Program Freezing Actions are unconstitutional, violate federal statutes, or are arbitrary and capricious are classic legal questions that courts assess every day in reviewing federal government actions. The government has no "discretion," for example, to refuse to comply with statutory directives, to fail to spend appropriations that Congress directed must be spent on particular purposes, to "defer" obligating or expending funds in violation of the Impoundment Control Act, or to make final decisions that lack reasoned decision-making, weigh improper considerations, and ignore reliance interests.

Defendants rely heavily on *Lincoln v. Vigil*, 508 U.S. 182 (1993), Dkt. No. 56 at 14–15, but that case involved decisions about the allocation of funds from a "lump-sum appropriation"—not competitive grant programs carefully crafted by Congress and already awarded by the Defendants. While in *Lincoln*, the Court invoked the "fundamental principle of appropriations law" that where "Congress merely appropriates lump-sum amounts without statutorily restricting what can be done with those funds, a clear inference arises that it does not intend to impose legally binding restrictions." 508 U.S. at 192. This is not true for the grant programs here, which have been awarded to Plaintiffs for specific purposes and with specific restrictions and which require Defendants to comply with federal grant regulations before taking any steps to freeze funds. *See* 2 C.F.R. §§ 200.300–200.346. These regulations provide "meaningful standards for the court to employ when reviewing agency decisions under the APA." *Woonasquatucket*, slip op. at 38 (quoting *Pol'y & Rsch., LLC*, 313 F. Supp. 3d at 76).

The other cases cited by Defendants are similarly unavailing. Dkt. No. 56 at 15. In *Milk Train Inc. v. Veneman*, Congress appropriated funds to be used "to provide assistance directly to . . . dairy producers, in a manner determined appropriate by the Secretary." 310 F.3d 747, 751 (D.C. Cir. 2002) (internal quotation omitted). No such broad grant of discretion is present in the

11

grant programs at issue here. And in *Community Action of Laramie Cnty, Inc. v. Bowen*, the court upheld an ALJ's selection of the remedy of grant termination after an organization violated the terms of the grant—a factual situation vastly different than the one here. 866 F.2d 347, 351, 354 (10th Cir. 1989).

Moreover, assuming *arguendo* that funding decisions fell within agency discretion, judicial review is appropriate where that decision-making is tainted by the consideration of unlawful factors. *See Save the Bay, Inc. v. EPA*, 556 F.2d 1282, 1293 (5th Cir. 1977); *see also Town of Orangetown v. Ruckelshaus,* 579 F. Supp. 15, 20 (S.D.N.Y. 1984) (requiring a "reasoned process of considering relevant factors"). Here, rather than considering "relevant factors," set out by Congress, Defendants simply froze funding based on unlawful directives.

For example, although Defendants have elsewhere claimed that the Equity EO only requires compliance with "already 'applicable Federal anti-discrimination laws,'" *see* Time Sensitive Motion for Stay Pending Appeal at 24–25, *Nat'l Assoc. of Diversity Officers in Higher Ed. v. Trump*, No. 25-1189 (4th Cir. Mar. 4, 2025), ECF No. 13, the Freezing actions at issue here go beyond neutral enforcement of such laws. EPA's freezing of grants based on the mere inclusion of certain disfavored keywords (like "black and latinX," "justice," and "equal opportunity," Dkt. No. 35-5 at 27–28) are unlawful factors, and reviewable here.

Further, contrary to Defendants' assertions, *see* Dkt. No. 56 at 28–29, "final agency actions, even if implementing an executive order, are subject to judicial review under the APA." *State v. Su*, 121 F.4th 1, 15 (9th Cir. 2024). "[T]hat the [agency actions] are based on the President's Executive Order hardly seems to insulate them from judicial review under the

APA[.]" *Chamber of Com. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996).[10]

> ## 2. The Program Freezing Actions Are Arbitrary and Capricious

Defendants fail to dispel the arbitrary and capricious nature of their actions. As to the

Plaintiffs' reliance interests, Defendants do not dispute they "indefinitely froze funding without

considering the 'serious reliance interests' of recipients, including Plaintiffs, on those funds."

Dkt. No. 24-1 at 24 (quoting *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

Instead, Defendants suggest they are not required to "account for grantees' reliance interests in

their continued receipt of funding" because "those reliance interests are contrary to the objectives

articulated by the President." Dkt. No. 56 at 30. Of course, there is no "the President really wants

it" exception to the APA's requirements. The reliance of DACA recipients was also contrary to

President Trump's policies, yet the Supreme Court held it was arbitrary and capricious to rescind

DACA without "assess[ing] whether there were reliance interests, determin[ing] whether they

were significant, and weigh[ing] any such interests against competing policy concerns." *Dep't of

Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 33 (2020). The same is true here.

