actions, that is properly the subject of separate litigation. But Plaintiffs cannot use a Complaint and TRO motion directed against an OMB Memorandum as a basis for obtaining significantly broader relief against Defendants' federal funding decisions writ large.

Indeed, even with respect to the now-withdrawn OMB Memo, Plaintiffs have not established that they would have suffered irreparable injury as a result of the Memo's direction to agencies that they temporarily pause certain funding, to the extent permissible by law, pending a review to ensure that such funding is consistent with the President's priorities. Plaintiffs' filings portray the OMB Memo as an across-the-board suspension of all Federal financial assistance. Although Plaintiffs acknowledged that OMB had subsequently issued additional Guidance clarifying that the OMB Memo did *not* apply across-the-board and did *not* apply to many types of funding, *see, e.g.*, Compl. ¶ 3, Plaintiffs opted not to file that Guidance with the Court. *See* OMB Guidance (attached hereto).

Importantly, that Guidance makes plain that many of Plaintiffs' claimed harms and sources of funding would not be subject to the pause. *See id.* at 1 ("Any program not implicated by the President's Executive Orders is not subject to the pause."); *id.* at 1-2 ("[A]ny program that provides direct benefits to Americans is explicitly excluded from the pause and exempted from this review process. In addition to Social Security and Medicare, already explicitly excluded in the guidance, mandatory programs like Medicaid and SNAP will continue without pause. Funds for small businesses, farmers, Pell grants, Head Start, rental

3

assistance, and other similar programs will not be paused."). Particularly in light of this Guidance, Plaintiffs have not carried their burden of establishing the need for immediate relief in the short timeframe relevant to litigating a preliminary-injunction motion.

**Second,** Plaintiffs cannot transform their lawsuit into a vehicle to seek relief against other actions, such as the President's Executive Orders or agencies' ongoing implementation of those Orders. The President's Executive Orders are not subject to direct challenge; the Supreme Court has made clear that courts have "no jurisdiction . . . to enjoin the President in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867); *see also Franklin v. Massachusetts*, 505 U.S. 788, 827 (1992) (Scalia, J., concurring in part). And with respect to agency actions, the Administrative Procedure Act (APA) permits review only over "final agency action," 5 U.S.C. § 704, and such final agency actions must be "circumscribed [and] discrete." *Norton v. Southern Utah Wilderness Alliance (SUWA)*, 542 U.S. 55, 62 (2004). The APA does not provide for "general judicial review of [an agency's] day-to-day-operations," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1999). But that is precisely what Plaintiffs seek here, by demanding ongoing judicial oversight over twenty-six Defendants' funding decisions. And they seek such relief despite their Complaint identifying only one agency action—the OMB Memo—that has now been withdrawn and was not itself a final agency action determining rights and consequences with respect to any particular funding award.

**Third,** even if the Court were willing to consider Plaintiffs' claims on the

EPA_00049368

merits, Plaintiffs have not established a likelihood of success. The overarching theme of Plaintiffs' claims is that OMB's categorical pause in funding was unlawful. But as a factual matter, OMB did not direct a categorical pause—it directed that agencies pause certain funding, to the extent permissible by law, consistent with their own individual authorities. Courts have routinely upheld such orders. *See, e.g., Allbaugh*, 295 F.3d at 32; *Common Cause v. Trump*, 506 F. Supp. 3d 39, 47 (D.D.C. 2020). Definitionally, directing executive agencies to take action *to the extent consistent with applicable law* cannot be interpreted as an order to violate the law.

As a legal matter, moreover, temporary pauses in funding are commonplace and accepted by the Legislative Branch. *See City of New Haven v. United States*, 809 F.2d 900, 901 (D.C. Cir. 1987) (explaining how Congress has previously "acknowledged that 'the executive branch necessarily withholds funds on hundreds of occasions during the course of a fiscal year' and such delays may result from the 'normal and orderly operation of the government'" (quoting H.R. Rep. No. 658, 93d Cong., 1st Sess. 41 (1971)). The Government Accountability Office (GAO), itself an entity within the Legislative Branch, has approved of agencies "taking the steps it reasonably believes are necessary to implement a program efficiently and equitably, even if the result is that funds temporarily go unobligated." *In re James R. Jones, House of Representatives*, B-203057 L/M, 1981 WL 23385 (Comp. Gen. Sept. 15, 1981). The OMB Memo fits comfortably within this Executive Branch practice of short-term delays in order to determine how best to implement programs consistent

5

EPA_00049369

with the President's policy objectives and consistent with the underlying law governing each program.

**Fourth**, the balance of the equities here weighs in favor of denying relief. Plaintiffs have not established irreparable harm based on the actual terms of the OMB Memo and OMB Guidance, and meanwhile they seek relief that would effectively prohibit twenty-six federal agency Defendants, as well as the President himself, from implementing the President's priorities consistent with their constitutional and statutory authorities. "Any time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (brackets omitted).

Thus, the proper course here is to deny relief entirely. To the extent the Court issues injunctive relief, the United States respectfully requests that such relief be stayed pending the disposition of any appeal that is authorized, or at a minimum that such relief be administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the court of appeals if an appeal is authorized.

## II.  Relief Should Be Limited In Five Ways

To the extent the Court considers entering Plaintiffs' proposed temporary restraining order, that order should be limited in five ways to mitigate (albeit not eliminate) the significant harms it would cause Defendants.

EPA_00049370

### 1.  Limit Relief Only to What Is Challenged In This Case

It is axiomatic that Plaintiffs are not entitled to emergency injunctive relief that goes beyond the scope of what they challenge in this case.  *See, e.g., Bird v. Barr*, No. 19-cv-1581, 2020 WL 4219784, at *2 (D.D.C. July 23, 2020) (a preliminary injunction "is not a generic means by which a plaintiff can obtain auxiliary forms of relief that may be helpful to them while they litigate unrelated claims"); *City of N.Y. v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 145 (2d Cir. 2011) ("An injunction is overbroad when it seeks to restrain the defendants from engaging in legal conduct, or from engaging in illegal conduct that was not fairly the subject of litigation."). Here, Plaintiffs' Complaint challenges only the now-rescinded OMB Memo, not any independent Executive Orders—which were issued prior to the OMB Memo and which Plaintiffs elected not to challenge.  The scope of Plaintiffs' challenge is clear from Plaintiffs' Prayer for Relief, which asks for various forms of relief relating only to the "OMB Directive," and not to any Executive Orders.  See Compl. at 35–36.

Thus, the Court's Order should make clear that it does not prohibit agencies from implementing the President's Executive Orders, to the extent permissible within the agency's underlying statutory authorities.  Failure to include that clarification would highlight the extraordinarily intrusive nature of Plaintiffs' relief, prohibiting twenty-six Defendants from implementing the President's priorities consistent with their authorities, as they are required to do.  *Sherley*, 689 F.3d at 784.

### 2.  Limit Relief Only to Awards Involving Plaintiffs

It is a bedrock principle of equity that "injunctive relief should be no more

EPA_00049371

burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). In some provisions, Plaintiffs' proposed TRO seems to request relief only to awards involving the Plaintiffs here. *E.g.*, Prop. TRO at 3 ("Defendants shall not impede Plaintiffs' access to such awards and obligations"). Other provisions, however, would seem to restrict Defendants' activities with respect to *all* federal financial assistance, regardless of recipient. *E.g.*, *id.* at 2 ("Defendants shall refrain from pausing, freezing, impeding, blocking, canceling, or terminating Defendants' compliance with awards and obligations to provide federal financial assistance").

There is no basis for extending relief to non-parties in this suit, and absent that limitation, Plaintiffs' requested TRO would threaten to interfere with implementation of Executive Orders that do not appear to have any effect on Plaintiffs. *See, e.g.*, Reevaluating and Realigning United States Foreign Aid (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/reevaluating-and-realigning-united-states-foreign-aid/. Accordingly the Court should include a paragraph confirming that all obligations in the TRO apply only with respect to awards involving Plaintiffs.

### 3. Eliminate Paragraph on Purported Re-Issuance of OMB Memo, or Clarify Defendants Are Allowed to Advise Agencies on Exercising Their Own Authority

Plaintiffs' proposed TRO includes a paragraph requesting that the Court "restrain[] and prohibit[] [Defendants] from reissuing, adopting, implementing, or otherwise giving effect to the OMB Directive under any other name or title or through

8

any other Defendants . . . such as the continued implementation identified by the White House Press Secretary statement of January 29, 2025." Prop. TRO at 3.

Defendants do not understand the meaning of this paragraph or how they could be expected to determine whether any particular funding decision could be construed as "giving effect to the OMB Directive under any other name or title." *Id.* In particular, the OMB Memo instructed agencies to act "to the extent permissible under applicable law." OMB Memorandum M-25-13 at 2, ECF No. 1-1. And as discussed above, there is no apparent dispute that agencies are allowed to exercise their own independent authorities in administering their federal funding, as the preceding paragraphs of Plaintiffs' proposed TRO reflect. But any of those actions— *e.g.*, further instructions from OMB that agencies should act consistent with their own authorities, or any individual agency's own funding-related decision pursuant to its own authorities—could be construed as "giving effect to the OMB Directive under" a different "name or title," or through a different Defendant. Thus, this paragraph threatens to prohibit actions that are plainly lawful, and that are expressly permitted elsewhere in Plaintiffs' proposed TRO.

Moreover, the second half of the paragraph—prohibiting "the continued implementation identified by the White House Press Secretary statement"—is further problematic for failing to "state its terms specifically," and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed R. Civ. P. 65(d)(1)(C).

