BRETT GUTHRIE, KENTUCKY
CHAIRMAN

FRANK PALLONE, JR., NEW JERSEY
RANKING MEMBER

ONE HUNDRED NINETEENTH CONGRESS

# Congress of the United States
## House of Representatives

COMMITTEE ON ENERGY AND COMMERCE
2125 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515-6115

Majority  (202) 225-3641
Minority  (202) 225-2927

February 5, 2025

The Honorable Lee Zeldin
Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue NW
Washington, D.C. 20004

Dear Administrator Zeldin:

Since taking office, President Donald Trump has broken the law and put crucial, congressionally appropriated investments in American workers, businesses, and communities at risk. As Ranking Members of the Committee with jurisdiction over the Environmental Protection Agency (EPA), we are writing to understand whether you intend to follow the Constitution, the law, and orders from federal judges, which all require that congressionally appropriated funds be released without delay.

On January 20, 2025, his first day in office, President Trump issued an executive order entitled "Unleashing American Energy," which, among other things, directed agencies to "pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022...or the Infrastructure Investment and Jobs Act..."[1] Then, on January 27, Acting Director of the Office of Management and Budget (OMB), Matthew Vaeth, issued a memorandum entitled "Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs," which went dramatically further by ordering federal agencies to "pause all activities related to obligation or disbursement of all Federal financial assistance that may be implicated by" a series of other executive orders spanning topics from health care to foreign aid to immigration.[2]

On January 29, OMB rescinded this memorandum, yet the same day, the White House Press Secretary issued a statement that "This is NOT a rescission of the federal funding freeze,"

---

[1] Exec. Order No. 14153, 90 Fed. Reg. 8353 (Jan. 29, 2025).

[2] Executive Office of the President, Office of Management and Budget, *Memorandum for Heads of Executive Departments and Agencies: Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs* (Jan. 27, 2025) (M-25-13).

The Honorable Lee Zeldin
February 5, 2025
Page 2

and "The President's EO's [sic] on federal funding remain in full force and effect, and will be rigorously implemented."[3, 4] This chaotic rollout of an unconstitutional power grab by the President has left communities and organizations that are owed federal funding reeling.

Federal funding through grants, loans, and other forms of assistance are essential to ensuring the health and well-being of American lives and businesses. Substance abuse treatment clinics rely on federal grant funding. Cancer research does as well. The Low-Income Home Energy Assistance Program, which helps ensure Americans do not freeze in their homes, is funded by the federal government as are numerous projects aimed at growing renewable energy sources and lowering energy costs. So are efforts to remove lead pipes from drinking water systems. Federal funds also ensure that America can manufacture semiconductors and microchips domestically to compete with our adversaries and fuel innovation. Other federal programs work to provide all Americans with reliable high-speed internet. The full list of federal programs that Americans rely on is extensive and the harm of withholding these critical services is incalculable.

Fortunately, two separate courts have already ruled in favor of parties seeking to put a stop to this unconstitutional power grab. First, on January 28, a D.C. court placed a temporary administrative hold on the reckless, illegal, and unconstitutional freeze on certain funds.[5] On February 3, that court went even further, granting a temporary restraining order requiring that the administration stop withholding certain obligated federal funds and stating that "[t]he appropriation of the government's resources is reserved for Congress, not the Executive Branch."[6] On January 31, a court in Rhode Island issued a broad temporary restraining order on the freeze of funds for the plaintiffs in that case—22 states and the District of Columbia—stating that the Executive had "acted contrary to law," and that its actions were "arbitrary and capricious" and "violate the separation of powers."[7] On Monday, a court filing in one of the cases indicated that some guidance had been issued by the administration regarding compliance

---

[3] *White House Response Adds to Confusion on Federal Funding Freeze,* National Public Radio (Jan. 29, 2025).

[4] Karoline Leavitt (@PressSec), X (Jan. 29, 2025, 1:40 PM) (https://x.com/PressSec/status/1884672871944901034).

[5] Associated Press, *Federal Judge Temporarily Blocks Trump Administration Freeze on Federal Grants and Loans* (Jan. 29, 2025) (https://apnews.com/article/donald-trump-pause-federal-grants-aid-f9948b9996c0ca971f0065fac85737ce).

[6] Memorandum Opinion and Order (Feb. 3, 2025) *National Council of Nonprofits et al. v. Trump,* D.D.C. (No. 25-cv-00239-LLA).

[7] Temporary Restraining Order (Jan. 31, 2025) *New York et al. v. Trump,* D.R.I. (No. 25-cv-39-JJM-PAS).

The Honorable Lee Zeldin
February 5, 2025
Page 3

with one of the orders.[8]  But reporting indicates that funds have still not been released as required.[9]

Full compliance with these court orders is a critical first step to ending an ongoing violation of the Constitution and the law.  It is essential that these congressionally approved funds be distributed immediately to ensure that the federal government remains a reliable and credible partner to the community organizations and contractors with whom you have binding legal contracts.  The government cannot simply walk away from its commitments on a whim unless the contract specifically allows for it, and there is no indication that the many agreements entered into by your agency have such provisions.

Workers and businesses are being harmed.  Americans in need of care are being harmed. Congress and the American people therefore deserve answers.  And so do the hard-working career civil servants at your agency that have had unreasonable, illegal, and unconstitutional orders pressed upon them while they are simultaneously being coerced to leave public service.[10]

Accordingly, please answer the following questions by Friday, February 7.[11]

1.  Please confirm whether EPA intends to comply with the courts' orders.[12]

2.  If EPA does intend to comply with the orders, please provide the following:

    a.  Identify the individual(s) responsible for ensuring compliance with the orders;

    b.  Detail what actions EPA has taken to ensure compliance, including the date and approximate time that each action was taken;

    c.  Produce all written guidance that has been provided in order to comply with the orders; and

    d.  State whether all funds covered by the orders have been released for disbursement or, if not, when they will be.

---

[8] Notice of Court Order (Feb. 3, 2025) *New York et al. v. Trump*, D.R.I. (No. 25-cv-39-JJM-PAS).

[9] *Some Nonprofits Say They Still Can't Access Federal Funds Despite Rulings Blocking Trump's Freeze,* NBC News (Feb. 3, 2025).

[10] *Official Email Urges Federal Workers to Find 'Higher Productivity' Jobs*, New York Times (Jan. 31, 2025).

[11] Note that this deadline is more time than OMB gave to agencies and funding recipients before seizing up to trillions of appropriated program dollars.

[12] For avoidance of confusion, the orders are appended to this letter.

The Honorable Lee Zeldin
February 5, 2025
Page 4

3.  If you do not intend to comply with the orders, please provide the following:

    a.  Identify the individual(s) responsible for the decision to not comply with the orders;

    b.  Identify by what authority the individual(s) believe they are permitted to violate orders from Article III judges; and

    c.  Describe whether the determination to not comply with the orders was made by the agency or whether the agency was directed to not comply by an individual at the White House.

4.  Please list any contracts or agreements for which you do not intend to immediately resume funding.  For each, explain which terms of the contracts or agreements you believe permit funds to be withheld.

    If you have any questions about this request, please contact the Committee Democratic staff at (202) 225-2927.

                                    Sincerely,


Frank Pallone, Jr.                          Paul D. Tonko
Ranking Member                              Ranking Member
                                            Subcommittee on Environment


Yvette D. Clarke
Ranking Member
Subcommittee on Oversight
  and Investigations

The Honorable Lee Zeldin
February 5, 2025
Page 5

      cc:    The Honorable Brett Guthrie
            Chairman

            The Honorable H. Morgan Griffith
            Chairman
            Subcommittee on Environment

            The Honorable Gary J. Palmer
            Chairman
            Subcommittee on Oversight and Investigations

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

STATE OF NEW YORK; STATE OF )
CALIFORNIA; STATE OF ILLINOIS; )
STATE OF RHODE ISLAND; STATE OF )
NEW JERSEY; COMMONWEALTH OF )
MASSACHUSETTS; STATE OF )
ARIZONA; STATE OF COLORADO; )
STATE OF CONNECTICUT; STATE OF )
DELAWARE; THE DISTRICT OF )
COLUMBIA; STATE OF HAWAI'I; )
STATE OF MAINE; STATE OF )
MARYLAND; STATE OF MICHIGAN; )
STATE OF MINNESOTA; STATE OF )
NEVADA; STATE OF NORTH )
CAROLINA; STATE OF NEW MEXICO; )
STATE OF OREGON; STATE OF )
VERMONT; STATE OF WASHINGTON; )
and STATE OF WISCONSIN, )
)
      Plaintiffs, )
)
v. )             C.A. No. 25-cv-39-JJM-PAS
)
DONALD TRUMP, *in his Official* )
*Capacity as President of the United* )
*States*; U.S. OFFICE OF )
MANAGEMENT AND BUDGET; )
MATTHEW J. VAETH, *in his Official* )
*Capacity as Acting Director of the U.S.* )
*Office of Management and Budget*; U.S. )
DEPARTMENT OF THE TREASURY; )
SCOTT BESSENT, *in his Official* )
*Capacity as Secretary of the Treasury*; )
PATRICIA COLLINS, *in her Official* )
*Capacity as Treasurer of the U.S.*; U.S. )
DEPARTMENT OF HEALTH AND )
HUMAN SERVICES; DOROTHY A. )
FINK, M.D., *in her Official Capacity As* )
*Acting Secretary Of Health And Human* )
*Services*; U.S. DEPARTMENT OF )
EDUCATION; DENISE CARTER, *in her* )
*Official Capacity as Acting Secretary of* )
*Education*; U.S. FEDERAL )
EMERGENCY MANAGEMENT )
AGENCY; CAMERON HAMILTON, *in* )

