Message

**From:**       Mandy, Cora [Mandy.Cora@epa.gov]
**Sent:**       2/25/2025 11:37:22 PM
**To:**         Adm17Lee [Adm17.Zeldin@epa.gov]
**CC:**         Vaseliou, Molly [Vaseliou.Molly@epa.gov]; Weiner, Ben [Weiner.Ben@epa.gov]; Gall, Daniel [Gall.Daniel@epa.gov]
**Subject:**    For Administrator Review: Press Release - 2nd Round of DOGE Cuts
**Attachments:** DRAFT EPA Administrator Lee Zeldin Cancels 20 Grants in 2nd Round of DOGE Cuts.docx

Administrator,

Please find the press release on the second round of DOGE cuts attached for your review. Thank you.

Best,
C

Cora Mandy
Principal Deputy Associate Administrator, Office of Public Affairs
Environmental Protection Agency

Message

| | |
|---|---|
| **From**: | Treml, Gregg [Treml.Gregg@epa.gov] |
| **Sent**: | 2/4/2025 6:17:33 PM |
| **To**: | Leadership_Deputy_Assistant_Administrators [Leadership_Deputy_Assistant_Administrators@epa.gov]; Leadership_Deputy_Associate_Administrators [Leadership_Deputy_Associate_Administrators@epa.gov]; Leadership_Deputy_Regional_Administrators [Leadership_Deputy_Regional_Administrators@epa.gov]; Career Senior Advisors for Management [Career_Senior_Advisors_for_Management@epa.gov] |
| **CC**: | Kadeli, Lek [Kadeli.Lek@epa.gov]; Jones-Peeler, Meshell [Jones-Peeler.Meshell@epa.gov]; Hanson, Paige (Catherine) [hanson.catherine@epa.gov]; OCFO-SROs [OCFO_SROs@epa.gov]; OCFO-SR-MGRS_SG [OCFOSRMGRS_SG@epa.gov]; Jennette, Vonda [Jennette.Vonda@epa.gov]; Luebbering, Gregory [luebbering.gregory@epa.gov]; OCFO-SBO [OCFOSBO@epa.gov]; OCFO-Regional-Comptroller [OCFORegionalComptroller@epa.gov]; OCFO-FCOs [OCFO-FCOs@epa.gov] |
| **Subject**: | Update on Inflation Reduction Act and Infrastructure Investment and Jobs Act Pause |
| **Attachments**: | Update on IIJA and IRA Pause_FINAL_2-4-2025.pdf |

Colleagues –

Please see the attached memorandum for an update on the Inflation Reduction Act and Infrastructure Investment and Jobs Act funding pause in response to a recent court directive.

As noted in the memorandum, OCFO, working closely with the Office of General Counsel and Office of Mission Support, will continue to keep the community updated on this matter.

Thank you,
-Gregg

Gregg Treml
Acting Chief Financial Officer
United States Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Room 4402A WJCN
Washington, DC  20460
(202)-564-1151
treml.gregg@epa.gov



# THE CHIEF FINANCIAL OFFICER

WASHINGTON, D.C. 20460

February 4, 2025

**MEMORANDUM**

**SUBJECT:**     Update on Inflation Reduction Act and Infrastructure Investment and Jobs Act Pause

**FROM:**        Gregg Treml, Chief Financial Officer (Acting)          GREGG TREML  *Digitally signed by GREGG TREML Date: 2025.02.04 12:53:31 -05'00'*

**TO:**          Deputy Assistant Administrators
                 Deputy Associate Administrators
                 Deputy Regional Administrators

Distribute as appropriate to those needed to carry out this direction.

This message provides an update pursuant to the recent Court directive addressing financial assistance. The Court directs that federal financial assistance shall not be paused based on the Office of Management and Budget's direction in the rescinded OMB memorandum or the President's Executive Orders, while ongoing litigation proceeds or until otherwise directed by a Court.

Consistent with the Order, the agency's financial system will now enable the obligation of financial assistance. This includes programs within the Infrastructure Investment and Jobs Act and the Inflation Reduction Act, including federal financial assistance in the State and Tribal Assistance Grants, Brownfields, and Superfund. The Office of Budget will follow-up with a detailed list. Additionally, the disbursement of funds connected to this notice will continue.

OCFO, working closely with the Office of General Counsel and Office of Mission Support, will continue to keep the community updated on this matter.

cc: Lek Kadeli
    Meshell Jones-Peeler
    Paige Hanson
    OCFO Senior Managers
    Vonda Jennette
    Greg Luebbering
    Senior Resource Officials
    Senior Budget Officers

Regional Comptrollers
Funds Control Officers

EPA_00048525

Message

| | |
|---|---|
| **From:** | Budget and Planning [Budget_and_Planning@epa.gov] |
| **Sent:** | 2/4/2025 6:45:33 PM |
| **To:** | OCFO-SBO [OCFOSBO@epa.gov]; OCFO-SBO-STAFF [OCFOSBOSTAFF@epa.gov]; OCFO-Regional-Comptroller [OCFORegionalComptroller@epa.gov]; OCFO-Regional Budget Officers [OCFORegional_Budget_Officers@epa.gov]; OCFO-SROs [OCFO_SROs@epa.gov]; Regional Mission Support Division - Directors [Regional_Mission_Support_Division_Directors@epa.gov]; Regional Mission Support Division - Directors [Regional_Mission_Support_Division_Directors@epa.gov]; OCFO-FCOs [OCFO-FCOs@epa.gov] |
| **CC:** | Wise, Melissa [wise.melissa@epa.gov]; Legare, Pamela [Legare.Pamela@epa.gov]; Rogers, JoanB [Rogers.JoanB@epa.gov]; Coogan, Daniel [Coogan.Daniel@epa.gov]; Kalikhman, Yulia [kalikhman.yulia@epa.gov]; Gulamali, Adil [Gulamali.Adil@epa.gov]; Lavergne, Dany [lavergne.dany@epa.gov]; Miller, Renee [Miller.Renee@epa.gov]; Jennette, Vonda [Jennette.Vonda@epa.gov]; Luebbering, Gregory [luebbering.gregory@epa.gov]; OCFO-OB-ALL. [OCFO-OB-ALL_x@epa.gov]; Talbert-Duarte, Angelia [talbert-duarte.angelia@epa.gov]; Goerke, Ariadne [Goerke.Ariadne@epa.gov]; Askew, Wendel [Askew.Wendel@epa.gov]; Holden, Allison [Holden.Allison@epa.gov] |
| **Subject:** | Additional Information on IIJA and IRA |
| **Attachments:** | Update on IIJA and IRA Pause_FINAL_2-4-2025.pdf; List of Sections.xlsx |
| | |
| **Importance:** | High |

This message provides additional detail to the attached message from the Acting Chief Financial Officer.

Consistent with Court Order, obligations and disbursements to carry out all necessary work can proceed for all federal financial assistance, including cooperative assistance agreements, all Superfund, and the accounts attached.

We will continue to keep the community updated as we implement Orders. Please note that effectuation in agency systems is occurring and requires sequencing.

*Please share this information within EPA as necessary to execute.*



# THE CHIEF FINANCIAL OFFICER
WASHINGTON, D.C. 20460

February 4, 2025

**MEMORANDUM**

**SUBJECT:**     Update on Inflation Reduction Act and Infrastructure Investment and Jobs Act Pause

**FROM:**       Gregg Treml, Chief Financial Officer (Acting)     GREGG TREML     Digitally signed by GREGG TREML Date: 2025.02.04 12:53:31 -05'00'

**TO:**         Deputy Assistant Administrators
                Deputy Associate Administrators
                Deputy Regional Administrators

Distribute as appropriate to those needed to carry out this direction.

This message provides an update pursuant to the recent Court directive addressing financial assistance. The Court directs that federal financial assistance shall not be paused based on the Office of Management and Budget's direction in the rescinded OMB memorandum or the President's Executive Orders, while ongoing litigation proceeds or until otherwise directed by a Court.

Consistent with the Order, the agency's financial system will now enable the obligation of financial assistance. This includes programs within the Infrastructure Investment and Jobs Act and the Inflation Reduction Act, including federal financial assistance in the State and Tribal Assistance Grants, Brownfields, and Superfund. The Office of Budget will follow-up with a detailed list. Additionally, the disbursement of funds connected to this notice will continue.

OCFO, working closely with the Office of General Counsel and Office of Mission Support, will continue to keep the community updated on this matter.

cc: Lek Kadeli
    Meshell Jones-Peeler
    Paige Hanson
    OCFO Senior Managers
    Vonda Jennette
    Greg Luebbering
    Senior Resource Officials
    Senior Budget Officers

Regional Comptrollers
Funds Control Officers

EPA_00048528

**This document is produced in native format.**

**Original file name:**

**List of Sections.xlsx**

EPA_00048529 - EPA_00048530

Message

**From**: Vaseliou, Molly [Vaseliou.Molly@epa.gov]
**Sent**: 3/25/2025 9:11:55 PM
**To**: Adm17Lee [Adm17.Zeldin@epa.gov]; Gall, Daniel [Gall.Daniel@epa.gov]
**Subject**: RE: Stories behind firewall

**EPA workers take to the streets of Boston, say Trump administration 'simply not to be trusted'**
**By Sabrina Shankman and Nathan Metcalf** Globe Staff  and Globe Correspondent,Updated March 25, 2025, 1 hour ago
**13**



Environmental Protection Agency (EPA) civil servants from the Boston area participate in a demonstration Tuesday, March 25, 2025, in Boston.Brett Phelps for The Boston Globe

On Tuesday afternoon, dozens of federal government employees with the Environmental Protection Agency held picket signs and marched near Post Office Square in downtown Boston. They were there as part of a show of solidarity occurring in eight US cities to protest the Trump administration's plans to dramatically slash the federal organization by 65 percent.

Since Trump took office, the EPA has been subject to funding freezes, cancelled grants, and mass firings.

Jack Melcher, a clean air act senior enforcement coordinator for the EPA's New England Region, helped lead the walkout in Boston. "I'm out here eating my lunch, and [EPA administrator] Lee Zeldin said we only need 35 percent of our budget, so I'm going to try eating off 35 percent of my plate," said Melcher, who is also vice president of the AFGE Local 3428 union, pulling out a torn-up paper plate.

Advertisement

"Oh, no, who took 65 percent of my sandwich?" he continued, producing a foil-wrapped, half-eaten sandwich. "That is a meaningful cut. That is a dramatic cut. I am not gonna have enough to eat today. It takes a lot of people to get our work done, doesn't it?"

Meredith Gutierrez, a physical scientist with the EPA marching on Tuesday, said she was worried about both her colleagues and the work they do. "People need clean air, clean water, and clean soil to grow crops, and without the EPA, that won't happen nearly as quickly, if at all," she said. "It's crucial that everyone who works here can fulfill our mission and do the work we were hired to do."

The EPA has drawn the specific ire of the president as Trump has tried to undo the the Biden administration's signature climate legislation, the Inflation Reduction Act.



Jack Melcher, a vice president of the local chapter of AFGE Council 238, shows attendees what proposed cuts to the EPA could look like using a lunch plate.Brett Phelps for The Boston Globe

That act — the first major climate bill passed in the United States — infused billions of dollars into the green energy transition, aiming to create jobs while supporting American industries focused on clean energy. Many of those dollars were funneled through the EPA, which had begun distributing funds to states and other entities prior to Trump taking office.

Established in 1970 under President Richard Nixon, the EPA works to ensure that Americans have access to clean air and drinking water. In recent years, the agency has also played a role monitoring pollutants in the wake of disasters fueled by climate change, as well as helping to reduce greenhouse gasses that contribute to global warming.

Advertisement

EPA administrator Lee Zeldin has said he plans to slash the agency's budget by 65 percent, a cut that would require major staffing reductions for jobs such as monitoring air and water quality, responding to natural disasters, and lead abatement, among many other agency functions, according to federal union officials.

Already, the terminations have been widespread. In February, the EPA fired 388 employees across the nation who had "probationary" status, generally defined as workers hired less than a year ago. Some were later reinstated, but it's not clear how many.

A few weeks later, the Trump administration announced that the EPA's environmental justice and DEI efforts would be terminated resulting in more sweeping cuts.
Meanwhile, Zeldin orchestrated what he has referred to as the "most consequential day of deregulation in American history," the planned rollback of a bevy of environmental regulations announced earlier this month. Those regulations include rules designed to reduce greenhouse gases, pollution from coal-fired power plants, and tailpipe emissions.

"We are driving a dagger through the heart of climate-change religion and ushering in America's Golden Age," Zeldin said in a press release dated March 17.
On Tuesday, The Washington Post reported that Trump officials knew their legal justification for terminating dozens of EPA grants was flawed, according to documents and internal emails reviewed by the newspaper.

**Related: EPA knew it wrongfully canceled dozens of environmental grants, documents show**

An agency lawyer warned officials that they had cited contractual language that did not apply to many of the grants the EPA has ended in recent weeks, advising them that terminations could be reversed if recipients challenged them administratively or in court.
Advertisement



EPA civil servants from the Boston area participate in a demonstration.Brett Phelps for The Boston Globe

Since Trump has taken office, the EPA has targeted billions of dollars in grants authorized by the Biden administration. This month, the agency announced the cancellation of an additional 400 grants, totaling $1.7 billion, many of which were meant to improve air and water quality and strengthen resilience to natural disasters.

In Boston on Tuesday, Kevin Reilly, 78, a drinking water state coordinator for the state within the EPA's New England Region who has worked at the EPA for more than 40 years, stood alongside his colleagues at the walkout. He said that while he's weathered previous political shakeups and budget cuts, nothing compares to the current assault on the agency.
"It just seems like a meat cleaver approach, just cutting everything without any thought," Reilly said.

Despite being past retirement age, Reilly rejected the resignation buyout offer extended to federal employees. "I don't trust them," Reilly said. "Day by day, they kept changing the parameters of what 'resign' meant. So it's a question of trust, and they're just simply not to be trusted."

---

**From:** Vaseliou, Molly
**Sent:** Tuesday, March 25, 2025 5:07 PM
**To:** Adm17Lee <Adm17.Zeldin@epa.gov>; Gall, Daniel <Gall.Daniel@epa.gov>
**Subject:** RE: Stories behind firewall

Washington Post:

**EPA knew it wrongfully canceled dozens of environmental grants, documents show**

According to an internal email, EPA officials knew they had no contractual right to cancel dozens of grants. They did it anyway.

Trump officials knew their legal justification for terminating dozens of Environmental Protection Agency grants was flawed, according to documents and internal emails reviewed by The Washington Post.

An agency lawyer warned officials they had cited contractual language that did not apply to many of the grants the EPA had ended in recent weeks, advising that terminations could be reversed if recipients challenged them administratively or in court.

Since President Donald Trump took office, the EPA has targeted billions of dollars in grants authorized by the Biden administration. This month, the agency announced the cancellation of an additional 400 grants, totaling $1.7 billion, many of which were meant to improve air and water quality and strengthen resilience to natural disasters.

Grant recipients received emails in late February stating that their grants had been terminated on the grounds that they no longer fit the agency's priorities, referring to a clause in their grants' general terms and conditions allowing for awards to be voided.

However, the clause in question applied only to grants issued between Aug, 13, 2020, and Sept. 30, 2024, and almost half of the terminated grants were finalized or updated after Sept. 30. In a Feb. 25 email obtained by the Senate Environment and Public Works Committee and shared with The Post, an assistant general counsel alerted officials that terminations issued by several regional offices had contained this "significant error."

The email also acknowledged that the terminations "may also be encompassed" by a Feb. 21 preliminary injunction issued by a federal judge blocking the Trump administration from enforcing executive orders targeting equity and environmental justice programs. That preliminary injunction was lifted by an appeals court on March 14.

In a follow-up email on March 3, the EPA attorney said that the office had learned the decision to cancel "the EJ grants" was "made with the knowledge" that the terms and conditions rationale did not apply to all of them, but that no retractions would be forthcoming. Appeals of these wrongful cancellations will "play out via the disputes process, or litigation, for those recipients that choose to pursue those avenues," the lawyer added.

In a letter to EPA Administrator Lee Zeldin on Monday, nine Democratic senators on the Environment Committee challenged the grant terminations, pointing out that the 2022 Inflation Reduction Act "directed EPA to distribute $3 billion to improve environmental protection in communities facing economic hardship."

The senators added that "Congress specifically articulated in the statute the activities for which the funds can be awarded," including climate risk, air pollution and toxin reduction, and addressing health risks from heat and wildfires.

"Any attempt to withhold these funds violates the Impoundment Control Act and Congress's constitutional Article I spending authority," the senators said.

In response to a request for comment, an EPA spokesperson said, "As the Trump Administration reins in wasteful spending of taxpayer dollars, EPA will continue terminating assistance agreements in line with those terms and conditions."

Julia Haggerty, an associate professor of geography at Montana State University, worked with local partners for almost a year to assemble a competitive application to create a program designed to provide technical assistance and resources to underserved communities.

The $10 million program, which launched in May, worked to address a range of issues in the region, including flooding and water contamination, lead pipes, and pollution from mining.

The EPA finalized an update to the program's agreement, which included new terms and conditions, on Dec. 27, according to documents reviewed by The Post.

Beginning in January, the program's funding oscillated between being frozen and unfrozen. The EPA terminated the grant on Feb. 21, saying the "award no longer effectuates the program goals or agency priorities," according to an email reviewed by The Post. The university has appealed the termination, citing breach of contract.

"It was just done so haphazardly and carelessly," Haggerty said. "As a public land grant university, we don't have the kind of resources to withstand this interruption in access to funding. "

A former EPA official who worked on related issues during the first Trump administration said the contractual language was updated by the White House Office of Management and Budget to provide predictability to grantees.

"The updated terms and conditions require the government to be specific about its reasons for terminating grant agreements," said the official, who spoke on the condition of anonymity because of ongoing legal challenges with the agency. In this case, the official added, the EPA's reason was not listed in the grant agreement, "so the agency can't just terminate."

---

**From:** Vaseliou, Molly
**Sent:** Tuesday, March 25, 2025 5:05 PM
**To:** Adm17Lee <Adm17.Zeldin@epa.gov>; Gall, Daniel <Gall.Daniel@epa.gov>
**Subject:** RE: Stories behind firewall

Sending one by one. Here's the Fox News piece

**LIZ PEEK: Trump, Zeldin bring a key ingredient to America's 'green agenda'**
EPA Administrator Lee Zeldin and President Trump have a special solution to the climate madness created by the Biden administration
By Liz Peek

Where is Greta Thunberg? Where are the enormous protests that should be greeting President Donald Trump's assault on Joe Biden's onerous climate mandates? Is climate activism dying?

EPA chief Lee Zeldin recently announced a massive reversal of "green" policies that were likely to put Detroit out of business and stymie our country's dominance of 21st century industries. He is eliminating or modifying 31 environmental regulations that would have, at the least, raised prices and limited choices for consumers. At the worst, they would have had us follow Europe toward sky-high power costs and stagnant growth.

Many were programs adopted by the Joe Biden White House in an effort to attract funding and votes from leftist climate activists. None would have moved the needle on global emissions; for that to happen, China and India would have to climb aboard. Those countries account for roughly 40% of global emissions, while the U.S. contributes less than 14%. So far, China and India have only paid lip service to international rule-making that would curb American growth and prosperity, while continuing to build more coal-fired power plants.

The rules tossed by Zeldin, who called the overhaul the "biggest deregulatory action in U.S. history," include redoing the regulations slapped on power plants by Biden's Clean Power Plan 2.0, tossing many of the restrictions currently "throttling the oil and gas industry," reviewing Obama's "endangerment finding" and reconsidering Biden's "backdoor EV mandates."

He also vowed to terminate the $20 billion in controversial grants shoveled out the door in the final weeks of the Biden administration.

All these measures are consequential, including possibly ditching Obama's "endangerment finding," which deems greenhouse gases a pollutant subject to agency regulation.

Forbes writes: "The national and global impacts stemming from EPA's 2009 endangerment finding are impossible to overstate," as it has "served as the foundation for a massive expansion of EPA authority, enabling it to impose its will into most aspects of American life."

That expansion of authority shows up in Biden's Clean Power Plant Rule, concluded last April, which would have mandated adoption of carbon capture techniques by existing coal and new gas-fired power plants by 2032, technology which is not even commercially viable today.

This foolhardy attack on both coal and natural gas would have driven greater reliance on unreliable renewable energy sources like wind and solar, likely leaving the U.S. with inadequate electricity to meet the demands of emerging industries like AI. One of the reasons many international companies are promising to increase their investments in the U.S is the availability of abundant cheap energy, something Zeldin's move will help guarantee.

Note that Biden's rule governing power plants was an extension of a similar Obama-era regulation which was rejected by the Supreme Court in 2022. The court found the EPA had gone beyond its authority in attempting to restructure the country's entire power system in favor of renewable energy.

Another critical change is the reversal of the "backdoor EV mandates" that supercharged efforts to get rid of gas-powered cars. Specifically, Zeldin is committed to rewriting the tailpipe and emissions regulations for cars and trucks that would have required 56% of new vehicles sold by 2032 to be electric. Since less than 9% of new car sales last year were EVs, that would have been quite a jolt.

Our electric grid is not ready to cope with such a massive shift; neither are consumers, who are still concerned about the inconvenience and costs of EVs A Pew poll last year even showed Americans unconvinced that EVs are better for the environment.

Most worrisome: Detroit automakers, which continue to lose money on EVs, are not ready for that change. The Big Three automakers will face even steeper competition ahead. China's automaker BYD has become the world's largest EV producer, just surpassing Tesla. While the company does not yet sell cars in the U.S., it announced in 2023 its intention to open a plant in Mexico, which would produce around 150,000 cars per year. BYD said it would not try to sell in the U.S., a promise many found unlikely.

Chinese EVs are cheaper and better than those made in the U.S. and in Europe. EV imports from China into the EU grew more than tenfold in value terms from 2020 to 2023. In response, European authorities imposed tariffs on car imports from China for the first time.

Climate zealots may be right that EVs are the future, but for the present, Detroit is better off making profitable cars that Americans actually want to buy.

Millions of people protested about climate change in 2019, one of the largest global demonstrations ever. Demonstrations have continued, but at a more modest level. Today, even after Zeldin's announcement, and although climate groups are suing to stop his sensible measures, public outrage seems muted. Many are rejecting the high-handed climate mandates which have hurt Europe and threaten the U.S.

Voters have become more skeptical about the climate apocalypse routinely forecast by activists like Al Gore (the end of polar bears) and New York Democrat Rep. Alexandria Ocasio-Cortez ("The world is gonna end in 12 years if we don't address climate change…")

Polling from Pew Research last fall showed that the country was split on whether Biden's climate policies helped or hurt the country, and that "51% of U.S. adults say they've felt suspicious of the groups pushing for action on climate change." That skepticism will doubtless have grown in the wake of revelations that billions of dollars allocated by Congress in the Inflation Reduction Act flowed to Democrat-aligned NGOs in the final weeks of the Biden administration. And, that some of those newly-formed organizations have little history of climate activism, like the $2 billion that flowed to Democratic activist and politician Stacey Abrams.

Voters elected Donald Trump last year because he embraced common sense. Dialing back some of Joe Biden's extreme climate diktats is just that.

**From:** Adm17Lee <Adm17.Zeldin@epa.gov>
**Sent:** Tuesday, March 25, 2025 4:50 PM

**To:** Vaseliou, Molly <Vaseliou.Molly@epa.gov>; Gall, Daniel <Gall.Daniel@epa.gov>
**Subject:** Re: Stories behind firewall

And this one:

https://www.washingtonpost.com/climate-environment/2025/03/25/epa-environment-grants-wrongful-termination/

Get Outlook for iOS

---

**From:** Adm17Lee
**Sent:** Tuesday, March 25, 2025 4:47:52 PM
**To:** Vaseliou, Molly <Vaseliou.Molly@epa.gov>; Gall, Daniel <Gall.Daniel@epa.gov>
**Subject:** Stories behind firewall

Can someone send these to me?

https://www.bostonglobe.com/2025/03/25/science/epa-workers-march-in-boston/

https://www.foxnews.com/opinion/liz-peek-trump-zeldin-bringing-key-ingredient-americas-green-agenda

Get Outlook for iOS

Message

---

**From:** Brown, Ashley [Brown.Ashley@epa.gov]
**Sent:** 1/31/2025 2:22:46 AM
**To:** Amidon, Eric [Amidon.Eric@epa.gov]; Adm17Lee [Adm17.Zeldin@epa.gov]; Gall, Daniel [Gall.Daniel@epa.gov]; Vaseliou, Molly [Vaseliou.Molly@epa.gov]; Weiner, Ben [Weiner.Ben@epa.gov]; Corlett, Thomas [Corlett.Thomas@epa.gov]
**Subject:** RE: Adm Zeldin Itinerary 1-31-25
**Attachments:** DRAFT Pen and Pad Talkers.pdf

Just realized this didn't send earlier.

Talkers for 11:00am added

---

**From:** Brown, Ashley
**Sent:** Thursday, January 30, 2025 9:17 PM
**To:** Amidon, Eric <Amidon.Eric@epa.gov>; adm17.zeldin@epa.gov; Gall, Daniel <Gall.Daniel@epa.gov>; Vaseliou, Molly <Vaseliou.Molly@epa.gov>; Weiner, Ben <Weiner.Ben@epa.gov>; Corlett, Thomas <Corlett.Thomas@epa.gov>
**Subject:** Adm Zeldin Itinerary 1-31-25

Adm Zeldin's Itinerary
Jan 31, 2025

**8:30am Detail pick up from home and will drive Adm to office**

**9:00am – 9:30am** EPA Prep
Location: Adm office
- Eric Amidon to staff

**9:45am – 10:15am** Meeting Prep
- Staff
  o Chad Mcintosh
  o Eric Amidon
  o Steven Cook

**10:15am – 10:45am** California Meeting (virtual and in person)
Location: Alm Room
- Staff
  o Steven Cook
  o Chad Mcintosh
  o Ellen Blake - ESF 3/Water Sector Region 9 office
  o **R9 Leadership**
    ▪ Cheree Peterson- Acting Regional Administrator
    ▪ Ellen Blake ESF 3/Water Sector Region 9 office
    ▪ Mike Montgomery- Director Superfund Emergency Management Division (SEMD)
    ▪ Pete Guria- Deputy Director SEMD and Regional Incident Coordinator (RIC)
    ▪ Lynn Keller-Deputy RIC
  o **Incident Command Post Staff**
    ▪ Tara Fitzgerald- Incident Commander (IC)
    ▪ Steve Calanog Deputy IC
    ▪ Karl Banks-Deputy IC office water
    ▪ Bill Jones- Liaison Officer
    ▪ Rusty Harris-Bishop-Public Information Officer

- - Julia Giarmoleo- Congressional Affairs
  - Tim Irvine- Logistics Section Chief
  - Ben Castalano- Ops Section Chief
  - **OEM Headquarters**
  - Lynda Kasonde Director of OEM
  - Brian Schlieger-Director PROD
  - Ray Ledbetter- Special Assistant

**11:00am – 11:30am** Media
Location: Adm office
- Daniel to staff
- This is 30 min max

**11:30am – 12:00pm** Security Briefing
Location: Adm office
- Staff
- Andrew Hanlin
- Celil Rodrigues
- Henry Barnet
- Thomas Corlett

**12:00pm – 1:00pm** Executive time

**1:00pm - 2:00pm** Grant Funding & Planning meeting
Location: Adm office
- Staff
- Paige Hanson
- Travis Voyles
- Eric Amidon
- Thomas Corlett
- Sean Donahue
- Kimberly Patrick
- Gregg Treml
- Elise Packard

**2:00pm – 2:30pm** Media
Location: Adm office
- Molly to staff
- This is 30 min max

**2:45pm – 3:45pm** Air Issue Overview
Location: Adm office
- Staff:
- Travis Voyles
- Eric Amidon
- Thomas Corlett
- Aaron Szabo
- Abigail Tardif
- Alexander Dominguez
- Sean Donahue

**TBD when detail will drive Adm home**

EPA_00048785

*Connecting American Innovation and Environmental Conservation:*

- **Making America Prosperous Again**
  - Under President Trump's leadership, I have no doubt we will unleash energy dominance, bring back American auto jobs, and become the AI capital of the world.
    - **Unleashing Energy Dominance:**
      - Pursuing energy independence and energy dominance will cut energy costs for everyday Americans who are simply trying to heat their homes and put gas in their cars.
      - This will allow our nation to stop relying on energy sources from adversaries, while lowering costs for hardworking middle income families, farmers, and small business owners.
      - I look forward to working with the greatest minds driving American innovation, to ensure we are producing and developing the cleanest energy on the planet.
- **Securing Historic New Investments and Reforming the Process of Issuing Permits**
  - Any business that wants to invest in America should be able to do so without having to face years-long, uncertain, and costly permitting processes that deter them from doing business in our country in the first place.
  - It will be important for the EPA to work with our partners at the state and federal levels to ensure projects are being approved and companies can invest billions of dollars into our nation.
  - Streamlining these processes, while partnering with businesses to follow the necessary steps to safeguard our environment, will incentivize investment into our economy and create American jobs.

*Accountability*

- **Biden Grants**
  - Topline:
    - We have a responsibility to be good stewards of taxpayer dollars. The EPA under the Biden Administration used the banners of "environmental justice" and "climate change" to dole out tens of billions of taxpayer dollars, frequently to radical, partisan organizations.

- Last month, a Biden political appointee at the EPA referred to this spending as tossing gold bars off the Titanic. That is so unacceptable and unforgivable.
- It is a top priority of mine to account for these funds and make sure that, going forward, every dollar EPA spends is spent correctly.
  - Background:
    - The Climate Justice Alliance, for example, was awarded $50 million in grant funding even though they claimed the "path to climate justice travels through a free Palestine."
    - A video circulated recently of a current Biden Administrator EPA staffer describing the distribution of these grants as "throwing gold bars off the titanic." Even worse, he mentioned how many EPA staffers are currently securing themselves positions at the same organizations they are funneling taxpayer dollars to.
    - $50 million to the New York Immigration Coalition (NYIC) and New Jersey Alliance for Immigrant Justice (NJAIJ)
      - NYIC condemned ICE as "racist and abusive." They rallied with Democrats in Albany to lobby against local law enforcement working with ICE.
      - NJAIJ called for ending "all ICE transfers" and "all forms of incarceration in New York and New Jersey."
    - $1-3 million to the Ella Baker Center in California which [tweeted](tweeted) "It's always been and always will be #DefundThePolice"
    - $100 million to the [NDN Collective](NDN Collective), who believe the United States is a "so-called country" and support defunding the police and military.
  - Background: Statement on pausing IRA funding through EO:
    - "EPA is working diligently to implement President Trump's 'Unleashing American Energy' Executive Order in coordination with the Office of Management and Budget. The agency has paused all funding actions related to the Inflation Reduction Act and the Infrastructure Investment and Jobs Act at this time. EPA is continuing to work with OMB as they review processes, policies, and programs, as required by the Executive Order."
    - *NOTE: The Trump EO was temporarily paused by a DC Circuit Court Judge.*
      - *"The short-term pause issued by US District Judge Loren L. AliKhan prevents the administration from carrying through with its plans to freeze funding for 'open awards' already granted by the federal government through at least 5 p.m. ET Monday, February 3." - CNN*

EPA_00048787

- **Remote Working**
  - *Topline Messaging:*
    - It has been brought to my attention that on any given day, the EPA building is only filled to 20% capacity.
    - COVID remote working is over. It's time to get back into the office.
    - The political team I have built around me is ready to work punishing hours in the office to advance this mission, and I hope to see more career staff in the office soon.
  - *Background:*
    - On January 24, EPA announced plans to rescind all regular telework and remote work agreements and to require employees to work full-time at an agency worksite, unless excused due to disability, qualifying medical condition, or other compelling reason certified by the agency head and the employee's supervisor.
    - Employees on telework and remote work agreements to report to an agency worksite full-time as soon as practicable and not later than February 24, 2025.
    - Employees who are within 50 miles of their original agency worksite return to that original agency worksite.
    - In a small office within the Office of the Administrator, there are already notifications of retirements in response to the Executive Order.
    - EPA currently has a workforce of 16,056 employees (this include staff funded by base appropriations, IRA, and BIL).
    - EPA hired at least 6,232 current full-time permanent and temporary employees since the beginning of the Biden administration.
    - Under the first Trump Administration, EPA staff numbers were roughly equal to their size during the Reagan Administration (in the 14,000s).

*Emergency Response:*

- **California Wildfire Talking Points**
  - EPA is not blocking residents from accessing their properties.
  - We urge homeowners and families to exercise extreme caution when returning to their properties. The people of Los Angeles County should be assured that EPA will continue to carry out its mission to assist our fellow Americans in need.
  - EPA has been assigned by the Federal Emergency Management Agency with the first stage of the overall recovery and cleanup: the project to

EPA_00048788

remove lithium-ion batteries and to survey, remove, and dispose of hazardous materials from properties burned by wildfires.

- **Background:**
  - On January 24, 2025, President Trump issued Executive Order Emergency Measures to Provide Water Resources in California and Improve Disaster Response in Certain Areas.
  - EPA's work removing hazardous materials is Phase 1 of the federal cleanup response.
  - According to the EPA incident commander, there will be upward of 1,000 people working on Phase 1 cleanup by this weekend.
  - This work, conducted at no cost to residents, is a mandatory process to ensure the safety of residents and the workers who will — after the hazardous material is gone — conduct the Phase 2 debris removal in the burn footprints, and to prevent these materials from being released into the environment.
  - Phase 2 is debris removal and will be coordinated by FEMA. Once Phase 1 has been completed at a property, Phase 2 will begin automatically.
  - ESF-10 Hazardous Material Removal
    - Total Residental Properties – 13,551
    - Total Commercial Properties – 277
    - Reconnaissance completed at properties: 4,360
      - Eaton – 2,450
      - Palisades – 1,910
      - Personnel Deployed as of 1/29/25: 29
      - Personnel Mobilizing today (1/30/25): 189

About EPA's Wildfire Response
- EPA's mission is to reduce the threat of immediate hazards
  - They do this by removing:
    - Everyday products like paints, cleaners, solvents, oils, batteries, pesticides, and larger asbestos debris not mixed with ash
    - Pressurized fuel cylinders
    - Lithium-ion batteries
  - FEMA gave EPA a Mission Assignment and provided an initial $175 million
- On January 26, 2025, FEMA sent a follow up letter directing EPA to immediately begin HHM removal and complete the mission within 30 days, by February 25, 2025.
- Current estimates based on inspections of 25% of all parcels show that 13,600 residential parcels and 300 commercial parcels require HHM removal
  - EPA will remove approximate 11,000 (residential and commercial)

Message

---

**From:** Brown, Ashley [Brown.Ashley@epa.gov]
**Sent:** 1/31/2025 5:03:23 AM
**To:** Amidon, Eric [Amidon.Eric@epa.gov]; Vaseliou, Molly [Vaseliou.Molly@epa.gov]; Corlett, Thomas [Corlett.Thomas@epa.gov]; Adm17Lee [Adm17.Zeldin@epa.gov]; Weiner, Ben [Weiner.Ben@epa.gov]; Gall, Daniel [Gall.Daniel@epa.gov]
**Subject:** FW: Adm Zeldin Itinerary 1-31-25
**Attachments:** DRAFT Pen and Pad Talkers.pdf

Update: 11:30am briefing to be rescheduled at another time

Adm Zeldin's Itinerary
Jan 31, 2025

**8:30am Detail pick up from home and will drive Adm to office**

**9:00am – 9:30am** EPA Prep
Location: Adm office
- Eric Amidon to staff

**9:45am – 10:15am** Meeting Prep
- Staff
o   Chad Mcintosh
o   Eric Amidon
o   Steven Cook

**10:15am – 10:45am** California Meeting (virtual and in person)
Location: Alm Room
- Staff
o   Steven Cook
o   Chad Mcintosh
o   Ellen Blake - ESF 3/Water Sector Region 9 office
o   **R9 Leadership**
▪   Cheree Peterson- Acting Regional Administrator
▪   Ellen Blake ESF 3/Water Sector Region 9 office
▪   Mike Montgomery- Director Superfund Emergency Management Division (SEMD)
▪   Pete Guria- Deputy Director SEMD and Regional Incident Coordinator (RIC)
▪   Lynn Keller-Deputy RIC
o   **Incident Command Post Staff**
▪   Tara Fitzgerald- Incident Commander (IC)
▪   Steve Calanog Deputy IC
▪   Karl Banks-Deputy IC office water
▪   Bill Jones- Liaison Officer
▪   Rusty Harris-Bishop-Public Information Officer
▪   Julia Giarmoleo- Congressional Affairs
▪   Tim Irvine- Logistics Section Chief
▪   Ben Castalano- Ops Section Chief
o   **OEM Headquarters**
▪   Lynda Kasonde Director of OEM
▪   Brian Schlieger-Director PROD
▪   Ray Ledbetter- Special Assistant

**11:00am – 11:30am** Media

Location: Adm office
- Daniel to staff
- This is 30 min max

**12:00pm – 1:00pm** Executive time

**1:00pm - 2:00pm** Grant Funding & Planning meeting
Location: Adm office
- Staff
  - Paige Hanson
  - Travis Voyles
  - Eric Amidon
  - Thomas Corlett
  - Sean Donahue
  - Kimberly Patrick
  - Gregg Treml
  - Elise Packard

**2:00pm – 2:30pm** Media
Location: Adm office
- Molly to staff
- This is 30 min max

**2:45pm – 3:45pm** Air Issue Overview
Location: Adm office
- Staff:
  - Travis Voyles
  - Eric Amidon
  - Thomas Corlett
  - Aaron Szabo
  - Abigail Tardif
  - Alexander Dominguez
  - Sean Donahue

**TBD when detail will drive Adm home**

*Connecting American Innovation and Environmental Conservation:*

- **Making America Prosperous Again**
  - Under President Trump's leadership, I have no doubt we will unleash energy dominance, bring back American auto jobs, and become the AI capital of the world.
    - **Unleashing Energy Dominance:**
      - Pursuing energy independence and energy dominance will cut energy costs for everyday Americans who are simply trying to heat their homes and put gas in their cars.
      - This will allow our nation to stop relying on energy sources from adversaries, while lowering costs for hardworking middle income families, farmers, and small business owners.
      - I look forward to working with the greatest minds driving American innovation, to ensure we are producing and developing the cleanest energy on the planet.
- **Securing Historic New Investments and Reforming the Process of Issuing Permits**
  - Any business that wants to invest in America should be able to do so without having to face years-long, uncertain, and costly permitting processes that deter them from doing business in our country in the first place.
  - It will be important for the EPA to work with our partners at the state and federal levels to ensure projects are being approved and companies can invest billions of dollars into our nation.
  - Streamlining these processes, while partnering with businesses to follow the necessary steps to safeguard our environment, will incentivize investment into our economy and create American jobs.

*Accountability*

- **Biden Grants**
  - Topline:
    - We have a responsibility to be good stewards of taxpayer dollars. The EPA under the Biden Administration used the banners of "environmental justice" and "climate change" to dole out tens of billions of taxpayer dollars, frequently to radical, partisan organizations.

EPA_00048792

- ■ Last month, a Biden political appointee at the EPA referred to this spending as tossing gold bars off the Titanic. That is so unacceptable and unforgivable.
- ■ It is a top priority of mine to account for these funds and make sure that, going forward, every dollar EPA spends is spent correctly.
- ○ Background:
    - ■ The Climate Justice Alliance, for example, was awarded $50 million in grant funding even though they claimed the "path to climate justice travels through a free Palestine."
    - ■ A video circulated recently of a current Biden Administrator EPA staffer describing the distribution of these grants as "throwing gold bars off the titanic." Even worse, he mentioned how many EPA staffers are currently securing themselves positions at the same organizations they are funneling taxpayer dollars to.
    - ■ $50 million to the New York Immigration Coalition (NYIC) and New Jersey Alliance for Immigrant Justice (NJAIJ)
        - ● NYIC condemned ICE as "racist and abusive." They rallied with Democrats in Albany to lobby against local law enforcement working with ICE.
        - ● NJAIJ called for ending "all ICE transfers" and "all forms of incarceration in New York and New Jersey."
    - ● $1-3 million to the Ella Baker Center in California which [tweeted](#) "It's always been and always will be #DefundThePolice"
    - ● $100 million to the [NDN Collective](#), who believe the United States is a "so-called country" and support defunding the police and military.
- ○ Background: Statement on pausing IRA funding through EO:
    - ■ "EPA is working diligently to implement President Trump's 'Unleashing American Energy' Executive Order in coordination with the Office of Management and Budget. The agency has paused all funding actions related to the Inflation Reduction Act and the Infrastructure Investment and Jobs Act at this time. EPA is continuing to work with OMB as they review processes, policies, and programs, as required by the Executive Order."
    - ■ *NOTE: The Trump EO was temporarily paused by a DC Circuit Court Judge.*
        - ● *"The short-term pause issued by US District Judge Loren L. AliKhan prevents the administration from carrying through with its plans to freeze funding for 'open awards' already granted by the federal government through at least 5 p.m. ET Monday, February 3." - CNN*

- **Remote Working**
  - *Topline Messaging:*
    - It has been brought to my attention that on any given day, the EPA building is only filled to 20% capacity.
    - COVID remote working is over. It's time to get back into the office.
    - The political team I have built around me is ready to work punishing hours in the office to advance this mission, and I hope to see more career staff in the office soon.
  - *Background:*
    - On January 24, EPA announced plans to rescind all regular telework and remote work agreements and to require employees to work full-time at an agency worksite, unless excused due to disability, qualifying medical condition, or other compelling reason certified by the agency head and the employee's supervisor.
    - Employees on telework and remote work agreements to report to an agency worksite full-time as soon as practicable and not later than February 24, 2025.
    - Employees who are within 50 miles of their original agency worksite return to that original agency worksite.
    - In a small office within the Office of the Administrator, there are already notifications of retirements in response to the Executive Order.
    - EPA currently has a workforce of 16,056 employees (this include staff funded by base appropriations, IRA, and BIL).
    - EPA hired at least 6,232 current full-time permanent and temporary employees since the beginning of the Biden administration.
    - Under the first Trump Administration, EPA staff numbers were roughly equal to their size during the Reagan Administration (in the 14,000s).

*Emergency Response:*

- **California Wildfire Talking Points**
  - EPA is not blocking residents from accessing their properties.
  - We urge homeowners and families to exercise extreme caution when returning to their properties. The people of Los Angeles County should be assured that EPA will continue to carry out its mission to assist our fellow Americans in need.
  - EPA has been assigned by the Federal Emergency Management Agency with the first stage of the overall recovery and cleanup: the project to

remove lithium-ion batteries and to survey, remove, and dispose of hazardous materials from properties burned by wildfires.

- **Background:**
  - On January 24, 2025, President Trump issued Executive Order Emergency Measures to Provide Water Resources in California and Improve Disaster Response in Certain Areas.
  - EPA's work removing hazardous materials is Phase 1 of the federal cleanup response.
  - According to the EPA incident commander, there will be upward of 1,000 people working on Phase 1 cleanup by this weekend.
  - This work, conducted at no cost to residents, is a mandatory process to ensure the safety of residents and the workers who will — after the hazardous material is gone — conduct the Phase 2 debris removal in the burn footprints, and to prevent these materials from being released into the environment.
  - Phase 2 is debris removal and will be coordinated by FEMA. Once Phase 1 has been completed at a property, Phase 2 will begin automatically.
  - ESF-10 Hazardous Material Removal
    - Total Residental Properties – 13,551
    - Total Commercial Properties – 277
    - Reconnaissance completed at properties: 4,360
      - Eaton – 2,450
      - Palisades – 1,910
      - Personnel Deployed as of 1/29/25: 29
      - Personnel Mobilizing today (1/30/25): 189

About EPA's Wildfire Response
- EPA's mission is to reduce the threat of immediate hazards
  - They do this by removing:
    - Everyday products like paints, cleaners, solvents, oils, batteries, pesticides, and larger asbestos debris not mixed with ash
    - Pressurized fuel cylinders
    - Lithium-ion batteries
  - FEMA gave EPA a Mission Assignment and provided an initial $175 million
- On January 26, 2025, FEMA sent a follow up letter directing EPA to immediately begin HHM removal and complete the mission within 30 days, by February 25, 2025.
- Current estimates based on inspections of 25% of all parcels show that 13,600 residential parcels and 300 commercial parcels require HHM removal
  - EPA will remove approximate 11,000 (residential and commercial)

EPA_00048795

Message

| | |
|---|---|
| **From:** | Adm17Lee [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=B540D458D2844EA08EB326F9EC92E64E-BF735879-FC] |
| **Sent:** | 2/22/2025 10:16:52 PM |
| **To:** | Vaseliou, Molly [Vaseliou.Molly@epa.gov]; Amidon, Eric [Amidon.Eric@epa.gov]; Gall, Daniel [Gall.Daniel@epa.gov]; Mandy, Cora [Mandy.Cora@epa.gov]; Weiner, Ben [Weiner.Ben@epa.gov] |
| **Subject:** | RE: Vaseliou, Molly shared "DRAFT DELIBERATIVE COMMS PLANNING 2.21.25 - Copy" with you |
| **Attachments:** | DRAFT DELIBERATIVE COMMS PLANNING 2.21.25 - Copy.docx |

Edits in yellow. Deletions in red. Comments in green.

**From:** Vaseliou, Molly <Vaseliou.Molly@epa.gov>
**Sent:** Saturday, February 22, 2025 3:46 PM
**To:** Adm17Lee <Adm17.Zeldin@epa.gov>; Amidon, Eric <Amidon.Eric@epa.gov>; Gall, Daniel <Gall.Daniel@epa.gov>; Mandy, Cora <Mandy.Cora@epa.gov>; Weiner, Ben <Weiner.Ben@epa.gov>
**Subject:** Vaseliou, Molly shared "DRAFT DELIBERATIVE COMMS PLANNING 2.21.25 - Copy" with you



**Vaseliou, Molly invited you to edit a file**



Running the WOTUS talkers through Jess today, but feel free to take a look at the document. Happy to adjust as needed.

DRAFT DELIBERATIVE COMMS PLANNING 2.21.25 - Copy

This invite will only work for you and people with existing access.

| Open | Share |
|---|---|



Privacy Statement

This email is generated through Environmental Protection Agency (EPA)'s use of Microsoft 365 and may contain content that is controlled by Environmental Protection Agency (EPA).

Message
_____

**From:**        Adm17Lee [Adm17.Zeldin@epa.gov]
**Sent:**        3/25/2025 10:49:57 PM
**To:**          Gall, Daniel [Gall.Daniel@epa.gov]
**CC:**          Vaseliou, Molly [Vaseliou.Molly@epa.gov]
**Subject:**     Re: Stories behind firewall


Edits below. Good as stand alone or embedding the video

Get Outlook for iOS

**From:** Gall, Daniel <Gall.Daniel@epa.gov>
**Sent:** Tuesday, March 25, 2025 5:33 PM
**To:** Adm17Lee <Adm17.Zeldin@epa.gov>
**Cc:** Vaseliou, Molly <Vaseliou.Molly@epa.gov>
**Subject:** Re: Stories behind firewall

Would you maybe want to post the text as a standalone or w/ the embedded video from our announcement to re-up it?

31 historic actions recently announced @EPA will END the Green New Scam while cutting trillions in regulatory costs for everyday Americans.

We will protect our environment AND grow our economy!


Get Outlook for iOS

**From:** Vaseliou, Molly <Vaseliou.Molly@epa.gov>
**Sent:** Tuesday, March 25, 2025 5:31:20 PM
**To:** Adm17Lee <Adm17.Zeldin@epa.gov>; Gall, Daniel <Gall.Daniel@epa.gov>
**Subject:** RE: Stories behind firewall

Oh I got it. I misread that.

**From:** Adm17Lee <Adm17.Zeldin@epa.gov>
**Sent:** Tuesday, March 25, 2025 5:28 PM
**To:** Vaseliou, Molly <Vaseliou.Molly@epa.gov>; Gall, Daniel <Gall.Daniel@epa.gov>
**Subject:** Re: Stories behind firewall

I meant more as a firewall, not a paywall, because it doesn't automatically load when you click the link and you have to do extra steps to see it

Get Outlook for iOS

**From:** Vaseliou, Molly <Vaseliou.Molly@epa.gov>
**Sent:** Tuesday, March 25, 2025 5:21:43 PM
**To:** Adm17Lee <Adm17.Zeldin@epa.gov>; Gall, Daniel <Gall.Daniel@epa.gov>
**Subject:** RE: Stories behind firewall

There shouldn't be a paywall for Fox News Digital. Sometimes it makes you input your email and sends you a unique link, but there's not a paywall.

**From:** Adm17Lee <Adm17.Zeldin@epa.gov>
**Sent:** Tuesday, March 25, 2025 5:19 PM
**To:** Gall, Daniel <Gall.Daniel@epa.gov>; Vaseliou, Molly <Vaseliou.Molly@epa.gov>
**Subject:** Re: Stories behind firewall

It's a good op-ed, but I'm not crazy about posting op-Ed's that are not easily accessible due to firewalls

Get Outlook for iOS

**From:** Gall, Daniel <Gall.Daniel@epa.gov>
**Sent:** Tuesday, March 25, 2025 5:10:45 PM
**To:** Vaseliou, Molly <Vaseliou.Molly@epa.gov>; Adm17Lee <Adm17.Zeldin@epa.gov>
**Subject:** RE: Stories behind firewall

Swung by your office but I know you are busy. Had this drafted on the Peek op-ed:

The 31 historic deregulatory actions @EPA is taking with END the Green New Scam while cutting trillions in costs for everyday Americans.

We will protect our environment and grow our economy. This is what the American people voted for.

w/ link Joe Biden had giant 'green agenda' for America. Trump, Zeldin bring this to EPA | Fox News

**From:** Vaseliou, Molly <Vaseliou.Molly@epa.gov>
**Sent:** Tuesday, March 25, 2025 5:05 PM
**To:** Adm17Lee <Adm17.Zeldin@epa.gov>; Gall, Daniel <Gall.Daniel@epa.gov>
**Subject:** RE: Stories behind firewall

Sending one by one. Here's the Fox News piece

**LIZ PEEK: Trump, Zeldin bring a key ingredient to America's 'green agenda'**
EPA Administrator Lee Zeldin and President Trump have a special solution to the climate madness created by the Biden administration
By Liz Peek

Where is Greta Thunberg? Where are the enormous protests that should be greeting President Donald Trump's assault on Joe Biden's onerous climate mandates? Is climate activism dying?
EPA chief Lee Zeldin recently announced a massive reversal of "green" policies that were likely to put Detroit out of business and stymie our country's dominance of 21st century industries. He is eliminating or modifying 31 environmental regulations that would have, at the least, raised prices and limited choices for consumers. At the worst, they would have had us follow Europe toward sky-high power costs and stagnant growth.
Many were programs adopted by the Joe Biden White House in an effort to attract funding and votes from leftist climate activists. None would have moved the needle on global emissions; for that to happen, China and India would have to climb aboard. Those countries account for roughly 40% of global emissions, while the U.S. contributes less than 14%. So far, China and India have only paid lip service to international rule-making that would curb American growth and prosperity, while continuing to build more coal-fired power plants.
The rules tossed by Zeldin, who called the overhaul the "biggest deregulatory action in U.S. history," include redoing the regulations slapped on power plants by Biden's Clean Power Plan 2.0, tossing many of the restrictions currently "throttling the oil and gas industry," reviewing Obama's "endangerment finding" and reconsidering Biden's "backdoor EV mandates."

He also vowed to terminate the $20 billion in controversial grants shoveled out the door in the final weeks of the Biden administration.

All these measures are consequential, including possibly ditching Obama's "endangerment finding," which deems greenhouse gases a pollutant subject to agency regulation.

Forbes writes: "The national and global impacts stemming from EPA's 2009 endangerment finding are impossible to overstate," as it has "served as the foundation for a massive expansion of EPA authority, enabling it to impose its will into most aspects of American life."

That expansion of authority shows up in Biden's Clean Power Plant Rule, concluded last April, which would have mandated adoption of carbon capture techniques by existing coal and new gas-fired power plants by 2032, technology which is not even commercially viable today.

This foolhardy attack on both coal and natural gas would have driven greater reliance on unreliable renewable energy sources like wind and solar, likely leaving the U.S. with inadequate electricity to meet the demands of emerging industries like AI. One of the reasons many international companies are promising to increase their investments in the U.S is the availability of abundant cheap energy, something Zeldin's move will help guarantee.

Note that Biden's rule governing power plants was an extension of a similar Obama-era regulation which was rejected by the Supreme Court in 2022. The court found the EPA had gone beyond its authority in attempting to restructure the country's entire power system in favor of renewable energy.

Another critical change is the reversal of the "backdoor EV mandates" that supercharged efforts to get rid of gas-powered cars. Specifically, Zeldin is committed to rewriting the tailpipe and emissions regulations for cars and trucks that would have required 56% of new vehicles sold by 2032 to be electric. Since less than 9% of new car sales last year were EVs, that would have been quite a jolt.

Our electric grid is not ready to cope with such a massive shift; neither are consumers, who are still concerned about the inconvenience and costs of EVs A Pew poll last year even showed Americans unconvinced that EVs are better for the environment.

Most worrisome: Detroit automakers, which continue to lose money on EVs, are not ready for that change. The Big Three automakers will face even steeper competition ahead. China's automaker BYD has become the world's largest EV producer, just surpassing Tesla. While the company does not yet sell cars in the U.S., it announced in 2023 its intention to open a plant in Mexico, which would produce around 150,000 cars per year. BYD said it would not try to sell in the U.S., a promise many found unlikely.

Chinese EVs are cheaper and better than those made in the U.S. and in Europe. EV imports from China into the EU grew more than tenfold in value terms from 2020 to 2023. In response, European authorities imposed tariffs on car imports from China for the first time.

Climate zealots may be right that EVs are the future, but for the present, Detroit is better off making profitable cars that Americans actually want to buy.

Millions of people protested about climate change in 2019, one of the largest global demonstrations ever. Demonstrations have continued, but at a more modest level. Today, even after Zeldin's announcement, and although climate groups are suing to stop his sensible measures, public outrage seems muted. Many are rejecting the high-handed climate mandates which have hurt Europe and threaten the U.S.

Voters have become more skeptical about the climate apocalypse routinely forecast by activists like Al Gore (the end of polar bears) and New York Democrat Rep. Alexandria Ocasio-Cortez ("The world is gonna end in 12 years if we don't address climate change…")

Polling from Pew Research last fall showed that the country was split on whether Biden's climate policies helped or hurt the country, and that "51% of U.S. adults say they've felt suspicious of the groups pushing for action on climate change."

That skepticism will doubtless have grown in the wake of revelations that billions of dollars allocated by Congress in the Inflation Reduction Act flowed to Democrat-aligned NGOs in the final weeks of the Biden administration. And, that some of those newly-formed organizations have little history of climate activism, like the $2 billion that flowed to Democratic activist and politician Stacey Abrams.

Voters elected Donald Trump last year because he embraced common sense. Dialing back some of Joe Biden's extreme climate diktats is just that.

---

**From:** Adm17Lee <Adm17.Zeldin@epa.gov>
**Sent:** Tuesday, March 25, 2025 4:50 PM
**To:** Vaseliou, Molly <Vaseliou.Molly@epa.gov>; Gall, Daniel <Gall.Daniel@epa.gov>
**Subject:** Re: Stories behind firewall

And this one:

https://www.washingtonpost.com/climate-environment/2025/03/25/epa-environment-grants-wrongful-termination/

Get Outlook for iOS

---

**From:** Adm17Lee
**Sent:** Tuesday, March 25, 2025 4:47:52 PM
**To:** Vaseliou, Molly <Vaseliou.Molly@epa.gov>; Gall, Daniel <Gall.Daniel@epa.gov>
**Subject:** Stories behind firewall

Can someone send these to me?

https://www.bostonglobe.com/2025/03/25/science/epa-workers-march-in-boston/

https://www.foxnews.com/opinion/liz-peek-trump-zeldin-bringing-key-ingredient-americas-green-agenda

Get Outlook for iOS

Message

| | |
|---|---|
| **From**: | Adm17Lee [Adm17.Zeldin@epa.gov] |
| **Sent**: | 3/25/2025 9:14:21 PM |
| **To**: | Vaseliou, Molly [Vaseliou.Molly@epa.gov]; Gall, Daniel [Gall.Daniel@epa.gov] |
| **Subject**: | Re: Stories behind firewall |

Should we push this out on social media? Maybe quoting the last two sentences?

Get Outlook for iOS

---

**From:** Vaseliou, Molly <Vaseliou.Molly@epa.gov>
**Sent:** Tuesday, March 25, 2025 5:05:25 PM
**To:** Adm17Lee <Adm17.Zeldin@epa.gov>; Gall, Daniel <Gall.Daniel@epa.gov>
**Subject:** RE: Stories behind firewall

Sending one by one. Here's the Fox News piece

**LIZ PEEK: Trump, Zeldin bring a key ingredient to America's 'green agenda'**
EPA Administrator Lee Zeldin and President Trump have a special solution to the climate madness created by the Biden administration
By Liz Peek

Where is Greta Thunberg? Where are the enormous protests that should be greeting President Donald Trump's assault on Joe Biden's onerous climate mandates? Is climate activism dying?

EPA chief Lee Zeldin recently announced a massive reversal of "green" policies that were likely to put Detroit out of business and stymie our country's dominance of 21st century industries. He is eliminating or modifying 31 environmental regulations that would have, at the least, raised prices and limited choices for consumers. At the worst, they would have had us follow Europe toward sky-high power costs and stagnant growth.

Many were programs adopted by the Joe Biden White House in an effort to attract funding and votes from leftist climate activists. None would have moved the needle on global emissions; for that to happen, China and India would have to climb aboard. Those countries account for roughly 40% of global emissions, while the U.S. contributes less than 14%. So far, China and India have only paid lip service to international rule-making that would curb American growth and prosperity, while continuing to build more coal-fired power plants.

The rules tossed by Zeldin, who called the overhaul the "biggest deregulatory action in U.S. history," include redoing the regulations slapped on power plants by Biden's Clean Power Plan 2.0, tossing many of the restrictions currently "throttling the oil and gas industry," reviewing Obama's "endangerment finding" and reconsidering Biden's "backdoor EV mandates."

He also vowed to terminate the $20 billion in controversial grants shoveled out the door in the final weeks of the Biden administration.

All these measures are consequential, including possibly ditching Obama's "endangerment finding," which deems greenhouse gases a pollutant subject to agency regulation.

Forbes writes: "The national and global impacts stemming from EPA's 2009 endangerment finding are impossible to overstate," as it has "served as the foundation for a massive expansion of EPA authority, enabling it to impose its will into most aspects of American life."

That expansion of authority shows up in Biden's Clean Power Plant Rule, concluded last April, which would have mandated adoption of carbon capture techniques by existing coal and new gas-fired power plants by 2032, technology which is not even commercially viable today.

This foolhardy attack on both coal and natural gas would have driven greater reliance on unreliable renewable energy sources like wind and solar, likely leaving the U.S. with inadequate electricity to meet the demands of emerging industries like AI. One of the reasons many international companies are promising to increase their investments in the U.S is the availability of abundant cheap energy, something Zeldin's move will help guarantee.

Note that Biden's rule governing power plants was an extension of a similar Obama-era regulation which was rejected by the Supreme Court in 2022. The court found the EPA had gone beyond its authority in attempting to restructure the country's entire power system in favor of renewable energy.

Another critical change is the reversal of the "backdoor EV mandates" that supercharged efforts to get rid of gas-powered cars. Specifically, Zeldin is committed to rewriting the tailpipe and emissions regulations for cars and trucks that would have required 56% of new vehicles sold by 2032 to be electric. Since less than 9% of new car sales last year were EVs, that would have been quite a jolt.

Our electric grid is not ready to cope with such a massive shift; neither are consumers, who are still concerned about the inconvenience and costs of EVs A Pew poll last year even showed Americans unconvinced that EVs are better for the environment.

Most worrisome: Detroit automakers, which continue to lose money on EVs, are not ready for that change. The Big Three automakers will face even steeper competition ahead. China's automaker BYD has become the world's largest EV producer, just surpassing Tesla. While the company does not yet sell cars in the U.S., it announced in 2023 its intention to open a plant in Mexico, which would produce around 150,000 cars per year. BYD said it would not try to sell in the U.S., a promise many found unlikely.

Chinese EVs are cheaper and better than those made in the U.S. and in Europe. EV imports from China into the EU grew more than tenfold in value terms from 2020 to 2023. In response, European authorities imposed tariffs on car imports from China for the first time.

Climate zealots may be right that EVs are the future, but for the present, Detroit is better off making profitable cars that Americans actually want to buy.

Millions of people protested about climate change in 2019, one of the largest global demonstrations ever. Demonstrations have continued, but at a more modest level. Today, even after Zeldin's announcement, and although climate groups are suing to stop his sensible measures, public outrage seems muted. Many are rejecting the high-handed climate mandates which have hurt Europe and threaten the U.S.

Voters have become more skeptical about the climate apocalypse routinely forecast by activists like Al Gore (the end of polar bears) and New York Democrat Rep. Alexandria Ocasio-Cortez ("The world is gonna end in 12 years if we don't address climate change…")

Polling from Pew Research last fall showed that the country was split on whether Biden's climate policies helped or hurt the country, and that "51% of U.S. adults say they've felt suspicious of the groups pushing for action on climate change." That skepticism will doubtless have grown in the wake of revelations that billions of dollars allocated by Congress in the Inflation Reduction Act flowed to Democrat-aligned NGOs in the final weeks of the Biden administration. And, that some of those newly-formed organizations have little history of climate activism, like the $2 billion that flowed to Democratic activist and politician Stacey Abrams.

Voters elected Donald Trump last year because he embraced common sense. Dialing back some of Joe Biden's extreme climate diktats is just that.

---

**From:** Adm17Lee <Adm17.Zeldin@epa.gov>
**Sent:** Tuesday, March 25, 2025 4:50 PM
**To:** Vaseliou, Molly <Vaseliou.Molly@epa.gov>; Gall, Daniel <Gall.Daniel@epa.gov>
**Subject:** Re: Stories behind firewall

And this one:

https://www.washingtonpost.com/climate-environment/2025/03/25/epa-environment-grants-wrongful-termination/

Get Outlook for iOS

---

**From:** Adm17Lee
**Sent:** Tuesday, March 25, 2025 4:47:52 PM
**To:** Vaseliou, Molly <Vaseliou.Molly@epa.gov>; Gall, Daniel <Gall.Daniel@epa.gov>
**Subject:** Stories behind firewall

Can someone send these to me?

https://www.bostonglobe.com/2025/03/25/science/epa-workers-march-in-boston/

https://www.foxnews.com/opinion/liz-peek-trump-zeldin-bringing-key-ingredient-americas-green-agenda

Get Outlook for iOS

Message

| | |
|---|---|
| **From:** | Goerke, Ariadne (she/her/hers) [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=E8B70BCD421E464BB63A31F451970F7E-AGOERKE] |
| **Sent:** | 1/28/2025 7:04:49 PM |
| **To:** | Packard, Elise [Packard.Elise@epa.gov] |
| **CC:** | Talbert-Duarte, Angelia [talbert-duarte.angelia@epa.gov] |
| **Subject:** | FW: Pause Fed Financial Assistance |
| **Attachments:** | OMB Q&A M-25-13 final.pdf |

Hold on the review we just sent you since this just came in and we need to digest it.

**Ariadne Goerke** *(she/her/hers)*
Deputy Associate, CRFLO/OGC/EPA
Room 7443M (WJCN) ph. 202-564-5471

*In office Thursdays, 1st Mon. and 2nd Wed.*

---

**From:** Boyd, Wyatt <Boyd.Wyatt@epa.gov>
**Sent:** Tuesday, January 28, 2025 1:42 PM
**To:** Talbert-Duarte, Angelia <talbert-duarte.angelia@epa.gov>; Goerke, Ariadne (she/her/hers) <Goerke.Ariadne@epa.gov>; Holden, Allison (she/her/hers) <Holden.Allison@epa.gov>
**Subject:** FW: Pause Fed Financial Assistance

Fresh from OMB



**EXECUTIVE OFFICE OF THE PRESIDENT**
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

In implementing President Trump's Executive Orders, OMB issued guidance requesting that agencies temporarily pause, to the extent permitted by law, grant, loan or federal financial assistance programs that are implicated by the President's Executive Orders.

**Any program not implicated by the President's Executive Orders is not subject to the pause.**

The Executive Orders listed in the guidance are:

> *Protecting the American People Against Invasion*
>
> *Reevaluating and Realigning United States Foreign Aid*
>
> *Putting America First in International Environmental Agreements*
>
> *Unleashing American Energy*
>
> *Ending Radical and Wasteful Government DEI Programs and Preferencing*
>
> *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*
>
> *Enforcing the Hyde Amendment*

Any program that provides direct benefits to individuals is not subject to the pause.

The guidance establishes a process for agencies to work with OMB to determine quickly whether any program is inconsistent with the President's Executive Orders. A pause could be as short as day. In fact, OMB has worked with agencies and has already approved many programs to continue even before the pause has gone into effect.

Any payment required by law to be paid will be paid without interruption or delay.

**Q: Is this a freeze on all Federal financial assistance?**

A: No, the pause does not apply across-the-board. It is expressly limited to programs, projects, and activities implicated by the President's Executive Orders, such as ending DEI, the green new deal, and funding nongovernmental organizations that undermine the national interest.

**Q: Is this a freeze on benefits to Americans like SNAP or student loans?**

A: No, any program that provides direct benefits to Americans is explicitly excluded from the pause and exempted from this review process. In addition to Social Security and Medicare, already explicitly excluded in the guidance, mandatory programs like Medicaid and SNAP will continue without pause.

Funds for small businesses, farmers, Pell grants, Head Start, rental assistance, and other similar programs will not be paused. If agencies are concerned that these programs may implicate the President's Executive Orders, they should consult OMB to begin to unwind these objectionable policies without a pause in the payments.

**Q:  Is the pause of federal financial assistance an impoundment?**

**A:**  No, it is not an impoundment under the Impoundment Control Act.  It is a temporary pause to give agencies time to ensure that financial assistance conforms to the policies set out in the President's Executive Orders, to the extent permitted by law.

Temporary pauses are a necessary part of program implementation that have been ordered by past presidents to ensure that programs are being executed and funds spent in accordance with a new President's policies and do not constitute impoundments.

**Q: Why was this pause necessary?**

**A:**  To act as faithful stewards of taxpayer money, new administrations must review federal programs to ensure that they are being executed in accordance with the law and the new President's policies.

Message

**From**: Goerke, Ariadne [Goerke.Ariadne@epa.gov]
**Sent**: 2/7/2025 8:50:29 AM
**Subject**: Fw: On risk
**Attachments**: Article on Contempt and Fines Against Federal Agencies.pdf

Get Outlook for iOS

**From:** Holden, Allison <Holden.Allison@epa.gov>
**Sent:** Wednesday, February 5, 2025 3:24:07 PM
**To:** Askew, Wendel <Askew.Wendel@epa.gov>; Talbert-Duarte, Angelia <talbert-duarte.angelia@epa.gov>; Goerke, Ariadne <Goerke.Ariadne@epa.gov>
**Cc:** Packard, Elise <Packard.Elise@epa.gov>
**Subject:** On risk

# CUI//PRIVILEGE

Relevant to legal risk, copying Elise at Angie's direction

-----------------------------------------------
Allison Holden
Attorney-Advisor
Civil Rights and Finance Law Office
Office of General Counsel
Environmental Protection Agency
Pronouns: she/her
202-564-3841

# Controlled by U.S. Environmental Protection Agency

VOLUME 131          JANUARY 2018          NUMBER 3

# HARVARD LAW REVIEW

© 2018 by The Harvard Law Review Association

## ARTICLE

## THE ENDGAME OF ADMINISTRATIVE LAW: GOVERNMENTAL DISOBEDIENCE AND THE JUDICIAL CONTEMPT POWER

*Nicholas R. Parrillo*

## CONTENTS

INTRODUCTION ........................................................................................................ 687
I.    FINES AGAINST THE AGENCY AS AN INSTITUTION .............................. 704
      A. *The Baseline: Contempt Fines Against Nonfederal Institutions* ..................... 704
      B. *Uncertain Doctrine* ........................................................................................ 707
      C. *Judicial Behavior: Blocking Fines While Avoiding Big Questions* ................ 712
      D. *Why a Fine Could (Probably) Be Taken from Agency Appropriations* .......... 735
II.   IMPRISONMENT OF THE AGENCY OFFICIAL ............................................ 739
      A. *The Baseline: Imprisonment of Nonfederal Contemnors* ............................... 740
      B. *Uncertain Doctrine* ........................................................................................ 741
      C. *Judicial Behavior: You Can Send Officials to Jail — But Don't Actually Do It!* ... 745
III.  FINES AGAINST AGENCY OFFICIALS ......................................................... 757
      A. *The Baseline: Contempt Fines Against Individuals Outside Federal Agencies* ....... 757
      B. *Uncertain Doctrine* ........................................................................................ 758
      C. *Judicial Behavior: Very Modest Use of Individual Fines* ............................... 761
IV.   THE SANCTION OF ADVERSE OUTCOMES ................................................ 764
V.    JUDGES' ACKNOWLEDGMENTS OF A DOUBLE STANDARD ................... 765
VI.   THE POWER OF CONTEMPT FINDINGS REGARDLESS OF SANCTIONS ......... 770
      A. *A Preliminary Matter: How to Characterize Attorneys' Fee Awards* ........... 771
      B. *The Prevalence of Sanctionless Contempt Findings* ..................................... 773
      C. *The Apparent Efficacy of Contempt Findings Without Sanctions* ................. 775
      D. *The Norm of Compliance and the Shame of Contempt* ................................ 777
VII.  LIMITATIONS ON CONTEMPT'S SHAMING POWER .................................. 789

685

EPA_00048962

# THE ENDGAME OF ADMINISTRATIVE LAW: GOVERNMENTAL DISOBEDIENCE AND THE JUDICIAL CONTEMPT POWER

## Nicholas R. Parrillo[*]

*Scholars of administrative law focus overwhelmingly on lawsuits to review federal government action while assuming that, if plaintiffs win such lawsuits, the government will do what the courts say. But in fact, the federal government's compliance with court orders is imperfect and fraught, especially with orders compelling the government to act affirmatively. Through an examination of thousands of opinions (especially of district courts), docket sheets, briefs, and other filings, plus archival research and interviews, this Article provides the first general assessment of how federal courts handle the federal government's disobedience. The Article makes four conclusions. First, the federal judiciary is willing to issue contempt findings against agencies and officials. Second, while several federal judges believe they can (and have tried to) attach sanctions (fines and imprisonment) to these findings, the higher courts have exhibited a virtually complete unwillingness to allow sanctions, at times swooping down at the eleventh hour to rescue an agency from incurring a budget-straining fine or its top official from being thrown in jail. Third, the higher courts, even as they unfailingly thwart sanctions in all but a few minor instances, have bent over backward to avoid making pronouncements that sanctions are categorically unavailable, deliberately keeping the sanctions issue in a state of low salience and at least nominal legal uncertainty. Fourth, even though contempt findings are practically devoid of sanctions, they have a shaming effect that gives them substantial if imperfect deterrent power.*

---

* Professor of Law, Yale Law School. For valuable exchanges about the project, I thank Bruce Ackerman, Nick Bagley, Sam Bray, Josh Chafetz, Don Elliott, Dan Esty, Eugene Fidell, Owen Fiss, Barry Friedman, Jack Goldsmith, Bob Gordon, Alison LaCroix, Richard Lazarus, Ron Levin, Daryl Levinson, Jeff Lubbers, Amy Kapczynski, Robert Katzmann, Doug Kysar, Jerry Mashaw, Nina Mendelson, Tom Merrill, Gillian Metzger, Joel Mintz, Doug NeJaime, Jennifer Nou, James Pfander, Chuck Sabel, Chris Schmidt, Peter Shane, Scott Shapiro, Kevin Stack, Richard Stewart, Peter Strauss, David Super, David Vladeck, Chris Walker, David Zaring, and participants in workshops at the American Bar Foundation, Chicago-Kent College of Law, Northwestern, the University of Chicago, and Yale. I am grateful to the several practitioners who sat for background interviews. I am indebted to several excellent student research assistants: Kim Jackson, Melissa Legge, James Mandilk, Urja Mittal, Christine Monahan, and Jacob Siegel. Librarians John Nann, Sarah Ryan, Michael VanderHeijden, and Drew Adan provided essential support. I thank the *Harvard Law Review* for thoughtful editorial assistance. The research was sponsored by the Oscar M. Ruebhausen Fund at Yale Law School. All errors are my own.

686

## INTRODUCTION

*Top management [at the Environmental Protection Agency] takes the threat of contempt quite seriously and personally, even though the threat is not real.*
          — *Report of the Environmental Law Institute*[1]

*I don't exactly know how to hold the FDA in contempt and what I would do if I did.*
          — *Remarks from the bench by U.S. District Judge Edward R. Korman*[2]

The United States is said to be "a government of laws."[3] Perhaps the most familiar guarantee of this principle is that bureaucrats must answer to judges. When a federal agency acts in violation of the law, or fails to act when the law requires it to act, a person injured by the unlawful action (or inaction) can hale the agency into federal court. The court can "set aside" action that the agency has taken unlawfully, and the court can "compel" the agency to take action that it has "unlawfully withheld," in the words of the Administrative Procedure Act[4] (APA). In the conventional view, these suits are essential to ensure that agencies respect their enabling statutes, their own rules, the APA's proscription against "arbitrary" action,[5] and the Constitution itself.

Administrative law, as a field, takes these suits as its main focus. Scholars devote tens of thousands of pages to questions about when the suits can be brought and how they should be decided. But scholars generally take for granted that these suits matter in the end — that if a court ultimately sets aside or compels agency action, the agency will obey the court's order.

Yet in fact, federal agency compliance with court orders is imperfect and fraught in ways that scholars have neglected, raising serious questions about what plaintiffs actually get once they "win" a suit against the federal government. Compliance problems can arise when a court sets aside agency action, as when district judges recently found that the Obama Administration disobeyed injunctions against halting offshore

---

[1] ENVTL. & ENERGY STUDY INST. & ENVTL. LAW INST., STATUTORY DEADLINES IN ENVIRONMENTAL LEGISLATION: NECESSARY BUT NEED IMPROVEMENT, at v (1985).

[2] Transcript of Civil Cause for Conference Before the Honorable Edward R. Korman United States District Judge at 8, Tummino v. Von Eschenbach, No. 05-cv-366 (E.D.N.Y. Dec. 16, 2011), ECF No. 342.

[3] Marbury v. Madison, 5 U.S. (1 Cranch) 137, 163 (1803).

[4] Pub. L. No. 79-404, ch. 324, § 10(e), 60 Stat. 237, 243 (1946) (codified at 5 U.S.C. § 706 (2012))

[5] *Id.*

*HARVARD LAW REVIEW* [Vol. 131:685

oil drilling[6] and against shielding aliens from deportation.[7] But compliance problems are most common when a court seeks to compel agency action, as often happens in the areas of environmental law, health and safety regulation, natural resource management, benefits programs, freedom of information, and elsewhere.  If a court compels an agency to take certain action, the order may strain limited agency funding and personnel, interfere with other agency priorities (including other tasks the agency is legally obliged to carry out), or force the agency to act on factual, technical, or scientific information so incomplete that the results may be clumsy or disastrous.  To be sure, there is a line of scholarship on how a court, when asked to issue an order compelling agency action to begin with, should anticipate and weigh problems like these.[8]  But once such an order is made, it is often just the beginning of a long and delicate negotiation between the judge and the agency, in which the agency returns to court, in many cases repeatedly, warning that it badly needs more latitude (especially more time) to comply.  This post-order negotiation phase, though key to the actual stakes of litigation against the federal government, is little discussed in academic work.[9]

---

[6] Hornbeck Offshore Servs., LLC v. Salazar, No. 10-1663, 2011 WL 454802 (E.D. La. Feb. 2, 2011) (finding civil contempt), *rev'd*, 713 F.3d 787 (5th Cir. 2013).

[7] Texas v. United States, No. B-14-254 (S.D. Tex. July 7, 2015) (order), ECF No. 281.

[8] *See, e.g.*, Eric Biber, *The Importance of Resource Allocation in Administrative Law*, 60 AD-MIN. L. REV. 1 (2008); Eric Biber, *Two Sides of the Same Coin: Judicial Review of Administrative Agency Action and Inaction*, 26 VA. ENVTL. L.J. 461 (2008); Lisa Schultz Bressman, *Judicial Review of Agency Inaction: An Arbitrariness Approach*, 79 N.Y.U. L. REV. 1657 (2004); Jacob E. Gersen & Anne Joseph O'Connell, *Deadlines in Administrative Law*, 156 U. PA. L. REV. 923 (2008); Michael D. Sant'Ambrogio, *Agency Delays: How a Principal-Agent Approach Can Inform Judicial and Executive Branch Review of Agency Foot-Dragging*, 79 GEO. WASH. L. REV. 1381 (2011); Glen Staszewski, *The Federal Inaction Commission*, 59 EMORY L.J. 369 (2009); Cass R. Sunstein & Adrian Vermeule, *The Law of "Not Now": When Agencies Defer Decisions*, 103 GEO. L.J. 157 (2014).

[9] Professors Jacob Gersen and Anne O'Connell devote a short section to the case law on compliance with statutory deadlines and do not mention contempt.  *See* Gersen & O'Connell, *supra* note 8, at 964–66.  Professors Cass Sunstein and Adrian Vermeule note only in passing that "even when courts insist on compliance with [statutory] deadlines, they give agencies a degree of flexibility and do not demand that they act tomorrow or the day after."  Sunstein & Vermeule, *supra* note 8, at 181.  Professor Michael Sant'Ambrogio briefly proposes a framework for courts to manage compliance issues, noting a possible role for the contempt power, without mention of sanctions.  *See* Sant'Ambrogio, *supra* note 8, at 1441–42; *see also id.* at 1431–32.  Alden Abbott's studies of court-enforced statutory deadlines address compliance negotiations only incidentally, as the articles are mainly concerned with the effect of deadlines on agencies' allocation of resources and the quality of their decisions.  *See* Alden F. Abbott, *Case Studies on the Costs of Federal Statutory and Judicial Deadlines*, 39 ADMIN. L. REV. 467 (1987); Alden F. Abbott, *The Case Against Federal Statutory and Judicial Deadlines: A Cost-Benefit Appraisal*, 39 ADMIN. L. REV. 171 (1987) [hereinafter Abbott, *Case Against*].  In addition, there are some case studies of individual agency initiatives that shed light on compliance negotiations.  An especially important one, analyzing the tension between judicial review and White House–induced delay in an Occupational Safety and Health Administration (OSHA) rulemaking, is David C. Vladeck, *Unreasonable Delay, Unreasonable Intervention: The Battle to Force Regulation of Ethylene Oxide*, in ADMINISTRATIVE LAW STORIES 190 (Peter

A court that gets pulled into such a negotiation is in a tough position. On the one hand, the judge does not want to tolerate governmental disobedience, especially if she suspects the bureaucrats are invoking limited resources, competing priorities, and incomplete information as smokescreens for their brute political aversion to the ordered action, or for their mere incompetence. On the other hand, the judge does not want to risk causing the agency to violate its *other* legal mandates or to take hastily conceived action with terrible results.[10] Such risks are ever present, for a judge in this situation is flying almost blind. The complexity of agency operations, combined with the strong presumption against allowing discovery against the agency,[11] makes it hard for the judge to tell whether the agency's assertions about resources, priorities, and information are accurate and reasonable.

In this predicament, judges quite often proceed cautiously, hold back, and relent. They may refrain from imposing hard deadlines for agency compliance, or impose deadlines but then grant repeated extensions while monitoring the agency's progress in an attempt to keep from being suckered. The legal justification for this flexible approach, laid down by the D.C. Circuit, is that orders to compel agency action are essentially injunctions, which courts generally have equitable discretion to grant, withhold, or calibrate to fit the equities of the case.[12] Negotiating agency compliance is a common and wearing task for federal judges, in many cases dragging out for years.[13]

---

L. Strauss ed., 2006). *See also* MARC K. LANDY ET AL., THE ENVIRONMENTAL PROTECTION AGENCY: ASKING THE WRONG QUESTIONS, FROM NIXON TO CLINTON 89–132 (expanded ed. 1994); ROSEMARY O'LEARY, ENVIRONMENTAL CHANGE: FEDERAL COURTS AND THE EPA 23–46, 95–116 (1993).

[10] For a poignant statement of this dilemma, see *Public Citizen Health Research Group v. Brock*, 823 F.2d 626, 627 (D.C. Cir. 1987), in which the court explained:

> We understand that an agency's limited resources may make impossible the rapid development of regulation on several fronts at once. And we understand that the agency before us has far greater medical and public health knowledge than do the lawyers who comprise this tribunal. But we also understand . . . that action Congress has ordered for the protection of the public health all too easily becomes hostage to bureaucratic recalcitrance, factional infighting, and special interest politics. At some point, we must lean forward from the bench to let an agency know, in no uncertain terms, that enough is enough.

[11] On the presumption against discovery, see LELAND E. BECK, AGENCY PRACTICES AND JUDICIAL REVIEW OF ADMINISTRATIVE RECORDS IN INFORMAL RULEMAKING 73–74 (2013), https://www.acus.gov/sites/default/files/documents/Agency%20Practices%20and%20Judicial%20Review%20of%20Administrative%20Records%20in%20Informal%20Rulemaking.pdf [https://perma.cc/HA28-APCA]; and Richard McMillan Jr. & Todd D. Peterson, *The Permissible Scope of Hearings, Discovery and Additional Factfinding During Judicial Review of Informal Agency Action*, 1982 DUKE L.J. 333, 334.

[12] Nat. Res. Def. Council, Inc. v. Train, 510 F.2d 692, 711–14 (D.C. Cir. 1975). On the nature of APA remedies and their equivalence to injunctions, see Ronald M. Levin, *"Vacation" at Sea: Judicial Remedies and Equitable Discretion in Administrative Law*, 53 DUKE L.J. 291, 309–44 (2003).

[13] For example, at the outset of a suit to force the Environmental Protection Agency (EPA) to regulate certain pollutants, Judge Posner sardonically forecasted "the monthly progress reports that the [plaintiff] asks us to direct the EPA to submit," "the inevitable request [by the EPA] at the end

This negotiation — often tense and fraught — demands more attention if we are to understand the nature and limits of the judiciary's capacity to influence the administrative state. Yet basic questions about it remain unexplored, including the most fundamental one: what is the endgame? If the agency does not comply and the judge does not credit the agency's reasons for why it supposedly needs more latitude, what (if anything) can the judge do to *make* the agency act? We cannot understand the negotiation between judge and agency unless we know what the consequences are (or what the judge and the agency perceive the consequences to be) of a breakdown of the negotiation. Yet there is almost no literature asking what the endgame is, what judges and officials perceive it to be, or how often (if ever) it is reached. Those are the questions of this Article.

When agency officials imagine the nasty things judges can do to them, they probably think most immediately of the judge imposing progressively more intrusive and onerous versions of the injunction — more specific and minute deadlines, or more exacting requirements to report progress.[14] Such measures can serve as sticks with which to beat the agency. They diminish agency autonomy and may elicit information that will embarrass the agency. Bureaucrats may experience such

of six months for an extension of time," and "the [plaintiffs'] hardly less inevitable request" that the court press the agency to act "when and if the EPA defaults on [the court's] last extension." Bethlehem Steel Corp. v. EPA, 782 F.2d 645, 656 (7th Cir. 1986). In a suit to compel Health and Human Services (HHS) to give clearer notices of benefit denials to Medicare recipients, Judge Weinstein found it took six years of modifying and clarifying his orders to get the agency to comply. David v. Sullivan, 777 F. Supp. 212, 214–17 (E.D.N.Y. 1991). At the end, he commented "that '[t]here ha[d] been stonewalling on the part of the agency,'" and added wearily, "[t]here almost always is [stonewalling] in these cases." *Id.* at 216 (alterations in original) (quoting Judge Weinstein's oral remarks). Other examples of drawn-out compliance negotiations include *Public Citizen Health Research Group*, 823 F.2d at 628–29 (granting another nine months after four-year delay); *Electronic Privacy Information Center v. U.S. Department of Homeland Security*, No. 12-333, at 2–3 (D.D.C. Oct. 16, 2012) (order), ECF No. 25 (referring to agency's "repeated last minute motions requesting extensions of time," and then granting another five-month extension); *Center for Biological Diversity v. Norton*, No. CV 01-409 (D. Ariz. Nov. 13, 2003) (order), ECF No. 121 (denying contempt motion after agency had one extension and would miss the extended deadline, granting another extension, telling parties to negotiate the duration of the extension, and ultimately choosing agency's proposed timeline when parties' proposals differed); and LANDY ET AL., *supra* note 9, at 109–12 (describing how the courts granted serial extensions for EPA rulemaking in 1978–1982).

[14] For extreme examples, see *Coalition of Arizona/New Mexico Counties for Stable Economic Growth v. Department of the Interior*, 100 F.3d 837, 839, 841 (10th Cir. 1996) (noting how trial court required daily progress reports); *Trentadue v. CIA*, No. 2:08-cv-0788 (D. Utah Apr. 30, 2015) (memorandum decision and order appointing special master), ECF No. 249 (appointing special master to monitor agency noncompliance); *Defenders of Wildlife v. Norton*, No. 00-2996, at 4–5, 11 (D.D.C. Jan. 15, 2004) (memorandum opinion), ECF No. 70 (shifting from an injunction requiring "prompt rulemaking" with status reports every 60 days — under which the agency did nothing for nearly 13 months — to a mandatory schedule requiring the agency to begin rulemaking within 3 months, issue a proposed rule within 21.5 months, and a final rule within 33.5 months); and *Sierra Club v. Army Corps of Engineers*, 614 F. Supp. 1475, 1477–82 (S.D.N.Y. 1985) (noting appointment of special master and intrusive recordkeeping requirements).

EPA_00048967

measures as a kind of punishment.  But the possibility of the judge imposing these measures also raises the question: what if the agency fails to comply with the more specific deadlines and reporting requirements?  What can the court do *then*?  We are not at the true endgame yet.

The true endgame is contempt.  If a party fails to comply with a court order, the court can find that party, even if it is a federal agency, in contempt.[15]  And it is not just the agency as an institution that is subject to a contempt finding.  Also vulnerable, in many circumstances, are the high officials who legally control the agency and are vested by statute with its powers.[16]  As the Supreme Court has noted passingly in dicta, "the grant of injunctive relief [against HHS] makes the Secretary's duty to comply enforceable by contempt order."[17]  In a recent study of judicial review of federal agency action, based partly on interviews with current and former high-ranking officials, one of the interviewees said: "The ultimate cost [of noncompliance] would be that the head of your agency was brought up on a contempt charge."[18]  In the last few decades, as my research shows, contempt motions have been made (or con-

---

[15]  Note the distinction between (a) an agency's noncompliance with a court order that actually binds that agency and (b) an agency's refusal, in taking action *not* subject to a court order, to acquiesce in the view of the law taken by the courts that *could* issue an order affecting that action *if* a plaintiff were to sue.  The former behavior is subject to a contempt finding.  The latter behavior — known as "nonacquiescence" — has substantial claims to being legitimate and is practiced regularly by several federal agencies, particularly those taking actions for which they know they are unlikely to be sued.  ROBERT J. HUME, HOW COURTS IMPACT FEDERAL ADMINISTRATIVE BEHAVIOR 92–106 (2009); Samuel Estreicher & Richard L. Revesz, *Nonacquiescence by Federal Administrative Agencies*, 98 YALE L.J. 679 (1989); Wendy Wagner, *Revisiting the Impact of Judicial Review on Agency Rulemakings: An Empirical Investigation*, 53 WM. & MARY L. REV. 1717, 1760–66 (2012).  Nonacquiescence is outside the scope of this Article.

[16]  *See infra* section II.B, pp. 741–45.

[17]  Califano v. Yamasaki, 442 U.S. 682, 705 (1979).  On the unique value of contempt-backed injunctive relief to plaintiffs litigating against government entities, over and above other forms of relief (including declaratory), see Michael T. Morley, *Public Law at the Cathedral: Enjoining the Government*, 35 CARDOZO L. REV. 2453, 2459–87 (2014).  While the judicial power to enjoin and find in contempt an agency official is not seriously questioned, it is uncertain whether, as a constitutional matter, the President could be enjoined or held in contempt.  In any event, there are ways for judges to indirectly control much presidential action.  *See, e.g.*, Franklin v. Massachusetts, 505 U.S. 788, 825–29 (1992) (Scalia, J., concurring) (arguing that there are no historical examples of courts enjoining the President in his official capacity and that such injunctions would violate the separation of powers, but conceding that injunctions usually are available against the subordinate officials who are necessary to carry out a President's order); United States v. Nixon, 418 U.S. 683, 692 (1974) ("The issue whether a President can be cited for contempt could itself engender protracted litigation . . . ."); Jonathan R. Siegel, *Suing the President: Nonstatutory Review Revisited*, 97 COLUM. L. REV. 1612, 1678–79 (1997) (noting that a few district court orders have run against the President and that noninjunctive declarations of the law have in fact induced the President to conform to a court's holding).

[18]  HUME, *supra* note 15, at 39.

tempt proceedings have been otherwise initiated) against federal agencies or officials about once a week nationwide.[19]  To know the endgame of administrative law, we must assess the nature and efficacy of contempt against federal agencies — a subject on which the literature is almost silent.[20]

Viewed generally, beyond the context of administrative law, a contempt finding is potent for the obvious reason that a court can back it up with sanctions.  In the words of 18 U.S.C. § 401, which loosely codifies the contempt power, a federal court has "power to punish by fine or imprisonment, or both, at its discretion," any "[d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command."[21]  Contempt sanctions can take various forms: (1) *civil coercive sanctions*, meaning the court incarcerates or periodically fines the contemnor until compliance, with the periodic fines set at whatever amount is necessary for their coercive purpose; (2) *civil compensatory sanctions*, meaning the

---

[19]  *See* Appendix, Part II, 131 HARV. L. REV. 685 app. (2018), https://harvardlawreview.org/wp-content/uploads/2018/01/685appendix.pdf [https://perma.cc/QAM3-ZEYE] (noting that our searches of U.S. District Court docket sheets since about 1990 turned up 1437 suits with a contempt motion or other such proceedings against a federal agency or official).

[20]  The only work that focuses specifically on contempt against federal agencies is a student note, Daniel Riess, Note, *Federal Sovereign Immunity and Compensatory Contempt*, 80 TEX. L. REV. 1487 (2002).  It covers only one kind of contempt sanction (compensatory civil contempt fines), which is probably the least efficacious sanction in terms of forcing defendants to obey and deterring disobedience.  Riess does not consider the phenomenon of sanctionless contempt findings.  Professor Richard Pierce's work on the Indian trust account litigation against the Interior Department indirectly sheds light on the nature of contempt against agencies.  Richard J. Pierce, Jr., *Judge Lamberth's Reign of Terror at the Department of Interior*, 56 ADMIN. L. REV. 235 (2004).  Professor Daniel Jacobs's work on federal government litigation misconduct briefly distinguishes that subject from the related but separate subject that is the main focus of this Article, that is, federal agency noncompliance with substantive court orders.  Daniel S. Jacobs, *The Role of the Federal Government in Defending Public Interest Litigation*, 44 SANTA CLARA L. REV. 1, 6–7 (2003).  Professor Robert Hume's study of judicial review, based partly on interviews with agency officials, briefly discusses those officials' general attitudes about contempt but says nothing specific about sanctions beyond a passing reference to attorneys' fee awards.  HUME, *supra* note 15, at 39–40.  Hume also gives an important if brief discussion about norms of compliance, *id.* at 73–78, on which I draw, *see infra* section VI.D, pp. 777–89.  Two illuminating works covering federal courts' use of contempt against *state and local* government defendants are Barry Friedman, *When Rights Encounter Reality: Enforcing Federal Remedies*, 65 S. CAL. L. REV. 735 (1992); and James M. Hirschhorn, *Where the Money Is: Remedies to Finance Compliance with Strict Structural Injunctions*, 82 MICH. L. REV. 1815 (1984).  For an analysis placing contempt sanctions against state and local defendants in the larger context of a fundamental tension between administration and law, see Adam Shinar, *Enabling Resistance: How Courts Facilitate Departures from the Law, and Why This May Not Be a Bad Thing*, 17 N.Y.U. J. LEGIS. & PUB. POL'Y 989, 1020–23 (2014).

[21]  Despite the word "punish," this enactment is understood to cover both civil and criminal contempt.  United States v. Barco Corp., 430 F.2d 998, 1000 (8th Cir. 1970).  On the original status of the contempt power as inherent in the federal courts, see Robert J. Pushaw, Jr., *The Inherent Powers of the Federal Courts and the Structural Constitution*, 86 IOWA L. REV. 735, 766–70 (2001).  The statute now codified at 18 U.S.C. § 401 was enacted in An Act Declaratory of the Law Concerning Contempts of Court, ch. 99, 4 Stat. 487 (1831).

EPA_00048969

court fines the contemnor in whatever amount is necessary to compensate the plaintiff for losses caused by the noncompliance; or (3) *criminal sanctions*, meaning the court imposes a flat fine or fixed jail term on the contemnor after the contemnor has defied the order, to punish the contemnor for the past disobedience and deter people from defying orders in the future.[22]

Do judges find noncompliant federal agencies and officials in contempt? Do they fine or jail noncompliant officials? Do they fine noncompliant agencies? It is tempting, at first blush, to answer these questions by simple reference to the separation of powers. When it comes to imprisonment or fines for officials, the officers who physically imprison contemnors and see to the collection of fines — the U.S. Marshals Service[23] — are themselves part of the Department of Justice (DOJ) and thus of the federal executive branch,[24] which might suggest that such sanctions will not be carried out, as the federal executive branch will not enforce against itself. And when it comes to fines against agencies, the Constitution says no money can be drawn from the treasury unless Congress appropriates it,[25] which might suggest that such fines are uncollectible.

But these answers are superficial and unsatisfactory. Yes, the U.S. Marshals Service is part of the executive branch, but the marshals are bound by statute to carry out all federal court orders,[26] and they do so as a matter of bureaucratic routine. To be sure, the President can appoint and fire the Service's leadership,[27] but this does not mean that, if a judge told the marshals to imprison or fine a noncomplying federal agency official, the President would call them off. (Note that the pardon power does not apply to civil contempt sanctions.[28]) Justice Breyer stated passingly in a lecture, with reference to state *and federal* officials: "[T]he threat that federal marshals will knock on the door of any individual official specifically identified in a court order remains quite real."[29] For the President to call off the marshals would flagrantly violate the statute charging the marshals to carry out court orders, as well

---

[22] 3A CHARLES ALAN WRIGHT & SARAH N. WELLING, FEDERAL PRACTICE AND PROCEDURE § 703, at 278–97 (2010).

[23] *E.g.*, 4A JAY E. GRENIG, WEST'S FEDERAL FORMS § 5676, at 389 (3d ed. 2005).

[24] 28 U.S.C. § 561 (2012). Regarding the dependence of the judiciary on DOJ to enforce its orders, see James E. Pfander & Jessica Dwinell, *A Declaratory Theory of State Accountability*, 102 VA. L. REV. 153, 183–93 (2016); and Siegel, *supra* note 17, at 1687.

[25] U.S. CONST. art. I, § 9, cl. 7.

[26] 28 U.S.C. § 566(c).

[27] 28 U.S.C. § 561(a), (c), (d). The rank and file of deputy marshals enjoy protection against firing without cause, enforceable by the Merit Systems Protection Board. *See, e.g.*, Rodriguez v. DOJ, No. NY-0752-10-0081-I-1, 2011 WL 12504584 (M.S.P.B. Oct. 7, 2011).

[28] *Ex parte* Grossman, 267 U.S. 87, 111 (1925).

[29] Stephen G. Breyer, *Judicial Independence in the United States*, 40 ST. LOUIS U. L.J. 989, 995 (1996).

694                          *HARVARD LAW REVIEW*                    [Vol. 131:685

as a norm unbroken since the 1800s that Presidents do not defy federal court orders.[30]  Breaking that norm would trigger a constitutional crisis of high risk to all sides.[31]  The President would trip this wire only if the

---

[30] Even in academia, there has long been near-total consensus that the President is bound to obey a federal court judgment.  Professor Michael Stokes Paulsen, the main dissenter from this convention, admitted at the time of his own work on the subject that he was essentially alone in his view.  Michael Stokes Paulsen, *The Merryman Power and the Dilemma of Autonomous Executive Branch Interpretation*, 15 CARDOZO L. REV. 81, 98–99 (1993); *see also* Michael Stokes Paulsen, *The Most Dangerous Branch: Executive Power to Say What the Law Is*, 83 GEO. L.J. 217, 223–24 (1994) ("[I]t is the *executive* that effectively has the last word on most controversies through its power to execute or decline to execute judgments rendered by courts (what I call *Merryman* power)." *Id.* at 223.); *accord* Gary Lawson & Christopher D. Moore, *The Executive Power of Constitutional Interpretation*, 81 IOWA L. REV. 1267, 1319–24 (1996) (stating that every modern departmentalist, except Paulsen, says the President must enforce specific judgments of courts and that this view is "taken for granted in our legal culture," *id.* at 1319).  For a more recent and more limited departure from the convention, arguing that a court judgment outside the court's jurisdiction is not binding on the President, see William Baude, *The Judgment Power*, 96 GEO. L.J. 1807 (2008).  Historically, the norm apparently stabilized sometime in the late 1800s.  During the Civil War, President Abraham Lincoln and Attorney General Edward Bates asserted a presidential prerogative to refuse to comply with court orders inconsistent with the President's view of the law.  *See* Suspension of the Privilege of the Writ of Habeas Corpus, 10 Op. Att'y Gen. 74, 85–86 (1861).  For an argument that the Lincoln Administration did not actually defy the court order in the famous case at issue in Attorney General Bates's opinion, see Seth Barrett Tillman, Ex Parte Merryman*: Myth, History, and Scholarship*, 224 MIL. L. REV. 481 (2016).  For other instances of executive defiance or alternative extreme tactics in 1861–1865, see Martin S. Lederman, *The Law (?) of the Lincoln Assassination*, 118 COLUM. L. REV. (forthcoming Mar. 2018) (manuscript at 53 n.240, 67–68), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2854195 [https://perma.cc/87BV-6DUX].  The literature gives no examples of open presidential defiance of court orders in the years since 1865.  While there seems not to be a comprehensive historical treatment of how Presidents came to accept the obligation to obey court judgments, there is a large literature on the related question of how the political branches came to accept judicial supremacy in interpreting the Constitution, with the inflection point being the latter part of the nineteenth century.  In that literature, see especially LARRY D. KRAMER, THE PEOPLE THEMSELVES: POPULAR CONSTITUTIONALISM AND JUDICIAL REVIEW 209–18 (2004); KEITH E. WHITTINGTON, POLITICAL FOUNDATIONS OF JUDICIAL SUPREMACY 255–71 (2007); Barry Friedman, *The History of the Countermajoritarian Difficulty, Part II: Reconstruction's Political Court*, 91 GEO. L.J. 1, 48–63 (2002); and Barry Friedman & Erin F. Delaney, *Becoming Supreme: The Federal Foundation of Judicial Supremacy*, 111 COLUM. L. REV. 1137 (2011).  Professor Richard Fallon cites two instances since 1865 of the norm coming near to being broken.  Richard H. Fallon, Jr., *Executive Power and the Political Constitution*, 2007 UTAH L. REV. 1, 9–10.  The first involved President Franklin Roosevelt's contingency plan in the event the government should lose the Gold Clause Cases that threatened the monetary system, but this plan may have amounted only to nonacquiescence pending an effort to get Congress to reimpose sovereign immunity and/or pack the Court; in any event, the government's eventual victory mooted the issue.  WILLIAM E. LEUCHTENBURG, THE SUPREME COURT REBORN 86–88 (1995).  The second instance occurred as the Supreme Court was asked to review a military commission trial of Nazi saboteurs, when Attorney General Francis Biddle told Justices Roberts and Black that he was "apprehensive" that President Roosevelt would execute the defendants regardless of what the Court did.  SIDNEY FINE, FRANK MURPHY: THE WASHINGTON YEARS 404 (1984).  Justice Roberts relayed Attorney General Biddle's comment to the Justices.  *Id.*  Ultimately the Court did not halt the military proceedings.  ALPHEUS THOMAS MASON, HARLAN FISKE STONE: PILLAR OF THE LAW 654–55 (1956).

[31] *Cf.* Eric A. Posner & Adrian Vermeule, *Constitutional Showdowns*, 156 U. PA. L. REV. 991 (2008) (analyzing "showdowns" between and within the various branches of government).

EPA_00048971

official or agency action involved were of peculiar and extreme importance to him. This renders presidential interference with the marshals irrelevant to a large percentage of agency litigation, and even if the matter were of peculiar importance to the President, that does not mean he would win the resulting constitutional showdown. In any event, the mere fact that the U.S. Marshals Service is part of the executive branch does not resolve the question of contempt's role. More broadly, fines and imprisonment certainly have an accepted role in the broad accountability regime for federal officials that ranges beyond violations of court orders. In just the last decade, DOJ criminal prosecutions for official misconduct have resulted in large fines or prison terms for at least three high-ranking federal agency officials.[32] And as to contempt fines against agencies (effectively docking their budgets), the conventional view in the rarefied field of appropriations law is that an agency's appropriations for a program *are* generally available to pay penalties incurred in implementing the program.[33] Plus, the general notion of holding an agency accountable by docking its budget is hardly unfamiliar. Several statutes aim to discourage bad bureaucratic behavior by docking agency appropriations for judicially determined contract damages, employment discrimination damages, whistleblower retaliation damages, and awards of attorneys' fees when agencies litigate unjustifiably.[34]

Thus, the question of contempt's role against federal agencies cannot be answered by simple reference to the separation of powers; it requires looking at what actually happens in litigation. But conventional research methods on litigation, confined to published appellate opinions, are hopeless for this purpose. There are no opinions of the Supreme Court on the subject. When the courts of appeals hear a potentially relevant case, they usually dispose of it on narrow, case-specific grounds in a deliberate attempt to avoid the bigger and more portentous issues about whether and when judges can use contempt sanctions against the federal government. After much conventional research, I have found it

---

[32] *Ex-FDA Chief Gets Probation, Fine for Lying About Stocks*, WASH. POST (Feb. 28, 2007), http://www.washingtonpost.com/wp-dyn/content/article/2007/02/27/AR2007022701521.html [https://perma.cc/JY4L-KEGU]; Michael S. Schmidt & Matt Apuzzo, *Petraeus Receives Probation for Giving Information to Lover*, N.Y. TIMES, Apr. 24, 2015, at A16; Del Quentin Wilber, *Ex-GSA Official Sentenced in Abramoff-Related Case*, WASH. POST, Oct. 17, 2009, at A2.

[33] *See infra* section I.D, pp. 735–39.

[34] Paul F. Figley, *The Judgment Fund: America's Deepest Pocket & Its Susceptibility to Executive Branch Misuse*, 18 J. CONST. L. 145, 167–75 (2015). To be sure, we should not expect a government agency to respond to monetary penalties in precisely the way a profit-maximizing firm would. Daryl J. Levinson, *Making Government Pay: Markets, Politics, and the Allocation of Constitutional Costs*, 67 U. CHI. L. REV. 345 (2000). But a fine cutting into agency appropriations would likely cause managerial problems for the agency and would require potentially politically costly negotiations with congressional appropriators and the Office of Management and Budget (OMB).

necessary to go beyond appellate case law — into appellate orders and briefs and district court orders, briefs, opinions, and docket sheets — to assemble a critical mass of sources and to provide the context necessary to recognize the agile dodging in which the higher courts engage.

Therefore, my research team and I conducted a series of searches, described in the Appendix, for federal court suits involving contempt against federal agencies.[35] In the Westlaw database of federal judicial opinions (including those of district courts), we conducted broad searches producing over 12,000 results, from which my team eliminated irrelevant documents and forwarded to me over 650 opinions in which contempt against a federal agency was considered at all seriously (almost all were post-1945). Among these opinions, I identified sixty-seven in which a court actually made a contempt finding against an agency or official at some point in the litigation (even if later overturned), plus another 150 that contained discussion of interest for the subject. Next, in the Bloomberg Law database of district court docket sheets (covering from about 1990 to the present), we conducted broad searches producing over 4000 suits that my team again vetted for relevance, locating over 1400 in which a contempt motion was made (or a contempt proceeding otherwise initiated) against a federal agency, including fifteen with actual contempt findings that did not duplicate the Westlaw results. I examined the docket sheets and (when available) relevant filings in those fifteen suits, plus about 200 others in which a contempt finding was denied.[36]

In addition, for about fifty of the suits that appeared in our various research avenues — those that came nearest to imposing major sanctions or deciding big questions about sanctions' availability or that involved agency actions of high substantive importance — I obtained additional primary materials, such as unpublished orders and briefs, to flesh out what really happened in the litigation. Sometimes this was through Bloomberg Law, or, in about twenty-five of the cases, in paper archives.

---

[35] Appendix, 131 HARV. L. REV. 685 app. (2018), https://harvardlawreview.org/wp-content/uploads/2018/01/685appendix.pdf [https://perma.cc/QAM3-ZEYE]. For reasons explained in the Appendix, I omitted from this project all cases arising under the bankruptcy code and all cases from non–Article III courts.

[36] In case-based research across Westlaw and Bloomberg, I looked for those cases involving contempt findings against federal agencies, proceedings that might lead to such findings, or discussion of the possibility of such findings. At times, contempt proceedings are aimed at agencies' alleged violations of substantive court orders, which is the subject that mainly interests me. However, sometimes contempt proceedings are aimed at agencies' litigation misconduct, such as failing to turn over documents. Because the doctrine on contempt is a unified one transcending substantive-order violations and litigation misconduct, I included the cases on litigation misconduct in my source base. It should be noted, however, that litigation misconduct can also be regulated and sanctioned by means other than contempt, such as by sanctions under Rules 11 or 37 of the Federal Rules of Civil Procedure. I did not set out to gather sources on these noncontempt means for addressing agencies' litigation misconduct. On federal agency litigation misconduct, see Daniel S. Jacobs, *The Role of the Federal Government in Defending Public Interest Litigation*, 44 SANTA CLARA L. REV. 1, 2–9 (2003).

Numerous briefs of DOJ and other sophisticated parties were helpful in identifying yet more relevant cases.

Plus, I conducted hour-long face-to-face interviews with about a dozen attorneys with extensive experience in bringing or defending suits challenging federal agency action. Though the interviews were on background, meaning I will not cite them, they give me confidence that I located all the important cases that veteran practitioners of administrative law would know about.

From this research, I make four conclusions. First, the federal judiciary is willing to issue contempt findings against federal agencies and officials. Second, while several individual federal judges believe they can (and have tried to) attach sanctions to these findings, the judiciary as an institution — particularly the higher courts — has exhibited a virtually complete unwillingness to allow sanctions, at times intervening dramatically to block imprisonment or budget-straining fines at the eleventh hour. Third, the higher courts, even as they unfailingly halt sanctions in all but a few minor instances, have bent over backward to avoid making authoritative pronouncements that sanctions are categorically unavailable, thus keeping the sanctions issue in a state of low salience and at least nominal legal uncertainty. Fourth, even though contempt findings are practically devoid of sanctions, they nonetheless have a shaming effect that gives them substantial if imperfect deterrent power. The efficacy of judicial review of agency action rests primarily on a strong norm, shared in the overlapping communities that agency officials inhabit, that officials comply with court orders. Shame-inducing contempt findings by judges are the means to weaponize that norm.

To demonstrate these conclusions, the Article proceeds in several parts. Part I begins by focusing on contempt fines against the agency as an institution. Against large private corporations that violate court orders, federal courts have repeatedly used contempt fines in spectacular ways. Against state and local government agencies, federal courts use contempt fines more rarely, but they generally conclude that such fines are available, rejecting state claims of sovereign immunity; and they have imposed them in several important instances, confirming their decisive coercive effect. Against federal agencies, federal judges have *tried* to use contempt fines more frequently than they have tried to use other sanctions (like imprisonment or individual fines against officials). But such fines are of uncertain legal availability, due to federal sovereign immunity, which DOJ has repeatedly invoked in response to judicial attempts to impose them. Some plaintiffs have argued that federal sovereign immunity to contempt fines is overridden by the constitutional imperative that courts be able to enforce their judgments, or that such immunity is negated by Congress's general waiver of immunity to non-damages suits against agencies (in 5 U.S.C. § 702); however, the question is uncertain. On the thirteen occasions in our sources when judges have sought to impose such fines (or issue a determinate schedule of such fines

to induce compliance), higher courts — or other supervening bodies like the Judicial Panel on Multidistrict Litigation — have consistently blocked the fines, sometimes swooping in with only days or hours remaining. They have failed to block fines in only three minor cases, involving tiny fines that were not appealed. Further, the blocking almost always occurs for some case-specific reason, which the higher court sometimes must bend over backward to find, rather than on sovereign immunity grounds. Thus the judiciary avoids imposing contempt fines or fine schedules but without stating whether such sanctions are available in principle. Part I concludes by explaining how — if sovereign immunity were overcome and a contempt fine were incurred by an agency — the fine would probably be payable from the agency's appropriations, though with some possible complications.

Part II considers imprisonment of agency officials responsible for noncompliance. The sanction of imprisonment is common against private contemnors, and while the sanction is rarely used against state and local officials, it has been used against them in a clear and well-publicized way, confirming that it is a real threat for them. Against federal agency officials, the story is different. Although DOJ has backtracked from the broad argument it made in the 1950s that federal officials are absolutely immune to imprisonment for contempt, the doctrine on corporate officers' contempt liability for a corporation's disobedience suggests there are prudential limits on personally sanctioning the officials of a noncompliant organization whose behavior the official may not fully control, and DOJ has accordingly made such prudential arguments to keep the heads of federal agencies out of jail. Compared with cases about contempt fines against the agency, there are even fewer cases in our search — four to be exact — in which a judge jailed a federal agency official (never for more than a few hours) or credibly threatened to do so.[37] In these cases, the higher courts play a similar role as in the context of contempt fines: they keep the lower-level sanctioning judges from going through with the sanction, but without questioning that the sanction is available in principle. In the most dramatic such case, which I discuss in depth, the Secretary of Commerce in 1951 engaged in hardball tactics to avoid complying with a judgment. The D.C. Circuit came within two days of jailing him, only to have the Justices of the Supreme Court stall the sanction through a series of stay orders and grants of certiorari, after which the plaintiffs settled the case at a big discount. Justice Jackson dissented from his colleagues' stay and accused them of signaling that they had no stomach to punish a lawbreaking government.

Part III covers contempt fines personally targeted at agency officials responsible for noncompliance. Courts can bar officials from seeking indemnification for such fines, but if that happens, the fines raise many

---

[37] None of the sources on these cases, nor on any case we found since the Civil War, suggest any possibility of the President calling off the U.S. Marshals.

of the same prudential worries as imprisonment, about sanctioning officials of an organization whose behavior they may not fully control. In any event, indemnification is the near-universal customary practice for all liabilities that officials — federal, state, or local — incur in the scope of their employment, and there is no reason to think contempt fines would be different. Thus, these fines normally would come from the public fisc. In the case of contempt fines against state officials, the Supreme Court has expressly approved the combination of personal fines and indemnification as a means to circumvent state sovereign immunity. A similar strategy, if tried against federal officials, is somewhat promising (though not a slam dunk) as a means of effectively docking the disobedient agency's appropriations while circumventing federal sovereign immunity and any possible obstacles in appropriations law. Yet our search turned up only nine cases in which courts had even initially imposed such fines, and the courts made the fines stick against truly disobedient agencies in only three cases, each involving modest penalties ($2000 to $6500 in 2017 dollars) imposed for already-completed disobedience, not to coerce compliance in the future.

In Part IV, I briefly discuss the handful of instances where federal courts have sanctioned agencies for contempt by means other than fine or imprisonment, in particular by imposing adverse outcomes on the agency within the litigation or within the agency proceeding that is the subject of the litigation. But these sanctions have major limitations. They beg the question of what happens if the agency does not follow the adverse ruling, they will probably never be imposed absent a judge's view that the adverse outcome is actually correct on the substantive law and facts, and they are of little use in the more complex agency proceedings that most frequently give rise to compliance problems, for in those cases, the court will not know what outcome to impose.

Thus, almost always, the judiciary avoids contempt sanctions against agencies without announcing that sanctions are generally unavailable. Part V assembles several judicial utterances — oral remarks, dissents, and guarded, oblique passages in appellate majority opinions — that indicate judges' peculiar discomfort and uncertainty when it comes to contempt against federal agencies, distinct from what they feel about contempt against other parties. These utterances, coupled with the obvious judicial stretching to avoid sanctions documented in Parts I and II, confirm that sanctions' absence reflects a meaningful and motivated choice by the judiciary. This evidence also helps refute an alternative theory of sanctions' absence, that is, that sanctions are threatened so credibly that agencies comply perfectly and thus never put judges in a position of being inclined to sanction. That theory is obviously false in light of judges' frequent modifications of injunctions, and even if revised to say that judges modify decrees only on the merits (for example, when compliance is truly impossible, and not out of judges' own skit-

tishness about sanctions), the theory becomes untenable when we consider judges' admissions that the idea of trying to hold a federal agency in contempt unnerves and confuses them.

Given the judiciary's reticence to impose contempt sanctions on agencies and officials, the most common type of contempt finding against an agency is, in fact, one that has no sanction.[38] Part VI considers these sanctionless contempt findings and the power they exert despite the absence of any direct financial or physical effect on the agency or official. Clearly agencies do feel substantial pressure to comply with court orders and to assure the judge they are doing their best, even as they negotiate for more latitude in complying. Officials are on record saying they fear contempt findings, and there are many examples of a previously noncompliant agency quickly getting its act together in response to a mere contempt motion or the mere threat of a contempt finding. As the Environmental Law Institute put the issue in discussing a case of sanctionless contempt: "Top management [at EPA] takes the threat of contempt quite seriously and personally, even though the threat is not real."[39]

The pressure that agencies feel arises from the shaming power of a contempt finding, regardless of sanctions. The concept of shaming is little discussed in the realm of public law, but it fits this subject quite well. Federal agency officials live in a community with a strong norm of compliance with court orders. This is evident from political science professor Robert Hume's interviews with officials,[40] and also from my own assembly of suits, in which agencies always genuflect by acknowledging their normative obligation to comply and profess to be making good-faith efforts to do so, even if they simultaneously argue that courts cannot lawfully sanction them. Contempt findings (even without sanctions) are the lower courts' means of weaponizing the compliance norm by imposing shame — that is, stigmatizing publicity and reputational harm — on the officials and agencies who violate it. Part VI analyzes a series of suits in which agency officials, government attorneys, judges, and plaintiffs have recognized the shaming power of contempt, made strategic decisions on the premise that such power exists, and sought consciously to exploit such power. That most agencies must get their legal representation from DOJ, an agency monopolized by lawyers with a unique stake in their reputation before the courts, does much to bolster the shame-based power of contempt.

---

[38] There may be literally no sanction, or sometimes a narrow award of attorneys' fees to the plaintiff for proceedings arising from the noncompliance, but such an award, as the D.C. Circuit has said, "cannot be considered relief for the underlying contempt," meaning that such an award really amounts to "no sanction." Cobell v. Norton, 334 F.3d 1128, 1145–46 (D.C. Cir. 2003). I discuss these attorneys' fee awards in section VI.A.

[39] ENVTL. & ENERGY STUDY INST. & ENVTL. LAW INST., *supra* note 1, at v.

[40] HUME, *supra* note 15, at 74–77.

However, as I explain in Part VII, contempt's shaming power — and with it, the very efficacy of administrative law — is subject to certain limitations. First, contempt's shamefulness depends in large part on the widespread perception that official disobedience is rare and therefore deviant. If the judiciary were to issue more contempt findings or impose (publicity-attracting) sanctions, it would raise the salience of violations and could thereby risk undermining the perception of universal compliance and, with it, the compliance norm itself. It is likely that judges, in order to avoid this, sometimes pull their punches, which helps explain why findings are rare and sanctions virtually absent. Second, contempt's shaming power depends on how deeply the defendant-official is immersed in the community that holds the pro-compliance norm. It has always been the case that bureaucrats must operate within multiple communities (for example, the legal world versus the scientific professions) and make tradeoffs between their efforts to satisfy the expectations of them all. On occasion, officials have been willing to endure the shame of contempt to preserve their credibility in a scientific field. Relatedly, the rise of partisan polarization could potentially fracture the pro-compliance community so badly that members of one party would refuse to acknowledge the shame of a contempt finding against a member of their own camp.

*     *     *

I close this Introduction with a word on why the judiciary refuses to use sanctions but also refuses to deny their availability. In refusing to use sanctions, judges are relying upon the existing pro-compliance norm, and their very reticence to sanction likely helps bolster that norm by keeping violations at low salience so as to preserve the impression that noncompliance is rare and deviant. Besides this, there are other reasons why sanctions are relatively unattractive to judges. As noted in Parts II and III, pinpointing the blameworthy individuals within an agency can be difficult, especially given agencies' size and complexity and the unique limits on discovery against them. Further, the misgivings that any judge feels about issuing an order compelling agency action to begin with — about straining the agency's limited resources, disrupting its other legally required operations, and pushing it to act hastily on poor information — arise again, at higher intensity, when she actually picks up and aims the loaded weapon of a contempt sanction. For example, jailing or personally fining the agency's high officials could greatly disrupt agency operations well beyond the matter in suit, as could docking the agency budget. There is also the danger that sanctions might sap the kind of bureaucratic cooperation that the court needs,[41] especially if

---

[41] This point is made with respect to state and local defendants in institutional reform litigation in Hirschhorn, *supra* note 20, at 1842–43.

the order pertains to a challenging task like formulating a regulation or reorganizing a program. Sanctions might even, at the extreme, push officials to resign (and deter anybody else from stepping up as a replacement),[42] thus disabling the agency. A fine against the agency itself could perversely diminish the resources available to comply with the injunction (though, to be fair, the court could take the money from the fine and use it to fund compliance-related agency tasks, which might be a means to effectively force the agency to reallocate its funding).[43]

I should note that these factors counseling against sanctions apply in principle to *all* government defendants, not just federal ones. Consistent with that, contempt sanctions against *state and local* government defendants are rare in an absolute sense, though more common and more clearly available than sanctions against federal defendants.[44] This pattern is backward as a matter of doctrine, for the Supreme Court has repeatedly suggested that federal court remedies should be relatively soft against states, out of respect for federalism.[45] Yet the pattern makes sense in light of the factors cited in the preceding paragraph. State and local agencies have a norm of complying with federal court orders, but federal officials' norm is stronger, because states and localities are diverse, meaning they will sometimes be political "outliers" whose officials are especially averse to federal law.[46] Identifying officials responsible for noncompliance can be difficult in state or local agencies, but it is even harder in federal agencies, which enjoy a stronger shield against discovery.[47] And though judges fear disrupting state and local agencies'

---

[42] Some state and local officials resigned to avoid contempt in the nineteenth century. *See* Friedman, *supra* note 20, at 763. I have found no examples of this happening at the federal level. Note that while resignation would allow the official to escape completely from coercive civil contempt sanctions, it would not provide an escape from compensatory sanctions or criminal contempt sanctions for disobedience that occurred prior to resignation. Also, an official might regard resignation under public threat of contempt sanctions as sufficiently humiliating that he or she would be induced to comply ex ante.

[43] For an example of a federal court doing this against a state defendant, see *Trueblood v. Washington State Department of Social & Health Services*, No. C14-1178-MJP, at 19 (W.D. Wash. July 7, 2016), ECF No. 289 (order of civil contempt).

[44] On sanctions against state and local defendants, see sections I.A, II.A, and III.A.

[45] *See, e.g.*, Horne v. Flores, 557 U.S. 433, 448 (2009) ("Federalism concerns are heightened when . . . a federal-court decree has the effect of dictating state or local budget priorities."); Hutto v. Finney, 437 U.S. 678, 691 (1978) ("The principles of federalism that inform Eleventh Amendment doctrine surely do not require federal courts to enforce their decrees only by sending high state officials to jail.").

[46] WHITTINGTON, *supra* note 30, at 105–20; Justin Driver, *Constitutional Outliers*, 81 U. CHI. L. REV. 929 (2014).

[47] For instance, most federal courts hold that the deliberative process privilege enjoyed by federal agencies does not apply to state or local agencies. 2 DAVID M. GREENWALD ET AL., TESTIMONIAL PRIVILEGES § 9:13, at 653 (2015).

operations, they fear disrupting federal agencies' operations more, because the latter are more far-flung and on average more technically sophisticated.

Given all these reasons to avoid sanctions, and the judiciary's strong habit of avoiding them, it is natural to ask why judges are so reticent to admit their unwillingness to use contempt sanctions. Why don't the courts hold outright that sovereign immunity bars fines against agencies, that insuperable prudential obstacles block imprisonment or fines for officials, and that compliance depends upon officials' sense of duty, enforced by public expectations about the rule of law? After all, officials must, at some level, be aware that contempt sanctions are not practically in the cards, if only because none of them can think of examples of such sanctions being imposed in a way that sticks. Yet the judiciary seems dead set against coming out and saying this.

There are four reasons why this silence likely advances the judiciary's goal of having agencies comply with court orders. First, judicial silence leaves the door open to imposing sanctions in some future situation where an official, undeterred by shame, violates a court order so openly as to overcome the judiciary's grave concerns regarding assignment of responsibility, disruption of agency operations, and so forth. Perhaps sanctions would dissuade such an official.[48] Second, even if the chances of sanctions are extremely low, their remote possibility might have a disproportionate effect on officials' behavior, especially when it comes to imprisonment, as people tend to overweigh future events that are of very low probability but high salience.[49] Third, officials' sense of moral obligation to comply with law may depend partly on their perception of how seriously a legal norm is taken by society, and they may perceive the attachment of coercive sanctions (even nominally) as a signal of that seriousness, even if they have no actual fear that judges will employ sanctions.[50] Fourth, in the eyes of the officialdom and the public, the nominal availability of sanctions maintains the idea that administrative law is "real law," in the sense of being continuous with the law that applies between private persons, the government being "just another party" before the courts, and not above the law. If judges openly distinguished between the government and private parties on a matter as fundamental as the power to sanction, they would be diminishing jural equality between the state and each of its citizens and, with it, the status of the judiciary as a body apart from the state that sits in disinterested judgment on it.

---

[48] Then again, such official behavior, if it occurred, might reflect a larger breakdown of norms in the political environment, and judicial attempts to impose sanctions might lead to yet more breakdown.

[49] *See, e.g.*, Cass R. Sunstein & Richard Zeckhauser, *Overreaction to Fearsome Risks*, 48 ENVTL. & RES. ECON. 435 (2011).

[50] FREDERICK SCHAUER, THE FORCE OF LAW 103 (2015).

## I. Fines Against the Agency as an Institution

Contempt fines against a federal agency as an institution are vanishingly rare, especially compared with their use against private organizations and state and local governments. The very legal availability of fines against federal agencies is in doubt, due to sovereign immunity. On the thirteen occasions in our sources when federal judges have sought to impose such fines (or issue a determinate schedule of such fines to induce compliance), higher courts or other supervening bodies like the Judicial Panel on Multidistrict Litigation have consistently blocked them, with only three minor exceptions in district court cases involving small fines not appealed. Further, the blocking usually occurs for some case-specific reason, which the higher court sometimes bends over backward to find, thereby avoiding any disposition on sovereign immunity. Thus the judiciary holds back from imposing contempt fines or fine schedules while keeping quiet on whether such sanctions are available in principle.

### A. *The Baseline: Contempt Fines Against Nonfederal Institutions*

One might speculate that the rarity of contempt fines or fine schedules against federal agencies merely reflects the fact that such fines are generally not imposed, or perhaps even needed, when it comes to large institutional defendants, public or private. But that is not so. One can easily find examples of federal courts imposing contempt fines (or fine schedules inducing compliance) against private institutional defendants — in several cases large or well-known companies, in big sums, ranging from coercive civil,[51]

---

[51] Some of many possible examples are:

    a) When IBM failed to comply with a discovery order, the district judge scheduled fines of $150,000 per day, equal to about 5% of the company's average daily earnings. IBM Corp. v. United States, 493 F.2d 112, 114, 116 (2d Cir. 1973). With the fines stayed, the Second Circuit found the sanction unappealable, *id.* at 117–18, and the Supreme Court denied certiorari, 416 U.S. 995 (1974) (mem.), after which IBM apparently complied.

    b) When Eastern Air Lines initiated the sale of a subsidiary in violation of a collective bargaining agreement, the district judge held the airline in contempt and scheduled fines of $10,000 per day (about 3% of daily earnings from Eastern's last profitable year); the airline halted the transaction on the day the fines were to begin. Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines, Inc., 849 F.2d 1481, 1484 n.4 (D.C. Cir. 1988). The contempt order was later vacated on appeal. *Id.* at 1487. On Eastern's profits, see *Eastern Says Safety Probe Will Be a Drag on Earnings*, BALT. SUN, Aug. 18, 1988, at 8C.

    c) In a suit to enforce a Federal Election Commission subpoena, the district court scheduled daily fines against Jesse Jackson's Rainbow Coalition of $1000 per day, doubling every five days ad infinitum. Docket Entry No. 11, FEC v. Jackson, No. 1:94-mc-00143 (D.D.C. Sept. 28, 1994) (describing order). The Coalition complied before fines began accruing. *See* Docket Entry No. 17, *Jackson*, No. 1:94-mc-00143 (describing order).

    d) In a suit by Motorola and Nokia against the Turkish telecom firm Telsim, the district court enjoined Telsim and its controlling individuals to transfer certain shares to the court's registry, under threat of a contempt fine of $1.7 *billion*. Nokia Corp. v. Uzan, 425 F.3d 1005, 1006 (2d Cir.

to criminal,[52] to compensatory.[53]

When it comes to state government defendants in federal court, contempt fines are rare compared to private defendants, but much more common than for federal defendants. Thus, the Third Circuit in 1982 upheld coercive civil fines of $10,000 per day against the Pennsylvania Department of Public Welfare (with the Department actually paying over $1.2 million, which it never got back).[54] The court faced no claim of state sovereign immunity, but other circuits have rejected such claims. For example, the First Circuit held that sovereign immunity did not bar coercive civil fines against the Massachusetts Department of Public Welfare of $100 per applicant per sixty days of delay.[55] The court reasoned that, because the district court surely had power to enjoin the state

---

2005). Defendants failed to make the transfer, the fine was imposed, and the Second Circuit dismissed the appeal. *Id.* at 1006–07.

    e) In a dispute between Telenor, Norway's largest telecom company, and Alfa Group, the Russian investment giant, the district court enjoined Alfa to comply with its side of an agreement, and when Alfa refused, the court imposed daily fines of $100,000, doubling every month ad infinitum. Telenor Mobile Commc'ns AS v. Storm LLC, 587 F. Supp. 2d 594, 621 (S.D.N.Y. 2008); *Alfa Units Lose Ruling to Telenor*, WALL ST. J., Nov. 21, 2008, at B4. Fines accrued from December 4 to 16 (that is, to $1.2 million at the $100,000 per diem rate) by the time Alfa complied, and the district judge remitted the fines, as Alfa had complied "as soon as was practicable following the Contempt Order." Telenor Mobile Commc'ns AS v. Storm LLC, No. 07 Civ. 6929, at 3 (S.D.N.Y. Dec. 19, 2008) (order), ECF No. 86.

    f) When Biolitec undertook a merger to put its assets beyond reach for collection of a judgment, the district court enjoined the merger, with monthly fines escalating from $1 million to $8 million per month, at which monthly amount they would continue to accrue indefinitely. Angiodynamics, Inc. v. Biolitec AG, 780 F.3d 420, 427 n.4 (1st Cir. 2015). Fines accumulated to $160 million, at which point the First Circuit said they should "cease to accrue at some total amount." *Id.* at 428. The district judge opted for $70 million. Y. Peter Kang, *Biolitec's Contempt Fine Capped at $70M in IP Dispute*, LAW360 (Apr. 24, 2015), https://www.law360.com/articles/647832/biolitec-s-contempt-fine-capped-at-70m-in-ip-dispute [https://perma.cc/W73F-8CSL].

    g) The Foreign Intelligence Surveillance Court ordered Yahoo to comply with a government surveillance program. Yahoo moved for a stay pending appeal; the government responded by moving for an order of civil contempt, requesting that if the company failed to comply within 24 hours of denial of the stay that the court impose daily fines of $250,000 doubling each week ad infinitum. Government's Motion for an Order of Civil Contempt, *In re* Directives to Yahoo Inc. Pursuant to Section 105B of the Foreign Intelligence Surveillance Act, No. 105B(g): 07-01 (F.I.S.C. May 9, 2008). The court denied the stay hours after the government's motion and warned that if Yahoo did not comply within five days, "the Court anticipates issuing a civil contempt order requiring payment of coercive fines." Order, *Directives to Yahoo Inc.*, No. 105B(g): 07-01. Yahoo complied. *Fines in NSA Dispute Might Have Bankrupted Yahoo*, WASH. POST, Sept. 16, 2014, at A13.

  [52] United States v. Greyhound Corp., 370 F. Supp. 881, 885 (N.D. Ill. 1974) (fining Greyhound $600,000, about 1% of annual profit), *aff'd*, 508 F.2d 529 (7th Cir. 1974).

  [53] When the Allied Pilots Association crippled American Airlines by conducting a "sick out," a district court imposed a $45 million fine on the Association. Am. Airlines, Inc. v. Allied Pilots Ass'n, 228 F.3d 574, 576 (5th Cir. 2000). The fine exceeded the Association's assets by about $10 million and forced it to place $20 million in escrow. *Pilots' $45.5 Million Fine Upheld*, WASH. POST, Feb. 27, 2001, at A15.

  [54] Halderman v. Pennhurst State Sch. & Hosp., 673 F.2d 628, 634–35 (3d Cir. 1982), *aff'g* 533 F. Supp. 641 (E.D. Pa. 1982).

  [55] Fortin v. Comm'r of the Mass. Dep't of Pub. Welfare, 692 F.2d 790, 797–98 (1st Cir. 1982).

agency (nominally the agency's top official), coercive civil fines were available by the same principle, being "ancillary to [the court's] power to order compliance with the law."[56]  The Fourth Circuit used the same reasoning to uphold structurally identical fines against the North Carolina state welfare department.[57]  The Fifth Circuit similarly upheld coercive civil fines for jail overcrowding of $50 per prisoner per day.[58]  To take a spectacular example from the district court level, in a suit against the Alabama Department of Transportation under Title VII, which abrogates state sovereign immunity, the judge between 2000 and 2009 collected over $19 million in coercive civil contempt fines for violations of a consent decree;[59] as of 2014, about $14 million worth of these fines remained in the court registry.[60]

For local governments, which have no sovereign immunity at all, federal court contempt fines are, again, much more common than for federal defendants.  In a housing desegregation suit against Yonkers, when the city council refused to pass an ordinance necessary to comply with a consent decree, the district judge imposed daily fines against the city escalating to $1 million per day.[61]  The city, whose annual budget was $337 million,[62] incurred fines totaling over $1 million, laid off 630 city workers, and closed down facilities, such as libraries, before the council gave in.[63]  There are additional instances of coercive fines against localities in the context of litigation over jail conditions: fines of $5000 per day of noncompliance,[64] or fines of $250 per day per overpopulated dormitory,[65] or fines of $300 per day per inmate.[66]  And there are yet more examples if we consider fines against local government officials

---

[56] *Id.* at 798.

[57] Alexander v. Hill, 707 F.2d 780, 782–85 (4th Cir. 1983).

[58] Alberti v. Klevenhagen, 46 F.3d 1347, 1357, 1359–60 (5th Cir. 1995).

[59] Reynolds v. Ala. Dep't of Transp., No. 85-cv-00665-MHT, at 3 (M.D. Ala. Mar. 20, 2009) (report and recommendation of special master), ECF No. 8378.

[60] Mike Cason, *After 29 Years, $300 Million, Discrimination Case Against Alabama DOT Not Over Yet*, AL.COM (July 2, 2014), http://www.al.com/news/index.ssf/2014/07/after_29_years_300_million_dis.html [https://perma.cc/DEP9-8YDP].  Another district court imposed over $20 million in daily fines on the state of Arizona in a successful effort to force the legislature to pass a statute on education funding.  Horne v. Flores, 557 U.S. 433, 442 (2009).  The fines were later vacated on case-specific grounds, though the statute they prompted remained on the books.  *Id.* at 444.

[61] LISA BELKIN, SHOW ME A HERO 89 (1999).

[62] *Id.* at 18.

[63] *Id.* at 85–102.  The fines against the city were sufficient to induce compliance even though the Supreme Court stayed and eventually reversed a separate set of contempt sanctions against individual city council members. Spallone v. United States, 493 U.S. 265, 273, 280 (1990).

[64] Mobile Cty. Jail Inmates v. Purvis, 551 F. Supp. 92, 97 (S.D. Ala. 1982) (noting that the fines against the officials in their official capacities would "ultimately burden the taxpayers of this community," *id.* at 98).

[65] Twelve John Does v. District of Columbia, 855 F.2d 874, 876 (D.C. Cir. 1988).

[66] Stone v. City & Cty. of S.F., 145 F.R.D. 553, 555 (N.D. Cal. 1993) (noting that fines against defendants, who included the city, accrued from September 1992 through January 1993, *id.* at 562).

EPA_00048983

who are indemnified by their governments, which I discuss later in section III.A.

## B. Uncertain Doctrine

There is a fraught legal question about contempt fines against federal agencies, which the courts have mostly avoided addressing: are such fines barred by federal sovereign immunity? There are two reasons why they might not be. First, sovereign immunity might be waived, most plausibly by 5 U.S.C. § 702. Second, sovereign immunity might be overridden by the separation of powers. My purpose here is not to answer these questions, but only to show they are sufficiently open as to create a backdrop of uncertainty for actual judicial behavior (analyzed later in section I.C).

*1. Is Sovereign Immunity Waived by 5 U.S.C. § 702?* — The federal government is immune to suit unless Congress has consented, in a statute, by an express waiver of sovereign immunity.[67] When Congress enacts such a waiver, it may limit the waiver to certain kinds of relief and not others.[68]

That said, our present regime of litigation against federal agencies came into being without the aid of a waiver of sovereign immunity. Ever since the nineteenth century, federal courts allowed plaintiffs to partly circumvent that immunity: a plaintiff could sue the individual official through whom the agency acts (say, the official vested with the agency's statutory powers) for injunctive relief against that official (though not damages), at least so long as the challenged action was beyond the agency's constitutional or statutory authority.[69] This meant that plaintiffs, even without a waiver of federal sovereign immunity, could often *effectively* sue federal agencies, though only for prospective relief. Causes of action on this model were frequently created by the federal courts under their equity powers in the late 1800s and early 1900s.[70]

The regime was ratified in 1946 in the APA, which originally contained no waiver of sovereign immunity yet said that reviewing courts could "compel" or "set aside" agency action and that the "form of pro-

---

[67] ERWIN CHEMERINSKY, FEDERAL JURISDICTION § 9.2.1 (7th ed. 2016).

[68] Indeed, if a statute waives sovereign immunity and expressly authorizes certain relief, it will often be construed to bar, by implication, all other relief. 14A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3659, at 61 (3d ed. 1998).

[69] CHEMERINSKY, *supra* note 67, § 9.2.2; Vicki C. Jackson, *Suing the Federal Government: Sovereignty, Immunity, and Judicial Independence*, 35 GEO. WASH. INT'L L. REV. 521, 553–57 (2003).

[70] John F. Duffy, *Administrative Common Law in Judicial Review*, 77 TEX. L. REV. 113, 121–30 (1998).

ceeding for judicial review" would include "actions for declaratory judgments or writs of prohibitory or mandatory injunction."[71] Though the APA and various enabling acts provided for much judicial review in the decades after 1946, the lack of a general waiver of sovereign immunity for review of agency action caused confusion about just when such review was available.[72]

To simplify matters, Congress in 1976 enacted the well-known general waiver of sovereign immunity for nondamages relief that appears in 5 U.S.C. § 702:

> An action in a court of the United States seeking *relief other than money damages* and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.[73]

The key phrase — "relief other than money damages" — clearly encompasses injunctions and declaratory judgments, which were the common forms of relief against federal agencies leading up to 1976 and are expressly contemplated in the APA.

Note that, although the waiver for nondamages relief is codified as part of the APA in 5 U.S.C. § 702, its applicability is not confined to suits that plaintiffs bring under the APA. Thus, even if a plaintiff takes her cause of action from pre-APA federal equity or from a statute besides the APA, she can still invoke § 702, so long as she is suing a federal agency for "relief other than money damages."[74]

What does all this mean for contempt fines? Section 702 surely waives immunity to injunctions against federal agencies. But if the agency disobeys the injunction and the court imposes contempt fines on the agency, does the lawsuit, insofar as contempt fines are involved, *become* an action seeking "money damages," which § 702 excepts from its waiver? If the fines are of the compensatory civil variety, one might argue that such fines are almost identical to money damages, since they involve money coming from the federal government and going to compensate a plaintiff for a loss. If the fines are of the civil coercive or criminal variety, the argument against waiver is weaker but perhaps still sufficient: the money need not go to the plaintiff (it goes by default into the court's registry), and its amount is not measured by the plaintiff's loss, but it does come from the federal government's coffers. However,

---

[71] Ch. 324, § 10(b), (e), 60 Stat. 237, 243 (1946) (codified as amended at 5 U.S.C. §§ 703, 706 (2012)).

[72] CHEMERINSKY, *supra* note 67, § 9.2, at 676.

[73] 5 U.S.C. § 702 (2012) (emphasis added).

[74] Raz v. Lee, 343 F.3d 936, 938 (8th Cir. 2003) (collecting cases from the Third, Eighth, and Ninth Circuits); Chamber of Commerce v. Reich, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("The APA's waiver of sovereign immunity applies to any suit whether under the APA or not."); Sea-Land Serv., Inc. v. Alaska R.R., 659 F.2d 243, 244 (D.C. Cir. 1981).

plaintiffs might counter that (a) sovereign immunity is clearly waived for injunctions and (b) coercive civil contempt fines and criminal contempt fines are historically incident to injunctions and practically necessary to injunctions' effectiveness. When § 702 authorizes injunctive relief, so the argument goes, it authorizes all varieties of contempt fines by necessary implication. But yet again, § 702 does not explicitly mention contempt fines of any kind, and the Supreme Court has long said that "[a] waiver of [federal] sovereign immunity must be unequivocally expressed in statutory text" and that such waivers are to be strictly construed in favor of the government.[75]

The leading Supreme Court case construing the phrase "money damages" in § 702, *Bowen v. Massachusetts*,[76] provides some support for the idea of a waiver as to coercive and criminal fines but not compensatory ones, though the case is probably not dispositive for any category. *Bowen* concerned the federal Medicaid statute and HHS regulations thereunder, which obligate HHS to pay certain sums to the states.[77] HHS determined that certain services provided under the Massachusetts Medicaid program were not covered by the statute or by HHS regulations and refused to pay for them.[78] Massachusetts sued HHS to challenge the refusal, seeking an order that HHS pay the money allegedly owed under the Medicaid act.[79] HHS invoked sovereign immunity,

---

[75] Lane v. Pena, 518 U.S. 187, 192 (1996). For an application of this approach to find that certain environmental statutes do not waive federal sovereign immunity to punitive fines (similar to criminal contempt fines), see *U.S. Department of Energy v. Ohio*, 503 U.S. 607, 628 (1992). One commentator argues that, while the Supreme Court is holding fast to the principle that the waiver itself requires unequivocal textual expression, the Court has been gradually but steadily losing faith in the idea that a waiver, once recognized, should be strictly construed, as opposed to being construed according to its ordinary meaning. Gregory C. Sisk, *Twilight for the Strict Construction of Waivers of Federal Sovereign Immunity*, 92 N.C. L. REV. 1245 (2014). However, the Court has not expressly repudiated the strict-construction principle. Further, the line between requiring an unequivocal expression of the waiver itself and strictly construing the waiver once recognized is a blurry one. Witness *FAA v. Cooper*, 566 U.S. 284 (2012), in which the majority invoked the unequivocal-expression principle to interpret "actual damages" to include only economic damages. *Id.* at 299. Relatedly, a leading treatise states, on the basis of a 2008 case, that "use of strict construction . . . is on the wane," and it cites three cases in the Federal Circuit and Court of Federal Claims between 2008 and 2010 to support the proposition that "[s]ome lower courts have read [a 2008 case from the Supreme Court] as marking a change in the Court's interpretive approach to statutes involving sovereign immunity." 14 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3654 (4th ed.) (Westlaw) (database updated April 2017). However, the treatise also says in the same passage: "[C]ourts at every level of the federal judiciary have applied a rule of strict construction to determine whether the Government's waiver encompasses monetary relief such as compensatory damages, punitive damages, attorneys' fees, and pre-judgment and post-judgment interest." *Id.* In support of this proposition, the treatise cites dozens of lower court cases, many of them more recent than 2010. *Id.*

[76] 487 U.S. 879 (1988).

[77] *Id.* at 883–84.

[78] *Id.* at 879.

[79] *Id.*

contending that an order to pay money would be "money damages" under § 702.[80]  The Supreme Court rejected this argument, holding that an order to pay the sum owed under the Medicaid statute and regulations was "specific" relief, giving plaintiff the "very thing" it was owed, in contrast to "money damages," which are defined as "a sum of money used as compensatory relief . . . given to the plaintiff to *substitute* for a suffered loss."[81]  "The fact that a judicial remedy may require one party to pay money to another," said the Court, "is not a sufficient reason to characterize the relief as 'money damages.'"[82]

*Bowen*'s definition of "money damages" as compensatory and substitutionary suggests the term includes compensatory contempt fines (which are measured by plaintiff's loss and go into plaintiff's pocket) but not coercive civil or criminal contempt fines (which are not measured by plaintiff's loss and normally do not go into plaintiff's pocket).  Further, *Bowen* repudiates the idea that "money damages" encompasses all governmental monetary payments, further weakening the argument that the term includes coercive civil or criminal fines.

That said, the actual holding of *Bowen* can be understood narrowly: that § 702 waives immunity for the kind of relief at issue in that case, that is, an order that an agency pay money to which plaintiff is entitled under a statute.[83]  Contempt fines are quite different: nobody is entitled to them under any statute, for they are imposed "at [the court's] discretion."[84]  Further, one might argue that contempt fines — particularly of the coercive civil and criminal variety — are sui generis and do not fit either of the two archetypes on which *Bowen* focuses (a compensatory payment versus specific relief ordering payment of a statutory entitlement).  My research on the use of *Bowen* in the lower courts turns up nothing on contempt fines specifically.  The decision generally has not been read expansively.[85]

*2. Is Sovereign Immunity Overridden by the Separation of Powers?* — Even if sovereign immunity is not waived as to contempt fines, one might argue that a different doctrine counsels in favor of federal government liability for such fines: the separation of powers, and particularly the vesting of "the judicial power" in the federal courts under Article III.  That Article "gives the Federal Judiciary the power, not merely to rule on cases, but to *decide* them."[86]  The judicial power might

---

[80] *See id.* at 887.
[81] *Id.* at 895 (quoting Md. Dep't of Human Res. v. Dep't of Health & Human Servs., 763 F.2d 1441, 1446 (D.C. Cir. 1985)).
[82] *Id.* at 893.
[83] *See id.* at 910.
[84] 18 U.S.C. § 401 (2012).
[85] GREGORY C. SISK, LITIGATION WITH THE FEDERAL GOVERNMENT § 4.13, at 348–58 (2016).
[86] Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 218–19 (1995).

be understood to include the power to enforce judgments, which, in turn, might be understood to necessitate contempt sanctions like fines, even against the government.[87]  Without such an enforcement mechanism, the argument goes, judicial rulings against the government amount to unconstitutional advisory opinions.[88]

There are no Supreme Court cases applying separation of powers principles to contempt fines against the government, but we may look to another line of cases that is indirectly relevant.  This line of cases applies separation of powers principles to congressional limitations on the judicial contempt power.  In the Clayton Antitrust Act of 1914,[89] Congress regulated the judicial contempt power by mandating a jury trial for criminal contempt, upon the demand of the accused, if the allegedly contemptuous conduct also violated a federal criminal statute.[90] The Supreme Court upheld this congressional intervention, but did so on the ground that it was a relatively modest one.[91]  The Court warned that "the attributes which inhere in [the contempt power] and are inseparable from it can neither be abrogated nor rendered practically inoperative [by Congress]."[92]  But the contempt power could legitimately "be regulated within limits not precisely defined."[93]  The Clayton Act regulation was narrow and thus permissible, but "a different and more serious question would arise" if Congress purported to limit coercive civil contempt or compensatory civil contempt.[94]  More recently, the Court reiterated that Congress can regulate the contempt power only within limits and cannot render it "practically inoperative."[95]  Further, it said federal courts must have the option of appointing private attorneys to prosecute criminal contempt if government prosecutors refused to do so,[96] since federal courts should not be left "at the mercy of another Branch," the Executive, in enforcing their judgments.[97]

---

[87] Appellants' Opening Brief at 15–17, United States v. Waksberg, 112 F.3d 1225 (D.C. Cir. 1997) (No. 95-5165).

[88] *Id.* at 17.

[89] Pub. L. No. 63-212, 38 Stat. 730.

[90] *Id.* §§ 21–22, 38 Stat. at 738–39 (codified at 15 U.S.C. §§ 12–27 (2012), 29 U.S.C. §§ 52–53).

[91] *See* Michaelson v. United States *ex rel.* Chi., St. Paul, Minneapolis & Omaha Ry. Co., 266 U.S. 42, 66 (1924).

[92] *Id.*

[93] *Id.*

[94] *Id.  See generally* Pushaw, *supra* note 21, at 768–71.

[95] Young v. United States *ex rel.* Vuitton et Fils S.A., 481 U.S. 787, 799 (1987) (quoting *Michaelson*, 266 U.S. at 66).

[96] *Id.* at 801.

[97] *Id.* at 796.

These cases suggest that the contempt power enjoys some level of constitutional protection vis-à-vis the other branches. But federal sovereign immunity, too, is arguably of constitutional status.[98] And the cases on congressional regulation of contempt, neither of which involved a federal government defendant, say nothing direct about how the contempt power relates to sovereign immunity.

## C. Judicial Behavior: Blocking Fines While Avoiding Big Questions

Given the uncertainties in the doctrinal framework, what do judges actually do when it comes to contempt fines against federal agencies? In this section, I discuss all the suits we found in which any federal court, at any stage of the litigation, attempted to impose contempt fines or a determinate fine schedule on a federal agency (thirteen cases) or held that a contempt fine is barred by sovereign immunity (five cases).[99] That gives us a universe of eighteen cases altogether. The agency was represented by DOJ in all these cases (except one of the minor-fine ones).[100] I devote section I.C.1 to the four cases in which the agency did not assert sovereign immunity and section I.C.2 to the fourteen cases in which it did.

*1. When Agencies Don't Assert Sovereign Immunity, They Suffer Negligible Losses.* — Of the four cases in which the government did not raise sovereign immunity, three are significant in that they are the only cases we found where fines against the agency "kicked in," that is, where the agency actually incurred fines or complied in the face of an unstayed fine schedule. But really, these are the exceptions that prove the rule of contempt fines' virtual absence in administrative law: they were all minor disputes, with small fines, which the government did not appeal, thus setting no precedent. In the first of these three cases, the district court imposed fines of $500 per day to force the agency to pay an individual employment discrimination award.[101] The government complied quickly, apparently never incurring an actual fine; indeed it seems the agency was planning to comply anyway and was delayed only because

---

[98] *In re* Sealed Case, 192 F.3d 995, 1000 n.7 (D.C. Cir. 1999). *See* Paul F. Figley & Jay Tidmarsh, *The Appropriations Power and Sovereign Immunity*, 107 MICH. L. REV. 1207, 1210 (2009) ("[T]he connection between sovereign immunity and the appropriations power is stronger and closer than is usually believed."); Jackson, *supra* note 69, at 543–45 (summarizing an argument that Article I's discussion of "Congress's role over taxing and spending" forms part of the basis for federal sovereign immunity, *id.* at 544).

[99] In this set of five cases, I include *Sealed Case*, 192 F.3d 995, because the court relied on the credibility of the sovereign immunity claim to allow an interlocutory appeal that halted the contempt proceeding. *See id.* at 999 ("We think that OIC's substantial claim of immunity from the proceedings ordered by the district court suffices to entitle OIC to an interlocutory appeal.").

[100] In *Crouche v. Shalala*, No. 98-3462 (E.D. Pa. 1999), discussed *infra* text accompanying notes 104–05, the Secretary of Health and Human Services was represented by Social Security Administration attorneys. Docket Sheet, *Crouche*, No. 98-3462.

[101] Henderson v. Orr, No. C-3-81-554, 1987 WL 19715, at *2 (S.D. Ohio May 5, 1987).

*ENDGAME OF ADMINISTRATIVE LAW*

of administrative errors.[102] In the second, the district court imposed a compensatory contempt fine of $1000 on HHS to make up for consequential harm arising from the agency's failure to pay court-ordered benefits,[103] and the agency presumably paid it. In the third, the district court imposed fines of $100 per day (to begin three weeks hence) to force the agency to calculate and pay the plaintiff's Social Security benefits;[104] just before the fines were to start, the government announced it had complied.[105] (In the fourth, the district judge sought to impose criminal contempt fines and daily coercive civil contempt fines on the agency for late compliance in an individual employment case, but DOJ got the Ninth Circuit to stay the sanctions immediately and then invalidate them on case-specific grounds.[106])

*2. When Agencies Assert Sovereign Immunity, They Always Win, if Not Always Because of the Defense.* — DOJ has routinely and aggressively asserted sovereign immunity to contempt fines against agencies. It did so in fourteen of the seventeen of our cases involving such fines in which it represented the agency and in all twelve of them that it has litigated since 1991. DOJ's invocation of sovereign immunity to such fines has been common across its many internal offices and across the administrations of Presidents Bush I, Clinton, Bush II, and Obama. DOJ's theory extends not just to compensatory civil fines (the easiest lift) but more aggressively to coercive civil fines[107] and criminal

---

[102] Government counsel said at the initial contempt hearing that "the checks were now before the Treasury for processing and printing." *Id.* at *1. Though the filings have been destroyed, the docket sheet, in Entry 47, says that after the date on which the fines were to begin, the judge canceled the follow-up contempt hearing he had initially scheduled when imposing the daily fines and "declin[ed] to award a penalty of $500 against the government." Docket Entry No. 47, Henderson v. Air Force Avionic Lab. WPAFB, No. C-3-81-554, 1987 WL 19715 (S.D. Ohio 1987). The case was later dismissed "due to satisfaction of all claims." Docket Entry No. 48, *Henderson*, No. C-3-81-554, 1987 WL 19715.

[103] Hinton v. Sullivan, 737 F. Supp. 232, 241 (S.D.N.Y. 1990).

[104] *Crouche*, No. 98-3462, ECF No. 18 (order).

[105] Commissioner's Notification of Compliance with the Court's Order Dated July 29, 1999, *Crouche*, No. 98-3462, ECF No. 19.

[106] Clemente v. United States, 766 F.2d 1358, 1362, 1367 (9th Cir. 1985). On the structure of the fines and the immediate stay, see Brief for Appellants at 16, 94, *Clemente*, 766 F.2d 1358 (Nos. 83-6187, 83-6188, 83-6430).

[107] See these briefs:

*Civil Division Appellate Staff Under Presidents Bush I and Clinton:* Brief for the Appellants at 47, Project B.A.S.I.C. v. Kemp, 947 F.2d 11 (1st Cir. 1991) (No. 91-1612); Reply Brief for the Appellants at 12, *Project B.A.S.I.C.*, 947 F.2d 11 (No. 91-1612); Brief for the Appellants at 19–20, Armstrong v. EOP, 1 F.3d 1274 (D.C. Cir. 1993) (Nos. 93-5002, 93-5048, 93-5156).

*Office of Immigration Litigation Under President Clinton:* Defendants' Memorandum of Points and Authorities in Opposition to Plaintiffs' Contempt Motion & in Support of Defendants' Motion to Modify Injunction at 9, Serquina v. United States, No. CV 93-0129 (C.D. Cal. July 31, 1995), ECF No. 96.

*Office of Federal Programs Under President Bush II:* Defendant's Response to Order to Show Cause at 26–27, 33–34, John Doe #1 v. Rumsfeld, No. 03-707 (D.D.C. Feb. 28, 2005), ECF No. 69.

fines.[108]

When DOJ invokes sovereign immunity to contempt fines, it always wins on the issue of whether fines should actually be imposed or scheduled, though the judicial rationales leading to government victory are never sweeping and are usually confined to the individual case. In response to DOJ's fourteen invocations of sovereign immunity in these cases, the courts have sometimes recognized immunity for limited categories of fines (four cases), or, more commonly, have blocked the fines on a case-specific ground (ten cases), thus handing victory to the government on the imposition of fines in the particular dispute without making a general pronouncement on immunity. In several cases in this latter category, the judiciary bends over backward to find a case-specific ground for blocking the fines.

The courts' few explicit acceptances of the sovereign immunity claim are less important, practically, than their inarticulate yet reliable pattern of finding case-specific grounds to avoid imposing fines in all other instances where DOJ raises sovereign immunity. Explicit holdings accepting the sovereign immunity claim have occurred in only a few courts of appeals (not including the D.C. Circuit) and apply only to limited categories of cases, most quite narrow. By contrast, the pattern of refraining from fines on case-specific grounds — and sometimes stretching to do so — has repeated itself in several cases of high substantive consequence (especially within the D.C. Circuit).

Strikingly, our search turns up *no* cases in which the judiciary has imposed a contempt fine, or allowed a determinate contempt-fine schedule to go forward to the point of eliciting agency compliance, in the face of an agency's invocation of sovereign immunity. Several district judges have sought to wield the weapon of contempt fines, but higher courts (or, in one instance, the MDL Panel and its transferee judge) have always found a way to block them. Further, every district court decision

---

*Environmental and Natural Resources Division Under Presidents Bush II and Obama:* Federal Defendants' Opposition to Order to Show Cause at 17, Am. Rivers v. Army Corps of Eng'rs, No. 03-00241 (D.D.C. July 20, 2003), ECF No. 108; Defendants' Response to Plaintiff Miccosukee Tribe of Indians' Memorandum on Remedies at 15–19, Miccosukee Tribe of Indians of Fla. v. United States, 706 F. Supp. 2d 1296 (S.D. Fla. 2010) (No. 04-21448), ECF No. 389.

[108] See these briefs:

*Criminal Division Under President Clinton:* DOJ's position is noted in *In re Sealed Case*, 192 F.3d 995, 998 (D.C. Cir. 1999), which also notes that government counsel was James K. Robinson (head of the DOJ Criminal Division), *id.* at 996.

*Environmental and Natural Resources Division Under President Bush II:* Defendant's Response to Order to Show Cause, *supra* note 107, at 26–27.

The cases cited in this note and the preceding one do not map perfectly onto the universe of eighteen cases that is the focus of this section, because some — besides *Crouche,* the one case without DOJ representation — are cases in which DOJ took a position on sovereign immunity but the court never reached the point of imposing a fine or fine schedule or holding fines barred by sovereign immunity.

rejecting an agency claim of sovereign immunity to contempt fines has been vacated (except one, but there, the case was later transferred to a different judge who stayed the fines indefinitely[109]).

Let us first consider the minority of cases (four) in which DOJ's claim of sovereign immunity has been accepted. All these holdings are limited. One dealt with the Federal Tort Claims Act[110] (FTCA), two with the criminal context (in which § 702 does not apply), and one with international trade statutes. By implication, separation of powers concerns were insufficient to override the baseline of sovereign immunity, but the courts neither embraced that argument directly nor grappled with the express waiver in § 702.

Of the four, the case with broadest application to administrative law is *Coleman v. Espy*,[111] a class action against the Farmers Home Administration (FmHA) for doing too little to notify farmers who borrowed from the federal government of debtor-friendly repayment options.[112] The district court enjoined FmHA to follow beefed-up procedures, but agency employees sometimes failed to do so.[113] Several farmers lost their homes to foreclosure, and they claimed this would not have happened if FmHA had followed the court-ordered procedures.[114] The farmers sought compensatory civil contempt fines for the loss of their homes and consequential harms.[115] The Eighth Circuit in *Coleman* shut down all such claims by holding that sovereign immunity bars compensatory civil contempt fines against federal agencies.[116] Yet while *Coleman* has proven to be one of the most-cited opinions from the sparse case law on federal sovereign immunity to contempt, the case is actually pretty limited. It is only one circuit. The opinion says nothing about coercive civil contempt fines or criminal contempt fines. And it strangely fails to address the § 702 waiver argument despite a dissent in an earlier related Eighth Circuit case that raised it.[117] Instead, *Coleman* emphasized that compensatory civil contempt fines would disrupt Congress's careful limitations on its waivers of sovereign immunity in statutes like the FTCA.[118]

Besides *Coleman*, the other three cases in which courts accepted DOJ's sovereign immunity claim have little application to most agency

---

[109] *Am. Rivers*, 274 F. Supp. 2d 62, discussed *infra* text accompanying notes 260–282.
[110] 28 U.S.C. § 1346(b) (2012).
[111] 986 F.2d 1184 (8th Cir. 1993).
[112] *Id.* at 1188–89.
[113] *Id.*
[114] *See id.*
[115] *Id.*
[116] *Id.* at 1189–92.
[117] *See* McBride v. Coleman, 955 F.2d 571, 580–81 (8th Cir. 1992) (Lay, C.J., dissenting).
[118] *Coleman*, 986 F.2d at 1192.

*HARVARD LAW REVIEW* [Vol. 131:685

litigation. In *United States v. Horn*,[119] the district court, invoking its supervisory power and not its contempt power, imposed an award of attorneys' fees on the government in a criminal case for prosecutorial misconduct.[120] The First Circuit held that sovereign immunity barred such an award, noting that the prosecutor's misconduct "perhaps could have been punished under the contempt statute," 18 U.S.C. § 401, but that the statute did not "overrun sovereign immunity."[121] Further, in rejecting the defendants' argument that the separation of powers necessitated empowering courts to sanction the government, the court noted several alternative means of controlling recalcitrant prosecutors (personal monetary sanctions, removal from the case, public reprimand, and so forth)[122] and then stated, more broadly, that "there is nothing sacrosanct about the courts' power to impose sanctions."[123] Crucially for us, the First Circuit had no occasion to address the § 702 waiver argument, as that provision applies only to nondamages civil suits against the government, not to criminal prosecutions like *Horn*. Similarly, in *United States v. Droganes*,[124] another criminal case, the government seized the defendant's property and violated a court order by failing to return it, but when the defendant sought compensatory civil contempt fines, the district court held them barred by sovereign immunity, and the Sixth Circuit affirmed.[125] As in *Horn*, § 702 was not in play because the context was criminal. Yet another narrow case is *Yancheng Baolong Biochemical Products Co. v. United States*,[126] in which the Commerce Department violated a preliminary injunction in how it processed imports.[127] The Court of International Trade held the Department in contempt, and the plaintiff sought "contempt damages" in the form of attorneys' fees, but the court said Congress had not waived sovereign immunity to such awards.[128] The Federal Circuit affirmed.[129] The opinion's reasoning might be broad enough to cover not just compensatory civil contempt fines but all types of contempt fines. Yet, importantly for us, the discussion of immunity and waiver was confined to the specific statutes and rules governing the Court of International Trade; the opinion never addressed § 702 or separation of powers.[130]

[119] 29 F.3d 754 (1st Cir. 1994).
[120] *Id.* at 759–60.
[121] *Id.* at 764 n.11; *see also id.* at 763, 765 n.13.
[122] *Id.* at 766–67.
[123] *Id.* at 767.
[124] 728 F.3d 580 (6th Cir. 2013).
[125] *See id.* at 584–85, 588–90.
[126] 406 F.3d 1377 (Fed. Cir. 2005).
[127] *Id.* at 1379–80.
[128] *Id.*
[129] *Id.* at 1383.
[130] *See id.* at 1382–83.

EPA_00048993

Now let us shift to the majority of cases (ten) in which the judiciary dodged DOJ's claim of sovereign immunity while finding a case-specific ground to shield the agency from contempt fines, sometimes stretching to do so. The most striking and illuminating of these cases — in showing the judiciary's unofficial yet reliable commitment to avoid imposing sanctions — are the four that have occurred within the D.C. Circuit, all between 1993 and 2003. Below I explain how the judiciary found a way out in these four cases.[131]

---

[131] The remaining six are:

(1) Ferrell v. Pierce, 785 F.2d 1372, 1376–83, 1386 (7th Cir. 1986) (rejecting district court's finding that HUD was in violation of a class action consent decree, thereby avoiding "difficult legal questions" about whether the court could impose compensatory civil contempt fines, *id.* at 1386, which the district court had announced plans to do but had not yet done, *id.* at 1376). Though HUD had argued sovereign immunity in the district court and lost, Ferrell v. Pierce, No. 73 C 334, 1985 WL 5161, at *28, *32 (N.D. Ill. Mar. 22, 1985), the agency urged the Seventh Circuit to avoid the question and simply reverse on the merits, Brief for Appellants at 50 n.32, *Ferrell*, 785 F.2d 1372 (No. 85-2186); Reply Brief for Appellants at 11–14, *Ferrell*, 785 F.2d 1372 (No. 85-2186).

(2) Barry v. Bowen, 884 F.2d 442, 443–44 (9th Cir. 1989) (holding that the district court's imposition of a $2200 criminal contempt fine on HHS was an abuse of discretion because it was disproportionate to the agency's violation, which was a mere twenty-two-day delay in paying an award of attorneys' fees under the Equal Access to Justice Act (EAJA); stating that "[d]oubts assail us" that a waiver of sovereign immunity can be found in the EAJA, *id.* at 444; and suggesting that a waiver cannot be found elsewhere, but oddly not mentioning § 702, *id.*). The opinion's dictum expressing "[d]oubts" about a waiver was so strongly worded that subsequent courts have mistaken it for the holding of the case. United States v. Horn, 29 F.3d 754, 763 (1st Cir. 1994); McBride v. Coleman, 955 F.2d 571, 576 (8th Cir. 1992).

(3) Project B.A.S.I.C. v. Kemp, 947 F.2d 11, 15–19 (1st Cir. 1991) (rejecting district court's imposition of a per diem coercive civil contempt fine against HUD, on the ground that the injunction covered only a local housing authority and not HUD). The daily fines were to accrue until they accumulated to a total sum equal to the amount the district court had enjoined HUD to pay in funding the project at issue, meaning they were arguably compensatory, rather than coercive. *See* Reply Brief for the Appellants at 12, *Project B.A.S.I.C.*, 947 F.2d 11 (No. 91-1612). The government argued sovereign immunity to both compensatory and coercive fines. Brief for Appellants at 47, *Project B.A.S.I.C.*, 947 F.2d 11 (No. 91-1612); Reply Brief for the Appellants at 12, *Project B.A.S.I.C.*, 947 F.2d 11 (No. 91-1612).

(4) *McBride*, 955 F.2d at 576–77 (rejecting district court's imposition of a compensatory civil contempt fine on FmHA on the ground that plaintiffs failed to show agency's action caused their loss, thereby avoiding sovereign immunity claim). This was the predecessor to *Coleman v. Espy*, discussed *supra* notes 111–18 and accompanying text.

(5) Shafer v. Army & Air Force Exch. Serv., 376 F.3d 386, 396, 398 (5th Cir. 2004) (rejecting district court's imposition of a compensatory civil contempt fine, on the ground of insufficient evidence, and the district court's imposition of $10,000 in "costs," on the ground that this was effectively a criminal contempt fine devoid of the requisite procedures and findings of intent). The government argued sovereign immunity on the civil fine and reserved the issue on the criminal fine. Brief for Appellants at 33–38, 48–55, 60–61, *Shafer*, 376 F.3d 386 (No. 03-10074).

(6) Oaks of Mid City Resident Council v. Sebelius, 723 F.3d 581, 585–86 (5th Cir. 2013) (rejecting district court's imposition of a compensatory civil contempt fine against HHS, on the ground that HHS did not actually violate the injunction). The court avoided HHS's alternative argument that the plaintiff's supposed claim against HHS was really a billing dispute that, under the Medicare statute, could be carried on only through an intra-agency proceeding, not a judicial contempt proceeding — an argument premised on, if not expressly invoking, the idea of sovereign immunity. Brief for Appellants at 25–31, *Oaks of Mid City Resident Council*, 723 F.3d 581 (No. 12-30860).

*Courts Find a Way Out, #1: Armstrong v. Executive Office of the President.*[132]  In this case, a district judge imposed a schedule of heavy coercive fines on the Executive Office of the President (EOP), only to be stopped by the D.C. Circuit on the ground that one of the joint bases for his contempt finding was premised on an order that, while surely contemplating certain action by the agency, did not directly require that action.[133]

The suit began in the aftermath of the Iran-Contra Affair, which involved scandalous machinations within the White House and particularly the National Security Council (NSC).  In 1989, as President Reagan left office, journalists and activist groups sued the EOP and the head of the National Archives and Records Administration (NARA) to ensure these agencies would preserve electronic communication records in accordance with the Federal Records Act (FRA).[134]  In 1993, District Judge Charles Richey granted summary judgment to the plaintiffs.[135]  In January of that year, he issued a declaratory judgment that EOP's and NSC's existing regulations regarding email preservation were "inadequate" and "contrary to law" under the APA in that they "permit[ted] the destruction of records contrary to the Federal Records Act"; he enjoined NARA to "take all necessary steps to preserve, without erasure, all electronic Federal Records generated at the defendant Agencies"; and he "enjoined" all the defendant agencies "from removing, deleting or altering their electronic records systems until such time as" NARA took action "to prevent the destruction of federal records."[136]

A few months later, plaintiffs moved to hold the agencies in contempt for violating the January 1993 order.[137]  On May 21, 1993, Judge Richey granted the motion, finding that (a) EOP and NSC initially did nothing to replace the existing email-preservation regulations that he had declared unlawful, and then, upon learning of plaintiffs' contempt motion, hastily issued an inadequate one-page regulation, and (b) EOP and NSC were causing the loss of email records by failing to recopy deteriorating backup tapes and by physically damaging certain tapes in delivering them to NARA.[138]

Judge Richey gave the agencies one month, until June 21, to promulgate new regulations and to "[t]ake all necessary steps to preserve the tapes" transferred to NARA.[139]  In the event they failed to do so, he also

---

[132] 1 F.3d 1274 (D.C. Cir. 1993).

[133] *Id.* at 1288–90.

[134] *Id.* at 1280; Armstrong v. Exec. Office of the President, 821 F. Supp. 761, 764 n.1 (D.D.C. 1993).

[135] Armstrong v. Exec. Office of the President, 810 F. Supp. 335, 337–39, 349–50 (D.D.C. 1993).

[136] *Id.* at 349–50.

[137] *See Armstrong*, 821 F. Supp. at 763.

[138] *Id.* at 765–74.

[139] *Id.* at 774–75.

*ENDGAME OF ADMINISTRATIVE LAW* 719

scheduled coercive civil contempt fines of $50,000 per day for the first week of noncompliance, $100,000 per day for the second week, and $200,000 per day for the third week, "with increases in such sanctions reserved thereafter," with all fines payable to the court registry.[140]  The annual budget of the entire EOP (including the NSC) in fiscal year (FY) 1993 was $194 million,[141] while the annual budget of NARA in FY 1993 was $168 million.[142]  Thus, the initial $50,000 daily sanction was 5% of the daily budget of the agencies combined, while the $200,000 daily sanction for the third week of noncompliance was 20% of that figure.[143]

The government in the district court asserted compliance but did not raise the issue of sovereign immunity.[144]  Nonetheless, Judge Richey addressed immunity in his contempt order, sua sponte.  He distinguished the Eighth Circuit's holding in *Coleman v. Espy* on the ground that it pertained only to *compensatory* fines, not to the *coercive* fines that he planned to impose here.[145]  He referred to the argument that § 702 waived sovereign immunity for all kinds of contempt fines when it came to nondamages relief against federal agencies.[146]  But Judge Richey did not quite rely upon the § 702 waiver, for he went on to say that he found sovereign immunity inapplicable to coercive contempt fines "[i]n any case," as "such coercive sanctions are necessary to ensure that 'the executive branch of government [does not] treat with impunity the valid orders of the judicial branch.'"[147]  Judge Richey appeared to be relying on a separation of powers argument, though he did not elaborate further.[148]

With the fines looming, the agencies, represented by the DOJ Civil Division's appellate staff, appealed to the D.C. Circuit.[149]  They briefed the case within a week, now asserting not only compliance but also sovereign immunity, which they insisted was not waived by the APA or any other statute.[150]  They further condemned the fines as "an unwarranted

---

[140]  *Id.*

[141]  OFFICE OF MGMT. & BUDGET, HISTORICAL TABLE 4.1 — OUTLAYS BY AGENCY: 1962–2022, www.whitehouse.gov/omb/budget/Historicals [https://perma.cc/D2BK-6KDM].

[142]  NAT'L ARCHIVES & RECORDS ADMIN., 1993 ANNUAL REPORT 43 (1994).

[143]  On whether the fine would be paid from the agency's appropriations or from the government-wide Judgment Fund, see *infra* section I.D, pp. 735–39.

[144]  *Armstrong*, 821 F. Supp. at 773.

[145]  *Id.*

[146]  *Id.*  He slightly misstated the law by saying that § 702 applied only to suits "under the Administrative Procedure Act." *Id.*; *see supra* note 74 and accompanying text.

[147]  *Armstrong*, 821 F. Supp. at 773 (alteration in original) (quoting Nelson v. Steiner, 279 F.2d 944, 948 (7th Cir. 1960)).  In *Nelson*, the Seventh Circuit affirmed compensatory civil contempt fines *not* against an agency but against two agency officials personally.  *Nelson* did not discuss sovereign immunity.  279 F.2d at 944–48; *see infra* pp. 764.

[148]  *See Armstrong*, 821 F. Supp. at 773.

[149]  Brief for Appellants, Armstrong v. Exec. Office of the President, 1 F.3d 1274 (D.C. Cir. 1993) (Nos. 93-5156, 93-5002, 93-5048).

[150]  *Id.* at 6–9, 19–20.

*HARVARD LAW REVIEW*   [Vol. 131:685]

affront to a coordinate branch"[151] that "invites an unnecessary and wholly avoidable constitutional confrontation."[152]   The D.C. Circuit heard oral argument on June 15, less than four weeks after the order, and stayed the fines immediately, six days before they were to start accruing.[153]

In deciding the appeal, on August 13, the D.C. Circuit found a case-specific ground on which to vacate the contempt finding (and thus the fines).   Judge Richey's contempt finding was based jointly on two alleged violations: the agencies had failed to promulgate new regulations and had caused damage to the backup tapes.[154]   The D.C. Circuit found that the judge's January 1993 order was not explicit enough in requiring the agencies to promulgate new regulations to render their inaction a violation.[155]   The order declared the existing regulations unlawful, and it surely contemplated that the agencies would issue new ones, but it did not directly enjoin them to do so.[156]   This lack of explicitness, in the D.C. Circuit's view, took away one of the joint bases for the contempt finding, rendering it invalid.[157]   Therefore the D.C. Circuit did not reach the agencies' argument that they had not in fact caused damage to the backup tapes.   And it did not have to "address . . . [the government's] claim of sovereign immunity from contempt fines."[158]

When Judge Richey got the case back on remand, he theoretically could have tried to reinstate contempt on the single ground of the agencies' alleged damage to the backup tapes.   But the D.C. Circuit had warned that any such future finding would have to take "into account all efforts that have or will then have been made to assure the tapes' integrity."[159]   After being rebuffed by the D.C. Circuit, Judge Richey and the plaintiffs had no stomach for it.   A few weeks after the D.C. Circuit ruling, with the agencies apparently moving forward in developing regulations, the plaintiffs and agencies agreed to "enter into good faith negotiations"[160] on settling various issues, including "the remand from the Court of Appeals on the matter of the contempt finding."[161]

---

[151] *Id.* at 19.

[152] *Id.* at 17.

[153] *Armstrong*, 1 F.3d at 1282.

[154] *Id.* at 1288.

[155] *Id.* at 1289.

[156] *Id.*

[157] *Id.*

[158] *Id.* at 1290 n.13.

[159] *Id.* at 1290.

[160] Stipulation and Order Re: Procedure for Resolving and/or Narrowing of Contested Issues in Litigation at 2, Armstrong v. Exec. Office of the President, 877 F. Supp. 690 (D.D.C. 1993) (No. 89-142), ECF No. 302.

[161] *Id.* at 3; *see also* Armstrong v. Exec. Office of the President, No. 89-142 (D.D.C. Sept. 9, 1993) (order), ECF No. 299 (summarizing preceding status conference).

In fact, contempt was never mentioned again, even as the parties' negotiations broke down permanently over the most important issue. Settlement discussions continued through winter 1993–1994, and the EOP would eventually issue FRA-compliant regulations for most of its internal components.[162]  But as to the NSC — which was among the agencies that Judge Richey's order of January 1993 contemplated would comply with the FRA — the Clinton Administration in March 1994 announced that it was breaking off negotiations and adopting a completely new, go-for-broke position: that the NSC was not subject to the FRA (or FOIA) to begin with — something no administration had ever dared assert.[163]  Plaintiffs moved for summary judgment on the matter, and in February 1995, Judge Richey ruled in their favor, declaring that the NSC was subject to the FRA and enjoining it to promulgate new regulations accordingly.[164]  But the government appealed to the D.C. Circuit and won in 1996, ending the litigation.[165]  Thus, the NSC, having narrowly escaped a schedule of contempt fines for failing to comply with the FRA, ended up being excused from compliance forevermore.

*Courts Find a Way Out, #2: United States v. Waksberg.*[166]  This case saw impressive briefing on the big constitutional and statutory questions arising from a contempt fine against the federal government — matched by impressive candor from the D.C. Circuit that it would find some way, any way, to head off the fine without answering those questions.

In 1988, HHS investigated Dr. Morry Waksberg for submitting false claims to Medicare.[167]  The agency and Waksberg signed a settlement stating that Waksberg was to be excluded from Medicare for a period of time.[168]  The government in 1991 sued Waksberg to enforce the agreement.[169]  He responded that the agreement was unenforceable because he and HHS had understood it to be contingent on the making of a separate agreement about possible criminal charges against him, which was never finalized.[170]

While proceedings on the agreement's enforceability were unfolding, the district court issued a preliminary injunction telling HHS not to ex-

---

[162] These regulations were issued in July 1994, as noted in *Armstrong v. Exec. Office of the President*, 877 F. Supp. 690, 695 n.3, 715 (D.D.C. 1995).  Note particularly the reference to the stipulation, *id.* at 696 n.3, and to "our settlement correspondence," *id.* at 715.

[163] *Id.* at 694–96.

[164] *Id.* at 708.

[165] Armstrong v. Exec. Office of the President, 90 F.3d 553 (D.C. Cir. 1996).

[166] 112 F.3d 1225 (D.C. Cir. 1997).

[167] Appellants' Opening Brief, *supra* note 87, at 1.

[168] *Waksberg*, 112 F.3d at 1226.

[169] Appellants' Opening Brief, *supra* note 87, at 2.

[170] *Id.* at 1–2.

clude Waksberg from Medicare and not to tell anyone that he was excluded.[171]    However, Transamerica-Occidental Life Insurance Company, a government Medicare carrier, included Waksberg's name in a 1991 newsletter listing Medicare-excluded providers.[172]  On Waksberg's motion, the district court held that Transamerica was acting as HHS's agent and that HHS was in contempt for violating the injunction.[173] The court signaled its willingness to impose compensatory civil fines on HHS for its harm to Waksberg's reputation but postponed deciding the issue until after trial on the enforceability of the agreement.[174]  After a trial, the court in 1994 found the agreement unenforceable, meaning that HHS could not use it to exclude Waksberg from Medicare.[175]

As the court then turned to the contempt sanction, HHS, represented by the U.S. Attorney's Office for D.C., argued that sovereign immunity barred compensatory civil contempt fines against HHS.[176]    District Judge June Green found it "thoroughly distasteful" to deny relief to Waksberg but accepted the government's argument.[177]  She rejected the idea that sovereign immunity was overridden by the "inherent power" of the federal courts, relying much on the First Circuit's ruling in *Horn*.[178]  Of course, *Horn* had not addressed § 702, but Judge Green held that § 702 was good "only for non-pecuniary claims,"[179] whereas Waksberg's claim for compensatory fines was essentially one for "money damages."[180]  Waksberg appealed to the D.C. Circuit.

There, his lawyer — the eminent constitutional scholar Professor Erwin Chemerinsky — framed the availability of contempt fines against federal agencies as a question of apocalyptic constitutional stakes.  "This case," he pronounced, "goes to the very core of the federal judicial power under Article III of the Constitution.  If sovereign immunity bars sanctions against the United States for contempt, then the most frequent litigant in federal court is free to disregard federal court orders with impunity."[181]  The ACLU, as amicus, made a similar argument, contending that sovereign immunity was simply less important than maintaining the separation of powers, to which contempt sanctions against

---

[171]  *Id.* at 2–3.
[172]  *Id.* at 3–4.
[173]  *Id.* at 4–5.
[174]  *Id.* at 5.
[175]  *Id.* at 5–6.
[176]  *Id.* at 6.
[177]  United States v. Waksberg, 881 F. Supp. 36, 41 (D.D.C. 1995).
[178]  *Id.*
[179]  *Id.* at 40.
[180]  *Id.* at 39.
[181]  Appellants' Opening Brief, *supra* note 87, at 12.

the government were essential.[182]  In response to these constitutional concerns, the U.S. Attorney's Office argued that, if necessary, federal courts *could* use contempt sanctions to enforce their orders — by using fines or even imprisonment against the responsible agency official as an individual, which would avoid the sovereign immunity problem.[183]

Chemerinsky and the ACLU also took issue with the government on whether the waiver of sovereign immunity in § 702 for "relief other than money damages"[184] covered compensatory civil contempt fines.  This was something of an uphill climb for Chemerinsky and the ACLU, given the obvious similarity between "money damages" and compensatory civil contempt fines.[185]  But, argued Chemerinsky and the ACLU, monetary sanctions for contempt are distinguishable in that they are mere incidents to injunctions, whereas "money damages" are free-standing claims not incident to anything.[186]  This distinction is manifest in several procedural differences, for example, that compensatory fines must be supported by clear and convincing evidence in a collateral proceeding, whereas money damages need be supported only by a preponderance of the evidence and can be the basis for their own suit.[187]

The briefing presented the sovereign immunity issue as so novel and portentous that the D.C. Circuit was scared to get anywhere near it.  "Whether sovereign immunity stands in the way of a federal court ordering the United States to compensate a party for losses caused by the government's violation of an injunction," wrote Judge Randolph for the panel, "is a question of first impression in this court, and in all but one other court of appeals," the Eighth Circuit, which had upheld sovereign immunity in *Coleman v. Espy*.[188]  Further, Waksberg's constitutional argument, which the Eighth Circuit had not addressed, raised a grave question of first impression for *all* circuits: whether "separation of powers principles require the government's immunity to give way because judicial power to enforce court orders against the United States through

---

[182]  Amici Curiae Brief of the Washington Legal Foundation and the ACLU of the National Capital Area in Support of Appellants at 11–12, United States v. Waksberg, 112 F.3d 1225 (D.C. Cir. 1997) (No. 95-5165) [hereinafter Amici Curiae Brief].

[183]  Brief for Appellee at 14–15, 18–19, *Waksberg*, 112 F.3d 1225 (No. 95-5165).  This plea for the court to turn its fire on the "responsible" official presents something of a catch-22 when placed alongside the argument made about a decade later by another part of DOJ, the Environment and Natural Resources Division, that threatening to jail the statutorily responsible head of the agency is improper, since that official does not really control the agency's behavior.  Defendant's Pre-Hearing Brief at 21–22, Forest Serv. Emps. for Envtl. Ethics v. U.S. Forest Serv., 530 F. Supp. 2d 1126 (D. Mont. 2008) (No. CV-03-165), ECF No. 153.

[184]  Amici Curiae Brief, *supra* note 182, at 4.

[185]  *See id.*

[186]  Appellants' Opening Brief, *supra* note 87, at 27; Amici Curiae Brief, *supra* note 182, at 23.

[187]  Amici Curiae Brief, *supra* note 182, at 19, 21.

[188]  *Waksberg*, 112 F.3d at 1227.

contempt is an essential feature of the judicial function."[189]  The D.C. Circuit did not even want to address the statutory § 702 argument, for Waksberg's "non-constitutional arguments" were "color[ed]" by his constitutional one.[190]

Awkwardly for the skittish panel, the record in the case — in contrast to *Armstrong* — contained no basis for a case-specific resolution by which to avoid the big sovereign immunity question.  So the D.C. Circuit tossed the case back to Judge Green and told her to find one!  In particular, Judge Randolph's opinion noted two possible escape hatches: though HHS had surely violated the injunction, Waksberg had not yet been made to show that he suffered reputational loss or that the Transamerica newsletter caused such loss.[191]  If Waksberg failed to show either, he would have no entitlement to fines, and the sovereign immunity question could be skipped.[192]

The D.C. Circuit got its wish: the case went away.  This outcome happened by a route somewhat different from the one Judge Randolph anticipated, but the D.C. Circuit's delay in adjudicating sovereign immunity opened the way for it.  Even as Waksberg litigated against HHS, he was simultaneously seeking redress through a state court suit against Transamerica for defamation.[193]  When the D.C. Circuit remanded the case to the district court in 1997, Waksberg and HHS agreed to put their dispute on hold pending the outcome of the Transamerica suit.  Ultimately, Waksberg won more than $7 million in damages against Transamerica.[194]  Back in the federal suit against HHS, Judge Green then dismissed the contempt proceeding, apparently to prevent double recovery.[195]  Despite HHS's contempt and the harm Waksberg apparently suffered, the agency was off the hook.

*Courts Find a Way Out, #3: In re Sealed Case.*[196]  In *In re Sealed Case*, the D.C. Circuit's maneuvering to head off the district judge's contempt threat showed exceptional sophistication.  The agency this

---

[189] *Id.*

[190] *Id.*

[191] *Id.*

[192] *Id.* at 1227–28.

[193] Waksberg v. Transamerica Occidental Life Ins. Co., No. B146582, 2002 WL 31630873 (Cal. Ct. App. Nov. 22, 2002).

[194] For the successful suit against Transamerica, see *Waksberg*, 2002 WL 31630873, at *4, in which the court noted that Waksberg agreed to dismiss the California action in March 2000 after agreeing to arbitration of an award guaranteed to be in the range of $7 million to $11 million.

[195] According to the docket sheet for *United States v. Waksberg*, No. 1:91-cv-01531 (D.D.C. filed June 20, 1991), Judge Green, after the D.C. Circuit's remand, initially stayed all proceedings pending the California suit, Docket Entry No. 182, United States v. Waksberg, No. 1:91-cv-01531 (D.D.C. Sept. 10, 1997) (order), and then, after Waksberg was guaranteed a large arbitration award in the California suit, dismissed the contempt proceeding altogether, Docket Entry No. 198, United States v. Waksberg, No. 1:91-cv-01531 (D.D.C. Dec. 18, 2000) (order).

[196] 192 F.3d 995 (D.C. Cir. 1999).

time was Ken Starr's Office of Independent Counsel (OIC), at the culmination of its battle with President Clinton.    During President Clinton's impeachment trial in early 1999, Starr's OIC was continuing its investigation of the President, using a grand jury presided over by District Judge Johnson.  On January 31, a story appeared in the *New York Times* about internal discussions among OIC officials on whether to indict President Clinton.[197]   The story's contents arguably indicated that someone at OIC had leaked internal grand jury material in violation of Rule 6(e) of the Federal Rules of Criminal Procedure.  The Clinton White House moved that Judge Johnson hold OIC or the responsible officials in contempt.[198]  The story proved to be based on leaks by OIC spokesman Charles Bakaly.[199]   On July 14, Judge Johnson issued an order initiating a criminal contempt case against Bakaly and OIC itself, appointing DOJ as prosecutor.[200]

This prosecution raised grave questions about sovereign immunity, but did so in a peculiar way that requires a word of explanation.  The prosecution of OIC did not implicate federal sovereign immunity to a contempt fine per se, but rather federal sovereign immunity to the very initiation of a criminal contempt proceeding, which is a prerequisite to any criminal contempt fine.  It is possible to speak of sovereign immunity to the initiation of a criminal contempt *proceeding* because — in contrast to a civil contempt proceeding that is always part of the original action in which the violated injunction was issued — a criminal contempt proceeding has traditionally been undertaken as its own separate action (with its own docket number).[201]  Thus, in a garden-variety APA suit against a federal agency (in which the agency's immunity *to suit* has been waived by § 702), we can speak of federal sovereign immunity *to particular sanctions* that might arise in a civil contempt proceeding within that suit.  But if the agency's violation of an injunction within that suit led to a criminal contempt proceeding as a separate action, we can speak of the agency's immunity *to that separate suit*, prior to any question about immunity to particular criminal contempt sanctions.

With this in mind, we can return to the narrative.  On July 16, Starr's OIC, representing itself, filed an emergency motion to stop the criminal

---

[197] Don Van Natta, Jr., *The President's Trial: The Independent Counsel; Starr Is Weighing Whether to Indict Sitting President*, N.Y. TIMES (Jan. 31, 1999), http://www.nyti.ms/2tB8J3g [https://perma.cc/S753-E8SY].

[198] *Sealed Case*, 192 F.3d at 997.

[199] *Id.*

[200] *Id.* at 998–99.  The district court criminal contempt case was *In re Grand Jury v. Bakaly*, No. 1:99-mc-00038 (D.D.C. June 29, 2000).

[201] On the traditional practice, see *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 445 (1911).  It is possible for a criminal contempt proceeding to be part of the original case, rather than being a separate action, so long as the defendant is given the requisite notice and procedural rights. United States v. United Mine Workers of Am., 330 U.S. 258, 298–301 (1947).

contempt proceeding on the ground that there was insufficient evidence of a Rule 6(e) violation and, more broadly, on the ground of OIC's sovereign immunity.[202] At about the same time, DOJ, despite its status as an executive agency and despite President Clinton's enmity for Starr, took OIC's side and asked Judge Johnson to halt the criminal contempt proceeding against OIC — likewise on the case-specific ground of insufficient evidence and the broad ground of sovereign immunity.[203]

As of July 22, Judge Johnson had not responded to OIC's emergency motion. Facing the judge's deadline to enter an appearance as a criminal defendant the next day, OIC went to the D.C. Circuit and filed an interlocutory appeal of Judge Johnson's constructive "denial" of its sovereign immunity claim.[204] The D.C. Circuit immediately stayed the criminal contempt proceedings, and because DOJ was taking OIC's side, the panel asked the Clinton White House to submit a briefing in favor of Judge Johnson's initiation of the contempt prosecution.[205]

In deciding the appeal, the D.C. Circuit was sympathetic to the claim that sovereign immunity barred criminal contempt proceedings,[206] and it seemed that Judge Johnson's constructive rejection of such immunity was the only viable basis for letting OIC make an interlocutory appeal and escape a contempt prosecution. Yet the D.C. Circuit was also reluctant to actually decide that sovereign immunity was a bar, for, as in *Waksberg*, this was a question of "first impression" that raised "constitutional concerns."[207]

To thread this needle, the D.C. Circuit engaged in a remarkable series of maneuvers. First, the court held *not* that OIC's sovereign immunity claim was correct, but that it was substantial enough to merit an interlocutory appeal.[208] Second, the court decided that the sovereign immunity question (which warranted the appeal) should be avoided and the appeal resolved on the merits (even though the merits themselves did not warrant an interlocutory appeal).[209]

The D.C. Circuit's first step was to express enough sympathy for the sovereign immunity claim that the claim could serve as a basis for letting OIC appeal, but not so much sympathy as to decide the claim.[210] The test for appealability of Judge Johnson's rejection of OIC's sovereign immunity was to ask if such rejection was a collateral order, separate

---

[202] *Sealed Case*, 192 F.3d at 998.

[203] *Id.* The date of the OIC motion (July 16) is in Entry 83 of the *Bakaly* docket sheet. Docket Entry No. 83, *In re* Grand Jury v. Bakaly, No. 1:99-mc-00038 (D.D.C. July 16, 1999).

[204] *Sealed Case*, 192 F.3d at 999.

[205] *Id.*

[206] *Id.* at 1000.

[207] *Id.* at 1000 & n.7.

[208] *Id.* at 999.

[209] *Id.* at 1000–01.

[210] *Id.* at 1000.

EPA_00049003

from the merits and effectively unreviewable on appeal from final judgment.[211]  The latter element of the test — effective unreviewability on final judgment — was the real hurdle for OIC.  It is unclear whether sovereign immunity was merely a defense to liability on the merits or, more strongly, a shield against having to litigate at all.  If it was the latter, then waiting to review Judge Johnson's rejection of sovereign immunity until the criminal contempt proceeding ran its course would effectively have denied sovereign immunity.  Without deciding the issue, the D.C. Circuit held that OIC had at least a "substantial claim of immunity *from the proceedings*," that is, a substantial claim that sovereign immunity applied to criminal contempt and amounted to a shield against even having to litigate the charge.[212]  This, the court held, was enough to meet the test for a claim of effective unreviewability at final judgment, thus warranting an interlocutory appeal.[213]  The court acknowledged broad readings of the § 702 waiver of sovereign immunity by other circuits outside the context of criminal contempt, but then said the following: "We rather doubt that federal sovereign immunity is so limited, especially in the unique circumstances presented here [that is, criminal contempt]. . . . We know of no statutory provision expressly waiving federal sovereign immunity from criminal contempt proceedings."[214]  The implication was that § 702 is probably not a waiver of immunity for criminal contempt proceedings.  But why did the D.C. Circuit see it that way?  The panel gave no reasons.  Possibly the panel was concerned about the seeming mismatch between § 702's language, which appears to contemplate civil actions by private plaintiffs, and criminal contempt proceedings, which are traditionally separate criminal actions brought by DOJ or by a court-appointed prosecutor.[215]

Whatever the basis for the D.C. Circuit's sympathy with OIC's sovereign immunity claim, the court ultimately avoided deciding the claim, despite its being the basis for the interlocutory appeal.  Instead the D.C. Circuit disposed of the case by deciding the merits — whether a criminal contempt prosecution against OIC was actually warranted by the evidence — even though no interlocutory appeal was available for that question.[216]  This was kosher, said the panel, because adjudicating the merits was a means of avoiding the constitutional sovereign immunity question.[217]

---

[211]  *Id.* at 999.
[212]  *Id.* (emphasis added).
[213]  *Id.*
[214]  *Id.* at 1000.
[215]  *See supra* text accompanying note 201.
[216]  *Sealed Case*, 192 F.3d at 1000–01.
[217]  *Id.* at 1000 & n.7.

If the D.C. Circuit's desperation to shield OIC without deciding sovereign immunity was not already obvious, it became so in the portion of the opinion adjudicating the merits. This portion of the opinion required a retreat from the D.C. Circuit's own precedent on the meaning of Rule 6(e). Only a year earlier, in *In re Motions of Dow Jones & Co.*,[218] the D.C. Circuit had construed Rule 6(e) to prohibit leaks of "what is likely to occur" before the grand jury,[219] as well as "the strategy or direction of the investigation."[220] The OIC leaks to the *New York Times* seemed to violate Rule 6(e) on this reading, for they revealed OIC prosecutors' internal discussions about whom to indict and when. But now the D.C. Circuit walked back what it called "the seemingly broad nature of the statements in *Dow Jones*."[221] In particular, the court now insisted on a strong distinction "between statements by a prosecutor's office with respect to its own investigation, and statements by a prosecutor's office with respect to a *grand jury's* investigation."[222] To be sure, OIC's leaks of its internal prosecutorial discussions were "troubling,"[223] and such leaks could harm the reputation of innocent suspects in ways similar to the disclosure of actual grand jury material that Rule 6(e) meant to prevent; however, the leaks nonetheless did not "directly" reveal grand jury proceedings.[224]

By rereading its own precedent on Rule 6(e) to take the OIC leaks out of the rule's purview, the D.C. Circuit found a reason to reverse Judge Johnson's order initiating criminal contempt proceedings against OIC without actually holding that federal agencies were immune to criminal contempt.[225] This maneuver did not halt the criminal contempt prosecution of OIC spokesman Charles Bakaly, for he had no claim of sovereign immunity and therefore could not seek an interlocutory appeal; Bakaly went through a bench trial in 2000, at the close of which Judge Johnson acquitted him.[226] By contrast, OIC was spared the ordeal of trial because its status as a federal agency gave it a "substantial claim"[227] to sovereign immunity that provided an interlocutory appeal and fast-track adjudication of the merits, if not an outright recognition of sovereign immunity from criminal contempt.

---

[218] 142 F.3d 496 (D.C. Cir. 1998).

[219] *Id.* at 500.

[220] *Id.* (quoting SEC v. Dresser Indus., Inc., 628 F.2d 1368, 1382 (D.C. Cir. 1980) (en banc)).

[221] *Sealed Case*, 192 F.3d at 1001.

[222] *Id.* at 1002.

[223] *Id.* at 1003–04.

[224] *Id.*

[225] *See supra* text accompanying notes 216–24.

[226] Docket Entry No. 50, *In re* Grand Jury v. Bakaly, No. 99-mc-00038 (D.D.C. Oct. 6, 2000) (order). Note that the document numbers on the docket sheet are out of sequence.

[227] *Sealed Case*, 192 F.3d at 999.

EPA_00049005

*Courts Find a Way Out, #4: American Rivers v. U.S. Army Corps of Engineers.*[228]  In *American Rivers*, as in *Armstrong*, a district judge scheduled large coercive fines, only to be headed off.  But whereas in *Armstrong* the D.C. Circuit rode to the rescue with six days to spare, here the MDL Panel performed the rescue, and did so at extraordinary speed with only hours to go — of course setting no precedent on contempt.

The Army Corps of Engineers found itself caught between two conflicting mandates as to how to manage the Missouri River.  On the one hand, the business-friendly Flood Control Act of 1944 requires the Corps to control the river's flow so that businesses can more easily navigate it for commerce. Specifically, it requires the Corps to operate dams and reservoirs to increase flow in the warm-weather navigation season.[229] On the other hand, the Endangered Species Act of 1973 (ESA) prohibits a federal agency from doing anything to jeopardize a protected species or adversely modify its critical habitat.[230]  Interfering with river flow can wreak havoc on protected species.

Businesses in each state through which the Missouri River flowed wanted more water in their state's section of the river, for navigation. In early 2002, the state of South Dakota sued the Corps in the South Dakota federal district court and won an injunction prohibiting the Corps, under the Flood Control Act, from lowering the water level in the section of the river that flows through the state.[231]  At about the same time, the Corps was hit with similar lawsuits by the states of North Dakota and Nebraska in their respective federal district courts, which issued similar injunctions.[232]  The Corps appealed these conflicting injunctions to the Eighth Circuit, which stayed them in May 2002.[233]  The next year, in June 2003, the Eighth Circuit upheld the Nebraska district court's injunction, which required the Corps to adhere to the plans in the Corps' own Master Manual, which called for high flows to support navigation, and it lifted the stay of that injunction.[234]  During all this litigation, the Corps never mentioned its obligations under the ESA.[235]

But the Corps also had environmental stakeholders to deal with.  If an agency is engaged in activities, like altering river flows, that risk harm to protected species, it must go to the Fish and Wildlife Service (FWS) to obtain a biological opinion stating the precautions it should

---

[228]  274 F. Supp. 2d 62 (D.D.C. 2003).
[229]  John R. Seeronen, *Judicial Challenges to Missouri River Mainstem Regulation*, 16 MO. ENVTL. L. & POL'Y REV. 59, 62–63 (2009).
[230]  16 U.S.C. § 1536(a) (2012).
[231]  *See* South Dakota v. Ubbelohde, 330 F.3d 1014, 1022 (8th Cir. 2003).
[232]  *See id.* at 1021–22.
[233]  *Id.* at 1022.
[234]  *Id.* at 1033.
[235]  *See id.* at 1019–33.

take in undertaking those activities so as to avoid ESA liability.[236]  Toward the end of the Clinton Administration, in 2000, the FWS issued a biological opinion telling the Corps to implement a certain degree of spring rise and summer low flow in order to avoid harm to protected species near the Missouri River.[237]  But in early 2003, the Corps, now under the Bush Administration, issued an annual operating plan that seemed inconsistent with this FWS opinion.[238]  Environmentalists sued the Corps in the U.S. District Court for the District of Columbia, before Judge Gladys Kessler.[239]  In April 2003, the Bush Administration's FWS issued a supplemental biological opinion making an "about-face" from the Clinton-era one, postponing any requirement that the Corps implement summer low flow that year.[240]

The state of Nebraska was all too aware that this environmental suit might interfere with the business-friendly injunction it had won in the Eighth Circuit.  Thus, in May 2003, Nebraska asked the MDL Panel to transfer the suit from D.C. to the district court in Nebraska.[241]  The Corps similarly urged transfer to a district court somewhere in the Eighth Circuit, while the environmentalists asked to keep the suit in D.C.[242]  On June 12, the MDL Panel set oral argument for July 24[243] — a date that would prove fateful.

On July 12, back in the district court in D.C., Judge Kessler granted the environmentalists' motion for a preliminary injunction to force the Corps to adhere to the Clinton-era FWS opinion, thus mandating a summer low flow from July 15 to August 15 (followed by a gradual stepping-up of the flow from August 15 to September 1).[244]  She found that the environmentalists were likely to succeed in their claim that the recent supplemental FWS opinion was unlawful, thus bringing the Clinton-era opinion back into force.[245]  And she found that, although the injunction would disrupt navigation and harm some businesses, preventing another

---

[236] *See* 16 U.S.C. § 1536(a)(1) (2012); *id.* § 662(a).

[237] *See* Am. Rivers v. U.S. Army Corps of Eng'rs, 271 F. Supp. 2d 230, 237 (D.D.C. 2003).

[238] *See id.*

[239] *See id.* at 236.

[240] *See id.* at 237.

[241] Motion for Transfer, *In re* Operation of the Mo. River Sys. Litig., MDL No. 1555 (J.P.M.L. May 30, 2003), ECF No. 1.

[242] Response of All Federal Defendants in Support of Motion of State of Nebraska for Transfer of Actions to District of Nebraska for Coordinated or Consolidated Pretrial Proceedings Pursuant to 28 U.S.C. § 1407, *In re* Operation of the Mo. River Sys. Litig., MDL No. 1555 (J.P.M.L. June 19, 2003), ECF No. 14; Opposition to Motion of the State of Nebraska for Transfer of Actions to the District of Nebraska for Coordinated and Consolidated Pretrial Proceedings, *In re Operation of the Mo. River Sys. Litig.*, MDL No. 1555 (J.P.M.L. June 19, 2003), ECF No. 13.

[243] Hearing Session Order, *Operation of the Mo. River Sys. Litig.*, MDL No. 1555 (J.P.M.L. June 12, 2003), ECF No. 7.

[244] *See Am. Rivers*, 271 F. Supp. 2d at 230, 263.  The Clinton-era FWS schedule is noted in a later opinion. Am. Rivers v. U.S. Army Corps of Eng'rs, 274 F. Supp. 2d 62, 66 (D.D.C. 2003).

[245] *Am. Rivers*, 271 F. Supp. 2d at 249–50.

EPA_00049007

*ENDGAME OF ADMINISTRATIVE LAW*

destructive summer of high flow *that year* was quite important to the continued existence of the protected species.[246]  The Corps warned that an injunction to follow the Clinton-era opinion would conflict with the Nebraska district court injunction, recently affirmed and unstayed by the Eighth Circuit, to maintain enough flow for navigation.[247]  Judge Kessler, while acknowledging this as the "most troubling" argument against her injunction, went ahead regardless because the potential conflict was "a problem of the Defendant's own making" — the Corps had neglected to mention the ESA in the Eighth Circuit litigation.[248]  The Corps sought a stay from Judge Kessler and was denied on July 15,[249] then sought a stay from the D.C. Circuit and was denied there on July 18.[250]

On Friday, July 18, three days after the injunction had gone into effect and the same day the D.C. Circuit denied a stay, the environmentalists accused the Corps of not implementing the summer low flow and moved for a finding of contempt and coercive civil contempt fines.[251]  Hours later, Judge Kessler ordered the Corps to appear for a contempt hearing the following Monday, July 21.[252]

Working through the weekend, the Corps' attorneys at the DOJ Environment and Natural Resources Division frantically submitted a brief that basically admitted the agency was not in compliance.  Their main argument was that Judge Kessler's injunction conflicted with the Nebraska injunction and that the Corps was doing its best to comply as much as possible with both, including by seeking modification from the Nebraska district court.[253]  But DOJ also raised the issue of sovereign immunity to contempt fines, arguing that compensatory fines were unavailable per *Coleman v. Espy* and further that "it is unclear that the Federal government has waived its immunity for a court to impose coercive fines and, thus, even coercive fines may be inappropriate."[254]

The day after the Monday hearing, Judge Kessler found the Corps in contempt and scheduled coercive civil fines of $500,000 per day to begin that Friday, July 25.[255]  The annual budget for the entire Corps

---

[246] *Id.* at 258–59.

[247] *Id.* at 262.

[248] *Id.*

[249] *Am. Rivers*, No. 03-cv-00241 (D.D.C. July 15, 2003) (order), ECF No. 95.

[250] Am. Rivers v. U.S. Army Corps of Eng'rs, No. 03-5177 (D.C. Cir. July 18, 2003) (order) (per curiam).

[251] Plaintiffs' Motion for an Order to Show Cause Why Defendant the U.S. Army Corps of Engineers Should Not Be Held in Contempt and Sanctioned and Supporting Memorandum of Points and Authorities, *Am. Rivers*, No. 03-cv-00241 (D.D.C. July 18, 2003), ECF No. 104.

[252] *Am. Rivers*, No. 03-cv-00241 (D.D.C. July 18, 2003) (order), ECF No. 106.

[253] Federal Defendants' Opposition to Order to Show Cause at 8–15, *Am. Rivers*, No. 03-cv-00241 (D.D.C. July 20, 2003), ECF No. 108.

[254] *Id.* at 17.

[255] Am. Rivers v. U.S. Army Corps of Eng'rs, 274 F. Supp. 2d 62, 70 (D.D.C. 2003).

of Engineers for Civil Works in FY 2003 was $4.682 billion,[256] so the daily fine of $500,000 was 4% of the agency's daily budget. The fines would run for seven days, through July 31, after which Judge Kessler warned she would consider "more draconian contempt remedies."[257]

In response to the Corps' agonized yelps about conflicting injunctions, Judge Kessler said the two injunctions *might* not conflict (depending on how you interpreted them) and that, regardless, any conflict was the Corps' fault and a result of its bad faith, both because the Corps neglected to raise the ESA in the Eighth Circuit and because the Corps, in seeking modification from the Nebraska district court, had delayed until after the D.C. Circuit refused to stay Judge Kessler's injunction, a full eight days after that injunction was issued.[258]

As to sovereign immunity, Judge Kessler held that coercive fines were distinguishable from the compensatory ones disapproved by the Eighth Circuit in *Coleman v. Espy*, that such fines *had* to be available under the separation of powers "to ensure that 'the executive branch of government [does not] treat with impunity the valid orders of the judicial branch,'" and that, in any event, § 702 waived sovereign immunity to such fines.[259]

The bomb was ticking, set to explode that Friday, but it would be defused just in time. Before Judge Kessler had even issued her injunction, the MDL Panel had scheduled oral argument on Nebraska's motion to transfer the Missouri River cases for Thursday, July 24, which turned out, by coincidence, to be the day before Judge Kessler's fines were to start.[260] At the MDL Panel's oral argument, DOJ argued that transfer of the cases to a single district court was necessary to head off the conflicting injunctions and the looming fines.[261] The environmen-

---

[256] OFFICE OF MGMT. & BUDGET, HISTORICAL TABLE 4.1 — OUTLAYS BY AGENCY: 1962–2022, *supra* note 141.

[257] *Am. Rivers*, 274 F. Supp. 2d at 70.

[258] *See id.* at 67–69.

[259] *Id.* at 69. Although Judge Kessler did not expressly cite § 702, she relied on the fact that *Sealed Case* had cited *Armstrong*'s statement that coercive fines were available against the federal government "under the APA," *id.*, which appears to be a reference to § 702. *See also supra* note 146 (noting that, while *Armstrong* said § 702 waived sovereign immunity for all suits brought under the APA, this was a slight misstatement).

[260] Hearing Session Order, *In re* Operation of the Mo. River Sys. Litig., MDL No. 1555 (J.P.M.L. June 12, 2003), ECF No. 7.

[261] Emergency Motion and Memorandum in Support of Motion of American Rivers Plaintiffs for Partial Lift of Stay to Reinstate Proceeding Against the U.S. Army Corps [of] Engineers at 3–4, *In re* Operation of the Mo. River Sys. Litig., No. 03-MD-1555 (D. Minn. July 28, 2003), ECF Nos. 3, 4.

EPA_00049009

talists opposed any transfer, believing there was only a "supposed conflict" between the injunctions and that the Nebraska injunction was unlawful for not taking account of the ESA.[262]

The MDL Panel moved like lightning to get the Corps out of trouble. With the fines to begin the next day, the seven-member Panel unanimously rejected the environmentalists' arguments and took the "extraordinary step of taking action on the same day" as oral argument.[263] "[W]ithin hours" of the hearing's end,[264] the Panel issued a one-sentence order, without an opinion, to transfer all the cases.[265] (When the opinion finally did come, nineteen days later, it said that transfer was "necessary in order to . . . prevent inconsistent pretrial rulings . . . particularly with respect to preliminary injunctive relief imposing or threatening to impose conflicting standards of conduct on the Corps."[266])

The transferee judge selected by the MDL Panel was Judge Paul Magnuson of the District of Minnesota,[267] who completed the judiciary's pullback from the brink. In a series of short case-handling orders that stated no general principles but operated from a seeming presumption in favor of governmental latitude and against severe sanctions, he caused the contempt fines to drop out of the litigation. First, upon receiving the cases on Thursday, July 24, he issued a stay of all orders pending therein for the next two weeks until August 7 — a standard practice for an MDL transferee court awaiting delivery of the records from all the various cases — but made clear that he was most keen to halt the fines, writing in his brief order, "This stay shall expressly include a stay of any conditional contempt order previously issued" by the district court in D.C.[268]

The next week, when the Eighth Circuit (in another testament to judicial comity with agencies) announced that a stay it had entered of

[262] Letter, *Operation of the Mo. River Sys. Litig.*, MDL No. 1555 (J.P.M.L. July 25, 2003), ECF No. 23.
[263] Memorandum in Support of Plaintiffs' Motion for an Order Requiring Expedited Compliance with the Court's Order and Seeking Contempt in the Event that the Corps Does Not Expedite Compliance and Renewed Opposition to Federal Defendants' Cross-Motion for Stay at 5, *Operation of the Mo. River Sys. Litig.*, No. 03-MD-1555 (D. Minn. Aug. 6, 2003), ECF No. 33.
[264] Federal Defendants' Memorandum in Opposition to Plaintiffs' Emergency Motion for Partial Lift of Stay to Reinstate Proceedings and in Support of Federal Defendants' Cross-Motion for Stay at 12, *Operation of the Mo. River Sys. Litig.*, No. 03-MD-1555 (D. Minn. July 30, 2003), ECF No. 14.
[265] *Operation of the Mo. River Sys. Litig.*, MDL No. 1555 (J.P.M.L. July 24, 2003) (transfer order), ECF No. 22 [hereinafter Transfer Order] ("Opinion to follow.").
[266] *Operation of the Mo. River Sys. Litig.*, MDL No. 1555, at 2 (J.P.M.L. Aug. 12, 2003) (transfer opinion), ECF No. 24.
[267] Transfer Order, *supra* note 265.
[268] *Operation of the Mo. River Sys. Litig.*, No. MDL-1555 (D. Minn. July 24, 2003) (order), ECF No. 2.

the Nebraska District Court injunction would remain in effect for several more weeks,[269] the environmental plaintiffs rushed to Judge Magnuson on July 28,[270] telling him that the problem of conflicting injunctions was now solved, so the fines should be reimposed immediately.[271]  After all, these were the crucial summer days during which high flow was so destructive to the protected species.[272]  Thirteen of the injunction's mandated thirty days of low flow had already slipped away due to the Corps' disobedience.  "Almost half of the critical period covered by the injunction has passed," warned the environmentalists, and "extending the stay will, as a practical matter, deny relief to Plaintiffs entirely and hand the Federal Defendants a victory that they already have litigated and lost."[273]

Yet even as the problem of conflicting injunctions was resolved, Judge Magnuson was averse to reinstating the contempt fines.  He made this clear in an order of August 4, effectively giving the Corps yet more latitude.[274]  Though bound by all substantive orders previously made in the transferred cases (including Judge Kessler's preliminary injunction), he found the contempt order to be procedural, and because he had "not yet received any files, docket sheets, or other information from the District Court for the District of Columbia," he "simply [could not] enforce a procedural order that threatens such severe sanctions. . . . Thus, the contempt order will continue to be stayed"[275] — apparently indefinitely.

The Corps took advantage of the latitude Judge Magnuson was providing: as of August 6, twenty-one days into the thirty-day period, it still had not complied with Judge Kessler's injunction, and it announced that it planned to comply only on August 12.[276]  (The further delay, said the Corps, was to allow time for businesses navigating the river to clear it and secure their vessels.[277])  This would be twenty-seven days into the thirty-day low flow period that, officially, had *always* been binding on

---

[269] South Dakota v. Ubbelohde, No. 02-2133SD (8th Cir. July 25, 2003) (order), ECF No. 53.

[270] Emergency Motion and Memorandum in Support of Motion of American Rivers Plaintiffs for Partial Lift of Stay to Reinstate Proceeding Against the U.S. Army Corps [of] Engineers, *Operation of the Mo. River Sys. Litig.*, No. MDL-1555 (D. Minn. July 28, 2003), ECF Nos. 3, 4.

[271] *See* Reply in Support of Emergency Motion for Partial Lift of Stay to Reinstate Proceedings Against the U.S. Army Corps of Engineers and Opposition to Motions of Federal Defendants and Nebraska for Extension of Stay at 3, *Operation of the Mo. River Sys. Litig.*, No. MDL-1555 (D. Minn. Aug. 1, 2003), ECF No. 16.

[272] *See id.* at 5.

[273] *Id.* at 2.

[274] *See Operation of the Mo. River Sys. Litig.*, No. 03-MD-1555 (D. Minn. Aug. 4, 2003) (order), ECF No. 24.

[275] *Id.* at 2–3.

[276] Federal Defendants' Request for Ruling on Pending Motion at 1, *Operation of the Mo. River Sys. Litig.*, No. 03-MD-1555 (D. Minn. Aug. 6, 2003), ECF No. 30.

[277] *Id.*

EPA_00049011

the Corps, though not actually enforced by fines.[278]   Moreover, the Corps asked Judge Magnuson for yet *more* time to comply beyond August 12, which would eat into the period of gradual step-up in flow before the low flow expired by its own terms on September 1.[279]   Environmentalists moved yet again to reimpose the contempt fines, lamenting that "the Corps has continually dragged its feet and attempted to avoid compliance."[280]   Judge Magnuson took a middle path.   He denied the plaintiffs' motion for fines, but he also expected some comity from the agency in return, reminding the Corps that Judge Kessler's injunction "remains the law of this case" and that he was "confident that the Corps will expediently and fully comply with its obligations."[281]   The agency, undoubtedly happy to deal with Judge Magnuson rather than Judge Kessler, did not press its luck; it complied on the generous terms he set.[282]

As in *Armstrong*, the agency, having narrowly escaped a schedule of contempt fines for noncompliance, went on to win a major victory on the nature of its long-run obligations.   In December 2003, the FWS issued yet another biological opinion, still quite friendly to commercial use of the river.[283]   On the basis of this opinion, the Corps issued a new policy for river flow that was challenged by the environmentalists but upheld by Judge Magnuson.[284]

### D. Why a Fine Could (Probably) Be Taken from Agency Appropriations

The judiciary has been nearly 100% successful in preventing federal agencies from incurring contempt fines.   But *if* sovereign immunity is overcome and an agency *does* incur such a fine (something that happened in our sources in only one tiny case),[285] the matter would not end

---

[278]   *See* Am. Rivers v. U.S. Army Corps of Eng'rs, 271 F. Supp. 2d 230, 262–63 (D.D.C. 2003) (ordering the Corps to comply with the Clinton-era FWS opinion, which mandates a low flow period from July 15 to August 15, *see* Am. Rivers v. U.S. Army Corps of Eng'rs, 274 F. Supp. 2d 62, 66 (D.D.C. 2003)).

[279]   Federal Defendants' Request for Ruling on Pending Motion, *Operation of the Mo. River Sys. Litig.*, No. 03-MD-1555 (D. Minn. Aug. 6, 2003), ECF No. 30.

[280]   Memorandum in Support of Plaintiffs' Motion for an Order Requiring Expedited Compliance with the Court's Order and Seeking Contempt in the Event that the Corps Does Not Expedite Compliance and Renewed Opposition to Federal Defendants' Cross-Motion for Stay at 1, *Operation of the Mo. River Sys. Litig.*, No. 03-MD-1555 (D. Minn. Aug. 6, 2003), ECF No. 33.

[281]   *Operation of the Mo. River Sys. Litig.*, No. 03-MD-1555, at 1–2 (D. Minn. Aug. 7, 2003) (order), ECF No. 37.

[282]   *See Operation of the Mo. River Sys. Litig.*, No. 03-MD-1555 (D. Minn. Aug. 14, 2003) (order), ECF No. 44.

[283]   *In re* Operation of the Mo. River Sys. Litig., 363 F. Supp. 2d 1145, 1152 (D. Minn. 2004), *aff'd in part, vacated in part, and remanded*, 421 F.3d 618 (8th Cir. 2005) (vacating the grant of summary judgment of three claims and ordering the MDL court to dismiss them without prejudice instead).

[284]   *Id.* at 1152, 1175.

[285]   *See supra* note 103 and accompanying text.

*HARVARD LAW REVIEW* [Vol. 131:685

there. An agency can pay a fine only if there is a congressional appropriation to do so. That is because there is a distinction between the entry of a judgment against the federal government and an appropriation to pay that judgment. The one does not imply the other.[286] Thus, to fully assess the efficacy of contempt fines against agencies, we must ask whether they can be paid. The answer is: probably yes, but with possible complications.

An appropriation ordinarily *would* be available to pay a contempt fine. That is because an appropriation for a program is normally read to cover penalties incurred by the agency in the course of implementing the program. In an opinion involving an environmental statute that subjected federal agencies to penalties for causing pollution (and waived sovereign immunity for that purpose), DOJ's Office of Legal Counsel stated that a federal agency incurring such penalties "would typically have authority to pay the penalties that have been lawfully assessed against it in the course of its conduct of agency business,"[287] for "a general appropriation may be used to pay any expense that is necessary or incident to the achievement of the underlying objectives for which the appropriation was made."[288] The Government Accountability Office (GAO) has taken a similar view regarding federal agency payment of environmental penalties.[289] This principle seems logically applicable to contempt fines. Indeed, GAO has suggested exactly that, in an opinion involving an award of attorneys' fees for contempt.[290] (Attorneys' fees are discussed later in section VI.A.) If the fine is indeed payable from agency appropriations, it would have the incentivizing effect, desired by

---

[286] Jackson, *supra* note 69, at 543–46, 589–605; David S. Law, *The Paradox of Omnipotence: Courts, Constitutions, and Commitments*, 40 GA. L. REV. 407, 426–30 (2006).

[287] EPA Assessment of Penalties Against Federal Agencies for Violation of the Underground Storage Tank Requirements of the Resource Conservation and Recovery Act, 24 Op. O.L.C. 84, 89 (2000).

[288] *Id.* (quoting Indemnification of Department of Justice Employees, 10 Op. O.L.C. 6, 8 (1986)).

[289] NOAA Payment of Civil Penalty for Violation of Local Air Quality Standards, B-191747, 1978 WL 9814 (Comp. Gen. June 6, 1978). Although statutes purport to vest GAO with authority to bind agencies on the meaning of appropriations law, the executive branch has considered this power, especially in light of *Bowsher v. Synar*, 478 U.S. 714 (1986), to be inconsistent with the Constitution, since the Comptroller General is appointed and removable by Congress and therefore is not supposed to possess "executive" power. DOJ has asserted that its own views on the meaning of appropriations law are binding on agencies, whereas GAO's views are mere persuasive authority. However, agencies may practically look to GAO, since it provides regular advice on appropriations in a way that DOJ does not. KENNETH J. ALLEN, FEDERAL GRANT PRACTICE § 8:12, at 126–27 (2011). And GAO, being a congressional entity, may be able to provide cover for the agency with congressional appropriators in a way that DOJ cannot; I thank Professor David Super for pointing this out to me.

[290] Burson, B-239556, 1990 WL 293549 at *1 (Comp. Gen. Oct. 12, 1990); *see also* Bradley, B-242786 (Comp. Gen. Jan. 31, 1991) (stating that, because a district court order mandating DOJ pay monetary sanctions was "intended to punish the agency," it could not be paid out of the Judgment Fund and instead could be made out of DOJ appropriations, *id.* at *3).

EPA_00049013

the sanctioning judge, of docking the agency's budget, thereby pressing the agency to comply.

But there is a possible obstacle. If the fine is payable from the government-wide Judgment Fund — a permanent indefinite appropriation for judgments and settlements against federal agencies enacted by Congress decades ago[291] — then its payment would not have to come from agency appropriations and it would have no incentive effect on the agency. Up until 1996, decisions about whether to make payments from the Judgment Fund were vested in GAO.[292] In 1990, after a federal agency accidentally attempted to collect a debt discharged in bankruptcy and was ordered to pay $2500 in attorneys' fees for contempt, GAO decided that, because the Judgment Fund's purpose was to pay compensation for losses, the Fund should be available to pay contempt fines that were "intended to compensate plaintiffs for losses arising from defendants' failure to comply with court orders," but it should not be available to pay "criminal contempt fines intended to punish defiance of the courts and vindicate their authority" nor "civil contempt fines intended to compel future compliance with court orders."[293] Criminal contempt fines and civil coercive contempt fines could be paid only from an agency appropriation — a procedure that would hit the agency in its wallet and force agency officials "to account, both internally and to Congress, for their actions."[294]

Assuming that the GAO approach still controls, judges who get past the sovereign immunity hurdle can use civil coercive and criminal contempt fines to dock agency appropriations. However, GAO's power to administer the Judgment Fund was transferred by Congress in 1996 to the Treasury Department,[295] whose guidance does not mention fines,[296] and which has not published decisions about the Judgment Fund in the way GAO did.[297] Because Treasury (unlike GAO) is an executive agency, it is possible that a presidential administration, if sympathetic to an agency that incurred a contempt fine, could pressure Treasury to cover the fine from the Judgment Fund,[298] thus insulating the agency's appropriations and making Congress less likely to get involved (as the

---

[291] 31 U.S.C. § 1304 (2012).

[292] OFFICE OF THE GEN. COUNSEL, U.S. GOV'T ACCOUNTABILITY OFFICE, 3 PRINCIPLES OF FEDERAL APPROPRIATIONS LAW 14–33 (3d ed. 2008).

[293] Burson, B-239556, 1990 WL 293549 at *1 (Comp. Gen. Oct. 12, 1990).

[294] *Id.* at *2. GAO later clarified that even if an award of litigation expenses were compensatory, payment from the Judgment Fund might still be barred if the court meant the award to be punitive. Bradley, B-242786 (Comp. Gen. Jan. 31, 1991).

[295] 3 PRINCIPLES OF FEDERAL APPROPRIATIONS LAW, *supra* note 292, at 14–33.

[296] 31 C.F.R. § 256 (2016); U.S. DEP'T OF THE TREASURY, TREASURY FINANCIAL MANUAL, pt. 6, ch. 3100 (2009).

[297] On transparency issues with the Judgment Fund (more with respect to accounting than substantive decisionmaking), see Figley, *supra* note 34, at 201–07.

[298] On the executive branch politics of the Judgment Fund, see *id.* at 183 n.291, 186–89.

Judgment Fund, being disconnected from the regular appropriations process, gets little congressional oversight).[299]

But assuming the GAO approach does control, judicial imposition of coercive civil or criminal contempt fines would, if the fines were large enough, create a new claim on the agency's budget and thereby command the attention of the agency's top officials, plus its political overseers. The Office of Management and Budget apportions agency appropriations by time and subject matter to ensure that agencies do not run out of money midyear,[300] so a large contempt liability would have the effect of elevating the issue of the agency's noncompliance to the level of OMB. Meanwhile, the contempt liability could also get the attention of the appropriations committees in the House and Senate. The appropriators are a key audience because, if they wish to protect the agency, they can insert a rider into the upcoming appropriations statute barring payment of the contempt fine, thereby getting the agency off the hook. Alternatively, if the appropriators do not like what the agency is doing, they can exert pressure on the agency accordingly.

But assuming that neither Congress nor the President concertedly acts to shield the agency or make it pay, the agency would simply be liable for the contempt fine and would have a general appropriation from which to lawfully pay it. This scenario — of a potentially large, judicially determined liability payable from a general agency appropriation — hardly arises in the real world, because agencies' judicially determined debts are paid overwhelmingly from the Judgment Fund.[301] The scenario is similar to the one that would have arisen had Congress in the 1990s enacted a proposal to charge compensation for regulatory takings against agency general appropriations. Gaming out that proposal, Professor Charles Tiefer suggested that an agency might delay payment of compensation, perhaps indefinitely, by invoking the Supreme Court's decision in *Lincoln v. Vigil*,[302] which says an agency has judicially unreviewable discretion to decide how to allocate a lump-sum appropriation among competing lawful needs, that being a fundamentally political task.[303] But I think *Lincoln* is distinguishable. The Court

[299] *Id.* at 179–80.

[300] Eloise Pasachoff, *The President's Budget as a Source of Agency Policy Control*, 125 YALE L.J. 2182, 2228 (2016).

[301] Of the most important statutes that charge judicially determined liabilities against agency appropriations — involving contract damages, employment discrimination, and attorneys' fees — all but the last provide for payment to be made from the Judgment Fund, which is then to be reimbursed by the agency. The Treasury has no power to force reimbursement, for which rates are about 25% to 50% for larger claims. Figley, *supra* note 34, at 167–75.

[302] 508 U.S. 182 (1993).

[303] Charles Tiefer, *Controlling Federal Agencies by Claims on Their Appropriations? The Takings Bill and the Power of the Purse*, 13 YALE J. ON REG. 501, 521, 526–30 (1996) (citing *Lincoln*, 508 U.S. at 192–93).

held unreviewable an agency's decision not to allocate money to a pro-
gram that the agency had previously created in its own discretion,[304]
which is different from a judicially determined liability like a contempt
fine. A couple of recent Supreme Court cases, though not directly on
point, bolster this reading. In these cases, an agency made contracts on
which payment was subject by statute "to the availability of appropria-
tions."[305] In both cases, the agency then refused to pay, saying there was
no liability because it needed to allocate the available appropriations to
other lawful needs, but the Court held in both instances that liability
was not extinguished.[306] So discretion to allocate a general appropria-
tion is probably not a warrant for the agency to avoid payment on a
judicially determined claim or delay it indefinitely. Eventually delay
would become unreasonable, and the court could issue a writ of man-
damus to the disbursing official responsible for payment,[307] backed by
personal contempt sanctions if necessary (on which see the next Parts).

## II. IMPRISONMENT OF THE AGENCY OFFICIAL

The judiciary's unwillingness to impose contempt fines on federal
agencies is matched by its unwillingness to imprison federal officials for
contempt. Although the head of a noncompliant agency is subject to
imprisonment in principle, prudential doctrines caution against impos-
ing the sanction in practice. Our search turns up even fewer cases of
judges imprisoning or credibly threatening to imprison agency offi-
cials — four to be exact — than of judges imposing or scheduling con-
tempt fines. (In the two cases where officials were actually jailed, it was
for only a few hours.) In these cases, higher courts play a similar role
as in the context of contempt fines: they keep the lower-level sanctioning
judges from going through with the sanction, but without questioning
that the sanction is available in principle.

### A. The Baseline: Imprisonment of Nonfederal Contemnors

The previous Part showed how contempt fines' vanishing rarity for
federal agencies contrasted starkly with their frequency for private in-
stitutional defendants. When it comes to imprisonment, the disparity
between federal officials and private individuals is similarly large. The
disparity becomes much smaller, though it still exists, if we change the

---

[304] *Lincoln*, 508 U.S. at 192–93.

[305] 25 U.S.C. § 450j-1(b) (2012).

[306] Salazar v. Ramah Navajo Chapter, 567 U.S. 182, 185 (2012); Cherokee Nation v. Leavitt, 543
U.S. 631, 634 (2005).

[307] On mandamus for unreasonable agency delay, see *In re Core Communications, Inc.*, 531 F.3d
849, 855–57 (D.C. Cir. 2008).

baseline from private individuals generally to private individuals jailed for disobedience by organizations they control.

Numerous private individuals are jailed for contempt. Probably the biggest category of these contemnors is parents violating orders to pay child support, generally in state courts.[308] Plus, of course, individuals are jailed for contempt of other kinds of orders — for example, rich people hiding assets,[309] or journalists refusing to turn over sources.[310]

There are some contemnors jailed or threatened with jail because of disobedience by corporations of which they are officers, but the cases are much harder to find than those imposing contempt fines on corporations, and they seem to involve only small firms.[311] Historically, the officers of labor unions were commonly jailed for union disobedience[312] — Al Shanker was jailed for contempt in 1967[313] and other union leaders were jailed into the 1970s[314] — though that practice seems to have disappeared in the last generation.

As to state and local officials, jailing for contempt is, as with other contempt sanctions, rare in an absolute sense — even rarer than fines against state or local officials or agencies — yet still more clearly available than for federal officials. Most prominently, a U.S. district court in September 2015 jailed Kim Davis, the clerk of a rural county in Kentucky, when she refused to comply with an injunction to issue marriage licenses in accordance with the Supreme Court's decision constitutionalizing same-sex unions.[315] Davis spent six days in jail until the court worked out a deal whereby her deputies would issue the licenses.[316] That is a far more substantial sanction than the couple of far-less-

---

[308] For an assembly of fragmentary statistics, suggesting the number jailed annually nationwide is in the many tens of thousands, see Elizabeth G. Patterson, *Civil Contempt and the Indigent Child Support Obligor: The Silent Return of Debtor's Prison*, 18 CORNELL J.L. & PUB. POL'Y 95, 117 (2008).

[309] For several examples, see Paul A. Avron & Franklin H. Caplan, *Incarceration for Civil Contempt: Noncompliance Is Its Own Reward*, FED. LAW., Dec. 2014, at 57; and Jennifer Fleischer, *In Defense of Civil Contempt Sanctions*, 36 COLUM. J.L. & SOC. PROBS. 35, 58–62 (2002).

[310] *See, e.g.*, Jesse McKinley, *Blogger Jailed After Defying Court Orders*, N.Y. TIMES, Aug. 2, 2006, at A15; Susan Schmidt & Jim VandeHei, *N.Y. Times Reporter Released from Jail*, WASH. POST (Sept. 30, 2005), http://www.washingtonpost.com/wp-dyn/content/article/2005/10/19/AR2005101900795_pf.html [https://perma.cc/49DN-363E].

[311] *E.g.*, United States v. Hochschild, 977 F.2d 208 (6th Cir. 1992) (four months for criminal contempt); Aguayo v. S. Coast Refuse Corp., No. CV 99-3053, 2000 WL 1280926 (C.D. Cal. Feb. 29, 2000) (threat of jail for civil contempt).

[312] *See, e.g.*, Edward J. Silberfarb, *Hospital Union Head Gets Six Months for Contempt*, N.Y. HERALD TRIB., July 17, 1962, at 7.

[313] Leonard Buder, *Shanker is Given 15 Days, $250 Fine for Defying Writ*, N.Y. TIMES, Oct. 5, 1967, at 1.

[314] Joseph A. O'Brien, *Judge Jails 9 Teachers for Contempt in Strike*, HARTFORD COURANT, Nov. 7, 1975, at 1.

[315] Miller v. Davis, 123 F. Supp. 3d 924 (E.D. Ky. 2015) (order lifting contempt sanction), ECF No. 89.

[316] *Id.*

EPA_00049017

publicized instances where federal officials have been detained for a few hours. Still, it is important to note that jailing of state or local officials is extremely rare: I find no examples apart from Davis in the last century.[317] That said, a focus on imprisonment may be too narrow to comprehend the role of physical coercion in enforcing federal court orders. After all, Presidents Eisenhower and Kennedy sent U.S. Marshals and Army troops to enforce desegregation injunctions in Little Rock in 1957 and at Ole Miss in 1962, in both cases to deal with riotous mobs encouraged by state official defendants.[318] These interventions sent a powerful message that, when state officials defied federal injunctions, the national judiciary could be backed by the sword. In that sense, there is an enormous disparity in the historical use of physical force against state defendants (almost no jail, but sometimes federal troops) as compared to federal defendants (almost no jail, period).

### B. Uncertain Doctrine

In the previous Part, we saw that there is intense controversy over whether contempt fines are available, in principle, against a federal agency, or are barred by sovereign immunity. But there is not much controversy over whether imprisonment is available, in principle, against the officer who heads an organization, including a federal agency, if that organization disobeys a court order. On principle, there is broad agreement that officers can be imprisoned. (Applying this principle in particular circumstances is where controversy and uncertainty enter, as we shall see in a moment.)

Regarding officers of a private organization, the Supreme Court boldly stated the controlling principle in *Wilson v. United States*,[319] which affirmed the coercive imprisonment of a corporation's president for disobeying a subpoena to the corporation:

> A command to the corporation is in effect a command to those who are officially responsible for the conduct of its affairs. If they, apprised of the writ directed to the corporation, prevent compliance or fail to take appropriate action within their power for the performance of the corporate duty,

---

[317] In his study of the enforcement of structural injunctions against state and local governments, Hirschhorn reported he could find "no federal case" in the period 1959–1984 "in which a public official has been imprisoned for civil or criminal contempt for violating an injunction," despite several obvious examples of state and local officials defying federal court orders, particularly during desegregation. Hirschhorn, *supra* note 20, at 1841; *see also* MALCOLM M. FEELEY & EDWARD L. RUBIN, JUDICIAL POLICY MAKING AND THE MODERN STATE: HOW THE COURTS REFORMED AMERICA'S PRISONS 357 (1998). I have seen one example of a federal judge issuing a jail ultimatum to a local official amid a school desegregation suit. United States v. Watson Chapel Sch. Dist. No. 24, 446 F.2d 933, 939 (8th Cir. 1971).

[318] CHARLES W. EAGLES, THE PRICE OF DEFIANCE: JAMES MEREDITH AND THE INTEGRATION OF OLE MISS 277–370 (2009); TONY A. FREYER, LITTLE ROCK ON TRIAL: *COOPER V. AARON* AND SCHOOL DESEGREGATION 112–44 (2007).

[319] 221 U.S. 361 (1911).

EPA_00049018

they, no less than the corporation itself, are guilty of disobedience, and may be punished for contempt.[320]

This is consistent with Rule 65(d)(2) of the Federal Rules of Civil Procedure, which says that an injunction binds the "officers" of a party, so long as they receive actual notice of it.[321]  In cases asking whether a corporate or union officer can be sanctioned for the corporation's or union's noncompliance, the courts of appeals have generally answered yes, on the ground that anyone "legally identified" with a contemnor can be sanctioned, and a corporate or union officer surely fits the bill.[322]  Occasionally, the cases express concern about whether the sanctioned officer is a party to the case, was served, and so forth.[323]  But those concerns are of little moment for litigation against federal agencies: for most agency action that is the subject of litigation, the power to do the action is vested by statute in the head official of the agency, and it is customary to name as defendants both the agency and its head official, both of whom can easily be served.

Consistent with the case law on private organizational defendants, there seems to be a widespread understanding that a federal agency's head official can, in principle, be imprisoned for the agency's disobedience of a court order.  In *Land v. Dollar*[324] in 1951, which concerned imprisonment of the Secretary of Commerce and which I shall discuss in depth below, DOJ tried to convince the D.C. Circuit that federal agency officials were absolutely immune to contempt sanctions for violating injunctions in the same way they were absolutely immune to damages for common law torts.[325]  The D.C. Circuit rejected this argument and ordered the Secretary jailed in five days if he did not comply with the injunction at issue.[326]  In the decades since *Land*, DOJ has apparently never again asserted this broad official immunity to imprisonment for contempt.  In *Waksberg* in 1997,[327] the DOJ brief to the D.C. Circuit,

---

[320] *Id.* at 376.

[321] FED. R. CIV. P. 65(d)(2).

[322] Elec. Workers Pension Tr. Fund of Local Union #58 v. Gary's Elec. Serv. Co., 340 F.3d 373, 380 (6th Cir. 2003) (quoting NLRB v. Sequoia Dist. Council of Carpenters, 568 F.2d 628, 633 (9th Cir. 1977)); *see also* Chi. Truck Drivers v. Bhd. Labor Leasing, 207 F.3d 500, 507 (8th Cir. 2000); United States v. Laurins, 857 F.2d 529, 535 (9th Cir. 1988); I.A.M. Nat'l Pension Fund, Benefit Plan A v. Wakefield Indus., Inc., 699 F.2d 1254, 1260 n.8 (D.C. Cir. 1983); Backo v. Local 281, United Bhd. of Carpenters, 438 F.2d 176, 180–81, 181 n.1 (2d Cir. 1970).

[323] See particularly the concern about service in *I.A.M.*, 699 F.2d at 1260–62.

[324] 190 F.2d 623 (D.C. Cir. 1951), *vacated in part and dismissed as moot in part sub nom.* Sawyer v. Dollar, 344 U.S. 806 (1952) (mem.).

[325] *Id.* at 638; *cf.* Gregoire v. Biddle, 177 F.2d 579 (2d Cir. 1949) (recognizing broad official immunity from common law tort actions).  Federal officials' absolute immunity from common law tort damages has since been imposed by legislation. *See* 28 U.S.C. § 2679(b) (2012).

[326] *Land*, 190 F.2d at 638–40, 648.  The Supreme Court granted certiorari, Land v. Dollar, 341 U.S. 737 (1951), but then the case settled, *Sawyer*, 344 U.S. at 806.  *See infra* text accompanying notes 416–432.

[327] *See supra* text accompanying notes 166–195.

written by the U.S. Attorney's Office in D.C., conceded the availability of imprisonment against agency officials and even invoked such imprisonment as a reason why contempt fines against the agency itself were unnecessary to ensure executive branch compliance with the law.[328] DOJ has similarly backed off the immunity claim outside the D.C. Circuit. In *Forest Service Employees for Environmental Ethics v. United States Forest Service*[329] in 2008, which involved potential imprisonment of the Undersecretary of Agriculture and which I also discuss in section II.C, DOJ's Environmental and Natural Resources Division made no general pronouncement against imprisonment of officials, admitting it could be a "last resort" and arguing against it as imprudent in the case's particular circumstances.[330]

This brings us to the key point: the doctrine on contempt cautions against sanctions in particular circumstances that tend to be prevalent when it comes to high-ranking federal officials. In general, civil contempt findings are available for any noncompliance with a court order, regardless of the defendant's intent to disobey (only *criminal* contempt requires intent).[331] But noncompliance cannot support any contempt finding, even a civil one, insofar as compliance is objectively impossible.[332] A related and perhaps identical doctrine says that a defendant can avoid a contempt finding by making all reasonable efforts at compliance or doing everything in his or her power to comply.[333] This is consistent with *Wilson's* pronouncement that corporate officers are in contempt if they "prevent compliance or *fail to take appropriate action within their power* for the performance of the corporate duty."[334] When a corporation is noncompliant, the court must determine whether the corporation can possibly comply, whether it is making all reasonable effort, and so forth. But in holding a corporate *officer* in contempt, presumably a court needs to make a distinct determination about impossibility and reasonable effort *as to that officer*. The judge has to

---

[328] Brief for Appellee at 15, United States v. Waksberg, 112 F.3d 1225 (D.C. Cir. 1997) (No. 95-5165).

[329] 530 F. Supp. 2d 1126 (D. Mont. 2008).

[330] Defendant's Pre-Hearing Brief at 20–22, *Forest Serv. Emps. for Envtl. Ethics*, 530 F. Supp. 2d 1126 (Civ. No. 03-165-M-DWM), ECF No. 153. The brief did make the somewhat more categorical argument that the official "cannot" be held in contempt for violating an injunction that names only the agency and not him. *Id.* at 22; *cf. supra* note 323 and accompanying text. But the district judge probably could have resolved this problem relatively easily by modifying the injunction to name the official.

[331] 11A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2960, at 382 (2d ed. 1995); 17 AM. JUR. 2D CONTEMPT § 13, text accompanying notes 4–6, Westlaw (database updated Aug. 2017).

[332] *See* Nat. Res. Def. Council v. Train, 510 F.2d 692, 713 (D.C. Cir. 1975).

[333] 11A WRIGHT ET AL., *supra* note 331, § 2960, at 380–82; 17 CONTEMPT, *supra* note 331, § 144, text accompanying notes 9–11.

[334] Wilson v. United States, 221 U.S. 361, 376 (1911) (emphasis added).

*HARVARD LAW REVIEW* [Vol. 131:685

decide, given the organization's size and internal managerial capacities, what is reasonable to expect the officer to do — that is, what is the "appropriate action" that *Wilson* demands of him or her.[335]  Of course, in many contempt cases, the disobedient corporation or union is a relatively small, simple organization,[336] such that the officer's capacity to comply differs little from the organization's capacity to comply.

But a federal agency is such a large and complex organization that it may be difficult for a court to tell what it can reasonably demand of the agency head.[337]  After all, the agency head is likely a political appointee, without long experience inside the agency, who faces a potentially large assembly of lower-level officials armed with vast knowledge, operating by preexisting procedures, and often protected by civil service regulations.  Confidently discerning the "appropriate action"[338] that an agency head must take may require the court to understand the agency's internal operations — something it lacks institutional competence to do.  And even if the judge could decide what the agency head reasonably ought to do, the doctrine says that, while civil contempt does not require intent, the contemnor's subjective state of mind is one factor in the calculus of deciding sanctions.[339]  Thus, even if an official fails to do what the court thinks is objectively appropriate to ensure compliance, the court would risk reversal for abuse of discretion if it imprisoned the official without sufficiently accounting for whether the official was subjectively trying, by his or her own lights, to comply.[340]

---

[335] This may be what the First Circuit had in mind when it said that "an officer, responsible for the corporation's affairs and for its disobedience, may be held liable for contempt." NLRB v. Me. Caterers, Inc., 732 F.2d 689, 691 (1st Cir. 1984).  In *Backo v. Local 281, United Brotherhood of Carpenters*, 438 F.2d 176, 180–81, 181 n.1 (2d Cir. 1970), the court relied partly on how the officers affirmatively caused the order against the organization to be violated and reserved the question of whether the officers' mere passivity could serve as the basis for contempt, but surely *Wilson* means that passivity is enough if action would be appropriate.

[336] *E.g.*, Cent. States, Se. & Sw. Areas Pension Fund v. Wintz Props., Inc., 155 F.3d 868, 876 (7th Cir. 1998) (upholding contempt finding against sole officer and shareholder of disobedient corporation).

[337] On problems of assigning responsibility to federal agency officials, see Appellants' Reply Brief at 13, United States v. Waksberg, 112 F.3d 1225 (D.C. Cir. 1997) (No. 95-5165); and Amici Curiae Brief of the Washington Legal Foundation and the American Civil Liberties Union of the National Capital Area in Support of Appellants at 14, *Waksberg*, 112 F.3d 1225 (No. 95-5165).

[338] *Wilson*, 221 U.S. at 376.

[339] *See* SEC v. Ormont Drug & Chem. Co., 739 F.2d 654, 657 n.8 (D.C. Cir. 1984); 17 CONTEMPT, *supra* note 331, § 13, text accompanying notes 9–11.

[340] On the reluctance of federal judges to impose contempt sanctions on *state and local* officials in structural reform litigation by reason of difficulty in assigning individual responsibility within organizations, see Hirschhorn, *supra* note 20, at 1841–43.

### C. Judicial Behavior: You Can Send Officials to Jail — But Don't Actually Do It!

Our assembly of sources reveals four cases in which one or more judges, at some level and at some stage of the litigation, imprisoned a federal agency official (briefly) or made an arguably credible threat to do so.[341] Each of these exceptional incidents, in its own way, helps prove the broader rule that the judiciary is adamantly averse to imprisoning federal officials for contempt, despite the sanction's availability in principle.

---

[341] In searching for cases that involve actual imprisonment of officials or credible threats thereof, I encountered some cases in which I found the threat was not credible or the imprisonment order was pro forma and not meant to result in actual imprisonment.

A threat that I consider not credible occurred in the prosecution of several reputed mobsters in Boston in the 1990s. Believing there was evidence that the government had obtained a warrant on false pretenses by withholding information about its use of informants, Judge Wolf ordered the government to reveal whether certain persons were informants. United States v. Salemme, 978 F. Supp. 364, 365–66 (D. Mass. 1997). The DOJ official with power to decide such disclosures — the Acting Deputy Attorney General (ADAG) — refused to disclose, and the government asked Judge Wolf to reconsider his order, with one DOJ official stating that the government was willing to risk Judge Wolf dismissing the case, or to get itself held in contempt so as to get appellate review of the order. *See id.* at 366. Defendants did indeed move for contempt. *Id.* at 365. In response, Judge Wolf issued an opinion stating why he continued to think his disclosure order was correct; repeatedly referring to the possibility of dismissing the case; explaining that a contempt order if issued would run against the ADAG; and making one statement mentioning imprisonment: "it may be necessary to hold a hearing to determine whether [the ADAG] should be held in civil contempt and incarcerated until he complies with the court's Orders." *Id.* at 374. At the end of the opinion, Judge Wolf ordered the ADAG to either comply, agree to exclusion of the allegedly tainted evidence, agree to dismiss the case, or show cause why he should not be held in contempt. *Id.* In this judicial pronouncement and lengthy subsequent ones that finally led to resolution of the issue, it seems that compliance, exclusion, and dismissal were the live possibilities, receiving nearly all the discussion, with contempt discussed less, and actual imprisonment for contempt mentioned only in the one sentence just cited. *See id. passim;* United States v. Salemme, 978 F. Supp. 379 (D. Mass. 1997); United States v. Salemme, 978 F. Supp. 390 (D. Mass. 1997); *see also* Barry Tarlow, *RICO Report,* CHAMPION, Mar. 1998, at 40 (analyzing the entire controversy at length without mentioning potential imprisonment of the ADAG).

In addition, there were several cases involving orders of imprisonment that were pro forma, as a device for appellate review of the underlying order. The official would be committed to DOJ's custody, but then the trial judge or appellate court would immediately grant a stay, release the official on his or her own recognizance, or the like:

(1) United States v. Cox, 342 F.2d 167 (5th Cir. 1965), *cert. denied,* 381 U.S. 935 (1965); Brief for Respondent in Opposition [to Certiorari] at 8–9, Cox v. Hauberg, 381 U.S. 935 (1965) (No. 1055).

(2) *In re* Spector, 42 Cust. Ct. 726, 731–32, 747–48 (1959).

(3) Harris v. Tex. & Pac. Ry. Co., 196 F.2d 88 (7th Cir. 1952). The official was committed to custody but "released on her own recognizance in the sum of $1,000," *id.* at 89, after which the contempt order was vacated on appeal, *id.* at 90.

(4) United States ex rel. Touhy v. Ragen, 340 U.S. 462, 463–66 (1951) (recounting lower court events); *Chicago FBI Chief Seized in Touhy Case; Freed on Bond,* CHI. TRIB., June 3, 1949, at 1.

(5) United States v. Bowman Dairy Co., 185 F.2d 159 (7th Cir. 1950), *vacated,* 341 U.S. 214 (1951); Transcript of Record at 102, *Bowman Dairy,* 341 U.S. 214 (No. 435).

(6) *Ex parte* Sackett, 74 F.2d 922 (9th Cir. 1935); *Judge Cites Federal Aide,* L.A. TIMES, Dec. 13, 1934, at A2.

*HARVARD LAW REVIEW* [Vol. 131:685]

The first case, and the most important, is *Land v. Dollar* (discussed in depth below), in which the D.C. Circuit in 1951 ordered the Secretary of Commerce and several other officials imprisoned in five days if they failed to comply with the injunction at issue.[342]   The Supreme Court, through a series of stays and certiorari grants, stalled the sanction indefinitely, and the plaintiffs settled at a fifty percent discount, so no precedent was set.[343]   But the litigation evinces the judiciary's institutional reluctance to employ imprisonment against agencies.

The second and third cases, *Knapp v. Kinsey*[344] and *Save Domestic Oil, Inc. v. United States*,[345] indicate that the judiciary's reluctance runs so deep that judges who dare use imprisonment against federal agencies (a) are themselves marginal actors with unusual and improper investment or bias in the case and (b) will be dealt with severely by the higher courts.   In *Knapp*, a district judge in 1955, hearing a private shareholder suit claiming corporate mismanagement, sought confidential material from the Securities and Exchange Commission (SEC) regarding its investigation of the company; the SEC General Counsel refused.[346]   The judge responded by committing the General Counsel to the custody of the U.S. Marshal.[347]   A Sixth Circuit judge stayed the imprisonment within hours,[348] and then, a few months later, the Sixth Circuit reversed the contempt finding as an abuse of discretion.[349]   Later, the Sixth Circuit removed the imprisoning judge from the underlying case for bias as evidenced partly by his extreme treatment of the SEC official.[350]

In *Save Domestic Oil*, the Court of International Trade, per Judge Aquilino, ordered the Commerce Department in 2000 to reconsider its dismissal of a petition for antidumping duties.[351]   The agency delayed acting on the order while pursuing an appeal to the Federal Circuit (without obtaining a stay),[352] only to have the Federal Circuit hold the order unappealable eight months later.[353]   Once this happened, Judge Aquilino initiated criminal contempt proceedings against the agency for supposedly delaying in bad faith with its frivolous appeal.[354]   At the

---

[342]   Land v. Dollar, 190 F.2d 623, 648 (D.C. Cir. 1951).

[343]   *See infra* text accompanying notes 416–37.

[344]   232 F.2d 458 (6th Cir. 1956).

[345]   357 F.3d 1278 (Fed. Cir. 2004).

[346]   Appeal of the SEC, 226 F.2d 501, 502 (6th Cir. 1955).

[347]   *Id.*

[348]   *Id.*

[349]   *Id.* at 520.

[350]   Knapp v. Kinsey, 232 F.2d 458, 461–62, 467 (6th Cir. 1956).

[351]   Save Domestic Oil, Inc. v. United States, 24 Ct. Int'l Trade 994, 1015 (2000).

[352]   Brief for the United States in Opposition at 3, U.S. Court of Int'l Trade v. United States, 534 U.S. 1117 (2002) (No. 01-684).

[353]   Save Domestic Oil, Inc. v. United States, 18 F. App'x 819, 821 (Fed. Cir. 2001).

[354]   *See* Save Domestic Oil, Inc. v. United States, 25 Ct. Int'l Trade 927 (2001).

EPA_00049023

contempt hearing, he demanded that two Commerce Department law-yers reveal the names of all officials involved in bringing the appeal. They refused, pleading ignorance and possible privilege. Judge Aquilino responded by jailing the two attorneys in the courthouse detention area, letting them go after about four hours.[355]  The government quickly ob-tained a writ of mandamus from the Federal Circuit halting the criminal contempt proceeding, there being insufficient evidence of bad faith.[356] Judge Aquilino — in a remarkable move — filed a petition for certiorari with the Supreme Court, asking it to override the Federal Circuit.[357] His main argument was that "government employees do not have license to completely disregard or willfully disobey court orders."[358]  After the Supreme Court denied certiorari,[359] some of the parties to the original suit (still ongoing) confronted the judge, accusing him of becoming an advocate in the proceedings.  Presumably realizing the Federal Circuit would remove him, he recused himself, in a wild opinion attacking "the indifference of those courts in Washington [i.e., the Federal Circuit and Supreme Court]" to lawbreaking by government officials.[360]  Thus, in both *Knapp* and *Save Domestic Oil*, the biggest loser ended up being the imprisoning judge.

The last of the four cases, *Forest Service Employees for Environmen-tal Ethics v. United States Forest Service*, may be read as the converse of *Knapp* and *Save Domestic Oil*.  In this case, the district judge issued a jail threat so indirect as to avoid trouble with the appellate bench, though perhaps also so indirect as not to be taken seriously.  After the Forest Service missed multiple deadlines to complete an environmental analysis of its use of chemical fire retardants, the district judge in 2008 issued an order that officially did nothing except schedule a hearing on whether to issue a contempt finding, but actually laid out evidence of the agency's bad faith and told the parties "to address the appropriate-ness and efficacy of the following sanctions the Court is considering": jailing the agency head, placing him under house arrest, or enjoining the Forest Service to use only water in fighting fires.[361]  Because the order technically just scheduled a hearing, it could not be the occasion for

---

[355] These events are recounted in Joint Brief for the Sanctioned Party-Appellants at 3–12, Save Domestic Oil v. United States, 53 F. App'x 72 (Fed. Cir. 2002) (Nos. 02-1042, 02-1043).  This brief includes the transcript of the contempt hearing as an appendix.

[356] *In re* United States, 20 F. App'x 847 (Fed. Cir. 2001).

[357] *See* Petition for Writ of Certiorari, *U.S. Court of Int'l Trade*, 534 U.S. 1117 (No. 01-684).

[358] *Id.* at 11.  Judge Aquilino's theory of why he could petition was that the mandamus proceed-ing was technically a distinct suit against his own court.

[359] 534 U.S. 1117 (2002).

[360] Save Domestic Oil, Inc. v. United States, 26 Ct. Int'l Trade 371, 378 (2002).

[361] Forest Serv. Emps. for Envtl. Ethics v. U.S. Forest Serv., 530 F. Supp. 2d 1126, 1136 (D. Mont. 2008).

appellate review. The agency did complete its analysis prior to the hearing,[362] which might imply the jail threat had an impact. But at the hearing, DOJ presented extensive testimony to indicate that the initial delay and eventual compliance reflected internal bureaucratic confusion, not willful defiance,[363] suggesting that the agency would have complied on the same schedule without mention of jail. Further, the DOJ attorneys' approach to the hearing indicated they were taking the threat of a nothing-but-water injunction much more seriously than the threat of jailing the agency head.[364]

To assess "up close" the judiciary's aversion to imprisoning officials, I devote the remainder of this section to a narrative of the most important imprisonment case, *Land v. Dollar*. The subject matter of *Land* was a government bailout.[365] During the Great Depression of the 1930s, one of the nation's largest ocean shipping firms, Dollar Steamship Lines, "found itself in dire straits, being indebted to the United States for over seven million dollars."[366] The majority shareholders, R. Stanley Dollar and his relatives, agreed to give their shares to the U.S. Maritime Commission (USMC) to hold "on behalf of the United States,"[367] in exchange for which the USMC released the shareholders from liability for the debt.[368] The USMC thereby took control of the company.[369] World War II made the company flush again, and it repaid its debt to the government.[370] Then, in 1945, the Dollars sued the USMC's members in the U.S. District Court for the District of Columbia, seeking to get the stock back.[371] They argued that their transfer of the stock had been a

---

[362] Defendant's Notice of Completion of Consultation and Further Decision Notice and Finding of No Significant Impact, *Forest Serv. Emps. for Envtl. Ethics* (No. 03-cv-00165), ECF No. 150.

[363] Agency officials testified that compliance had been drawn out because of miscommunication and misunderstanding between administrators regarding the fire retardant program, which caused them initially to underestimate how much work had to be done. Transcript of Hearing on Motion for Contempt at 19, 32, 37–38, 52–53, 63, 84–86, 88, 94, 100, 151–52, *Forest Serv. Emps. for Envtl. Ethics* (No. CV-03-165), ECF No. ___ (transcript was produced specifically for this author and is now on file with the Harvard Law School Library). The officials testified that they were never denied resources they requested or discouraged from complying with the law. *Id.* at 34, 62–63, 75, 81, 94, 110, 120–21.

[364] During the entire two-day hearing, there were only two passing references to incarceration as a contempt sanction, one by a DOJ attorney, *id.* at 219, and one by the plaintiff's attorney, *id.* at 226. For more abstract (and still brief) references to "sanctions," see *id.* at 7, 13, 35, 223. Meanwhile, DOJ attorneys called two witnesses to explain at great length why a nothing-but-water injunction was unnecessary and would have harmful, far-reaching consequences. *Id.* at 16–17, 20–23, 153–73, 173–97.

[365] Nad Peterson, Note, *Collateral Estoppel and the Dollar Litigation*, 20 GEO. WASH. L. REV. 749, 750 (1952).

[366] *Id.*

[367] Land v. Dollar, 188 F.2d 629, 630 (D.C. Cir. 1951).

[368] Peterson, *supra* note 365, at 750.

[369] *Id.*

[370] *Id.*

[371] Dollar v. Land, 184 F.2d 245, 248 (D.C. Cir. 1950).

mere pledge of collateral for the company's repayment of the debt.[372] The USMC members, "represented throughout by attorneys from [DOJ]," countered that ownership of the stock had been transferred outright.[373] The USMC also argued that the suit was really against the United States and was therefore barred by sovereign immunity[374] (this being prior to Congress's waiver of sovereign immunity to nondamages relief in 1976[375]).

The sovereign immunity question went to the Supreme Court in 1947.[376] The Court held that the shareholders' suit could go forward because of the well-established doctrine, going back seventy years to *United States v. Lee*,[377] that if the federal government held property unlawfully, plaintiffs could personally sue the federal officials who possessed it and recover it from them, sovereign immunity notwithstanding.[378] The *Lee* doctrine was an important basis for judicial review of agency action through much of the twentieth century.[379] Applying it to the USMC case, the Court said that "if the allegations of the petition [that is, that ownership of the stock was never transferred] are true, the shares of stock never were property of the United States,"[380] meaning that only the officials, and not the United States, were necessary parties (and also that any "judgment would not be *res judicata* as against the United States").[381]

After the case went below, the plaintiffs went to trial and lost on the merits before the district court.[382] But in the summer of 1950, the D.C. Circuit reversed, holding that the transfer had been merely a pledge, in part because the USMC lacked statutory authority to acquire ownership outright.[383] Judgment thus went for the plaintiffs.[384] That fall, a presidential reorganization plan abolished the USMC, and the Secretary of

---

[372] *Id.*
[373] Peterson, *supra* note 365, at 750.
[374] *Id.*
[375] Act of Oct. 21, 1976, Pub. L. No. 94-574, 90 Stat. 2721 (codified at 5 U.S.C. § 702 (1988)).
[376] Land v. Dollar, 330 U.S. 731 (1947).
[377] 106 U.S. 196 (1882).
[378] *Land*, 330 U.S. at 736 (citing *Lee*, 106 U.S. at 219).
[379] SISK, *supra* note 85, at 81 n.64 (describing such suits as "integral to the early development of administrative law").
[380] *Land*, 330 U.S. at 738.
[381] *Id.* at 739.
[382] Dollar v. Land, 82 F. Supp. 919 (D.D.C. 1948).
[383] Dollar v. Land, 184 F.2d 245, 254, 257 (D.C. Cir. 1950).
[384] *Id.* at 257. Although the Supreme Court had since narrowed the *Lee* doctrine in *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949), the Court there expressly said *Lee* still stood as to suits against officers alleged to be acting beyond their statutory authority, and it cited its 1947 ruling in *Land* as within that category. *Id.* at 701–02 & n.26. Of course, the D.C. Circuit was mindful of this. *Land*, 184 F.2d at 257 n.12.

Commerce, Charles Sawyer, came into possession of the stock.[385]  President Truman told Secretary Sawyer to take "[a]ll appropriate action" to maintain the government's right to the company.[386]  There were different stories about the Administration's motivation for trying to keep the stock: that the company would be mismanaged if it fell back into the shareholders' hands,[387] or that President Truman was trying to protect political friends installed in the firm's management.[388]  Whatever its reasons, the government petitioned the Supreme Court for certiorari to review the merits, but the Justices declined on November 13.[389]

The district court entered a judgment in favor of the shareholders on December 11.[390]  The defendants, concerned that the judgment "purported to determine the title to the shares of stock as against all the world" and thus did not fit with the Supreme Court's statement about res judicata against the United States, appealed to the D.C. Circuit.[391]  On January 31, 1951, the D.C. Circuit ordered a modification of the judgment, clarifying that, as between Secretary Sawyer and the plaintiffs, "effective possession" of the stock had to be transferred to the plaintiffs, including "all rights belonging to possessors of the shares."[392]  The government petitioned for certiorari to review this decision, and also sought rehearing on the Supreme Court's prior denial on the merits; the Supreme Court denied both on March 12.[393]  On March 16, the district court entered the "effective possession" judgment accordingly, adding specific instructions that Secretary Sawyer endorse the stock certificates and instruct the company management to make the transfer on the company books — and that the court clerk perform these actions if the Secretary failed to do so.[394]

Secretary Sawyer, acting jointly with DOJ leadership and on their advice,[395] began carrying out a remarkably aggressive two-pronged strategy to keep control of the company.  First, while Secretary Sawyer

---

[385] Petition for a Writ of Certiorari at 9 n.8, Land v. Dollar, 344 U.S. 806 (1952) (mem.) (No. 697, 1950 Term; renumbered No. 32, 1951 Term; renumbered No. 1, 1952 Term) [hereinafter Main Petition].

[386] *See id.* (quoting Memorandum from President Truman to Secretary Charles Sawyer (Nov. 30, 1950)).

[387] These arguments are cited in the opinion appended to Main Petition, *supra* note 385, at 63.

[388] Arthur Krock, *In the Nation: The Tangled Dollar Steamship Case*, N.Y. TIMES, May 22, 1951, at 30.

[389] 340 U.S. 884 (1950) (mem.).

[390] Main Petition, *supra* note 385, at 8–9.

[391] Land v. Dollar, 188 F.2d 629, 631 (D.C. Cir. 1951).

[392] *Id.*

[393] Land v. Dollar, 340 U.S. 948 (1951) (mem.) (denying No. 353, rehearing as to the merits, and No. 552, as to the "effective possession" order).

[394] Transcript of Record at 3–6, Land v. Dollar, 344 U.S. 806 (1952) (mem.) (No. 32, 1951 Term; renumbered No. 1, 1952 Term).

[395] Land v. Dollar, 190 F.2d 623, 627 (D.C. Cir. 1951), *vacated as moot*, 344 U.S. 806 (mem.).

EPA_00049027

physically delivered the stock certificates to the plaintiffs, he neither en-
dorsed them nor instructed that they be transferred on the books, and
he executed a proxy appointing Commerce Department officials to vote
the stock at the upcoming shareholders' meeting on March 19.[396] At
that meeting, Commerce Department officials — saying they acted on
instructions from DOJ — successfully persuaded the firm's management
not to obey the court clerk's instruction to transfer the shares on the
books, and the officials then voted the shares adversely to the
plaintiffs.[397]

Second, Secretary Sawyer and DOJ sought to exploit the idea that
the judgment bound only the Secretary of Commerce and not the United
States. On March 12, hours after the Supreme Court issued its second
and third denials of certiorari, the government defendants filed an en-
tirely new lawsuit, this time in the U.S. district court in San Francisco,
in the name of "the United States."[398] As Justice Frankfurter later ob-
served, the "claim urged" by the government in this new suit "was sub-
stantially the same as that which Government counsel for members of
the Maritime Commission had unsuccessfully advanced in the litigation
in the District of Columbia."[399] On March 19, the same day as the
shareholders' meeting, the government sought a preliminary injunction
from the San Francisco district court to block transfer of the shares from
Secretary Sawyer to the plaintiffs, contending that if the stock fell into
the plaintiffs' hands, the company would be mismanaged, thus threat-
ening the United States' possible, as-yet-unadjudicated interest in the
stock.[400] On April 6, the district court granted the injunction.[401]

In response to this extreme hardball, the D.C. Circuit on April 6
initiated contempt proceedings against Secretary Sawyer and several top
officials at DOJ and the Commerce Department.[402] After a hearing, the
D.C. Circuit on May 18 held them in civil contempt for their continuing
and flagrant violation of the order to transfer "effective possession" of
the shares.[403] To be sure, the defendants were now under an injunction
from the San Francisco district court *not* to transfer the shares.[404] But
they had obtained that injunction themselves, and they could easily
undo it (without even giving up the San Francisco lawsuit), which the
D.C. Circuit said they must do, as a step toward coming into compliance

---

[396] *Id.* at 629.
[397] *Id.* at 630–31.
[398] Main Petition, *supra* note 385, at 11.
[399] Land v. Dollar, 341 U.S. 737, 743–44 (1951) (separate memorandum of Frankfurter, J.).
[400] Main Petition, *supra* note 385, at 63.
[401] The opinion is appended to Main Petition, *supra* note 385, at 49–65.
[402] Land v. Dollar, 190 F.2d 366, 367 (D.C. Cir. 1951) (noting show cause order of the preceding
Friday, April 6).
[403] Land v. Dollar, 190 F.2d 623, 634 (D.C. Cir. 1951), *vacated as moot*, 344 U.S. 806 (1952) (mem.).
[404] *Id.* at 630.

with the D.C. decree.[405] The defendants relied heavily on the Supreme Court's statement that any "judgment [against the officials] would not be *res judicata* against the United States,"[406] but the D.C. Circuit pointed out that if the United States, in the wake of a judgment holding that its officials possessed property unlawfully on its behalf, could simply go into another court and get that judgment effectively nullified, the entire *Lee* doctrine would be destroyed.[407] In *Lee* and its progeny, said the D.C. Circuit, "[t]he Supreme Court has repeatedly laid down the rule that a citizen may recover through court action possession of property wrongfully withheld from him by an official of the Government."[408] That rule would become "a valueless nullity if the United States, upon merely asserting a claim to title in another court, [were] entitled to an order precisely and explicitly forbidding surrender of that very possession by that very official."[409] The principle that *Lee* suits were not res judicata against the United States was obviously meant to cover particular situations where the United States raised "a point of law or of fact not presented or not presentable in the litigation between the citizen and the official," but the government had not set forth any such point here.[410] If not so confined, the principle would invite duplicative litigation that would swallow the larger, well-established doctrine.

As to the contempt power, DOJ made the sweeping claim that federal agency officials' "immunity from suits for damages [for common law torts] applies with equal force to contempt proceedings."[411] The D.C. Circuit squarely rejected this. "The matter reaches to bedrock," said the court.[412] The immunity claim "[would] deny one of the fundamental concepts of our government," that citizens have rights against the sovereign adjudicable by a coequal judicial branch.[413]

The D.C. Circuit issued an ultimatum. Secretary Sawyer and his compatriots had five days, until May 24 at 3:00 p.m., to give the plaintiffs "effective possession" of the shares, or they would "be committed to custody to remain in confinement until they have fully and effectively complied."[414] As DOJ frantically sought a stay from the Supreme Court,

---

[405] *Id.* at 633–35.
[406] Land v. Dollar, 330 U.S. 731, 739 (1947).
[407] *Land*, 190 F.2d at 640–41.
[408] *Id.* at 640.
[409] *Id.*
[410] *Id.* at 645.
[411] *Id.* at 638. Government attorneys premised their immunity argument partly on the defendant officials' obedience to orders of more senior officials, including, in this case, the President. *Id.* at 638–39.
[412] *Id.* at 638.
[413] *Id.* at 639.
[414] *Id.* at 635.

EPA_00049029

the five days ticked down. There were conflicting press reports on whether Secretary Sawyer planned to comply with the order or go to jail.[415]

With two days left, on May 22, Chief Justice Vinson granted a stay of the contempt sanctions against all defendants.[416] As justification, he said that if sanctions were to go forward, the defendants might comply, thereby mooting several issues that were the subject of pending or forthcoming petitions for certiorari that the Supreme Court might want to hear.[417] One of these was the government's promised petition to seek review of the contempt order itself; the government, in its rushed application for a stay, said it anticipated making sweeping arguments "that government officials cannot be held guilty of contempt for acts committed pursuant to orders of superiors" (presumably the President) and "that they are immune for actions taken 'in their official capacity.'"[418] By granting a stay partly to allow review of the contempt order, Chief Justice Vinson implied that the Supreme Court would take seriously the argument that contempt sanctions were simply unavailable against federal officials. He also cited other issues in pending or forthcoming petitions that the Court might want to review. (The government, after being rebuffed on certiorari three times already, had recently filed new petitions to review the D.C. district court's March 16 implementational order and the D.C. Circuit's order that DOJ halt the San Francisco injunction.[419]) But these were generally questionable as bases for certiorari.[420]

---

[415] *Compare* Felix Belair, Jr., *Sawyer Given 5 Days to Obey or Be Jailed in Dollar Line Suit*, N.Y. TIMES, May 19, 1951, at 21 (reporting that Sawyer "said he would obey . . . unless excused . . . by the Supreme Court"), *with* Krock, *supra* note 388, at 30 (reporting that Sawyer "has said that . . . he will serve his jail sentence").

[416] Sawyer v. Dollar, 1951 WL 44185, at *1 (U.S. May 22, 1951) (Vinson, C.J., opinion in chambers).

[417] *Id.*

[418] Brief in Opposition to Petition for Writ of Certiorari at 2, Sawyer v. Dollar, 344 U.S. 806 (1952) (mem.) (No. 247, 1951 Term; renumbered No. 5, 1952 Term) (paraphrasing the unpublished motion for stay).

[419] *See Sawyer*, 1951 WL 44185, at *1.

[420] Chief Justice Vinson's stay order covered (or at least arguably covered) four issues. *See id.*

First, there was the issue of the propriety of the D.C. district court's order of March 16. *Id.* But that order merely implemented in easily foreseeable ways the instruction about "effective possession" set forth in a decision of the D.C. Circuit, on which the Supreme Court had already denied certiorari back in March. Transcript of Record at 3–6, Land v. Dollar, 344 U.S. 806 (1952) (No. 32, 1951 Term; renumbered No. 1, 1952 Term) (giving the March 16 orders); *see also* Land v. Dollar, 188 F.2d 629, 631–32 (D.C. Cir. 1951) (giving the D.C. Circuit's instructions); Main Petition, *supra* note 385, at 42–45 (arguing that the order was unlawful); Land v. Dollar, 190 F.2d 623, 636–38 (D.C. Cir. 1951) (exposing incoherence of government's argument).

Second, there was the issue of the propriety of the D.C. Circuit trying to make DOJ undo the injunction in the San Francisco suit. Main Petition, *supra* note 385, at 24–29. But if the defendants had complied (for example, by withdrawing that suit to dissolve the injunction and then refiling it, *see Land*, 190 F.2d at 634–35), the San Francisco suit could still have gone forward and allowed the

Justice Jackson was disturbed to see the contempt sanctions stayed, for he believed it sent a signal that the Supreme Court had no stomach to use the contempt power against official defiance — and would use stays and certiorari to head it off. When the plaintiffs moved the Supreme Court to vacate Chief Justice Vinson's stay, Justice Jackson wanted his fellow Justices to postpone their summer vacation to hear argument on the question and decide it immediately.[421] To do otherwise was to reward the government's defiance by further delaying the day when it had to comply.[422] But Justice Jackson was outvoted. On June

United States to adjudicate any rights it had. This was assuming that DOJ came up with any new points of law or fact, of which there is no evidence in its two pending petitions for certiorari, *see* Main Petition, *supra* note 385; Petition for a Writ of Certiorari, Land v. Dollar, 340 U.S. 948 (1951) (mem.) (No. 353), or in the forthcoming petition on contempt that it later filed, *see* Petition for a Writ of Certiorari, *Sawyer*, 344 U.S. 806 (1952) (mem.) (No. 247, 1951 Term; renumbered No. 5, 1952 Term) [hereinafter Contempt Petition]. Perhaps the Supreme Court might have wanted to review the abstract question of whether a court could order federal officials to litigate in a certain way, *see* Main Petition, *supra* note 385, at 40–42, but review of that question was not necessary for the protection of any right of the United States in the stock. Also, the government claimed to be worried that the plaintiffs would mismanage the company, or sell it and thereby extinguish the government's rights, but those concerns could have been handled by a narrower injunction than the one the D.C. Circuit was telling DOJ to undo — an injunction that allowed the plaintiffs to have the shares but barred them from wasting or selling the assets, not one that kept them from getting the shares at all. *See* Land v. Dollar, 190 F.2d 366, 373 (D.C. Cir. 1951); Note, *At the Crossroads of the Doctrine of Sovereign Immunity: The Dollar Case*, 40 GEO. L.J. 289, 302 (1952). On this point, Chief Justice Vinson also expressed concern about the conflict between the San Francisco and D.C. orders, but tellingly, the only details he gave were about the company's president, George Killion, who was under simultaneous orders to make and not make the transfer on the company books. *See* Petition of George L. Killion for a Writ of Certiorari, *In re* George L. Killion, 344 U.S. 806 (1952) (mem.) (No. 702, 1950 Term; renumbered No. 34, 1951 Term; renumbered No. 2, 1952 Term). Secretary Sawyer and the other officials, unlike Killion, had the power to dissolve any conflict by getting rid of the San Francisco injunction they had procured; no stay was necessary to prevent a conflict of court orders as to them.

Third, there was the issue of whether a court of appeals, rather than a district court, could enforce by contempt a district court order entered according to the court of appeals' instructions. Main Petition, *supra* note 385, at 39–40. This was perhaps an interesting question, but answering it was unlikely to resolve the dispute, since the district court could just step up and enforce. Note, *supra*, at 303.

Fourth, when the petition for certiorari on the contempt order was finally filed, *after* Vinson granted the stay and after the Court refused to vacate the stay, that petition cited some reasons to review the order besides the sweeping arguments about immunity (which the petition reserved but oddly did not make). Contempt Petition, *supra*, at 53 n.45. The petition recapped another pending petition's arguments about (a) the D.C. Circuit's order that DOJ undo the San Francisco injunction, (b) the March 16 order, and (c) the court of appeals' contempt power. *Id.* at 29–32. Also, the petition made case-specific arguments about whether the D.C. injunction was specific enough and whether the D.C. Circuit had applied it correctly to the facts, *id.* at 43–52, but those arguments were unique to the case and therefore strange candidates for review by certiorari. The petition also made a seemingly arcane argument about whether the San Francisco judge's refusal to hold certain officials in contempt constituted res judicata on the contempt issue for *other* officials in the D.C. litigation who were in privity. *Id.* at 39–43.

[421] Land v. Dollar, 341 U.S. 737, 748, 750 (1951) (Jackson, J., dissenting from denial of motion to vacate stay).

[422] *Id.*

4, with two Justices recused, the Court voted to leave the stay in place, without a full hearing of both sides.[423] Further, the Court voted to grant certiorari in the government's two pending petitions in the litigation (and would do the same once the forthcoming petition on the contempt order was filed).[424] As Justice Jackson warned, this action — granting the petitions while refusing to vacate the stay or even expedite the hearing — "fixes it as the Court's policy to suspend enforcement indefinitely,"[425] for the Court's disposition of the various matters, which eventually would likely include the San Francisco suit, would "be in terms of years rather than months."[426]

To Justice Jackson, this created the appearance and probably the reality of the Supreme Court's prolonging and protecting governmental defiance. Justice Jackson clearly believed Secretary Sawyer was in violation. Certiorari had been denied twice on the merits and a third time on the D.C. Circuit's instruction that the defendants deliver "effective possession" of the shares, and yet, said Justice Jackson, "'effective possession' has not been delivered."[427] The Supreme Court was now "den[ying plaintiffs], for an indefinite period, the benefits of the judgment they have won."[428] The company "is kept out of the hands of those whom years of litigation have adjudged to be its owners, and no protection . . . is provided for them during such time as it is kept in the hands adjudged to have it illegally."[429] The D.C. Circuit had "embarked on this effort at enforcement only after this Court had refused to review the basic orders. [The D.C. Circuit judges] were clearly justified in believing that we expected the order to be enforced."[430]

Justice Jackson apparently believed his colleagues were stalling out of discomfort with the idea of jailing high officials, and he feared what signal this sent:

> It is the [Supreme] Court that is now on trial. . . . The spectacle of this Court stalling the enforcement efforts of lower courts while there is outstanding a judgment that some of the Nation's high officials are guilty of contempt of court is not wholesome. The evil influence of such an example will be increased by delay. This Court should exercise utmost care lest it appear to be indifferent to a claim of official disobedience.[431]

Justice Jackson noted a double standard between the present case and another, four years earlier, in which the federal government sued to

---

[423] *Id.* at 738 (per curiam).
[424] *Id.*; 342 U.S. 875 (1951).
[425] *Land*, 341 U.S. at 748 (Jackson, J., dissenting from denial of motion to vacate stay).
[426] *Id.* at 749.
[427] *Id.* at 748.
[428] *Id.* at 749.
[429] *Id.*
[430] *Id.* at 750.
[431] *Id.* at 749–50.

halt a United Mine Workers strike. There, when "the shoe of contempt was on the other foot," the Supreme Court had "strongly supported the Government's demand for complete submission to court decrees, even before they were sustained by this Court and though their validity was reasonably in doubt," resulting in a civil contempt ultimatum against the mine workers enforced by a \$2.8 million fine (\$30 million in 2017).[432]

Once the government's extreme hardball in *Land* had been practically excused by a stay — and indeed rewarded by grants of certiorari — DOJ quickly moderated the sweeping claims of immunity that had initially helped win the stay. DOJ's actual petition for certiorari on the contempt order, submitted months after the stay, focused on narrow claims about the lawfulness of the underlying injunction or its particular terms or application, though DOJ reserved the right to argue full immunity.[433] In the main brief, submitted in January 1952, DOJ confined its claim of immunity to official actions taken under legal advice from the Attorney General. High officials like Secretary Sawyer, argued DOJ, had limited personal knowledge of, or participation in, the agencies they ran.[434] On legally complex subjects like the Dollar Steamship stock, officials like Sawyer relied on DOJ, which "handles Government suits upon its own responsibility."[435] Essentially, the government was asking the Court to hold that DOJ could be trusted to maintain governmental legality and that DOJ should therefore be effectively empowered to insulate executive officials from judicial coercion. That said, the brief conceded that the Attorney General's advice would lose its insulating power once it was finally "overruled" by the judiciary.[436] But the brief was unclear as to how the overruling of the Attorney General was to occur, other than by a court's rejection of DOJ's argument on behalf of a high official, which had *already occurred* in the D.C. Circuit proceeding below.

Ultimately, the case went away, which is presumably what the Justices had hoped for in stalling. In June 1952, the plaintiffs settled with the government for fifty percent of the disputed stock.[437] In other words, they accepted half of what they had won in the lower courts. The discount might reflect the Dollars' lack of confidence in winning on the various questions for which certiorari had been granted. But it

---

[432] *Id.* at 749; *see also* United States v. United Mine Workers, 330 U.S. 258, 305 (1947).

[433] For the reservation, see Contempt Petition, *supra* note 420, at 53 n.45. On the other arguments, see *supra* note 420.

[434] Brief for Charles Sawyer, Secretary of Commerce at 34, Sawyer v. Dollar, 344 U.S. 806 (1952) (mem.) (No. 247, 1951 Term; renumbered No. 5, 1952 Term).

[435] *Id.*

[436] *Id.* at 30.

[437] *Stock Sale to End Dollar Line Fight*, N.Y. TIMES, June 12, 1952, at 33. To be exact, the agreement said the stock should be auctioned off by a trustee, with the proceeds to be divided evenly between the government and the plaintiffs (in contemplation of the plaintiffs' ultimately buying all the stock). *Id.*; *see also Sawyer*, 344 U.S. at 806 (vacating the contempt order with instructions to dismiss as moot).

might also reflect their lack of confidence that the courts would enforce the judgment against recalcitrant government officials. More subtly, the discount might reflect the plaintiffs' judgment that, if agency officials evidenced strong willingness to put the judiciary to the test in enforcing its orders, the judiciary would likely back off by finding *some* way to rule for the government.

## III. Fines Against Agency Officials

Just as it is theoretically possible to imprison a top agency official for an agency's noncompliance, so it may be possible to impose fines on an official, as distinct from fining the agency as a body. Indeed, this kind of sanction, coupled with the customary practice of indemnification, might serve as a means to dock agency appropriations while circumventing sovereign immunity. Yet in our sources, the federal judiciary shows little interest in going this route in litigation against federal officials, never using it to dock the appropriations of a recalcitrant agency in a noticeable way. So judicial behavior on this score is of a piece with what we have already seen.

### A. The Baseline: Contempt Fines Against Individuals Outside Federal Agencies

As with the sanction of imprisonment, there are numerous examples of courts using contempt fines against private individuals. Mostly these are low-profile business or tort disputes,[438] but they also include a $500 per diem fine against journalists at the *New York Times* and elsewhere for not disclosing sources,[439] fines totaling $50,000 against the leader of Operation Rescue for blocking access to abortion clinics,[440] and fines of $100 doubling each day to more than $13 million against a former finance CEO said to be hiding assets.[441] Contempt fines can also be used against individuals to affect the behavior of organizations they control. When this happens in the business context, it seems to be mainly against

---

[438] *E.g.*, Enovative Techs., LLC v. Leor, 86 F. Supp. 3d 445 (D. Md. 2015); Chesapeake Bank v. Berger, No. 4:14cv66, 2014 WL 5500872 (E.D. Va. Oct. 30, 2014); Ranco Indus., Inc. v. Bos. Floor Mats, No. H-10-5214, 2012 WL 4620389 (S.D. Tex. Oct. 2, 2012).

[439] Lee v. U.S. Dep't of Justice, 327 F. Supp. 2d 26, 33 (D.D.C. 2004), *aff'd in part*, 413 F.3d 53 (D.C. Cir. 2005).

[440] N.Y. State Nat'l Org. for Women v. Terry, 886 F.2d 1339, 1353 (2d Cir. 1989).

[441] SEC v. Credit Bancorp, Ltd., No. 99 CIV. 11395(RWS), 2000 WL 968010, at *4–5 (S.D.N.Y. July 12, 2000).

small businesses.[442]  Fines have also been used against labor union officers in suits against their unions.[443]

On the public side, there have certainly been contempt fines against state officials and local officials as a means of influencing the agencies they control.[444]  However, when state- or local-government employees face liability incurred in the course of their employment, their governments indemnify them virtually 100% of the time, even in cases of very bad conduct.[445]  Thus contempt fines against officials very likely fall, in reality, on their governments.  Although sovereign immunity has not proven much of an obstacle to fines against states directly,[446] fines against individual state officials in contemplation of indemnification are a means to circumvent it — a maneuver that the Supreme Court has endorsed, as we shall see in the next section.

## B. Uncertain Doctrine

Can federal judges use contempt fines against federal agency officials?  We should start by noting that contempt fines have radically different consequences depending on who actually pays them.  The DOJ Office of Legal Counsel has said that agencies can indemnify their employees for personal liability arising in the scope of their employment; the money must come from the agency's appropriations for its employees' salaries and/or for the activity in which the liable employee was engaged, *not* from the Judgment Fund, which is only available to pay liabilities of the government itself.[447]  GAO has followed the same reasoning and applied it specifically to contempt fines incurred by agency

---

[442] *See, e.g.*, Carpenters Health & Welfare Fund of Phila. v. Special Servs. for Bus. & Educ., Inc., No. 09-CV-4701, 2011 WL 2162902, at *3 (E.D. Pa. June 1, 2011).

[443] *E.g.*, EEOC v. Local 638 & Local 28 of the Sheet Metal Workers' Int'l Ass'n (SMW), No. 71 Civ. 2877, 1983 WL 493, at *1–2 (S.D.N.Y. Mar. 21, 1983); *Teamsters Penalty Stands in U.S. Court*, N.Y. TIMES, Apr. 30, 1971, at 78.

[444] *E.g.*, Cabrera v. Municipality of Bayamon, 622 F.2d 4, 7 (1st Cir. 1980) (affirming $1000 per day against mayor); Alberti v. Klevenhagen, 610 F. Supp. 138, 143 (S.D. Tex. 1985) ($5000 per day against sheriff and county commissioners); Miller v. Carson, 550 F. Supp. 543, 549 (M.D. Fla. 1982) ($10,000 flat sum and $5000 per day against sheriff and others "in their individual and official capacities"); Palmigiano v. DiPrete, 737 F. Supp. 1257, 1258 (D.R.I. 1990) (referencing an earlier award of $50 per day per prisoner against governor and state corrections director).

[445] Hirschhorn, *supra* note 20, at 1842; *see also* LARRY W. YACKLE, REFORM AND REGRET: THE STORY OF FEDERAL JUDICIAL INVOLVEMENT IN THE ALABAMA PRISON SYSTEM 247 (1989) (fines against the Alabama attorney general accumulating to $300,000, apparently indemnified and causing a "drain" on the office's budget); Joanna C. Schwartz, *Police Indemnification*, 89 N.Y.U. L. REV. 885, 890 (2014).

[446] *See supra* notes 55–56 and accompanying text.

[447] Indemnification of Treasury Department Officers & Employees, 15 Op. O.L.C. 57, 60 (1991); *see also* Authority of the Environmental Protection Agency to Indemnify Its Employees, 13 Op. O.L.C. 46 (1989); Indemnification of Department of Justice Employees, 10 Op. O.L.C. 6 (1986). *But see infra* note 462 and accompanying text.

EPA_00049035

employees.[448]  In practice, it is a "virtual certainty" that the agency will opt to indemnify its employees when they are facing judgments or settlements for constitutional torts,[449] and there is no reason to think the practice would differ for contempt fines, especially if the contemnor is a high-level official whose action constitutes agency policy or a low-level official executing agency policy.  Thus, we should presume that contempt fines against an official effectively run against the agency itself.

However, it appears that a judge could prohibit indemnification and thereby render the fine a personally targeted sanction, more akin to imprisonment.[450]  If the judge goes this route, there seems to be no categorical objection to the sanction, just as there is none to imprisonment.  Indeed, one DOJ brief, in contending that agencies themselves enjoy sovereign immunity from contempt fines, assured the court that judicial power remained strong by suggesting that the judge could impose fines on officials personally.[451]  Yet, if the judge goes that route, many of the prudential obstacles and uncertainties that we observed in the context of imprisonment would arise.[452]  So there is still much uncertainty about the practical availability of contempt fines, if not a categorical bar.

But consider the more likely scenario in which the fines are only nominally personal and actually come from the agency through indemnification.  At a glance, this seems to open the way for an end run around the potential obstacles to contempt fines against agencies noted in Part I.  First, sovereign immunity is not applicable.  Second, whereas an agency owing a fine could drag its feet in paying or even persuade Congress to enact an appropriation rider barring payment, a fine against an official would flip the incentives: it would spur the official to lobby hard *in favor* of the agency paying.

The Supreme Court has suggested, indirectly, that this is a viable way around sovereign immunity.  In *Hutto v. Finney*,[453] the Supreme Court held that *state* sovereign immunity did not bar an award of attorneys' fees against the top officials at the Arkansas Department of Corrections for violating an injunction, even though the Court premised

[448] Walter B. Toner, B-205438, 1981 WL 23117 (Comp. Gen. Nov. 12, 1981); To the Acting Attorney General, 44 Comp. Gen. 312 (1964).

[449] Cornelia T.L. Pillard, *Taking Fiction Seriously: The Strange Results of Public Officials' Individual Liability Under* Bivens, 88 GEO. L.J. 65, 77 (1999).

[450] At least one circuit has upheld a district judge's power to fine a DOJ attorney for contempt (for litigation misconduct) and prohibit indemnification.  Chilcutt v. United States, 4 F.3d 1313, 1325–27, 1327 n.37 (5th Cir. 1993).

[451] Defendants' Memorandum of Points & Authorities in Respect to Sovereign Immunity & Modification of the Injunction at 10, Serquina v. United States, No. CV 93-0129 (C.D. Cal. Aug. 14, 1995), ECF No. 96 (invoking Nelson v. Steiner, 279 F.2d 944 (7th Cir. 1960), which involved personal fines).

[452] *See supra* section II.B, pp. 741–45.

[453] 437 U.S. 678 (1978).

part of its holding on the understanding that the officials would be indemnified from the Arkansas state fisc.[454] Although this award was not a contempt fine, the Court expressly drew an analogy to contempt in upholding it. "[F]ederal courts," said the opinion, "are not reduced to issuing injunctions against state officers and hoping for compliance. Once issued, an injunction may be enforced. Many of the court's most effective enforcement weapons involve financial penalties."[455] The Court then reasoned: "The principles of federalism that inform Eleventh Amendment doctrine surely do not require federal courts to enforce their decrees only by sending high state officials to jail. The less intrusive power to impose a fine is properly treated as ancillary to the federal court's power to impose injunctive relief."[456] Having stated that a court could legitimately use contempt fines in this situation, *Hutto* went on to analogize such fines to the district court's award of attorneys' fees: "In this case, the award of attorneys' fees for bad faith served the same purpose as a remedial fine imposed for civil contempt," since it served compensatory and coercive ends.[457]

Can *Hutto*'s maneuver for circumventing sovereign immunity — imposing a fine on agency officials personally but in the expectation that they will be indemnified — be extended from state agencies to federal agencies? It is not clear. In general, not every principle of state sovereign immunity carries over to its federal analogue.[458] Three possible obstacles present themselves. First, in *Lander v. Morton*,[459] decided prior to *Hutto*, the D.C. Circuit overturned a district court's $5000 compensatory contempt fine against the Secretary of Interior for a compliance delay that was apparently the result of neglect by subordinate officials, in which the Secretary had no proven involvement. The Secretary, said the D.C. Circuit, "was not vicariously liable for the actions of his subordinates."[460] This holding suggests that *Wilson*-like problems with assigning responsibility to high officials may block the *Hutto* strategy for circumventing sovereign immunity, even when indemnification seems likely (as was presumably the case in *Lander*). Second, even after *Hutto*, in the Eighth Circuit's ruling in *Coleman v. Espy*

---

[454] *Id.* at 689–700. In holding that it was harmless error for the district court to style the award as one against the Arkansas Department of Corrections (when it should have been styled as an award against the individual officials), the Supreme Court added: "We do not understand the [Arkansas] Attorney General to urge that the fees should have been awarded against the officers personally; that would be a remarkable way to treat individuals who have relied on the Attorney General to represent their interests throughout this litigation." *Id.* at 692 n.19.

[455] *Id.* at 690.

[456] *Id.* at 691.

[457] *Id.*

[458] Jackson, *supra* note 69, at 537–41, 541 n.84.

[459] 518 F.2d 1084 (D.C. Cir. 1975).

[460] *Id.* at 1087.

EPA_00049037

that federal sovereign immunity bars compensatory civil contempt fines against a federal agency, the panel refused to credit the fact that nominally the fines were sought against agency officials. The Eighth Circuit said that the plaintiffs were "seeking contempt sanctions against various FmHA officials who were acting in their official capacities"; "[a]s long as the government entity receives notice and an opportunity to respond, a suit against a government employee in his official capacity is to be treated as a suit against the entity."[461] Third, even if the judiciary were to approve a contempt fine against an agency head, the Treasury Department — perhaps lobbied by the agency or the White House — could possibly intervene to open the Judgment Fund to indemnify the official, thereby shielding the agency's appropriations. This could be done on the ground, recognized by GAO in an old edition of its treatise, that if an agency head's role in a suit is purely nominal, a judgment, "in appropriate circumstances," can be viewed as against the United States and can thus be paid from the Judgment Fund.[462] To block this maneuver, a court might try structuring the fine so as to bar payment from the Judgment Fund, or make clear that the fine runs against the high official personally. The court might need to state that the official had some actual connection with the violation (a repeat of the problem of attributing responsibility).

### C. Judicial Behavior: Very Modest Use of Individual Fines

Whatever the promise of individual fines as a means to dock agency budgets or pressure officials, the judiciary shows little interest in using them. Judging from our sources, courts hardly ever employ personal contempt fines to deal with true institution-level recalcitrance. To be sure, there are seven instances of courts imposing contempt fines on individual DOJ attorneys for litigation misconduct (showing up late to a hearing, abusing discovery, and so forth), but I consider these marginal to our topic, as they generally concern one-off individual misbehavior.[463]

---

[461] *Coleman v. Espy*, 986 F.2d 1184, 1189 (8th Cir. 1993). Note that the long and apparently unabbreviated caption in *Coleman v. Espy* refers only to named officials, never to any agency or the United States.

[462] U.S. GOV'T ACCOUNTABILITY OFFICE, 3 PRINCIPLES OF FEDERAL APPROPRIATIONS LAW 14-21 (2d ed. 1994).

[463] Two of the seven saw the finding overridden by an appellate court. *In re* Contempt Order, 441 F.3d 1266 (10th Cir. 2006); *In re* Greene, 213 F.3d 223 (5th Cir. 2000). The other five apparently stood. Chilcutt v. United States, 4 F.3d 1313 (5th Cir. 1993) (order for reimbursement of attorneys' fees due to failure to comply with discovery order); *In re* Grand Jury Proceedings, 875 F.2d 927 (1st Cir. 1989) (contempt conviction and fine for disobeying court order to stay Grand Jury proceedings); Docket Entry No. 25, Ortiz v. Apfel, No. 00-cv-00500 (S.D. Tex. June 14, 2001) (describing order for deferred sanctions due to motion filed out of time); Docket Entry No. 29, Chaid v. Glickman, No. 98-cv-01004 (N.D. Cal. Feb. 18, 1999) (noting the court's imposition of fines on U.S. Attorneys for disobeying order of the court); Docket Entry No. 5, Best For Less Food v. Dep't of Agric., No.

Of greater interest are eight cases where contempt fines were imposed on agency officials for behavior that violated a court order but was required by an agency's general policy,[464] or at least by the decision of a high-level agency official.[465]  None of these cases suggest that the court considered barring indemnification, and given that the disobedient officials always acted pursuant to bureaucratic directives, we should probably assume that indemnification was a foregone conclusion in all of them.[466]

Yet if we follow the eight cases to their respective conclusions, we find no examples of the judiciary using this device to dock an agency's budget in a way that was likely noticeable to the agency.  In three of the cases, the fines were specified in modest amounts (or, in the case of one fine not specified, stayed pending appeal) and were all vacated by appellate courts on the case-specific ground that the violated court order was itself improper.[467]  In a fourth case, the fine was the largest of the eight cases in inflation-adjusted terms ($1000 in 1957, or $8600 in 2017) but was stayed pending appeal[468] and then apparently negated by new legislation that mooted the dispute.[469]  Of the four remaining cases, two involved modest compensatory fines imposed for delayed obedience to orders halting enforcement activities,[470] and one involved a modest

---

95-cv-00229 (N.D. Tex. Apr. 11, 1995) (describing order requiring proposal for contents of scheduling order and imposing fines for contempt of court).

[464] *In re* Irving, 600 F.2d 1027, 1037 n.10 (2d Cir. 1979) (noncompliance "based on Board instructions and a well-founded, judicially recognized Board policy"); Wilmot v. Doyle, 403 F.2d 811, 813–14 (9th Cir. 1968) (noncompliance required by "the Board's Rules" and "under explicit directions of the General Counsel"); Giancana v. Johnson, 335 F.2d 372, 372–73 (7th Cir. 1964) (noncompliance at the direction of departmental regulation and instruction of the agency head); United States v. Hall, 153 F. Supp. 661, 663 (W.D. Ky. 1957) (contemnor "was directed by the Attorney General").

[465] W. Elec. Co. v. Piezo Tech., 860 F.2d 428, 430 (Fed. Cir. 1988) (the agency head "had directed the Examiner not to answer the questions"); Ala. Rural Fire Ins. Co. v. Naylor, 530 F.2d 1221, 1221, 1224 (5th Cir. 1976) (action "at the instruction," *id.* at 1224, of the agency's "Associate Administrator," *id.* at 1221); Norman Bridge Drug Co. v. Banner, 529 F.2d 822, 825 (5th Cir. 1976) (action "on the advice of the U.S. Attorney and of . . . [the] Chief of Compliance of the Regional Drug Enforcement Administration"); Nelson v. Steiner, 279 F.2d 944, 948 (7th Cir. 1960) (noncompliance by IRS district office director and by the chief of the DOJ Tax Division's Claims Section, both claiming that their action was "taken pursuant to superior authority").  We also found one case of a fine against a marshal during the Civil War, *Ex parte* Field, 9 F. Cas. 1 (C.C.D. Vt. 1862) (No. 4761), which I ignore because of historical remoteness.

[466] There is direct evidence that the officer in one of the cases was indemnified, from agency appropriations. *See infra* note 471.

[467] *W. Elec. Co.*, 860 F.2d at 430, 433 ($300 fine, apparently criminal, stayed pending appeal, vacated); *Ala. Rural Fire Ins. Co.*, 530 F.2d at 1225, 1230 ($600 compensatory fine, vacated); *Wilmot*, 403 F.2d at 814, 816 (daily fine of unspecified sum, stayed pending appeal, vacated).

[468] *Hall*, 153 F. Supp. at 666–67.

[469] *See* Jencks Act, Pub. L. No. 85-269, 71 Stat. 595 (1957) (codified as amended at 18 U.S.C. § 3500).

[470] *Norman Bridge*, 529 F.2d at 825, 828 ("joint fine" of $500 spread across two officials in 1976, *id.* at 828, equal to about $2100 in 2017); *Nelson*, 279 F.2d at 946–48 ($800 spread across two officials in 1960, equal to about $6500 in 2017).

EPA_00049039

*ENDGAME OF ADMINISTRATIVE LAW*

criminal fine for refusal to disclose information, with the court apparently unwilling to coerce future compliance.[471] The last remaining case is a bit more complicated yet consistent with the pattern. A district court in 1978 ordered the NLRB to disclose certain information, and the agency refused.[472] The court held the general counsel in contempt, imposing daily coercive fines of $1000 plus a criminal contempt fine of $10,000.[473] This sounds like a serious confrontation, but all players recognized the contempt as a mere device to obtain appellate review of the disclosure order.[474] Thus, the district court stayed all fines pending appeal, and "[t]he record indicate[d] that if the contempt orders [were] upheld [on appeal], the Board [would] relinquish the [information]."[475] In hearing the appeal, the Second Circuit recognized what the Board was doing and suggested its handling of the matter was justified and understandable.[476] The only aspect of these contempt proceedings that might seem inconsistent with their being a mere device for appellate review was the $10,000 criminal contempt fine, but tellingly, the Second Circuit vacated that fine as an abuse of discretion even as it upheld the disclosure order and the coercive fines.[477] After that, the agency, having obtained the appellate review it sought, presumably complied.

None of the cases in this part of the survey saw the agency make categorical arguments against the vulnerability of agency officials to contempt fines, except possibly one of the cases involving modest compensatory fines for delayed compliance. There it appears the agency argued for some sort of official immunity from contempt (the year was 1960, not long after *Land v. Dollar*), but the Seventh Circuit tersely rejected the claim: "The executive branch of government has no right to treat with impunity the valid orders of the judicial branch."[478]

## IV. The Sanction of Adverse Outcomes

Instead of fines or imprisonment, courts seeking to sanction an agency for contempt have occasionally imposed adverse outcomes on the agency within the lawsuit itself or within the particular agency proceeding that is the subject of the lawsuit. Our sources reveal four instances of this. First, when the Office of Federal Housing Enterprise

---

[471] Giancana v. Johnson, 335 F.2d 372, 372 (7th Cir. 1964) ($500 in 1964, about $3900 in 2017). This officer was definitely indemnified. To the Acting Attorney General, 44 Comp. Gen. 312, 314 (1964).
[472] *In re* Irving, 600 F.2d 1027, 1030 (2d Cir. 1979).
[473] *Id.*
[474] *See id.*
[475] *Id.*
[476] *Id.* at 1037 n.10.
[477] *Id.* at 1037.
[478] Nelson v. Steiner, 279 F.2d 944, 948 (7th Cir. 1960).

Oversight failed to comply with a stipulated discovery order, the district court subjected the agency, as a contempt sanction, to expanded discovery beyond the obligations it had initially violated.[479]  The D.C. Circuit affirmed.[480]  Second, when the INS delayed complying with a court order to adjudicate a class of naturalization applications, the district court found the agency in contempt and, as a sanction, resolved to adjudicate the applications itself — something the enabling act expressly empowers courts to do — and bar the agency from objecting.[481]  There was no appeal.  Third, when the National Marine Fisheries Service failed to comply with an order to redo a fishing quota with better economic analysis, the district court lambasted the agency for its noncompliance and, as a "sanction," set a new fishing quota itself, at a number preferred by the plaintiffs more than the agency.[482]  There was no appeal.  Fourth, when the Bureau of Indian Affairs denied recognition to a putative Indian tribe, the tribe sued in district court, which invalidated the denial and remanded the matter pursuant to an injunction on what procedures were to be followed.[483]  When the Bureau later recognized the tribe but on unfavorable terms, the district court found that one particular Bureau official had departed from the court-ordered procedures.[484]  The court held that official in contempt, ordered the terms of recognition changed to more favorable ones recommended by a different official, and sanctioned the disobedient official by banning him from any future involvement in the proceedings or with the tribe.[485]  Again, no appeal.

These types of sanctions are subject to several serious limitations.  Practically, they beg the question of what the court should do if the agency fails to respect the order imposing the adverse outcome; they are steps toward the endgame, not the endgame itself.  Further, courts may not have the authority to impose these kinds of sanctions to begin with.  The contempt statute, 18 U.S.C. § 401, says courts may sanction "by fine or imprisonment,"[486] and the Supreme Court long ago held those two methods to be exclusive.[487]  Even if adverse-outcome sanctions are permissible in principle, it is problematic that they often involve the court

---

[479] *In re* Fannie Mae Sec. Litig., 552 F.3d 814, 817 (D.C. Cir. 2009).

[480] *Id.* at 823–24.

[481] Serquina v. United States, No. CV 93-0129, at 9–10 (C.D. Cal. July 6, 1995) (order granting motion to hold defendants in contempt; order granting motion to modify injunction and make injunction permanent), ECF No. 89; Serquina v. United States, No. CV 93-0129, at 4 (C.D. Cal. Sept. 7, 1995) (order granting motion to hold defendants in contempt; order granting motion to modify injunction and make injunction permanent), ECF No. 102.

[482] N.C. Fisheries Ass'n v. Daley, 27 F. Supp. 2d 650, 666–69 (E.D. Va. 1998).

[483] Greene v. Babbitt, 943 F. Supp. 1278, 1281–82 (W.D. Wash. 1996).

[484] *Id.* at 1288–89.

[485] *Id.* at 1289.

[486] 18 U.S.C. § 401 (2012).

[487] *Ex parte* Robinson, 86 U.S. (19 Wall.) 505, 512 (1874).

EPA_00049041

mandating a certain outcome within the agency proceeding — a maneuver the Supreme Court strongly disfavors, preferring that the court remand the matter and let the agency try again.[488]  I have seen no explanation of how the contempt power somehow expands a court's latitude under this doctrine.[489]  Relatedly, it is not at all clear that a court can require an agency proceeding to reach a particular outcome simply as a sanction for the agency's noncompliance, without some finding that the outcome is defensible on the merits given the applicable substantive law and the facts.[490]  Plus, many of the suits that involve fraught compliance negotiations involve a plaintiff trying to force an agency to do something complex that requires expertise (like formulate a regulation), and in those cases, the court will not know what outcome to tell the agency to reach.

## V. JUDGES' ACKNOWLEDGMENTS OF A DOUBLE STANDARD

As we have seen, the federal judiciary almost always holds back on contempt sanctions against federal agencies, while hardly ever officially announcing that sanctions are generally unavailable.  The stretches that judges sometimes perform to avoid sanctions are evidence that the absence of sanctions is not merely random, but meaningful and motivated.  As further confirmation of that point, this Part sets forth several judicial utterances — dissents, oral remarks from the bench, and guarded, oblique passages in majority appellate opinions — indicating that a contempt finding or sanction against a federal agency makes judges or their colleagues distinctly uncomfortable and uncertain in a way that contempt against other parties does not.

I note these utterances in part because they help refute an alternative theory of why contempt sanctions against agencies are virtually absent: that sanctions are so terrifying and threatened so credibly that agencies comply perfectly and thus never place courts in the position of being inclined to sanction.  Stated so baldly, this alternative theory is obviously wrong.  Nobody can deny that judges frequently modify injunctions to give agencies more latitude.  That is, agencies frequently fail to comply

---

[488] RICHARD J. PIERCE, JR., 3 ADMINISTRATIVE LAW TREATISE § 18.1 (5th ed. 2010).

[489] Mandating a particular outcome was kosher in *Serquina* because there the court faced a peculiar statute that authorized a judge to step into the shoes of the agency and do the agency's adjudicatory job itself.  *See* 8 U.S.C. § 1447(b) (1994); Serquina v. United States, No. CV 93-0129, at 9 (C.D. Cal. July 6, 1995) (order granting motion to hold defendants in contempt; order granting motion to modify injunction and make injunction permanent), ECF No. 89.

[490] *Cf.* FED. R. CIV. P. 55(d) ("A default judgment may be entered against the United States, its officers, or its agencies only if the claimant establishes a claim or right to relief by evidence that satisfies the court.").  The district courts in *North Carolina Fisheries Ass'n v. Daley*, 27 F. Supp. 2d 650 (E.D. Va. 1998), and *Greene v. Babbitt*, 943 F. Supp. 1278, both appear to have believed that the outcomes they mandated had a basis in the merits of the case and were not arbitrarily chosen just because they were disliked by the agency.  And the contempt sanction in *In re Fannie Mae Securities Litigation*, 553 F.3d 814 (D.C. Cir. 2009), pertained to discovery, on which the law gives district judges wide discretion.

with injunctions *as originally formulated*, but they virtually always get judges to approve such departures, either beforehand or after the fact, through modification. One might revise the alternative theory to say that, although judges frequently go along with agency requests for modification, the judges are doing so purely because of the merits of those requests (that is, compliance is truly impossible), and everybody understands that, if the judge thought modification unwarranted on the merits, the agency would snap into compliance out of fear of sanction. This revised version of the alternative theory is untenable given the judicial utterances that I set forth below (plus judges' obvious stretching to avoid sanctions as observed in earlier Parts). If judges themselves admit to their discomfort, uncertainty, and double standards, it is hard to believe that agencies are not also aware of these things and sometimes willing to take advantage of them — that is, to press for modification knowing that judges, uncertain of the endgame, will pull their punches.

Begin by recalling how Justice Jackson accused his fellow Justices of a double standard favoring the government in *Land v. Dollar* in 1951. His brethren stalled the imprisonment of the Secretary of Commerce, granting certiorari in a case where they had thrice denied it, in stark contrast to their willingness to impose enormous contempt fines "[w]hen the shoe of contempt was on the other foot" in a case involving a contumacious private organization sued by the government, only four years earlier.[491] "The spectacle of this Court stalling the enforcement efforts of lower courts while there is outstanding a judgment that some of the Nation's high officials are guilty of contempt of court is not wholesome," Justice Jackson said.[492] "This Court should exercise utmost care lest it appear to be indifferent to a claim of official disobedience."[493]

Judges themselves sometimes admit that they are more reluctant to use the contempt power against federal agencies than against other parties. Most striking is *Socialist Workers Party v. Attorney General*,[494] in which the Socialist Workers Party in 1973 sued the FBI for illegal surveillance, seeking an injunction and FTCA damages.[495] After the district judge determined that the names of hundreds of FBI informants were central to the Party's case and ordered their production in 1977,

---

[491] Land v. Dollar, 341 U.S. 737, 748–49 (1951) (Jackson, J., dissenting from denial of motion to vacate stay).

[492] *Id.* at 749–50.

[493] *Id.* at 750.

[494] 642 F. Supp. 1357 (S.D.N.Y. 1986).

[495] *Id.* at 1362–63.

Attorney General Griffin Bell refused to reveal the names.[496]  The district judge held Bell in contempt (with no sanction as yet).[497]  Bell appealed the contempt finding to the Second Circuit, seeking thereby to get review of the underlying disclosure order.[498]  But rather than review the disclosure order itself,[499] the Second Circuit assumed the order was lawful and held — *taking as given that the Attorney General was openly defying a lawful federal court order* — that finding such an official in contempt went too far.[500]  According to the Second Circuit, "a contempt sanction imposed on the Attorney General in his official capacity has greater public importance, with separation of power overtones, and warrants more sensitive judicial scrutiny than such a sanction imposed on an ordinary litigant."[501]  In light of this, "holding the Attorney General of the United States in contempt to ensure compliance with a court order should be a last resort, to be undertaken only after all other means to achieve the ends legitimately sought by the court have been exhausted."[502]  The Second Circuit granted a writ of mandamus invalidating the contempt finding and directing the district court to figure out a way to adjudicate the Party's claim while using less severe, issue-based sanctions against Bell.[503]  On remand, the district judge reached a compromise with the parties whereby the plaintiffs would not get the direct access to the names they wanted, but a special master would review the information in camera and make findings on that basis.[504]  Based on this, the Party won a quarter million dollars in damages but mostly lost its claims for injunctive relief.[505]

Bell's is not the only case in which judges admit their double standard.  In 1984, in a suit to force the Social Security Administration to grant disability benefits, District Judge John L. Kane, Jr., lashed out at the Social Security Appeals Council for its disobedience, saying, "I think their conduct is unconscionable and it's despicable," but also saying, "[i]f this were anything *other than an agency of the United States government*, I would have every one of those people [the appeals council] in here for contempt of court."[506]  In 1987, after OSHA had delayed nearly five years in promulgating a life-saving rule on ethylene oxide, the D.C.

---

[496] *Id.* at 1377–78.

[497] *Id.* at 1378.

[498] *In re* Att'y Gen., 596 F.2d 58, 60 (2d Cir. 1979).

[499] The court was asked to do this and refrained.  *Id.* at 68.

[500] *Id.* at 64, 67–68.

[501] *Id.* at 64.

[502] *Id.* at 65.

[503] *Id.* at 66–68.

[504] Socialist Workers Party v. Att'y Gen., 642 F. Supp. 1357, 1378 (S.D.N.Y. 1986).

[505] *Id.* at 1432.

[506] Ornelas v. Heckler, 598 F. Supp. 1089, 1090 (D. Colo. 1984) (emphasis added, second alteration in original) (quoting prior oral remarks from the bench).

Circuit, facing plaintiffs' accusation that OSHA was "contemptuously and unreasonably delay[ing]," stated: "This allegation places [this] court in a delicate position. . . . [T]he court's proper role within the constitutional system counsels caution in fashioning a remedy."[507]  With OSHA asking for nine more months, the court refrained from holding the agency in contempt, granted the additional time, and sounded skittish even when discussing what would happen if *that* deadline were missed.[508]  Nine more months, said the panel, would bring OSHA to "the very lip of the abyss of unreasonable delay," and "any delay whatever beyond the proposed schedule is unreasonable" and "*may well* expose OSHA to liability for contempt."[509]

Federal agencies also get special treatment when it comes to contempt's role in appellate review of discovery.  The courts of appeals normally deny review of a discovery order unless the targeted person disobeys and gets herself held in contempt, but several circuits have created an exception to that rule for federal agencies.  The Eleventh Circuit, and, more recently, the Second and Fifth Circuits, have justified this partly on the ground that "[r]equiring [a federal agency official] to incur a contempt sanction would have serious repercussions for the relationship between two coequal branches of government,"[510] with the Second Circuit adding that "there is a marked difference between requiring a private litigant to submit to a contempt order before seeking appellate relief and requiring executive agency officials to do so."[511]

Another illustration comes from a suit in which environmentalists sought to force EPA to hold the state of Florida delinquent in its obligations to preserve the Everglades under the Clean Water Act.  District Judge Alan Gold in 2008 enjoined the Florida Department of Environmental Protection and directed EPA to evaluate Florida's compliance.[512]  Fifteen months later, EPA had not acted.[513]  When plaintiffs moved for contempt, EPA issued an evaluation that the judge found woefully inadequate, leading him to find that EPA had sought to "avoid compliance" and had acted with "glacial slowness."[514]  Yet, Judge Gold held back on the contempt finding and sanctions that plaintiffs were seeking and instead issued a tighter injunction, threatened to hold the agency in

---

[507] Pub. Citizen Health Research Grp. v. Brock, 823 F.2d 626, 627 (D.C. Cir. 1987).

[508] *Id.* at 628–29.

[509] *Id.* at 629 (emphasis added).

[510] *In re* United States, 985 F.2d 510, 513 (11th Cir. 1993).  For subsequent cases quoting this language, see *In re FDIC*, 58 F.3d 1055, 1060 n.7 (5th Cir. 1995); and *In re SEC*, 374 F.3d 184, 188 (2d Cir. 2004).

[511] *In re SEC*, 374 F.3d at 188.

[512] Miccosukee Tribe of Indians of Fla. v. United States, 706 F. Supp. 2d 1296, 1298 n.1 (S.D. Fla. 2010).

[513] *Id.* at 1305.

[514] *Id.* at 1302, 1305–06, 1315.

EPA_00049045

contempt if it fell behind, and ordered the EPA Administrator to show up at a hearing to report on her agency's compliance six months hence — a means of ensuring that he had EPA's attention.[515] But at DOJ's behest, the Eleventh Circuit blocked this last order, holding that lower-level officials could be at least equally helpful in providing information about compliance and that courts cannot force agency heads to show up at hearings as a quasi-sanction for noncompliance.[516] This elicited an outraged dissent from Judge Beverly B. Martin, who denounced the majority's double standard:

> *In any other case*, we would impose nothing short of the harshest sanctions against a private party that behaved in a manner analogous to the EPA. Indeed, I would be shocked if the only intermediate consequence to befall a corporation that so brazenly disobeyed a federal court Order was that its CEO was directed to testify about future compliance efforts. . . . I am well aware that the offending party is a government agency, and so normal remedies must be evaluated in the context of the separation of powers. Yet, to conclude that respect for a co-equal branch means we are powerless to enforce our judgments turns the doctrine of separation of powers on its head.[517]

A frank admission of uncertainty about contempt sanctions against agencies came from Judge Edward R. Korman in the high-profile litigation to compel the Food and Drug Administration (FDA) to broaden the availability of morning-after contraception in the face of alleged interference from political appointees and the White House. Judge Korman scheduled a contempt hearing on the FDA's noncompliance, only to have the agency comply with the particular order shortly before the hearing.[518] Korman, a twenty-six-year veteran of the federal bench, said he had hoped for this outcome, "because I don't exactly know how to hold the FDA in contempt and what I would do if I did."[519]

The press has noticed that courts are unwilling to use contempt fines or imprisonment against agencies and posited that agency officials operate on this understanding. In the *Cobell* class action against the Department of Interior for mismanaging Indian trust accounts, Judge Royce C. Lamberth held Interior Secretary Bruce Babbitt in contempt in 1999, but imposed only a narrow award of attorneys' fees, with no threat of fines or jail.[520] When Judge Lamberth issued a similar contempt finding against Babbitt's successor, Gale Norton, in 2002,[521] a

---

[515] *Id.* at 1323–25.

[516] *In re* USA, 624 F.3d 1368, 1375–76 (11th Cir. 2010).

[517] *Id.* at 1381 (Martin, J., dissenting) (emphasis added).

[518] Transcript of Contempt Hearing at 41, Tummino v. Von Eschenbach, 427 F. Supp. 2d 212 (No. 05-cv-00366) (E.D.N.Y. Dec. 16, 2011), ECF No. 342.

[519] *Id.* at 8.

[520] Cobell v. Babbitt, 188 F.R.D. 122, 139–40 (D.D.C. 1999).

[521] Cobell v. Norton, 226 F. Supp. 2d 1, 11 (D.D.C. 2002), *vacated*, 334 F.3d 1128 (D.C. Cir. 2003).

EPA_00049046

columnist for *Indian Country Today* noted that Norton and one of her assistant secretaries faced "possible fines and jail time for their contempt conviction. Will it compel them to abide by court demands for accountability and fix the Indian Trust problem? Not likely. Norton knows from her predecessor's experience that Judge Lamberth's 'punishment' for disobeying his orders are more bark than bite."[522]

## VI. The Power of Contempt Findings Regardless of Sanctions

Consistent with the judiciary's virtually complete unwillingness to impose contempt sanctions on agencies and officials, the most common type of contempt finding against an agency is one that has no sanction at all — a mere reprimand. Yet despite the judiciary's aversion to employing sanctions and the prevalence of sanctionless contempt findings, agencies do typically take contempt findings quite seriously, often coming into compliance at the mere threat of one, even if sanctions seem unimaginable. The reason is that contempt findings, regardless of sanctions, have the power to shame agencies and officials for breaking accepted norms of compliance with court orders.

### A. A Preliminary Matter: How to Characterize Attorneys' Fee Awards

Before we discuss the shaming power of contempt regardless of sanctions, we must consider the preliminary question of whether to understand attorneys' fee awards as a "sanction" on a level with fines and imprisonment. There are several suits in which a court finds a federal agency in contempt and imposes such an award (plus sometimes an award of other, presumably much lesser, litigation costs). These awards are generally narrow: they may be for the fees incurred in seeking the contempt finding, or, somewhat more broadly, for the fees incurred as a result of the agency's noncompliance, which might also include the costs

---

[522] Gary Moore, *Norton's Contempt Confirms Government Double Standard*, Indian Country Today, Nov. 27, 2002, at A5. For more judicial acknowledgments in this vein, see *NRDC v. EPA*, 489 F.3d 1250, 1266 (D.C. Cir. 2007) (Rogers, J., dissenting) ("[A] court-imposed deadline for agency action may not easily be enforced."); *Leopold v. U.S. Civil Service Commission*, 450 F. Supp. 154, 155 (E.D.N.Y. 1978) (noting that in a prior proceeding, the judge, in deciding a contempt motion against the agency, said he was "reluctant to impose fines on federal officials" and "concluded charitably that the [agency's allegedly contemptuous] action was based on a 'misunderstanding' of the court's order" and remanded the matter to the agency for a second time); and *United States v. AT&T Co.*, 461 F. Supp. 1314, 1331 (D.D.C. 1978) (concluding that contempt, though formally available against the head of any agency that fails to comply with a subpoena, was not an "effective" remedy: "Whatever might be the theoretical amenability of heads of government departments to the Court's contempt power, in the context of its possible application to many officials in a great number of potential discovery disputes that power would undoubtedly prove to be an extremely blunt and unwieldy, and hence impractical, instrument." (footnote omitted)).

EPA_00049047

of filing motions to enforce the judgment, gathering information or reviewing documents to support litigation against the noncompliance, and so forth.[523]  It does not seem that contempt findings have resulted in awards of attorneys' fees for the entire suit (as could occur, say, under the Equal Access to Justice Act (EAJA) in the case of an individual or nonprofit plaintiff when the agency's position is not "substantially justified").[524]  It appears these narrow awards are usually paid from agency appropriations.[525]

These narrow awards of attorneys' fees raise the question of how to characterize them for purposes of analyzing sanctions.  In a high-profile case of contempt against a federal agency, the D.C. Circuit said that the district court's award of expenses for the contempt proceedings "cannot be considered relief for the underlying contempt."[526]  According to the D.C. Circuit, the contempt finding with the fee award had "no sanction" other than serving as a "reprimand."[527]

I think the D.C. Circuit is correct to view narrow awards of fees as "no sanction."  Such awards are categorically different from contempt sanctions like coercive civil fines, criminal fines, or compensatory civil fines.  Doctrinally, awards of attorneys' fees can be obtained even without a contempt finding (for example, under EAJA).  Functionally, such awards have much weaker incentive properties than contempt sanctions have.  They merely make it budget-neutral to litigate the agency's violations; they do not compensate for any harm the plaintiff suffers from the violations beyond having to pay lawyers.  Most important, such awards may be small in comparison to the political or organizational advantages that the agency derives from noncompliance.  Unlike coercive sanctions, fee awards are not calibrated to force the agency to comply, and unlike criminal fines, they are not calibrated to deter or punish governmental disobedience either specifically or generally.  The largest attorneys' fee award that our search turned up was in the massive *Cobell* class action to force the Interior Department to reform its management of Indian trust accounts.  Upon finding the Secretary in contempt in 1999, the judge awarded about $625,000 in fees incurred by plaintiffs

---

[523] *E.g.*, Hornbeck Offshore Servs., LLC v. Salazar, No. 10-1663, at 26–53 (E.D. La. June 1, 2011) (findings and recommendation of U.S. Magistrate Judge), ECF No. 265.

[524] 28 U.S.C. § 2412(d) (2012).

[525] When the GAO administered the Judgment Fund up to 1996, it initially suggested that all compensatory awards for contempt (including attorneys' fees) would be payable from the Judgment Fund. Burson, B-239556, 1990 WL 293549, at *1 (Comp. Gen. Oct. 12, 1990). But it then said that if an award to compensate plaintiffs had the purpose of sanctioning agency misconduct (as I think most or all contempt-based awards would), it would have to come from agency appropriations. Bradley, B-242786 (Comp. Gen. Jan. 31, 1991).  As noted *supra* notes 295–299 and accompanying text, control of the Judgment Fund shifted in 1996 to the Treasury Department, which has no public information on this.

[526] Cobell v. Norton, 334 F.3d 1128, 1145 (D.C. Cir. 2003).

[527] *Id.* at 1146.

due to the agency's noncompliance,[528] but this amount was less than one ten-thousandth of Interior's FY 1999 budget of $7.8 billion,[529] and was dwarfed by the economic stakes of the litigation, which was settled in 2010 for $3.4 *billion*.[530]  Compare this one-shot fee award, equivalent to one ten-thousandth of the agency's budget, to the coercive civil contempt fines imposed on the Army Corps of Engineers in *American Rivers*, which were $500,000 *per day*, amounting to 4% of the agency's daily budget.[531]

According to Professor Harold Krent's study of EAJA for the Administrative Conference of the United States, the prospect of attorneys' fee awards under that statute has at best a "modest" incentive effect on low-level agency officials making decisions about enforcement and implementation and likely no incentive effect on high-level officials making decisions about policy.[532]  To be sure, some of the reasons Krent cites for EAJA's incentive weakness may not apply to attorneys' fee awards under the contempt power (for example, the attenuation in time between the agency decision and the litigation, or the plaintiff eligibility standards limiting access to fees under the statute).[533]  But fee awards for contempt have other properties that give them less incentive power than EAJA fees, most notably that EAJA offers fees for the entire litigation, whereas contempt-based fee awards are almost always confined to the fees incurred due to the agency's noncompliance.

## B. The Prevalence of Sanctionless Contempt Findings

Against federal agencies, contempt findings with literally no sanction — or with only a narrow award of attorneys' fees that the D.C. Circuit has called "no sanction" — are more common than contempt findings to which the court attaches (or tries to attach) more severe sanctions.

Let us count the number of cases in our sources that have the more severe kinds of sanctions.  In Part I, we saw thirteen cases in which

---

[528] Cobell v. Babbitt, 188 F.R.D. 122, 123 (D.D.C. 1999).

[529] OFFICE OF MGMT. & BUDGET, HISTORICAL TABLE 4.1 — OUTLAYS BY AGENCY: 1962–2022, *supra* note 141.

[530] Armen H. Merjian, *An Unbroken Chain of Injustice: The Dawes Act, Native American Trusts, and* Cobell v. Salazar, 46 GONZ. L. REV. 609, 653 (2011).

[531] *Supra* text accompanying notes 255–257.

[532] Harold J. Krent, *Fee Shifting Under the Equal Access to Justice Act — A Qualified Success*, 11 YALE L. & POL'Y REV. 458, 474 (1993).

[533] *See id.* at 467–76.  Systematic data is no longer collected government-wide on EAJA fees paid by agencies.  There are a few agency-specific studies, for example, Michael J. Mortimer & Robert W. Malmsheimer, *The Equal Access to Justice Act and US Forest Service Land Management: Incentives to Litigate?*, 109 J. FORESTRY 352, 354–58 (2011) (finding that the United States Forest Service (USFS) paid an average of over $876,000 per year in EAJA fees in 1999–2005, *id.* at 354, compared with the 2009 annual budget of $1.51 billion, *id.* at 358 n.7, and making no claims about the effect of fee awards' prospect on USFS "perceptions and behaviors," *id.* at 357).

EPA_00049049

courts attempted to impose contempt fines on an agency, in ten of which the fine was blocked, leaving three where it stuck. In Part II, we saw four cases in which a judge imprisoned or credibly threatened to imprison an agency official, in one of which a higher court blocked the threat, leaving three in which imprisonment occurred or the threat stood. In Part III, we saw nine cases[534] in which a judge attempted to impose fines on an agency, in five of which the fine was blocked, leaving four where it stuck (plus seven cases of fines against individual government attorneys for litigation misconduct, of which five stuck). In Part IV, we saw four cases in which courts imposed adverse outcomes on the agency within the relevant lawsuits as contempt sanctions, none of which were blocked. Besides these, I should also note two cases in which a court held an individual government attorney in contempt and initiated bar disciplinary proceedings as a sanction, neither of which holdings was blocked.[535] Adding all these up, we have thirty-nine cases in which courts attempted to impose more severe types of contempt sanctions, and twenty-one where they stuck.

Compare those numbers with cases containing findings that have no sanction at all, or findings with a narrow fee award. In our sources, the cases containing findings of contempt with no sanction numbered twenty-two, which diminishes to eighteen after appeals.[536] The cases of findings with a narrow fee award (in which category I conservatively include cases unclear as to whether there was any award at all, or awarding only lesser items like travel costs) numbered twenty-one,

---

[534] These consist of the eight in section III.C, plus *Lander v. Morton*, 518 F.2d 1084 (D.C. Cir. 1975), discussed in section III.B.

[535] Lindstrom v. Graber, 203 F.3d 470 (7th Cir. 2000); Barone v. United States, 610 F. Supp. 2d 150 (D. Mass. 2009).

[536] Note that some of these cases do involve a tightening of the injunction, see *supra* note 14 and accompanying text. In eighteen cases, findings were not reversed. *See In re* Contempt Finding in United States v. Stevens, 663 F.3d 1270 (D.C. Cir. 2011); Yancheng Baolong Biochemical Prods. Co. v. United States, 406 F.3d 1377 (Fed. Cir. 2005); Hall v. Stone, 179 F.3d 1043 (7th Cir. 1999); United States v. Waksberg, 112 F.3d 1225 (D.C. Cir. 1997); Hartman v. Lyng, 884 F.2d 1103 (8th Cir. 1989); Berger v. Heckler, 771 F.2d 1556 (2d Cir. 1985); Cohn v. EEOC, 569 F.2d 909, 911 (5th Cir. 1978) (no "contempt sanction" other than to order personnel decisions benefiting plaintiff that court apparently viewed as constituting compliance with consent decree); Yanish v. Barber, 232 F.2d 939 (9th Cir. 1956); Docket Entry No. 40, Quiñonez Flores v. United States, 142 F. Supp. 3d 279 (No. 1:41-cv-03166) (E.D.N.Y. 2015) (describing minute entry); United States v. Droganes, 893 F. Supp. 2d 855, 880–88 (E.D. Ky. 2013); Al-Adahi v. Obama, 672 F. Supp. 2d 114 (D.D.C. 2009); Roman v. Korson, 307 F. Supp. 2d 908, 918–22 (W.D. Mich. 2004); Allegheny Bradford Corp. v. United States, 342 F. Supp. 2d 1162, 1171–72 (Ct. Int'l Trade 2004); Ramirez v. United States, No. 95-CR-79-3, 2003 WL 21147796, at *1, *3 (D. Minn. May 7, 2003); Estate of Smith v. Bowen, 675 F. Supp. 586 (D. Colo. 1987); Sierra Club v. Ruckelshaus, 602 F. Supp. 892 (N.D. Cal. 1984); Int'l Union of Operating Eng'rs, Local 627 v. Arthurs, 355 F. Supp. 7 (W.D. Okla. 1973); *In re* Sylvester, 41 F.2d 231, 232 (S.D.N.Y. 1930). In four cases, contempt findings were reversed. *See* Ferrell v. HUD, 186 F.3d 805 (7th Cir. 1999); Franklin Savs. Ass'n v. Ryan, 922 F.2d 209 (4th Cir. 1991); *In re* Att'y Gen., 596 F.2d 58 (2d Cir. 1979); Theriault v. Carlson, 495 F.2d 390 (5th Cir. 1974).

which diminishes to eighteen after appeals.[537]  Summing up the two categories, we get forty-three, or thirty-six after appeals.  Thus, the cases that originally had no sanction or a narrow fee award (forty-three) outnumber those that originally had more severe kinds of sanctions (thirty-nine).  After appeals, the disparity is even greater (thirty-six to twenty-one).

I do not want to make too much of the numbers, as the suits vary greatly in magnitude and the violations vary greatly in seriousness, but some of the most important cases do fall into the category of having no sanction, or only a narrow fee award.  The contempt findings with nothing but a fee award include those against two Interior Secretaries in 1999 and 2002 in the *Cobell* Native American trust account litigation, which received much attention in the press and Congress, with the case ultimately settling for billions of dollars.[538]  The contempt findings with no sanction nor even a fee award include the finding against Attorney General Griffin Bell in 1978 for refusing to turn over eighteen informant files in a lawsuit against the FBI for illegal surveillance,[539] which made the front page of the *Washington Post*.[540]  Another example is the finding against EPA Administrator William Ruckelshaus in 1984 for defying

---

[537] That is, in eighteen cases, findings were not reversed.  *See* Bernardi v. Yeutter, 951 F.2d 971, 977 (9th Cir. 1991); Idaho Wool Growers Ass'n v. Vilsack, 17 F. Supp. 3d 1085 (No. 1:08-cv-00394), at 22–26 (D. Idaho Feb. 23, 2016) (memorandum decision and order), ECF No. 66 (contemplating motion for fees); Huene v. IRS, No. 2:11-cv-2110, at 7 (E.D. Cal. Jan. 30, 2013) (order), ECF No. 55 (finding that "sanctions are warranted for [defendant officials'] failure to appear at their depositions," consisting of videographer and court reporter fees, in response to plaintiff's motion seeking "contempt sanctions" for those costs); Inst. for Wildlife Prot. v. U.S. Fish & Wildlife Serv., No. 6:02-cv-6178, at 6 (D. Or. Aug. 27, 2012) (opinion and order), ECF No. 81; Landmark Legal Found. v. EPA, 272 F. Supp. 2d 70, 89 (D.D.C. 2003); EEOC v. Dial Corp., No. 99 c 3356, at 9–10 (N.D. Ill. Nov. 29, 2001) (memorandum and order on defendant's motion for contempt order), ECF No. 216; Cobell v. Babbitt, 188 F.R.D. 122, 123 (D.D.C. 1999); United States v. Attaluri, 34 F. Supp. 2d 1280, 1286 (N.D. Okla. 1999); Docket Entry No. 27, Oliver v. Runyon, No. 1:96-cv-02064 (D. Colo. Nov. 21, 1997) (describing the court's order); Docket Entry No. 78, Harrigan v. Runyon, No. 1:96-cv-00384 (D. Colo. Oct. 29, 1997) (describing the court's order); Askew v. Callahan, No. 4:95CV61, at 1–2 (S.D. Miss. Aug. 28, 1997) (order), ECF No. 27; Maniktahla v. John J. Pershing V.A. Med. Ctr., No. 1:95CV71 (E.D. Mo. Feb. 16, 1996) (order), ECF No. 34; Cook v. Rockwell Int'l Corp., 907 F. Supp. 1460, 1468 (D. Colo. 1995); Docket Entry No. 86, Huffman v. U.S. Dep't of Veterans Affairs, No. 6:92-cv-00922 (D.N.M. Dec. 9, 1994) (describing the court's order); Docket Entry No. 234, Cuffee v. Sullivan, No. 4:90-cv-00460 (W.D. Mo. Apr. 23, 1993) (describing the court's order); D & M Watch Corp. v. United States, 795 F. Supp. 1160, 1169–72 (Ct. Int'l Trade 1992); Smith v. Bowen, No. 81 CV 1284, 1988 WL 16178, at *4 (E.D.N.Y. Feb. 16, 1988); Johnson v. United States, 573 F. Supp. 641, 647 (S.D.N.Y. 1983).  In three cases, findings were reversed.  *See* Hornbeck Offshore Servs., L.L.C. v. Salazar, 713 F.3d 787, 796 (5th Cir. 2013); Akzo Nobel Inc. v. United States, 478 F. App'x 126, 131, 137 (5th Cir. 2012); Cobell v. Norton, 334 F.3d 1128, 1145–46, 1150 (D.C. Cir. 2003).

[538] Merjian, *supra* note 530, at 639–42, 646, 653–57.

[539] Socialist Workers Party v. Att'y Gen., 458 F. Supp. 895, 897, 915 (S.D.N.Y. 1978), *vacated*, 596 F.2d 58 (2d Cir. 1979).

[540] Charles R. Babcock, *Judge Cites Bell for Contempt over FBI Files*, WASH. POST, July 7, 1978, at A1.

an injunction to promulgate a rule when he considered the science insufficient,[541] which also received extensive media coverage.[542]

One might think that sanctionless contempt findings are mere artifacts of timing: the judge takes a stepwise approach, imposing the finding, seeing if the official complies, and then imposing sanctions if not. But that is not necessarily so. For example, in the FBI surveillance suit, when the district judge ordered Attorney General Bell to hand over the documents by a certain date on pain of a contempt finding (with no sanction), he said vaguely that he would later "entertain a motion for more drastic sanctions" but also insisted: "It is obvious that the *status* of civil contempt would, *in and of itself*, be a severe sanction against the highest law enforcement officer in the United States."[543] To take another example, in a tort suit against nuclear power plants indemnified by the Department of Energy (DOE), the DOE stonewalled in turning over documents and was held in contempt in 1995 with only a narrow fee award.[544] When DOE still had not come into compliance nine months later, the judge refused to escalate the sanctions, on the ground that DOE was making enough of an effort to get itself into compliance.[545]

## C. *The Apparent Efficacy of Contempt Findings Without Sanctions*

While this Article has presented evidence that federal courts have an extreme aversion to using contempt sanctions against federal agencies, it would be absurd to say that federal agencies feel no pressure from judges, or that agencies get whatever they want in compliance negotiations.[546] On the contrary, agency personnel negotiating compliance consider it very important to keep courts satisfied, for example, by making

---

[541] *Sierra Club*, 602 F. Supp. at 894–95, 897, 904.

[542] *See U.S. Judge Rules E.P.A. in Contempt; Agency Is Called 'Evasive' for Not Issuing Standards on Radioactive Emissions*, N.Y. TIMES, Dec. 12, 1984, at A27.

[543] *Socialist Workers Party*, 458 F. Supp. at 903 (emphasis added).

[544] Cook v. Rockwell Int'l Corp., 907 F. Supp. 1460, 1463–64, 1468 (D. Colo. 1995).

[545] Cook v. Rockwell Int'l Corp., 935 F. Supp. 1452, 1463 (D. Colo. 1996). On DOE's role in the litigation, see Milo Geyelin, *Federal Judge Finds Energy Department in Contempt*, WALL ST. J., Nov. 17, 1995, at B5.

[546] Statistical studies of the time it takes agencies to perform certain stages of rulemakings generally find that the presence of a judicial deadline speeds up the process. Gersen & O'Connell, *supra* note 8, at 948–50, 949 n.84; Stéphane Lavertu & Susan Webb Yackee, *Regulatory Delay and Rulemaking Deadlines*, 24 J. PUB. ADMIN. RES. & THEORY 185, 196–97 (2014); Jason Webb Yackee & Susan Webb Yackee, *Administrative Procedures and Bureaucratic Performance: Is Federal Rule-making "Ossified"?*, 20 J. PUB. ADMIN. RES. & THEORY 261, 277–78 (2010); Rachel Augustine Potter, Slow-Rolling, Fast-Tracking, and the Pace of Bureaucratic Decisions in Rulemaking 21–22 (Apr. 4, 2016) (unpublished manuscript), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2759117 [https://perma.cc/54SH-ZW3W]. Another quantitative study of agency responses to judicial rulings (specifically, to U.S. Supreme Court rulings) finds that agencies never defy or evade such rulings, James F. Spriggs II, *Explaining Federal Bureaucratic Compliance with Supreme Court Opinions*, 50 POL. RES. Q. 567, 575–78 (1997), though it must be read with the proviso that the

some steady progress toward compliance, professing their respect for the court and their aspiration to comply, and providing assurances that they are trying hard and allocating reasonable levels of personnel and funding. This approach gives courts a face-saving way to allow agencies more latitude and is a major reason why there are, in fact, so few contempt sanctions. There are many judicial opinions that say, more or less outright, that an initially recalcitrant agency complied as a result of being threatened with a mere contempt motion or contempt finding.[547] In Hume's study of judicial review, based partly on interviews with about thirty-five current and former agency officials, he notes:

> Respondents universally reported that their agencies associated high costs with contempt citations, mandamus actions, and other sanctions [that is, sanctions in a nontechnical sense that includes mere citations], and took extra measures to avoid them. 'If we think there might be a contempt citation, we will back off,' stated one.[548]

This seeming paradox — that contempt findings elicit a great deal of agency compliance even though it seems unimaginable that the judiciary will follow through with sanctions — was beautifully captured in a passing comment by the Environmental Law Institute, a highly respected nonpartisan outfit. The comment appeared in a report published in 1985, soon after a district court held EPA Administrator William Ruckelshaus in contempt for failing to set a certain emission standard by a court-ordered deadline.[549] The judge imposed no sanction, but simply told EPA to set the standard within thirty days.[550] The Institute's report wondered why EPA invested so much in meeting court-ordered deadlines when, as this one case showed, the ultimate consequence of noncompliance would be mere sanctionless contempt: "Top management [at EPA] takes the threat of contempt quite seriously and personally, even though the threat is not real."[551]

---

Supreme Court enjoys extraordinary prestige and can review only a tiny fraction of administrative law litigation.

[547] *E.g.*, Pollack v. U.S. Bureau of Prisons, 879 F.2d 406, 408 (8th Cir. 1989); Am. Trucking Ass'ns v. ICC, 770 F.2d 535, 538 (5th Cir. 1985); NRDC v. EPA, 529 F.2d 755, 760 (5th Cir. 1976); A Quaker Action Grp. v. Morton, 460 F.2d 854, 857 (D.C. Cir. 1971) (Department of Interior); Miccosukee Tribe of Indians of Fla. v. United States, 706 F. Supp. 2d 1296, 1305 (S.D. Fla. 2010) (EPA); Atl. Fish Spotters Ass'n v. Evans, 206 F. Supp. 2d 81, 95 (D. Mass. 2002) (Commerce Department); Cobell v. Norton, 226 F. Supp. 2d 1, 131 (D.D.C. 2002) (Department of Interior); Tom v. Babbitt, No. 94-K 1242 (D. Colo. Oct. 25, 1999) (recommendation of United States Magistrate Judge), ECF No. 114 (Bureau of Indian Affairs); Jurgens v. EEOC, 660 F. Supp. 1097, 1102 (N.D. Tex. 1987); Lundy v. Interfirst Corp., 105 F.R.D. 499, 504–05 (D.D.C. 1985) (Office of the Comptroller of the Currency); Powell v. United States, 569 F. Supp. 1192, 1194 (N.D. Cal. 1983) (DOJ).

[548] HUME, *supra* note 15, at 39.

[549] Sierra Club v. Ruckelshaus, 602 F. Supp. 892, 904 (N.D. Cal. 1984).

[550] *Id.*

[551] ENVTL. & ENERGY STUDY INST. & ENVTL. LAW INST., *supra* note 1, at v. As noted in an interview-based study of EPA, "[a] court mandate always gets the attention of upper-echelon managers at the EPA." O'LEARY, *supra* note 9, at 166; *see also id.* at 168–69, 171–72.

### D.  The Norm of Compliance and the Shame of Contempt

If the judiciary is so unwilling to attach sanctions to contempt findings, why does it issue the findings at all?  And why do the findings often elicit strong effort from agencies?  If the threat of contempt is "not real," why do agency officials take it "quite seriously and personally"?

The answer appears to be norms and shaming.  Federal agency officials inhabit an overlapping cluster of communities, including revolving-door types, civil servants, members of Congress and staff, lobbyists, the legal profession, the media, and possibly certain voting publics.  These communities recognize a strong norm in favor of compliance with court orders.[552]  Violators of this norm are subject to shame in the eyes of fellow community members.  A contempt finding marks one as a violator.  The desire to avoid such shame is a powerful (if not perfect) motivator, regardless of any material sanction.

First, consider the norm itself.  In Hume's study of judicial review, based partly on interviews with about three dozen current and former high-ranking federal agency officials,[553] he reports:

> None of the respondents admitted to disobeying court decisions outright, insisting that they always obey the letter of a judge's order.  "Clearly we will follow what we were directly ordered to do," said [one] administrator, expressing a sentiment universally shared by respondents.  "I followed bad decisions where I had no choice," another of them emphasized.  "As a rule noncompliance does not happen."[554]

Hume's interviewees would admit to interpreting court orders narrowly, or to delaying implementation where the order allowed them discretion on timing, but not to outright failure to comply with an order's terms.[555]  This behavior was norm driven.  "The people I interviewed," says Hume, "suggested that their behavior is . . . influenced by a professional obligation to comply."[556]  One of his interviewees "seemed offended when . . . asked whether the head of her agency ever refused to implement a court decision."[557]  The agency head, insisted the interviewee, was "a very responsible woman" and "a woman of integrity [who] would not have disregarded a court decision."[558]  The interviewee

---

[552] I use the term *norm*, following the shaming literature, but we might also use the term *convention*, that is, a "regular pattern[] of political behavior . . . followed from a sense of obligation." Adrian Vermeule, *Conventions of Agency Independence*, 113 COLUM. L. REV. 1163, 1185 (2013). Vermeule passingly refers to "the norm that political actors will obey adverse judicial judgments" as a convention, though his example (Al Gore after the 2000 election) involves a candidate rather than an agency official. *Id.* at 1193.

[553] HUME, *supra* note 15, at 127.

[554] *Id.* at 77.

[555] *Id.*

[556] *Id.* at 76.

[557] *Id.*

[558] *Id.*

"believed that it would have been unprofessional for her agency to resist implementing an adverse ruling."[559]  Significantly, the norm of official compliance is also accepted among the interest groups that deal with the agencies.  Hume's interviewees told him that private-sector lobbyists would cease pressing the agency to adopt a policy if a court foreclosed it.[560]

In my own research, the norm is confirmed by the agencies' own positions in even the most trying litigation.  The hundreds of suits I have examined in which judges made or considered contempt findings are universally consistent with Hume's interviewees' statements in the sense that the agency always recognizes its obligation to comply and claims (at least) to be making a good-faith effort to do so.  When an agency faces contempt proceedings, its most common argument, by far, is that its actions are consistent with the injunction properly interpreted.  Even in the cases in which the government invokes sovereign immunity as a bar to fines against the agency, or invokes prudential limits on enforcement to head off other sanctions, these arguments are in the alternative.  The agency never suggests that the alleged unavailability of material sanctions diminishes its normative obligation to comply; on the contrary, the agency always insists that it has complied or is doing its best to comply.[561]

Why do U.S. officials have a norm in favor of compliance with court orders?  There is almost no scholarship specifically on this question, and it is beyond the scope of this Article, which is about the norm's consequences, not its basis.  Suffice it to say that any answer would likely draw upon the large literature addressing the more general question of why the political branches have come to accept a powerful and independent judiciary.  That literature focuses overwhelmingly on U.S. Supreme Court constitutional cases (sometimes with comparisons to foreign or international law), not on the lower court statutory cases that are the bread and butter of administrative law.  Despite this difference in focus, some of the literature's insights likely apply to agency compliance with statute-based orders of lower courts.  At an instrumental level, members of the political branches find a strong judiciary useful as a

---

[559] *Id.*

[560] *Id.* at 74–75.

[561] Several DOJ briefs simultaneously argue that the agency is complying (or doing everything possible to comply) and for more general legal limits on sanctions.  *E.g.*, Defendant's Pre-Hearing Brief, *supra* note 183, at 9–13, 19–20, 26 (prudential limits on imprisonment); Defendant's Response to Order to Show Cause, *supra* note 107, at 22–23, 26–27 (sovereign immunity to fines); Brief for the Appellants, *Project B.A.S.I.C.*, *supra* note 107, at 26, 47 (sovereign immunity to fines); Brief for Charles Sawyer, Secretary of Commerce, *supra* note 434, at 27–35 (official immunity from all sanctions for action pursuant to DOJ advice).

EPA_00049055

means to make credible commitments,[562] as "insurance" against the most extreme consequences of losing future elections,[563] or as an ally in rivalry with other political actors.[564]  At a psychological level, officials in the political branches may support the judiciary out of faith in its fairness or neutrality,[565] or because of the prestige of courts in American legal culture.[566]  And once a sufficient number of political actors (including agency officials) have begun supporting and obeying judicial authority, their behavior becomes self-reinforcing: people become positively invested in the established way of doing things (for example, the legal profession);[567] the expectation of compliance makes it hard to undertake the collective action necessary for noncompliance to be effective;[568] and recoordinating around a different expectation comes to seem very costly, perhaps an invitation to chaos.[569]  Moreover, habitual behavior acculturates people, reshaping their preferences and moral perceptions, perhaps limiting their very capacity to conceive of doing things differently.[570]

[562] William M. Landes & Richard A. Posner, *The Independent Judiciary in an Interest-Group Perspective*, 18 J.L. & ECON. 875, 877 (1975); Law, *supra* note 286, at 449–50; Christopher A. Whytock, *Thinking Beyond the Domestic-International Divide: Toward a Unified Concept of Public Law*, 36 GEO. J. INT'L L. 155, 172–75 (2004).

[563] Matthew C. Stephenson, *"When the Devil Turns . . . ": The Political Foundations of Independent Judicial Review*, 32 J. LEGAL STUD. 59, 85 (2003).

[564] *See* Landes & Posner, *supra* note 562, at 888; McNollgast, *The Political Origins of the Administrative Procedure Act*, 15 J.L. ECON. & ORG. 180 (1999); *see also* WHITTINGTON, *supra* note 30, at 105–20, 287–88.

[565] WHITTINGTON, *supra* note 30, at 294; Jack Goldsmith & Daryl Levinson, *Law for States: International Law, Constitutional Law, Public Law*, 122 HARV. L. REV. 1791, 1838–40, 1842 (2009) (citing TOM R. TYLER, WHY PEOPLE OBEY THE LAW (2006)); Whytock, *supra* note 562, at 184–85.

[566] *See* ROBERT A. KAGAN, ADVERSARIAL LEGALISM: THE AMERICAN WAY OF LAW 215 (2001).

[567] Daryl J. Levinson, *Parchment and Politics: The Positive Puzzle of Constitutional Commitment*, 124 HARV. L. REV. 657, 686–87, 713, 743 (2011).

[568] David S. Law, *A Theory of Judicial Power and Judicial Review*, 97 GEO. L.J. 723, 757–64, 778–81 (2009).

[569] Goldsmith & Levinson, *supra* note 565, at 1835–36; Levinson, *supra* note 567, at 708, 712.

[570] Levinson, *supra* note 567, at 690–91; *see also* Richard H. Fallon, Jr., *Legitimacy and the Constitution*, 118 HARV. L. REV. 1787, 1827–33 (2005) (discussing the sociological legitimacy of the judiciary, particularly public acceptance of Supreme Court decisions).

*HARVARD LAW REVIEW* [Vol. 131:685]

Regardless of how the compliance norm has originated and survived, it surely exists, meaning that a noncompliant official or agency, identified by a contempt citation,[571] is subject to shame. Shaming — a phenomenon whose important role in public law is little discussed[572] — occurs when a member of a community is humiliated, with the community as audience, for violating a community norm. Though shaming is archetypically associated with close-knit, face-to-face communities of the premodern world,[573] it can also be effective today in any group that sustains some kind of cohesion, for example, "civic and professional communities,"[574] and it is especially effective against status-conscious people who believe they possess, and wish to preserve, "bourgeois respectability."[575] For example, when appellate courts overturn criminal convictions for prosecutorial misconduct, they usually avoid revealing the prosecutor's name in the opinion, and DOJ has specifically asked for names that have been included in opinions to be removed, apparently to shield its employees from reputational harm in the profession and related communities.[576]

---

[571] Professor Frederick Schauer observes that American political culture has a norm of official compliance with law, the violation of which comes at a political cost, but he warns that the norm is often very hard to enforce because noncompliant officials can claim that they are following *their interpretations* of the law, thereby cloaking the violation as mere interpretive disagreement. Frederick Schauer, *Official Obedience and the Politics of Defining "Law,"* 86 S. CAL. L. REV. 1165, 1173–74, 1177–78, 1185 (2013). Schauer does not discuss contempt, but he does more generally emphasize that we need clear, rule-like laws — or authoritative courts to settle the meaning of vague laws — if we want lawbreaking officials to suffer a concentrated political backlash. *Id.* at 1190, 1192. Judicial contempt findings — clear and authoritative means of designating officials as violators — are the U.S. political system's means for creating the backlash-concentrating clarity that Schauer thinks necessary to official compliance in the absence of material sanctions.

[572] In the legal literature, scholars have most extensively analyzed shaming in criminal justice. *E.g.,* Dan M. Kahan, *What Do Alternative Sanctions Mean?*, 63 U. CHI. L. REV. 591 (1996); Toni M. Massaro, *The Meanings of Shame: Implications for Legal Reform*, 3 PSYCHOL. PUB. POL'Y & L. 645 (1997); James Q. Whitman, *What Is Wrong with Inflicting Shame Sanctions?*, 107 YALE L.J. 1055 (1998). Shaming has also been discussed in corporate law, *e.g.,* David A. Skeel, Jr., *Shaming in Corporate Law*, 149 U. PA. L. REV. 1811 (2001), and international law, *e.g.,* Sandeep Gopalan & Roslyn Fuller, *Enforcing International Law: States, IOs, and Courts as Shaming Reference Groups*, 39 BROOK. J. INT'L L. 73 (2014). Two pieces discuss judicial use of shaming against criminal prosecutors for misconduct. Lara Bazelon, *For Shame: The Public Humiliation of Prosecutors by Judges to Correct Wrongful Convictions*, 29 GEO. J. LEGAL ETHICS 305 (2016); Adam M. Gershowitz, *Prosecutorial Shaming: Naming Attorneys to Reduce Prosecutorial Misconduct*, 42 U.C. DAVIS L. REV. 1059 (2009). Outside of criminal justice, there is only one piece on shaming in domestic public law, Emily Chiang, *Institutional Reform Shaming*, 120 PENN ST. L. REV. 53 (2015), but it focuses on how plaintiffs and their activist attorneys can use discovery and other litigation processes to acquire information about institutional defendants (primarily state and local government defendants like prisons) to shame them directly; the piece identifies no role for judges or judicial findings in the shaming.

[573] Massaro, *supra* note 572, at 673–88, 693–94.

[574] Kahan, *supra* note 572, at 642; *see also* Massaro, *supra* note 572, at 695–96.

[575] Whitman, *supra* 572, at 1666–68.

[576] Gershowitz, *supra* note 572, at 1069, 1094.

The relevant community, in the case of contempt findings in administrative law, is a cluster of overlapping groups — generally quite status conscious and bourgeois — that recognize the norm of official compliance with injunctions: revolving-door types, career agency officials, congressmen, Hill staff, lobbyists, the legal profession, and the media (plus, possibly, certain voting publics). The humiliation takes the form of stigmatizing publicity[577] — the identification of the violator by name in a public judicial contempt order, which may be further disseminated by word of mouth or media. The shaming surely has external consequences, in the sense of threatening the violator's reputation, and may also have internal psychological consequences, depending on how much the violator has internalized the community's norms and the authority of judges to decide when they have been transgressed.[578]

Individual officials are not the only possible targets for shaming; agencies themselves can be shamed in the sense that their reputations can be damaged. As the political scientist Professor Daniel Carpenter argues, a government agency is a reputation-bearing entity whose image before various audiences can determine the level of authority or funding it enjoys from lawmakers; the latitude or resistance it receives from businesses, activists, courts, or professional bodies; and the degree of prestige or status felt by its employees.[579] Relatedly, as Professor Tom Tyler has argued, a government decisionmaker that is perceived as procedurally fair and motivated by good intentions has an easier job of eliciting compliance from the people under its jurisdiction.[580] An agency's officials often work hard to "protect, maintain, and enhance" its reputation, and they may refrain from acting when they fear putting agency reputation at risk.[581] As Carpenter notes, agencies can have better or worse reputations along several dimensions, including moral and legal-procedural ones.[582]

When it comes to contempt against agencies, our primary sources confirm that judges, attorneys, officials, plaintiffs, and observers conceive of what is happening in terms of shame, using words like *shameful, opprobrium, disparagement, branded, unseemliness, reputation,* and *public perception*. "Contempt has a shameful cast," said one anonymous agency official to Hume, who concludes in his brief discussion of contempt that it is "highly embarrassing for the administrators involved

---

[577] Kahan, *supra* note 572, at 631.
[578] The internalized effect is not necessary to shaming, *id.* at 636, but may play an important role, Whitman, *supra* note 572, at 1065–66.
[579] DANIEL CARPENTER, REPUTATION AND POWER: ORGANIZATIONAL IMAGE AND PHARMACEUTICAL REGULATION AT THE FDA 43–61 (2010).
[580] TYLER, *supra* note 565; TOM R. TYLER & YUEN J. HUO, TRUST IN THE LAW (2002).
[581] CARPENTER, *supra* note 579, at 66–68.
[582] *Id.* at 46–47.

EPA_00049058

*HARVARD LAW REVIEW* [Vol. 131:685

and harmful for their future political prospects" — "so harmful to the reputations of administrators" that judges use it "sparingly."[583]

The shamefulness of contempt for officials, even without sanction, is a key assumption on which judges practically rely. Take for example appellate review of discovery orders. Though discovery orders are not normally subject to immediate appeal, a party can obtain higher court review by disobeying the order, getting herself held in contempt, and then appealing the contempt finding.[584] Federal agencies and their employees find themselves in this position not infrequently, because they possess much information that is valuable to private litigants but often want to keep it confidential under various privileges. In a 1979 opinion, Judge Friendly explained how the review-by-contempt maneuver should be executed so as to spare the agency official any material burden.[585] When a "Government employee makes a non-frivolous assertion of governmental privilege at his agency's request," the district judge ordinarily should issue a "citation for civil contempt without any other immediate sanction pending prompt application for review."[586] If the agency wins on appeal, "the citation should be expunged," and if it loses, the only sanction should be compensation to the other side (mainly attorneys' fees), which "should be paid by the Government and not by the employee."[587]

Judge Friendly believed that a contempt finding, even when executed in his prescribed manner to minimize material sanctions and insulate individual officials from them entirely, still had an incentive effect on agencies. (Judge Friendly cared about incentives, for he was concerned that appeals were becoming excessive and wanted to deter them.[588]) The "requirement of submission to contempt" — "[e]ven as thus softened" by holding back sanctions and then minimizing them or indemnifying the officials if the appellate court upheld the discovery order — "still serves a useful purpose in curtailing appeals" that cause "delay in litigation."[589] "The person ordered to respond [to the discovery order] may decide, as [the agency] could well have done here, that the importance of the issue and the risk of adverse appellate determination do not warrant being branded as a contemnor."[590] Simply to be

[583] HUME, *supra* note 15, at 39. The passage does not clearly address the question of whether sanctions are attached to the findings under discussion.
[584] 8 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2006, at 109–10 (3d ed. 2010).
[585] Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch., 591 F.2d 174, 180 (2d Cir. 1979).
[586] *Id.*
[587] *Id.*
[588] *See* United States v. Fried, 386 F.2d 691, 694–95 (2d Cir. 1967) (Friendly, J.) (warning that acceptance of the defendant's position would "open the door to countless appeals").
[589] *Nat'l Super Spuds*, 591 F.2d at 180.
[590] *Id.*

"branded as a contemnor" was a cost that rational officials would trade off against the benefits of noncompliance.[591]

That same year, the Second Circuit overturned the contempt finding against Attorney General Bell for his refusal to reveal the names of FBI informants in the Socialist Workers Party suit for illegal surveillance, holding that such a finding could be made against the Attorney General only as a "last resort."[592]  The district court's contempt finding had been sanctionless, yet with significant reputational costs for Bell.  In refusing plaintiffs' motion to impose sanctions, the district judge had said: "It is obvious that the status of civil contempt would, in and of itself, be a severe sanction against the highest law enforcement officer in the United States."[593]  Bell himself argued that the contempt finding itself "will adversely affect my ability to function as attorney general."[594]  When the district court handed down the finding, it made the front page of the *Washington Post* and of the *Atlanta Constitution* in Bell's home state of Georgia.[595]

Despite Judge Friendly's belief in sanctionless contempt findings as a means to test the intensity of preference of a party (including an agency) for appellate review of a discovery order, some courts more recently have found the reputational cost of such a finding so great as to justify relieving agencies of the obligation to incur it.  For example, in 1993, the Eleventh Circuit held that the FDA should be excepted from the usual requirement that litigants must be willing to get held in contempt in order to obtain review of discovery orders, partly on the ground that "[r]equiring the FDA Commissioner to [fight the subpoena by placing himself in contempt . . . would harm the public perception of the FDA."[596]  In other contexts where agencies have historically been obligated to get themselves held in contempt to obtain appellate review, some courts of appeals have likewise carved out exceptions, noting "the unseemliness of forcing a government agency to act in contempt."[597]

The D.C. Circuit has recognized the shaming power of sanctionless contempt as an especially appropriate weapon for courts to use in response to agency disobedience.  This recognition came in the *Cobell*

---

[591]  *Id.*

[592]  Att'y Gen. v. Att'y Gen., 596 F.2d 58, 65 (2d Cir. 1979).

[593]  Socialist Workers Party v. Att'y Gen., 458 F. Supp. 895, 903 (S.D.N.Y. 1978).

[594]  Babcock, *supra* note 540, at A1.

[595]  *Id.*; Jeff Nesmith, *Court Holds Griffin Bell in Contempt*, ATLANTA CONST., July 7, 1978, at 1.

[596]  *In re* United States of America, 985 F.2d 510, 512 (11th Cir. 1993).  For courts adhering to the old approach, see *In re Kessler*, 100 F.3d 1015 (D.C. Cir. 1996); and *Connaught Laboratories, Inc. v. SmithKline Beecham PLC*, 165 F.3d 1368 (Fed. Cir. 1999).

[597]  Miami Tribe of Okla. v. United States, 656 F.3d 1129, 1139 n.11 (10th Cir. 2011) (quoting 15B CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3914.32, at 240 (2d ed. 1992); *see also* Crowder v. Sullivan, 897 F.2d 252, 253 (7th Cir. 1990) (noting that forcing an agency to be held in contempt is an "unseemly route for obtaining appellate review").

Indian trust account litigation. In 2002, District Judge Royce Lamberth, having already issued a contempt finding (requiring the payment of attorneys' fees but nothing more) against Interior Secretary Bruce Babbitt three years earlier,[598] issued another such finding (again with only attorneys' fees) against Babbitt's successor, Gale Norton, for noncompliance with the judge's substantive orders and for misleading him.[599] This landed Norton on the front page of the *Washington Post*.[600] Norton appealed the contempt finding in her official capacity, represented by DOJ, but she also took the unusual step of appealing in her personal capacity, represented by an eminent private litigator, Herbert Fenster.[601] When the plaintiffs insisted that Norton had no right to litigate personally, Fenster replied that Judge Lamberth's contempt finding and especially his opinion's statement that Norton was "unfit" to manage the Indian trust accounts gave her a reputational stake in the litigation, in part because the finding was such a powerful weapon for the plaintiffs to further undermine her:

> [Plaintiffs'] counsel have used [the district court's contempt] ruling as the premise for a series of *ad hominem* statements that have actually exacerbated the reputational disparagement initiated by the District Court. . . .
>
> It is clear that the Plaintiffs are maximizing the use of the trial court's "unfit" term to demonize a sitting Cabinet member, to denigrate her credibility and reduce her effectiveness before the courts, Congress and even within her own Department. The latest such effort involving the trial court's "unfit" epithet consists of a statement to the media by Plaintiffs' counsel . . . .[602]

In arguing that mandamus was justified "to prevent immediate and concrete harm to reputation from a district court order," Fenster noted that Norton was an attorney and previously attorney general of Colorado and that plaintiffs were threatening to extend "their disparagement of her reputation to the licensing bars that could affect her professional life in the future."[603]

When the D.C. Circuit decided Norton's appeal in mid-2003, it discussed the shaming power of contempt findings for agency defendants:

> The exceedingly strong words [that the district court] used in finding the defendants in contempt — in particular its statement that Secretary Norton was "unfit" — suggest the court intended the adjudication [of contempt] and accompanying opinion to serve as a reprimand to Secretary Norton and

---

[598] Cobell v. Babbitt, 37 F. Supp. 2d 6, 9 (D.D.C. 1999).

[599] Cobell v. Norton, 226 F. Supp. 2d 1, 153–55 (D.D.C. 2002).

[600] Helen Rumbelow & Neely Tucker, *Interior's Norton Cited for Contempt in Trust Suit*, WASH. POST, Sept. 18, 2002, at A1.

[601] Final Brief of Gale A. Norton in Her Individual Capacity, Cobell v. Norton, 334 F.3d 1128 (D.C. Cir. 2003) (No. 02-5374).

[602] Final Reply Brief of Gale A. Norton in Her Individual Capacity at 6–8, *Cobell*, 334 F.3d 1128 (No. 02-5374).

[603] *Id.* at 14, 14 n.6.

EPA_00049061

> Assistant Secretary McCaleb. Indeed, the defendants reasonably character-
> ize the decision as having "impose[d] opprobrium" upon them. Norton and
> McCaleb in particular believed the district court's adjudication to be so
> injurious to their reputations that they engaged private counsel and sought
> to intervene as appellants and to present arguments in their respective per-
> sonal capacities. We see no reason a district court may not impose a repri-
> mand as the sole sanction for an adjudication of contempt, particularly
> when the contemnor is a public official acting in her official capacity.[604]

Though it recognized the appropriateness of using reputational harm
against public officials, the D.C. Circuit vacated the contempt finding
on case-specific grounds. The most important basis for its decision was
that, because the findings were for wholly past conduct, they were crim-
inal in nature, which required Norton to have committed the violations
with intent, of which there was insufficient proof.[605]

Contempt's shaming power was also evident in another series of
events in the *Cobell* litigation: Judge Lamberth's initiation of contempt
proceedings against a large number of midlevel officials and government
attorneys who he thought were obstructing the project to reform trust
account management. Whereas Babbitt and two other high-level offi-
cials in 1999 had successfully persuaded Judge Lamberth to target his
contempt findings at them alone,[606] Judge Lamberth by 2004 had be-
come so convinced of mass noncompliance throughout DOI and DOJ
that he initiated contempt charges against about eighty employees of
those agencies.[607] He never issued actual contempt findings (to say
nothing of sanctions) against any of these lesser players, but, according
to a 2004 study by Professor Richard Pierce, the mere threats of con-
tempt findings profoundly upset numerous DOI employees: "The DOI's
employees are well aware of Judge Lamberth's reign of terror, and they
are truly terrorized."[608] Pierce elaborated:

> One former DOI lawyer (now in private practice) related an anecdote
> to me to illustrate the way Judge Lamberth uses threats of contempt. Sev-
> eral years ago, the DOI planned to use statistical sampling to accomplish
> part of the task of verifying the accuracy of some of the account data it was
> attempting to compile. The DOI abandoned that part of its plan for over a
> year, however, when Judge Lamberth referred to such an idea as "contemp-
> tuous." The DOI employees who put the plan together feared that any
> proposed use of statistical sampling would elicit from Judge Lamberth a
> string of personal insults, a show cause order, and a potential contempt ci-
> tation. Like everyone else involved in the case, the source of this anecdote
> is unwilling to discuss the case on the record for fear that he will be the
> subject of reprisals by Judge Lamberth. He is one of eighty government

[604] *Cobell*, 334 F.3d at 1146.
[605] *Id.* at 1147, 1149–50.
[606] *See* Cobell v. Babbitt, 37 F. Supp. 2d 6, 8 n.1 (D.D.C. 1999).
[607] Pierce, *supra* note 20, at 240.
[608] *Id.* at 249.

employees who remain subject to one of Judge Lamberth's open-ended or-
ders that threaten the employees with contempt citations. . . .

> . . . .
>
> . . . By now, it is abundantly clear that anyone who has any role in ac-
> counting for the Indian trust assets or in improving computer security at
> the DOI is in serious jeopardy of being officially characterized as an incom-
> petent lying fraud. An official characterization of that type can do consid-
> erable damage to one's reputation, as it did with Cabinet Secretaries Bruce
> Babbitt and Gale Norton.[609]

The reactions of DOI employees to Judge Lamberth's use of con-
tempt indicate that a judge can pressure an agency without using fines
or imprisonment. That said, it may be that the reputational harms of
contempt proceedings are so great, at least if employed as Judge
Lamberth used them, as to replicate the pathologies that judges fear
when using actual sanctions, particularly the danger of undermining
agency cooperation. As Pierce documents, DOI employees' fear of con-
tempt proceedings made them seek to avoid working on anything related
to Indian trust accounts.[610]

DOJ, too, recognizes the shame of contempt findings and is willing
to litigate an appeal even when such shame is the sole matter at stake —
which is telling in light of DOJ's stringent internal bureaucratic process
for selecting which cases to appeal. In *Save Domestic Oil, Inc. v. United
States*, discussed earlier,[611] Judge Aquilino in 2001 initiated a criminal
contempt proceeding against the Commerce Department, in which he
demanded that agency attorneys Robert Heilferty and Lucius Lau re-
veal the names of all officials involved in taking what Judge Aquilino
considered a baseless appeal in violation of a deadline he had im-
posed.[612] When Heilferty and Lau delayed answering, invoking their
ignorance and possible privilege, Judge Aquilino found them in civil
contempt and ordered them held in the courthouse detention area.[613]
After less than five hours, he vacated the detention order and never
reinstated it.[614] Soon the government obtained a writ of mandamus

---

[609] *Id.* at 244–45, 249 (citation omitted).
[610] *Id.* at 249–50. Judge Lamberth in 2006 was removed from the case for bias by the D.C.
Circuit. Cobell v. Kempthorne, 455 F.3d 317, 335 (D.C. Cir. 2006). His removal was not based
solely on his aggressive use of the contempt power; it rested on the fact that he was repeatedly
reversed on numerous issues (including contempt) and on certain extreme and legally irrelevant
criticisms he made of DOI. *Id.* at 330, 333–34. Still, Judge Lamberth's removal may stand as a
warning to judges against being too aggressive in using contempt findings (even sanctionless ones)
against a federal agency.
[611] *See supra* notes 351–360 and accompanying text.
[612] 53 F. App'x 72, 73 (Fed. Cir. 2002).
[613] *Id.* at 74.
[614] *Id.* at 74–75.

from the Federal Circuit halting the criminal contempt proceedings altogether.[615]  Thus, Heilferty and Lau were no longer suffering any sanction for their civil contempt, and with the proceedings shut down, there was no chance of them suffering any future sanction.  Yet technically the civil contempt finding against them stood, and even though the finding had no physical consequences, DOJ took an appeal to the Federal Circuit on Lau and Heilferty's behalf, seeking to have the finding vacated.[616]  In its brief, DOJ justified the appeal as necessary to rehabilitate Lau and Heilferty's reputations: the findings and jail sanctions "received considerable attention from the press" in publications like the *Legal Times* and prompted the D.C. bar to investigate the two attorneys.[617]  Although the bar's investigation had already ended favorably for the two men, the findings "exert[ed] a continuing adverse influence on their reputations," and there was "no reason that their reputations should remain at risk."[618]  The Federal Circuit, finding that Lau and Heilferty were not plainly unjustified in delaying their answers to the judge's question, vacated the findings.[619]

The shaming power of contempt findings against agencies is also recognized by sophisticated plaintiffs who self-consciously seek to trigger it.  The ACLU in 2004 brought a FOIA suit against several agencies, seeking information about interrogations of detainees whom the United States held abroad.[620]  District Judge Alvin Hellerstein ordered the agencies to produce all responsive records, only to find, in late 2007, that the Central Intelligence Agency (CIA) had destroyed several videotapes of interrogations subsequent to his order.[621]  The ACLU promptly moved to hold the CIA in contempt.[622]  Judge Hellerstein held a hearing on the motion in January 2008, but he then deferred consideration of the contempt motion for several years pending a DOJ criminal investigation of the CIA.[623]  Then, in 2011, the parties reargued the contempt motion.[624]

Although the ACLU requested attorneys' fees, it clearly assigned value to the contempt finding per se, as a shaming device.  In response to the CIA's expressed willingness to pay the ACLU's attorneys' fees *without* a contempt finding, the ACLU insisted that such fees were

---

[615] *Id.* at 74.
[616] *See id.* at 72.
[617] Joint Brief for the Sanctioned Party-Appellants, *supra* note 355, at 11–12.
[618] *Id.* at 32.
[619] *Save Domestic Oil, Inc.*, 53 F. App'x at 74–75.
[620] ACLU v. Dep't of Def., 827 F. Supp. 2d 217, 219 (S.D.N.Y. 2011).
[621] *Id.* at 219, 225–27.
[622] *Id.* at 227.
[623] *Id.* at 227–30.
[624] *Id.* at 230.

"not . . . sufficient under the circumstances of this case."[625] "A finding of civil contempt," contended the ACLU, "is necessary so that this Court may *officially acknowledge and express disapproval of* the CIA's conduct in unjustifiably ignoring a judicial decree . . . . Such a judicial *statement* is an essential element of the remedy that Plaintiffs request . . . ."[626] The ACLU later referred to "the importance of a civil contempt finding, *on its own*, as a means of officially acknowledging the violation of a court order."[627]

Judge Hellerstein, in deliberating on the ACLU's motion, recognized that sanctionless contempt against an agency consists essentially of bad publicity.[628] But he drew different implications from this point than the ACLU did. The ACLU's motion asked for a *civil* contempt finding (presumably to avoid the intent requirement and heightened procedures associated with criminal contempt).[629] One might argue that civil contempt findings by definition must be attached to sanctions to coerce the defendant's compliance or compensate the plaintiff's loss. Yet the ACLU was asking for only attorneys' fees (which could be awarded without any contempt finding) and further discovery and injunctive relief (which likewise did not require a contempt finding, and which Judge Hellerstein did not find warranted in any event).[630] Thus, starting in the 2008 hearing, Judge Hellerstein expressed concern that the kind of contempt finding sought by the ACLU would serve no forward-looking or compensatory purpose. As he said at the 2008 hearing, "nothing is accomplished by labeling [the CIA's conduct] as a contempt. It's just a pejorative term."[631] What he apparently meant, consistent with the D.C. Circuit's view in *Cobell*, is that such a finding would be criminal contempt — which the ACLU did not profess to seek. Judge Hellerstein's role, he cautioned, was "remedial, not punishment. I'm not about to punish the government . . . ."[632] Under these circumstances, he asked, "what value flows from . . . a holding of contempt . . . except to write a newspaper headline?"[633] When finally deciding the motion in 2011, Judge Hellerstein granted the ACLU a relatively broad award of attorneys' fees but *without* a finding of contempt.[634]

---

[625] Supplemental Memorandum of Law in Support of Plaintiffs' Motion for Contempt & Sanctions at 29, *ACLU*, 827 F. Supp. 2d 217 (No. 04-cv-4151), ECF No. 449.

[626] *Id.* (emphasis added).

[627] *Id.* at 30 (emphasis added).

[628] *See ACLU*, 827 F. Supp. 2d at 230–33.

[629] *Id.* at 218.

[630] *Id.* at 230–33; Transcript of Hearing Before Hon. Alvin K. Hellerstein at 57, *ACLU*, 827 F. Supp. 2d 217 (No. 04-cv-04151).

[631] Transcript of Hearing Before Hon. Alvin K. Hellerstein, *supra* note 630, at 57.

[632] *Id.*

[633] *Id.* at 59.

[634] *ACLU*, 827 F. Supp. 2d at 233. Problems may arise from the D.C. Circuit and Judge Hellerstein's categorization of sanctionless contempt findings as criminal. Such a categorization

While the cases in this section confirm contempt's general power to shame officials, they also help reveal the special role of lawyers and the legal profession in maintaining that power. Federal agency posts are commonly staffed by lawyers, who likely have peculiar sensitivity to the stigma of contempt findings. Recall how contempt findings raised potential threats to the law licenses and lawyerly reputations of Norton in *Cobell* and of Lau and Heilferty in *Save Domestic Oil*.[635] Further, most federal agencies can be represented in court only by DOJ — usually by shops like Federal Programs, Civil Appellate, or Environment and Natural Resources, or by U.S. Attorney's Offices — all of which are staffed almost entirely by litigators. These litigators are nearly all non-political career employees, who are likely to care more about their long-term reputations before the judiciary than about any particular agency or program, rendering them more responsive to the reputational threat of contempt.[636] Even if the agency is shameless, its DOJ attorneys (whom it cannot fire) are not.

## VII. LIMITATIONS ON CONTEMPT'S SHAMING POWER

Despite all it does to make officials comply, contempt's shaming effect has at least two significant limitations. The first limitation is that a norm of official compliance with court decisions likely rests substantially on each official's perception that *other* officials virtually never disobey, such that disobedience is deviant and probably futile. This point has not been made in the context of U.S. administrative law, nor in the context of the enforcement of remedies, but it has been made by scholars studying merits adjudication and selection of remedies in U.S. Supreme Court constitutional cases, foreign constitutional courts, and international courts. According to these scholars, if a judge issues an order so

---

imposes heightened procedural demands and requires the court to find intent, which high agency officials, given the size and complexity of their organizations, may often lack. In the long run, the result of categorizing sanctionless contempt as criminal may be either (a) to render sanctionless contempt findings more difficult to obtain, thus weakening the role of contempt as a motivator for agency compliance, or (b) to push courts, ironically, toward using material sanctions that will render the findings civil in nature, or toward granting more discovery against agencies to identify the individual officials who have the intent necessary for a criminal contempt finding. But perhaps neither eventuality will come to pass: the D.C. Circuit backtracked somewhat in a recent case, holding that a sanctionless contempt finding is not criminal if not coupled with the kind of harsh rhetoric that Judge Lamberth used. *In re* Contempt Finding in United States v. Stevens, 663 F.3d 1270, 1274–77 (D.C. Cir. 2011).

[635]  *See supra* notes 598–619 and accompanying text.

[636]  Neal Devins & Michael Herz, *The Uneasy Case for Department of Justice Control of Federal Litigation*, 5 U. PA. J. CONST. L. 558, 587 (2003) ("[A]gencies are more willing to run litigation risks than is DOJ."); Thomas W. Merrill, *High-Level, "Tenured" Lawyers*, 61 LAW & CONTEMP. PROBS. 83, 95–99 (1998) (discussing tendency of career DOJ attorneys to invest in long-term credibility with the judiciary more than would political appointees).

aggressive or rigid as to invite official disobedience, the judge risks undermining the self-reinforcing perception that compliance is the norm. Even worse, the official might continue to disobey, perhaps thereby publicizing the absence of material sanctions, which could further undermine officials' sense that disobedience is verboten. These risks suggest that judges, in order to protect the compliance norm, will pull their punches in terms of how aggressively they apply substantive law and how tightly they design injunctions.[637] Based on my study, it is quite plausible that the same dynamic is at play in U.S. administrative law, and that it arises not only in deciding the merits or designing injunctions, but also in the decisions of whether and how to *enforce* injunctions. Agencies do a good deal of complying, but at the same time, judges do a good deal of backing off, such that it is rare to have a contempt finding (which would create norm-undermining publicity for official lawbreaking) and rarer still to have an attempt at contempt sanctions (which would create even more publicity for lawbreaking, and perhaps an embarrassing show of judicial impotence).[638] On the one hand, officials behave far differently than if they had their druthers, free from judicial oversight. On the other hand, official behavior does not perfectly match the judges' platonic views of the law and of the best remedies. Judges shape agency behavior quite a lot,[639] but a measure of judicial restraint likely helps maintain what power the judiciary has.[640]

---

[637] *See* SHAI DOTHAN, REPUTATION AND JUDICIAL TACTICS: A THEORY OF NATIONAL AND INTERNATIONAL COURTS (2015); Goldsmith & Levinson, *supra* note 565, at 1831–32; Law, *supra* note 286, at 456–59; Law, *supra* note 568, at 778–85; Jeffrey K. Staton & Georg Vanberg, *The Value of Vagueness: Delegation, Defiance, and Judicial Opinions*, 52 AM. J. POL. SCI. 504 (2008). For a similar argument that the federal judiciary has used sovereign immunity to money judgments to protect itself from the embarrassment of making orders that Congress may not honor, see Jackson, *supra* note 69, at 604–09.

[638] *E.g.*, Bergman v. United States, 565 F. Supp. 1353, 1371 (W.D. Mich. 1983) ("[C]iting certain parties for contempt will simply serve to create a public spectacle pitting the Court and the Justice Department on opposite sides of the controversy . . . . [S]uch an order of incarceration or fine would not shed any light whatsoever upon the hidden documents.").

[639] *See supra* note 546.

[640] One empirical study seeks indirectly to measure judicial punch pulling — in litigation stages prior to enforcement of remedies — and the factors that render it more likely, albeit in one very peculiar court (the U.S. Supreme Court). Clifford J. Carrubba & Christopher Zorn, *Executive Discretion, Judicial Decision Making, and Separation of Powers in the United States*, 72 J. POL. 812 (2010). Professors Eric Posner and Adrian Vermeule — again focusing on litigation stages prior to enforcement of remedies — argue that courts pull their punches so completely in emergency situations (for example, post-9/11 terrorism cases) that law has basically no effect on executive behavior there. ERIC A. POSNER & ADRIAN VERMEULE, THE EXECUTIVE UNBOUND (2010). Though my focus in this article is not on emergency cases, my findings on judges' reticence to employ contempt reinforce Posner and Vermeule's general view that judicial power depends upon a legitimacy that may diverge from strict legality, and that judges have less legitimacy and therefore pull their punches more when facing extreme complexity or opacity in agency business. *Id.* at 19, 33, 101–02, 105. However, my assessment of officials' judgment-compliance norm draws some support from critics of Posner and Vermeule who have argued that executive officials are constrained by law even

The second major limitation on contempt's shaming power is that it depends on how deeply and exclusively the defendant official is committed to the group(s) that hold dear the norm. Though high federal officials are members of groups that expect compliance with court orders, they may also be members of other communities that value other goods as much, or more, than strict court compliance. Contempt-based shame must sometimes be traded off against pressures from competing communities, and incurring the wrath of the law-centered community in the form of a contempt finding can be a signal to members of another community that the official is willing to "go to bat" for them.

A vivid illustration is the conflict between legal and scientific demands at EPA during the Reagan Administration. For the position of EPA Administrator, President Reagan in 1981 selected Anne Gorsuch, who was strongly pro-industry.[641] She was ultimately forced to resign amid scandal in 1983.[642] President Reagan, under pressure, sought to control the damage by selecting as her replacement the centrist William Ruckelshaus, who was respected by all sides and could restore EPA credibility.[643] President Reagan gave Ruckelshaus free rein.[644]

It thus fell to Ruckelshaus to balance the competing legal and scientific demands on EPA. Environmental statutes impose various deadlines by which the agency must propose and promulgate rules limiting emission of pollutants. Many such deadlines are unrealistic given the agency's resources and the scientific research necessary for legally defensible rules.[645] After EPA missed a Clean Air Act deadline to propose rules on radionuclides, Judge William Orrick of the U.S. District Court for the Northern District of California enjoined the agency to propose rules within six months, which it did.[646] The proposal triggered a second six-month deadline under the statute, which EPA then missed.[647] In July 1984, Judge Orrick ordered EPA to issue final rules within ninety

---

in emergencies, in the sense that legality (even if courts do little or nothing to define or enforce it) helps determine the executive's level of political credibility and that executive officials themselves can sometimes have preferences for legality. *See* Aziz Z. Huq, *Binding the Executive (by Law or by Politics)*, 79 U. CHI. L. REV. 777, 825–36 (2012) (reviewing POSNER & VERMEULE, *supra*); Julian Davis Mortenson, *Law Matters, Even to the Executive*, 112 MICH. L. REV. 1015, 1027–31 (2014) (reviewing JACK GOLDSMITH, POWER AND CONSTRAINT (2012); and POSNER & VERMEULE, *supra*); Richard H. Pildes, *Law and the President*, 125 HARV. L. REV. 1381, 1400–04 (2012) (reviewing POSNER & VERMEULE, *supra*).

[641] LANDY ET AL., *supra* note 9, at 246–50.

[642] *Id.* at 250–51.

[643] *Id.* at 251–52.

[644] MARISSA MARTINO GOLDEN, WHAT MOTIVATES BUREAUCRATS? POLITICS AND ADMINISTRATION DURING THE REAGAN YEARS 137–39 (2000).

[645] Abbott, *Case Against*, *supra* note 9; Gersen & O'Connell, *supra* note 8, at 949 n.84.

[646] O'LEARY, *supra* note 9, at 96–98.

[647] *Id.* at 96, 98–99.

*HARVARD LAW REVIEW* [Vol. 131:685]

days (by late October).[648]  But, at about the same time, EPA's Science Advisory Board, a body of outside experts, issued a report severely criticizing the proposed emission limits as lacking any scientific basis.[649] One EPA staffer commented that this was no surprise, as the limits had been selected without sufficient time or study.[650]

The court's looming October deadline to finalize the rules presented Ruckelshaus with:

> one of the toughest dilemmas of his career.  Should he promulgate regulations that were considered scientifically questionable to comply with a federal court order?  Or should he withdraw the radionuclide regulations for further study, thus preserving the scientific credibility of the EPA — an action that was sure to yield a contempt of court citation?[651]

Ruckelshaus decided "to choose scientific credibility over court compliance,"[652] at least at the outset.  On October 23, 1984, he withdrew the proposed rules.[653]  This ignited a contempt-based shaming process aimed at privileging the claims of Ruckelshaus's legal audience over his scientific one.  At a hearing on October 31, Judge Orrick sought to leverage Ruckelshaus's background as an attorney and onetime DOJ official: the judge said he was "very disturbed that a person as high in the U.S. government as Mr. Ruckelshaus [would] prove to be nothing more than a scofflaw" and that he found it "outrageous that a responsible person in the U.S. government, a man who has been Assistant Attorney General in charge of the Civil Division [of DOJ] . . . can so cavalierly disregard an order of the United States District Court."[654]  Judge Orrick set a contempt hearing for November 21.[655]  At that hearing, Ruckelshaus's attorneys engaged in argumentative contortions to try to show that the withdrawal was consistent with a clearly adverse court order.[656]

The result was that Judge Orrick held Ruckelshaus in contempt (without mention of any sanction) and gave EPA another thirty days to comply with the order,[657] after which the Ninth Circuit and Supreme Court denied requests for a stay.[658]  Facing the judiciary's demand to set emission levels when the Science Advisory Board saw no basis for

---

[648] *Id.* at 100.
[649] *Id.* at 99–102.
[650] *Id.* at 99–100.
[651] *Id.* at 102.
[652] *Id.* at 114.
[653] Sierra Club v. Ruckelshaus, 602 F. Supp. 892, 901 (N.D. Cal. 1984).
[654] O'LEARY, *supra* note 9, at 104 (quoting the preliminary contempt hearing transcript, which has since been destroyed).
[655] *Id.*
[656] *Sierra Club*, 602 F. Supp. at 902–03.
[657] *Id.* at 904.
[658] O'LEARY, *supra* note 9, at 107.

doing so, EPA in January 1985 chose levels higher than what the industry was currently emitting, meaning the rules effectively required nothing. EPA said as much in its preamble to the rules,[659] which observers correctly labeled "sham regulations."[660] Because the Clean Air Act's deadline provisions require "only that the agency act, not that it act in a particular way,"[661] the sham regulations were enough to comply with Judge Orrick's order and purge the contempt. The environmentalists could now challenge the rules as being overly lax on the merits, but that required a whole new lawsuit, which would take years.[662]

Thus did EPA muddle through the process of satisfying the divergent expectations of distinct communities. For its legal audience, the agency offered compliance with the technical letter of the law. For its scientific audience, the agency mitigated the evils of scientifically unready rulemaking by (a) formulating the unready rule so that it would have no practical effect and (b) bowing to the legal demand for an unready rule only after getting itself held in contempt — a kind of signal to scientists that the agency cared enough about their opinions to sacrifice some of its legal reputation.

Because shame depends on the cohesion of the community that holds the violated norm, it can weaken if the community splits up. Rising partisan polarization could, ultimately, diminish the shaming power of contempt findings if people affiliated with a political party come to dismiss any contempt finding that goes against officials of their party.[663]

Recent history suggests that political actors' partisan affiliations affect how they view contempt findings, but not so much as to delegitimate those findings entirely. When Judge Lamberth held Secretary Norton in contempt in 2002, there were numerous media comments by members of Congress, which sorted along partisan lines: Democrats favorable, Republicans not. Yet Republican criticism was restrained. Consider the most extensively reported Republican comment, from the usually outspoken conservative Rep. J.D. Hayworth of Arizona:

> I share Judge Lamberth's desire for a prompt resolution to the Indian trust fund scandal, but I believe his decision to hold Secretary Norton in contempt is misdirected, unfair, and untimely. It is tantamount to having someone condemn all the progress and hard work by Dr. Jonas Salk days before his historic breakthrough against polio.

---

[659] National Emission Standards for Hazardous Air Pollutants; Standards for Radionuclides, 50 Fed. Reg. 5190 (Feb. 6, 1985).

[660] O'LEARY, *supra* note 9, at 107–08, 113.

[661] Sidney A. Shapiro & Robert L. Glicksman, *Congress, the Supreme Court, and the Quiet Revolution in Administrative Law*, 1988 DUKE L.J. 819, 836.

[662] O'LEARY, *supra* note 9, at 109–13.

[663] *Cf.* Gopalan & Fuller, *supra* note 572, at 125–26 (noting that partisanship can undermine the effectiveness of shaming in the context of international law).

> To subject Secretary Norton to this sort of judicial jawboning is unnecessary. She fully appreciates the urgency of solving this problem. Unlike some of her predecessors, she takes the court's consternation very seriously and she is devoting extraordinary attention . . . to resolve the problem, and she is making very significant progress toward that goal.
>
> . . . Secretary Norton has been in office less than two years. She deserves commendation, not contempt, for the commitment and energy she has brought to bear on this problem and for the real results she has achieved.[664]

Rep. Hayworth confines his criticism to the merits, not impugning the judge's motives or competence. He emphasizes that he and Norton ultimately share the judge's goals and are taking the judge "very seriously." And his tone seems to acknowledge that the contempt finding's shame, though undeserved, is real. Somewhat similarly, when a district judge held Interior Secretary Ken Salazar in contempt in 2011 for halting offshore oil drilling in violation of an injunction (imposing an award of attorneys' fees), Republican media and lawmakers praised the decision, while the Obama Administration and Democratic lawmakers apparently made no media criticism of it (though DOJ eventually appealed it and won).[665] Contrast this with the Obama Administration's open hostility and dismissiveness when Attorney General Eric Holder was held in contempt *of Congress* in 2012: the communications director called the finding a "transparently political stunt."[666] If partisanship regarding judicial contempt approached that regarding congressional contempt, it could diminish contempt's shame and ultimately the efficacy of judicial review of the federal government.

---

[664] Jim Adams, *Norton and McCaleb Found Guilty of Contempt of Court*, INDIAN COUNTRY (Sept. 18, 2002), https://indiancountrymedianetwork.com/news/norton-and-mccaleb-found-guilty-of-contempt-of-court/ [https://perma.cc/QZG7-NVU4]. For another extensive report of congressional reactions, see Mary Helen Yarborough, *Court Holds Norton in Contempt Over Indian Trust Muddle*, INSIDE ENERGY, Sept. 23, 2002, at 9–10.

[665] *See* Lawrence Hurley, *Obama Admin Weighs Appeal of Contempt Ruling in Offshore Drilling Moratorium Case*, N.Y. TIMES (Feb. 16, 2011), http://www.nytimes.com/gwire/2011/02/16/16greenwire-obama-admin-weighs-appeal-of-contempt-ruling-i-42874.html [https://perma.cc/82X9-BLBA]; Stephen Power, *Administration's Drill Ban Draws Blast from Judge*, WALL ST. J. (Feb. 3, 2011, 9:48 PM), https://www.wsj.com/articles/SB10001424052748703437304576120863247164104 [https://perma.cc/Z9X4-4AV4].

[666] John Bresnahan & Seung Min Kim, *Holder Held in Contempt*, POLITICO (June 28, 2012, 5:47 PM), http://www.politico.com/story/2012/06/holder-held-in-contempt-of-congress-077988 [https://perma.cc/DLP2-2KB2].

EPA_00049071

Message

| | |
|---|---|
| **From:** | Drummond, James [Drummond.James@epa.gov] |
| **Sent:** | 2/24/2025 10:16:35 PM |
| **To:** | HR@opm.gov [hr8@opm.gov] |
| **CC:** | Goerke, Ariadne [Goerke.Ariadne@epa.gov] |
| **Subject:** | RE: What did you do last week? |

Listed below are five accomplishments between February 17, 2025 and February 22, 2024.   Note that my response has been tailored to comply with Professional Standards of Conduct arising from my membership in the Maryland Bar as well as direction from EPA senior management not to disclose privileged information in response to this inquiry.  Please note that the five listed accomplishments are representative and do not describe all of the activities I carried out during the above specified period.

1.  Reviewed February 21, 2025 decision of the Federal District Court for the District of Maryland in *National Association of Diversity Officers in Higher Education et. al. v. Trump*.

2.  Provided an analysis of dispute rights for recipients of EPA subject to termination actions for changes in priorities relating to funding for equity and environmental justice grant programs.

3.  Conducted file research for records relating to conflict of interest safeguards for selection of applicants for competitive funding under the Greenhouse Gas Reduction Fund.

4.  Provided legal advice on the importance of complying with statutory requirements to Brownfields Job Training Coordinators at their February 19 monthly meeting.

5.  Counseled staff from EPA's Solid Waste Infrastructure Recycling and Recycling Education and Outreach programs on legal issues relating to program implementation at our February 18 weekly meeting.

---

**From:** HR-OPM-GOV <hr@opm.gov>
**Sent:** Saturday, February 22, 2025 4:46 PM
**Subject:** What did you do last week?
**Importance:** High

Please reply to this email with approx. 5 bullets of what you accomplished last week and cc your manager.

Please **do not send** any classified information, links, or attachments.

Deadline is this Monday at 11:59pmEST.

Appointment

| | |
|---|---|
| **From**: | Wise, Melissa [wise.melissa@epa.gov] |
| **Sent**: | 2/26/2025 10:04:14 PM |
| **To**: | Wise, Melissa [wise.melissa@epa.gov]; Goerke, Ariadne [Goerke.Ariadne@epa.gov]; Askew, Wendel [Askew.Wendel@epa.gov]; Coogan, Daniel [Coogan.Daniel@epa.gov] |
| **CC**: | Talbert-Duarte, Angelia [talbert-duarte.angelia@epa.gov] |

| | |
|---|---|
| **Subject**: | Grant terminations |
| **Attachments**: | FW: Grant terminations |
| **Location**: | Microsoft Teams Meeting |

| | |
|---|---|
| **Start**: | 2/27/2025 2:00:00 PM |
| **End**: | 2/27/2025 2:30:00 PM |
| **Show Time As**: | Tentative |

-----Original Appointment-----
**From:** Wise, Melissa <wise.melissa@epa.gov>
**Sent:** Tuesday, February 25, 2025 5:55 PM
**To:** Wise, Melissa; Askew, Wendel; Coogan, Daniel
**Cc:** Talbert-Duarte, Angelia
**Subject:** Grant terminations
**When:** Thursday, February 27, 2025 9:00 AM-9:30 AM (UTC-05:00) Eastern Time (US & Canada).
**Where:** Microsoft Teams Meeting

-----Original Appointment-----
**From:** Wise, Melissa <wise.melissa@epa.gov>
**Sent:** Tuesday, February 25, 2025 3:52 PM
**To:** Wise, Melissa; Askew, Wendel; Coogan, Daniel
**Subject:** Grant terminations
**When:** Thursday, February 27, 2025 9:00 AM-9:30 AM (UTC-05:00) Eastern Time (US & Canada).
**Where:** Microsoft Teams Meeting

Hi Wendel and Dan,

To discuss the recent EJ grant terminations.

Thank you,
Melissa
_____

# Microsoft Teams  Need help?

## Join the meeting now

Meeting ID: 220 228 950 670

Passcode: XG2X75XU

**Dial in by phone**

+1 206-800-4483,,549972130# United States, Richmond Beach

Find a local number

Phone conference ID: 549 972 130#

**Join on a video conferencing device**

Tenant key: sip:teams@video.epa.gov

Video ID: 114 534 277 0

More info

For organizers: Meeting options | Reset dial-in PIN

This meeting may be recorded. If the meeting is recorded, it will be announced via a banner showing "this meeting is being recorded." Participation in a recorded meeting will be deemed as consent to be recorded. Meeting recordings may be official agency records subject to appropriate policy, rules and regulations.

_____

Appointment

| | |
|---|---|
| **From**: | Quenemoen, Marianna [Quenemoen.Marianna@epa.gov] |
| **Sent**: | 3/21/2025 4:55:36 PM |
| **To**: | Quenemoen, Marianna [Quenemoen.Marianna@epa.gov]; Askew, Wendel [Askew.Wendel@epa.gov] |
| **CC**: | Liem, Lucille [Liem.Lucille@epa.gov] |

| | |
|---|---|
| **Subject**: | EJ Grant Pause |
| **Location**: | Microsoft Teams Meeting |

| | |
|---|---|
| **Start**: | 3/24/2025 5:00:00 PM |
| **End**: | 3/24/2025 5:30:00 PM |
| **Show Time As**: | Busy |

| | |
|---|---|
| **Required Attendees**: | Askew, Wendel |
| **Optional Attendees**: | Liem, Lucille |

Hi Wendel, Jacob is reporting that none of the EJ grantees have access to ASAP going on three weeks now. I saw there is litigation on this now. I want to meet to see what we can do.

---

# Microsoft Teams [Need help?](#)

## [Join the meeting now](#)

Meeting ID: 249 900 213 660

Passcode: UT7x953o

---

### Dial in by phone

[+1 206-800-4483,,434363473#](#) United States, Richmond Beach

[Find a local number](#)

Phone conference ID: 434 363 473#

### Join on a video conferencing device

Tenant key: sip:teams@video.epa.gov

Video ID: 119 635 240 3

[More info](#)

For organizers: [Meeting options](#) | [Reset dial-in PIN](#)

This meeting may be recorded. If the meeting is recorded, it will be announced via a banner showing "this meeting is being recorded." Participation in a recorded meeting will be deemed as consent to be recorded. Meeting recordings may be official agency records subject to appropriate policy, rules and regulations.

EPA_00049079

Message

| | |
|---|---|
| **From**: | Kenealy, Timi (she/her/hers) [Kenealy.Timi@epa.gov] |
| **Sent**: | 1/27/2025 11:33:27 PM |
| **To**: | Goerke, Ariadne (she/her/hers) [Goerke.Ariadne@epa.gov]; OGC CRFLO MGMT [OGC_CRFLO_MGMT@epa.gov] |
| **Subject**: | RE: Inflation Reduction Act and Infrastructure Investment and Jobs Act Funding Action Pause |

Thank you.

Timi Nickerson Kenealy
Assistant General Counsel
Procurement Law Practice Group
Civil Rights and Finance Law Office
U.S. EPA Office of General Counsel
1200 Pennsylvania Avenue, NW (WJCN – 7522C)
Washington, DC 20460
202-565-2066

**Attorney-Client Privileged; Pre-Decisional/Deliberative:**
**For Internal EPA Use Only/Do Not Share Outside EPA**

**From:** Goerke, Ariadne (she/her/hers) <Goerke.Ariadne@epa.gov>
**Sent:** Monday, January 27, 2025 6:28 PM
**To:** OGC CRFLO MGMT <OGC_CRFLO_MGMT@epa.gov>
**Subject:** FW: Inflation Reduction Act and Infrastructure Investment and Jobs Act Funding Action Pause

**Ariadne Goerke** *(she/her/hers)*
**Deputy Associate, CRFLO/OGC/EPA**
Room 7443M (WJCN) ph. 202-564-5471

*In office Thursdays, 1ˢᵗ Mon. and 2ⁿᵈ Wed.*

**From:** Boyd, Wyatt <Boyd.Wyatt@epa.gov>
**Sent:** Monday, January 27, 2025 6:10 PM
**To:** Holden, Allison (she/her/hers) <Holden.Allison@epa.gov>; Talbert-Duarte, Angelia <talbert-duarte.angelia@epa.gov>; Goerke, Ariadne (she/her/hers) <Goerke.Ariadne@epa.gov>
**Cc:** Coogan, Daniel <Coogan.Daniel@epa.gov>
**Subject:** FW: Inflation Reduction Act and Infrastructure Investment and Jobs Act Funding Action Pause

**From:** Treml, Gregg <Treml.Gregg@epa.gov>
**Sent:** Monday, January 27, 2025 5:18 PM
**To:** Leadership_Deputy_Assistant_Administrators <Leadership_Deputy_Assistant_Administrators@epa.gov>; Leadership_Deputy_Associate_Administrators <Leadership_Deputy_Associate_Administrators@epa.gov>; Leadership_Deputy_Assistant_Administrators <Leadership_Deputy_Assistant_Administrators@epa.gov>
**Cc:** Kadeli, Lek <Kadeli.Lek@epa.gov>; Jones-Peeler, Meshell <Jones-Peeler.Meshell@epa.gov>; Hanson, Paige (Catherine) <hanson.catherine@epa.gov>; OCFO-SROs <OCFO_SROs@epa.gov>; OCFO-Regional-Comptroller <OCFORegionalComptroller@epa.gov>; OCFO-FCOs <OCFO-FCOs@epa.gov>; OCFO-SBO <OCFOSBO@epa.gov>
**Subject:** Inflation Reduction Act and Infrastructure Investment and Jobs Act Funding Action Pause

Colleagues –

As EPA works diligently to implement President Trump's "Unleashing American Energy" Executive Order in coordination with the Office of Management and Budget, I am providing the attached memorandum as guidance. The agency has paused all funding actions related to the Inflation Reduction Act and the Infrastructure Investment and Jobs Act at this time.

As noted in the memorandum, the agency will continue to work with OMB to review processes, policies, and programs, as required by the Executive Order.

Thank you,
-Gregg

Gregg Treml
Acting Chief Financial Officer
United States Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Room 4402A WJCN
Washington, DC  20460
(202)-564-1151
treml.gregg@epa.gov



**EXECUTIVE OFFICE OF THE PRESIDENT**
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

THE DIRECTOR

January 27, 2025

M-25-13

MEMORANDUM FOR HEADS OF EXECUTIVE DEPARTMENTS AND AGENCIES

FROM:       Matthew J. Vaeth, Acting Director, Office of Management and Budget

SUBJECT:     Temporary Pause of Agency Grant, Loan, and Other Financial Assistance
Programs

      The American people elected Donald J. Trump to be President of the United States and gave him a mandate to increase the impact of every federal taxpayer dollar. In Fiscal Year 2024, of the nearly $10 trillion that the Federal Government spent, more than $3 trillion was Federal financial assistance, such as grants and loans. Career and political appointees in the Executive Branch have a duty to align Federal spending and action with the will of the American people as expressed through Presidential priorities. Financial assistance should be dedicated to advancing Administration priorities, focusing taxpayer dollars to advance a stronger and safer America, eliminating the financial burden of inflation for citizens, unleashing American energy and manufacturing, ending "wokeness" and the weaponization of government, promoting efficiency in government, and Making America Healthy Again. The use of Federal resources to advance Marxist equity, transgenderism, and green new deal social engineering policies is a waste of taxpayer dollars that does not improve the day-to-day lives of those we serve.

      This memorandum requires Federal agencies to identify and review all Federal financial assistance[1] programs and supporting activities consistent with the President's policies and requirements.[2] For example, during the initial days of his Administration, President Donald J. Trump issued a series of executive orders to protect the American people and safeguard valuable taxpayer resources, including *Protecting the American People Against Invasion* (Jan. 20, 2025), *Reevaluating and Realigning United States Foreign Aid* (Jan. 20, 2025), *Putting America First in International Environmental Agreements* (Jan. 20, 2025), *Unleashing American Energy* (Jan. 20, 2025), *Ending Radical and Wasteful Government DEI Programs and Preferencing* (Jan. 20,

---

[1] 2 CFR 200.1 defines Federal financial assistance to mean "[a]ssistance that recipients or subrecipients receive or administer" in various forms, but this term does not include assistance provided directly to individuals. For the purposes of this memorandum, Federal financial assistance includes: (i) all forms of assistance listed in paragraphs (1) and (2) of the definition of this term at 2 CFR 200.1; and (ii) assistance received or administered by recipients or subrecipients of any type except for assistance received directly by individuals.

[2] Nothing in this memo should be construed to impact Medicare or Social Security benefits.

2025), *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (Jan. 20, 2025), and *Enforcing the Hyde Amendment* (Jan. 24, 2025).

These executive orders ensure that Federal funds are used to support hardworking American families.

To implement these orders, each agency must complete a comprehensive analysis of all of their Federal financial assistance programs to identify programs, projects, and activities that may be implicated by any of the President's executive orders.  In the interim, to the extent permissible under applicable law, Federal agencies **must temporarily pause** all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders, including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal.

This temporary pause will provide the Administration time to review agency programs and determine the best uses of the funding for those programs consistent with the law and the President's priorities.  The temporary pause will become effective on January 28, 2025, at 5:00 PM. Even before completing their comprehensive analysis, Federal agencies must immediately identify any legally mandated actions or deadlines for assistance programs arising while the pause remains in effect. Federal agencies must report this information to OMB along with an analysis of the requirement. OMB also directs Federal agencies to pause all activities associated with open NOFOs, such as conducting merit review panels.

No later than February 10, 2025, agencies shall submit to OMB detailed information on any programs, projects or activities subject to this pause. Each agency must pause: (i) issuance of new awards; (ii) disbursement of Federal funds under all open awards; and (iii) other relevant agency actions that may be implicated by the executive orders, to the extent permissible by law, until OMB has reviewed and provided guidance to your agency with respect to the information submitted.

OMB may grant exceptions allowing Federal agencies to issue new awards or take other actions on a case-by-case basis.  To the extent required by law, Federal agencies may continue taking certain administrative actions, such as closeout of Federal awards (2 CFR 200.344), or recording obligations expressly required by law.

Additionally, agencies must, for each Federal financial assistance program: (i) assign responsibility and oversight to a senior political appointee to ensure Federal financial assistance conforms to Administration priorities; (ii) review currently pending Federal financial assistance announcements to ensure Administration priorities are addressed, and, subject to program statutory authority, modify unpublished Federal financial assistance announcements, withdraw any announcements already published, and, to the extent permissible by law, cancel awards already awarded that are in conflict with Administration priorities, and; (iii) ensure adequate oversight of Federal financial assistance programs and initiate investigations when warranted to identify underperforming recipients, and address identified issues up to and including cancellation of awards.

EPA_00049176



# THE CHIEF FINANCIAL OFFICER
WASHINGTON, D.C. 20460

January 27, 2025

## CUI//SP-BUDG

**MEMORANDUM**

**SUBJECT:**  Inflation Reduction Act and Infrastructure Investment and Jobs Act Funding Action Pause

**FROM:**  Gregg Treml, Chief Financial Officer (Acting)    GREGG TREML    Digitally signed by GREGG TREML Date: 2025.01.27 16:59:02 -05'00'

**TO:**    Deputy Assistant Administrators
Deputy Associate Administrators
Deputy Regional Administrators

This message is being provided based on instruction from OMB.

In accordance with the Executive Order *Unleashing American Energy,* unobligated funds (including unobligated commitments) appropriated by the Inflation Reduction Act of 2022 (P.L. 117-169) and the Infrastructure Investment and Jobs Act (P.L. 117-58) are paused. Pursuant to this pause, the Compass financial system will temporarily not allow obligations to be made in these lines of accounting. EPA is in discussions with the Office of Management and Budget on the continuation of payroll in IIJA and IRA.

Additionally, all disbursements for unliquidated obligations funded by any line of accounting including funds appropriated by the Inflation Reduction Act of 2022 (P.L. 117-169) and the Infrastructure Investment and Jobs Act (P.L. 117-58), are paused. Additional details on the pause in disbursements will be provided separately by the Office of the Controller.

This pause will allow for the review of processes, policies and programs as required by Section 7 of the Order.

All related actions, including new contract, grant, rebate and interagency actions, to include drawdowns, for IIJA and IRA are paused. Offices are not to put IIJA or IRA lines of accounting on any actions and all current actions are paused. Further, no IIJA or IRA funded travel is permissible at this time and all upcoming travel funded from either should be cancelled.

EPA_00049178

A process has been established at OMB for their review and approval of obligations and disbursements based on the Order. We will continue to update the community. We appreciate your work to ensure compliance with the Order.

cc: Lek Kadeli
    Meshell Jones-Peeler
    Paige Hanson
    Senior Resource Officials
    Senior Budget Officers
    Regional Comptrollers
    Funds Control Officers

# Controlled by U.S. Environmental Protection Agency

EPA_00049179

Message

**From:**     EPA_Grants_Info [EPA_Grants_Info@epa.gov]
**Sent:**     1/28/2025 9:41:00 PM
**Subject:**     Pause EPA Grants

Dear Grant Recipient,

EPA is working diligently to implement President Trump's *Unleashing American Energy* Executive Order issued on January 20 in coordination with the Office of Management and Budget. The agency has paused all funding actions related to the Inflation Reduction Act and the Infrastructure Investment and Jobs Act at this time. EPA is continuing to work with OMB as they review processes, policies, and programs, as required by the Executive Order.

Thank you.

*Please do not reply to this message. This mailbox is not monitored.*



## THE CHIEF FINANCIAL OFFICER
WASHINGTON, D.C. 20460

January 27, 2025

# CUI//SP-BUDG

**MEMORANDUM**

**SUBJECT:**   Inflation Reduction Act and Infrastructure Investment and Jobs Act Funding Action
Pause

**FROM:**   Gregg Treml, Chief Financial Officer (Acting)   GREGG TREML   Digitally signed by GREGG TREML Date: 2025.01.27 16:59:02 -05'00'

**TO:**   Deputy Assistant Administrators
Deputy Associate Administrators
Deputy Regional Administrators

This message is being provided based on instruction from OMB.

In accordance with the Executive Order *Unleashing American Energy,* unobligated funds (including
unobligated commitments) appropriated by the Inflation Reduction Act of 2022 (P.L. 117-169) and the
Infrastructure Investment and Jobs Act (P.L. 117-58) are paused. Pursuant to this pause, the Compass
financial system will temporarily not allow obligations to be made in these lines of accounting. EPA is in
discussions with the Office of Management and Budget on the continuation of payroll in IIJA and IRA.

Additionally, all disbursements for unliquidated obligations funded by any line of accounting including
funds appropriated by the Inflation Reduction Act of 2022 (P.L. 117-169) and the Infrastructure
Investment and Jobs Act (P.L. 117-58), are paused. Additional details on the pause in disbursements
will be provided separately by the Office of the Controller.

This pause will allow for the review of processes, policies and programs as required by Section 7 of the
Order.

All related actions, including new contract, grant, rebate and interagency actions, to include
drawdowns, for IIJA and IRA are paused. Offices are not to put IIJA or IRA lines of accounting on any
actions and all current actions are paused. Further, no IIJA or IRA funded travel is permissible at this
time and all upcoming travel funded from either should be cancelled.

A process has been established at OMB for their review and approval of obligations and disbursements based on the Order. We will continue to update the community. We appreciate your work to ensure compliance with the Order.

cc: Lek Kadeli
     Meshell Jones-Peeler
     Paige Hanson
     Senior Resource Officials
     Senior Budget Officers
     Regional Comptrollers
     Funds Control Officers


# Controlled by U.S. Environmental Protection Agency

2

Message

| | |
|---|---|
| **From:** | Askew, Wendel [Askew.Wendel@epa.gov] |
| **Sent:** | 1/30/2025 3:29:51 PM |
| **To:** | Hales, Daniel [Hales.Daniel@epa.gov]; Goerke, Ariadne (she/her/hers) [Goerke.Ariadne@epa.gov]; Talbert-Duarte, Angelia [talbert-duarte.angelia@epa.gov]; Christopher, Katherine [Christopher.Katherine@epa.gov]; Drummond, James [Drummond.James@epa.gov]; Rich, Stephanie (she/her/hers) [Rich.Stephanie@epa.gov] |
| **Subject:** | RE: Climatewire: EPA cuts off IRA solar money already under contract |
| **Attachments:** | Pause EPA Grants |

# CUI//PRIVILEGE

I think the reference is to the attached email that went from OGD to all IRA and IIJA recipients.

Wendel J. Askew
Assistant General Counsel for Financial Assistance Law
Civil Rights and Finance Law Office
Office of General Counsel
US Environmental Protection Agency
Mail Code 2399A
202-564-3987
7454H WJCN

## Controlled by U.S. Environmental Protection Agency

**From:** Hales, Daniel <Hales.Daniel@epa.gov>
**Sent:** Thursday, January 30, 2025 10:28 AM
**To:** Goerke, Ariadne (she/her/hers) <Goerke.Ariadne@epa.gov>; Askew, Wendel <Askew.Wendel@epa.gov>; Talbert-Duarte, Angelia <talbert-duarte.angelia@epa.gov>; Christopher, Katherine <Christopher.Katherine@epa.gov>; Drummond, James <Drummond.James@epa.gov>; Rich, Stephanie (she/her/hers) <Rich.Stephanie@epa.gov>
**Subject:** RE: Climatewire: EPA cuts off IRA solar money already under contract

# CUI//PRIVILEGE

Has anyone seen the letter to recipients mentioned in the article? Who did it come from?

Dan

## Controlled by U.S. Environmental Protection Agency

**From:** Goerke, Ariadne (she/her/hers) <Goerke.Ariadne@epa.gov>
**Sent:** Thursday, January 30, 2025 7:30 AM
**To:** Askew, Wendel <Askew.Wendel@epa.gov>; Talbert-Duarte, Angelia <talbert-duarte.angelia@epa.gov>; Christopher, Katherine <Christopher.Katherine@epa.gov>; Drummond, James <Drummond.James@epa.gov>; Hales, Daniel <Hales.Daniel@epa.gov>; Rich, Stephanie (she/her/hers) <Rich.Stephanie@epa.gov>
**Subject:** FW: Climatewire: EPA cuts off IRA solar money already under contract

Re: Solar for All

**Ariadne Goerke** *(she/her/hers)*
**Deputy Associate, CRFLO/OGC/EPA**
Room 7443M (WJCN) ph. 202-564-5471

*In office Thursdays, 1st Mon. and 2nd Wed.*

---

**From:** E&E News <edition@email.eenews.net>
**Sent:** Thursday, January 30, 2025 6:24 AM
**To:** Goerke, Ariadne (she/her/hers) <Goerke.Ariadne@epa.gov>
**Subject:** Climatewire: EPA cuts off IRA solar money already under contract

> **Caution:** This email originated from outside EPA, please exercise additional caution when deciding whether to open attachments or click on provided links.

View in browser

# CLIMATEWIRE

### AN E&E NEWS PUBLICATION

### THURSDAY, JANUARY 30, 2025

**1    EPA cuts off IRA solar money already under contract**

JEAN CHEMNICK

Recipients of the $7 billion Solar For All program were locked out of an online portal that's used to distribute federal funding.

The Solar For All program is designed to spur clean energy projects in low-income areas. | Mario Tama/AFP via Getty Images

**TOP STORIES**

2    How Trump's obsession with Greenland could sink offshore wind
BENJAMIN STORROW

3    Freeze on foreign aid could leave climate programs in the cold
SARA SCHONHARDT

4    Sanders, RFK Jr. clash over climate change at hearing

EPA_00049200

ARIEL WITTENBERG

## LAW

5    Court ruling sets up clash between Trump DOJ and red states over climate rule

LESLEY CLARK

## POLITICS

6    Republicans to Trump: Mend FEMA — don't end it

ZACK COLMAN

7    Auto experts doubt Duffy's CAFE standards review will lower prices

CHRIS MARQUETTE, ALEX GUILLÉN

## IN THE STATES

8    Southern California's largest water supplier fires general manager

CAMILLE VON KAENEL

9    Lawmakers question New York governor's climate funding commitment

MARIE J. FRENCH

10   New York aims to provide flexibility on clean truck rules

MARIE J. FRENCH

EPA_00049201

## INTERNATIONAL

**11**  Who can share seeds? It's a growing question for Kenyan farm program.
*ASSOCIATED PRESS*

**12**  Amazon's advocates fear Trump's return means little US help for rainforest
*ASSOCIATED PRESS*

### *ABOUT*

# CLIMATEWIRE

Policy. Science. Business

Explores how the threat of climate change is driving politics, regulations, finance, corporate strategy, science and consumer habits. *Climatewire* publishes daily by 7:00 a.m. Get subscriber access.

Unsubscribe | Privacy Policy | Terms of Service

This email alert has been sent for the exclusive use of E&E News subscriber, goerke.ariadne@epa.gov. Forwarding or reproducing the alert without the express, written permission of E&E News is a violation of copyright law and the E&E News subscription agreement. For the avoidance of doubt, occasional, unsystematic sharing and linking to content and use of the E&E News website share tools shall be permitted.

Copyright © 2025 by POLITICO LLC.

E&E News
1000 Wilson Blvd. Arlington, VA 22209 - USA
Phone: 202-628-6500

EPA_00049202

EPA_00049203