Message

**From**:     EPA_Grants_Info [EPA_Grants_Info@epa.gov]
**Sent**:     1/28/2025 9:41:00 PM
**Subject**:   Pause EPA Grants

Dear Grant Recipient,

EPA is working diligently to implement President Trump's *Unleashing American Energy* Executive Order issued on January 20 in coordination with the Office of Management and Budget. The agency has paused all funding actions related to the Inflation Reduction Act and the Infrastructure Investment and Jobs Act at this time. EPA is continuing to work with OMB as they review processes, policies, and programs, as required by the Executive Order.

Thank you.

*Please do not reply to this message. This mailbox is not monitored.*

Message

**From:** InsideEPA.com [epa-alerts@iwpnews.com]
**Sent:** 2/3/2025 12:46:20 PM
**To:** Goerke, Ariadne [Goerke.Ariadne@epa.gov]
**Subject:** The Morning Headlines from InsideEPA.com -- February 3, 2025

**Caution:** This email originated from outside EPA, please exercise additional caution when deciding whether to open attachments or click on provided links.

February 3, 2025

**Latest News**

## Trump Funding Freeze Drives Confusion Among EPA Employees, Contractors

The Trump administration's recent actions seeking to freeze funding at EPA and other agencies are driving confusion among EPA employees, contractors and grantees, with experts warning that the freeze or other funding restraints could continue despite court rulings blocking them. **FULL STORY**

## Judge Enjoins Trump's 'Unilateral' Freeze Of EPA, Other Grant Funding

Citing in part actions at EPA, a federal judge is blocking the Trump administration's controversial funding freeze at EPA and other agencies, agreeing with Democratic states that the administration's "unilateral" decision to indefinitely pause a variety of funding via the president's executive orders (EOs) and other directives violates the Constitution and key statutes. **FULL STORY**

*From Climate Extra*

## Industry Lawyer Doubts Fresh Bid For Trump Stay Of Utility GHG Limits

An industry attorney is casting doubt on new calls for the Trump EPA to issue an administrative stay of the Biden EPA's greenhouse gas power plant standards while it pursues a longer rulemaking to undo them, warning that courts rejected a similar move during the first Trump administration to stay methane rules. **FULL STORY**

## D.C. Circuit Restarts Refinery Suit Over 'Three Strikes' Air Act Exemption

The U.S. Court of Appeals for the District of Columbia Circuit has restarted litigation in a years-old dispute over the so-called "three strikes" air emissions exemption, allowing the issue to be adjudicated in the context of a suit over EPA refinery air rules. **FULL STORY**

*From Inside PFAS Policy*

## EPA Grants Industry Call To Extend Comment Period On Contested MSGP

At the request of multiple industry groups, the Trump EPA has extended for 60 days the public comment period on a contested Biden-era proposal revising the agency's multi-sector general permit (MSGP) for industrial stormwater, which includes first-time PFAS monitoring requirements, clearing the way for the new administration to revisit the permit. **FULL STORY**

## GAO Urges Corps To Bolster 404 Transparency As Trump Speeds Permitting

The Government Accountability Office (GAO) is urging the Army Corps of Engineers to strengthen transparency regarding the use of expedited permit processing for Clean Water Act (CWA) section 404 dredge-and-fill projects, just as the Trump administration is requiring the Corps to use "emergency powers" to expedite permitting. **FULL STORY**

## Trump EPA Expected To Reassign Senior Career Officials To New Slots

The Trump EPA is expected to reassign senior career officials, including deputy assistant administrators, to other positions in a reshuffling of duties, akin to the action taken earlier this month when the Justice Department (DOJ) reassigned four of the ten section chiefs in its environment division to immigration posts, sources close to the agency say. **FULL STORY**

---

**EDITORIAL CONTACT**

703-562-8763

E-MAIL →

**CUSTOMER SERVICE**

703-416-8505

E-MAIL →

---

SITE LICENSES

Want to share access to InsideEPA.com with your colleagues? We have economical site license packages available to fit any size organization, from a few people at one location to company-wide access. For more information on how you can get greater access to InsideEPA.com for your office, contact our Online Customer Service department at 703-416-8505 or iepa@iwpnews.com.

## CONNECTIONS



## UNSUBSCRIBE

If you no longer wish to receive these messages, you can **unsubscribe here**.

Mailing address: 1919 South Eads Street, Suite 100, Arlington VA 22202

Telephone: 703-416-8500 or 1-800-424-9068

Copyright © 2025 Inside Washington Publishers. All rights reserved About Us | Privacy Policy

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

STATE OF NEW YORK; STATE OF
CALIFORNIA; STATE OF ILLINOIS; STATE OF
RHODE ISLAND; STATE OF NEW JERSEY;
COMMONWEALTH OF MASSACHUSETTS;
STATE OF ARIZONA; STATE OF COLORADO;
STATE OF CONNECTICUT; STATE OF
DELAWARE; THE DISTRICT OF COLUMBIA;
STATE OF HAWAI'I; STATE OF MAINE; STATE
OF MARYLAND; STATE OF MICHIGAN; STATE
OF MINNESOTA; STATE OF NEVADA; STATE
OF NORTH CAROLINA; STATE OF NEW
MEXICO; STATE OF OREGON; STATE OF
VERMONT STATE OF WASHINGTON; STATE
OF WISCONSIN,

     Plaintiffs,

v.

DONALD TRUMP, IN HIS OFFICIAL CAPACITY
AS PRESIDENT OF THE UNITED STATES; U.S.
OFFICE OF MANAGEMENT AND BUDGET;
MATTHEW J. VAETH, IN HIS OFFICIAL
CAPACITY AS ACTING DIRECTOR OF THE
U.S. OFFICE OF MANAGEMENT AND
BUDGET; U.S. DEPARTMENT OF THE
TREASURY; SCOTT BESSENT, IN HIS
OFFICIAL CAPACITY AS SECRETARY OF THE
TREASURY; PATRICIA COLLINS IN HER
OFFICIAL CAPACITY AS TREASURER OF THE
U.S.; U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES; DOROTHY A. FINK, M.D.,
IN HER OFFICIAL CAPACITY AS ACTING
SECRETARY OF HEALTH AND HUMAN
SERVICES; U.S. DEPARTMENT OF
EDUCATION; DENISE CARTER, IN HER
OFFICIAL CAPACITY AS ACTING SECRETARY
OF EDUCATION; U.S. FEDERAL EMERGENCY
MANAGEMENT AGENCY; CAMERON
HAMILTON, IN HIS OFFICIAL CAPACITY AS
ACTING ADMINISTRATOR OF THE U.S.
FEDERAL EMERGENCY MANAGEMENT

C.A. No. 1:25-cv-00039-JJM-PAS

1

AGENCY; U.S. DEPARTMENT OF
TRANSPORTATION;
JUDITH KALETA, IN HER OFFICIAL
CAPACITY AS ACTING SECRETARY OF
TRANSPORTATION;
U.S. DEPARTMENT OF LABOR; VINCE
MICONE, IN HIS OFFICIAL CAPACITY AS
ACTING SECRETARY OF LABOR; U.S.
DEPARTMENT OF ENERGY; INGRID KOLB, IN
HER OFFICIAL CAPACITY AS ACTING
SECRETARY OF THE U.S. DEPARTMENT OF
ENERGY; U.S. ENVIRONMENTAL
PROTECTION AGENCY; JAMES PAYNE, IN HIS
OFFICIAL CAPACITY AS ACTING
ADMINISTRATOR OF THE U.S.
ENVIRONMENTAL PROTECTION AGENCY;
U.S. DEPARTMENT OF HOMELAND
SECURITY; KRISTI NOEM, IN HER CAPACITY
AS SECRETARY OF THE U.S. DEPARTMENT
OF HOMELAND SECURITY; U.S.
DEPARTMENT OF JUSTICE; JAMES R.
McHENRY III, IN HIS OFFICIAL CAPACITY AS
ACTING ATTORNEY GENERAL OF THE U.S.
DEPARTMENT OF JUSTICE; THE NATIONAL
SCIENCE FOUNDATION and DR.
SETHURAMAN PANCHANATHAN, IN HIS
CAPACITY AS DIRECTOR OF THE NATIONAL
SCIENCE FOUNDATION,

     Defendants.

## [PROPOSED] TEMPORARY RESTRAINING ORDER

To maintain the status quo until the Court may rule on Plaintiffs' forthcoming motion for

preliminary injunction, it is hereby ORDERED that a TEMPORARY RESTRAINING ORDER

is entered in this case until this Court rules upon Plaintiffs' motion for a preliminary injunction,

which shall be filed on a date ordered by the Court.

During the pendency of the Temporary Restraining Order, Defendants shall refrain from

pausing, freezing, impeding, blocking, canceling, or terminating Defendants' compliance with

EPA_00049478

awards and obligations to provide federal financial assistance, and Defendants shall not impede Plaintiffs' access to such awards and obligations, except on the basis of the applicable authorizing statutes, regulations, and terms.

To the extent Defendants engage in the "identif[ication] and review" of federal financial assistance programs, as identified in the OMB Directive as referenced in the Complaint, such exercise shall not effect a pause, freeze, impediment, block, cancellation, or termination of Defendants' compliance with such awards and obligations, except on the basis of the applicable authorizing statutes, regulations, and terms.

Defendants shall also be restrained and prohibited from reissuing, adopting, implementing, or otherwise giving effect to the OMB Directive under any other name or title or through any other Defendants (or agency supervised, administered, or controlled by any Defendant), such as the continued implementation identified by the White House Press Secretary statement of January 29, 2025.

Defendants shall provide written notice of this order to all Defendants and agencies and their employees, contractors, and grantees within two hours of the issuance of this Order.

Defendants shall comply with all notice and procedural requirements set forth in the award, agreement, or other instrument relating to decisions to stop, delay, or otherwise withhold federal financial assistance programs.

