

# THE CHIEF FINANCIAL OFFICER
WASHINGTON, D.C. 20460

January 27, 2025

## CUI//SP-BUDG

**MEMORANDUM**

**SUBJECT:**   Inflation Reduction Act and Infrastructure Investment and Jobs Act Funding Action Pause

**FROM:**   Gregg Treml, Chief Financial Officer (Acting)

GREGG TREML
Digitally signed by GREGG TREML
Date: 2025.01.27 16:59:02 -05'00'

**TO:**   Deputy Assistant Administrators
Deputy Associate Administrators
Deputy Regional Administrators

This message is being provided based on instruction from OMB.

In accordance with the Executive Order *Unleashing American Energy,* unobligated funds (including unobligated commitments) appropriated by the Inflation Reduction Act of 2022 (P.L. 117-169) and the Infrastructure Investment and Jobs Act (P.L. 117-58) are paused. Pursuant to this pause, the Compass financial system will temporarily not allow obligations to be made in these lines of accounting. EPA is in discussions with the Office of Management and Budget on the continuation of payroll in IIJA and IRA.

Additionally, all disbursements for unliquidated obligations funded by any line of accounting including funds appropriated by the Inflation Reduction Act of 2022 (P.L. 117-169) and the Infrastructure Investment and Jobs Act (P.L. 117-58), are paused. Additional details on the pause in disbursements will be provided separately by the Office of the Controller.

This pause will allow for the review of processes, policies and programs as required by Section 7 of the Order.

All related actions, including new contract, grant, rebate and interagency actions, to include drawdowns, for IIJA and IRA are paused. Offices are not to put IIJA or IRA lines of accounting on any actions and all current actions are paused. Further, no IIJA or IRA funded travel is permissible at this time and all upcoming travel funded from either should be cancelled.

A process has been established at OMB for their review and approval of obligations and disbursements based on the Order. We will continue to update the community. We appreciate your work to ensure compliance with the Order.

cc: Lek Kadeli
    Meshell Jones-Peeler
    Paige Hanson
    Senior Resource Officials
    Senior Budget Officers
    Regional Comptrollers
    Funds Control Officers

# Controlled by U.S. Environmental Protection Agency

EPA_00051171

Message

**From:** Donahue, Sean [donahue.sean@epa.gov]
**Sent:** 2/12/2025 3:13:41 PM
**To:** Askew, Wendel [Askew.Wendel@epa.gov]; Talbert-Duarte, Angelia [talbert-duarte.angelia@epa.gov]; Holden, Allison [Holden.Allison@epa.gov]; Goerke, Ariadne [Goerke.Ariadne@epa.gov]
**CC:** Packard, Elise [Packard.Elise@epa.gov]
**Subject:** New Order on Funding
**Attachments:** 107 - Order re Mots for Permission (002) (002).pdf

All,

You may have already received this, but I wanted to make sure. Please see the attached most recent order from the district court judge in the funding pause case.

Sean Donahue
Principal Deputy General Counsel
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Washington, DC 20460
T: (202) 564-7153
E: Donahue.Sean@epa.gov

Message

| | |
|---|---|
| **From:** | Budget and Planning [Budget_and_Planning@epa.gov] |
| **Sent:** | 2/7/2025 11:03:44 PM |
| **To:** | Budget and Planning [Budget_and_Planning@epa.gov]; OCFO-SBO [OCFOSBO@epa.gov]; OCFO-SBO-STAFF [OCFOSBOSTAFF@epa.gov]; OCFO-Regional-Comptroller [OCFORegionalComptroller@epa.gov]; OCFO-Regional Budget Officers [OCFORegional_Budget_Officers@epa.gov]; OCFO-SROs [OCFO_SROs@epa.gov]; Regional Mission Support Division - Directors [Regional_Mission_Support_Division_Directors@epa.gov]; Regional Mission Support Division - Directors [Regional_Mission_Support_Division_Directors@epa.gov]; OCFO-FCOs [OCFO-FCOs@epa.gov] |
| **CC:** | Wise, Melissa [wise.melissa@epa.gov]; Legare, Pamela [Legare.Pamela@epa.gov]; Rogers, JoanB [Rogers.JoanB@epa.gov]; Coogan, Daniel [Coogan.Daniel@epa.gov]; Kalikhman, Yulia [kalikhman.yulia@epa.gov]; Gulamali, Adil [Gulamali.Adil@epa.gov]; Lavergne, Dany [lavergne.dany@epa.gov]; Miller, Renee [Miller.Renee@epa.gov]; Jennette, Vonda [Jennette.Vonda@epa.gov]; Luebbering, Gregory [luebbering.gregory@epa.gov]; Henry, Latonya [Henry.Latonya@epa.gov]; Talbert-Duarte, Angelia [talbert-duarte.angelia@epa.gov]; Goerke, Ariadne [Goerke.Ariadne@epa.gov]; Askew, Wendel [Askew.Wendel@epa.gov]; Holden, Allison [Holden.Allison@epa.gov]; Kadeli, Lek [Kadeli.Lek@epa.gov]; Jones-Peeler, Meshell [Jones-Peeler.Meshell@epa.gov]; Lane, Gary [Lane.Gary@epa.gov]; Robinson, Angel [robinson.angel@epa.gov]; Boyd, Wyatt [Boyd.Wyatt@epa.gov]; Katz, Brian [Katz.Brian@epa.gov]; Cardenas, Andrew [Cardenas.Andrew@epa.gov]; Li, Sylvana [li.sylvana@epa.gov]; Beg, Gul [Beg.Gul@epa.gov]; Cottrill, Edward [Cottrill.Edward@epa.gov] |
| **Subject:** | RE: Additional Information on IIJA and IRA - program review pause |

Pursuant to the review of financial assistance programs announced by the Acting Deputy Administrator on February 6, the following accounts are temporarily paused for new obligations or disbursements for assistance agreements, loans, rebates, interagency agreements, procurements, and no-cost actions pending a review for compliance with applicable administrative rules and policies.

Air Quality Sensors in Low Income and Disadvantaged Communities (OAR) (STAG)
Clean Heavy-Duty Vehicles (OAR) (STAG)
Clean Heavy-Duty Vehicles in Nonattainment Areas (OAR) (STAG)
Clean School Bus Program (STAG)
Competitive Grants (OAR) (STAG)
Diesel Emissions Reductions (OAR) (STAG)
Emissions from Wood Heaters (OAR/ORD) (STAG)
Environmental and Climate Justice Block Grants – Technical Assistance (OEJECR)
Environmental and Climate Justice Block Grants (OEJECR)
Environmental Product Declaration Assistance (OCSPP/ORD/OAR)
Fenceline Air Monitoring and Screening Air Monitoring (OAR/ORD) (STAG)
Funding for the Implementation of the American Innovation and Manufacturing Act (OAR)
Funding for Section 211 of the Clean Air Act – Advanced Biofuels (OAR)
GHG Air Pollution Implementation Grants (OAR) (STAG)
GHG and Zero Emission Standards for Mobile Sources (OAR) (STAG)
GHG Pollution Planning Grants (OAR) (STAG)
Grants to Reduce Air Pollution at Ports (OAR) (STAG)
Grants to Reduce Air Pollution at Ports in Nonattainment Areas (OAR) (STAG)
Greenhouse Gas Corporate Reporting (OAR) (STAG)
Greenhouse Gas Reduction Fund – General Assistance (OA) (STAG)
Greenhouse Gas Reduction Fund – Low Income and Disadvantaged Communities (OA) (STAG)
Greenhouse Gas Reduction Fund – Zero Emision Technologies (OA) (STAG)
Implementation / Accountability (OAR)
Implementation and Compliance (OECA)
Industry Outreach (OAR)
Low Embodied Carbon Labeling for Construction Materials for Transportation Methane Monitoring (OCSPP/OAR/ORD)
Multipollutant Monitoring Stations (OAR) (STAG)
State/Tribal/Local Government Outreach (OAR)
Technical Assistance for Low Income Communities (OAR)

**From:** Budget and Planning <Budget_and_Planning@epa.gov>
**Sent:** Friday, February 7, 2025 11:29 AM
**To:** Budget and Planning <Budget_and_Planning@epa.gov>; OCFO-SBO <OCFOSBO@epa.gov>; OCFO-SBO-STAFF <OCFOSBOSTAFF@epa.gov>; OCFO-Regional-Comptroller <OCFORegionalComptroller@epa.gov>; OCFO-Regional Budget Officers <OCFORegional_Budget_Officers@epa.gov>; OCFO-SROs <OCFO_SROs@epa.gov>; Regional Mission Support Division - Directors <Regional_Mission_Support_Division_Directors@epa.gov>; Regional Mission Support Division - Directors <Regional_Mission_Support_Division_Directors@epa.gov>; OCFO-FCOs <OCFO-FCOs@epa.gov>
**Cc:** Wise, Melissa <wise.melissa@epa.gov>; Legare, Pamela <Legare.Pamela@epa.gov>; Rogers, JoanB <Rogers.JoanB@epa.gov>; Coogan, Daniel <Coogan.Daniel@epa.gov>; Kalikhman, Yulia <kalikhman.yulia@epa.gov>; Gulamali, Adil <Gulamali.Adil@epa.gov>; Lavergne, Dany <lavergne.dany@epa.gov>; Miller, Renee <Miller.Renee@epa.gov>; Jennette, Vonda <Jennette.Vonda@epa.gov>; Luebbering, Gregory <luebbering.gregory@epa.gov>; OCFO-OB-ALL. <OCFO-OB-ALL_x@epa.gov>; Talbert-Duarte, Angelia <talbert-duarte.angelia@epa.gov>; Goerke, Ariadne <Goerke.Ariadne@epa.gov>; Askew, Wendel <Askew.Wendel@epa.gov>; Holden, Allison <Holden.Allison@epa.gov>
**Subject:** RE: Additional Information on IIJA and IRA

We are working expeditiously to carry out the attached and request your assistance where appropriate.

