**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| THE SUSTAINABILITY INSTITUTE, AGRARIAN TRUST, ALLIANCE FOR AGRICULTURE, ALLIANCE FOR THE SHENANDOAH VALLEY, BRONX RIVER ALLIANCE, CLEANAIRE NC, CONSERVATION INNOVATION FUND, EARTH ISLAND INSTITUTE, LEADERSHIP COUNSEL FOR JUSTICE AND ACCOUNTABILITY, MARBLESEED, ORGANIC ASSOCIATION OF KENTUCKY, PENNSYLVANIA ASSOCIATION FOR SUSTAINABLE AGRICULTURE AND RURAL ADVANCEMENT FOUNDATION INTERNATIONAL-USA, and MAYOR AND CITY COUNCIL OF BALTIMORE, CITY OF COLUMBUS, CITY OF MADISON, METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, CITY OF NEW HAVEN, CITY OF SAN DIEGO <br><br> Plaintiffs, <br><br> v. <br><br> DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES, KEVIN HASSETT, in his official capacity as Assistant to the President for Economic Policy and Director of the National Economic Council; UNITED STATES OFFICE OF MANAGEMENT AND BUDGET; RUSSELL VOUGHT, in his official capacity as Director of the United States Office of Management and Budget; UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; LEE ZELDIN, in his official capacity as Administrator of the United States Environmental Protection Agency; UNITED STATES DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS, in her official capacity as Secretary of Agriculture; UNITED STATES DEPARTMENT OF TRANSPORTATION; SEAN DUFFY, in his official capacity as the Secretary of the United States | Case No. 2:25-cv-02152-RMG <br><br> Leave to file granted on April 23, 2025 <br><br><br> **BRIEF OF AMICI CURIAE NONPROFIT RECIPIENTS OF FEDERAL FUNDING IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |

Department of Transportation; UNITED STATES DEPARTMENT OF ENERGY; CHRIS WRIGHT, in his official capacity as the Secretary of the United States Department of Energy; UNITED STATES DEPARTMENT OF GOVERNMENTAL EFFICIENCY SERVICE; AMY GLEASON, in her official capacity as Acting Administrator of the United States DOGE Service; ELON MUSK, in his official capacity as Senior Advisor of the United States DOGE Service.

Defendants.

# TABLE OF CONTENTS

**Page**

INTERESTS OF AMICI CURIAE.................................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................3

ARGUMENT .............................................................................................................4

    I. The Executive Orders and Agency Program Freezing Actions Irreparably Harm Nonprofit Grantees By Violating the First Amendment...................................................................5

    II. Freezing of Federal Funding Violates the Administrative Procedure Act ..............................7

        a. The Freezing of Federal Funds is a Final Agency Action ..................................7

        b. The Freezing of Federal Funds is Arbitrary and Capricious................................9

    III. The Executive Orders and Agency Program Freezing Actions Irreparably Harm all Government and Nonprofit Grantees By Violating the Separation of Powers...........................11

        A. The Executive Orders and Agency Program Freezing Actions Usurp Congress' Power of the Purse.........................................................................................................11

        B. The Executive Branch does not have unilateral authority to refuse to spend Congressionally-appropriated funds. .................................................................13

    IV. The Balance of Equities and Public Interest Factors Favor an Injunction. ..........................15

CONCLUSION...........................................................................................................18

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

***Constitution***                                                                                        **Page**

U.S. Const. art. I, § 1 …......………………………………………………12
U.S. Const. art. I, § 8, cl. 1……………………………………………………12
U.S. Const. art. I, § 9, cl. 7……………………………………………………12
U.S. Const. art. II, § 3 …………………………………………………….. 12

***Statutes***

5 U.S.C. § 704…………………………………………………………………8
5 U.S.C. § 714 *et seq.*…………………………………………………………15
5 U.S.C. § 3318…………………………………………………………………15
Inflation Reduction Act of 2022,
    Pub. L. No. 117-169,136 Stat. 1818 (2022) ……………………………………14, 15, 16
Infrastructure Investment and Jobs Act,
    Pub. L. No. 117-58, 135 Stat. 429 (2021) ……………………………..…14, 15, 16

***Cases***

*In re Aiken County,*
    725 F.3d 255 (D.C. Cir. 2013) ………………………………………………..
                                                                                                     12, 13
*Alliance for Open Society International v. U.S. Agency for International Development,*
    651 F.3d 218 (2d Cir. 2011) …………………………………………………..
                                                                                                      6
*Bennet v. Spear,*
    520 U.S. 154 (1997) ……………………………………………………..
                                                                                                      8
*Bowsher v. Synar,*
    478 U.S. 714 (1986) ……………………………………………………………
                                                                                                     8, 14
*Citizens United v. Federal Election Commission,*
    558 U.S. 310 (2010) ……………………………………………………..
                                                                                                      6
*City of San Francisco v. Trump,*
    897 F.3d 1225 (9th Cir. 2018) ………………………………………………..
                                                                                                      14
*Clinton v. City of New York,*
    524 U.S. 417 (1998) ……………………………………………………………
                                                                                                      14
*Department of Homeland Security v. Regents of the University of California,*
    591 U.S. 1 (2020) ………………………………………………………..
                                                                                                     10, 11