As to the agencies' reliance "'on factors which Congress has not intended [them] to

consider,'" Dkt. No. 24-1 at 25, Defendants cannot explain the blatant conflicts between the

policies motivating the Program Freezing Actions and the policies of Congress in the IRA, IIJA,

and other statutory grant programs. *See id.* at 4–6, 8–15, 26–28; *supra* at 7–8. Defendants'

contention that the President's freezing policies "dovetail[]" with Congress's strains credulity

and is not supported by any evidence. Dkt. No. 56 at 29; *see also supra* note 8.  And while

---

[10] Defendants rely on *Franklin v. Massachusetts*, which held that the *President's* actions are not subject to APA review because the *President* is not an "agency." 505 U.S. 788, 800–01 (1992). "But expanding *Franklin* to cover such actions—taken by an agency—contradicts the text of the APA." *Su*, 121 F.4th at 15.

Defendants suggest they may redefine "disadvantaged communities" and other policy objectives set out in the statutory grant programs, *see* Dkt. No 56 at 3–5, 16, Defendants have not provided new definitions of these concepts, much less given "good reasons for the new policy" or an explanation as to why it would be "permissible under the statute." *Fox*, 556 U.S. at 515.

### 3. The Program Freezing Actions Substantively Violate the APA

Defendants provide no rebuttal to justify their substantive APA violations. As to Defendants' violations of the statutory grant programs, *see* Dkt. No. 24-1 at 27–28, Defendants claim these statutes afford them discretion in how to allocate funds. Dkt. No. 56 at 2–5, 14–16. But whatever discretion Defendants may have clearly does not allow them to freeze or cancel grants based on policies that *conflict with Congress's*. *Supra* at 7–8; Dkt. No. 24-1 at 27–28.

As to the Impoundment Control Act ("ICA"), Defendants do not dispute that the Program Freezing Actions violate the ICA, Dkt. No. 24-1 at 28–29, thus waiving any defense on the merits. Instead, Defendants assert that Plaintiffs may not bring such a claim under the APA at all, Dkt. No. 56 at 24–25—an argument twice rejected by courts in recent weeks. *AIDS Vaccine Advoc. Coal.*, 2025 WL 752378, at *17 n.17; *New York v. Trump*, No. 25-cv-39, 2025 WL 715621, at *9–10 & n.13 (D.R.I. Mar. 6, 2025). The APA allows claims for the violation of other statutes, 5 U.S.C. § 706(2)(A), (C), "except to the extent that [] statutes preclude judicial review." *Id.* § 701(a)(1). Nothing in the ICA precludes review of APA claims "with sufficient clarity to overcome the strong presumption in favor of judicial review." *Confederated Tribes of Chehalis Rsrv. v. Mnuchin*, 976 F.3d 15, 21 (D.C. Cir. 2020) (quotation omitted), *rev'd on other grounds sub nom.*, *Yellen v. Confederated Tribes of Chehalis Rsrv.*, 594 U.S. 338 (2021).[11]

---

[11] Indeed, Defendants point to the Comptroller General's authority to sue under the ICA as implicitly precluding review under the APA, Dkt. No. 56 at 24–25, yet the ICA grants no authority to the Comptroller to sue over funds *already obligated*—which is the case for the vast

Defendants are also wrong that the remedy for a violation of the ICA "would be a directive to communicate the special message" to Congress. Dkt. No. 56 at 25. On the contrary, "[t]he ICA does not permit deferrals for policy reasons," GAO, *Office of Mgmt. & Budget – Withholding of Ukraine Security Assistance*, B-331564, at 6 (Jan. 16, 2020), https://perma.cc/6TMT-3CH2; 2 U.S.C. § 684(b), necessitating an injunction to preclude these unlawful deferrals. Moreover, the President has no authority to rescind appropriated funds without Congress's approval, *see* 2 U.S.C. § 683(b), making an injunction doubly appropriate.

## II.     Plaintiffs Face Irreparable Harm and Have Standing

Defendants claim that "in some cases," Plaintiffs have failed to allege facts to support standing, Dkt. No. 56 at 17, and failed to show irreparable harm for "each Plaintiff . . . on its own." *Id.* at 31 n.3. Only one Plaintiff needs standing, *Doe v. Porter-Gaud School*, 649 F. Supp. 3d 164, 172 (D.S.C. 2023), and with constitutional violations at stake, an injunction is warranted without the microscopic harm analysis urged by Defendants. *See Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) ("Because there is a likely constitutional violation, the irreparable harm factor is satisfied."). Nevertheless, Plaintiffs have demonstrated standing and irreparable harm for *every* Plaintiff. As Plaintiffs explained in their opening brief, Dkt. No. 24-1 at 30–34, Plaintiffs' injuries are organizational, reputational, and constitutional. As the chart attached as Exhibit 2 summarizes, Plaintiffs' allegations and sworn declarations demonstrate at least one such injury for each Plaintiff.