Given the problems inherent in this paragraph's vague language, and the risk

EPA_00049373

that this paragraph could enjoin large swaths of lawful efforts to implement Federal financial assistance, the simplest solution would be to delete the paragraph entirely. Notably, the paragraph is not necessary to address concerns about ensuring that funding continues, which would already be addressed by other paragraphs in Plaintiffs' proposed order. Thus, it should be deleted as unnecessary and overbroad. *Cf. Mickalis Pawn Shop*, 645 F.3d at 145 ("An injunction is overbroad when it seeks to restrain the defendants from engaging in legal conduct, or from engaging in illegal conduct that was not fairly the subject of litigation.").

Regardless of whether the Court deletes the above-referenced paragraph, Defendants request that the Court include an additional paragraph making clear that nothing in the order interferes with Defendants' ability to exercise their lawful authorities, *i.e.*: "Nothing in this Order prohibits Defendants from giving directions to federal agencies regarding how to exercise their legal authority, or from exercising their own authorities pursuant to applicable authorizing statutes, regulations, and terms."

### 4. Eliminate Two-Hour Written Notice Requirement

Plaintiffs also request that the Court Order the twenty-six Defendants to "provide written notice of this order to all Defendants and agencies and their employees, contractors, and grantees within two hours of the issuance of this Order."

It is simply not feasible for twenty-six federal Defendants to disseminate the Court's Order, without knowing when that Order will issue, to the extraordinarily large universe of all "employees, contractors, and grantees" in a matter of only two

EPA_00049374

hours, especially in the absence of any demonstrated need. That order is far more "burdensome . . . than is necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017). When "fashioning interim relief," balancing the equities requires "focusing specifically on the concrete burdens that would fall on [both parties]." *Id.* at 580-81. Given the impracticability of providing notice in this short a time frame, Defendant respectfully requests this requirement be struck, or at least modified so as not to include an arbitrary timeframe for provision of notice.

### 5.   Eliminate Relief Against the President

Plaintiffs' requested temporary restraining order seeks relief against all Defendants, which includes the President. But as discussed above, the Supreme Court has made clear that courts have "no jurisdiction . . . to enjoin the President in the performance of his official duties." *Mississippi*, 71 U.S. at 501 (1867); *see also Franklin*, 505 U.S. at 827 (Scalia, J., concurring in part). Thus, any relief entered must not apply to the President.

*     *     *

Plaintiffs have not established the need for emergency, expedited relief in this matter, and any such relief would be highly burdensome to the Government. Thus, relief should be denied. To the extent the Court enters Plaintiffs' proposed temporary

restraining order, however, at a minimum it should be modified as set forth above.



Dated: January 30, 2025    Respectfully Submitted,

           BRETT A. SHUMATE
           Acting Assistant Attorney General

           ALEXANDER K. HAAS
           Director

           */s/ Daniel Schwei*
           DANIEL SCHWEI
           Special Counsel
           ANDREW F. FREIDAH
           EITAN R. SIRKOVICH
           Trial Attorneys
           United States Department of Justice
           Civil Division, Federal Programs Branch
           1100 L Street NW
           Washington, DC 20530
           Tel.: (202) 305-8693
           Fax: (202) 616-8470
           Email: daniel.s.schwei@usdoj.gov

           *Counsel for Defendants*

EPA_00049376

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that on January 30, 2025, I electronically filed the within Certification with the Clerk of the United States District Court for the District of Rhode Island using the CM/ECF System, thereby serving it on all registered users in accordance with Federal Rule of Civil Procedure 5(b)(2)(E) and Local Rule Gen 305.

<u>/s/ *Daniel Schwei*</u>
Daneil Schwei

EPA_00049377



**EXECUTIVE OFFICE OF THE PRESIDENT**
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

In implementing President Trump's Executive Orders, OMB issued guidance requesting that agencies temporarily pause, to the extent permitted by law, grant, loan or federal financial assistance programs that are implicated by the President's Executive Orders.

**Any program not implicated by the President's Executive Orders is not subject to the pause.**

The Executive Orders listed in the guidance are:

*Protecting the American People Against Invasion*

*Reevaluating and Realigning United States Foreign Aid*

*Putting America First in International Environmental Agreements*

*Unleashing American Energy*

*Ending Radical and Wasteful Government DEI Programs and Preferencing*

*Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*

*Enforcing the Hyde Amendment*

Any program that provides direct benefits to individuals is not subject to the pause.

The guidance establishes a process for agencies to work with OMB to determine quickly whether any program is inconsistent with the President's Executive Orders. A pause could be as short as day. In fact, OMB has worked with agencies and has already approved many programs to continue even before the pause has gone into effect.

Any payment required by law to be paid will be paid without interruption or delay.

**Q: Is this a freeze on all Federal financial assistance?**

A: No, the pause does not apply across-the-board. It is expressly limited to programs, projects, and activities implicated by the President's Executive Orders, such as ending DEI, the green new deal, and funding nongovernmental organizations that undermine the national interest.

**Q: Is this a freeze on benefits to Americans like SNAP or student loans?**

A: No, any program that provides direct benefits to Americans is explicitly excluded from the pause and exempted from this review process. In addition to Social Security and Medicare, already explicitly excluded in the guidance, mandatory programs like Medicaid and SNAP will continue without pause.

EPA_00049378

Funds for small businesses, farmers, Pell grants, Head Start, rental assistance, and other similar programs will not be paused. If agencies are concerned that these programs may implicate the President's Executive Orders, they should consult OMB to begin to unwind these objectionable policies without a pause in the payments.

**Q:  Is the pause of federal financial assistance an impoundment?**

**A:**  No, it is not an impoundment under the Impoundment Control Act.  It is a temporary pause to give agencies time to ensure that financial assistance conforms to the policies set out in the President's Executive Orders, to the extent permitted by law.

Temporary pauses are a necessary part of program implementation that have been ordered by past presidents to ensure that programs are being executed and funds spent in accordance with a new President's policies and do not constitute impoundments.

**Q: Why was this pause necessary?**

**A:**  To act as faithful stewards of taxpayer money, new administrations must review federal programs to ensure that they are being executed in accordance with the law and the new President's policies.

EPA_00049379

Message

---

**From:** Talbert-Duarte, Angelia [talbert-duarte.angelia@epa.gov]
**Sent:** 2/20/2025 5:32:22 PM
**To:** Goerke, Ariadne [Goerke.Ariadne@epa.gov]
**Subject:** FW: FYSA: IMPORTANT- Needs Action: Additional Information on IIJA and IRA - program review pause
**Attachments:** Suspension a o 2-18-25.xlsx

**Importance:** High

Angelia Talbert-Duarte
Associate General Counsel
Civil Rights and Finance Law Office
U.S. Environmental Protection Agency
Phone – (202) 564-8158
Fax – (202) 564-5432

*Please note that I may have sent this communication outside regular business hours.  If you receive this email outside of your normal working hours, please know that I do not expect a response until you are back at work during your normal hours.*

---

**From:** Holden, Allison <Holden.Allison@epa.gov>
**Sent:** Thursday, February 20, 2025 12:21 PM
**To:** Talbert-Duarte, Angelia <talbert-duarte.angelia@epa.gov>
**Subject:** FW: FYSA: IMPORTANT- Needs Action: Additional Information on IIJA and IRA - program review pause
**Importance:** High

-----------------------------------------------
Allison Holden
Attorney-Advisor
Civil Rights and Finance Law Office
Office of General Counsel
U.S. Environmental Protection Agency
202-564-3841
Holden.Allison@epa.gov

---

**From:** Binder, Kelsey <Binder.Kelsey@epa.gov>
**Sent:** Wednesday, February 19, 2025 3:55 PM
**To:** Askew, Wendel <Askew.Wendel@epa.gov>; Holden, Allison <Holden.Allison@epa.gov>
**Subject:** FYSA: IMPORTANT- Needs Action: Additional Information on IIJA and IRA - program review pause
**Importance:** High

-----------------------------------------------
Kelsey Binder
Attorney-Advisor

Civil Rights and Finance Law Office
Office of General Counsel
Environmental Protection Agency
Pronouns: she/her
202-564-2103

**<u>Attorney-Client Privileged; Pre-Decisional/Deliberative: For Internal EPA Use Only/Do Not Share Outside EPA</u>**

**From:** Kohn, Jeffrey <Kohn.Jeffrey@epa.gov>
**Sent:** Wednesday, February 19, 2025 3:54 PM
**To:** Binder, Kelsey <Binder.Kelsey@epa.gov>; Defendeifer, Darren <Defendeifer.Darren@epa.gov>; Kapust, Edna <Kapust.Edna@epa.gov>
**Cc:** Clapp, Brian <Clapp.Brian@epa.gov>
**Subject:** FW: IMPORTANT- Needs Action: Additional Information on IIJA and IRA - program review pause
**Importance:** High

FYI. P2 grants (4U, NP, X9) are not on the suspended list, however we do not think this gives us authorization to award new grants. Anahita is going to check with our management.

Thanks,
Jeff

**From:** Milbeck, Regina <Milbeck.Regina@epa.gov>
**Sent:** Wednesday, February 19, 2025 1:49 PM
**To:** OPPT Division Directors <OPPT_Division_Directors@epa.gov>; OPPT Deputy & Associate Directors <OPPT-Deputy-Associate-Director@epa.gov>
**Subject:** FW: Additional Information on IIJA and IRA - program review pause

Good afternoon,

As a follow-up to the information shared below, OCFO has confirmed **that all grants are now unsuspended in ASAP, except for the grants on the attached list** which are still under review.