EPA_00048404

his *Official Capacity as Acting*
*Administrator of the U.S. Federal*
*Emergency Management Agency*; U.S.
DEPARTMENT OF
TRANSPORTATION;
JUDITH KALETA, *in her Official*
*Capacity as Acting Secretary of*
*Transportation*; U.S. DEPARTMENT OF
LABOR; VINCE MICONE, *in his Official*
*Capacity as Acting Secretary of Labor*;
U.S. DEPARTMENT OF ENERGY;
INGRID KOLB*, in her Official Capacity*
*as Acting Secretary of the U.S.*
*Department of Energy*; U.S.
ENVIRONMENTAL PROTECTION
AGENCY; JAMES PAYNE, *in his Official*
*Capacity as Acting Administrator of the*
*U.S. Environmental Protection Agency*;
U.S. DEPARTMENT OF HOMELAND
SECURITY; KRISTI NOEM, i*n her*
*Capacity as Secretary of the U.S.*
*Department of Homeland Security*; U.S.
DEPARTMENT OF JUSTICE; JAMES R.
McHENRY III, *in his Official Capacity as*
*Acting Attorney General of the U.S.*
*Department of Justice*; THE NATIONAL
SCIENCE FOUNDATION; and DR.
SETHURAMAN PANCHANATHAN, *in*
*his Capacity as Director of the National*
*Science Foundation*,

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

# **TEMPORARY RESTRAINING ORDER**

The legal standard for a Temporary Restraining Order ("TRO") mirrors that of

a preliminary injunction.  The Plaintiff States must show that weighing these four

factors favors granting a TRO:

     1.  likelihood of success on the merits;

     2.  potential for irreparable injury;

     3.  balance of the relevant equities; and

EPA_00048405

4. effect on the public interest if the Court grants or denies the TRO.

*Planned Parenthood League v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir. 1981). The traditional equity doctrine that preliminary injunctive relief is an extraordinary and drastic remedy that is never awarded as of right guides the Court. *Id.* The Court is also fully aware of the judiciary's role as one of the three independent branches of government, and that the doctrine of separation of powers restricts its reach into the Executive Branch. The Court now turns to the four factors.

## Likelihood of Success on the Merits

We begin with what courts have called a key factor—a consideration of the movant's likelihood of success on the merits.

In **Count I**, the States allege that the Executive's actions by the Office of Management and Budget ("OMB")[1] violate the Administrative Procedure Act ("APA")[2] because Congress has not delegated any unilateral authority to the Executive to indefinitely pause all federal financial assistance without considering the statutory and contractual terms governing these billions of dollars of grants.

In **Count II**, the States allege that the Executive's actions violate the APA because the failure to spend funds appropriated by Congress is arbitrary and capricious in multiple respects.

---

[1] See *supra* for discussion of mootness.
[2] 5 U.S.C. § 551 et seq.

3

EPA_00048406

In **Count III**, the States allege that the failure to spend funds appropriated by Congress violates the separation of powers because the Executive has overridden Congress' judgments by refusing to disburse already-allocated funding for many federal grant programs.

In **Count IV**, the States allege a violation of the Spending Clause of the U.S. Constitution. U.S. Const. art. I, § 8, cl. law 1.

And in **Count V**, the States allege a violation of the presentment (U.S. Const. art. I, § 7, cl. 2), appropriations (U.S. Const. art. I, § 7), and take care clauses (U.S. Const. art. II, § 3, cl. 3) (the Executive must "take care that the laws be faithfully executed . . .").

Because of the breadth and ambiguity of the "pause," the Court must consider the States' TRO motion today based on the effect it will have on many—but perhaps not all—grants and programs it is intended to cover. Are there some aspects of the pause that might be legal and appropriate constitutionally for the Executive to take? The Court imagines there are, but it is equally sure that there are many instances in the Executive Orders' wide-ranging, all-encompassing, and ambiguous "pause" of critical funding that are not. The Court must act in these early stages of the litigation under the "worst case scenario" because the breadth and ambiguity of the Executive's action makes it impossible to do otherwise.

The Court finds that, based on the evidence before it now, some of which is set forth below, the States are likely to succeed on the merits of some, if not all, their claims. The reasons are as follows:

EPA_00048407

- The Executive's action unilaterally suspends the payment of federal funds to the States and others simply by choosing to do so, no matter the authorizing or appropriating statute, the regulatory regime, or the terms of the grant itself. The Executive cites no legal authority allowing it to do so; indeed, no federal law would authorize the Executive's unilateral action here.

- Congress has instructed the Executive to provide funding to States based on stated statutory factors—for example, population or the expenditure of qualifying State funds. By trying to impose certain conditions on this funding, the Executive has acted contrary to law and in violation of the APA.

- The Executive Orders threaten the States' ability to conduct essential activities and gave the States and others less than 24 hours' notice of this arbitrary pause, preventing them from making other plans or strategizing how they would continue to function without these promised funds.

- Congress appropriated many of these funds, and the Executive's refusal to disburse them is contrary to congressional intent and directive and thus arbitrary and capricious.

- Congress has not given the Executive limitless power to broadly and indefinitely pause all funds that it has expressly directed to specific recipients and purposes and therefore the Executive's actions violate the separation of powers.

Judge Bruce M. Selya of the First Circuit succinctly set out the black letter law about appropriated funds and Executive powers:

EPA_00048408

> When an executive agency administers a federal statute, the agency's power to act is "authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297, 133 S. Ct. 1863, 185 L. Ed. 2d 941 (2013). It is no exaggeration to say that "an agency literally has no power to act ... unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374, 106 S. Ct. 1890, 90 L. Ed. 2d 369 (1986). Any action that an agency takes outside the bounds of its statutory authority is ultra vires, see *City of Arlington*, 569 U.S. at 297, 133 S. Ct. 1863, and violates the Administrative Procedure Act, see 5 U.S.C. § 706(2)(C).

*City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020).

The Executive's statement that the Executive Branch has a duty "to align Federal spending and action with the will of the American people *as expressed through Presidential priorities*," (ECF No. 48-1 at 11) (emphasis added) is a constitutionally flawed statement. The Executive Branch has a duty to align federal spending and action with the will of the people as **expressed through congressional appropriations,** not through "Presidential priorities." U.S. Const. art. II, § 3, cl. 3 (establishing that the Executive must "take care that the laws be faithfully executed . . ."). Federal law specifies how the Executive should act if it believes that appropriations are inconsistent with the President's priorities–it must ask Congress, not act unilaterally. The Impoundment Control Act of 1974 specifies that the President may ask that Congress rescind appropriated funds.[3] Here, there is no evidence that the Executive has followed the law by notifying Congress and thereby effectuating a potentially legally permitted so-called "pause."

---

[3] If both the Senate and the House of Representatives have not approved a rescission proposal (by passing legislation) within forty-five days of continuous session, any funds the Executive is withholding must be made available for obligation.

EPA_00048409

Justice Brett Kavanaugh wrote when he was on the D.C. Circuit:

> Like the Commission here, a President sometimes has policy reasons (as distinct from constitutional reasons, *cf. infra* note 3) for wanting to spend less than the full amount appropriated by Congress for a particular project or program.  But in those circumstances, even the President does not have unilateral authority to refuse to spend the funds.  Instead, the President must propose the rescission of funds, and Congress then may decide whether to approve a rescission bill.  *See* 2 U.S.C. § 683; *see also Train v. City of New York*, 420 U.S. 35, 95 S. Ct. 839, 43 L. Ed. 2d 1 (1975); Memorandum from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, to Edward L. Morgan, Deputy Counsel to the President (Dec. 1, 1969), *reprinted in Executive Impoundment of Appropriated Funds: Hearings Before the Subcomm. on Separation of Powers of the S. Comm. on the Judiciary*, 92d Cong. 279, 282 (1971) ("With respect to the suggestion that the President has a constitutional power to decline to spend appropriated funds, we must conclude that existence of such a broad power is supported by neither reason nor precedent.")

*In re Aiken Cnty.*, 725 F.3d 255, 261, n.1 (D.C. Cir. 2013).

The Court finds that the record now before it substantiates the likelihood of a successful claim that the Executive's actions violate the Constitution and statutes of the United States.

The Court now moves on to the remaining three injunction considerations.

## **Irreparable Harm**

The States have put forth sufficient evidence at this stage that they will likely suffer severe and irreparable harm if the Court denies their request to enjoin enforcement of the funding pause.

- All the States rely on federal funds to provide and maintain vital programs and services and have introduced evidence that the withholding of federal funds

EPA_00048410

will cause severe disruption in their ability to administer such vital services–
even if it is for a brief time.

- The States detail many examples of where the Executive's overarching pause
  on funding that Congress has allocated will harm them and their citizens.
  These programs range from highway planning and construction, childcare,
  veteran nursing care funding, special education grants, and state health
  departments, who receive billions of dollars to run programs that maintain
  functional health systems. *See, e.g.*, ECF No. 3-1 at 56 (highway construction
  programs in Delaware), at 73 (childcare programs in Michigan), at 113
  (veterans nursing care funding in Washington state), at 77 (special education
  programs in Minnesota), and at 100–01 (health care programs in New Mexico).