The TRO shall be in effect for 14 days from the date of this Order, and may be extended for an additional 14 days for good cause shown.

It is so ordered.

EPA_00049479

By the Court:

_____          _____
Dated                            McConnell, Chief Judge

EPA_00049480

Message

| | |
|---|---|
| **From**: | Conrad, Daniel [conrad.daniel@epa.gov] |
| **Sent**: | 2/3/2025 2:23:12 PM |
| **To**: | OGC ALL USERS [OGC_ALL_USERS@epa.gov] |
| **Subject**: | RE: Temporary Restraining Order Related to Pause on All Federal Financial Assistance |
| **Attachments**: | Notice of Temporary Restraining Order 01-31-2025.pdf |

PDF attached per several requests.
-Dan

---

**From:** Conrad, Daniel
**Sent:** Monday, February 3, 2025 9:20 AM
**To:** OGC ALL USERS <OGC_ALL_USERS@epa.gov>
**Subject:** RE: Temporary Restraining Order Related to Pause on All Federal Financial Assistance

An FYI to OGC, the link works, the intranet currently does not.

The mass mailer and everyone clicking on the link at once has taxed the system.
-Dan

---

**From:** MassMailer <massmailer@epa.gov>
**Sent:** Monday, February 3, 2025 8:46 AM
**To:** MassMailer <massmailer@epa.gov>
**Subject:** Temporary Restraining Order Related to Pause on All Federal Financial Assistance



U.S. ENVIRONMENTAL PROTECTION AGENCY
**AGENCY MASS MAILER**
This message is being sent to EPA employees.

Colleagues,

Pursuant to the Court's directive in *New York et al. v. Trump*, No. 25-cv-39-JJM-PAS (D.R.I.), ECF No. 50 (Jan. 31, 2025) underline all EPA employees are receiving this Notice of the Court's Order for awareness and information. A copy of the Court's Order is provided/linked for reference. If you have any questions about the scope or effect of the Court's Order, please contact the Office of General Counsel Civil Rights and Finance Law Office. Additional EPA-specific guidance on agency financial assistance will be forthcoming from the Office of Mission Support. Thank you for your attention to this matter.

Sean Donahue
Acting General Counsel

## NOTICE OF COURT ORDER

You are hereby advised that a temporary restraining order has been entered in the case of *New York et al. v. Trump*, No. 25-cv-39-JJM-PAS (D.R.I.), ECF No. 50 (Jan. 31, 2025). You are receiving this Notice pursuant to the Court's directive that notice of the order be provided "to all Defendants and agencies and their employees, contractors, and grantees by Monday, February 3, 2025, at 9 a.m." A copy of the Court's Order is attached for reference.

This case challenges an alleged "pause" of certain Federal financial assistance, related to OMB Memorandum M-25-13, *Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs* (Jan. 27, 2025) ("OMB Memo"). Although that OMB Memo was rescinded on January 29, 2025, the plaintiffs in the above-referenced case allege that the funding pause directed by the OMB Memo is still in effect, including because of recently issued Executive Orders by the President.

In response, the Court has entered a temporary restraining order prohibiting certain actions by the Defendants in the case, which is effective immediately. All Defendants—including their employees, contractors, and grantees—must immediately comply with the Court's Order. For complete details and terms of the Court's Order, please refer to pages 11 and 12 of the enclosed Order.

To assist in your compliance, here is a summary of the key terms:

1. **Federal agencies cannot pause, freeze, impede, block, cancel, or terminate any awards or obligations on the basis of the OMB Memo, or on the basis of the President's recently issued Executive Orders.**

2. **This prohibition applies to all awards or obligations—not just those involving the Plaintiff States in the above-referenced case—and also applies to future assistance (not just current or existing awards or obligations).**

3. **Agencies may exercise their own authority to pause awards or obligations, provided agencies do so purely based on their own discretion—not as a result of the OMB Memo or the President's Executive Orders—and provided the pause complies with all notice and procedural requirements in the award, agreement, or other instrument relating to such a pause.**

   a. On pages 11 and 12 of the Order, the Court prohibits agencies from pausing funding "except on the basis of the applicable authorizing statutes, regulations, and terms." Thus, agencies remain free to exercise their own discretion under their "authorizing statutes, regulations, and terms," including any exercise of discretion to pause certain funding. Additionally, agencies remain free to take action pursuant to the terms of the relevant award or obligation, such as in cases of grantee noncompliance.

   b. Any exercise of agency discretion, however, cannot be based on the OMB Memo or the President's Executive Orders, given that the Court has prohibited agencies from "implementing or giving effect to the OMB [Memo] under any other name

EPA_00049501

or title[.]" (Order, pg.12).  Additionally, any decision to pause, stop, delay, or otherwise withhold federal financial assistance programs must comply with all notice and procedural requirements in the award, agreement, or other instrument setting forth the terms of the award or obligation.

4. **Out of an abundance of caution, all federal agencies (even those not named as defendants in the case) should comply with the above-referenced terms.**

As the Court's Order reflects, the above terms are temporary as litigation in the case is ongoing. At present, however, the Court's Order is in effect and must be complied with.

If you have any questions about the scope or effect of the Court's Order, please contact your agency's Office of General Counsel or your grant officer, as appropriate.  Thank you for your attention to this matter.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

STATE OF NEW YORK; STATE OF
CALIFORNIA; STATE OF ILLINOIS;
STATE OF RHODE ISLAND; STATE OF
NEW JERSEY; COMMONWEALTH OF
MASSACHUSETTS; STATE OF
ARIZONA; STATE OF COLORADO;
STATE OF CONNECTICUT; STATE OF
DELAWARE; THE DISTRICT OF
COLUMBIA; STATE OF HAWAI'I;
STATE OF MAINE; STATE OF
MARYLAND; STATE OF MICHIGAN;
STATE OF MINNESOTA; STATE OF
NEVADA; STATE OF NORTH
CAROLINA; STATE OF NEW MEXICO;
STATE OF OREGON; STATE OF
VERMONT; STATE OF WASHINGTON;
and STATE OF WISCONSIN,

      Plaintiffs,

v.

DONALD TRUMP, *in his Official
Capacity as President of the United
States*; U.S. OFFICE OF
MANAGEMENT AND BUDGET;
MATTHEW J. VAETH, *in his Official
Capacity as Acting Director of the U.S.
Office of Management and Budget*; U.S.
DEPARTMENT OF THE TREASURY;
SCOTT BESSENT, *in his Official
Capacity as Secretary of the Treasury*;
PATRICIA COLLINS, *in her Official
Capacity as Treasurer of the U.S.*; U.S.
DEPARTMENT OF HEALTH AND
HUMAN SERVICES; DOROTHY A.
FINK, M.D., *in her Official Capacity As
Acting Secretary Of Health And Human
Services*; U.S. DEPARTMENT OF
EDUCATION; DENISE CARTER, *in her
Official Capacity as Acting Secretary of
Education*; U.S. FEDERAL
EMERGENCY MANAGEMENT
AGENCY; CAMERON HAMILTON, *in*

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

      C.A. No. 25-cv-39-JJM-PAS

EPA_00049503

| | |
|---|---|
| *his Official Capacity as Acting* | ) |
| *Administrator of the U.S. Federal* | ) |
| *Emergency Management Agency;* U.S. | ) |
| DEPARTMENT OF | ) |
| TRANSPORTATION; | ) |
| JUDITH KALETA, *in her Official* | ) |
| *Capacity as Acting Secretary of* | ) |
| *Transportation;* U.S. DEPARTMENT OF | ) |
| LABOR; VINCE MICONE, *in his Official* | ) |
| *Capacity as Acting Secretary of Labor;* | ) |
| U.S. DEPARTMENT OF ENERGY; | ) |
| INGRID KOLB, *in her Official Capacity* | ) |
| *as Acting Secretary of the U.S.* | ) |
| *Department of Energy;* U.S. | ) |
| ENVIRONMENTAL PROTECTION | ) |
| AGENCY; JAMES PAYNE, *in his Official* | ) |
| *Capacity as Acting Administrator of the* | ) |
| *U.S. Environmental Protection Agency;* | ) |
| U.S. DEPARTMENT OF HOMELAND | ) |
| SECURITY; KRISTI NOEM, i*n her* | ) |
| *Capacity as Secretary of the U.S.* | ) |
| *Department of Homeland Security;* U.S. | ) |
| DEPARTMENT OF JUSTICE; JAMES R. | ) |
| McHENRY III, *in his Official Capacity as* | ) |
| *Acting Attorney General of the U.S.* | ) |
| *Department of Justice;* THE NATIONAL | ) |
| SCIENCE FOUNDATION; and DR. | ) |
| SETHURAMAN PANCHANATHAN, *in* | ) |
| *his Capacity as Director of the National* | ) |
| *Science Foundation,* | ) |
| | ) |
| Defendants. | ) |
| | ) |

## **TEMPORARY RESTRAINING ORDER**

The legal standard for a Temporary Restraining Order ("TRO") mirrors that of

a preliminary injunction.  The Plaintiff States must show that weighing these four

factors favors granting a TRO:

1. likelihood of success on the merits;
2. potential for irreparable injury;
3. balance of the relevant equities; and

2

EPA_00049504

> 4. effect on the public interest if the Court grants or denies the TRO.

*Planned Parenthood League v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir. 1981). The traditional equity doctrine that preliminary injunctive relief is an extraordinary and drastic remedy that is never awarded as of right guides the Court. *Id.* The Court is also fully aware of the judiciary's role as one of the three independent branches of government, and that the doctrine of separation of powers restricts its reach into the Executive Branch. The Court now turns to the four factors.

## Likelihood of Success on the Merits

We begin with what courts have called a key factor—a consideration of the movant's likelihood of success on the merits.

In **Count I**, the States allege that the Executive's actions by the Office of Management and Budget ("OMB")[1] violate the Administrative Procedure Act ("APA")[2] because Congress has not delegated any unilateral authority to the Executive to indefinitely pause all federal financial assistance without considering the statutory and contractual terms governing these billions of dollars of grants.