*(excerpt)*

> Notwithstanding this directive, any disbursements on open grant awards that were paused due to Office of Management and Budget Memorandum M-25-13 or any Executive Order underlying that Memorandum shall continue to be immediately released, as the Agency initiated on February 3, 2025.

**From:** Budget and Planning <Budget_and_Planning@epa.gov>
**Sent:** Wednesday, February 5, 2025 11:00 AM
**To:** Budget and Planning <Budget_and_Planning@epa.gov>; OCFO-SBO <OCFOSBO@epa.gov>; OCFO-SBO-STAFF <OCFOSBOSTAFF@epa.gov>; OCFO-Regional-Comptroller <OCFORegionalComptroller@epa.gov>; OCFO-Regional Budget Officers <OCFORegional_Budget_Officers@epa.gov>; OCFO-SROs <OCFO_SROs@epa.gov>; Regional Mission Support Division - Directors <Regional_Mission_Support_Division_Directors@epa.gov>; Regional Mission Support Division - Directors <Regional_Mission_Support_Division_Directors@epa.gov>; OCFO-FCOs <OCFO-FCOs@epa.gov>
**Cc:** Wise, Melissa <wise.melissa@epa.gov>; Legare, Pamela <Legare.Pamela@epa.gov>; Rogers, JoanB <Rogers.JoanB@epa.gov>; Coogan, Daniel <Coogan.Daniel@epa.gov>; Kalikhman, Yulia <kalikhman.yulia@epa.gov>; Gulamali, Adil <Gulamali.Adil@epa.gov>; Lavergne, Dany <lavergne.dany@epa.gov>; Miller, Renee <Miller.Renee@epa.gov>; Jennette, Vonda <Jennette.Vonda@epa.gov>; Luebbering, Gregory <luebbering.gregory@epa.gov>; OCFO-OB-ALL. <OCFO-OB-ALL_x@epa.gov>; Talbert-Duarte, Angelia <talbert-duarte.angelia@epa.gov>; Goerke, Ariadne <Goerke.Ariadne@epa.gov>; Askew, Wendel <Askew.Wendel@epa.gov>; Holden, Allison <Holden.Allison@epa.gov>
**Subject:** RE: Additional Information on IIJA and IRA

Clarifying the compound sentence in the original message.

Consistent with Court Order, obligations and disbursements to carry out all necessary work can proceed for:
- federal financial assistance;
- Superfund;
- and the accounts (originally) attached.

Note that thousands of accounts are involved and this is a manual process.

---

**From:** Budget and Planning <Budget_and_Planning@epa.gov>
**Sent:** Tuesday, February 4, 2025 1:46 PM
**To:** OCFO-SBO <OCFOSBO@epa.gov>; OCFO-SBO-STAFF <OCFOSBOSTAFF@epa.gov>; OCFO-Regional-Comptroller <OCFORegionalComptroller@epa.gov>; OCFO-Regional Budget Officers <OCFORegional_Budget_Officers@epa.gov>; OCFO-SROs <OCFO_SROs@epa.gov>; Regional Mission Support Division - Directors <Regional_Mission_Support_Division_Directors@epa.gov>; Regional Mission Support Division - Directors <Regional_Mission_Support_Division_Directors@epa.gov>; OCFO-FCOs <OCFO-FCOs@epa.gov>
**Cc:** Wise, Melissa <wise.melissa@epa.gov>; Legare, Pamela <Legare.Pamela@epa.gov>; Rogers, JoanB <Rogers.JoanB@epa.gov>; Coogan, Daniel <Coogan.Daniel@epa.gov>; Kalikhman, Yulia <kalikhman.yulia@epa.gov>; Gulamali, Adil <Gulamali.Adil@epa.gov>; Lavergne, Dany <lavergne.dany@epa.gov>; Miller, Renee <Miller.Renee@epa.gov>; Jennette, Vonda <Jennette.Vonda@epa.gov>; Luebbering, Gregory <luebbering.gregory@epa.gov>; OCFO-OB-ALL. <OCFO-OB-ALL_x@epa.gov>; Talbert-Duarte, Angelia <talbert-duarte.angelia@epa.gov>; Goerke, Ariadne <Goerke.Ariadne@epa.gov>; Askew, Wendel <Askew.Wendel@epa.gov>; Holden, Allison <Holden.Allison@epa.gov>
**Subject:** Additional Information on IIJA and IRA
**Importance:** High

This message provides additional detail to the attached message from the Acting Chief Financial Officer.

Consistent with Court Order, obligations and disbursements to carry out all necessary work can proceed for all federal financial assistance, including cooperative assistance agreements, all Superfund, and the accounts attached.

We will continue to keep the community updated as we implement Orders. Please note that effectuation in agency systems is occurring and requires sequencing.

*Please share this information within EPA as necessary to execute.*

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF NEW YORK, *et al.*,<br><br>      Plaintiffs,<br><br>      v.<br><br>DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES, *et al.*,<br><br>      Defendants. | Civil Action No. 1:25-cv-39 (JJM) |

## **DECLARATION**

I, Cameron Hamilton, hereby state as follows:

1. I am the Senior Official Performing the Duties of the Administrator, Department of Homeland Security (DHS), Federal Emergency Management Agency (FEMA). The Senior Official Performing the Duties of the FEMA Administrator is the DHS official responsible for being the principal advisor to the President and the Secretary for all matters relating to emergency management in the United States.

2. Since being sworn in on January 25, 2025, the Secretary of Homeland Security has issued a number of written and verbal directives regarding payments made by the Department of Homeland Security, all of which were designed to ensure that any payments made by the Department are consistent with law and do not promote fraud, waste, or abuse. One such directive is attached as Exhibit 1.

3. Consistent with those directives, the Department has been reviewing a variety of grant programs to ensure compliance with all grant conditions. Every grant issued by the

EPA_00051200

Department requires compliance with applicable federal laws. An example of such grant conditions is attached as Exhibit 2.

4. The current Department leadership believes that its grant programs are not being administered in a way that prevents fraud, waste, and abuse, that its grant programs are going to entities violating applicable federal laws, and that grants are possibly even funding illegal activity. Given the time sensitive nature of this request, I am discussing the Shelter and Services Program as an illustrative example.

### Shelter and Services Program

5. The Shelter and Service Programs is supposed to provide temporary shelter and other services to aliens released from custody. *See* Department of Homeland Security Appropriations Act, 2024, Pub. L. No. 118-47, Div. C (2024); Department of Homeland Security Appropriations Act, 2023, Pub. L. No. 117-328, Div. F (2022).

6. As of today, the Department has paused funding to the Shelter and Services Program based on significant concerns that the funding is going to entities engaged in or facilitating illegal activities.

7. For example, a substantial portion of Shelter and Services Program money goes to funding alien housing at the Roosevelt Hotel in New York City. According to media reports, the vicious Venezuelan gang Tren De Aragua has taken over the hotel and is using it as a recruiting center and base of operations to plan a variety of crimes.[1] According to these same reports, these crimes include gun and drug sales as well as sex trafficking, which can reasonably be presumed to be conducted in the hotel itself. One of the groups responsible

---

[1] https://nypost.com/2024/10/17/us-news/nyc-migrant-hotels-violent-gang-rep-is-all-over-tiktok-say-fed-up-residents-who-worry-its-only-gonna-get-worse/; NYPD says migrant children behind several violent crimes near Times Square - ABC7 New York.

EPA_00051201

for these activities refer to themselves as "diablos de la 42," which means the devils of 42nd St., a street near where the Roosevelt Hotel is located. Notably, the alien who murdered Laken Riley stayed at this hotel, which is funded by payments from the Department.[2]

8. I am aware of criminal investigations into many of these activities, but I have been informed that these details are law enforcement sensitive and should not be shared in a public declaration.