*Federal Communications Commission v. Fox Television Stations, Inc.,*

556 U.S. 502 (2009) ................................................................................
10

*Federal Communications Commission v. Prometheus Radio Project*,
592 U.S. 414 (2021) ..............................................................9, 10, 11

*Larson v. Domestic & Foreign Commerce Corp.*,
337 U.S. 682 (1949) ................................................................................
12

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024) ................................................................................
8

*Massachusetts v. National Institutes of Health*,
No. 25-CV-10338, 2025 WL 702163 (D. Mass. Mar. 5, 2025) ................................
11

*Miller-Wohl Co., Inc. v. Commissioner of Labor and Industries*,
694 F.2d 203 (9th Cir. 1982) ................................................................................
1

*Mistretta v. United States*,
488 U.S. 361 (1989) ................................................................................
12

*Motor Vehicle Manufacturers. Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Company*,
463 U.S. 29 (1983) ................................................................................
10

*National Council of Nonprofits v. Office of Management and Budget*,
No. 25-cv-239, 2025 WL 368852 (D.D.C. Feb. 3, 2025) ................................
11

*National Veterans Legal Services Program v. United States Department of Defense*,
990 F.3d 834 (4th Cir. 2021) ................................................................................
8

*New York v. Trump*,
No. 25-cv-39, 2025 WL 715621 (D.R.I. Mar. 6, 2025) ................................
9

*Perez v. Mortgage Bankers Association*,
575 U.S. 92 (2015) ................................................................................
8

*Rochester Pure Waters District v. Environmental Protection Agency*,
960 F.2d 180 (D.C. Cir. 1992) ................................................................................
12

*Rosenberger v. Rector and Visitors of the University of Virginia*,
515 U.S. 819 (1995) ................................................................................
5

*Smiley v. Citibank (S. Dakota), N.A.*,
517 U.S. 735 (1996) ................................................................................
10

*Strickland v. United States*,
32 F.4th 311 (4th Cir. 2022) ................................................................................
13

*United States v. Morton Salt*,
    338 U.S. 632 (1950) ………………………………………………………………….
                                                               8

### *Executive Orders*

Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025) ………………………………………...3
Exec. Order No. 14154, 90 Fed. Reg. 8353 (Jan. 20, 2025) ………………………………………...3
Exec. Order No. 14222, 90 Fed. Reg. 11095 (Feb. 26, 2025) …………………………………… 3

### *Other Authorities*

Hannah Martin *et al.*, *Nonprofit Trends and Impacts 2021–2023*, Urban Institute (2024),
    https://www.urban.org/sites/default/files/2024-10/Nonprofit_Trends_and_
    Impacts_2021-2023_National_Findings_on_Government_Grants_and_
    Contracts.pdf#:~:text=NONPROFIT%20TRENDS%20AND%20IMPACTS
    %202022%E2%80%932023%20Government%20funding,of%20nonprofits'
        %20revenue%20came%20from%20government%20agencies …………………………..
                                           4, 13
H.R. Rep. No. 117-130(I) (2021) ………………………………………………………………..15
OMB Memorandum M-25-13 (Jan. 27, 2025) ……………………………………………………4
*Outcomes Dashboard*, Climateprogramportal.org,
    https://climateprogramportal.org/outcomes-dashboard/#methodology ………………… 15
U.S. Gov't Accountability Office, Office of the General Counsel, Principles of
Federal Appropriations Law, GAO-16-464SP (4th ed. 2016) …………………………………..12

ActiveSGV, Environmental Protection Network (EPN), Heru Urban Farming and Garden, Kalamazoo Climate Crisis Coalition, Landforce, and the MetroHealth System submit this brief as *amici curiae*.[1]  *Amici* are six nonprofit organizations that have been awarded federal grant funds, either as direct recipients or as sub-grantees, to carry out specific programs enacted by Congress under the Inflation Reduction Act ("IRA") and Infrastructure Investment and Jobs Act ("IIJA"), along with other federal statutes.  These organizations have leveraged their deep community ties to provide essential services in areas spanning environmental protection, air quality improvement, public health, access to local food, support for farmers and local agriculture, economic and workforce development in underserved communities, and disaster planning. *Amici* rely on these binding federal grant agreements to operate their programs, often filling critical gaps where federal, state and local institutions fall short.  In addition, some *amici* support nonprofits who are, themselves, navigating the complexity of federal grant programs, and hold a unique perspective on the impact of disrupted programs on the sector, as a whole.  Information about each of the *amici* is detailed in the declarations attached alongside this brief.

From day one, the incoming Executive Administration has taken unconstitutional and harmful aim at *amici* and other federal grantees that it accused of engaging in "illegal" speech and activities, without defining what constitutes harm or what laws they break. They have used this censorious tactic to frighten good people who are engaged in the hard, noble work of improving our country, while freezing the funds they need to perform that work or demanding that they change their work plans to fit vague directives that would actually place them out of compliance with the

---

[1]    No party or counsel for a party authored this brief in whole or in part. No party, counsel for a party, or person other than *amici curiae* or their counsel made any monetary contribution intended to fund the preparation or submission of this brief.

terms and conditions of their Congressionally-approved federal funding.  Notably, to date, no *amici* have received notice that their grants are out of compliance with their terms and conditions.