Defendants do not dispute that these injuries are "fairly traceable" to the Executive Orders or Program Freezing Actions, or that they are "likely to be redressed by a favorable

---

majority of Plaintiffs' withheld funding. *See* 2 U.S.C. § 687 (granting Comptroller authority to sue "to require . . . budget authority *to be made available for obligation*" (emphasis added)).

decision." *See Bryant v. Woodall*, 1 F.4th 280, 285 (4th Cir. 2021) (elements of standing). Instead, Defendants contest the injuries themselves, to no avail.

First, Defendants note that certain grant agreements have not yet been finalized. Dkt. No. 56 at 17. But Plaintiffs have standing to challenge the freeze of grants they wish to compete for and finalize. *See Preston v. Heckler*, 734 F.2d 1359, 1365 (9th Cir. 1984) ("[W]hen challenged agency conduct allegedly renders a person unable to fairly compete for some benefit, that person has suffered a sufficient 'injury in fact' and has standing under the APA.").

Defendants next assert that some Plaintiffs lack standing as "subrecipients" of federal grants. Dkt. No. 56 at 18. That could be true if Plaintiffs were bringing a breach of contract action, but they are not. Defendants do not dispute that the Executive Orders and Program Freezing Actions caused subrecipients' injuries, depriving them of funds they otherwise would have received from the prime recipients. That establishes the subrecipients' standing to challenge these actions. *See Tozzi v. U.S. Dep't of Health & Human Servs.*, 271 F.3d 301, 308 (D.C. Cir. 2001) (when challenging agency action causing injury through a third party, "we have required only a showing that the agency action is at least a substantial factor motivating the third parties' actions"); *see also City of Cleveland v. Ohio*, 508 F.3d 827, 835–36 (6th Cir. 2007).

Defendants further claim that "some Plaintiffs have access to money" *at this moment*. Dkt. No. 56 at 17. Defendants overlook that, for those few Plaintiffs, access to funds has shifted on and off again, creating significant uncertainty that makes grant administration nearly impossible as organizations struggle to plan, commit to large purchases, and hire necessary staff. *See, e.g.*, Dkt. No. 23 ¶¶ 63, 72. "A single disbursement does not protect a recipient when the next disbursement is equally as vital." *Nat'l Council of Nonprofits*, 2025 WL 597959, at *18.

16

Defendants discount Plaintiff Cities' irreparable harm. Dkt. No. 56 at 34. Defendants overlook that the Cities operate on thin budgets, *e.g.*, Dkt. No. 24-20 ¶¶ 5–6 (San Diego's expected $1 billion deficit), with tens of millions in frozen grant funds creating "budget uncertainty [that] is also causing . . . irreparable harm," *County of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017); threatening layoffs of grant-funded positions and harming local job and business growth, Dkt. No. 24-20 ¶ 8; Dkt. No. 24-18 ¶¶ 12, 24; Dkt. No. 24-17 ¶ 35; Dkt. No. 24-19 ¶¶ 14, 27, 30–31; preventing the Cities from honoring agreements with sub-grantees, Dkt. No. 24-17 ¶¶ 24–25; undermining referenda, Dkt. No. 24-18 ¶¶ 15, 19–23; jeopardizing the Cities' ability to plan for the future, Dkt. No. 24-19 ¶¶ 19, 28; diverting funds away from other services for citizens, including essential services, Dkt. No. 24-20 ¶ 8; Dkt. No. 24-16 ¶¶ 19–22; Dkt. No. 24-15 ¶ 36; and depriving citizens of access to important public programs, Dkt. No. 24-17 ¶¶ 30, 33–35; Dkt. No. 24-18 ¶¶ 10, 14, 25; Dkt. No. 24-15 ¶¶ 22–24, 37, 45–46; Dkt. No. 24-19 ¶¶ 15, 20–21, 29. These harms defy damages and are irreparable.

Defendants' remaining arguments can be quickly discarded. Defendants' selective quotes from *three* of Plaintiffs' *twenty* declarations are undermined by the clear statements of harm in the same paragraphs Defendants quote. Dkt. No. 56 at 32–33.[12] Defendants' assertion that monetary harms can be remedied by damages at final judgment, *id*. at 33–34, ignores the significant non-monetary and irreparable harms caused by the ongoing lack of reliable access to promised funds, which cannot be remedied at judgment. *See* Dkt. No. 24-1 at 30–34; Ex. 2.