Outside of the grants on the attached list, any obligations EPA made as of 3pm EST on 2/13 can be released for payment.

Best Regards,
Missy

**Missy Milbeck, OPPT**
(919) 541-3732; milbeck.regina@epa.gov

**From:** Keigwin, Richard <Keigwin.Richard@epa.gov>
**Sent:** Wednesday, February 19, 2025 12:41 PM
**To:** Hughes, Hayley <hughes.hayley@epa.gov>; Fligger, Karen <Fligger.Karen@epa.gov>; Smith, Kimberly <Smith.Kimberly@epa.gov>; Reaves, Elissa <Reaves.Elissa@epa.gov>; Milbeck, Regina <Milbeck.Regina@epa.gov>; Canavan, Sheila <Canavan.Sheila@epa.gov>
**Subject:** FW: Additional Information on IIJA and IRA - program review pause

FYI

**From:** Wise, Melissa <wise.melissa@epa.gov>
**Sent:** Wednesday, February 19, 2025 12:25 PM
**To:** OMS-OGD-GMOs Only <OMS-OGD-GMOs-Only@epa.gov>
**Cc:** OCFO-SROs <OCFO_SROs@epa.gov>; OMS-OGD-Grants JROs <OMS-OGD-Grants-JROs@epa.gov>; Regional Mission Support Division - Directors <Regional_Mission_Support_Division_Directors@epa.gov>; Regional Mission Support Division - Deputy Directors <Regional_Mission_Support_Division_Deputy_Directors@epa.gov>; Coogan, Daniel <Coogan.Daniel@epa.gov>
**Subject:** RE: Additional Information on IIJA and IRA - program review pause

Good afternoon, GMOs,

As a follow-up to the information shared below, OCFO has confirmed that all grants are now unsuspended in ASAP, except for the grants on the attached list which are still under review.

Outside of the grants on the attached list, any obligations EPA made as of 3pm EST on 2/13 can be released for payment.

Thank you,
Melissa

---

**From:** Wise, Melissa
**Sent:** Thursday, February 13, 2025 3:46 PM
**To:** OMS-OGD-GMOs Only OMS-OGD-GMOs-Only@epa.gov
**Cc:** OCFO-SROs OCFO_SROs@epa.gov; OMS-OGD-Grants JROs OMS-OGD-Grants-JROs@epa.gov; Regional Mission Support Division - Directors Regional_Mission_Support_Division_Directors@epa.gov>; Regional Mission Support Division - Deputy Directors <Regional_Mission_Support_Division_Deputy_Directors@epa.gov>; Coogan, Daniel <Coogan.Daniel@epa.gov>
**Subject:** FW: Additional Information on IIJA and IRA - program review pause
**Importance:** High

Good afternoon, GMOs,

For your situational awareness.

Thank you,
Melissa

---

**From:** Budget and Planning <Budget_and_Planning@epa.gov>
**Sent:** Thursday, February 13, 2025 3:31 PM
**To:** Budget and Planning <Budget_and_Planning@epa.gov>; OCFO-SBO <OCFOSBO@epa.gov>; OCFO-SBO-STAFF <OCFOSBOSTAFF@epa.gov>; OCFO-Regional-Comptroller <OCFORegionalComptroller@epa.gov>; OCFO-Regional Budget Officers <OCFORegional_Budget_Officers@epa.gov>; OCFO-SROs <OCFO_SROs@epa.gov>; Regional Mission Support Division - Directors <Regional_Mission_Support_Division_Directors@epa.gov>; Regional Mission Support Division - Directors <Regional_Mission_Support_Division_Directors@epa.gov>; OCFO-FCOs <OCFO-FCOs@epa.gov>; Leadership_Deputy_Regional_Administrators <Leadership_Deputy_Regional_Administrators@epa.gov>; Leadership_Deputy_Assistant_Administrators <Leadership_Deputy_Assistant_Administrators@epa.gov>
**Cc:** Wise, Melissa <wise.melissa@epa.gov>; Legare, Pamela <Legare.Pamela@epa.gov>; Rogers, JoanB <Rogers.JoanB@epa.gov>; Coogan, Daniel <Coogan.Daniel@epa.gov>; Kalikhman, Yulia <kalikhman.yulia@epa.gov>; Gulamali, Adil <Gulamali.Adil@epa.gov>; Lavergne, Dany <lavergne.dany@epa.gov>; Miller, Renee <Miller.Renee@epa.gov>; Jennette, Vonda <Jennette.Vonda@epa.gov>; Luebbering, Gregory <luebbering.gregory@epa.gov>; Henry, Latonya <Henry.Latonya@epa.gov>; Talbert-Duarte, Angelia <talbert-duarte.angelia@epa.gov>; Goerke, Ariadne <Goerke.Ariadne@epa.gov>; Askew, Wendel <Askew.Wendel@epa.gov>; Holden, Allison <Holden.Allison@epa.gov>; Kadeli, Lek <Kadeli.Lek@epa.gov>; Jones-Peeler, Meshell <Jones-

Peeler.Meshell@epa.gov>; Lane, Gary <Lane.Gary@epa.gov>; Robinson, Angel <robinson.angel@epa.gov>; Katz, Brian <Katz.Brian@epa.gov>; Cardenas, Andrew <Cardenas.Andrew@epa.gov>; Li, Sylvana <li.sylvana@epa.gov>; Beg, Gul <Beg.Gul@epa.gov>; Cottrill, Edward <Cottrill.Edward@epa.gov>; Hurley, Kevin <Hurley.Kevin@epa.gov>; Humes, Hamilton <Humes.Hamilton@epa.gov>; Wang, Lili <Wang.Lili@epa.gov>
**Subject:** RE: Additional Information on IIJA and IRA - program review pause
**Importance:** High

Sharing another update as the program review proceeds.

Obligations from EPA already made as of 3 PM EST today can be released for payment. The agency will continue robust oversight of these funds and take appropriate action if any of them are found to be used outside of the terms and conditions of their agreements.

Note this excludes the Greenhouse Gas Reduction Fund.

---

**From:** Budget and Planning <Budget_and_Planning@epa.gov>
**Sent:** Friday, February 7, 2025 6:04 PM
**To:** Budget and Planning <Budget_and_Planning@epa.gov>; OCFO-SBO <OCFOSBO@epa.gov>; OCFO-SBO-STAFF <OCFOSBOSTAFF@epa.gov>; OCFO-Regional-Comptroller <OCFORegionalComptroller@epa.gov>; OCFO-Regional Budget Officers <OCFORegional_Budget_Officers@epa.gov>; OCFO-SROs <OCFO_SROs@epa.gov>; Regional Mission Support Division - Directors <Regional_Mission_Support_Division_Directors@epa.gov>; Regional Mission Support Division - Directors <Regional_Mission_Support_Division_Directors@epa.gov>; OCFO-FCOs <OCFO-FCOs@epa.gov>
**Cc:** Wise, Melissa <wise.melissa@epa.gov>; Legare, Pamela <Legare.Pamela@epa.gov>; Rogers, JoanB <Rogers.JoanB@epa.gov>; Coogan, Daniel <Coogan.Daniel@epa.gov>; Kalikhman, Yulia <kalikhman.yulia@epa.gov>; Gulamali, Adil <Gulamali.Adil@epa.gov>; Lavergne, Dany <lavergne.dany@epa.gov>; Miller, Renee <Miller.Renee@epa.gov>; Jennette, Vonda <Jennette.Vonda@epa.gov>; Luebbering, Gregory <luebbering.gregory@epa.gov>; Henry, Latonya <Henry.Latonya@epa.gov>; Talbert-Duarte, Angelia <talbert-duarte.angelia@epa.gov>; Goerke, Ariadne <Goerke.Ariadne@epa.gov>; Askew, Wendel <Askew.Wendel@epa.gov>; Holden, Allison <Holden.Allison@epa.gov>; Kadeli, Lek <Kadeli.Lek@epa.gov>; Jones-Peeler, Meshell <Jones-Peeler.Meshell@epa.gov>; Lane, Gary <Lane.Gary@epa.gov>; Robinson, Angel <robinson.angel@epa.gov>; Boyd, Wyatt <Boyd.Wyatt@epa.gov>; Katz, Brian <Katz.Brian@epa.gov>; Cardenas, Andrew <Cardenas.Andrew@epa.gov>; Li, Sylvana <li.sylvana@epa.gov>; Beg, Gul <Beg.Gul@epa.gov>; Cottrill, Edward <Cottrill.Edward@epa.gov>
**Subject:** RE: Additional Information on IIJA and IRA - program review pause

Pursuant to the review of financial assistance programs announced by the Acting Deputy Administrator on February 6, the following accounts are temporarily paused for new obligations or disbursements for assistance agreements, loans, rebates, interagency agreements, procurements, and no-cost actions pending a review for compliance with applicable administrative rules and policies.