- The pause in federal funding will also hurt current disaster relief efforts. The
  States assert that the pause applies to federal actions directing federal
  financial assistance to North Carolina to address the damage inflicted by
  Hurricane Helene and to any Federal Emergency Management Agency grant
  money not yet disbursed, including key support for California's ongoing
  response to the fires. ECF No. 1 ¶¶ 80–81.

- A January 28, 2025, email from Shannon Kelly, the Director of the National
  High Intensity Drug Case Trafficking Areas (HIDTA) program, who aids law
  enforcement in high drug-trafficking areas, shows that payments to state-
  based HIDTA programs have been paused, putting the public's safety at risk.
  *Id.* ¶ 83.

EPA_00048411

The States have set forth facts showing that the Executive's abrupt "pause" in potentially trillions of dollars of federal funding will cause a ripple effect that would directly impact the States and other's ability to provide and administer vital services and relief to their citizens.  Thus, the federal grants to States and others that are impounded through the Executive's pause in disbursement will cause irreparable harm.

And it is more than monetary harm that is at stake here.  As Justice Anthony Kennedy reminds us, "Liberty is always at stake when one or more of the branches seek to transgress the separation of powers."  *Clinton v. City of New York*, 524 U.S. 417, 449–50 (1998) (Kennedy, J. concurring)

## Balance of the Equities and Public Interest

As the Court considers the final two factors, the record shows that the balance of equities weighs heavily in favor of granting the States' TRO.

- If the Defendants are prevented from enforcing the directive contained in the OMB Directive, they merely would have to disburse funds that Congress has appropriated to the States and others.

- On the other hand, if the Court denies the TRO, the funding that the States and others are presumably due under law is in an indefinite limbo—a hardship worsened by the fact that the States had less than 24 hours' notice to act in anticipation of the funding shortfall.

- The fact that the States have shown a likelihood of success on the merits strongly suggests that a TRO would serve the public interest.  Moreover, the

EPA_00048412

public interest further favors a TRO because absent such an order, there is a substantial risk that the States and its citizens will face a significant disruption in health, education, and other public services that are integral to their daily lives due to this pause in federal funding.

The evidence in the record at this point shows that, despite the rescission of the OMB Directive, the Executive's decision to pause appropriated federal funds "remains in full force and effect." ECF No. 44.

## Mootness

The Defendants now claim that this matter is moot because it rescinded the OMB Directive. But the evidence shows that the alleged rescission of the OMB Directive was in name-only and may have been issued simply to defeat the jurisdiction of the courts. The substantive effect of the directive carries on.

Messaging from the White House and agencies proves the point. At 2:04 EST, less than an hour before the Court's hearing on the States' motion on Wednesday, the Defendants filed a Notice saying, "OMB elected to rescind that challenged Memorandum. *See* OMB Mem. M-25-14, *Rescission of M-25-13* (Jan. 28, 2025) ('OMB Memorandum M-25-13 is rescinded.')." ECF No. 43. Yet about twenty minutes before the Defendants filed the Notice, the President's Press Secretary sent a statement via the X platform that said: "The President's [Executive Orders] EO's on federal funding remain in full force and effect and will be rigorously implemented." ECF No. 44. And then the following day (January 30, 2025 at 7:50 MST and again at 5:27 p.m. EST) after the so-called rescission, the Environmental Protection Agency, in an email to

10

EPA_00048413

federal grant recipients, said that the awarded money could not be disbursed while it worked "diligently to implement the [OMB] Memorandum, Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs, to align Federal spending and action with the will of the American people as expressed through President Trump's priorities. The agency is temporarily pausing all activities related to the obligation or disbursement of EPA Federal financial assistance at this time. EPA is continuing to work with OMB as they review processes, policies, and programs, as required by the memorandum." ECF No. 48-1 at 6, 11.

Based on the Press Secretary's unequivocal statement and the continued actions of Executive agencies, the Court finds that the policies in the OMB Directive that the States challenge here are still in full force and effect and thus the issues presented in the States' TRO motion are not moot.

Conclusion

Consistent with the findings above, and to keep the status quo, the Court hereby ORDERS that a TEMPORARY RESTRAINING ORDER is entered in this case until this Court rules on the States' forthcoming motion for a preliminary injunction, which the States shall file expeditiously.

During the pendency of the Temporary Restraining Order, Defendants shall not pause, freeze, impede, block, cancel, or terminate Defendants' compliance with awards and obligations to provide federal financial assistance to the States, and Defendants shall not impede the States' access to such awards and obligations, except on the basis of the applicable authorizing statutes, regulations, and terms.

11

EPA_00048414

If Defendants engage in the "identif[ication] and review" of federal financial assistance programs, as identified in the OMB Directive, such exercise shall not affect a pause, freeze, impediment, block, cancellation, or termination of Defendants' compliance with such awards and obligations, except on the basis of the applicable authorizing statutes, regulations, and terms.

Defendants shall also be restrained and prohibited from reissuing, adopting, implementing, or otherwise giving effect to the OMB Directive under any other name or title or through any other Defendants (or agency supervised, administered, or controlled by any Defendant), such as the continued implementation identified by the White House Press Secretary's statement of January 29, 2025. ECF No. 44.

Defendants' attorneys shall provide written notice of this Order to all Defendants and agencies and their employees, contractors, and grantees by Monday, February 3, 2025, at 9 a.m. Defendants shall file a copy of the notice on the docket at the same time.

Defendants shall comply with all notice and procedural requirements in the award, agreement, or other instrument relating to decisions to stop, delay, or otherwise withhold federal financial assistance programs.

The TRO shall be in effect until further Order of this Court. A preliminary hearing, at which time the States will have to produce specific evidence in support of a preliminary injunction, will be set shortly at a day and time that is convenient to the parties and the Court.

EPA_00048415

IT IS SO ORDERED.

*s/John J. McConnell, Jr.*

_____
John J. McConnell, Jr.
Chief Judge
United States District Court for the District of Rhode Island

January 31, 2025

EPA_00048416

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NATIONAL COUNCIL OF
NONPROFITS, *et al.*,

        *Plaintiffs*,

   v.

OFFICE OF MANAGEMENT AND
BUDGET, *et al.*,

        *Defendants*.

Civil Action No. 25-239 (LLA)

<u>**MEMORANDUM OPINION AND ORDER**</u>

This matter is before the court on Plaintiffs' Motion for a Temporary Restraining Order, ECF No. 5, and Defendants' Motion to Dismiss, ECF No. 21. Upon consideration of the parties' briefs, oral argument, and for the reasons explained below, the court grants Plaintiffs' motion, denies Defendants' motion, and enters a temporary restraining order against Defendants pursuant to the terms outlined at the end of this order.

## I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.     Office of Management and Budget Memorandum M-25-13

On January 27, 2025, Matthew J. Vaeth, Acting Director of the Office of Management and Budget ("OMB"), issued a memorandum ("M-25-13") directing federal agencies to "complete a comprehensive analysis of all of their Federal financial assistance programs to identify programs, projects, and activities that may be implicated by any of the President's executive orders." ECF No. 1 ¶ 15. The memorandum further stated that, "[i]n the interim, to the extent permissible under applicable law, Federal agencies *must temporarily pause* all activities related to [the] obligation or

EPA_00048417

disbursement of all Federal financial assistance, and other relevant agency acti[vities] that may be implicated by the executive orders, including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal." *Id.* ¶ 16; *Off. of Mgmt. & Budget, Exec. Off. of the President, Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs* (Jan. 27, 2025), https://perma.cc/69QB-VFG8 ("OMB Pause Memorandum").

The memorandum defined "Federal financial assistance" as: "(i) all forms of assistance listed in paragraphs (1) and (2) of the definition of this term at 2 [C.F.R. §] 200.1; and (ii) assistance received or administered by recipients or subrecipients of any type except for assistance received directly by individuals." *Id.* ¶ 17. This includes all federal assistance in the form of grants, loans, loan guarantees, and insurance. *Id.* ¶ 18; *see* 2 C.F.R. § 200.1. As relevant executive orders, it listed:

- *Protecting the American People Against Invasion* (Jan. 20, 2025);

- *Reevaluating and Realigning United States Foreign Aid* (Jan. 20, 2025);

- *Putting America First in International Environmental Agreements* (Jan. 20, 2025);

- *Unleashing American Energy* (Jan. 20, 2025);

- *Ending Radical and Wasteful Government DEI Programs and Preferencing* (Jan. 20, 2025);

- *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (Jan. 20, 2025); and

- *Enforcing the Hyde Amendment* (Jan. 24, 2025).

OMB Pause Memorandum, at 1-2.

The memorandum stated that "[t]he temporary pause [would] become effective on January 28, 2025 at 5:00 PM." *Id.* at 2. During the pause, agencies were directed to "submit to

2

OMB detailed information on any programs, projects[,] or activities subject to [the] pause" on or before February 10, 2025. *Id.* at 2.

### B.   Complaint, Emergency Hearing, and Administrative Stay

Shortly after noon on January 28, several coalitions of nonprofit organizations brought this action against OMB and Acting Director Vaeth arguing that OMB's action violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* ECF No. 1. Plaintiffs alleged that the implicated federal grants and funding "are the lifeblood of operations and programs for many . . . nonprofits, and [that] even a short pause in funding . . . could deprive people and communities of their life-saving services." *Id.* ¶ 32. They argue that Defendants' action was arbitrary and capricious, violated the First Amendment of the United States Constitution, and exceeded OMB's statutory authority. *Id.* ¶¶ 43-61.