In **Count II**, the States allege that the Executive's actions violate the APA because the failure to spend funds appropriated by Congress is arbitrary and capricious in multiple respects.

---

[1] See *supra* for discussion of mootness.
[2] 5 U.S.C. § 551 et seq.

3

EPA_00049505

In **Count III**, the States allege that the failure to spend funds appropriated by Congress violates the separation of powers because the Executive has overridden Congress' judgments by refusing to disburse already-allocated funding for many federal grant programs.

In **Count IV**, the States allege a violation of the Spending Clause of the U.S. Constitution.  U.S. Const. art. I, § 8, cl. law 1.

And in **Count V**, the States allege a violation of the presentment (U.S. Const. art. I, § 7, cl. 2), appropriations (U.S. Const. art. I, § 7), and take care clauses (U.S. Const. art. II, § 3, cl. 3) (the Executive must "take care that the laws be faithfully executed . . .").

Because of the breadth and ambiguity of the "pause," the Court must consider the States' TRO motion today based on the effect it will have on many—but perhaps not all—grants and programs it is intended to cover.  Are there some aspects of the pause that might be legal and appropriate constitutionally for the Executive to take?  The Court imagines there are, but it is equally sure that there are many instances in the Executive Orders' wide-ranging, all-encompassing, and ambiguous "pause" of critical funding that are not.  The Court must act in these early stages of the litigation under the "worst case scenario" because the breadth and ambiguity of the Executive's action makes it impossible to do otherwise.

The Court finds that, based on the evidence before it now, some of which is set forth below, the States are likely to succeed on the merits of some, if not all, their claims.  The reasons are as follows:

4

EPA_00049506

- The Executive's action unilaterally suspends the payment of federal funds to the States and others simply by choosing to do so, no matter the authorizing or appropriating statute, the regulatory regime, or the terms of the grant itself. The Executive cites no legal authority allowing it to do so; indeed, no federal law would authorize the Executive's unilateral action here.

- Congress has instructed the Executive to provide funding to States based on stated statutory factors—for example, population or the expenditure of qualifying State funds. By trying to impose certain conditions on this funding, the Executive has acted contrary to law and in violation of the APA.

- The Executive Orders threaten the States' ability to conduct essential activities and gave the States and others less than 24 hours' notice of this arbitrary pause, preventing them from making other plans or strategizing how they would continue to function without these promised funds.

- Congress appropriated many of these funds, and the Executive's refusal to disburse them is contrary to congressional intent and directive and thus arbitrary and capricious.

- Congress has not given the Executive limitless power to broadly and indefinitely pause all funds that it has expressly directed to specific recipients and purposes and therefore the Executive's actions violate the separation of powers.

Judge Bruce M. Selya of the First Circuit succinctly set out the black letter law about appropriated funds and Executive powers:

EPA_00049507

> When an executive agency administers a federal statute, the agency's power to act is "authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297, 133 S. Ct. 1863, 185 L. Ed. 2d 941 (2013). It is no exaggeration to say that "an agency literally has no power to act ... unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374, 106 S. Ct. 1890, 90 L. Ed. 2d 369 (1986). Any action that an agency takes outside the bounds of its statutory authority is ultra vires, see *City of Arlington*, 569 U.S. at 297, 133 S. Ct. 1863, and violates the Administrative Procedure Act, see 5 U.S.C. § 706(2)(C).

*City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020).

The Executive's statement that the Executive Branch has a duty "to align Federal spending and action with the will of the American people *as expressed through Presidential priorities*," (ECF No. 48-1 at 11) (emphasis added) is a constitutionally flawed statement. The Executive Branch has a duty to align federal spending and action with the will of the people as **expressed through congressional appropriations,** not through "Presidential priorities." U.S. Const. art. II, § 3, cl. 3 (establishing that the Executive must "take care that the laws be faithfully executed . . ."). Federal law specifies how the Executive should act if it believes that appropriations are inconsistent with the President's priorities–it must ask Congress, not act unilaterally. The Impoundment Control Act of 1974 specifies that the President may ask that Congress rescind appropriated funds.[3] Here, there is no evidence that the Executive has followed the law by notifying Congress and thereby effectuating a potentially legally permitted so-called "pause."

---

[3] If both the Senate and the House of Representatives have not approved a rescission proposal (by passing legislation) within forty-five days of continuous session, any funds the Executive is withholding must be made available for obligation.

6

EPA_00049508

Justice Brett Kavanaugh wrote when he was on the D.C. Circuit:

Like the Commission here, a President sometimes has policy reasons (as distinct from constitutional reasons, *cf. infra* note 3) for wanting to spend less than the full amount appropriated by Congress for a particular project or program.  But in those circumstances, even the President does not have unilateral authority to refuse to spend the funds.  Instead, the President must propose the rescission of funds, and Congress then may decide whether to approve a rescission bill.  *See* 2 U.S.C. § 683; *see also Train v. City of New York,* 420 U.S. 35, 95 S. Ct. 839, 43 L. Ed. 2d 1 (1975); Memorandum from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, to Edward L. Morgan, Deputy Counsel to the President (Dec. 1, 1969), *reprinted in Executive Impoundment of Appropriated Funds: Hearings Before the Subcomm. on Separation of Powers of the S. Comm. on the Judiciary,* 92d Cong. 279, 282 (1971) ("With respect to the suggestion that the President has a constitutional power to decline to spend appropriated funds, we must conclude that existence of such a broad power is supported by neither reason nor precedent.")

*In re Aiken Cnty.,* 725 F.3d 255, 261, n.1 (D.C. Cir. 2013).

The Court finds that the record now before it substantiates the likelihood of a successful claim that the Executive's actions violate the Constitution and statutes of the United States.

The Court now moves on to the remaining three injunction considerations.

### Irreparable Harm

The States have put forth sufficient evidence at this stage that they will likely suffer severe and irreparable harm if the Court denies their request to enjoin enforcement of the funding pause.

- All the States rely on federal funds to provide and maintain vital programs and services and have introduced evidence that the withholding of federal funds

7

will cause severe disruption in their ability to administer such vital services—
even if it is for a brief time.

- The States detail many examples of where the Executive's overarching pause
  on funding that Congress has allocated will harm them and their citizens.
  These programs range from highway planning and construction, childcare,
  veteran nursing care funding, special education grants, and state health
  departments, who receive billions of dollars to run programs that maintain
  functional health systems. *See, e.g.*, ECF No. 3-1 at 56 (highway construction
  programs in Delaware), at 73 (childcare programs in Michigan), at 113
  (veterans nursing care funding in Washington state), at 77 (special education
  programs in Minnesota), and at 100–01 (health care programs in New Mexico).

- The pause in federal funding will also hurt current disaster relief efforts. The
  States assert that the pause applies to federal actions directing federal
  financial assistance to North Carolina to address the damage inflicted by
  Hurricane Helene and to any Federal Emergency Management Agency grant
  money not yet disbursed, including key support for California's ongoing
  response to the fires. ECF No. 1 ¶¶ 80–81.

- A January 28, 2025, email from Shannon Kelly, the Director of the National
  High Intensity Drug Case Trafficking Areas (HIDTA) program, who aids law
  enforcement in high drug-trafficking areas, shows that payments to state-
  based HIDTA programs have been paused, putting the public's safety at risk.
  *Id.* ¶ 83.

8

EPA_00049510

The States have set forth facts showing that the Executive's abrupt "pause" in potentially trillions of dollars of federal funding will cause a ripple effect that would directly impact the States and other's ability to provide and administer vital services and relief to their citizens. Thus, the federal grants to States and others that are impounded through the Executive's pause in disbursement will cause irreparable harm.

And it is more than monetary harm that is at stake here. As Justice Anthony Kennedy reminds us, "Liberty is always at stake when one or more of the branches seek to transgress the separation of powers." *Clinton v. City of New York*, 524 U.S. 417, 449–50 (1998) (Kennedy, J. concurring)

### Balance of the Equities and Public Interest

As the Court considers the final two factors, the record shows that the balance of equities weighs heavily in favor of granting the States' TRO.

- If the Defendants are prevented from enforcing the directive contained in the OMB Directive, they merely would have to disburse funds that Congress has appropriated to the States and others.

- On the other hand, if the Court denies the TRO, the funding that the States and others are presumably due under law is in an indefinite limbo—a hardship worsened by the fact that the States had less than 24 hours' notice to act in anticipation of the funding shortfall.

- The fact that the States have shown a likelihood of success on the merits strongly suggests that a TRO would serve the public interest. Moreover, the

EPA_00049511

public interest further favors a TRO because absent such an order, there is a substantial risk that the States and its citizens will face a significant disruption in health, education, and other public services that are integral to their daily lives due to this pause in federal funding.

The evidence in the record at this point shows that, despite the rescission of the OMB Directive, the Executive's decision to pause appropriated federal funds "remains in full force and effect." ECF No. 44.

**Mootness**

The Defendants now claim that this matter is moot because it rescinded the OMB Directive. But the evidence shows that the alleged rescission of the OMB Directive was in name-only and may have been issued simply to defeat the jurisdiction of the courts. The substantive effect of the directive carries on.

Messaging from the White House and agencies proves the point. At 2:04 EST, less than an hour before the Court's hearing on the States' motion on Wednesday, the Defendants filed a Notice saying, "OMB elected to rescind that challenged Memorandum. *See* OMB Mem. M-25-14, *Rescission of M-25-13* (Jan. 28, 2025) ('OMB Memorandum M-25-13 is rescinded.')." ECF No. 43. Yet about twenty minutes before the Defendants filed the Notice, the President's Press Secretary sent a statement via the X platform that said: "The President's [Executive Orders] EO's on federal funding remain in full force and effect and will be rigorously implemented." ECF No. 44. And then the following day (January 30, 2025 at 7:50 MST and again at 5:27 p.m. EST) after the so-called rescission, the Environmental Protection Agency, in an email to

10

EPA_00049512

federal grant recipients, said that the awarded money could not be disbursed while it worked "diligently to implement the [OMB] Memorandum, Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs, to align Federal spending and action with the will of the American people as expressed through President Trump's priorities. The agency is temporarily pausing all activities related to the obligation or disbursement of EPA Federal financial assistance at this time. EPA is continuing to work with OMB as they review processes, policies, and programs, as required by the memorandum." ECF No. 48-1 at 6, 11.