9. Despite all of these issues, absent an exception from this court and with confirmation this funding pause based on the terms of the award falls within the court's order, the Department would be required by the court to make payments to fund the housing of aliens in this hotel, and likely fund criminal activity.

10. In addition to the crimes mentioned above, I am concerned that entities receiving payment under this program may be guilty of encouraging or inducing an alien to come to, enter, or reside in the United States in violation of law, 8 U.S.C. § 1324(a)(1)(A)(iv), transporting or moving illegal aliens, *id.* § 1324(a)(1)(A)(ii), harboring, concealing, or shielding from detection illegal aliens, *id.* § 1324(a)(1)(A)(iii), or applicable conspiracy, aiding or abetting, or attempt liability respecting these statutes. On its face, the program funds sheltering and transportation for unauthorized aliens. And a previous Office of Inspector General report concluded that Department of Homeland Security grant recipients used funds from a similar program to provide service to clandestine aliens who never had an encounter with the Department.[3] *See* Exhibit 3.

---

[2] https://www.nationalreview.com/news/laken-riley-murder-suspect-received-taxpayer-funded-stay-at-roosevelt-hotel-flight-to-georgia/.

[3] https://www.foxnews.com/politics/dhs-oig-finds-millions-american-rescue-plan-funds-misused-ngos-given-gotaway-illegal-immigrants.

EPA_00051202

11. Based on the above-described concerns of illegal activity in connection with the performance of this award, FEMA paused funding for this award. FEMA is required to administer its grant awards so as to ensure that federal funding is expended and associated programs are implemented in full accordance with the U.S. Constitution, applicable federal statutes, and regulations. 2 C.F.R. § 200.300(a). The terms and conditions of the award allow the Department to suspend the grant or terminate the award for a failure to comply with the conditions of the award or applicable federal statutes. *See* 2 C.F.R. §§ 200.208; 200.340; and 200.339(a).

12. In addition, FEMA is in the process of requesting information from New York City to further investigate this matter to ensure that federal funds are not being used for illegal activities. The Department paused funding quickly in this matter to protect that funding from the potential for its misuse for the illegal activity described above.

13. FEMA will begin the process of providing notice to New York City regarding the funding pause and will provide the information and process required by regulation and the terms and conditions of the award. *See* 2 C.F.R. § 200.242.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on this 11th day of February 2025.

/s/ _____

Cameron Hamilton
Senior Official Performing the Duties of Administrator
Federal Emergency Management Agency

EPA_00051203

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

STATE OF NEW YORK et al.,

        Plaintiffs,

   v.

DONALD TRUMP, IN HIS OFFICIAL
CAPACITY AS PRESIDENT OF THE
UNITED STATES et al.,

        Defendants.

Civil Action No. 1:25-00039

## DECLARATION OF MELISSA BRUCE

I, Melissa Bruce, declare as follows pursuant to 28 U.S.C. § 1746:

1.     I am the Deputy Assistant Secretary for Administration and Director of the Program Support Center (PSC). I am also serving as the Acting Director of the Financial Management Portfolio which encompasses accounting services, internal controls, financial reporting, cost allocation services, and payment management services. The Payment Management System (PMS) team falls within the Payment Management Services Division under my purview. I make this declaration based on personal knowledge and information provided to me by my staff in the course of my official duties.

2.     The PMS is operated by the Department of Health and Human Services (HHS), but it serves as the funding disbursement platform for numerous agencies' grants.

3.     The way PMS currently operates, a grantee can log into the system and request a withdrawal on the awarded grant. Under the current PMS system, grantees can obtain those withdrawals without submitting invoices, details on the expenses being reimbursed, or other

1

documentation to support the payment. It is not the role or responsibility of the PMS team to

govern grantees. That is done by the awarding agencies and/or the Office of Inspector General.

4.      For decades, the PMS team has had a process in place pursuant to which the PMS

"flags" unusual payment requests for further review. A payment request may be flagged because,

for example, the amount of the request is unusually large, because the grant pursuant to which

the payment is requested has expired, or because the grantee has not submitted required financial

reporting. When a payment is flagged, the payment is sent to the awarding agency for review and

either approval or rejection. A payment may be rejected by the awarding agency because, for

example, the awarding agency has confirmed that the grant has expired or that the grantee has

not complied with the grant's reporting requirements.

5.      Under normal circumstances, there are approximately 400 payments flagged for

further review at any given time. Payments that are not moved to the manual review queue by the

system are automatically paid without intervention from the PMS team.

6.      After the challenged OMB Memorandum was issued on January 27, 2025, a large

number of entities attempted to draw down funds in PMS, with many grant recipients requesting

unusually large amounts, sometimes up to their full grant balances. As of January 31, 2025, over

7,000 payment requests were flagged for further review, pursuant to the PMS team's

longstanding process described above.

7.      Following its process for reviewing flagged payments, the PMS team has been

coordinating with the awarding agencies for review and approval of these flagged payment

requests. The PMS team has successfully reduced the number of flagged payment requests to its

usual levels. Specifically, as of today, there were fewer than 300 requests flagged and sitting in

the queue for manual review pursuant to the team's longstanding process.

EPA_00051205

8.     The total amount of funds currently in queue for review exceeds $300,000,000. If the PMS team is not permitted to continue its process of reviewing these flagged payments as a result of this Court's order of February 10, 2025, and is instead required to immediately release payment pursuant to every payment request, some of this $300,000,000 could be paid out on grants that have expired, could be paid out in amounts that exceed permissible grant payment amounts, or could be paid out despite the grantee's non-compliance with reporting obligations.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on February 11, 2025

_____
Melissa Bruce
Deputy Assistant Secretary for Administration
Director, Program Support Center
U.S. Department of Health and Human Services

EPA_00051206

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOSH SHAPIRO, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE COMMONWEALTH OF PENNSYLVANIA; PENNSYLVANIA DEPARTMENT OF ENVIRONMENTAL PROTECTION; PENNSYLVANIA DEPARTMENT OF CONSERVATION AND NATURAL RESOURCES; PENNSYLVANIA DEPARTMENT OF TRANSPORTATION; AND PENNSYLVANIA DEPARTMENT OF COMMUNITY AND ECONOMIC DEVELOPMENT,<br><br>          Plaintiffs,<br><br>      v.<br><br>U.S. DEPARTMENT OF THE INTERIOR; DOUG BURGUM, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF THE INTERIOR; U.S. ENVIRONMENTAL PROTECTION AGENCY; LEE ZELDIN, IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE U.S. ENVIRONMENTAL PROTECTION AGENCY; U.S. DEPARTMENT OF ENERGY; CHRIS WRIGHT, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF ENERGY; U.S. DEPARTMENT OF TRANSPORTATION; SEAN DUFFY, IN HIS OFFICIAL CAPACITY AS SECRETARY OF U.S. DEPARTMENT OF TRANSPORTATION; OFFICE OF MANAGEMENT AND BUDGET; AND RUSSELL VOUGHT, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF OFFICE OF MANAGEMENT AND BUDGET,<br><br>          Defendants. | No. 25-cv-763 |

EPA_00051281

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.     Congress has authorized and appropriated billions of dollars for programs that are currently being carried out across the Commonwealth of Pennsylvania. The Commonwealth's executive branch relies on these funds to provide essential services to people across Pennsylvania.

2.     For example, one current federal grant program provides Pennsylvania's Department of Environmental Protection (PaDEP) more than $3 billion over 15 years to meet the multi-billion dollar need to repair abandoned mine lands (meaning former sites of ore and mineral mining) throughout Pennsylvania and the waterways impacted by those former mine sites. Abandoned mine lands can cause land to cave in, which can be—and in recent months has been—fatal. Proactively repairing abandoned mine lands and responding to emergencies they cause is a critical public safety service. This grant funding would allow for reclamation of around 24,000 acres of abandoned mine land, for construction or maintenance of 16 water treatment systems that deal with toxic runoff from abandoned mines, and for responding to about 60 emergency events per year.

3.     PaDEP also currently has about $76 million of federal funding available to plug abandoned oil and gas wells, which are both a significant source of

2

EPA_00051282

greenhouse gas emissions and possible sources of gas migrations that can cause explosions. That funding will allow the Commonwealth to plug over 500 abandoned wells.

4.      Two more grant programs allocate about $126 million each to Pennsylvania for programs that will allow up to 28,000 low-income households to perform work on their homes that will lower their utility bills.

5.      The Pennsylvania agencies that run these programs have entered into agreements with their federal partners that obligate those funds to Pennsylvania and define the terms of the money's use.

6.      Nevertheless, federal agencies are now unilaterally and arbitrarily suspending or restricting Commonwealth agencies' access to the congressionally appropriated grant funds that that have been committed to them.