      *Amici* have been awarded federal grants to provide critical services in their respective communities, including projects that provide workforce development, reduce asthma, minimize energy burdens, engage urban communities in agriculture, and mitigate pollution that directly impacts the health and well-being of local residents.  In turn, these grantees have been targeted by the Executive Branch with unlawful funding freezes, fear-mongering, certification requests, and terminations that significantly impact their organizations' capacity to function and, for some of our *amici*, have halted life-saving services.  Organizations have had to struggle with whether to continue their work under threat of retaliation while dealing with intermittently available or frozen funding, leading to uncertainty regarding the ability to pay staff and contractors responsible for key provisions of the federally-funded programs.  This leaves *amici* forced to take action to address the situation, including laying off workers, halting critical projects, and altering the words they use in project documents for fear of retribution.

      *Amici* are facing terminations, demands to certify and requests to amend their environmental justice awards on what this Administration inaccurately defines as diversity, equity, and inclusion ("DEI"). DEI-focused termination, as this brief will show, constitutes viewpoint discrimination that is in violation of the First Amendment. Non-DEI terminations, in turn, have focused on baseless–and therefore arbitrary and capricious–claims of fraud, waste and abuse, and stated that the grant was being terminated due to it no longer effectuating agency priorities, despite that being an impermissible rationale in many cases.  The administration's attempt to terminate *amici*'s congressionally-approved funding for programs advocating for environmental justice represents an overreach of presidential power and constitutes a violation of both the separation of powers and the First Amendment. The President does not possess the authority to selectively

terminate or withhold funding approved by Congress, especially when that funding supports programs aimed at addressing critical issues of public concern.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The United States has a long and noble tradition of nonprofit entities working in partnership with the government to serve communities, drive innovation and redress past harms. Nonprofit groups have close ties to the constituencies they serve, and for decades this government-nonprofit partnership has been an effective and efficient way to improve the lives of Americans. Approximately one third of nonprofits receive some type of federal grant funding.[2] Some of these groups are large national organizations, but the vast majority are small scale, community-based entities. *Amici* reflect this majority, ranging in size from medium-scale organizations like Environmental Protection Network ("EPN") with roughly twenty staff to tiny community based organizations composed primarily of volunteers. Some organizations rely on federal funding to do much of their work, while for others this was their first grant. All are driven by one thing: a desire to serve and improve lives. They are the life blood of our nation, and yet, through the Administration's recent executive orders and funding freezes, our Executive Branch is treating plaintiffs, *amici* and thousands of similar organizations like criminals for seeking to fulfill their promises to Congress.

When the Executive Branch shifted its stance from supporting this government-nonprofit partnership to vilifying it, the impact on plaintiffs, *amici* and thousands of similarly situated grantees was immediate, with consequences cascading across the country. Having dedicated

---

[2] Hannah Martin *et al.*, *Nonprofit Trends and Impacts 2021–2023*, Urban Institute at 4 (2024) ("*Nonprofit Trends and Impacts 2021-2023*"), https://www.urban.org/sites/default/files/2024-10/Nonprofit_Trends_and_Impacts_2021-2023_National_Findings_on_Government_Grants_and_Contracts.pdf#:~:text=NONPROFIT%20TRENDS%20AND%20IMPACTS%202022%E2%80%932023%20Government%20funding,of%20nonprofits'%20revenue%20came%20from%20government%20agencies.

countless hours of time to plans, application processes, recruitment and hiring, thousands of organizations were already performing on their contracts when funding was threatened or pulled. After the Executive Orders, many said they were afraid to perform the work for fear of retaliation. They were further harmed by actions that violated the First Amendment by using direct and indirect means to chill speech and activities that advance equity, climate, and environmental justice.

Most federal grants operate as reimbursable expenses meaning that organizations are faced with an unwinnable dilemma: should they continue to do the important work they have committed to as part of their grant terms and risk that they will never be reimbursed, or should they cease the work they had promised to deliver, thus letting down both the constituencies they serve and risking that they miss agreed-to project milestones? Some of these organizations are even contemplating shuttering their doors because they cannot access tens of millions of dollars that they were promised from the government. Organizations that have been trusted pillars of their communities have begun to feel their reputations start to crumble as they struggle to provide requested services. Many *amici* have been forced to lay off employees because they cannot make payroll. Meanwhile, outreach to federal grant managers about how to navigate these challenges has been met with silence and vagueness. Many amici have suffered the chilling effect of the Administration's free speech infringement, censoring their organizational mission and work to avoid retaliation in the form of frozen or terminated funding. These harms are real, immediate, irreparable, and are currently hurting Americans across the country.

## ARGUMENT

### I. The Executive Orders and Agency Program Freezing Actions Irreparably Harm Nonprofit Grantees By Violating the First Amendment.