---

[12] *E.g.*, Dkt. No. 24-2 ¶¶ 42, 45 ("We need access to funding to proceed with every aspect of this project" and "any disruption due to the funding freeze erodes [] trust" in the Sustainability Institute); Dkt. No. 24-11 ¶ 24 ("Because of the federal funding freeze, we are also unable to pay our Climate-Smart sub-awardees, . . . which will lead to serious consequences to our relationships with our partners [and] farmers we serve[.]"); Dkt. No. 24-6 ¶ 17 (funding freeze "directly harms public health and water quality").

### III.     The Equities and Public Interest Favor a Preliminary Injunction

Orderly implementation of the grant programs mandated by Congress is manifestly in the public interest. *See* Dkt. No. 24-1 at 35–36. Defendants emphasize the large totals of federal grant funding at issue in this case, but as Plaintiffs have explained, grantees are not paid a lump sum, but rather reimbursed as they implement their grant program plans. *See* Dkt. No. 24-1 at 7. Moreover, Defendants' concern about funding they may need to disburse during the pendency of this litigation is overstated. Plaintiff Pasa Sustainable Agriculture, singled out by Defendants, Dkt. No. 56 at 35, could not immediately draw down $59 million, but rather seeks only the orderly funding of its grant to enable it to continue its work; due to Defendants' actions, it has been forced to furlough seventy-seven staff members. Exhibit 3 at ¶ 4.

### IV.     A Security Bond Is Not Required Here

As Plaintiffs have explained, a zero or minimal security bond is appropriate here. Dkt. 24 at 2–3. The fact that the White House has a policy directing the Department of Justice to seek security bonds has no relevance to the Court's analysis on this point.

### V.     Conclusion

The Court should grant Plaintiffs' motion for preliminary injunction.

Respectfully submitted, this 16th day of April, 2025,

/s/ Carl T. Brzorad
Carl T. Brzorad (S. C. Bar No. 105413)
SOUTHERN ENVIRONMENTAL LAW
CENTER
525 East Bay Street, Suite 200
Charleston, SC 29403
Telephone: (843) 720-5270
Facsimile: (843) 414-7039
cbrzorad@selc.org

/s/ Kimberley Hunter
Kimberley Hunter (N. C. Bar No. 41333)

Irena Como (N. C. Bar No. 51812)
Nicholas S. Torrey (N. C. Bar No. 43382)
Benjamin J. Grillot (DC Bar No. 982114)
(Pro Hac Vice pending)
SOUTHERN ENVIRONMENTAL LAW
CENTER
136 East Rosemary Street, Suite 500
Chapel Hill, NC 27514
Telephone: (919) 967-1450
Facsimile: (919) 929-9421
kmeyer@selc.org
icomo@selc.org

ntorrey@selc.org
bgrillot@selc.org

*Counsel for Plaintiffs The Sustainability
Institute, Agrarian Trust, Alliance for
Agriculture, Alliance for the Shenandoah
Valley, Bronx River Alliance, CleanAIRE
NC, Conservation Innovation Fund, Earth
Island Institute, Leadership Counsel for
Justice and Accountability, Marbleseed,
Organic Association of Kentucky,
Pennsylvania Association of Sustainable
Agriculture, and Rural Advancement
Foundation International - USA*

/s/ Graham Provost
Graham Provost (DC Bar No. 1780222)
(Pro Hac Vice pending)
Elaine Poon (VA Bar No. 91963)
(Pro Hac Vice pending)
Jon Miller (MA Bar No. 663012)
(Pro Hac Vice pending)
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609
Telephone: (510) 738-6788
graham@publicrightsproject.org

*Counsel for Plaintiffs Baltimore, Maryland,
Columbus, Ohio, Madison, Wisconsin,
Nashville, Tennessee, and New Haven,
Connecticut*

/s/ Mark Ankcorn
Mark Ankcorn, Senior Chief Deputy City
Attorney
(CA Bar No. 166871)
(Pro Hac Vice pending)
1200 Third Avenue, Suite 1100
San Diego, California 92101-4100
(619) 533-5800
mankcorn@sandiego.gov

*Counsel for Plaintiff City of San Diego*

## CERTIFICATE OF SERVICE

I certify that on April 16th, 2025, I electronically filed the foregoing with the Clerk of the Court by using the Court's CM/ECF system.

/s/ Carl T. Brzorad
Carl T. Brzorad (S. C. Bar No. 105413)
SOUTHERN ENVIRONMENTAL LAW CENTER
525 East Bay Street, Suite 200
Charleston, SC 29403
Telephone: (843) 720-5270
Facsimile: (843) 414-7039
cbrzorad@selc.org