Air Quality Sensors in Low Income and Disadvantaged Communities (OAR) (STAG)
Clean Heavy-Duty Vehicles (OAR) (STAG)
Clean Heavy-Duty Vehicles in Nonattainment Areas (OAR) (STAG)
Clean School Bus Program (STAG)
Competitive Grants (OAR) (STAG)
Diesel Emissions Reductions (OAR) (STAG)
Emissions from Wood Heaters (OAR/ORD) (STAG)
Environmental and Climate Justice Block Grants – Technical Assistance (OEJECR)
Environmental and Climate Justice Block Grants (OEJECR)
Environmental Product Declaration Assistance (OCSPP/ORD/OAR)
Fenceline Air Monitoring and Screening Air Monitoring (OAR/ORD) (STAG)
Funding for the Implementation of the American Innovation and Manufacturing Act (OAR)
Funding for Section 211 of the Clean Air Act – Advanced Biofuels (OAR)

GHG Air Pollution Implementation Grants (OAR) (STAG)
GHG and Zero Emission Standards for Mobile Sources (OAR) (STAG)
GHG Pollution Planning Grants (OAR) (STAG)
Grants to Reduce Air Pollution at Ports (OAR) (STAG)
Grants to Reduce Air Pollution at Ports in Nonattainment Areas (OAR) (STAG)
Greenhouse Gas Corporate Reporting (OAR)
Greenhouse Gas Reduction Fund – General Assistance (OA) (STAG)
Greenhouse Gas Reduction Fund – Low Income and Disadvantaged Communities (OA) (STAG)
Greenhouse Gas Reduction Fund – Zero Emision Technologies (OA) (STAG)
Implementation / Accountability (OAR)
Implementation and Compliance (OECA)
Industry Outreach (OAR)
Low Embodied Carbon Labeling for Construction Materials for Transportation Methane Monitoring (OCSPP/OAR/ORD)
Multipollutant Monitoring Stations (OAR) (STAG)
State/Tribal/Local Government Outreach (OAR)
Technical Assistance for Low Income Communities (OAR)

---

**From:** Budget and Planning <Budget_and_Planning@epa.gov>
**Sent:** Friday, February 7, 2025 11:29 AM
**To:** Budget and Planning <Budget_and_Planning@epa.gov>; OCFO-SBO <OCFOSBO@epa.gov>; OCFO-SBO-STAFF <OCFOSBOSTAFF@epa.gov>; OCFO-Regional-Comptroller <OCFORegionalComptroller@epa.gov>; OCFO-Regional Budget Officers <OCFORegional_Budget_Officers@epa.gov>; OCFO-SROs <OCFO_SROs@epa.gov>; Regional Mission Support Division - Directors <Regional_Mission_Support_Division_Directors@epa.gov>; Regional Mission Support Division - Directors <Regional_Mission_Support_Division_Directors@epa.gov>; OCFO-FCOs <OCFO-FCOs@epa.gov>
**Cc:** Wise, Melissa <wise.melissa@epa.gov>; Legare, Pamela <Legare.Pamela@epa.gov>; Rogers, JoanB <Rogers.JoanB@epa.gov>; Coogan, Daniel <Coogan.Daniel@epa.gov>; Kalikhman, Yulia <kalikhman.yulia@epa.gov>; Gulamali, Adil <Gulamali.Adil@epa.gov>; Lavergne, Dany <lavergne.dany@epa.gov>; Miller, Renee <Miller.Renee@epa.gov>; Jennette, Vonda <Jennette.Vonda@epa.gov>; Luebbering, Gregory <luebbering.gregory@epa.gov>; OCFO-OB-ALL. <OCFO-OB-ALL_x@epa.gov>; Talbert-Duarte, Angelia <talbert-duarte.angelia@epa.gov>; Goerke, Ariadne <Goerke.Ariadne@epa.gov>; Askew, Wendel <Askew.Wendel@epa.gov>; Holden, Allison <Holden.Allison@epa.gov>
**Subject:** RE: Additional Information on IIJA and IRA

We are working expeditiously to carry out the attached and request your assistance where appropriate.

*(excerpt)*

Notwithstanding this directive, any disbursements on open grant awards that were paused due to Office of Management and Budget Memorandum M-25-13 or any Executive Order underlying that Memorandum shall continue to be immediately released, as the Agency initiated on February 3, 2025.

---

**From:** Budget and Planning <Budget_and_Planning@epa.gov>
**Sent:** Wednesday, February 5, 2025 11:00 AM
**To:** Budget and Planning <Budget_and_Planning@epa.gov>; OCFO-SBO <OCFOSBO@epa.gov>; OCFO-SBO-STAFF <OCFOSBOSTAFF@epa.gov>; OCFO-Regional-Comptroller <OCFORegionalComptroller@epa.gov>; OCFO-Regional Budget Officers <OCFORegional_Budget_Officers@epa.gov>; OCFO-SROs <OCFO_SROs@epa.gov>; Regional Mission Support Division - Directors <Regional_Mission_Support_Division_Directors@epa.gov>; Regional Mission Support Division - Directors <Regional_Mission_Support_Division_Directors@epa.gov>; OCFO-FCOs <OCFO-FCOs@epa.gov>
**Cc:** Wise, Melissa <wise.melissa@epa.gov>; Legare, Pamela <Legare.Pamela@epa.gov>; Rogers, JoanB <Rogers.JoanB@epa.gov>; Coogan, Daniel <Coogan.Daniel@epa.gov>; Kalikhman, Yulia <kalikhman.yulia@epa.gov>; Gulamali, Adil <Gulamali.Adil@epa.gov>; Lavergne, Dany <lavergne.dany@epa.gov>; Miller, Renee

<Miller.Renee@epa.gov>; Jennette, Vonda <Jennette.Vonda@epa.gov>; Luebbering, Gregory <luebbering.gregory@epa.gov>; OCFO-OB-ALL. <OCFO-OB-ALL_x@epa.gov>; Talbert-Duarte, Angelia <talbert-duarte.angelia@epa.gov> Goerke, Ariadne <Goerke.Ariadne@epa.gov>; Askew, Wendel <Askew.Wendel@epa.gov>; Holden, Allison <Holden.Allison@epa.gov>
**Subject:** RE: Additional Information on IIJA and IRA

Clarifying the compound sentence in the original message.

Consistent with Court Order, obligations and disbursements to carry out all necessary work can proceed for:
- federal financial assistance;
- Superfund;
- and the accounts (originally) attached.

Note that thousands of accounts are involved and this is a manual process.

---

**From:** Budget and Planning <Budget_and_Planning@epa.gov>
**Sent:** Tuesday, February 4, 2025 1:46 PM
**To:** OCFO-SBO <OCFOSBO@epa.gov>; OCFO-SBO-STAFF <OCFOSBOSTAFF@epa.gov>; OCFO-Regional-Comptroller <OCFORegionalComptroller@epa.gov>; OCFO-Regional Budget Officers <OCFORegional_Budget_Officers@epa.gov>; OCFO-SROs <OCFO_SROs@epa.gov>; Regional Mission Support Division - Directors <Regional_Mission_Support_Division_Directors@epa.gov>; Regional Mission Support Division - Directors <Regional_Mission_Support_Division_Directors@epa.gov>; OCFO-FCOs <OCFO-FCOs@epa.gov>
**Cc:** Wise, Melissa <wise.melissa@epa.gov>; Legare, Pamela <Legare.Pamela@epa.gov>; Rogers, JoanB <Rogers.JoanB@epa.gov>; Coogan, Daniel <Coogan.Daniel@epa.gov>; Kalikhman, Yulia <kalikhman.yulia@epa.gov>; Gulamali, Adil <Gulamali.Adil@epa.gov>; Lavergne, Dany <lavergne.dany@epa.gov>; Miller, Renee <Miller.Renee@epa.gov>; Jennette, Vonda <Jennette.Vonda@epa.gov>; Luebbering, Gregory <luebbering.gregory@epa.gov>; OCFO-OB-ALL. <OCFO-OB-ALL_x@epa.gov>; Talbert-Duarte, Angelia <talbert-duarte.angelia@epa.gov>; Goerke, Ariadne <Goerke.Ariadne@epa.gov>; Askew, Wendel <Askew.Wendel@epa.gov>; Holden, Allison <Holden.Allison@epa.gov>
**Subject:** Additional Information on IIJA and IRA
**Importance:** High

This message provides additional detail to the attached message from the Acting Chief Financial Officer.

Consistent with Court Order, obligations and disbursements to carry out all necessary work can proceed for all federal financial assistance, including cooperative assistance agreements, all Superfund, and the accounts attached.

We will continue to keep the community updated as we implement Orders. Please note that effectuation in agency systems is occurring and requires sequencing.

*Please share this information within EPA as necessary to execute.*

Message

| | |
|---|---|
| **From:** | OGC IO Notifications [OGC-IO-Notifications@epa.gov] |
| **Sent:** | 3/21/2025 1:42:52 PM |
| **To:** | Rhodes, Julia [Rhodes.Julia@epa.gov]; OGC IO Administrative Professional Staff [OGC-IO-AdminProf@epa.gov]; OGC Immediate Office MGMT [OGC_Immediate_Office_MGMT@epa.gov] |
| **CC:** | Askew, Wendel [Askew.Wendel@epa.gov]; Talbert-Duarte, Angelia [talbert-duarte.angelia@epa.gov]; Goerke, Ariadne [Goerke.Ariadne@epa.gov]; Holden, Allison [Holden.Allison@epa.gov]; O'Sullivan, Caitlin [OSullivan.Caitlin@epa.gov]; Binder, Kelsey [Binder.Kelsey@epa.gov]; Hales, Daniel [Hales.Daniel@epa.gov]; Liem, Lucille [Liem.Lucille@epa.gov]; Quenemoen, Marianna [Quenemoen.Marianna@epa.gov]; Hogan, Joanne [Hogan.Joanne@epa.gov] |
| **Subject:** | New Litigation: The Sustainability Institute, et al. v, Donald J. Trump, et al, Clv. No. 2:25-cv-02152-RMG (District Court of South Carolina) |
| **Attachments:** | The Sustainability Institute v Donald J Trump 25-2152.pdf |

**Importance:**   Low

# CUI//PRIVILEGE

Date Received: 2025-03-21

Parties/Requestors: The Sustainability Institute, et al.