Along with their complaint, Plaintiffs sought a temporary restraining order ("TRO") "barring the OMB and all of its officers, employees, and agents from taking any steps to implement, apply, or enforce Memo M-25-13." ECF No. 5, at 18. Defendants entered an appearance, ECF No. 9, and the court held an emergency hearing at 4:00 p.m. on January 28 to discern the parties' positions with respect to the issuance of a brief administrative stay pending the resolution of Plaintiffs' request for a TRO, Minute Order (D.D.C. Jan. 28, 2025).

Given the extreme time constraints of the litigation and the magnitude of the legal issues, the court entered a brief administrative stay to permit the parties to fully brief the TRO motion and "buy[] the court time to deliberate."[1] ECF No. 13, at 3 (quoting *United States v. Texas*, 144 S. Ct.

---

[1] The court issued the administrative stay from the bench shortly before 5:00 p.m., when the "temporary pause" of federal funding was set to take effect. Transcript of Emergency Hearing, *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-CV-239 (D.D.C. Jan. 28, 2025).

EPA_00048419

797, 798 (2024) (Barrett, J., concurring)). The administrative stay prohibited Defendants "from implementing OMB Memorandum M-25-13 with respect to the disbursement of Federal funds under all open awards" until 5:00 p.m. on February 3, 2025. *Id.* at 4-5. The court also set a hearing on Plaintiffs' TRO motion for 11:00 a.m. on February 3, 2025. *Id.* at 5.

### C. Rescission of Memorandum M-25-13 and Aftermath

On January 29, the day after the court entered its administrative stay, OMB issued a new memorandum ("M-25-14") that purported to rescind M-25-13. *See* ECF Nos. 18, 18-1. The new memorandum consisted of two sentences: "OMB Memorandum M-25-13 is rescinded. If you have questions about implementing the President's Executive Orders, please contact your agency General Counsel." ECF No. 18-1.

Shortly after this "rescission" was issued, White House Press Secretary Karoline Leavitt announced from her official social media account that the new memorandum was "NOT a rescission of the federal funding freeze." Karoline Leavitt, X (formerly Twitter) (Jan. 29, 2025), https://perma.cc/99C4-5V6G. Instead, she stated that "[i]t [was] simply a rescission of [OMB memorandum M-25-13]." *Id.* She further explained that the purpose of the rescission was "[t]o end any confusion created by the court's injunction." *Id.* The entire post may be viewed below:



*Id.*

EPA_00048420

On January 30, Defendants filed their opposition to Plaintiffs' TRO motion and concurrently moved to dismiss the complaint for lack of subject matter jurisdiction. ECF Nos. 20, 21. As of February 1, both motions were fully briefed. ECF Nos. 24, 25, 26.

### D.        Temporary Restraining Order Hearing

On the morning of February 3, 2025, the court held a hearing on Plaintiffs' motion for a TRO. *See* Minute Entry, (D.D.C. Feb. 3, 2025). At the conclusion of the hearing, the court explained that it was inclined to grant a TRO and deny Defendants' motion to dismiss. Oral Argument, *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-CV-239 (D.D.C. Feb. 3, 2025). Pursuant to the court's request, Plaintiffs submitted a proposed TRO order shortly after the hearing concluded, and Defendants responded to the proposed order by mid-afternoon.

### E.        Parallel Litigation in the District of Rhode Island

On the same day Plaintiffs filed this suit, and several hours before memorandum M-25-13's pause was to go into effect, twenty-two states and the District of Columbia filed suit in the U.S. District Court for the District of Rhode Island and sought a TRO to halt implementation of the memorandum. *See* Compl., *New York v. Trump*, No. 25-CV-39 (D.R.I. Jan. 28, 2025), ECF No. 1. The district court scheduled a hearing for January 29 at 3:00 p.m.

Following the hearing, which took place after OMB had "rescinded" memorandum M-25-13, the court granted the States' request and issued a TRO on January 31, 2025. TRO, *New York*, No. 25-CV-39 (D.R.I. Jan. 31, 2025), ECF No. 50. The restraining order prohibited the defendants (President Trump, OMB, and eleven federal agencies) from "paus[ing], freez[ing], imped[ing], block[ing], cancel[ing], or terminat[ing] [their] compliance with awards and obligations to provide federal financial assistance to the [plaintiff] States." *Id.* at 11. The order also prohibited the defendants "from reissuing, adopting, implementing, or otherwise giving effect to the [OMB

5

memorandum M-25-13] under any other name or title, . . . such as the continued implementation identified by the White House Press Secretary's statement of January 29, 2025." *Id.* at 12. Finally, the court directed the plaintiff States to file their forthcoming motion for a preliminary injunction expeditiously. *Id.* at 11.

On the morning of February 3, the defendants filed a notice of compliance with the court's TRO. Notice of Compliance with Court's TRO, *New York*, No. 25-CV-39 (D.R.I. Feb. 3, 2025), ECF No. 51. In it, the defendants explained that they had provided written notice to all defendant agencies on January 31 to inform them of the TRO and instruct them to comply with its restrictions. *Id.* ¶ 1. The defendants also notified the court that they believed certain terms of the TRO "constitute[d] significant intrusions on the Executive Branch's lawful authorities and the separation of powers." *Id.* ¶ 2.

The litigation remains ongoing.

## II.    DISCUSSION

### A.    Jurisdiction

Before reaching the merits, Defendants raise two threshold jurisdictional arguments. First, they argue that Plaintiffs lack standing because they have not adequately alleged injury in fact, causation, or redressability. ECF No. 21-1, at 7-11. Second, they claim that the case is now moot because OMB rescinded memorandum M-25-13 after Plaintiffs filed suit. *Id.* at 6. The court is unpersuaded on both counts.

#### 1.    Standing

A plaintiff seeking relief in federal court must establish standing by showing: (1) that it suffered an injury in fact, which is a concrete and particularized harm that is actual or imminent, rather than hypothetical, (2) a causal connection between the injury and the challenged conduct

EPA_00048422

that is fairly traceable to the defendant's actions, and (3) a non-speculative likelihood that the injury will be redressed by a decision in the plaintiff's favor. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Standing is "assessed as of the time a suit commences," meaning that post-complaint events will not deprive a plaintiff of standing. *Chamber of Commerce of the U.S. v. EPA*, 642 F.3d 192, 200 (D.C. Cir. 2011). Defendants argue that Plaintiffs fail to satisfy all three elements of standing. The court disagrees.

### a.    Injury in fact

When a plaintiff association tries to sue on behalf of its members, it must demonstrate that: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."[2] *Metro. Wash. Chapter, Associated Builders & Contractors, Inc. v. District of Columbia*, 62 F.4th 567, 572 (D.C. Cir. 2023) (quoting *Hunt v. Wash. State Apple Advert Comm'n*, 432 U.S. 333, 343 (1977)). When facing a motion to dismiss, an association plaintiff "need only make a plausible allegation of facts establishing each element of standing." *Cutler v. U.S. Dep't of Health & Hum. Servs.*, 797 F.3d 1173, 1179 (D.C. Cir. 2015).

Defendants claim that Plaintiffs have failed to "identif[y] a single member who . . . would be injured," ECF No. 21-1, at 9 (quoting *Chamber of Commerce*, 642 F.3d at 200), but that is incorrect. Plaintiffs allege that even a temporary pause in funding to their members, such as the American Public Health Association and Main Street Alliance, would destroy their ability to provide medical and low-income childcare services. ECF No. 1 ¶¶ 33-34, 36-40. On top of these

---

[2] Defendants do not contest prongs (b) or (c). *See* ECF No. 24, at 18 n.11.

EPA_00048423

economic injuries, Plaintiffs' members face First Amendment harms because the memorandum targets funds that relate to "DEI [and] woke gender ideology." OMB Pause Memorandum, at 2; ECF No. 1 ¶¶ 35-36, 42. Defendants reply that Plaintiffs "must present more than allegations of a subjective chill" and need to allege "present objective harm or a threat of specific future harm." ECF No. 26, at 3 (quoting *Bigelow v. Virginia*, 421 U.S. 809, 816-17 (1975)). At this early stage, Plaintiffs have done exactly that: they claim that Defendants have singled out their funding programs (in other words, their economic lifelines) based on their exercise of speech and association.

Defendants further argue that a temporary pause would be far too brief to cause lasting damage, but the record belies these claims. First, Defendants have no factual basis on which to build such a counterargument. The pause outlined in memorandum M-25-13 is effectively indefinite with no clear parameters for when it will end. OMB Pause Memorandum, at 2. Second, Plaintiffs have provided numerous declarations showing that many organizations need weekly injections of federal funds in order to continue operating.[3] One health center pays its employees "biweekly, on

---

[3] Plaintiffs submitted most of these declarations alongside their reply in support of the TRO motion, ECF No. 24, and submitted an additional declaration the evening of February 2, 2025, ECF No. 27. While such declarations should normally be filed concurrently with the complaint, any delay in compiling these materials is entirely of Defendants' own making. OMB issued memorandum M-25-13 less than twenty-four hours before it was set to take effect. Plaintiffs can hardly be blamed for needing more than a single morning and afternoon to submit critical evidence under exigent circumstances. Defendants object to one of the declarations, "Exhibit F," ECF No. 24-6, because it came from a party that only joined one of the Plaintiff coalitions *after* the lawsuit was filed. Because standing "is assessed as of the time a suit commences," *Chamber of Commerce*, 642 F.3d at 200, the court will not consider Exhibit F as part of its standing analysis. The court may, however, consider Exhibit F for purposes of assessing mootness because mootness asks whether post-complaint events impact the court's jurisdiction. *See Garcia v. U.S. Citizenship & Immgr. Servs.*, 168 F. Supp. 3d 50, 65 (D.D.C. 2016) (explaining that standing "is concerned with the presence of injury, causation, and redressability *at the time a complaint is filed*," whereas mootness "scrutinizes the presence of these elements *after filing—i.e.*, at the time of a court's decision").