Based on the Press Secretary's unequivocal statement and the continued actions of Executive agencies, the Court finds that the policies in the OMB Directive that the States challenge here are still in full force and effect and thus the issues presented in the States' TRO motion are not moot.

### Conclusion

Consistent with the findings above, and to keep the status quo, the Court hereby ORDERS that a TEMPORARY RESTRAINING ORDER is entered in this case until this Court rules on the States' forthcoming motion for a preliminary injunction, which the States shall file expeditiously.

During the pendency of the Temporary Restraining Order, Defendants shall not pause, freeze, impede, block, cancel, or terminate Defendants' compliance with awards and obligations to provide federal financial assistance to the States, and Defendants shall not impede the States' access to such awards and obligations, except on the basis of the applicable authorizing statutes, regulations, and terms.

EPA_00049513

If Defendants engage in the "identif[ication] and review" of federal financial assistance programs, as identified in the OMB Directive, such exercise shall not affect a pause, freeze, impediment, block, cancellation, or termination of Defendants' compliance with such awards and obligations, except on the basis of the applicable authorizing statutes, regulations, and terms.

Defendants shall also be restrained and prohibited from reissuing, adopting, implementing, or otherwise giving effect to the OMB Directive under any other name or title or through any other Defendants (or agency supervised, administered, or controlled by any Defendant), such as the continued implementation identified by the White House Press Secretary's statement of January 29, 2025. ECF No. 44.

Defendants' attorneys shall provide written notice of this Order to all Defendants and agencies and their employees, contractors, and grantees by Monday, February 3, 2025, at 9 a.m. Defendants shall file a copy of the notice on the docket at the same time.

Defendants shall comply with all notice and procedural requirements in the award, agreement, or other instrument relating to decisions to stop, delay, or otherwise withhold federal financial assistance programs.

The TRO shall be in effect until further Order of this Court. A preliminary hearing, at which time the States will have to produce specific evidence in support of a preliminary injunction, will be set shortly at a day and time that is convenient to the parties and the Court.

EPA_00049514

IT IS SO ORDERED.


*s/John J. McConnell, Jr.*

_____
John J. McConnell, Jr.
Chief Judge
United States District Court for the District of Rhode Island

January 31, 2025

EPA_00049515

Message

---

**From:** Askew, Wendel [Askew.Wendel@epa.gov]
**Sent:** 2/4/2025 5:40:25 PM
**To:** Goerke, Ariadne [Goerke.Ariadne@epa.gov]
**Subject:** FW: DOJ filing in TRO
**Attachments:** 51 - Defs' Notice of Compliance.pdf


Wendel J. Askew
Assistant General Counsel for Financial Assistance Law
Civil Rights and Finance Law Office
Office of General Counsel
US Environmental Protection Agency
Mail Code 2399A
202-564-3987
7454H WJCN

---

**From:** Askew, Wendel
**Sent:** Tuesday, February 4, 2025 11:51 AM
**To:** Talbert-Duarte, Angelia <talbert-duarte.angelia@epa.gov>
**Subject:** DOJ filing in TRO

DOJ language asking for clarity is on page 2:

Defendants do not read the Order to prevent the President or his advisors from communicating with federal agencies or the public about the President's priorities regarding federal spending. Nor do Defendants construe the Order as enjoining the President's Executive Orders, which are plainly lawful and unchallenged in this case. Further, Defendants do not read the Order as imposing compliance obligations on federal agencies that are not Defendants in this case. Defendants respectfully request that the Court notify Defendants if they have misunderstood the intended scope of the Court's Order.

Wendel J. Askew
Assistant General Counsel for Financial Assistance Law
Civil Rights and Finance Law Office
Office of General Counsel
US Environmental Protection Agency
Mail Code 2399A
202-564-3987
7454H WJCN

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF NEW YORK, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 1:25-cv-39 (JJM) |
| DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES, *et al.*, | |
| Defendants. | |

## DEFENDANTS' NOTICE OF COMPLIANCE WITH COURT'S
## TEMPORARY RESTRAINING ORDER

Defendants respectfully submit this Notice of Compliance regarding the
Court's temporary restraining order entered on January 31, 2025. *See* ECF No. 50.

1. As noted, this Court entered a temporary restraining order on the
evening of Friday, January 31, 2025. That Order directed (among other things):

> Defendants' attorneys shall provide written notice of this Order to all
> Defendants and agencies and their employees, contractors, and grantees by
> Monday, February 3, 2025, at 9 a.m. Defendants shall file a copy of the notice
> on the docket at the same time.

ECF No. 50 at 12. Consistent with that directive, later that same night Defendants'
attorneys provided written notice of the Order to all Defendant agencies,[1] stating that
Defendant agencies should disseminate this written notice to all "employees,
contractors, and grantees by Monday, February 3, 2025, at 9 a.m." A copy of that
written notice is attached hereto.

---

[1] One of the Defendants in this matter is the President of the United States. To fulfill the
Court's directive to provide notice to "all Defendants" with respect to the President, Defendants'
attorneys provided written notice of the Order to attorneys in the Office of the White House Counsel.

Case 1:25-cv-01510-DLB   Document 25-1   Filed 04/21/25   Page 27 of 54
Case 1:25-cv-00239-JJM-PAS   Document 111   Filed 02/03/25   Page 2 of 3 PageID #:
716

   2.     The Order contains several ambiguous terms and provisions that could
be read to constitute significant intrusions on the Executive Branch's lawful
authorities and the separation of powers.  *See* ECF No. 50 at 12 (prohibiting
"reissuing, adopting, implementing, or otherwise giving effect to the OMB Directive
under any other name or title or through any other Defendants (or agency supervised,
administered, or controlled by any Defendant), such as the continued implementation
identified by the White House Press Secretary's statement of January 29, 2025").
Given that the Plaintiffs only challenged the OMB Memorandum, Defendants do not
read the Order to prevent the President or his advisors from communicating with
federal agencies or the public about the President's priorities regarding federal
spending.  Nor do Defendants construe the Order as enjoining the President's
Executive Orders, which are plainly lawful and unchallenged in this case.  Further,
Defendants do not read the Order as imposing compliance obligations on federal
agencies that are not Defendants in this case.  Defendants respectfully request that
the Court notify Defendants if they have misunderstood the intended scope of the
Court's Order.


   Dated: February 3, 2025            Respectfully Submitted,

                                      BRETT A. SHUMATE
                                      Acting Assistant Attorney General

                                      ALEXANDER K. HAAS
                                      Director

                                      */s/ Daniel Schwei*
                                      DANIEL SCHWEI
                                      Special Counsel

                                           2

EPA_00049561

ANDREW F. FREIDAH
EITAN R. SIRKOVICH
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Tel.: (202) 305-8693
Fax: (202) 616-8470
Email: daniel.s.schwei@usdoj.gov

*Counsel for Defendants*

3

EPA_00049562

## **CERTIFICATION OF SERVICE**

I hereby certify that on February 3, 2025, I electronically filed the within Certification with the Clerk of the United States District Court for the District of Rhode Island using the CM/ECF System, thereby serving it on all registered users in accordance with Federal Rule of Civil Procedure 5(b)(2)(E) and Local Rule Gen 305.

/s/ *Daniel Schwei*
Daneil Schwei

EPA_00049563

## NOTICE OF COURT ORDER

You are hereby advised that a temporary restraining order has been entered in the case of *New York et al. v. Trump*, No. 25-cv-39-JJM-PAS (D.R.I.), ECF No. 50 (Jan. 31, 2025). You are receiving this Notice pursuant to the Court's directive that notice of the order be provided "to all Defendants and agencies and their employees, contractors, and grantees by Monday, February 3, 2025, at 9 a.m." A copy of the Court's Order is attached for reference.

This case challenges an alleged "pause" of certain Federal financial assistance, related to OMB Memorandum M-25-13, *Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs* (Jan. 27, 2025) ("OMB Memo"). Although that OMB Memo was rescinded on January 29, 2025, the plaintiffs in the above-referenced case allege that the funding pause directed by the OMB Memo is still in effect, including because of recently issued Executive Orders by the President.

In response, the Court has entered a temporary restraining order prohibiting certain actions by the Defendants in the case, which is effective immediately. All Defendants—including their employees, contractors, and grantees—must immediately comply with the Court's Order. For complete details and terms of the Court's Order, please refer to pages 11 and 12 of the enclosed Order.

To assist in your compliance, here is a summary of the key terms:

1. **Federal agencies cannot pause, freeze, impede, block, cancel, or terminate any awards or obligations on the basis of the OMB Memo, or on the basis of the President's recently issued Executive Orders.**

2. **This prohibition applies to all awards or obligations—not just those involving the Plaintiff States in the above-referenced case—and also applies to future assistance (not just current or existing awards or obligations).**

3. **Agencies may exercise their own authority to pause awards or obligations, provided agencies do so purely based on their own discretion—not as a result of the OMB Memo or the President's Executive Orders—and provided the pause complies with all notice and procedural requirements in the award, agreement, or other instrument relating to such a pause.**

   a. On pages 11 and 12 of the Order, the Court prohibits agencies from pausing funding "except on the basis of the applicable authorizing statutes, regulations, and terms." Thus, agencies remain free to exercise their own discretion under their "authorizing statutes, regulations, and terms," including any exercise of discretion to pause certain funding. Additionally, agencies remain free to take action pursuant to the terms of the relevant award or obligation, such as in cases of grantee noncompliance.

   b. Any exercise of agency discretion, however, cannot be based on the OMB Memo or the President's Executive Orders, given that the Court has prohibited agencies from "implementing or giving effect to the OMB [Memo] under any other name

or title[.]" (Order, pg.12). Additionally, any decision to pause, stop, delay, or otherwise withhold federal financial assistance programs must comply with all notice and procedural requirements in the award, agreement, or other instrument setting forth the terms of the award or obligation.