7.      Since around January 27, 2025, federal agencies have restricted Pennsylvania agencies' ability to access funding for grant programs that, in total, obligated over $3.1 billion to Pennsylvania for fiscal years 2022 to 2026. In addition to funding for the programs described above (and many more), these include around $800 million in funding authorized and appropriated for Pennsylvania to provide grants for investment in clean water infrastructure, nearly $400 for a program that would allow manufacturing and industrial companies throughout Pennsylvania to

3

EPA_00051283

mitigate their greenhouse gas emissions, and tens of millions for a program that supports resilient and reliable electric service in rural communities.

8. Pennsylvania agencies have over $2.5 billion remaining under grant programs that are now suspended or for which reimbursement of authorized expenses now requires some federal agency review that is not contained within the terms of Congress' statutes or any funding agreements, and which has not been described to Commonwealth agencies. Over $1 billion of the $2.5 billion of available money has already been obligated, including to subrecipients performing work under the various grants now at risk.

9. In addition, about $2.69 billion has been appropriated to Pennsylvania for fiscal years 2027 to 2037 for the currently suspended abandoned mine program. In all, then, federal agencies' recent funding suspensions have jeopardized at least $5.5 billion that has been committed to Pennsylvania.

10. Governor Josh Shapiro and members of Pennsylvania's agencies have been working with federal partners and legislators to try to fully restore access to these funds. Despite that work, and despite two temporary restraining orders requiring federal agencies to restore access to suspended funds, federal agencies continue to deny Pennsylvania agencies funding that they are entitled to receive.

11. So, Governor Shapiro and several Pennsylvania executive agencies now seek relief from the federal agencies' flagrantly lawless actions.

4

EPA_00051284

12.     Indeed, in executing the ongoing funding suspensions, federal agencies have asserted the power to suspend and restrict access to appropriated money without regard for whether they have any legal authority to do so. Rather, federal agencies have restricted Pennsylvania's ability to use appropriated and obligated funds merely when agencies believe that President Trump dislikes the purpose of Congress's appropriation.

13.     Of course, no statute, regulation, or anything else gives any federal agency power to unilaterally refuse to spend congressionally appropriated funds that have already been committed to Pennsylvania merely because the agency (or even the President) has policy disagreements with the appropriations Congress has made.

14.     Here, the federal agency defendants have not only exceeded any legitimate authority, but they have also suspended access to billions in funding without supplying a plausible explanation as to why certain funds are being suspended, giving any consideration to the harm their action would cause, or considering how Commonwealth agencies have relied on receiving that committed funding.

15.     Unilaterally suspending funds as federal agencies have done also violates the U.S. Constitution. Nothing in the Constitution empowers agencies—nor the President—to arrogate to themselves the power to suspend states' access to

5

EPA_00051285

money that Congress appropriated or to impose new conditions on money already appropriated and obligated. In fact, the Constitution specifically requires otherwise.

16.　　Governor Shapiro and the Commonwealth agencies bring this action to restore law and order by preventing the federal agency defendants from violating statutes under which billions in federal funds have been authorized, appropriated, and obligated to Pennsylvania agencies. Clear and unequivocal judicial orders are necessary to remedy federal agencies' unlawful conduct.

## JURISDICTION AND VENUE

17.　　This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Jurisdiction is also proper under the judicial review provisions of the Administrative Procedure Act. *See* 5 U.S.C. § 702.

18.　　Venue is proper in this district under 28 U.S.C. § 1391(b)(2), (e)(1). Defendants are United States agencies or officers sued in their official capacities. A substantial part of the events giving rise to this Complaint occurred and continue to occur within this district.

EPA_00051286

# PARTIES

## A.    Plaintiffs

19.    Josh Shapiro is the Governor of Pennsylvania. He brings this case in his official capacity.

20.    The Pennsylvania Constitution vests "[t]he supreme executive power" in the Governor. Pa. Const. art. IV, § 2.

21.    The Governor oversees all executive agencies in Pennsylvania.

22.    Pennsylvania Department of Environmental Proteciton (PaDEP) is an executive agency within the Commonwealth of Pennsylvania. 71 P.S. § 510-1.

23.    The Pennsylvania Department of Conservation and Natural Resources (PaDCNR) is an executive agency within the Commonwealth of Pennsylvania. 71 P.S. § 1340.301.

24.    The Pennsylvania Department of Community and Economic Development (PaDCED) is an executive agency within the Commonwealth of Pennsylvania. 71 P.S. § 1709.301.

25.    The Pennsylvania Department of Transportation (PennDOT) is an executive agency within the Commonwealth of Pennsylvania. 71 P.S. § 511.

## B.    Defendants

26.    Defendant U.S. Environmental Protection Agency (EPA) is an independent agency within the executive branch of the United States government.

7

EPA_00051287

27.   Defendant Lee Zeldin is the Administrator of the EPA, and that agency's highest ranking official. He is sued in his official capacity.

28.   Defendant U.S. Department of the Interior (DOI) is a cabinet agency within the executive branch of the United States government. 43 U.S.C. § 1451.

29.   Defendant Doug Burgum is the Secretary of DOI, and that agency's highest ranking official. 43 U.S.C. § 1451. He is sued in his official capacity.

30.   Defendant U.S. Department of Energy (DOE) is a cabinet agency within the executive branch of the United States government. 42 U.S.C. § 7131.

31.   Defendant Chris Wright Kolb is the Secretary of DOE, and that agency's highest ranking official. He is sued in his official capacity. 42 U.S.C. § 7131.

32.   Defendant U.S. Department of Transportation (U.S. DOT) is a cabinet agency within the executive branch of the United States government. 49 U.S.C. § 102.

33.   Defendant Sean Duffy is the Secretary of U.S. DOT, and that agency's highest ranking official. He is sued in his official capacity. 49 U.S.C. § 102.

34.   Defendant the Office of Management and Budget (OMB) is office within the Executive Office of the President. OMB is responsible for oversight of federal agencies' performance and the administration of the federal budget. 31 U.S.C. § 501.

8

35.     Defendant Russell Vought is the Director of OMB, and that agency's highest ranking official. He is sued in his official capacity.

## FACTS

36.     Since taking office, President Trump and his Administration have issued a slew of directives that federal agencies immediately pause the disbursement of money that Congress has appropriated, and which in many cases has subsequently been obligated to Commonwealth agencies.

37.     The various directives have been vague, beyond any statutory or constitutional authority, and the cause of immediate harm.

38.     The agencies implementing these directives have done so arbitrarily and without authority.

### A.     President Trump's Executive Orders

39.     The day he was inaugurated, President Trump signed several executive orders (EOs).

40.     *Unleashing American Energy* was among the day-one EOs.

41.     In that order, the President directed that "All agencies shall immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022 (Public Law 117-169) or the Infrastructure Investment and Jobs Act (Public Law 117-58), including but not limited to funds for electric vehicle charging stations made available through the National Electric Vehicle Infrastructure Formula

9

EPA_00051289

Program and the Charging and Fueling Infrastructure Discretionary Grant Program." EO 14154, 90 Fed. Reg. 8353 (Jan. 20, 2025).

42.     The Inflation Reduction Act (IRA), which was passed by Congress and signed by the President in 2022, appropriated $891 billion in spending over the following decade.

43.     The Infrastructure Investment and Jobs Act (IIJA), which was enacted in 2021, appropriated $1.2 trillion.

44.     Since each statute was passed, federal agencies have disbursed billions of dollars to states, including Pennsylvania. Pennsylvania agencies have executed funding or grant agreements that govern the terms under which the state agencies are receiving and may use the federally appropriated funds.

45.     Ordering that all funding appropriated through these two statutes be paused caused immediate harm to Commonwealth agencies, as well as their subrecipients.

46.     Specifically, Commonwealth agencies cannot draw from federal accounts, which means that agencies are stuck incurring debts and obligations in ongoing projects that cannot be reimbursed. While agencies have some reserves and discretionary dollars to cover small unexpected debts, the scope of the federal freeze will far exceed those reserves.

EPA_00051290

47.     With respect to subrecipients of IRA and IIJA grants, Commonwealth agencies find themselves in an untenable position. Grant subrecipients are performing in accordance with the existing terms of their agreements with the state, which were executed in accordance with federal law. Yet, federal agencies are threatening not to reimburse Commonwealth agencies if the federal agency does not support some activity of the subrecipient. The Commonwealth thus either violates its obligations to subrecipients by withholding money, or it risks being denied reimbursement later by the federal government.

48.     The day after the *Unleashing American Energy* EO was signed, OMB's Acting Director published a memo (called OMB Memorandum M-25-11) asserting that the funding pause ordered under that EO "only applies to funds supporting programs, projects, or activities that may be implicated by the policy established in Section 2 of the [executive] order."[1]

49.     Section 2 of that EO vaguely announced several broad policy ambitions of the new presidential administration. Relevant here, those include: (1) encouraging energy exploration on federal land and water; (2) establishing the United States as a leading producer of non-fuel minerals; (3) ensuring an abundant

---

[1] Available at: https://www.whitehouse.gov/briefings-statements/2025/01/omb-memo-m-25-11/.