The termination of funding for federal grantees engaged in environmental justice and diversity initiatives constitutes a clear form of viewpoint discrimination. As outlined in

*Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819 (1995), the government cannot discriminate against speech based on its content or viewpoint. The organizations in this case are advocating for policies that aim to rectify long-standing environmental inequalities affecting marginalized communities, including low-income and communities of color. The termination of their funding based on the ideological content of their advocacy—environmental justice and diversity—violates the First Amendment's protection against viewpoint-based discrimination. At least a dozen grantees have already received termination letters because their "project activities" support diversity, equity, and inclusion programs. (Decl. of Roos ¶ 13(a).) The First Amendment safeguards the right to express ideas, even those that are unpopular or politically contentious at the moment.

Further, in *Alliance for Open Society International v. U.S. Agency for International Development*, 651 F.3d 218 (2d. Cir. 2011), the Supreme Court ruled that the government cannot require grantees to adopt certain viewpoints as a condition of receiving funding. Similarly, in *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010) the Court reaffirmed that the government cannot restrict political speech based on the content or viewpoint of that speech, especially when it involves public policy debates.

Executive Order Number 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing,* makes a clear and unequivocal statement: its purpose is to dismantle all programs aimed at advancing diversity, equity, or inclusion, regardless of their form, beneficiaries, or funding sources. Exec. Order No. 14151, 90 Fed. Reg. 8339, 8339 (Jan. 20, 2025) ("Equity EO"). The Equity EO Viewpoint discrimination is a powerful and insidious threat to the fundamental rights of free expression and equal treatment grounded in the Constitution. When the Government targets individuals or organizations based on the ideas, opinions, or perspectives they

express, rather than on neutral or legitimate ground, it runs afoul of the nation's constitutional requirements.

In the present case, the federal grantees—organizations dedicated to environmental justice—have been disproportionately harmed by government actions that are driven not by the merit of their work, but by the administration's hostility toward the viewpoints they represent. At least a dozen grantees working with EPN have been terminated for explicitly "DEI activities" without explanation of what that actually entails. (Decl. of Roos ¶ 13). These grantees focus on addressing systemic environmental harms that disproportionately affect marginalized communities, particularly low-income and communities of color. They have been stripped of critical funding, not because their projects fail to meet federal requirements or standards, but because their advocacy for environmental justice runs counter to the administration's broader ideological stance. These terminations have left the remaining hundreds of grantees wondering whether they need to revise their grants to avoid previously benign terms like "equity" or "diversity" or "inclusion" to avoid receiving their own illegal termination letter. (Decl. of Roos ¶ 13(a).) One grantee was even asked to amend their Statutory Partnership Agreement to remove references to DEI activities. (Decl. of Roos ¶ 12.) Even more grantees tell EPN on a weekly basis that they are unsure what to say to their project officers for fear of termination or retribution by EPA. (Decl. of Roos ¶ 11(a).)

This kind of targeted defunding constitutes a textbook example of viewpoint discrimination. The government is penalizing these grantees solely for their advocacy of a specific, legally protected viewpoint: the imperative of environmental justice. The administration's actions silence crucial voices pushing for reform, undermines efforts to address the disproportionate environmental burdens borne by vulnerable communities, and imposes a chilling effect on organizations across the country working to ensure that all Americans have a right to a healthy and safe environment. In fact, grantees have explicitly stated not "feel[ing] safe expressing our values or speaking openly

6

about the urgent environmental needs in our community . . . seeing the focus on sabotaging DEI initiatives, we fear naming that some residents are people of color." (Decl. of Doezema ¶ 27).

## II.     Freezing of Federal Funding Violates the Administrative Procedure Act

The Administrative Procedure Act ("APA") permits judicial review of a final agency action when there is "no other adequate remedy in a court." 5 U.S.C. § 704.  Congress enacted the APA "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 391 (2024) (quoting *U.S. v. Morton Salt*, 338 U.S. 632, 644 (1950)).  In *Loper Bright*, the Supreme Court clarified that "respect" did not equate to deference—rather, "Section 706 makes clear that agency interpretations of statutes—like agency interpretations of the Constitution—are *not* entitled to deference."  Id. at 392 (emphasis in original).  Rather, it "remains the responsibility of the court to decide whether the law means what the agency says." *Id*. (quoting *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 109 (2015) (Scalia, J., concurring in judgment)).

Here, the federal government's freezing of federal funding for federal grant awardees violates the APA because it is a final agency action with legal consequences, it is arbitrary and capricious, and it is otherwise not in accordance with the law.

### a.   The Freezing of Federal Funds is a Final Agency Action

To be a final agency action for the purposes of the APA, an agency action must be (1) the "consummation of the agency's decision-making process" and not " merely tentative" or of "interlocutory nature;" and (2) one by which "rights or obligations have been determined" and "legal consequences must flow." *Bennet v. Spear*, 520 U.S. 154, 177-78 (1997); *see also Nat'l Veterans Legal Servs. Program v. U.S. Dep't of Def.*, 990 F.3d 834, 839 (4th Cir. 2021).