Statute: Administrative Procedure Act;Other (Please Specify in Summary)

Summary of Action:

Complaint was filed by multiple plaintiffs against seven agencies/officials. The factual allegations pertaining to EPA concern lack of access to awarded grants and disruption to operations, including potential layoffs, and to projects regarding the following: Plaintiff Bronx River Alliance was awarded both a Community Change (CCG) and an EJ Collaborative Problem Solving Grant (ECPS) grant; Plaintiff CleanAIRE was awarded an ECPS grant; Plaintiff Leadership Counsel for Justice and Accountability was awarded a CCG grant; Plaintiff City of Baltimore, MD was awarded both a Solid Waste Infrastructure for Recycling (SWIFR) and an Environmental Justice Government to Government (EJG2G) grant; and Plaintiff City of New Haven, CT was awarded both an EJG2G and a Climate Pollution Reduction Program grant. Plaintiffs allege violations of separation of powers; the presentment clauses; the Administrative Procedures Act, First Amendment, and the IRA, IIJA and other relevant statutes. They seek declaratory and injunction relief (both preliminary and permanent)

Does EPA have a statutory obligation to respond?:
By what date?:

Click Here to Open Item

# Controlled by U.S. Environmental Protection Agency

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

The Sustainability Institute, Agrarian Trust,
Alliance for Agriculture, Alliance for the
Shenandoah Valley, Bronx River Alliance,
CleanAIRE NC, Conservation Innovation
Fund, Leadership Counsel for Justice and
Accountability, Marbleseed, Pennsylvania
Association for Sustainable Agriculture,
and Rural Advancement Foundation
International-USA,
and
Baltimore, Maryland; Columbus, Ohio;
Madison, Wisconsin; Nashville, Tennessee;      Case No.   2:25-cv-02152-RMG
New Haven, Connecticut; San Diego,
California,

                  Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity
as President of the United States;
KEVIN HASSETT, in his official capacity as      **COMPLAINT FOR DECLARATORY**
Assistant to the President for Economic Policy   **AND INJUNCTIVE RELIEF**
and Director of the National Economic Council;
UNITED STATES OFFICE OF MANAGEMENT
AND BUDGET; RUSSELL VOUGHT, in his
official capacity as Director of the United States
Office of Management and Budget; UNITED
STATES ENVIRONMENTAL PROTECTION
AGENCY; LEE ZELDIN, in his official capacity
as Administrator of the United States Environmental
Protection Agency; UNITED STATES DEPARTMENT
OF AGRICULTURE; BROOKE ROLLINS, in her
official capacity as Secretary of Agriculture; UNITED
STATES DEPARTMENT OF TRANSPORTATION;
SEAN DUFFY, in his official capacity as the Secretary
of the United States Department of Transportation;
UNITED STATES DEPARTMENT OF
GOVERNMENTAL EFFICIENCY SERVICE;
AMY GLEASON, in her official capacity as
Acting Administrator of the United States DOGE
Service; ELON MUSK, in his official capacity as
Senior Advisor of the United States DOGE Service.

                  Defendants.

**INTRODUCTION**

1. This action seeks to ensure that programs and funding that Congress has lawfully enacted to improve lives, strengthen communities, and protect the environment throughout the nation reach their intended recipients and fulfill their intended purposes without unlawful interference by the executive branch of the federal government. Plaintiffs are nonprofit organizations and municipalities that have been awarded federal grant funds, either as direct recipients or as sub-grantees, to carry out specific programs enacted by Congress under the Inflation Reduction Act ("IRA") and Infrastructure Investment and Jobs Act ("IIJA), and other federal statutes.

2. Beginning the day he took office, the President issued multiple executive orders carrying out his intention to unlawfully defy Congressional mandates by freezing, disrupting, and terminating funds that Congress had directed and appropriated to specific grant programs to benefit the environment and support communities.

3. One order, *Unleashing American Energy*, directed federal agencies to "*Terminat[e]*," by which the President meant to "immediately" stop, the disbursement of all funds—totaling over $1 trillion—appropriated by Congress under the IRA and IIJA. Exec. Order No. 14154, 90 Fed. Reg. 8353, 8357 (Jan. 20, 2025) ("Energy EO") (emphasis added). The Energy EO prohibits agencies from disbursing *any* funds under the two statutes that are not "consistent" with a list of Presidential "polic[ies]," as determined by the President's political appointees. Energy EO §§ 2, 7.

4. Another, titled *Ending Radical and Wasteful Government DEI Programs and Preferencing*, mandates the termination of all 'equity-related' grants or contracts within 60 days. Exec. Order No. 14151, 90 Fed. Reg. 8339, 8339 (Jan. 20, 2025) ("Equity EO") (emphasis added).

2

EPA_00050948

5. A third, *Implementing the President's "Department of Government Efficiency" Cost Efficiency Initiative*, orders agencies to "terminate or modify" contracts and grants to "advance the policies of [the Trump] Administration." Exec. Order 14222, 90 Fed. Reg. 11095, 11096 (Feb. 26, 2025) ("DOGE EO") (together with the Energy EO and the Equity EO, the "Executive Orders").

6. These Executive Orders cite no legal authority for the President or his agencies to unilaterally freeze, let alone terminate, congressionally appropriated funds. Nor do the Orders cite authority which would allow the executive branch to condition the spending of congressionally appropriated funds on compliance with the President's policies and preferences—as distinct from Congress's. Because there is none. Defendants' freezes are not only wholly unsupported by law, but in fact directly contradict duly enacted statutes.

7. In the weeks since the Executive Orders, senior officials from federal agencies including the Office of Management and Budget ("OMB"), Environmental Protection Agency ("EPA"), Department of Agriculture ("USDA"), the Department of Transportation ("USDOT"), and Department of Government Efficiency ("DOGE"), have enforced these unconstitutional Executive Orders and taken other actions to interfere with the disbursement of congressionally mandated and awarded federal grants.

8. The officials have directed agency staff to freeze IRA and IIJA funding, Ex. A ("First OMB Memo"), Ex. B ("Second OMB Memo") Ex. C ("USDA Directive"), including funds "obligat[ed]" to specific recipients, Ex. D. ("EPA Memo"). They have required agency staff to certify that funding disbursements comply with the Executive Orders prior to releasing funds to recipients, Ex. E ("EPA Executive Order Compliance Review Requirement"). They have directed staff to identify projects for potential removal. Ex. F. ("DOT Memo") and they have prohibited

3

EPA_00050949

disbursements of funds over $50,000 without new approvals from DOGE. Ex. G ("EPA Notice of DOGE Approval Requirement").

9. EPA, USDA and USDOT staff have taken various actions that prevent Plaintiffs from accessing grant funds to proceed with the congressionally mandated programs entrusted to them. For example, EPA, USDA and USDOT have blocked Plaintiffs' access to the websites and portals needed to access funds, frozen or labeled as "suspended" the accounts containing the grant funds preventing Plaintiffs from drawing down funds, informed Plaintiffs orally that funds are frozen and cannot be drawn down, and communicated through state agencies that expenditures may not be reimbursed, usually with no explanation or justification. These actions by EPA, USDA and USDOT, together with those described in Paragraph 8 above, are collectively referred to in this complaint as the "Program Freezing Actions."

10. In addition, EPA, USDA and USDOT grant officers have become unavailable, and in many cases have failed to provide grantees with clear answers about the status of their grants or any explanation as to why they have been frozen.

11. Two federal courts have already issued temporary restraining orders and preliminary injunctions against aspects of the Administration's funding freezes, finding that they lack constitutional, statutory, and/or regulatory authority.

12. Despite these judicial orders, grants continue to be repeatedly frozen, unfrozen, and then frozen again with no notice or justification. This inflicts significant harm on Plaintiffs, preventing them from executing critical projects, carrying out their missions, planning for the future, paying their employees, contractors, or sub-awardees, and serving the communities where they are implementing these congressional priorities.

EPA_00050950

13. The Administration's unlawful and arbitrary freeze of congressionally mandated programs and funding appropriated and awarded to carry out those programs violates multiple statutory provisions, as well as fundamental constitutional and administrative safeguards. In this nation, Congress enacts laws, and the Executive Branch, whoever may be occupying it at any given time, must faithfully execute those laws. The Administration has simply refused to do so with respect to the programs at issue in this case and instead has seized control of federal spending to further its own aims, in the process undoing the spending decisions made by Congress.

14. For the reasons set forth herein, Plaintiffs respectfully request that the Court grant appropriate relief to remedy Plaintiffs' injuries and to enforce the Constitution and the Administrative Procedure Act ("APA").

## JURISDICTION AND VENUE

15. Plaintiffs bring this action under the U.S. Constitution and the APA, 5 U.S.C. §§ 702, 704. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and may issue declaratory and injunctive relief under 28 U.S.C. §§ 2201(a) and 2202, as well as vacatur under 5 U.S.C. § 706.

16. Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1)(C) because Defendants are "officer[s]," "employee[s]," and "agenc[ies]" of the United States, and because Plaintiff The Sustainability Institute is headquartered in North Charleston and resides in South Carolina. Venue is proper in the Charleston Division because "a substantial part of the events or omissions giving rise to the claim occurred" in this Division, Local Civ. Rule 3.01(A)(1)—for example, The Sustainability Institute's project to build and weatherize affordable homes in North

5

Charleston is funded by a congressionally authorized Community Change Grant, which is subject to the funding freeze challenged in this case.