EPA_00048424

Thursdays," requiring it to "draw down grant funds on the preceding Tuesday" so that they reach the health center's bank account by Wednesday. ECF No. 24-4 ¶ 6. Some of those employees "live paycheck to paycheck," meaning that a single missed payment could prevent them from buying groceries or paying rent. *Id.* ¶ 7. Separately, a member of a tribal organization was forced to lay off two employees on January 28 because it could not access its grant funds that day. ECF No. 24-5 ¶ 13. And another nonprofit dedicated to ending homelessness was forced to suspend a birth certificate and identification card program just so that it could keep its employees on payroll. ECF No. 24-7 ¶ 20-21.

Defendants also speculate that, at least for some organizations, OMB may have pre-approved certain programs so as to prevent any interruption in disbursements. Unfortunately for Defendants, the precise opposite appears to be true. According to Plaintiffs' declarations, many organizations were blocked from accessing their funds well *before* 5:00 p.m. on January 28, when the freeze was set to begin. *See, e.g.*, ECF Nos. 24-4 ¶ 8 (unable to access fund portal during the day on January 28); 24-7 ¶ 13 (same); 24-8 ¶ 9 (unable to access fund portal on January 27).

The alleged injuries to Plaintiffs' many members are sufficiently concrete and imminent to satisfy the first element of standing. For many, the harms caused by the freeze are non-speculative, impending, and potentially catastrophic. Defendants' assertion that these injuries are nothing more than "a setback to [Plaintiffs'] abstract social interests," ECF No. 26, at 3-4 (quoting *Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367, 394 (2024)), is blatantly contradicted by the record. Plaintiffs have adequately shown injury in fact.

### b.  Causation

Defendants next try to break the causal chain between memorandum M-25-13 and Plaintiffs' harms. Defendants argue that with the memorandum now rescinded, any lingering pauses in

EPA_00048425

funding are not fairly traceable to the memorandum itself. Instead, they say, Plaintiffs must take up their grievances with the individual agencies responsible for disbursing their funds. ECF Nos. 21-1, at 10-11; 26, at 5-7.

At a high level, Defendants are correct that harms caused by third parties are generally not traceable to the defendant. *See Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) (en banc) (explaining that traceability must be to "the challenged acts of the defendant, not of some absent third party"). And where causation "hinge[s] on the independent choices of [a] regulated third party," like the states or other federal actors, it is the plaintiff's burden "to adduce facts showing that those choices have been or will be made in such manner as to produce causation." *Ctr. for L. & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161 (D.C. Cir. 2005). Plaintiffs claim that memorandum M-25-13 "was not a suggestion but a command to agencies, and [the agencies] have treated it as such." ECF No. 24, at 17. They further allege that their economic and constitutional harms stem directly from the memorandum's directives, making OMB and Acting Director Vaeth the proper defendants. *Id.*

In their briefing, Defendants rely on two cases to make their counterargument. *See* ECF No. 21-1, at 10-11. In *Louisiana ex rel. Landry v. Biden*, 64 F.4th 674 (5th Cir. 2023), the Fifth Circuit held that an OMB working group's "guidance" and publication of cost estimates did not confer standing on plaintiffs who sought to block its effects, *id.* at 681-82. As an initial matter, the Fifth Circuit's ruling had nothing to do with the causation element of standing. The court only considered whether the "possibility of regulation" was an "injury in fact." *Id.* (quoting *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 13 (D.C. Cir. 2011)). But even if the court were to extend its reasoning to causation, Defendants' argument still fails. The executive order in *Louisiana* "d[id] not *require* any action from federal agencies." *Id.* at 681. Agencies were not mandated to

EPA_00048426

"implement the Interim Estimates" and could "exercise discretion" in choosing whether or not they applied. *Id.* In contrast, memorandum M-25-13 states in no uncertain terms (and in bold typeface, no less) that "Federal agencies *must temporarily pause* all activities related to [the] obligation or disbursement of all Federal financial assistance." OMB Pause Memorandum, at 2. Such a directive leaves no room for discretion. *Louisiana* is therefore inapposite.

Defendants' second case fares no better. In *Jacobson v. Florida Secretary of State*, 974 F.3d 1236 (11th Cir. 2020), voters sued to change the process by which gubernatorial candidates were listed on voting ballots, *id.* at 1242. The plaintiffs only named the Florida secretary of state as a defendant. *Id.* The Eleventh Circuit held that the plaintiffs could not show causation because nonparty "supervisors of elections"—not the secretary of state—determined the ballot order. *Id.* at 1253. But critical to the court's ruling was the fact that the supervisors were "independent officials under Florida law who [were] not subject to the [s]ecretary's control." *Id.* Instead, they were "constitutional officers who [were] elected at the county level by the people of Florida." *Id.* Suing the secretary was therefore futile because she exercised no executive, statutory, or other authority over the supervisors' actions. Here, however, Defendants do not argue that OMB is powerless to dictate executive policy, nor could they (indeed, they try to argue the exact opposite). *See* 31 U.S.C. § 503 (establishing that OMB "[p]rovides overall direction and leadership to the executive branch on financial management matters by establishing financial management policies and requirements"); ECF No. 21-1, at 16-20. Unlike the secretary in *Jacobson*, OMB can exert *some* influence on federal spending policy (even though Plaintiffs dispute the extend of that authority). Its actions therefore give rise to causation in this case.

The record also supports Plaintiffs' allegations of causation. On January 30, *after* this court's administrative stay and OMB's purported "rescission" of M-25-13, the Environmental Protection

EPA_00048427

Agency responded to a nonprofit's funding inquiry by saying that it was still "working diligently to implement [OMB]'s memorandum, Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs."  ECF No. 24-1, at 7.  The EPA further explained that it was "temporarily pausing all activities related to the obligation or disbursement of EPA Federal financial assistance at this time" and was "continuing to work with OMB" to do so.  *Id.*  The EPA's statement that it was freezing funds in order to "implement" memorandum M-25-13 contradicts Defendants' claim that continued pauses are only attributable to independent agency action.  At oral argument, Defendants represented that as soon as they learned of EPA's continued pause, they contacted the agency to correct any misunderstandings.  Oral Argument, *Nat'l Council of Nonprofits*, No. 25-CV-239 (D.D.C. Feb. 3, 2025).  In this early posture, however, and pending further factual development by the parties, the court relies on Plaintiffs' post-rescission declarations to conclude that Plaintiffs have sufficiently alleged causation.

### c.    Redressability

Causation and redressability are closely related.  While the former "focus[es] on whether a particular party is appropriate[,] redressability [considers] whether the forum is." *Bentsen*, 94 F.3d at 664.  In short, a plaintiff must demonstrate that the relief sought, if granted, "will likely alleviate the particularized injury alleged." *Id.* at 663-64.  Plaintiffs argue that blocking Defendants from doing anything to implement the substance of memorandum M-25-13 would remedy their harms.  ECF No. 24, at 17-18.

Defendants respond by saying that blocking memorandum M-25-13 "would not prevent non-defendant agencies from exercising their own independent authorities to determine whether . . . a pause is warranted."  ECF No. 21-1, at 11.  But, as discussed above, there is at least

EPA_00048428

some evidence that agencies are pausing disbursements *because of* memorandum M-25-13. *See supra* Part II.A.1.b.

Prior to the issuance of memorandum M-25-13, Plaintiffs' members reportedly never had problems drawing down funds or receiving financial assistance. ECF Nos. 24-4 ¶ 8; 24-5 ¶ 10. That all changed beginning January 28, immediately after OMB issued memorandum M-25-13. Streams of funds that had steadily flowed for years without issue suddenly ran dry. If the court were to grant Plaintiffs' requested relief, Defendants would be barred from instructing all federal agencies across the board to temporarily pause (or continue pausing) financial assistance on the basis of the memorandum or its substance.[4] In other words, agencies would need to behave as if the memorandum were never issued. Defendants act as if any continued freeze is merely a random coincidence that could not possibly have anything to do with their memorandum. In the court's view, that explanation ignores both logic and fact. Plaintiffs have adequately shown that a ruling in their favor will alleviate their alleged injuries.

### 2. Mootness

Mootness concerns whether there is still a live controversy for the court to adjudicate. Courts often describe mootness as "the doctrine of standing set in a time frame." *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980) (quoting Henry P. Monaghan, *Constitutional Adjudication: The Who and When*, 82 Yale L.J. 1363, 1384 (1973)). Defendants characterize Plaintiffs' complaint as only challenging OMB memorandum M-25-13. ECF No. 21-1, at 6. Therefore, in Defendants'

---

[4] Based on Plaintiffs' representations at oral argument, this relief would only apply to open awards that have been affected by OMB's directive. Oral Argument, *Nat'l Council of Nonprofits*, No. 25-CV-239 (D.D.C. Feb. 3, 2025).