4. **Out of an abundance of caution, all federal agencies (even those not named as defendants in the case) should comply with the above-referenced terms.**

As the Court's Order reflects, the above terms are temporary as litigation in the case is ongoing. At present, however, the Court's Order is in effect and must be complied with.

If you have any questions about the scope or effect of the Court's Order, please contact your agency's Office of General Counsel or your grant officer, as appropriate. Thank you for your attention to this matter.

EPA_00049565

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

_____

)
STATE OF NEW YORK; STATE OF )
CALIFORNIA; STATE OF ILLINOIS; )
STATE OF RHODE ISLAND; STATE OF )
NEW JERSEY; COMMONWEALTH OF )
MASSACHUSETTS; STATE OF )
ARIZONA; STATE OF COLORADO; )
STATE OF CONNECTICUT; STATE OF )
DELAWARE; THE DISTRICT OF )
COLUMBIA; STATE OF HAWAI'I; )
STATE OF MAINE; STATE OF )
MARYLAND; STATE OF MICHIGAN; )
STATE OF MINNESOTA; STATE OF )
NEVADA; STATE OF NORTH )
CAROLINA; STATE OF NEW MEXICO; )
STATE OF OREGON; STATE OF )
VERMONT; STATE OF WASHINGTON; )
and STATE OF WISCONSIN, )
)
      Plaintiffs, )
)
v. )       C.A. No. 25-cv-39-JJM-PAS
)
DONALD TRUMP, _in his Official_ )
_Capacity as President of the United_ )
_States_; U.S. OFFICE OF )
MANAGEMENT AND BUDGET; )
MATTHEW J. VAETH, _in his Official_ )
_Capacity as Acting Director of the U.S._ )
_Office of Management and Budget_; U.S. )
DEPARTMENT OF THE TREASURY; )
SCOTT BESSENT, _in his Official_ )
_Capacity as Secretary of the Treasury_; )
PATRICIA COLLINS, _in her Official_ )
_Capacity as Treasurer of the U.S._; U.S. )
DEPARTMENT OF HEALTH AND )
HUMAN SERVICES; DOROTHY A. )
FINK, M.D., _in her Official Capacity As_ )
_Acting Secretary Of Health And Human_ )
_Services_; U.S. DEPARTMENT OF )
EDUCATION; DENISE CARTER, _in her_ )
_Official Capacity as Acting Secretary of_ )
_Education_; U.S. FEDERAL )
EMERGENCY MANAGEMENT )
AGENCY; CAMERON HAMILTON, _in_ )

his Official Capacity as Acting )
Administrator of the U.S. Federal )
Emergency Management Agency; U.S. )
DEPARTMENT OF )
TRANSPORTATION; )
JUDITH KALETA, in her Official )
Capacity as Acting Secretary of )
Transportation; U.S. DEPARTMENT OF )
LABOR; VINCE MICONE, in his Official )
Capacity as Acting Secretary of Labor; )
U.S. DEPARTMENT OF ENERGY; )
INGRID KOLB, in her Official Capacity )
as Acting Secretary of the U.S. )
Department of Energy; U.S. )
ENVIRONMENTAL PROTECTION )
AGENCY; JAMES PAYNE, in his Official )
Capacity as Acting Administrator of the )
U.S. Environmental Protection Agency; )
U.S. DEPARTMENT OF HOMELAND )
SECURITY; KRISTI NOEM, in her )
Capacity as Secretary of the U.S. )
Department of Homeland Security; U.S. )
DEPARTMENT OF JUSTICE; JAMES R. )
McHENRY III, in his Official Capacity as )
Acting Attorney General of the U.S. )
Department of Justice; THE NATIONAL )
SCIENCE FOUNDATION; and DR. )
SETHURAMAN PANCHANATHAN, in )
his Capacity as Director of the National )
Science Foundation, )
                     )
        Defendants. )

## **TEMPORARY RESTRAINING ORDER**

The legal standard for a Temporary Restraining Order ("TRO") mirrors that of

a preliminary injunction. The Plaintiff States must show that weighing these four

factors favors granting a TRO:

1. likelihood of success on the merits;
2. potential for irreparable injury;
3. balance of the relevant equities; and

EPA_00049567

    4. effect on the public interest if the Court grants or denies the TRO.

*Planned Parenthood League v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir. 1981). The traditional equity doctrine that preliminary injunctive relief is an extraordinary and drastic remedy that is never awarded as of right guides the Court. *Id.* The Court is also fully aware of the judiciary's role as one of the three independent branches of government, and that the doctrine of separation of powers restricts its reach into the Executive Branch. The Court now turns to the four factors.

### <u>Likelihood of Success on the Merits</u>

We begin with what courts have called a key factor—a consideration of the movant's likelihood of success on the merits.

In **<u>Count I</u>**, the States allege that the Executive's actions by the Office of Management and Budget ("OMB")[1] violate the Administrative Procedure Act ("APA")[2] because Congress has not delegated any unilateral authority to the Executive to indefinitely pause all federal financial assistance without considering the statutory and contractual terms governing these billions of dollars of grants.

In **<u>Count II</u>**, the States allege that the Executive's actions violate the APA because the failure to spend funds appropriated by Congress is arbitrary and capricious in multiple respects.

---

[1] See *supra* for discussion of mootness.
[2] 5 U.S.C. § 551 et seq.

3

EPA_00049568

In **Count III**, the States allege that the failure to spend funds appropriated by Congress violates the separation of powers because the Executive has overridden Congress' judgments by refusing to disburse already-allocated funding for many federal grant programs.

In **Count IV**, the States allege a violation of the Spending Clause of the U.S. Constitution.  U.S. Const. art. I, § 8, cl. law 1.

And in **Count V**, the States allege a violation of the presentment (U.S. Const. art. I, § 7, cl. 2), appropriations (U.S. Const. art. I, § 7), and take care clauses (U.S. Const. art. II, § 3, cl. 3) (the Executive must "take care that the laws be faithfully executed . . .").

Because of the breadth and ambiguity of the "pause," the Court must consider the States' TRO motion today based on the effect it will have on many—but perhaps not all—grants and programs it is intended to cover.  Are there some aspects of the pause that might be legal and appropriate constitutionally for the Executive to take? The Court imagines there are, but it is equally sure that there are many instances in the Executive Orders' wide-ranging, all-encompassing, and ambiguous "pause" of critical funding that are not.  The Court must act in these early stages of the litigation under the "worst case scenario" because the breadth and ambiguity of the Executive's action makes it impossible to do otherwise.

The Court finds that, based on the evidence before it now, some of which is set forth below, the States are likely to succeed on the merits of some, if not all, their claims.  The reasons are as follows:

4

EPA_00049569

- The Executive's action unilaterally suspends the payment of federal funds to the States and others simply by choosing to do so, no matter the authorizing or appropriating statute, the regulatory regime, or the terms of the grant itself. The Executive cites no legal authority allowing it to do so; indeed, no federal law would authorize the Executive's unilateral action here.

- Congress has instructed the Executive to provide funding to States based on stated statutory factors—for example, population or the expenditure of qualifying State funds. By trying to impose certain conditions on this funding, the Executive has acted contrary to law and in violation of the APA.

- The Executive Orders threaten the States' ability to conduct essential activities and gave the States and others less than 24 hours' notice of this arbitrary pause, preventing them from making other plans or strategizing how they would continue to function without these promised funds.

- Congress appropriated many of these funds, and the Executive's refusal to disburse them is contrary to congressional intent and directive and thus arbitrary and capricious.

- Congress has not given the Executive limitless power to broadly and indefinitely pause all funds that it has expressly directed to specific recipients and purposes and therefore the Executive's actions violate the separation of powers.

Judge Bruce M. Selya of the First Circuit succinctly set out the black letter law about appropriated funds and Executive powers:

EPA_00049570

When an executive agency administers a federal statute, the agency's power to act is "authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297, 133 S. Ct. 1863, 185 L. Ed. 2d 941 (2013). It is no exaggeration to say that "an agency literally has no power to act ... unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374, 106 S. Ct. 1890, 90 L. Ed. 2d 369 (1986). Any action that an agency takes outside the bounds of its statutory authority is ultra vires, see *City of Arlington*, 569 U.S. at 297, 133 S. Ct. 1863, and violates the Administrative Procedure Act, see 5 U.S.C. § 706(2)(C).

*City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020).

The Executive's statement that the Executive Branch has a duty "to align Federal spending and action with the will of the American people *as expressed through Presidential priorities*," (ECF No. 48-1 at 11) (emphasis added) is a constitutionally flawed statement. The Executive Branch has a duty to align federal spending and action with the will of the people as **expressed through congressional appropriations,** not through "Presidential priorities." U.S. Const. art. II, § 3, cl. 3 (establishing that the Executive must "take care that the laws be faithfully executed . . ."). Federal law specifies how the Executive should act if it believes that appropriations are inconsistent with the President's priorities–it must ask Congress, not act unilaterally. The Impoundment Control Act of 1974 specifies that the President may ask that Congress rescind appropriated funds.[3] Here, there is no evidence that the Executive has followed the law by notifying Congress and thereby effectuating a potentially legally permitted so-called "pause."

---

[3] If both the Senate and the House of Representatives have not approved a rescission proposal (by passing legislation) within forty-five days of continuous session, any funds the Executive is withholding must be made available for obligation.