11

EPA_00051291

energy supply; (4) eliminating "the electric vehicle mandate"; and (5) promoting consumer choice generally and specifically with respect to appliances.

50.     Other EOs similarly sought to withhold, or condition, disbursement of federal money appropriated by Congress. An EO called *Ending Radical and Wasteful Government DEI Programs and Preferencing* directed that each federal agency head shall, among other things, terminate "all 'equity action plans,' 'equity' actions, initiatives, or programs, 'equity-related' grants or contracts." EO 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025).

51.     In an EO called *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, President Trump directed that every contract or grant award include a term requiring the recipient to certify that they do not operate any programs that promote diversity, equity, and inclusion. EO 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025).

52.     An EO called *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* required that "Federal funds shall not be used to promote gender ideology. Each agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." EO 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025).

12

### B. OMB Directives and Agency Funding Suspensions

53. Following release of these EOs, Commonwealth agencies started receiving communication from federal agencies about their plans to implement the EOs.

54. Late on January 27, 2025, Commonwealth agencies learned that the OMB Acting Director had sent a directive (called OMB Memorandum M-25-13) to the head of every federal executive department and agency regarding a "Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs."

55. The OMB directive stated that "Career and political appointees in the Executive Branch have a duty to align Federal spending and action with the will of the American people as expressed through Presidential priorities."

56. It continued that "Financial assistance should be dedicated to advancing Administration priorities, focusing taxpayer dollars to advance a stronger and safer America, eliminating the financial burden of inflation for citizens, unleashing American energy and manufacturing, ending 'wokeness' and the weaponization of government, promoting efficiency in government, and Making America Healthy Again." The OMB directive did not define what "stronger and safer America," "wokeness," "weaponization," "efficiency," or "Making America Health Again" mean.

EPA_00051293

57.    Conversely, the directive claimed, federal resources should not be used "to advance Marxist equity, transgenderism, and green new deal social engineering policies." The OMB directive did not define what any of these terms mean.

58.    The Acting Director directed that all federal agencies review federal financial assistance programs to ensure that they are consistent with presidential policies. In the interim, all agencies were instructed that they "must temporarily pause all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders, including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal."

59.    The OMB directive did not cite a legal basis to pause *any* obligation or disbursement of federal funds, let alone a basis to pause *all* of them.

60.    The pause was to be effective on January 28, 2025, at 5:00 PM.

61.    That next day, OMB issued a question-and-answer document, an inadequate attempt to clarify its January 27 directive.

62.    That Q&A document stated that the pause is "limited to programs, projects, and activities implicated by the President's Executive Orders, such as ending DEI, the green new deal, and funding nongovernmental organizations that undermine the national interest."

14

EPA_00051294

63.     At the same time OMB issued its directive and subsequent Q&A document, federal agencies started communicating that disbursement of certain federal funds would be paused.

64.     On January 27, 2025, Commonwealth agencies received a memo from DOE stating, "DOE is moving aggressively to implement" President Trump's *Ending Radical and Wasteful Government DEI Programs and Preferencing* EO by directing the suspension of DEI activities, community benefits plans, and Justice40 Requirements authorization under "any loans, loan guarantees, grants, cost sharing agreements, contracts, contract awards, or any other source." DOE's memo did not identify what programs, activities, contracts, or loans would be terminated. Nor did it identify any legal authority.

65.     On January 28, 2025, PaDEP received an email from EPA_Grants_Info@epa.gov stating that, "EPA is working diligently to implement President Trump's *Unleashing American Energy* Executive Order issued on January 20 in coordination with the Office of Management and Budget. The agency has paused all funding actions related to the Inflation Reduction Act and the Infrastructure Investment and Jobs Act at this time. EPA is continuing to work with OMB as they review processes, policies, and programs, as required by the Executive Order." The email did not identify what funding related actions would be paused. Nor did it identify any legal authority.

15

66.   PENNVEST, Pennsylvania's Infrastructure Investment Authority, received a memo from the EPA dated January 27, 2025, that stated "unobligated funds (including unobligated commitments) appropriated by the Inflation Reduction Act of 2022 (P.L. 117-169) and the Infrastructure Investment and Jobs Act (P.L. 117-58) are paused." The memo also stated that "all disbursements for unliquidated obligations funded by any line of accounting including funds appropriated by the Inflation Reduction Act of 2022 (P.L. 117-169) and the Infrastructure Investment and Jobs Act (P.L. 117-58), are paused." The memo did not identify what specific funds would be paused. Nor did it identify any legal authority.

67.   On January 29, 2025, the U.S. Department of Health and Human Services (HHS) sent a letter to recipients of grant awards from the Center for Disease Control and Prevention stating that grant recipients must terminate all activity that promotes "'diversity, equity, and inclusion' (DEI) at every level and activity, regardless of your location or the citizenship of employees or contractors, that are supported with funds from this award. Any vestige, remnant, or re-named piece of any DEI programs funded by the U.S. government under this award are immediately, completely, and permanently terminated." HHS's letter did not identify what programs, activities, contracts, or loans would be terminated. Nor did it identify any legal authority.

16

EPA_00051296

68.     On January 31, 2025, the Pennsylvania Department of Health received an email from the Health Resources & Services Administration, an agency within HHS, stating that "Effective immediately, HRSA grant funds may not be used for activities that do not align with Executive Orders (E.O.) entitled Ending Radical and Wasteful Government DEI Programs and Preferencing, Initial Rescissions of Harmful Executive Orders and Action, Protecting Children from Chemical and Surgical Mutilation, and Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government (Defending Women). Any vestige, remnant, or re-named piece of any programs in conflict with these E.O.s are terminated in whole or in part." The email did not identify what programs, activities, contracts, or loans would be terminated. Nor did it identify any legal authority.

**C.     Litigation Over Federal Agencies' Funding Suspension**

69.     Agencies' freeze of federal funds were immediately the subject of two lawsuits.

70.     In the first of those, an action that non-profit organizations filed against OMB, the District Court for the District of Columbia entered the following order shortly before the OMB memo's January 28 at 5:00 PM deadline:

> [I]t is hereby **ORDERED** that an **ADMINISTRATIVE STAY** is entered in this case until **5:00 p.m. at February 3, 2025**. During the pendency of the stay, Defendants shall refrain from implementing OMB Memorandum M-25-13 with respect to the disbursement of Federal funds under all open awards.

17

EPA_00051297

See Order, *Nat'l Council of Nonprofits v. OMB*, No. 25-239 (D.D.C. Jan. 28, 2025) (ECF No. 13).

71. The second of those, filed in the District of Rhode Island by 22 states and the District of Columbia, sought a temporary restraining order of the pause on disbursement of federal funds. *See generally New York v. Trump*, No. 25-39 (D.R.I.).

72. A few hours before a hearing on the motion for a temporary restraining order was set to begin, OMB released a new memo that purported to rescind Memorandum M-25-13.

73. But the Trump Administration quickly clarified that it rescinded only the memorandum and not the actual directive to pause federal funding. After the recission memo was released, President Trump's Press Secretary tweeted that the recession memo was "NOT a recission of the federal funding freeze." She added that "The President's EO's on federal funding remain in full force and effect, and will be rigorously implemented."[2]

74. The Press Secretary made clear that the rescission of the OMB directive was a clumsy attempt to circumvent federal district court orders. Her tweet stated the recission memo was meant to "end any confusion created by the [District of Columbia] court's injunction." Further, the Trump Administration later argued in Rhode Island district court that the challenge to federal policy was moot after the

---

[2] Available at: https://x.com/PressSec/status/1884672871944901034.

EPA_00051298

rescission because enjoining the ***memorandum*** was not the same as enjoining the ***policy*** set forth in the memorandum.

75.     On January 31, the Rhode Island district court granted the States' request for a temporary restraining order. That court noted that the Defendants identified no authority that allows them to unilaterally suspend the payment of federal funds, and that the Court was not aware of any. *See* Order at 5, *New York v. Trump*, No. 25-39 (D.R.I. Jan. 31, 2025) (ECF No. 50). Further, the Court concluded, imposing conditions on appropriated funds that are beyond what Congress has authorized is contrary to law. *Id.*

76.     After concluding that withholding money from States inflicts irreparable harm, the Court entered a temporary restraining order stating, "Defendants shall not pause, freeze, impede, block, cancel, or terminate Defendants' compliance with awards and obligations to provide federal financial assistance to the States, and Defendants shall not impede the States' access to such awards and obligations, except on the basis of the applicable authorizing statutes, regulations, and terms." *Id.*at 11.

77.     On February 3, 2025, Commonwealth agencies started receiving a notice of the temporary restraining order from federal agencies. That notice was drafted by the U.S. Department of Justice for federal agencies.