Here, the various executive orders and notices constitute final actions under the APA. Plaintiffs and other grantees are unable to access funds due to the consummation of agency

decisions to comply with top-down directives, not interim agency decisions. *See New York v. Trump*, No. 25-cv-39, 2025 WL 715621, at *8-*9 (D.R.I. Mar. 6, 2025) (implementing funding pauses due to OMB guidance and executive orders "marked the consummation of each agency's decision to comply" with executive orders and directives, "not to exercise [agency] discretion.").

Additionally, there can be no question that legal consequences have followed from the government's decision to pause funding. Federal grant awardees, like the amici, have made commitments to partners, staff, and beneficiaries that will go unfulfilled without the promised federal funds, and those unfulfilled promises will have consequences on the awardees, their employees, their partners, and their communities. *See* Decl. of Roos ¶ 11-13, 31 (specifying the layoffs, programmatic misses, and reputational damages caused by federal funds being frozen). Each of the *amici* represented in this brief who are direct recipients of federal grants have experienced frozen funding, had their accounts disappeared, and in some cases, outright terminated without cause. *See* Decl. of Roos ¶ 5.) The freeze, and the current uncertainty, means that many are having to adjust, or even consider cancelling, the important work they had committed to do.

For example, the funding freeze has caused widespread panic through Pennsylvania communities served by Landforce, halting job training for farmers, critical food resources, and damaging long-standing community relationships in the agricultural community. (Decl. of Manspeizer ¶ 6 ). Rather than engaging in essential work for their community, nonprofits like Landforce are forced to expend valuable time and resources navigating conflicting information, strategizing about operations sustainability, creating and implementing contingency plans, and consulting with legal and financial experts.

### b. The Freezing of Federal Funds is Arbitrary and Capricious

The freezing of federal funds is arbitrary and capricious for several reasons. First, the federal funding freeze is neither "reasonable nor reasonably explained," as required by the APA.

*Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Second, the executive department improperly relied upon "factors which Congress has not intended [the executive department] to consider." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Third, and most relevant to the arguments of the amici here, the federal funding freeze failed to consider the "serious reliance interests" on prior agency interpretations. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (citing *Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 742 (1996)).

When an agency's prior policy "has engendered serious reliance interests" by entities, the agency must consider those reliance interests or the agency's new action is arbitrary and capricious and a violation of the APA. *Fed. Commc'ns Comm'n*, 592 U.S. at 423; *see also Smiley*, 517 U.S. at 742; *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020) ("When an agency changes course, . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.") (internal quotation marks omitted). The executive branch's disregard of the serious reliance of grantees like plaintiffs and the *amici* was egregious.

Like many of the plaintiffs, the *amici* here have invested massively in applying for these grants, negotiating the terms, complying with requirements, and working to obtain community support. They have relied upon the promise from congressional appropriations as well as the agency application and approval process to make financial and organizational commitments to hire employees to assist in carrying out these projects. (Decl. of Lewis ¶ 8). Besides the loss of programmatic achievements that would result from the federal funding freeze, which are too numerous and extensive to detail here, federal funding grantees have invested time, money, and manpower, based upon the promise of the federal grant, that will no longer be reimbursed.

MetroHealth System ("MetroHealth"), an awardee for a Community Change Grant, is no longer able to hire on the planned workers it needs to implement its $18 million project. (Decl. of Sehgal ¶ 14, 19). In anticipation of that grant, which was fully approved, obligated, and funded, MetroHealth hired or planned to hire twenty new staff members and contractors, who are now at risk of losing their jobs, who now must be laid off. Additionally, the collapse of the funding strains MetroHealth's relationship with local partners that were working with MetroHealth or benefitting from the grant program, causing damage to MetroHealth's reputation. (Decl. of Sehgal ¶ 17).

The executive branch disregarded all such reliance by organizations when making the decision to freeze federal funds. It disregarded the "serious reliance" grantees placed on the financial commitment from the federal government. *See Fed. Commc'ns Comm'n*, 592 U.S. at 423. It ignored the "legitimate reliance" federal grantees placed in the government living up to its financial commitments. *See Regents of the Univ. of California*, 591 U.S. at 30. And several other courts in the United States have held that federal awardees' reliance on promised disbursement of federal funds has met this reliance standard. *See Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-cv-239, 2025 WL 368852, at *11 (D.D.C. Feb. 3, 2025); *Massachusetts v. Nat'l Institutes of Health*, No. 25-CV-10338, 2025 WL 702163, at *19 (D. Mass. Mar. 5, 2025). The same principles apply in this case: federal grant awardees reasonably, seriously, and legitimately relied upon appropriated and obligated grant money.

The executive branch failed to show any consideration of the serious reliance grantees like plaintiffs and amici placed upon the fulfillment of funding federal grants, demonstrating that the decision to freeze federal funding was arbitrary and capricious, and violated the APA.