**PARTIES**

**I.    Plaintiffs**

17. Plaintiffs are eleven Community Groups: The Sustainability Institute; Agrarian Trust; Alliance for Agriculture; Alliance for the Shenandoah Valley; Bronx River Alliance; CleanAIRE NC; Conservation Innovation Fund; Marbleseed; Leadership Counsel for Justice and Accountability; Pennsylvania Association for Sustainable Agriculture; and Rural Advancement Foundation International-USA; and six cities: Baltimore, Maryland; Columbus, Ohio; Madison, Wisconsin; Nashville, Tennessee; New Haven, Connecticut; and San Diego, California.

*Community Groups*

18. Plaintiff The Sustainability Institute is a 501(c)(3) nonprofit organization headquartered in North Charleston, South Carolina. Established in 1999, the Sustainability Institute's mission is to advance sustainable and resilient communities while building the next generation of conservation leaders. The Sustainability Institute applied for and was awarded a 3-year, $11.4 million "Community Change Grant" from EPA in 2024. This grant was authorized by Congress as part of the IRA.

19. The Sustainability Institute intends to use this grant to carry out specific projects approved by EPA to advance Congress's objectives for the grant program. Under terms of the grant, the Sustainability Institute will work with the City of North Charleston to develop energy-efficient affordable homes for disadvantaged people in the Union Heights neighborhood; reduce greenhouse gas emissions by weatherizing and retrofitting homes; and restore a historically black community fragmented by the construction of Highway 218, among other projects.

6

EPA_00050952

20. On January 29, 2025, the Sustainability Institute's Community Change Grant was first suspended. Later, on February 7, the organization was able to make a successful draw down of funds using the online portal grantees use to access funds. On February 10, the funds were frozen again. On February 19, funds were unfrozen again, only to be frozen again on March 9. Grant funds have remained frozen since March 9. Multiple inquiries by Sustainability Institute to its EPA grant officer have gone unanswered, and Sustainability Institute was notified by its former grant officer that she received a directive not to communicate with grantees.

21. The funding pause is causing widespread disruption to the Sustainability Institute's internal operations and its ability to implement programs that align with its mission.  Most pressing, the freeze in funding is preventing the Sustainability Institute from work on the Union Heights redevelopment project because it requires significant investments in new equipment and hiring contractors. Without certainty that federal funding will be available to reimburse these major expenditures, Sustainability Institute is unable to advance the project. Sustainability Institute has also had to shift significant resources towards managing how to address the loss of funding and spend time and resources discussing how to manage projects in absence of support from the federal government. Sustainability Institute is also concerned about harm to the reputation it has built up after almost two decades working in the Charleston community if it fails to deliver the project it has committed to.

22. Plaintiff Agrarian Trust is a 501(c)(3) nonprofit organization incorporated in California and based in Oregon which focuses on securing land for sustainable farming and fostering a more just and equitable food system. The organization works to protect farmland from development and ensure that it remains accessible to farmers, particularly those from marginalized communities. Agrarian Trust promotes land access and stewardship through

7

community-driven solutions, offering tools and resources to help transition agricultural land into the hands of farmers committed to sustainable and equitable practices in 15 states. In 2024, Agrarian Trust was awarded a five-year, IRA-funded Increasing Land, Capital and Market Access grant ("Increasing Land Access Grant") by USDA totaling $12,966,593.00 to fund farmland acquisitions in Nebraska, Texas, and New York, as well as farmer-led initiatives and partnerships with community-based organizations in West Virginia, Virginia, Washington, Maine, and Montana.

23. Agrarian Trust has not been reimbursed for its work since the funding freeze began in January 2025. As a result, the organization has not been able to proceed with its land acquisition work for four farms and has been forced to start depleting its savings to sustain operations and programs. Agrarian Trust has been forced to put contracts on hold, alter workplans and consider reducing hours, furloughs, or staff layoffs, including for four staff hired as part of this grant. The funding freeze has caused distress to the organization's staff, as well as farmers and community partners across 15 states.

24. Plaintiff Alliance for Agriculture is a 501(c)(3) nonprofit organization based in Orocovis, Puerto Rico. Alliance for Agriculture's mission is to transform the way agriculture is done in Puerto Rico. The organization achieves this mission by amplifying the local agricultural sector and supporting small farmers and processors, farmers markets and community organizations, working with distribution channels to bring organic products to a wider market, and raising awareness about local food consumption.

25. Alliance for Agriculture is the subawardee under a cooperative agreement between Plaintiff Rural Advancement Foundation International ("RAFI-USA") and USDA Natural Resources Conservation Service Outreach and Advocacy Division through the Increasing Land

8

Access Grant program. This subaward agreement obligated $1,538,200 to Alliance for Agriculture. The purpose of this project is for Alliance for Agriculture to work with RAFI-USA to achieve the goal of improving farmland access and security by addressing core barriers to attaining land while also working to retain farmland by mitigating and preventing land loss. Alliance for Agriculture is also the subawardee under a separate Conservation Technical Assistance grant between RAFI-USA and USDA Natural Resources Conservation Service Outreach and Advocacy Division that obligated $129,316 to Alliance for Agriculture. The purpose of this project is for the Alliance for Agriculture to provide localized outreach, education, and hands-on technical assistance regarding Natural Resources Conservation Service programs. The primary focus is on assisting small-scale, farmers that are Black, Indigenous, or People of Color through the Natural Resources Conservation Service application process and conservation action plan preparation.

26. Alliance for Agriculture has not been able to access its federal grant funds since January 28, 2025. The funding freeze has had a severe impact on the Alliance as well as farmers and agricultural communities in Puerto Rico. Farmers expect to be able to receive this crucial support, including technical assistance, land access guidance, and financial resources, but are now left in limbo. Training programs, infrastructure investments, and local food system funding has been stalled. The interruption to funding from these awards and uncertainty about when funding will resume has negatively impacted the Alliance's ability to operate. Rather than focusing on its core mission of supporting farmworkers and agricultural communities in Puerto Rico, the Alliance has been forced to divert attention to navigating the federal funding freeze. If the federal funding freeze continues, the organization will have to lay personnel off. A continued

9

freeze will also undoubtedly damage Alliance for Agriculture's reputation. Farmers and partners trust the Alliance to deliver on promises, and stalled commitments risk eroding that trust.

27. Plaintiff Alliance for the Shenandoah Valley is a 501(c)(3) nonprofit organization that is headquartered in New Market, Virginia. Alliance for the Shenandoah Valley works to ensure the Valley's rural character, scenic beauty, clean water and vibrant communities are protected by providing accurate and timely information to community members and decision makers. It achieves this, in part, by informing and engaging people to protect the natural resources, cultural heritages, and rural character of its region. Alliance for the Shenandoah Valley is the recipient of several USDA grants that have been disrupted by the federal funding freeze.

28. Alliance for the Shenandoah Valley was awarded a subgrant from the National Fish and Wildlife Foundation for $1,531,595.72 on January 14, 2025 under the Innovative Nutrient and Sediment Reduction Grants Program. The purpose of this subaward is to accelerate the rate of implementation and increase the effectiveness of water quality best management practices in a high priority agricultural region of the Chesapeake Bay watershed. Alliance for the Shenandoah Valley was also awarded a subgrant from the Conservation Innovation Fund for $400,000 in October 2023, under the Partnerships for Climate-Smart Commodities Program grant program. Under the subaward, the Alliance will engage farmers in implementing climate-smart agriculture and forestry practices.

29. Alliance for the Shenandoah Valley has not been able to access federal funds for either federal grant since February 12, 2025. This pause has harmed the Alliance for the Shenandoah Valley's programs and the organization itself. The organization's relationship with farmers and landowners, which took years to build, are eroded by this disruption to Alliance's ability to provide support and assistance. In reliance on the availability of the Partnerships program,

10

EPA_00050956

farmers that the organization works with to join the partnership program have made investments to adopt sustainable practices expecting to be reimbursed, but now that funding is unavailable to them.

30. Plaintiff Bronx River Alliance is a 501(c)(3) nonprofit organization based in New York City which serves as a coordinated voice for the Bronx River and works with over 100 partners including the New York City Department of Parks and Recreation to protect and restore the Bronx River corridor and greenway so that it can be a healthy ecological, recreational, educational and economic resource for the communities through which the river flows. Bronx River Alliance was awarded a nearly $1 million EPA Community Change grant to enable communities in the Bronx to have a voice in decisions related to coastal adaptation, habitat restoration and infrastructure projects. The organization was also awarded a $500,000 Environmental Justice Collaborative Problem Solving Program grant ("Environmental Justice Problem Solving Grant") to improve water quality in four Bronx and Westchester County waterways by partnering with local communities to collect and use water quality data in advocating for policy and infrastructure improvements that address longstanding sources of water pollution.

31. Bronx River Alliance has not been able to reliably access funds under both EPA grants since around January 29, 2025. The grants were accessible for a few days in early February but were both suspended again on February 12. The grants were last suspended on March 10. This disruption in funding has forced the organization to cover costs for water quality monitoring supplies, equipment and partner and subaward obligations. The funding freeze has also made it difficult to pay staff to coordinate volunteers for water sample collection, resulting in reduced data collection. The reduction in data will impede municipalities, advocates, and elected officials

11

from securing funding to upgrade aging sewage infrastructure, which directly harms public health and water quality. This will also result in increased health risks from recreational water activities, including paddling, fishing, and swimming in the river. The organization has not been able to proceed with hiring projected staff, causing existing staff members to continue working without pay. The freeze is affecting the organization's ability to cover at least three staff positions. The organization's Community Change subawards are directly tied to community engagement, with each partner committed to engaging 100 community members—work that has also been stalled. The nonprofit's inability to access the grant funds means that community members are prevented from having a voice in infrastructure and development projects to address flooding and heat impacts on vulnerable populations, including children, the elderly, and individuals with chronic illnesses. The inability to follow through on multi-year organizational commitments is also jeopardizing relationships years in the making with community partners, government agencies, and elected officials.