13

view, OMB's post-complaint rescission of that memorandum eliminated the lawsuit's only basis and mooted Plaintiffs' claims. *Id.* This fails for several reasons.

First, it is blackletter law that a defendant's "voluntary cessation of a challenged practice does not deprive a federal court of its power to determine [its] legality." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). If voluntary cessation automatically mooted every case, a defendant would be "free to return to [its] old ways" as soon as the case was dismissed. *Id.* (quoting *City of Mesquite*, 455 U.S. at 289). Voluntary cessation can only deprive the court of jurisdiction if it is "*absolutely clear* [that] the allegedly wrongful behavior could not reasonably be expected to recur." *Pub. Citizen, Inc. v. Fed. Energy Reg. Comm'n*, 92 F.4th 1124, 1128 (D.C. Cir. 2024) (emphasis added) (quoting *Friends of the Earth, Inc.*, 528 U.S. at 189). This is a "heavy burden" for the party asserting mootness. *Id.*

Here, Defendants claim that they have ended any allegedly unlawful activity by retracting memorandum M-25-13. Even taking the rescission at face value, however, Defendants have not convincingly shown that they will refrain from "resum[ing] the challenged activity" in the future. *Pub. Citizen, Inc.*, 92 F.4th at 1128. As evidenced by the White House Press Secretary's statements, OMB and the various agencies it communicates with appear committed to restricting federal funding. If Defendants retracted the memorandum in name only while continuing to execute its directives, it is far from "absolutely clear" that the conduct is gone for good. There is nothing stopping OMB from rewording, repackaging, or reissuing the substance of memorandum M-25-13 if the court were to dismiss this lawsuit.

The voluntary cessation doctrine is especially important in cases where the defendant is suspected of "manipulating the judicial process through the false pretense of singlehandedly

14

ending a dispute." *Pub. Citizen, Inc.*, 92 F.4th at 1128 (internal quotation marks omitted) (quoting *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 15 (D.C. Cir. 2019) (per curiam)). Plaintiffs accuse Defendants of doing exactly that here. ECF No. 24, at 19-20.

Defendants understandably dispute this accusation. They protest that such a conclusion "would be contrary to the presumption of good faith that courts routinely accord the government when assessing voluntary cessation." ECF No. 26, at 8 (citing *Am. Cargo Transp., Inc. v. United States*, 625 F.3d 1176, 1180 (9th Cir. 2010)). Defendants are correct that courts of this circuit generally hesitate "to impute such manipulative conduct to a coordinate branch of government." *Pub. Citizen, Inc.*, 92 F.4th at 1128-29 (quoting *Clarke v. United States*, 915 F.2d 699, 705 (D.C. Cir. 1990) (en banc)). But this reluctance does not apply when the government defendant deliberately acts "in order to avoid litigation." *Alaska v. U.S. Dep't of Agric.*, 17 F.4th 1224, 1229 (D.C. Cir. 2021) (quoting *Am. Bar Ass'n v. Fed. Trade Comm'n*, 636 F.3d 641, 648 (D.C. Cir. 2011)). Here, Defendants' plea for a presumption of good faith rings hollow when their own actions contradict their representations.

Within hours of OMB's rescission, White House Press Secretary Leavitt announced that the rescission was to have no tangible effect on "the federal funding freeze." Leavitt, X (formerly Twitter) (Jan. 29, 2025), https://perma.cc/99C4-5V6G. Moreover, she explained that the primary purpose of the rescission was "[t]o end any confusion created by the court's injunction." *Id.* That statement unambiguously reflects that the rescission was in direct response to this court's issuance of an administrative stay on January 28.[5] For Defendants to innocently claim that OMB's post-stay actions were merely a noble attempt to "end[] confusion," ECF No. 26, at 8, strains credulity.

---

[5] The U.S. District Court for the District of Rhode Island had yet to enter a TRO at the time of the Press Secretary's social media post, so the post could not have been referring to that case. *See* TRO, *New York*, No. 25-CV-39 (D.R.I. Jan. 31, 2025), ECF No. 50.

EPA_00048431

By rescinding the memorandum that announced the freeze, but "NOT . . . the federal funding freeze" itself, *id.*, it appears that OMB sought to overcome a judicially imposed obstacle without actually ceasing the challenged conduct. The court can think of few things more disingenuous. Preventing a defendant from evading judicial review under such false pretenses is precisely why the voluntary cessation doctrine exists. The rescission, if it can be called that, appears to be nothing more than a thinly veiled attempt to prevent this court from granting relief.

Second, even if voluntary cessation did not apply, the facts on the ground indicate that this case is anything but moot. Even aside from the Press Secretary's seeming admission that the pause will continue as planned, Plaintiffs have presented evidence that fund recipients continue to be deprived of critical loans, grants, and other resources. For example, the chief executive officer of a community health center stated that he was unable to access critical funds awarded under an H80 grant (authorized by the Public Health Service Act) starting on January 28. ECF No. 24-4 ¶ 10. After this court entered its administrative stay that afternoon, he was still unable to access funds the next day. *Id.* ¶ 11. And after OMB rescinded memorandum M-25-13 on January 29, he was still blocked from accessing grant funds as recently as January 31. *Id.* ¶ 12. Similarly, members of a tribal organization who were unable to draw down grant funds starting on January 28 had still not received any funds as recently as January 31. ECF No. 24-5 ¶ 24. And low-income parents who rely on federal grants to enable their children to attend childcare still had not received their subsidies as recently as January 31. ECF No. 24-11 ¶ 19; *see, e.g.*, ECF Nos. 24-6, 24-7, 24-8, 24-9. Each of these examples indicates that the funding pause remains in effect—at least for some recipients—despite OMB's rescission of memorandum M-25-13. Defendants cannot persuasively argue that the rescission of memorandum M-25-13 moots the case if the effects and directives of

16

that memorandum continue to remain in full force. Destroying the paper trail of allegedly illegal activity means nothing if the activity persists.

In a last-ditch effort to toss the case on mootness grounds, Defendants argue that even if aspects of the funding freeze remain in effect, they persist independent of memorandum M-25-13 and thus must be challenged in a different lawsuit. ECF No. 26, at 9. In their view, just because some money is not "going out the door" does not necessarily mean that it is due to OMB's action. Oral Argument, *Nat'l Council of Nonprofits*, No. 25-CV-239 (D.D.C. Feb. 3, 2025). To the extent that funds still remain paused in spite of this court's administrative stay or the memorandum's rescission, Defendants argue that those pauses are the result of independent agency discretion or the President's executive orders.

This is essentially a slightly repackaged version of Defendants' causation argument: with the memorandum now rescinded, any lingering pauses in funding are not fairly traceable to the memorandum itself. Insofar as this lawsuit challenges the memorandum, Defendants argue that that avenue to relief is now closed. But, as explained above, *supra* Part II.A.1.b. & n.4, the court is not persuaded that the continuing freezes are solely due to independent agency action. Both logic and record evidence point to the opposite conclusion. As Plaintiffs' counsel noted at oral argument, it is unclear whether twenty-four hours is sufficient time for an agency to independently review a single grant, let alone hundreds of thousands of them. Oral Argument, *Nat'l Council of Nonprofits*, No. 25-CV-239 (D.D.C. Feb. 3, 2025).

With respect to the executive orders, which the parties discussed at length during oral argument, the court remains unconvinced. Defendants' counsel cited provisions of the executive orders referenced in M-25-13 that purportedly required temporary pauses in funding. *Id.* It is true that at least some of the executive orders contain language that could be construed as requiring fund

17

pauses (albeit on much more drawn out timelines than memorandum M-25-13). *See* Exec. Order No. 14,151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, 90 Fed. Reg. 8339 (Jan. 20, 2025) (requiring all federal agencies to "terminate, to the maximum extent allowed by law, . . . 'equity-related' grants or contracts" within sixty days); Exec. Order No. 14,162, *Putting America First in International Environmental Agreements*, 90 Fed. Reg. 8455 (Jan. 20, 2025) (directing the United States Ambassador to the United Nations to "immediately cease or revoke any purported financial commitment made by the United States under the United Nations Framework Convention on Climate Change"). But Plaintiffs have provided evidence that the scope of frozen funds appears to extend far beyond the reach of the executive orders, thus undermining Defendants' claims.

As just one example, a health center that provides medical, dental, and behavioral health services to a rural community was denied access to grant funds. *See* ECF No. 24-4. None of the seven executive orders listed in memorandum M-25-13 would seem to cover such activity. *See, e.g.*, Exec. Order No. 14,159, *Protecting the American People Against Invasion*, 90 Fed. Reg. 8443 (Jan. 20, 2025) (addressing illegal immigration); Exec. Order No. 14,169, *Reevaluating and Realigning United States Foreign Aid*, 90 Fed. Reg. 8619 (Jan. 20, 2025) (addressing foreign aid); Exec. Order No. 14,162, *Putting America First in International Environmental Agreements*, 90 Fed. Reg. 8455 (Jan. 20, 2025) (addressing international environmental agreements); Exec. Order No. 14,154, *Unleashing American Energy*, 90 Fed. Reg. 8353 (Jan. 20, 2025) (addressing energy industry and regulations); Exec. Order No. 14,151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, 90 Fed. Reg. 8339 (Jan. 20, 2025) (addressing diversity, equity, and inclusion programs); Exec. Order No. 14,168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20,

18

EPA_00048434

2025) (addressing "gender ideology"); Exec. Order No. 14,182, *Enforcing the Hyde Amendment*, 90 Fed. Reg. 8751 (Jan. 24, 2025) (addressing federal funding of abortion). At oral argument, when asked about another declarant who was receiving a grant from the National Science Foundation, *see* ECF No. 24-7, Defendants could not give a clear answer as to why that recipient would be denied funds pursuant to the executive orders, Oral Argument, *Nat'l Council of Nonprofits*, No. 25-CV-239 (D.D.C. Feb. 3, 2025). In sum, the court agrees with Plaintiffs that rescinding memorandum M-25-13 did not moot the case.