EPA_00049571

Justice Brett Kavanaugh wrote when he was on the D.C. Circuit:

> Like the Commission here, a President sometimes has policy reasons (as distinct from constitutional reasons, *cf. infra* note 3) for wanting to spend less than the full amount appropriated by Congress for a particular project or program.  But in those circumstances, even the President does not have unilateral authority to refuse to spend the funds.  Instead, the President must propose the rescission of funds, and Congress then may decide whether to approve a rescission bill.  *See* 2 U.S.C. § 683; *see also Train v. City of New York*, 420 U.S. 35, 95 S. Ct. 839, 43 L. Ed. 2d 1 (1975); Memorandum from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, to Edward L. Morgan, Deputy Counsel to the President (Dec. 1, 1969), *reprinted in Executive Impoundment of Appropriated Funds: Hearings Before the Subcomm. on Separation of Powers of the S. Comm. on the Judiciary*, 92d Cong. 279, 282 (1971) ("With respect to the suggestion that the President has a constitutional power to decline to spend appropriated funds, we must conclude that existence of such a broad power is supported by neither reason nor precedent.")

*In re Aiken Cnty.*, 725 F.3d 255, 261, n.1 (D.C. Cir. 2013).

The Court finds that the record now before it substantiates the likelihood of a successful claim that the Executive's actions violate the Constitution and statutes of the United States.

The Court now moves on to the remaining three injunction considerations.

### **Irreparable Harm**

The States have put forth sufficient evidence at this stage that they will likely suffer severe and irreparable harm if the Court denies their request to enjoin enforcement of the funding pause.

- All the States rely on federal funds to provide and maintain vital programs and services and have introduced evidence that the withholding of federal funds

7

will cause severe disruption in their ability to administer such vital services—even if it is for a brief time.

- The States detail many examples of where the Executive's overarching pause on funding that Congress has allocated will harm them and their citizens. These programs range from highway planning and construction, childcare, veteran nursing care funding, special education grants, and state health departments, who receive billions of dollars to run programs that maintain functional health systems. *See, e.g.*, ECF No. 3-1 at 56 (highway construction programs in Delaware), at 73 (childcare programs in Michigan), at 113 (veterans nursing care funding in Washington state), at 77 (special education programs in Minnesota), and at 100–01 (health care programs in New Mexico).

- The pause in federal funding will also hurt current disaster relief efforts. The States assert that the pause applies to federal actions directing federal financial assistance to North Carolina to address the damage inflicted by Hurricane Helene and to any Federal Emergency Management Agency grant money not yet disbursed, including key support for California's ongoing response to the fires. ECF No. 1 ¶¶ 80–81.

- A January 28, 2025, email from Shannon Kelly, the Director of the National High Intensity Drug Case Trafficking Areas (HIDTA) program, who aids law enforcement in high drug-trafficking areas, shows that payments to state-based HIDTA programs have been paused, putting the public's safety at risk. *Id.* ¶ 83.

8

The States have set forth facts showing that the Executive's abrupt "pause" in potentially trillions of dollars of federal funding will cause a ripple effect that would directly impact the States and other's ability to provide and administer vital services and relief to their citizens. Thus, the federal grants to States and others that are impounded through the Executive's pause in disbursement will cause irreparable harm.

And it is more than monetary harm that is at stake here. As Justice Anthony Kennedy reminds us, "Liberty is always at stake when one or more of the branches seek to transgress the separation of powers." *Clinton v. City of New York*, 524 U.S. 417, 449–50 (1998) (Kennedy, J. concurring)

### Balance of the Equities and Public Interest

As the Court considers the final two factors, the record shows that the balance of equities weighs heavily in favor of granting the States' TRO.

- If the Defendants are prevented from enforcing the directive contained in the OMB Directive, they merely would have to disburse funds that Congress has appropriated to the States and others.

- On the other hand, if the Court denies the TRO, the funding that the States and others are presumably due under law is in an indefinite limbo—a hardship worsened by the fact that the States had less than 24 hours' notice to act in anticipation of the funding shortfall.

- The fact that the States have shown a likelihood of success on the merits strongly suggests that a TRO would serve the public interest. Moreover, the

9

EPA_00049574

public interest further favors a TRO because absent such an order, there is a substantial risk that the States and its citizens will face a significant disruption in health, education, and other public services that are integral to their daily lives due to this pause in federal funding.

The evidence in the record at this point shows that, despite the rescission of the OMB Directive, the Executive's decision to pause appropriated federal funds "remains in full force and effect." ECF No. 44.

### Mootness

The Defendants now claim that this matter is moot because it rescinded the OMB Directive. But the evidence shows that the alleged rescission of the OMB Directive was in name-only and may have been issued simply to defeat the jurisdiction of the courts. The substantive effect of the directive carries on.

Messaging from the White House and agencies proves the point. At 2:04 EST, less than an hour before the Court's hearing on the States' motion on Wednesday, the Defendants filed a Notice saying, "OMB elected to rescind that challenged Memorandum. *See* OMB Mem. M-25-14, *Rescission of M-25-13* (Jan. 28, 2025) ('OMB Memorandum M-25-13 is rescinded.')." ECF No. 43. Yet about twenty minutes before the Defendants filed the Notice, the President's Press Secretary sent a statement via the X platform that said: "The President's [Executive Orders] EO's on federal funding remain in full force and effect and will be rigorously implemented." ECF No. 44. And then the following day (January 30, 2025 at 7:50 MST and again at 5:27 p.m. EST) after the so-called rescission, the Environmental Protection Agency, in an email to

federal grant recipients, said that the awarded money could not be disbursed while it worked "diligently to implement the [OMB] Memorandum, Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs, to align Federal spending and action with the will of the American people as expressed through President Trump's priorities. The agency is temporarily pausing all activities related to the obligation or disbursement of EPA Federal financial assistance at this time. EPA is continuing to work with OMB as they review processes, policies, and programs, as required by the memorandum." ECF No. 48-1 at 6, 11.

Based on the Press Secretary's unequivocal statement and the continued actions of Executive agencies, the Court finds that the policies in the OMB Directive that the States challenge here are still in full force and effect and thus the issues presented in the States' TRO motion are not moot.

### Conclusion

Consistent with the findings above, and to keep the status quo, the Court hereby ORDERS that a TEMPORARY RESTRAINING ORDER is entered in this case until this Court rules on the States' forthcoming motion for a preliminary injunction, which the States shall file expeditiously.

During the pendency of the Temporary Restraining Order, Defendants shall not pause, freeze, impede, block, cancel, or terminate Defendants' compliance with awards and obligations to provide federal financial assistance to the States, and Defendants shall not impede the States' access to such awards and obligations, except on the basis of the applicable authorizing statutes, regulations, and terms.

EPA_00049576

If Defendants engage in the "identif[ication] and review" of federal financial assistance programs, as identified in the OMB Directive, such exercise shall not affect a pause, freeze, impediment, block, cancellation, or termination of Defendants' compliance with such awards and obligations, except on the basis of the applicable authorizing statutes, regulations, and terms.

Defendants shall also be restrained and prohibited from reissuing, adopting, implementing, or otherwise giving effect to the OMB Directive under any other name or title or through any other Defendants (or agency supervised, administered, or controlled by any Defendant), such as the continued implementation identified by the White House Press Secretary's statement of January 29, 2025. ECF No. 44.

Defendants' attorneys shall provide written notice of this Order to all Defendants and agencies and their employees, contractors, and grantees by Monday, February 3, 2025, at 9 a.m. Defendants shall file a copy of the notice on the docket at the same time.

Defendants shall comply with all notice and procedural requirements in the award, agreement, or other instrument relating to decisions to stop, delay, or otherwise withhold federal financial assistance programs.

The TRO shall be in effect until further Order of this Court. A preliminary hearing, at which time the States will have to produce specific evidence in support of a preliminary injunction, will be set shortly at a day and time that is convenient to the parties and the Court.

EPA_00049577

IT IS SO ORDERED.

*s/John J. McConnell, Jr.*

_____

John J. McConnell, Jr.
Chief Judge
United States District Court for the District of Rhode Island

January 31, 2025

EPA_00049578

Message

---

**From**:     Epp, Timothy [Epp.Timothy@epa.gov]
**Sent**:     3/25/2025 5:31:59 PM
**To**:       Talbert-Duarte, Angelia [talbert-duarte.angelia@epa.gov]; Goerke, Ariadne [Goerke.Ariadne@epa.gov]
**Subject**:  FW: Can I have this article?

FYI – I'm trying to hunt down whether we have any information on how they obtained the referenced emails.

**Timothy R. Epp**
Associate General Counsel
National FOIA Office, Office of General Counsel
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

*Please note that I sent this at a time that was convenient for me without expectation for a response outside of business hours. If you receive this email outside of your normal working hours, please know that I do not expect a response until you are back at work during your normal hours*

---

**From:** Wadlington, Christina <Wadlington.Christina@epa.gov>
**Sent:** Tuesday, March 25, 2025 1:23 PM
**To:** Epp, Timothy <Epp.Timothy@epa.gov>
**Cc:** Drinkard, Andrea <Drinkard.Andrea@epa.gov>
**Subject:** FW: Can I have this article?

Thanks for chatting Tim. Here's the full article, I'll check in with Andrea and others on the parts highlighted below.

---

**From:** Daguillard, Robert <Daguillard.Robert@epa.gov>
**Sent:** Tuesday, March 25, 2025 1:22 PM
**To:** Wadlington, Christina <Wadlington.Christina@epa.gov>
**Cc:** Landis, Jeffrey <Landis.Jeffrey@epa.gov>; Powell, Shayla <Powell.Shayla@epa.gov>; Drinkard, Andrea <Drinkard.Andrea@epa.gov>
**Subject:** FW: Can I have this article?

## EPA knew it wrongfully canceled dozens of environmental grants, documents show

*According to an internal email, EPA officials knew they had no contractual right to cancel dozens of grants. They did it anyway.*
*Updated*
March 25, 2025 at 8:29 a.m.