EPA_00051299

78.    The notice stated that "Federal agencies cannot pause, freeze, impede, block, cancel, or terminate any awards or obligations on the basis of the OMB Memo, or on the basis of the President's recently issued Executive Orders." The notice added that the prohibition "applies to all awards or obligations—not just those involving the Plaintiff States in the above-referenced case—and also applies to future assistance (not just current or existing awards or obligations)."

79.    Yet, the notice also stated that "Agencies may exercise their own authority to pause awards or obligations, provided agencies do so purely based on their own discretion—not as a result of the OMB Memo or the President's Executive Orders—and provided the pause complies with all notice and procedural requirements in the award, agreement, or other instrument relating to such a pause."

80.    Also on February 3, 2025, the District Court for the District of Columbia granted a temporary restraining order in the non-profits' action. *See* Memorandum Opinion & Order, *NCN v. OMB*, No. 25-239 (D.D.C. Feb. 3, 2025) (ECF No. 30).

81.    That court concluded the executive branch's immediate suspension of money that Congress had appropriated was likely arbitrary and capricious and unconstitutional. *Id.* at 23-26.

82.    The order entered in *NCN* enjoined Defendants "from implementing, giving effect to, or reinstating under a different name the directives in OMB

20

Memorandum M-25-13 with respect to the disbursement of Federal funds under all open awards." *Id.* at 29.

83.     On February 7, 2025, Plaintiffs in *New York v. Trump* filed an emergency motion to enforce the temporary restraining order, supplying the court with evidence that defendants were not fully compliant with the clear terms of the restraining order. Motion, *New York v. Trump*, No. 25-39 (D.R.I. Feb. 7, 2025) (ECF No. 66). That motion was granted, with the court reiterating that defendants must immediately restore the states' access to funds frozen or paused based on the OMB directive, President Trump's EOs, or guidance and agency action implementing either. Order, *New York v. Trump*, No. 25-39 (D.R.I. Feb. 7, 2025).

84.     On February 11, 2025, the United States Court of Appeals for the First Circuit denied a motion from defendants in *New York v. Trump* to enter an administrative stay and a stay pending appeal while defendants appealed the temporary restraining order and the order to enforce it. Order, *New York v. Trump*, No. 25-1138 (1st Cir. Feb. 11, 2025).

### D.     Harm to Pennsylvania

85.     Pennsylvania's agencies receive billions in federal funding every year. For the 2023-24 state fiscal year, Pennsylvania agencies received about $46 billion, which was roughly 40% of the total revenue needed to operate Pennsylvania's programs that year. For the 2024-25 state fiscal year, Pennsylvania agencies expect

21

EPA_00051301

to receive about $49 billion, which likewise will be about 40% of the total revenue needed to operate Pennsylvania's programs for the year.

86. Much of this money comes from grants awarded to Pennsylvania.

87. Congress authorizes, and appropriates money for, federal grants through its powers under the Appropriations and Spending Clauses of the U.S. Constitution.

88. Congress can authorize, and appropriate funds for, different types of grants. As just some examples, Congress may create grants of a defined amount that every state is entitled to receive. Congress may also create "formula grants" through which Congress legislatively determines the formula it wants an agency to use to allocate appropriated funds among states. Congress also can create competitive grants in which an agency is afforded more discretion to identify grant recipients consistent with the factors Congress has identified.

89. For most federal grants, when a Commonwealth agency is to receive federal funds, the Commonwealth agency grantee enters a funding agreement with the federal agency grantor that commits the money to the Commonwealth agency and defines the terms and conditions for receipt and use of the funds. The grantee then begins performing, either by directly conducting work consistent with the agreement or by entering into subrecipient agreements with third parties who will perform consistent with the agreement.

22

EPA_00051302

90.     Pennsylvania agency grantees typically access federal funding by incurring expenses authorized under the grant agreement and then seeking reimbursement from the federal agency grantor.

91.     Pennsylvania agencies make frequent—typically weekly but sometimes daily—drawdowns from federal funds that have been awarded to them.

92.     Shortly after OMB issued its January 27 memo, and even before that memo's January 28, 2025, 5:00 PM deadline, Pennsylvania agencies were frozen out from nearly every platform used to drawn down committed federal funds.

93.     Suspension of access was not limited to platforms for seeking reimbursement for expenses under a grant award, but also included platforms for accessing funding for some of the most essential programs, such as Medicaid and Head Start.

94.     Once OMB released its January 28 Q&A document, certain accounts that the Commonwealth accesses to receive federal funds obligated to it slowly reopened to Pennsylvania agencies. Many, however, including accounts for more than a dozen grant programs authorized under the IIJA or IRA, remained frozen.

95.     A few more accounts that Commonwealth agencies access to seek reimbursement for authorized expenses became available after temporary restraining order were entered in the District of Rhode Island and the District of the District of Columbia.

23

EPA_00051303

96.    But even after those orders were entered, access to the reimbursement platform for other grant accounts remained suspended.

97.    Still more accounts included a note on the reimbursement platform that any requests for reimbursement of authorized expenses were subject to further agency review. This appears to be a funding freeze by a different name. Despite the appearance of those notes, in no case has a federal agency communicated with a Commonwealth agency to report that reimbursements requests for certain grant programs will be subject to further agency review, what that further review entails, or why certain programs now require further review before reimbursements are paid.

98.    After January 27, 2025, congressionally appropriated funds that have been obligated to Pennsylvania agencies, totaling at least $3.36 billion, were frozen or marked as subject to undescribed further agency review.

99.    As of February 13, 2025, by which point the federal agency defendants' funding suspensions were already subject to two temporary restraining orders, Commonwealth agencies still had funding over $1.2 billion in grant funding suspended, and more than $900 million in granting funding that is now marked as requiring further (but unarticulated) federal agency review before reimbursement requests can be approved.

100.   Much of the affected grant funding was appropriated under either the IIJA or IRA.

EPA_00051304

101.   Commonwealth agencies have entered funding agreements with federal agencies that govern the term and conditions of the Commonwealth agency's receipt and use of federal grant funds.

102.   Further, Commonwealth agencies have spent months preparing to apply for and implement each grant award. In many cases, the Commonwealth agency has executed an agreement for a subaward. For example, of the $156 million Solar for All grant, an agreement is in place with the Philadelphia Green Capital Corporation to subaward about $70 million.

103.   Many of these grant programs have deadlines by which Commonwealth agencies must use their grant award.

104.   As one example of a now suspended account, the IIJA appropriated $11.2 billion to the Abandoned Mine Reclamation Fund. *See* 30 U.S.C. § 1231a(a). By statute, that money "shall be used to provide, as expeditiously as practicable, to States and Indian Tribes described in paragraph (2) annual grants for abandoned mine land and water reclamation projects." *Id.* § 1231a(b)(1).

105.   The IIJA directed that the Secretary of the Interior "shall allocate and distribute amounts made available for grants under subsection (b)(1) to States and Indian Tribes on an equal annual basis over a 15-year period beginning on November 15, 2021, based on the number of tons of coal historically produced in the States or from the applicable Indian land before August 3, 1977." *Id.* § 1321a(d)(1).

EPA_00051305

106.   Consistent with what the IIJA requires, Pennsylvania, through PaDEP, receives an annual grant of roughly $245 million from DOI and will do so until 2037.

107.   This money funds work needed to reclaim abandoned mine land, which Pennsylvania has more of than any other state in the country. When abandoned mine land is left unaddressed it can, among other things, cave in, causing injury and even death and ruining property, including homes, that may be near an abandoned mine. This money also funds work to address acid mind drainage, which occurs when heavy metal leach from mines into waterways.

108.   PaDEP's access to these annual grant awards was suspended after January 27, 2025.

109.   DOI has not identified, and does not possess, any authority to suspend access to these appropriated and obligated funds. DOI did not state that it was suspending funds under any statutory authority or other legal authority.

110.   As another example, the IRA appropriated $4.75 billion for the Administrator of the EPA to award competitive grants to state entities to implement plans to reduce greenhouse gas air pollution. 42 U.S.C. § 7437(a)(2), (c).

111.   The IRA also appropriated $250 million to the EPA to fund the costs incurred to develop the implementation plan. *Id.* § 7437(a)(1), (b).

26

112.   PaDEP received $3 million as a planning grant and, in July 2024, was awarded a $396 million implementation grant for its plan to create a statewide industrial decarbonization program.

113.   PaDEP has entered funding agreements with the EPA that govern these grant awards.

114.   After January 27, 2025, PaDEP's access to both the $3 million planning grant and the $396 million implementation grant was suspended.

115.   EPA has not identified, and does not possess, any authority to suspend access to these appropriated and obligated funds. EPA did not state that it was suspending funds under any statutory authority or other legal authority.

116.   As another example, the IIJA created a program for plugging, remediating, and restoring orphaned well sites around the country. *See* 42 U.S.C. § 15907. Orphaned wells are unproductive oil and gas wells that are a significant source of toxic emissions, including methane emissions.