III.   **The Executive Orders and Agency Program Freezing Actions Irreparably Harm all Government and Nonprofit Grantees By Violating the Separation of Powers.**

   A.   **The Executive Orders and Agency Program Freezing Actions Usurp Congress' Power of the Purse.**

Congress holds exclusive, absolute, Constitutionally-mandated power over the Nation's purse.  U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); art. I, § 8, cl. 1 (Spending Clause); art. I, § 1 (legislative power).  The President's duty to implement the laws that Congress passes is at its apex on matters of federal funding. *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992) (internal quotation omitted). Once Congress appropriates funds for a specified purpose, it imposes a duty on the President to spend those funds according to the terms set by Congress. *See* U.S. Const. art. II, § 3 (Take Care Clause); U.S. Gov't Accountability Office, Office of the General Counsel, Principles of Federal Appropriations Law, at 2-3–2-4, GAO-16-464SP (4th ed. 2016) (the "Red Book"). These are "settled, bedrock principles of constitutional law." *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.). This outcome preserves an enduring system of checks and balances that the Founders considered to be "essential to the preservation of liberty." *Mistretta v. United States*, 488 U.S. 361, 380 (1989).  When a President attempts to overstep their authority in this way, their actions are considered *ultra vires* and "therefore may be made the object of specific relief." *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949). Such *ultra vires* abuses of Constitutional authority are not shielded by sovereign immunity from nonstatutory review claims. *Strickland v. United States*, 32 F.4th 311, 365–66 (4th Cir. 2022).

Justice Kavanaugh, as Circuit Judge in 2013, declared, "where previously appropriated money is available for an agency to perform a statutorily mandated activity, we see no basis for a court to excuse the agency from that statutory mandate."  *In re Aiken Cnty.*, 725 F.3d at 255, 259. Kavanaugh further states, "the President may not decline to follow a statutory mandate…simply

because of policy objections" *Id*. at 259. In *In re Aiken County*, the court found that "Congress speaks through the laws it enacts." *Id*. at 260.

At present, Congress has continued to speak through the laws they enact. They've allocated billions of dollars in funding to go towards IIJA and IRA. The Administration's unilateral freezing of legally-obligated funds with no Congressional authority is a fundamental u*ltra vires* overstep of his Constitutional authority. Indeed, this Administration has released statements that it plans to cut 400 grants under IIJA and IRA Congressionally-approved programs. (Decl. of Roos ¶ 9.) This 'hit list' is causing fear, panic, and anxiety throughout the nonprofit industry. (Decl. of Roos ¶ 9.)

*Amici* have been awarded grants that Congress already appropriated and committed toward funding their programmatic efforts, with specific terms and conditions the parties agreed to and signed off on prior to the President taking office. The President and Executive Branch Agencies cannot now decide to withhold those funds without disrupting the country's separation of powers. This upset would not only harm plaintiffs and amici, but every single entity - nonprofits, states, municipal governments, defense contractors, public health providers, etc., that rely on government funding and that rely on the federal government to be a trustworthy business partner. Government grants and contracts provide the second largest source of funding for nonprofits in the United States, and over a third of nonprofits are recipients of some type of federal grant.[3] By distributing funding to nonprofit entities embedded in specific communities, the federal government effectively improves lives on the ground without creating an entire new federal infrastructure to do so. At the same time, nonprofit organizations benefit from the financial stability federal grants provide. The grantees represented by this brief alone have lost over $2 billion in federal funding since this Administration took office. *See generally* Decl. of Roos; Decl. of Lewis (discussing the allocation

---

[3] *Nonprofit Trends and Impacts 2021–2023*, at 1, 4.

of federal funding for various environmental projects). Rather than relying exclusively on the whims of individual donors and funding priorities of foundations, government funding has historically provided, until now, a reliable way to help ensure communities consistently get the services they need. Federal grants range in size and type from smaller $50,000 Environmental Protection Agency ("EPA") Environmental Justice Collaborative Problem Solving air monitoring grants to the more $50 million awarded last year to Pasa by the United States Department of Agriculture ("USDA") Partnerships for Climate-Smart Commodities to support farmers across 15 states in implementing scientifically- validated conservation practices.

Further, the Executive Orders attempt to unilaterally repeal the IRA and IIJA by censoring and defunding its programs are yet another overreach of the President's power. "[A]s the Supreme Court has observed, "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *City of S.F. v. Trump*, 897 F.3d 1225, 1232 (9th Cir. 2018) (quoting *Clinton v. City of New York*, 524 U.S. 417, 438 (1998)).

### B. The Executive Branch does not have unilateral authority to refuse to spend Congressionally-appropriated funds.

The Supreme Court has consistently reaffirmed that Congress—not the President—holds the power to appropriate and regulate federal funds. In *Bowsher v. Synar*, 478 U.S. 714 (1986), the Court held that the President cannot exercise powers vested in Congress, particularly the power over appropriations and the discretion to spend or withhold federal funds. The Court made clear that Congress cannot delegate its power to the Executive to manage funds in a way that would violate the constitutional separation of powers and accordingly, the President cannot selectively withhold congressionally-approved funding based on ideological or political views, as has occurred in the present instance.

The Executive Orders and Agency Program Freezing Actions directly infringe upon

Congress' intended policy goals for these funds. Congress passed the IRA, among other purposes, to invest in "low- and zero-emission products, technologies, and services" and "other greenhouse gas emission reduction activities." 136 Stat. at 2066; *see also* H.R. Rep. No. 117-130(I), at 5 (2021) This includes Congress instructing that EPA "shall" use $2.8 billion in appropriated funds "to award grants…to eligible entities to carry out [specified environmental projects] that benefit disadvantaged communities." IRA § 60201, 136 Stat. at 2078–79 (codified at 42 U.S.C. § 7438). Congress passed the IIJA "to authorize funds for Federal-aid highways, highway safety programs, and transit programs, and for other purposes." 135 Stat. at 429.