32. Plaintiff CleanAIRE NC is a 501(c)(3) nonprofit organization headquartered in Charlotte, North Carolina. CleanAIRE NC works to protect the health of all North Carolinians by pursuing equitable and collaborative strategies to address air pollution and fight climate change. CleanAIRE was awarded a $500,000 Environmental Justice Problem Solving Grant on June 2, 2024. With this grant, CleanAIRE NC will engage in air monitoring in four impacted communities across north Mecklenburg County to address health impacts associated with air pollution. CleanAIRE NC will also work with partners to train Community Health Workers as lead AirKeepers and conduct a Health Impact Assessment with Lake Norman Community Health Clinic, Mecklenburg County Health Department, Atrium Health, and North Carolina State University.

12

33. However, as of January 29, 2025, CleanAIRE NC has been unable to make drawdown requests for funding under its Environmental Justice Problem Solving Grant. If funds remain frozen, CleanAIRE NC may be forced to let go of key staff and stop important community air monitoring programs. Currently staff are being forced to shift away from programmatic priorities to manage the fallout from the funding freeze.

34. Plaintiff Conservation Innovation Fund is a 501(c)(3) nonprofit organization incorporated in Wyoming and headquartered in Washington, D.C. Across the country, Conservation Innovation Fund creates water, carbon, and biodiversity "environmental assets" to address the regulatory and voluntary needs of its municipal and corporate partners while supporting the sale of sustainably produced commodities. Conservation Innovation Fund is the recipient of a USDA Partnerships for Climate-Smart Commodities grant and award of $24,999,954 over five years. Conservation Innovation Fund was awarded this grant on June 8, 2023.

35. The purposes of this grant are to develop a private-sector mechanism within the U.S. economy for commodities such as milk, beef, and grain that are cultivated with sustainable practices; to create incremental markets for environmental assets tied to sustainable practices; and to invest in America's rural and agricultural communities. Conservation Innovation Fund works with farms to integrate agricultural best management practices such as cover crops, zero tillage production, nutrient management and manure management into dairy, beef and grain supply chains, with greenhouse gas reductions and water quality benefits that can be purchased by supply chain partners and other stakeholders. Farmers in Virginia, Maryland, Pennsylvania, Delaware, and West Virginia, as well as Maryland & Virginia Milk Producers Cooperative Association members in Ohio, North Carolina, South Carolina, Tennessee, New Jersey and New

13

EPA_00050959

York, are eligible for assistance through the grant. The grant agreement and award are the culmination of over 10 years of planning and preparation and coordination with USDA.

36. The reimbursement requests that Conservation Innovation Fund has submitted since January 20, 2025 have not been paid out. The disruption in funding has significantly delayed program implementation. Conservation Innovation Fund provides funding directly to farmers for implementation of best management practices. 29 farms await payment of $1,937,735.50, related to implementation of best management practices, which must be implemented in the springtime for the best outcomes. Due to the pause in USDA funding, farms have been forced to delay necessary purchases for equipment, seed and services related to the implementation of best management practices. Without access to this USDA funding, CIF has been forced to reduce staff, shutter business development opportunities, and seek alternative funding sources. Conservation Innovation Fund hired new employees to support implementation of the Climate-Smart Commodities Market Program over the five-year grant program period. Since the funding freeze, two full-time employees have left the organization. The pause also harms Conservation Innovation Fund's reputation with farmers, customers and funders.  Farmers had begun to reach out directly to Conservation Innovation Fund and its partners, and to build momentum among their rural communities behind the economic opportunity presented by the program, which targets hundreds of small farmers.  Now that the funding is paused, these calls have stopped. The pause in USDA funding also has caused efforts to expand capital for market-based conservation programs to come to a standstill, creating uncertainty and chaos for an entire emerging sector of the agricultural economy.

37. Plaintiff Leadership Counsel for Justice and Accountability is a 501(c)(3) nonprofit organization based in Fresno, California.  Leadership Counsel's mission is to work alongside the

EPA_00050960

most impacted California communities to advocate for sound policy and eradicate injustice to secure equal access to opportunity regardless of wealth, race, income, and place. Leadership Counsel was awarded a Community Change Grant of over $3 million from EPA in 2024. With this funding, Leadership Counsel is carrying out an EPA-approved project to connect disadvantaged communities in California's San Joaquin Valley to public decision-making venues and better equip these communities to advocate for their interests on climate change issues.

38. Since early February, Leadership Counsel has not been able to reliably request reimbursements through the federal government's online portal for withdrawing grant funds called Automated Standard Application for Payments ("ASAP"). Leadership Counsel's inability to access funds, and the uncertainty about when these funds will become reliably available, has forced the organization to adjust its workplans and engagements with community members. Leadership Counsel and one subawardee have been forced to pay for staff time and other expenses for work done on this program themselves while this funding has been paused.

39. Plaintiff Marbleseed is a 501(c)(3) nonprofit organization headquartered in Spring Valley, Wisconsin. Established in 1995, Marbleseed is committed to supporting farmers in their transition toward sustainable, organic farming systems that are ecologically sound, economically viable, and socially just. Marbleseed works with small farms to support peer-to-peer learning with free and farmer-led programs, print and digital resources, and in-person events that support thriving regenerative and organic farms and food systems.

40. Marbleseed received a $4,517,254. 65 award under USDA's Partnerships for Climate-Smart Commodities. Under this program, Marbleseed will provide rural and agricultural communities with the tools needed to build operational and environmental resiliency by implementing climate-smart production practices that reduce greenhouse gas emissions and

15

sequester carbon. Marbleseed was also awarded a $300,000 grant Organic Technical Staffing Assistance grant under USDA's Conservation Stewardship Program to improve conservation performance by installing and adopting additional activities and improving, maintaining, and managing existing activities on agricultural land and nonindustrial private forest land. Marbleseed's work will expand conservation planning assistance to organic agricultural producers and accelerate conservation practice implementation for farmers in their network. This grant has been frozen since January 31, 2025, and Marbleseed has not received reimbursement for its work.

41. Marbleseed's Climate-Smart grant has been frozen since March 7, 2025, causing significant harm to the farmers Marbleseed supports. The funding uncertainty has disrupted the trusting, supportive network Marbleseed has worked to build. Marbleseed is hesitant to take next steps in agreements with partners because the organization does not want to make promises they cannot deliver on. Marbleseed's programmatic work has slowed. The organization has imposed a hiring freeze, closed an open full-time staff position, reduced employee working hours as an alternative to layoffs, and redirected staff time to other program areas. During this time of the year, the Marbleseed team typically plans field days comprised of on-the-farm trainings and education events but has been unable to provide this opportunity to partners and communities due to the freeze. All of this has taken a significant toll on employees.

42. Plaintiff the Pennsylvania Association for Sustainable Agriculture, d/b/a Pasa Sustainable Agriculture ("Pasa"), is a 501(c)(3) nonprofit organization based in Harrisburg, Pennsylvania. Pasa's mission is to support farmers in creating economically viable, environmentally sound, and community-focused farms and food systems. In 2023, Pasa applied for and was awarded a five-year USDA grant of over $55 million through the IRA-funded Partnerships for Climate-Smart

16

EPA_00050962

Commodities program.  In 2024, USDA increased the award amount to just over $59. 5 million.
With this funding, Pasa plans to implement a USDA-approved project to support over 20,000
small to mid-scale underserved farmers from Maine to South Carolina to implement
scientifically validated conservation practices that increase efficiency and productivity and
reduce and sequester greenhouse gasses.  Funding under that grant is currently paused.

43. Pasa has a $32,380,331.30 USDA Agricultural Marketing Service Farm and Farmworker
Relief grant to provide financial relief to frontline farmworkers and meatpacking workers with
expenses related to the COVID-19 pandemic.  Pasa was advised it could only submit expenses
incurred before January 20, 2025, with no guidance from USDA about subsequent expenses
covering payments for farmers and food workers.  Pasa also has a $1,496,963 award from
USDA's Farm Service Agency for an Urban Agriculture and Innovative Production grant to
support urban agriculture efforts in Philadelphia.  After submitting an invoice on March 7, 2025,
Pasa was instructed to revise its January invoice to only include expenses before January 19,
2025, and has received no guidance for expenses incurred after January 20, 2025.

44. Pasa faces several financial challenges as a result of the funding pause.  First, Pasa will
potentially have to pay a large sum of unemployment claims for potentially 60 employees.
Second, Pasa has been forced to use rainy day funds to reimburse farmers and contractors for
completed work, as well as cover employee payroll for the month of March.  Finally, Pasa has
been unable to secure alternative funding because banks are hesitant to loan money to non-profits
when there are no assurances that government contracts will be honored.  The disruptions to
Pasa's operations frustrate the organization's mission and its ability to serve frontline
farmworkers.

17

45. Plaintiff Rural Advancement Foundation International – USA ("RAFI-USA") is a nonprofit organization dedicated to supporting family farmers, rural communities, and food systems across the country. Based in North Carolina, RAFI-USA works to advance sustainable agriculture and economic justice to promote equity and resilience in rural areas. RAFI-USA provides direct support to underserved farmers, particularly those who are Black, Indigenous, and People of Color, small-scale, or facing systemic barriers, through grant programs, technical assistance, and advocacy efforts. RAFI-USA is the recipient of several USDA grants that have been disrupted by the federal funding freeze.