*     *     *

For these reasons, the court concludes that it has jurisdiction over Plaintiffs' complaint.

### B.     Temporary Restraining Order

A temporary restraining order is an extraordinary remedy meant to prevent serious and imminent harm in dire circumstances. To obtain one, "the moving party must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

These four considerations are factors, not elements. "A district court must 'balance the strengths of the requesting party's arguments in each of the four required areas.'" *Id.* (quoting *CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)). When a government entity is a party to the case, the third and fourth factors merge. *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016).

Prior to the Supreme Court's decision in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), courts in this circuit tended to employ a "sliding scale" method in which

EPA_00048435

"a strong showing on one factor could make up for a weaker showing on another." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). While the D.C. Circuit has considered abandoning the sliding-scale method for one that treats the substantial likelihood prong as "an independent, free-standing requirement," *id.* at 393, it has yet to decide one way or the other, *see Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022). At the very least, however, the plaintiff must present a "serious legal question on the merits." *Raimondo*, 40 F.4th at 726 (quoting *Sherley*, 644 F.3d at 398). Given the ambiguity with respect to the sliding-scale approach, the court will consider all factors and only delve into their relevant weight if it would affect the outcome. *See Costa v. Bazron*, 456 F. Supp. 3d 126, 133 (D.D.C. 2020).

### 1. Likelihood of Success on the Merits

The parties break this factor into several subcomponents, but the court only needs to address two at this stage. First, they dispute whether memorandum M-25-13 is final agency action subject to judicial review. If it is not, then Plaintiffs' APA claims cannot proceed. Second, they debate the merits of Plaintiffs' three separate claims. While the parties discussed all three claims in their briefs and at oral argument, the court only needs to find that Plaintiffs are likely to succeed on one in order for this factor to weigh in favor of a TRO.[6] *See Media Matters for Am. v. Paxton*,

---

[6] Although two of Plaintiffs' claims are not critical to the court's ruling at this juncture, the parties will have the opportunity to further develop all three claims as this case proceeds. Even so, the court notes that Plaintiffs have shown some likelihood of success—or, at the very least, a 'serious legal question' on the merits," *Sherley*, 644 F.3d at 398—on their remaining claims. There is substantial room for debate as to whether OMB's authorizing statute, 31 U.S.C. § 503, permits it to order the kind of sweeping, nationwide directive that it commanded here. And while Defendants are correct that the government "is not required to subsidize First Amendment rights," *Leathers v. Medlock*, 499 U.S. 439, 450 (1991), it is less clear whether it may deliberately withhold funds that have already been earmarked for certain recipients based exclusively on the recipient's viewpoints.

EPA_00048436

732 F. Supp. 3d 1, 27 (D.D.C.), *appeal filed*, No. 24-7059 (D.C. Cir. 2024). The court will therefore focus on Plaintiffs' assertion that OMB's actions were arbitrary and capricious.

### a. Final agency action

The APA only permits judicial review of "final agency action," 5 U.S.C. § 704, which is action that "mark[s] the consummation of the agency's decisionmaking process" and determines "rights or obligations . . . from which legal consequences will flow," *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (first quoting *Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948), then quoting *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)). The APA does not allow a court to review an agency's "day-to-day operations." *Lujan*, 497 U.S. at 899.

Defendants argue that the memorandum simply told agencies to conduct their own review of financial disbursements and thus "did not determine legal consequences."[7] ECF No. 26, at 12. This characterization, however, is in tension with the language of the memorandum and the facts on the ground. Defendants' assertion that the memorandum "did not itself determine which funds or grants should be paused" is true, but not in a way that helps them. Memorandum M-25-13 did not specify *certain* funds to be frozen; it froze *all* of them. Rather than give the agencies full control over what to freeze and what to leave undisturbed, Defendants mandated that all "Federal agencies *must temporarily pause* all activities related to [the] obligation or disbursement of *all* Federal financial assistance." OMB Pause Memorandum, at 2 (second emphasis added). That is

---

[7] In their briefs, Defendants only seem to challenge whether the memorandum determined "rights or obligations . . . from which legal consequences will flow," and not whether it marked the "consummation of the agency's decisionmaking." *See* ECF No. 24, at 22.

EPA_00048437

not merely a guidance. It is a directive that immediately produced legal consequences across the entire federal funding system.

Defendants' cited cases do not help them. In *Fund for Animals, Inc. v. U.S. Bureau of Land Management*, 460 F.3d 13 (D.C. Cir. 2006), for example, an agency's strategy to justify a larger budget was not final agency action because it "d[id] not command anyone to do anything or to refrain from doing anything," *id.* at 22 (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998)). Memorandum M-25-13, however, commanded agencies to pause all funding obligations within twenty-four hours. In *Village of Bensenville v. Federal Aviation Administration*, 457 F.3d 52 (D.C. Cir. 2006), an agency's letter of intent proposing a reimbursement schedule was not final agency action because the reimbursement recipient still needed to file additional documents before the money could be disbursed, *id.* at 69. Here, Plaintiffs have alleged that open awards—ones that have already been approved and partially disbursed—were shut down in response to M-25-13. And in *Center for Auto Safety v. National Highway Traffic Safety Administration*, 452 F.3d 798 (D.C. Cir. 2006), an agency's policy guideline was not final agency action because it "[did] not command[], require[], order[], or dictate[]" anything, *id.* at 809. It simply made general recommendations that manufacturers could choose to follow. *Id.* The agency's own officials were not even bound to the letter of the recommendation; they "remained free to exercise discretion" in any tasks implicated by the guideline. *Id.* M-25-13, in contrast, did not merely suggest that agencies temporarily suspend grants; it announced that agencies "*must*" do so.

A true "guidance" might have advised federal agencies to conduct independent reviews and pause funds as necessary. But M-25-13 did not condition any such pause in this way. It said that all federal agencies "*must temporarily pause* all activities related to [the] obligation or disbursement of *all* Federal financial assistance" while such review was still ongoing. OMB Pause

22

Memorandum, at 2 (second emphasis added).  By any measure, Defendants' action led to legal consequences and constituted final agency action.

### b.    Whether OMB's actions were arbitrary and capricious

Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  To pass muster, the agency "must examine the relevant data and articulate a satisfactory explanation for its action, including 'a rational connection between the facts found and the choice made.'"  *Id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  Agency action is generally deemed unlawful if it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Id.*

Plaintiffs allege that OMB's funding freeze lacked any reasonable basis and failed to consider the disastrous effects it would have.  ECF No. 1 ¶¶ 43-48.  Defendants, meanwhile, insist that "there is nothing irrational about a temporary pause in funding" when it is done "to ensure compliance with the President's priorities."  ECF No. 21-1, at 22.  But furthering the President's wishes cannot be a blank check for OMB to do as it pleases.  The APA requires a rational connection between the facts, the agency's rationale, and the ultimate decision.  Defendants have offered no rational explanation for why they needed to freeze *all* federal financial assistance— with less than twenty-four-hours' notice—to "safeguard valuable taxpayer resources."  OMB

23

Pause Memorandum, at 1. If Defendants intend to conduct an exhaustive review of what programs should or should not be funded, such a review could be conducted without depriving millions of Americans access to vital resources. As Defendants themselves admit, the memorandum implicated as much as $3 trillion in financial assistance. That is a breathtakingly large sum of money to suspend practically overnight. Rather than taking a measured approach to identify purportedly wasteful spending, Defendants cut the fuel supply to a vast, complicated, nationwide machine—seemingly without any consideration for the consequences of that decision. To say that OMB "failed to consider an important aspect of the problem" would be putting it mildly.

Defendants also ignored significant reliance interests in deciding to freeze federal funds on such a massive scale. While "*unidentified and unproven* reliance interests are not a valid basis on which to undo agency action," *Solenex LLC v. Bernhardt*, 962 F.3d 520, 529 (D.C. Cir. 2020) (emphasis added), Plaintiffs have marshalled considerable evidence showing that countless organizations depend on continued disbursements to continue functioning at all. For at least some of Plaintiffs' members, having federal funds arrive on time and as scheduled is vital.[8] *See* ECF Nos. 24-4 ¶¶ 4, 6 (explaining that federal grants cover roughly 30% of the organization's payroll and that disbursements are ordinarily so consistent that funds are paid to employees within a week of receipt); 24-5 ¶ 13 (explaining that a tribal organization relied so heavily on consistent disbursements that it was forced to lay off two employees as soon as the pause began on

---

[8] The court is unpersuaded by Defendants' assertion that reliance interests only apply to the *receipt* of funds but not the *timing* of when they are received. ECF No. 21-1, at 23. Such a claim is without legal support and defies logic. If an organization is unable to meet payroll, that could immediately prevent its employees from paying rent or affording groceries. Similarly, if a clinic is forced to shut its doors and turn away patients, that produces instant harm that cannot be remedied by a later resumption of funds.