By Amudalat Ajasa
Trump officials knew their legal justification for terminating dozens of Environmental Protection Agency grants was flawed, according to documents and internal emails reviewed by The Washington Post.

An agency lawyer warned officials they had cited contractual language that did not apply to many of the grants the EPA had ended in recent weeks, advising that terminations could be reversed if recipients challenged them administratively or in court.

Since President Donald Trump took office, the EPA has targeted billions of dollars in grants authorized by the Biden administration. This month, the agency announced the cancellation of an additional 400 grants, totaling $1.7 billion, many of which were meant to improve air and water quality and strengthen resilience to natural disasters.

Grant recipients received emails in late February stating that their grants had been terminated on the grounds that they no longer fit the agency's priorities, referring to a clause in their grants' general terms and conditions allowing for awards to be voided.

However, the clause in question applied only to grants issued between Aug, 13, 2020, and Sept. 30, 2024, and almost half of the terminated grants were finalized or updated after Sept. 30. In a Feb. 25 email obtained by the Senate Environment and Public Works Committee and shared with The Post, an assistant general counsel alerted officials that terminations issued by several regional offices had contained this "significant error."

The email also acknowledged that the terminations "may also be encompassed" by a Feb. 21 preliminary injunction issued by a federal judge blocking the Trump administration from enforcing executive orders targeting equity and environmental justice programs. That preliminary injunction was lifted by an appeals court on March 14.

In a follow-up email on March 3, the EPA attorney said that the office had learned the decision to cancel "the EJ grants" was "made with the knowledge" that the terms and conditions rationale did not apply to all of them, but that no retractions would be forthcoming. Appeals of these wrongful cancellations will "play out via the disputes process, or litigation, for those recipients that choose to pursue those avenues," the lawyer added.

In a letter to EPA Administrator Lee Zeldin on Monday, nine Democratic senators on the Environment Committee challenged the grant terminations, pointing out that the 2022 Inflation Reduction Act "directed EPA to distribute $3 billion to improve environmental protection in communities facing economic hardship."

The senators added that "Congress specifically articulated in the statute the activities for which the funds can be awarded," including climate risk, air pollution and toxin reduction, and addressing health risks from heat and wildfires.

"Any attempt to withhold these funds violates the Impoundment Control Act and Congress's constitutional Article I spending authority," the senators said.

In response to a request for comment, an EPA spokesperson said, "As the Trump Administration reins in wasteful spending of taxpayer dollars, EPA will continue terminating assistance agreements in line with those terms and conditions."

Julia Haggerty, an associate professor of geography at Montana State University, worked with local partners for almost a year to assemble a competitive application to create a program designed to provide technical assistance and resources to underserved communities.

The $10 million program, which launched in May, worked to address a range of issues in the region, including flooding and water contamination, lead pipes, and pollution from mining.

The EPA finalized an update to the program's agreement, which included new terms and conditions, on Dec. 27, according to documents reviewed by The Post.

Beginning in January, the program's funding oscillated between being frozen and unfrozen. The EPA terminated the grant on Feb. 21, saying the "award no longer effectuates the program goals or agency priorities," according to an email reviewed by The Post. The university has appealed the termination, citing breach of contract.

"It was just done so haphazardly and carelessly," Haggerty said. "As a public land grant university, we don't have the kind of resources to withstand this interruption in access to funding."

A former EPA official who worked on related issues during the first Trump administration said the contractual language was updated by the White House Office of Management and Budget to provide predictability to grantees.

"The updated terms and conditions require the government to be specific about its reasons for terminating grant agreements," said the official, who spoke on the condition of anonymity because of ongoing legal challenges with the agency. In this case, the official added, the EPA's reason was not listed in the grant agreement, "so the agency can't just terminate."

**From:** Wadlington, Christina <Wadlington.Christina@epa.gov>
**Sent:** Tuesday, March 25, 2025 1:18 PM
**To:** Landis, Jeffrey <Landis.Jeffrey@epa.gov>; Powell, Shayla <Powell.Shayla@epa.gov>; Daguillard, Robert <Daguillard.Robert@epa.gov>
**Cc:** Drinkard, Andrea <Drinkard.Andrea@epa.gov>
**Subject:** Can I have this article?

https://www.washingtonpost.com/climate-environment/2025/03/25/epa-environment-grants-wrongful-termination/

Message

**From:** Packard, Elise [Packard.Elise@epa.gov]
**Sent:** 3/25/2025 6:26:31 PM
**To:** Goerke, Ariadne [Goerke.Ariadne@epa.gov]; Talbert-Duarte, Angelia [talbert-duarte.angelia@epa.gov]
**Subject:** RE: Breaking issue

I don't think so. Thanks!

Elise B. Packard
Deputy General Counsel for Operations
Office of General Counsel
U.S. Environmental Protection Agency
(202) 564-7729

**From:** Goerke, Ariadne <Goerke.Ariadne@epa.gov>
**Sent:** Tuesday, March 25, 2025 2:09 PM
**To:** Packard, Elise <Packard.Elise@epa.gov>; Talbert-Duarte, Angelia <talbert-duarte.angelia@epa.gov>
**Subject:** RE: Breaking issue

Yes, it was taken from Wendel's email, one on February 25 and one on March 3. The article states that the reporter received this from the hill. Assuming there was a congressional request where it was provided.

**Ariadne Goerke**
Deputy Associate
CRFLO/OGC/EPA
Room 7443M (WJCN) ph. 202-564-5471

**From:** Packard, Elise <Packard.Elise@epa.gov>
**Sent:** Tuesday, March 25, 2025 1:47 PM
**To:** Talbert-Duarte, Angelia <talbert-duarte.angelia@epa.gov>; Goerke, Ariadne <Goerke.Ariadne@epa.gov>
**Subject:** FW: Breaking issue

Can we get a copy of the actual Feb. 25 email? If the report is correct, I assume it's from Wendel? I don't have one from him on that date. Nice to know the entirety of what it says.

Elise B. Packard
Deputy General Counsel for Operations
Office of General Counsel
U.S. Environmental Protection Agency
(202) 564-7729

**From:** Epp, Timothy <Epp.Timothy@epa.gov>
**Sent:** Tuesday, March 25, 2025 1:31 PM
**To:** Tisa, Nathaniel <Tisa.Nathaniel@epa.gov>; Donahue, Sean <donahue.sean@epa.gov>; Packard, Elise <Packard.Elise@epa.gov>; Payne, James (Jim) <payne.james@epa.gov>
**Subject:** Breaking issue

FYI – see article below.

I'm trying to hunt down whether we can identify any information on how they obtained the referenced emails.

Tim

**Timothy R. Epp**
Associate General Counsel
National FOIA Office, Office of General Counsel
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

*Please note that I sent this at a time that was convenient for me without expectation for a response outside of business hours.  If you receive this email outside of your normal working hours, please know that I do not expect a response until you are back at work during your normal hours*

---

**From:** Wadlington, Christina <Wadlington.Christina@epa.gov>
**Sent:** Tuesday, March 25, 2025 1:23 PM
**To:** Epp, Timothy <Epp.Timothy@epa.gov>
**Cc:** Drinkard, Andrea <Drinkard.Andrea@epa.gov>
**Subject:** FW: Can I have this article?

Thanks for chatting Tim. Here's the full article, I'll check in with Andrea and others on the parts highlighted below.

---

**From:** Daguillard, Robert <Daguillard.Robert@epa.gov>
**Sent:** Tuesday, March 25, 2025 1:22 PM
**To:** Wadlington, Christina <Wadlington.Christina@epa.gov>
**Cc:** Landis, Jeffrey <Landis.Jeffrey@epa.gov>; Powell, Shayla <Powell.Shayla@epa.gov>; Drinkard, Andrea <Drinkard.Andrea@epa.gov>
**Subject:** FW: Can I have this article?

## EPA knew it wrongfully canceled dozens of environmental grants, documents show
*According to an internal email, EPA officials knew they had no contractual right to cancel dozens of grants. They did it anyway.*
*Updated*
March 25, 2025 at 8:29 a.m.

By Amudalat Ajasa
Trump officials knew their legal justification for terminating dozens of Environmental Protection Agency grants was flawed, according to documents and internal emails reviewed by The Washington Post.

An agency lawyer warned officials they had cited contractual language that did not apply to many of the grants the EPA had ended in recent weeks, advising that terminations could be reversed if recipients challenged them administratively or in court.

Since President Donald Trump took office, the EPA has targeted billions of dollars in grants authorized by the Biden administration. This month, the agency announced the cancellation of an additional 400 grants, totaling $1.7 billion, many of which were meant to improve air and water quality and strengthen resilience to natural disasters.

Grant recipients received emails in late February stating that their grants had been terminated on the grounds that they no longer fit the agency's priorities, referring to a clause in their grants' general terms and conditions allowing for awards to be voided.

However, the clause in question applied only to grants issued between Aug, 13, 2020, and Sept. 30, 2024, and almost half of the terminated grants were finalized or updated after Sept. 30. In a Feb. 25 email obtained by the Senate Environment and Public Works Committee and shared with The Post, an assistant general counsel alerted officials that terminations issued by several regional offices had contained this "significant error."

The email also acknowledged that the terminations "may also be encompassed" by a Feb. 21 preliminary injunction issued by a federal judge blocking the Trump administration from enforcing executive orders targeting equity and environmental justice programs. That preliminary injunction was lifted by an appeals court on March 14.

In a follow-up email on March 3, the EPA attorney said that the office had learned the decision to cancel "the EJ grants" was "made with the knowledge" that the terms and conditions rationale did not apply to all of them, but that no retractions would be forthcoming. Appeals of these wrongful cancellations will "play out via the disputes process, or litigation, for those recipients that choose to pursue those avenues," the lawyer added.