117.   Congress appropriated $4.675 billion to DOI to allocate for well plugging programs created under the IIJA. *Id.* § 15907(h)(1).

118.   That included $2 billion to be provided as grants consistent with a formula created under the IIJA. *Id.* § 15907(h)(1)(C). That formula requires that the Secretary of Interior make grant awards based on a formula that considers oil and

EPA_00051307

gas industry job losses and the number of documented orphaned wells in a state. *Id.* § 15907(c)(4)(A)(iii).

119. PaDEP was awarded over $260 million under this program. DOI already has authorized PaDEP to use more than $100 million of that funding, of which about $76 million remains available for PaDEP to obligate in support of its well plugging programs.

120. After January 27, 2025, PaDEP's ability to submit reimbursements for authorized uses of this available grant funding became subject to DOI's undefined further review. DOI has not indicated what it will be reviewing for or how quickly it will review and approve reimbursement of PaDEP's lawful costs, if DOI will do so at all.

121. DOI has not identified, and does not possess, any authority to unilaterally restrict, or impose new conditions on, PaDEP's ability to be reimbursed for authorized expenses incurred against these appropriated and obligated funds. DOI has not stated it is imposing new conditions on PaDEP's use of money for this grant award under any statutory authority.

122. By conditioning, and possibly freezing access to appropriated and obligated funding, DOI has jeopardized work that is necessary to, for example, eliminate toxic emissions that result from unplugged and unproductive oil and gas

EPA_00051308

well and to curtail stray gas from migrating into private homes and water wells, which risks home explosions.

123. Similarly, after January 27, 2025, DOE subjected two grants DEP received (each for about $127 million) for improving energy efficiency in low-income homes to unidentified agency review before DOE will approve reimbursement claims. DOE did the same with a $186 million grant that the Pennsylvania Department of Community and Economic Development (PaDCED) received for its weatherization assistance program, which helps low-income families perform work on their home that reduced energy costs.

124. DOE has not indicated what it will be reviewing for or how quickly it will review and approve reimbursement of either PaDEP's or PaDCED's lawful costs, if DOE will do so at all.

125. DOE has not identified, and does not possess, any authority to unilaterally impose new conditions on PaDEP's or PaDCED's ability to be reimbursed for authorized expenses incurred against these appropriated and obligated funds. DOE has not stated it is imposing new conditions on PaDEP's or PaDCED's use of money for this grant award under any statutory authority.

126. As another example, when Congress passed the IIJA, it appropriated the following amounts to each of the Safe Water State Revolving Fund and Drinking Water State Revolving Fund: $2.4 billion for fiscal year 2022; $2.75 billion for fiscal

EPA_00051309

year 2023; $ 3 billion for fiscal year 2024, and $3.25 billion for each of fiscal years 2025 and 2026. Additional funds were appropriated to each revolving fund to address emerging water contaminants.

127. These appropriations are for investments in infrastructure needed to provide Americans access to safe, clean, and healthy water. Congress has authorized use of these funds and defined how they should be allotted among states. 33 U.S.C. §§ 1384, 1385, 1389; *see also* 42 U.S.C. § 300j-12(a)(1)(D)-(E), (h).

128. PENNVEST, which is the Pennsylvania entity responsible for administering such capitalization grants for Pennsylvania, has entered funding agreements with the EPA for its allotment of these appropriations.

129. After January 27, 2025, EPA suspended PENNVEST's ability to access about $803 million in available funds from these capitalization grants for fiscal years 2020 through 2024.

130. The EPA has not identified, and does not possess, any authority to suspend access to these appropriated and obligated funds. EPA has not stated it is suspending funds under any statutory authority.

131. The EPA has also suspended, or conditioned use of, grant awards made to the Pennsylvania Department of Conservation and Natural Resources (PaDCNR). The EPA has not identified, and does not possess, any authority to suspend access

30

to funds appropriated by Congress and obligated to PaDCNR. The EPA did not state that it was suspending funds under any statutory authority or other legal authority.

132.    U.S. DOT has also suspended, or conditioned use of, grant awards made to PennDOT. U.S. DOT has not identified, and does not possess, any authority to suspend access to funds appropriated by Congress and obligated to PennDOT. U.S. DOT did not state that it was suspending funds under any statutory authority or other legal authority.

133.    If the federal agency defendants' suspension of federal funds continues, Pennsylvania could be required to furlough employees across state agencies. A furloughed employee could be rehired later, but he or she might seek alternative new employment, causing Pennsylvania to permanently lose the benefit of that employee's service.

134.    Commonwealth agencies have been contacted by subgrantees and contractors who have stated they will not continue performing work under the terms of their agreement unless it is certain that the federal government will fulfill its obligations to provide funding.

## CLAIMS FOR RELIEF

### Count I – Violation of the Administrative Procedure Act
### Contrary to Law

135.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

31

136.   Under the Administrative Procedure Act, a reviewing court shall hold unlawful agency action that is "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A)-(C).

137.   Defendants are agencies under the APA. 5 U.S.C. § 551(1).

138.   Executive agencies must follow the laws that govern their conduct and may not engage in any conduct not authorized by law.

139.   Congress has authorized and appropriated funds, including under the IRA and IIJA, that have since been obligated to the Commonwealth agencies.

140.   Defendant agencies possess no authority to refuse to disburse funds authorized and appropriated by Congress and obligated to Pennsylvania agencies.

141.   Defendant agencies possess no authority to terminate funding agreements with Pennsylvania agencies for reasons not identified in statute or a funding agreement between the federal and state agencies.

142.   Defendant agencies possess no authority to impose new conditions on funds that already have been obligated to Pennsylvania agencies beyond the conditions that exist under statute or the existing funding agreement.

143.   Defendant agencies' duty is to execute the laws that Congress has passed, including laws appropriating funds, rather than amend or repeal them.

EPA_00051312

144.    By refusing to disburse congressionally authorized and appropriated funds that have been obligated to the Commonwealth agencies, the Defendant agencies are acting in violation of the law.

### Count II – Violation of the Administrative Procedure Act
### Arbitrary and Capricious

145.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

146.    Under the Administrative Procedure Act (APA), a reviewing court shall hold unlawful agency action that is "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A).

147.    Agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *Ohio v. Environmental Protection Agency*, 603 U.S. 279, 292 (2024). This standard requires that agencies provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Id.*

148.    The pause of the disbursement of federal money is arbitrary and capricious.

149.    Defendant agencies are withholding federal money that Congress has authorized and appropriated and which has been obligated to Commonwealth agencies without providing any discernable standard or reasonable basis by which the decisions to freeze the disbursement of federal funds are being made.

EPA_00051313

150.    The EOs that the Defendant agencies have referenced in support of their withholding funds cannot modify the statutory requirement to disburse already obligated funds nor amend the conditions under which funds have already been awarded to Commonwealth agencies.

151.    The EOs that Defendant agencies have referenced in support of their withholding funds do not provide a reasoned standard for why or when agencies should refuse to disburse appropriated, obligated funds.

152.    Defendant agencies' decisions to immediately suspend billions of dollars in federal funds committed to Pennsylvania failed to consider reliance interests Pennsylvania's agencies have in receiving those funds or the harm caused by such suspensions.

153.    Additionally, subjecting disbursement of appropriated, obligated funds to unspecified and indeterminate agency review is arbitrary and capricious.

154.    By refusing to disburse congressionally appropriated funds that have since been obligated to the Commonwealth agencies, without any reasoned standard for their decisions, the Defendant agencies are acting arbitrarily and capriciously.

### Count III – Unconstitutional Withholding of Funds

155.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

EPA_00051314

156.    Under the U.S. Constitution, it is the President's and the Executive Branch's duty to "take Care that the laws by faithfully executed." U.S. Const. art. II, § 3. Of course, the laws that must be faithfully executed are those that have "passed the House of Representatives and the Senate" and then "presented to the President of the United States." U.S. Const. art. I, § 7.

157.    Where Congress passes a law through its power under the Spending Clause of the U.S. Constitution, any conditions it imposes on the receipt of federal funds must be "unambiguous[]" and cannot "surprise[] participating States with post acceptance or 'retroactive' conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981).

158.    Once a State has accepted funds pursuant to a federal spending program, the Federal government cannot alter the conditions attached to those funds so significantly as to "accomplish[ ] a shift in kind, not merely degree." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 583-84 (2012). Further, whatever conditions Congress imposes on the receipt of funding funds must be "reasonably related to the purpose of the expenditure." *New York v. United States*, 505 U.S. 144, 172 (1992) (citing *Mass. v. United States*, 435 U.S. 444 (1978)).

159.    Neither the President nor any executive branch agency has the power to unilaterally enact, amend, or repeal any statute. That is as true of a statute appropriating funds as it is any other statute.

EPA_00051315

160.  New conditions may not be added to the receipt of federal funds after a state has already accepted those funds. Nor can federal funds be terminated for reasons not specifically articulated by law or in a funding agreement entered into by state and federal agencies.