To advance Congress' policy priorities, agencies awarded these funds through a competitive process following public funding opportunity announcements by means of binding, legal agreements, to recipients – such as states, municipalities, nonprofits, and other organizations – which must comply with strict federal requirements, including reporting, auditing and other programmatic criteria. Because these procedures can be burdensome, less well-resourced organizations have often failed to reap the benefits of federal grants. Attempting to rectify this disparity, Congress explicitly crafted the IRA and IIJA to ensure funding reached historically excluded organizations and communities. *E.g.*, IRA, 136 Stat. at 1921– 22, 2066–69, 2073 (creating numerous programs to benefit or prioritize funding for "low-income communities," "disadvantaged communities," and organizations that serve them); IIJA, 135 Stat. at 576, 613, 796, 977, 1081–82, 1102, 1140 (same). In fact, nonprofit organizations directly secured over $26 billion in funding from these programs.[4] *See, e.g.*, Decl. of Roos ¶ 3*;* Decl. of Sehgal ¶ 12.

Despite these efforts, the application process for these federal grants remains onerous and complex. For nonprofits without professional grant writers on staff, putting together a single federal

---

[4] *Outcomes Dashboard*, CLIMATEPROGRAMPORTAL.ORG, https://climateprogramportal.org/outcomes-dashboard/#methodology.

grant application can take up to 120 hours of staff time, per staff member. (Decl. of Sehgal ¶ 12). Outreach to potential collaborating entities adds more time. Each of these federal grants and awards can be the culmination of years of collaboration with stakeholders and community partners.  This is all time that nonprofit entities could have spent on other important work.  They invested their energy in the grant process only because they believed they could trust the federal government to keep its promises.

**IV.    The Balance of Equities and Public Interest Factors Favor an Injunction.**

The federal funding committed to the nonprofit organizations represented on this brief serves a diverse array of needs for communities across the country.  Many of these grants fund and support specialized work built upon years of community trust that is not easily transferable between nonprofits.

EPA data shows millions of Americans live in places with unhealthy air, causing thousands of premature deaths each year and exacerbating  diseases like asthma and heart disease. The most harmful impacts from air pollution occur in overburdened communities of color and/or low-income communities.  A number of federal grants issued in recent years attempt to address this problem. For example, MetroHealth received an EPA grant of $18 million for a project that aims to convert gas stoves to electric stoves in the homes of 1,200 people with asthma in order to improve indoor air quality and asthma control. MetroHealth decided to focus on asthma because Cleveland has a very high prevalence of asthma. About 21% of people in Cleveland have a history of asthma. Cleveland is among the country's four most challenging cities for people with asthma to live in according to rankings based on asthma prevalence, death rate, and emergency department visits. Additionally, we decided to focus on air quality because Cleveland outdoor air quality ranks poorly, with grades ranging from "C" to "F" from the American Lung Association for specific pollutants. (Decl. of Sehgal ¶ 4, 7).

The Community Change Grant Program provides critical funding to frontline organizations and local government agencies to implement impactful projects that will reduce air pollution and asthma rates, remove lead from drinking water, provide resilience hubs in the event of a hurricane power outage, and provide essential food services to low income communities. (Decl. of Roos ¶ 11.a.)  In Pennsylvania, Landforce was awarded a Community Change Grant to engage in workforce development programs.  Landforce recruits and trains adults residing in Pittsburgh who have faced structural barriers to stable, family-sustaining, employment based upon race or personal histories. The grant will allow Landforce to expand and create infrastructure for upcycling and commercializing value-added materials derived from local wood waste and organic materials streams, giving new life to fallen city trees and other materials, while providing pathways for career development.  (Decl. of Manspeizer ¶ 6a-h.)

One organization was awarded a grant with its partners in Puerto Rico to work to install solar and battery storage systems on community health facilities to provide them energy resilience in the event of yet another catastrophic storm caused by climate change. Over 300,000 people stand to benefit annually if these systems are installed. The organization has also committed to working with the United States Department of Energy to provide education and training on sustainable energy sources to Puerto Rican consumers, lowering bills and stabilizing the energy supply.  But at this point, they cannot access their $20 million grant funding because the federal government has frozen their funding.  (Decl. of Roos ¶ 11.a.)

The impacted nonprofits are also facing significant staffing disruptions. For example, EPN reports that several grantees have employees whose jobs are now at risk. (Decl. of Roos ¶ 15-16). Other amici report the same, for example Landforce has also been forced to lay off workers, close programs, and reduce services to community members. (Decl. of Manspeizer ¶ 6). Nonprofits who had hired staff specifically to implement the work they had committed to under grant agreements

16

face significant uncertainty. (Decl. of Lewis ¶ 6). The emotional toll on both leadership and staff is significant, as organizations expend energy to maintain team morale, reassure their teams in the face of potential job-loss, retain staff, uphold their missions, and continue providing essential services, despite financial instability and ongoing attacks against specific areas of work and communities. (Decl. of Lewis ¶ 6-8). Many of these grantees are contemplating laying off more workers, if their funding is not released immediately. (Decl. of Lewis ¶ 8.)