46. RAFI-USA was awarded a cooperative agreement with USDA through the Increasing Land Access Program for $8,499,695 in May 2024. This grant funds the Gaining New Ground project, which improves land access and land security for underserved farmers of color in North Carolina, Florida, the U.S. Virgin Islands, and Puerto Rico. RAFI-USA was also awarded a cooperative agreement with the USDA Farm Service Agency through the Distressed Borrower Assistance Network Program for $2,389,182.72 in August 2024 to address the critical need for farm advocates and technical assistance providers by developing training and peer support resources and establishing a Distressed Borrower Assistance Network. RAFI-USA also has an American Rescue Plan Technical Assistance Investment Program grant from the USDA National Institute of Food and Agriculture for $425,000. Under the grant, RAFI-USA will work to increase familiarity with, and access to, USDA Farm Service Agency loan programs among farmers who are young and Black, Indigenous, and People of Color.

47. RAFI-USA was awarded a cooperative agreement with the USDA Natural Resources Conservation Service through the Partnerships for Climate-Smart Commodities Program for $2,073,301 in September 2023. The purpose of this project is to reduce barriers for small and

EPA_00050964

underserved farmers to implement climate-smart agriculture and forestry practices. RAFI-USA was also awarded a Rural Development Policy Cooperative Agreement with the USDA Farm Service Agency Outreach Office for $1,548,896.68 in September 2023 to help ensure that all farmers have equitable access to services.  Another cooperative agreement through the Equity in Conservation Outreach Cooperative Agreement program for $696,664 is intended to help expand delivery of conservation services to historically underserved producers.

48. RAFI-USA has submitted several reimbursement requests through each of these grant programs since January 20, 2025. RAFI-USA only recently received a reimbursement for its agreement through the Equity in Conservation Outreach Cooperative Agreement program after unsuccessfully submitting reimbursement requests since January. RAFI-USA has not received payments for any of its reimbursement requests for the other grant programs. RAFI-USA's mission is being undercut because farmers and rural communities are being directly harmed due to their inability to access promised funds and RAFI-USA has been prevented from continuing to provide critical support and assistance to these communities. The pause has also harmed RAFI-USA financially. The organization has been forced to pause hiring for two positions and has taken out a line of credit to cover costs in the absence of federal reimbursements.

*Cities*

49. Plaintiff the City of Baltimore ("Baltimore")[1] is a municipal corporation, organized pursuant to Articles XI and XI-A of the Maryland Constitution, entrusted with all the powers of local self-government and home rule afforded by those articles. Baltimore is the largest city in

---

[1] Because Baltimore is a party to ongoing litigation relating to the Equity EO, Baltimore joins the claims asserted in this complaint only as to the Energy EO, Cost Efficiency EO, and agency actions to implement the Energy EO and Cost Efficiency EO. Baltimore does not join the asserted claims as to the Equity EO and agency actions to implement the Equity EO.

19

Maryland and the thirtieth largest city in the United States.  Over the past three years, Baltimore has been awarded more than 20 federal grants funded by the IRA and IIJA.  These grants include a $4 million grant under the EPA's Solid Waste Infrastructure for Recycling ("SWIFR") grant program to help develop a solar-powered composting facility, as well as two EPA Environmental Justice Government-to-Government ("EJG2G") awards, totaling over $500,000, for its YH2O+ Career Training Program, which prepares young adults for jobs in the water and solid waste industries.

50. The Solid Waste Infrastructure for Recycling Grant-funded composting facility is expected to benefit the City in several ways.  If completed, it will have the capacity to compost approximately 12,000 tons of organic materials per year, diverting those materials from landfills and incinerators and reducing greenhouse gas emissions by 6,000 tons.  It will also encourage renewable energy and reduce long-term energy costs, create four or five permanent full-time, higher-paying green energy jobs for local residents, provide Baltimore residents access to organics recycling, and benefit local food production.  On January 31, 2025, Baltimore received an email from an EPA official stating that "Funding has been paused for grants under the Infrastructure Investment and Jobs Act at this time," including "all funding on existing grants for the Solid Waste Infrastructure for Recycling (SWIFR) grant program." The funding pause applied to the City's $4 million Solid Waste Infrastructure for Recycling Grant.  Then, two weeks later, Baltimore received word on February 12, 2025, from the EPA that "you can return to work on the EPA SWIFR grant again." Although the grant is unfrozen as of the date of filing, such volatility in funding availability disrupts this project.  Baltimore expects to draw down the funds gradually over the three-year grant period, and it cannot predict possible future funding freezes.  Baltimore is faced with the catch-22 of deciding whether to expend resources on the

EPA_00050966

project given the risk that the funding will be suspended, and expenses will not be reimbursed or halting this important project.

51. The YH2O+ Career Training Program prepares young adults for full-time jobs in the water and solid waste industries. 158 young men and women have successfully completed the program since its inception in 2015. The YH2O+ program benefits the City by providing a better-trained workforce prepared for well-paying jobs. The EPA awarded Baltimore $524,000 through the Environmental Justice Government-to-Government Program (previously known as the State Environmental Justice Cooperative Agreement Program) for fiscal years 2021 through 2025, including a $324,000 award for fiscal year 2025. This 2025 award would allow Baltimore to expand the program by offering more slots and possibly operating two sessions a year, one in the spring and one in the fall. These awards were suspended following the President's issuance of the Energy EO. As of February 6, 2025, and February 18, 2025, the funds were unavailable to be drawn down from Baltimore's payment portal. The funds had been present in the portal consistently prior to January 23, 2025—it was not until recently that the funds started to disappear and reappear. The $200,000 award for fiscal years 2021 through 2024 subsequently reappeared in the portal and Baltimore was able to draw down the funds and close out on or about March 6, 2025. However, as of March 11, 2025, the $324,000 award for fiscal year 2025 is unavailable in Baltimore's funding portal, and none of it has been drawn down. Without these funds Baltimore will not be able to operate the program effectively, thus hindering its ability to train and hire young adults. The program is on hold and Baltimore is unsure if it will be able to have a spring 2025 or fall 2025 class.

52. Plaintiff the City of Columbus ("Columbus") is a municipal corporation organized under Ohio law. *See* Ohio Constitution, Art. XVIII. Columbus prioritizes planting trees to improve

21

residents' health and quality of life, increase property values, and improve the environment. Trees are particularly important in Columbus because they help to mitigate the city's severe urban heat island effect. As a part of its plan to improve the City's tree canopy, Columbus, through its Recreation and Parks Department, successfully applied for a $500,000 Urban and Community Forestry Grant as a subgrantee of the Ohio Department of Natural Resources ("ODNR"). The grant is designed to "further expand [Columbus's] tree canopy through the purchase and plantings of approximately 1,250 diverse, large-class street trees in disadvantaged areas."

53. During the 2024 planting season, Columbus expended $393,930 of the awarded $500,000. On February 18, 2025, the ODNR sent a letter to the Columbus Recreation and Parks Department explaining that the State's reimbursement requests were not being processed by the U.S. Forestry Service and suggesting that Columbus temporarily suspend expenses against their grant, given the risk that expenses would not be reimbursed. On February 27, 2025, Columbus nonetheless submitted a "Sub Awardee Request for Reimbursement(s)" to the ODNR requesting reimbursement in the amount of $393,930. On March 13, 2025, ODNR sent an email reversing course, stating that the grant was "approved for implementation." However, Columbus has not yet been reimbursed for the $393,930 it has already spent and is concerned that the federal government will continue to turn this grant on and off and may well not ultimately reimburse the city for the full amount of eligible expenses. If Columbus does not receive the reimbursement it is owed under this grant, it will be forced to cover this expense through money from its capital budget.

54. Plaintiff the City of Madison ("Madison") is a municipal corporation organized and existing under the laws of the State of Wisconsin. Madison has been awarded a $20 million grant

22

EPA_00050968

through EPA's Community Change Grants Program to lead a collaborative project to improve housing affordability through whole home energy upgrades, thereby saving residents money on energy bills, improving indoor air quality, and cutting climate pollution. The project—a partnership with four community organizations—aims to upgrade 825 units of housing in low-income census tracts. These homes tend to be least energy efficient, and the residents are forced to spend a disproportionate share of their income on home energy bills. Madison's project also aims to provide an additional 1,050 households with technology to reduce energy use by items plugged into outlets in the home and 60 early career workers with workforce training.

55.  On or around January 31, 2025, Madison's grant disappeared from the ASAP transaction page, making it impossible to draw down funds. The grant was then labeled as "Suspended" until around February 19, 2025, when that status changed to "Open." On or around March 10, 2025, the status changed back to "Suspended," and Madison remains unable to draw down funds. Two of Madison's partner organizations—Sustain Dane and Project Home—have already begun work to deliver their whole home upgrade programs, but they will not be able to continue if funding is not unfrozen. Freezing this grant creates several contractual problems for Madison: Madison cannot continue to honor its subrecipient agreements with Sustain Dane and Project Home, cannot execute expected subrecipient agreements with the remaining two local partners identified in the grant, and has an existing "Statutory Partnership Agreement" with one of these two partners, which the City will not be able to honor if the grant remains frozen. The Statutory Partnership Agreement required by EPA to apply for this grant established an expectation that the statutory partner will receive funds as a subrecipient and conduct the activities described in that Partnership Agreement. EPA's requiring of this partnership agreement and then unilaterally suspending the City's grant funds places Madison at risk of defending a breach of contract action

23