EPA_00048440

January 28). Unlike the district court in *Solenex*, the court here makes no assumptions about reliance interests. Those interests, as illustrated through Plaintiffs' declarations, are all too real.

In addition, Defendants' actions appear to suffer from infirmities of a constitutional magnitude. The appropriation of the government's resources is reserved for Congress, not the Executive Branch. And a wealth of legal authority supports this fundamental separation of powers. The legislature's "power of the purse is the ultimate check on the . . . power of the Executive." *U.S. House of Representatives v. Burwell*, 130 F. Supp. 3d 53, 76 (D.D.C. 2015). The Appropriations Clause of the Constitution gives Congress "exclusive power" over federal spending. *U.S. Dep't of the Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (quoting *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992)). Without it, "the executive would possess an unbounded power over the public purse of the nation[] and might apply all its monied resources at his pleasure." *Id.* at 1347 (quoting 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1342, at 213-14 (1833)). Indeed, the Clause "was intended as a restriction upon the disbursing authority of the Executive [Branch]." *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937).

Congress has exercised its plenary power to give meaning to the Appropriations Clause and "reinforce [its] control over appropriated funds." *Id.* In 1982, Congress enacted the "Purpose Statute," which requires the appropriation of federal funds in accordance with "the objects for which . . . [they] were made." 31 U.S.C. § 1301(a). Any "reappropriation and diversion of the unexpended balance of an appropriation for a purpose other than that for which [it] originally was made" is treated "as a new appropriation." *Id.* § 1301(b). Related laws expressly prohibit the Executive Branch from encroaching on Congress's appropriations power. *See id.* §§ 1341, 1350.

Most notably, the Impoundment Act of 1974, 2 U.S.C. § 681 *et seq.*, lays out specific procedures whenever the President wishes to suspend appropriations that have already been enacted.

Defendants' actions in this case potentially run roughshod over a "bulwark of the Constitution" by interfering with Congress's appropriation of federal funds. *U.S. Dep't of the Navy*, 665 F.3d at 1347. OMB ordered a nationwide freeze on pre-existing financial commitments without considering any of the specifics of the individual loans, grants, or funds. It did not indicate when that freeze would end (if it was to end at all). And it attempted to wrest the power of the purse away from the only branch of government entitled to wield it. If Defendants' actions violated the separation of powers, that would certainly be arbitrary and capricious under the APA.

At this stage, Plaintiffs have shown that they are likely to succeed on the merits of their arbitrary and capricious claim.

2.       Irreparable Injury

Irreparable injury is "a high standard." *England*, 454 F.3d at 297. First, the injury "must be both certain and great," "actual and not theoretical," and "of such *imminence* that there is a 'clear and present' need for equitable relief." *Id.* (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)). Second, the injury "must be beyond remediation," meaning that "[t]he possibility [of] adequate compensatory or other corrective relief . . . at a later date . . . weighs heavily against a claim of irreparable harm." *Id.* at 297-98 (quoting *Wis. Gas Co.*, 758 F.2d at 674). Plaintiffs easily meet their burden here.

"[O]bstacles [that] unquestionably make it more difficult for the [plaintiff] to accomplish [its] primary mission . . . provide injury for purposes . . . [of] irreparable harm." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). While ordinary economic injuries are

26

usually insufficient, financial harm can "constitute irreparable harm . . . where the loss threatens the very existence of the movant's business." *Wis. Gas Co.*, 758 F.2d at 674.

If the freeze were to remain in effect, Plaintiffs' members will suffer "existential injuries" and some programs may "simply disappear." ECF No. 5-1, at 12. Their workers may be unable to pay for housing or food. ECF No. 24-4 ¶ 7 ("A lot of our staff live paycheck to paycheck, and if they can't get paid, then they are unable to pay rent or buy groceries."). Some have already been forced to "shutter [their] programs" just to make payroll. ECF No. 24-7 ¶¶ 20-21. And patients or customers that rely on their services may be denied care when it is most needed. ECF Nos. 24-4 ¶ 16; 24-5 ¶ 21. For some, these are harms for which "there can be no do over and no redress." *Newby*, 838 F.3d at 9 (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)); *see* ECF No. 24-4 ¶ 7 ("[I]f my Health Center loses physicians, dentist, or nurse practitioners, then it will be virtually impossible to recruit replacements to a rural Health System that is suddenly an unreliable source of income.").

Some of these organizations are still waiting for funds to be disbursed. ECF Nos. 24-4 ¶ 11; 24-6 ¶ 18; 24-8 ¶ 10-11. In the meantime, they've been forced to dismiss employees, cut essential programs, and pay workers out of their own pockets. ECF Nos. 24-4 ¶ 12; 24-5 ¶ 13; 24-7 ¶ 21; 24-8 ¶ 12. Each day that the pause continues to ripple across the country is an additional day that Americans are being denied access to programs that heal them, house them, and feed

27

them. Because the funding freeze threatens the lifeline that keeps countless organizations operational, Plaintiffs have met their burden of showing irreparable harm.[9]

3.    Prejudice and Public Interest

The declarations and evidence presented by Plaintiffs paint a stark picture of nationwide panic in the wake of the funding freeze. Organizations with every conceivable mission—healthcare, scientific research, emergency shelters, and more—were shut out of funding portals or denied critical resources beginning on January 28. *See* ECF Nos. 24-4, 24-5, 24-6, 24-7, 24-8, 24-9, 24-10, 24-11. For many, the chaos began well before 5:00 p.m. as various agencies—themselves scrambling to figure out how to comply with memorandum M-25-13—began taking their funding apparatuses offline. ECF Nos. 24-8 ¶¶ 8-9; 24-6 ¶ 15; 24-7 ¶ 13; 24-8 ¶ 9. The directors of the recipient organizations were forced to take drastic measures. Some tried desperately for hours to log into their grant accounts, while others prepared for the worst by laying off employees. Many of the organizations rely on federal funding to pay their workers, meaning that the freeze forced them to send staff home or close their doors.

The potential scope of the freeze is as great as $3 trillion and its effects are difficult to fully grasp. Plaintiffs point to news reports detailing far-reaching effects: preschools could not pay their

---

[9] At oral argument, Defendants asserted that the TRO issued by the U.S. District Court for the District of Rhode Island undermined Plaintiffs' claims of irreparable harm. The government defendants in that case understood the TRO to apply to "all awards or obligations—not just those involving the Plaintiff States." Notice of Compliance with Court's TRO, Ex. A, *New York*, No. 25-CV-39 (D.R.I. Feb. 3, 2025), ECF No. 51-1, at 1. Even assuming that the Rhode Island TRO applies to Plaintiffs, that would not block this court from entering a TRO of its own. *See Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 60 (D.D.C. 2020) ("[C]ourts routinely grant follow-on injunctions against the Government, even in instances when an earlier nationwide injunction has already provided plaintiffs in the later action with their desired relief.") (collecting cases). This court has no control over the duration or scope of the District of Rhode Island's TRO. Failing to grant a TRO here when Plaintiffs have met the requirements for one would leave them unprotected and vulnerable to further harm.

28

EPA_00048444

staff; Los Angeles and North Carolina were denied disaster relief aid; and elderly Americans who relied on subsidized programs for food did not know if their next meal would come. ECF No. 24, at 41. The court concludes that the balance of the equities and public interest heavily favor granting Plaintiffs' request.[10]

### III.   CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Plaintiffs' Motion for a Temporary Restraining Order, ECF No. 5, is **GRANTED**. It is further

**ORDERED** that Defendants' Motion to Dismiss, ECF No. 21, is **DENIED**. It is further

**ORDERED** that Defendants are enjoined from implementing, giving effect to, or reinstating under a different name the directives in OMB Memorandum M-25-13 with respect to the disbursement of Federal funds under all open awards; it is further

**ORDERED** that Defendants must provide written notice of the court's temporary restraining order to all agencies to which OMB Memorandum M-25-13 was addressed. The written notice shall instruct those agencies that they may not take any steps to implement, give effect to, or reinstate under a different name the directives in OMB Memorandum M-25-13 with respect to the disbursement of Federal Funds under all open awards. It shall also instruct those agencies to release any disbursements on open awards that were paused due to OMB Memorandum M-25-13; it is further

---

[10] Defendants also request that the court convert this proceeding into one for a preliminary injunction (rather than a TRO). Oral Argument, *Nat'l Council of Nonprofits*, No. 25-CV-239 (D.D.C. Feb. 3, 2025). Given that this case was filed less than a week ago, concerns weighty legal issues that require careful consideration, and involves a constantly shifting factual landscape, the court declines Defendants' request. The parties will be given an opportunity to fully brief and argue Plaintiffs' request for a preliminary injunction on a schedule of their choosing.

EPA_00048445

ORDERED that this Order shall apply to the maximum extent provided for by Federal Rule of Civil Procedure 65(d)(2) and 5 U.S.C. §§ 705 and 706. It is further

ORDERED that Defendants shall file a status report on or before February 7, 2025, apprising the court of the status of its compliance with this Order, including by providing a copy of the written notice described above; and it is further

ORDERED that the parties shall meet and confer and file a joint status report proposing a preliminary injunction briefing schedule on or before February 7, 2025.

**SO ORDERED.**

_____
LOREN L. ALIKHAN
United States District Judge

Date: February 3, 2025

30

EPA_00048446