In a letter to EPA Administrator Lee Zeldin on Monday, nine Democratic senators on the Environment Committee challenged the grant terminations, pointing out that the 2022 Inflation Reduction Act "directed EPA to distribute $3 billion to improve environmental protection in communities facing economic hardship."

The senators added that "Congress specifically articulated in the statute the activities for which the funds can be awarded," including climate risk, air pollution and toxin reduction, and addressing health risks from heat and wildfires.

"Any attempt to withhold these funds violates the Impoundment Control Act and Congress's constitutional Article I spending authority," the senators said.

In response to a request for comment, an EPA spokesperson said, "As the Trump Administration reins in wasteful spending of taxpayer dollars, EPA will continue terminating assistance agreements in line with those terms and conditions."

Julia Haggerty, an associate professor of geography at Montana State University, worked with local partners for almost a year to assemble a competitive application to create a program designed to provide technical assistance and resources to underserved communities.

The $10 million program, which launched in May, worked to address a range of issues in the region, including flooding and water contamination, lead pipes, and pollution from mining.

The EPA finalized an update to the program's agreement, which included new terms and conditions, on Dec. 27, according to documents reviewed by The Post.

Beginning in January, the program's funding oscillated between being frozen and unfrozen. The EPA terminated the grant on Feb. 21, saying the "award no longer effectuates the program goals or agency priorities," according to an email reviewed by The Post. The university has appealed the termination, citing breach of contract.

"It was just done so haphazardly and carelessly," Haggerty said. "As a public land grant university, we don't have the kind of resources to withstand this interruption in access to funding."

A former EPA official who worked on related issues during the first Trump administration said the contractual language was updated by the White House Office of Management and Budget to provide predictability to grantees.

"The updated terms and conditions require the government to be specific about its reasons for terminating grant agreements," said the official, who spoke on the condition of anonymity because of ongoing legal challenges with the agency. In this case, the official added, the EPA's reason was not listed in the grant agreement, "so the agency can't just terminate."

**From:** Wadlington, Christina <Wadlington.Christina@epa.gov>
**Sent:** Tuesday, March 25, 2025 1:18 PM
**To:** Landis, Jeffrey <Landis.Jeffrey@epa.gov>; Powell, Shayla <Powell.Shayla@epa.gov>; Daguillard, Robert <Daguillard.Robert@epa.gov>
**Cc:** Drinkard, Andrea <Drinkard.Andrea@epa.gov>
**Subject:** Can I have this article?

https://www.washingtonpost.com/climate-environment/2025/03/25/epa-environment-grants-wrongful-termination/

Message

---

**From**: Packard, Elise [Packard.Elise@epa.gov]
**Sent**: 3/25/2025 6:00:43 PM
**To**: Talbert-Duarte, Angelia [talbert-duarte.angelia@epa.gov]; Goerke, Ariadne [Goerke.Ariadne@epa.gov]
**Subject**: FW: WaPost Article on Grants
**Attachments**: FW: Grant terminations; RE: Grant terminations

Never mind – got it from Tim.

Elise B. Packard
Deputy General Counsel for Operations
Office of General Counsel
U.S. Environmental Protection Agency
(202) 564-7729

**From:** Epp, Timothy <Epp.Timothy@epa.gov>
**Sent:** Tuesday, March 25, 2025 1:58 PM
**To:** Packard, Elise <Packard.Elise@epa.gov>
**Subject:** FW: WaPost Article on Grants

FYI

**Timothy R. Epp**
Associate General Counsel
National FOIA Office, Office of General Counsel
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

*Please note that I sent this at a time that was convenient for me without expectation for a response outside of business hours. If you receive this email outside of your normal working hours, please know that I do not expect a response until you are back at work during your normal hours*

**From:** Coogan, Daniel <Coogan.Daniel@epa.gov>
**Sent:** Tuesday, March 25, 2025 1:32 PM
**To:** Wadlington, Christina <Wadlington.Christina@epa.gov>; Drinkard, Andrea <Drinkard.Andrea@epa.gov>
**Cc:** Epp, Timothy <Epp.Timothy@epa.gov>
**Subject:** RE: WaPost Article on Grants

Both are attached.

**From:** Wadlington, Christina <Wadlington.Christina@epa.gov>
**Sent:** Tuesday, March 25, 2025 1:25 PM
**To:** Coogan, Daniel <Coogan.Daniel@epa.gov>; Drinkard, Andrea <Drinkard.Andrea@epa.gov>
**Cc:** Epp, Timothy <Epp.Timothy@epa.gov>
**Subject:** WaPost Article on Grants

Dan/Andrea,

Would either of you happen to have the referenced emails in the below? Tim is trying to track down whether this was a FIOA release or a direct email to the EPW.

**From:** Wadlington, Christina
**Sent:** Tuesday, March 25, 2025 1:23 PM
**To:** Epp, Timothy <Epp.Timothy@epa.gov>
**Cc:** Drinkard, Andrea <Drinkard.Andrea@epa.gov>
**Subject:** FW: Can I have this article?

Thanks for chatting Tim. Here's the full article, I'll check in with Andrea and others on the parts highlighted below.

**From:** Daguillard, Robert <Daguillard.Robert@epa.gov>
**Sent:** Tuesday, March 25, 2025 1:22 PM
**To:** Wadlington, Christina <Wadlington.Christina@epa.gov>
**Cc:** Landis, Jeffrey <Landis.Jeffrey@epa.gov>; Powell, Shayla <Powell.Shayla@epa.gov>; Drinkard, Andrea <Drinkard.Andrea@epa.gov>
**Subject:** FW: Can I have this article?


## EPA knew it wrongfully canceled dozens of environmental grants, documents show

*According to an internal email, EPA officials knew they had no contractual right to cancel dozens of grants. They did it anyway.*
*Updated*
March 25, 2025 at 8:29 a.m.

By Amudalat Ajasa
Trump officials knew their legal justification for terminating dozens of Environmental Protection Agency grants was flawed, according to documents and internal emails reviewed by The Washington Post.

An agency lawyer warned officials they had cited contractual language that did not apply to many of the grants the EPA had ended in recent weeks, advising that terminations could be reversed if recipients challenged them administratively or in court.

Since President Donald Trump took office, the EPA has targeted billions of dollars in grants authorized by the Biden administration. This month, the agency announced the cancellation of an additional 400 grants, totaling $1.7 billion, many of which were meant to improve air and water quality and strengthen resilience to natural disasters.

Grant recipients received emails in late February stating that their grants had been terminated on the grounds that they no longer fit the agency's priorities, referring to a clause in their grants' general terms and conditions allowing for awards to be voided.

However, the clause in question applied only to grants issued between Aug, 13, 2020, and Sept. 30, 2024, and almost half of the terminated grants were finalized or updated after Sept. 30. In a Feb. 25 email obtained by the Senate Environment and Public Works Committee and shared with The Post, an assistant general counsel alerted officials that terminations issued by several regional offices had contained this "significant error."

The email also acknowledged that the terminations "may also be encompassed" by a Feb. 21 preliminary injunction issued by a federal judge blocking the Trump administration from enforcing executive orders targeting equity and environmental justice programs. That preliminary injunction was lifted by an appeals court on March 14.

In a follow-up email on March 3, the EPA attorney said that the office had learned the decision to cancel "the EJ grants" was "made with the knowledge" that the terms and conditions rationale did not apply to all of them, but that no retractions would be forthcoming. Appeals of these wrongful cancellations will "play out via the disputes process, or litigation, for those recipients that choose to pursue those avenues," the lawyer added.

In a letter to EPA Administrator Lee Zeldin on Monday, nine Democratic senators on the Environment Committee challenged the grant terminations, pointing out that the 2022 Inflation Reduction Act "directed EPA to distribute $3 billion to improve environmental protection in communities facing economic hardship."

The senators added that "Congress specifically articulated in the statute the activities for which the funds can be awarded," including climate risk, air pollution and toxin reduction, and addressing health risks from heat and wildfires.

"Any attempt to withhold these funds violates the Impoundment Control Act and Congress's constitutional Article I spending authority," the senators said.

In response to a request for comment, an EPA spokesperson said, "As the Trump Administration reins in wasteful spending of taxpayer dollars, EPA will continue terminating assistance agreements in line with those terms and conditions."

Julia Haggerty, an associate professor of geography at Montana State University, worked with local partners for almost a year to assemble a competitive application to create a program designed to provide technical assistance and resources to underserved communities.

The $10 million program, which launched in May, worked to address a range of issues in the region, including flooding and water contamination, lead pipes, and pollution from mining.

The EPA finalized an update to the program's agreement, which included new terms and conditions, on Dec. 27, according to documents reviewed by The Post.

Beginning in January, the program's funding oscillated between being frozen and unfrozen. The EPA terminated the grant on Feb. 21, saying the "award no longer effectuates the program goals or agency priorities," according to an email reviewed by The Post. The university has appealed the termination, citing breach of contract.

"It was just done so haphazardly and carelessly," Haggerty said. "As a public land grant university, we don't have the kind of resources to withstand this interruption in access to funding."

A former EPA official who worked on related issues during the first Trump administration said the contractual language was updated by the White House Office of Management and Budget to provide predictability to grantees.

"The updated terms and conditions require the government to be specific about its reasons for terminating grant agreements," said the official, who spoke on the condition of anonymity because of ongoing legal challenges with the agency. In this case, the official added, the EPA's reason was not listed in the grant agreement, "so the agency can't just terminate."

---

**From:** Wadlington, Christina <Wadlington.Christina@epa.gov>
**Sent:** Tuesday, March 25, 2025 1:18 PM
**To:** Landis, Jeffrey <Landis.Jeffrey@epa.gov>; Powell, Shayla <Powell.Shayla@epa.gov>; Daguillard, Robert <Daguillard.Robert@epa.gov>
**Cc:** Drinkard, Andrea <Drinkard.Andrea@epa.gov>
**Subject:** Can I have this article?

https://www.washingtonpost.com/climate-environment/2025/03/25/epa-environment-grants-wrongful-termination/