161.  The President and executive branch agencies have an obligation to execute the laws that have been properly enacted.

162.  Defendant agencies' withholding of appropriated, obligated funds violates these fundamental constitutional tenets and is therefore unconstitutional.

163.  By seeking to impose new conditions on funds that have already been appropriated and obligated to the Commonwealth agencies, and by terminating federal funds for reasons not clearly articulated in statute or at the time Commonwealth agencies received funds, Defendant agencies have violated the U.S. Constitution's Spending Clause.

## PRAYER FOR RELIEF

Plaintiffs respectfully ask that this Court enter the following relief:

a.     Declare that Defendant agencies' implementation of President Trump's executive orders, or of OMB's directives implementing those executive orders, by withholding congressionally appropriated federal funds that have been obligated to the Pennsylvania agencies is contrary to law;

EPA_00051316

b.     Declare that Defendant agencies' withholding of congressionally appropriated federal funds that have been obligated to the Pennsylvania agencies is contrary to law;

c.     Declare that Defendant agencies' implementation of President Trump's executive orders, or of OMB's directives implementing those executive orders, by withholding congressionally appropriated federal funds that have been obligated to the Pennsylvania agencies is arbitrary and capricious;

d.     Declare that Defendant agencies' withholding of congressionally appropriated federal funds that have been obligated to the Pennsylvania agencies is arbitrary and capricious;

e.     Declare that Defendant agencies' implementation of President Trump's executive orders, or of OMB's directives implementing those executive orders, by withholding congressionally appropriated federal funds that have been obligated to the Pennsylvania agencies violates the U.S. Constitution;

f.     Declare that Defendant agencies' withholding of congressionally appropriated federal funds that have been obligated to the Pennsylvania agencies violates the U.S. Constitution;

g.     Enjoin the Defendant agencies from freezing, pausing, conditioning, or otherwise interfering with, the disbursement of any congressionally appropriated

37

funds that have been obligated to the Pennsylvania agencies where Defendant agencies have no specific statutory to do so;

     h.    Award plaintiffs' costs and reasonable attorneys' fees, as appropriate; and

     i.    Grant any other relief the Court deems just and appropriate.


February 13, 2025          Respectfully submitted,

               s/ *Jacob B. Boyer*
               Jacob B. Boyer (Pa. No. 324396)
               Michael J. Fischer (Pa. No. 322311)
               Stephen R. Kovatis (Pa. No. 209495)
               Office of General Counsel
               30 North Street, Suite 200
               Harrisburg, PA 17101
               jacobboyer@pa.gov
               (717) 460-6786

               *Counsel for Plaintiffs*

EPA_00051318



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

**MEMORANDUM**

DEPUTY ADMINISTRATOR

**SUBJECT:**   Review of Financial Assistance Programs

**FROM:**   Chad McIntosh, Acting Deputy Administrator

**TO:**   Gregg Treml, Acting Chief Financial Officer
Kimberly Y. Patrick, Principal Deputy Assistant Administrator, OMS
Deputy Assistant Administrators
Deputy Associate Administrators
Deputy Regional Administrators

Distribute as appropriate to those needed to carry out this direction.

Upon confirmation, EPA Administrator Lee Zeldin pledged to enthusiastically uphold the EPA's mission and our moral responsibility to be good stewards of our environment for generations to come. With that commitment is the promise to be accountable for the Agency's use of hard-earned American taxpayer dollars.

Congress has been clear on the need for oversight of funds provided to the Agency in the Inflation Reduction Act (IRA) (Pub. Law 117-169, Aug. 16, 2021, 136 Stat 1818) and other funding programs that may be improperly utilized. However, over the course of the prior Adminstration, several reports and investigations have raised serious concerns with the implementation of certain grant programs and subsequent grant awards.

Problems with implementation of these funding programs were egregiously confirmed from documented statements by Biden-Harris Administration political appointee staff at EPA describing the Agency's then funding push as "throwing gold bars off the Titanic."

In one example of the potential problematic implementation of programs, to expend, the Biden-Harris Adminstration utilized an external financial agent to hold funding, which is the first time the Agency has ever operated a grant funding program in that manner which could limit Agency oversight.

Not only have these instances been well documented, but during his confirmation hearing before the U.S. Senate Committee on Environment and Public Works and through additional Congressional requests, Administrator Zeldin has been specifically asked to ensure accountability of Agency funding. These documented accounts of potential waste, fraud, and abuse of hard-earned American taxpayer dollars warrant further attention and oversight.

EPA_00051330

For these reasons, I am directing our leadership team and all Agency personnel as follows:

Agency personnel shall immediately initiate and conduct an internal review of all relevant grant programs, grant awards, grants that have not yet been awarded and obligated to specific individuals or entities (e.g., notices of funding opportunities), and issued grants. This includes a review of payments on all grant programs and awards where Agency personnel suspect that the grant is unlawful or contrary to Agency policy priorities, or suspect that the grant program implementation or payment might be fraudulent, abusive, duplicative, or implemented in a way that failed to safeguard Agency dollars.

This directive shall be implemented by personnel in the Office of the Chief Financial Officer, the Office of Mission Support, and all relevant program and regional offices responsible for the execution of the Agency's programs, consistent with all notice and procedural requirements in each affected award, agreement, or other instrument. Whenever a program or award has been identified, Agency personnel shall utilize all available means to ensure necessary review for any administrative and criminal violations.

If any program, award, or action is deemed inconsistent with necessary financial and oversight procedural requirements or grant conditions, the Agency shall, where permitted by applicable law, take immediate action to ensure compliance. This includes coordination and further referral to the Office of the Inspector General and other entities to ensure full accountability and prosecution where applicable.

Notwithstanding this directive, any disbursements on open grant awards that were paused due to Office of Management and Budget Memorandum M-25-13 or any Executive Order underlying that Memorandum shall continue to be immediately released, as the Agency initiated on February 3, 2025.

Thank you for your continued service to ensure the effective implementation and use of taxpayer dollars.

| Federal Agency | State Agency | Federal Program (ALN) | Grant Number(s) | Grant Name/Number |
|---|---|---|---|---|
| FRA | PDOT | 20.326; 20.327; 20.525; 20.528 | N60124; N60624 | N60124 & N60624 IIJA Grants |
| EPA | DCNR | 66.964 | W96321 | 95303401 IIJA Chesapeake Bay Infrastructure W96321 |
| DOE | DCED | 81.042 | P40121; P40221; P40321 | EE0009927 Weatherization Assistance Program P40221, 321 |
| DOE | DCED | 81.042 | P00040 | EE0010012 BIL IIJA Weatherization Assistance Program P00040 |
| DOE | DCED | 81.253 | P40323 | DEMS0000039 Smart Manufacturing P40323 |
| DOI | DEP | 15.252 | V619110000.0000 | 2022 OSMRE BIL |
| DOI | DEP | 15.252 | V623110000.0000 | 2023 OSMRE BIL |
| DOI | DEP | 15.252 | V624110000.0000 | 2024 OSMRE BIL |
| DOI | DEP | 15.018 | V229000000.0000 | Orphaned Well Program - Initial Grant |
| DOI | DEP | 15.018 | V240000000.0000 | IIJA - Orphaned Well Prog Formula Phase 1 |
| EPA | DEP | 66.046 | V238100000.0000 | Climate Pollution Reduction PL |
| EPA | DEP | 66.046 | V248050000.0000 | CPRG Competitive Grant (Rise PA) |
| EPA | DEP | 66.034 | V24800 | IRA Air Monitoring |
| EPA | DEP | 66.454 | V08319 | 2022 Water Quality Management |
| EPA | DEP | 66.040 | V03685 | State Clean Diesel |
| EPA | DEP | 66.040 | V03686 | 2021 State Clean Diesel |
| EPA | DEP | 66.040 | V03687 | 2023 State Clean Diesel |
| EPA | DEP | 66.959 | V231110000.0000 | PEDA - Solar for All |
| DOE | DEP | 81.041 | V224000000.0000 | 2022 SEP-BIL |
| DOE | DEP | 81.041 | V245200000.0000 | EE RLF (Revolving Loan Fund) |
| DOE | DEP | 81.041 | V238040000.0000 | IRA EnergyPrfrmHomes (HOMES) (HER) |
| DOE | DEP | 81.041 | V238070000.0000 | IRA HighEffElectAppli (HEAR) |
| DOE | DEP | 81.128 | V245100000.0000 | EE CBG |
| DOE | DEP | 81.041 | V241270000.0000 | IRA TREC |
| DOE | DEP | 81.117 | Not Created | IRA Assistance for Latest and Zero Building Energy Code |
| DOE | DEP | 81.254 | V228000000.0000 | Electric Grid Resilience |
| USGS | DCNR | 15.073; 15.814 | W37724; W37824; W57624; W37719; W47723; W47724 | Earth Mapping/Topographic Data Preservation |

EPA_00051335