Nonprofits have been left to navigate the chaos described above without any meaningful guidance or support from the relevant federal agencies. In fact, these agencies have further compounded the confusion by offering inconsistent information or, in several cases, ceasing communication with grantees entirely. For example, although Landforce has been able to communicate with program officers, they have not provided clear guidance on when, or if, funds in the amount of $15,300,000 would be released, leaving the organization in a state of deep uncertainty. (Decl. of Manspeizer ¶ 6). Other grantees have faced erratic access to their funding. Funding sites have been turned on and off with little or no explanation to awardees, leaving them to speculate as to the future of their grant. Dozens of grantees briefly regained access to suspended funding accounts after January 28, 2025, only to have that access removed again; many grantees have been without access to funding since March 7, 2025. *See, e.g.,* Decl. of Roos ¶ 6*;* Decl. of Reutimann ¶ 5. They have been unable to obtain information explaining these changes or guidance on how to navigate them, threatening the grantees' operation and putting vital work at risk.

Because nonprofits are deeply embedded in the communities they serve, the federal funding freeze is having far-reaching consequences beyond the financial and programmatic strain described above. The freeze is directly undermining relationships with community stakeholders, local leaders, academic institutions and partner organizations – relationships painstakingly built over years and decades of earned trust and consistent engagement. If those projects do not move

forward, trust between impacted communities and the organizations will be irreparably eroded.

The abrupt, unexplained and illegal steps the federal government has taken in breaking its promises to these organizations will seriously damage the nonprofit community's longstanding belief that the government can be trusted to uphold its commitments. Congress has long relied on the nongovernmental sector to help implement its goals, and the nonprofit sector has historically been a reliable partner to realize legislative priorities, despite the significant application, recordkeeping and reporting obligations that often accompany federal grants. *Amici* and nonprofit organizations throughout the country invested significant time and resources designing, refining and submitting detailed plans to assist Congress in meeting its stated goals. The nonprofit groups crafted their workplans and adjusted their commitments to be in line with Congressional priorities, because they believed they had a trusted partner in the federal government and strong safeguards in the Constitution, the APA, and principles of separation of powers. That trust has been violated.

If a preliminary injunction is not issued to stop the Executive Branch from its illegal behavior and federal funding remains frozen, literally hundreds of nonprofit organizations around the country, beyond the hardworking employees that staff our *amici* groups employ, and beyond the diverse and vibrant communities these groups serve will be harmed. Critical life-saving projects like lead-removal from drinking water and air quality benefits to children with asthma will be halted and hundreds of organizations will go under. The erosion of trust will be most chilling for the participation of the smallest nonprofits in government programs. The executive's blanket attack on legally binding agreements will undermine Congress' future ability to leverage the nonprofit sector to implement its priorities. This harm is real, imminent, and almost certainly irreparable.

## CONCLUSION

For the reasons outlined above, we respectfully request that the Court grant the Plaintiffs' request for a preliminary injunction.

18

Respectfully submitted,

*s/Kathleen McDaniel*
Kathleen McDaniel (Fed. Bar No. 10139)
BURNETTE SHUTT & McDANIEL, P.A.
Post Office Box 1929
Columbia, SC 29202
T: 803.904.7913
F: 803-904-7910
KMcDaniel@BurnetteShutt.law
*Counsel for Amici Curiae*


Khadijah Silver (NY Bar No. 5473558)
LAWYERS FOR GOOD GOVERNMENT
6218 Georgia Ave NW, Unit 5001
Washington, DC 20011
T: 617.997.3394
khadijah@lawyersforgoodgovernment.org
*Counsel for Amici Curiae*
(admitted *pro hac vice*)


Jillian Beth Blanchard (CA Bar No. 203593)
LAWYERS FOR GOOD GOVERNMENT
6218 Georgia Ave NW, Unit 5001
Washington, DC 20011
T: 617.997.3394
Jillian@lawyersforgoodgovernment.org
*Counsel for Amici Curiae*
(admitted *pro hac vice*)


Larissa Mika Koehler (CA Bar No. 289581)
LAWYERS FOR GOOD GOVERNMENT
6218 Georgia Ave NW, Unit 5001
Washington, DC 20011
T: 224.216.3885
Larissa@lawyersforgoodgovernment.org
*Counsel for Amici Curiae*
(admitted *pro hac vice*)

April 23, 2025
Columbia, South Carolina

**CERTIFICATE OF SERVICE**

I hereby certify that on April 3, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of South Carolina by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served automatically by the CM/ECF system.

Date: April 23, 2025

_s/Kathleen McDaniel_
Kathleen McDaniel (Fed. Bar No. 10139)
BURNETTE SHUTT & McDANIEL, P.A.
Post Office Box 1929
Columbia, SC 29202
T: 803.904.7913
F: 803-904-7910
KMcDaniel@BurnetteShutt.law
_Counsel for Amici Curiae_