**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| The Sustainability Institute *et al.*, <br><br> Plaintiffs, <br> v. <br><br> Donald J. Trump, in his official capacity as President of the United States, *et al.* <br><br> Defendants. | Case No. 2:25-cv-2152-RMG <br><br><br> **ORDER** |

The Court conducted a hearing on April 23, 2025 to address the issue of jurisdiction and review recent developments regarding the grants at issue in this case. The Court memorializes and supplements its rulings from the bench at the April 23 hearing in two sections below. First, the Court addresses the issue of jurisdiction. Second, the Court addresses supplementing the record.

**I.    Jurisdiction**

Plaintiffs bring this case under the United States Constitution and the APA, 5 U.S.C. §§ 702, 704, alleging that Defendants improperly froze Plaintiffs' grant funds appropriated by Congress under the Inflation Reduction Act ("IRA") and the Infrastructure Investment and Jobs Act ("IIJA"). Defendants argue that this court lacks subject matter jurisdiction to hear Plaintiffs claims because (A) the Tucker Act provides the Court of Federal Claims with exclusive jurisdiction over Plaintiffs' claims and (B) Plaintiffs are challenging funding decisions committed to agency discretion by law which are not subject to Administrative Procedure Act ("APA") review.

**A.  Tucker Act**

"Absent a wavier, sovereign immunity shields the Federal Government and its agencies from suit." *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994); *see United States v. Mitchell*, 463 U.S.

1

206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction.").

The Tucker Act confers jurisdiction upon the Court of Federal Claims over specific categories of actions brought against the United States and waives the Government's sovereign immunity for those actions. 28 U.S.C.A. § 1491, *see Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005). Specifically, "[t]he Tucker act grants jurisdiction to the United States Court of Federal Claims 'to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, . . . or for liquidated or unliquidated damages in cases not sounding in tort.'" *Randall v. United States*, 95 F.3d 330, 346 (4th Cir. 1996) (quoting 28 U.S.C. § 1491). "Jurisdiction is exclusive in the Court of Federal Claims for claims over $10,000, while district courts have concurrent jurisdiction with the Court of Federal Claims for claims at or under $10,000." *Coleman v. Kendall*, 74 F.4th 610, 615 (4th Cir. 2023), *cert denied*, 144 S. Ct. 818 (2024) (citing *Randall*, 95 F.3d at 347).

The APA also offers a waiver of sovereign immunity and entitles "a person suffering legal wrong because of any agency action" to seek "judicial review thereof." 5 U.S.C. § 702. Section 702 of the APA specifies that sovereign immunity is not available as a defense when the party seeks "relief other than money damages" against the United States or its agencies. 5 U.S.C. § 702; *Bowen v. Massachusetts*, 487 U.S. 879, 891-92 (1988) (stating that Congress amended § 702 in 1976 to "broaden the avenues for judicial review of agency action be eliminating the defense of sovereign immunity" in suits "seeking relief other than money damages."). Section 704 of the APA specifies that judicial review of agency action may be had when "there is no other adequate remedy in a court." 5 U.S.C. § 704. Therefore, courts interpreting sections 702 and 704, have held that for the APA's waiver of sovereign immunity to apply, a claim must (1) request "relief other than

money damages" and (2) show no "adequate remedy" is available elsewhere, such as in the Court of Federal Claims under the Tucker Act. *See Doe v. United States*, 372 F.3d 1308, 1312 (Fed. Cir. 2004).

"The interplay between the Tucker Act and the APA is somewhat complicated and raises some significant issues of federal court jurisdiction." *Randall*, 95 F.3d at 346. As discussed, "[t]he APA allows private parties to sue the federal government in district court over final agency actions, so long as they seek relief other than monetary damages 'for which there is no other adequate remedy in a court.'" *Coleman*, 74 F.4th at 615 (quoting *Randall*, 95 F.3d at 346). And "[c]laims for money, by contrast, proceed under the Tucker Act and in the Court of Federal Claims." *Williams v. Roth*, No. 8:21-CV-02135-PX, 2022 WL 4134316, at *5 (D. Md. Sept. 12, 2022) (citing 28 U.S.C. §§ 1346(a)(2), 1491). To that end, "where 'a plaintiff has an adequate remedy by suit under the Tucker Act,' they are precluded from review under the APA." *Coleman*, 74 F.4th at 615 (quoting *Randall*, 95 F.3d at 346); *see also Maine Cmty. Health Options v. United States*, 590 U.S. 296, 324 (2020) (noting the flip side of the same coin: "[t]he Tucker Act yields when the . . . Administrative Procedure Act. . . provides an avenue for relief").

There is a "distinction between an action at law for damages—which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation—and an equitable action for specific relief . . . ." *Bowen*, 487 U.S. at 893. A claim for specific relief through declaratory judgment or injunction that requires the federal government to pay money to plaintiffs does not automatically transform the action into one for money damages. *Id.* ("The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'"); *Harrison v. Kendall*, 670 F.Supp.3d 280, 297 (E.D. Va. 2023) ("[a] suit which does not seek monetary damages does not arise under the Tucker Act

3

simply because the plaintiff's success will result in eventual monetary gain from the government."). Instead, "[t]o determine whether a plaintiff seeks primarily injunctive relief such that a district court has jurisdiction over his claim, courts must look to the 'essence' of the complaint and whether the relief requested is 'not . . . an incident of, or collateral to, a monetary award.'" *Coleman*, 74 F.4th at 615-16 (quoting *Randall*, 95 F.3d at 346).

"The classification of a particular action as one which is or is not 'at its essence' a contract action depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982).

The Court discusses the elements of the *Megapulse* framework in turn below.

**1. Source of Rights**

Defendants argue that Plaintiffs' source of rights stem from their grant agreements with the government. (Dkt. No. 56 at 10-11). Defendants point to language in Plaintiffs' motion for preliminary injunction and their amended complaint where Plaintiffs assert that they have entered into binding agreements with the government; that the government has provided funding up to a specified dollar amount, over a specified time period, for specified work; and that the government has not abided by the grant agreements and regulations. (*Id.*) Defendants further argue that Plaintiffs characterized the remedy they are seeking as simply requiring the government to honor commitments it has already made to Plaintiffs in binding grant agreements. (*Id.* at 11).

Plaintiffs argue that their claims are not based on contract, but instead are rooted in the Constitution and the grant programs' respective authorizing statutes. (Dkt. No. 64 at 5). In their amended complaint, Plaintiffs explicitly ask the Court to interpret and enforce federal law, not the individual grants. (Dkt. No. 23 at 77-88). In counts I and II of the amended complaint, Plaintiffs

contend that Defendants freezing actions violate separation of powers and were done *ultra vires*. (*Id.* at 77-81). Specifically, Plaintiffs allege that Defendants did not have any statutory, regulatory, or constitutional authority to indefinitely freeze congressionally appropriated funds and that the Defendants' actions usurped Congress' constitutionally authorized spending and legislative powers. (*Id.*) In count III, Plaintiffs allege that Defendants actions were arbitrary and capricious and violate the APA because Defendants froze all IRA and IIJA funding relying on factors which Congress did not intend them to consider. (*Id.* at 81-83). In count IV, Plaintiffs allege that Defendants violated the APA because Defendants actions are contrary to the IRA and IIJA and are not in accordance with the statutory requirements to create, fund, and carry out the grant programs. (*Id.* at 83-85). In count V, Plaintiffs allege that Defendants freezing actions violate the First Amendment of the Constitution because Defendants targeted federal funding recipients based on their viewpoint. (*Id.* at 85-87). And in count VI, Plaintiffs allege that Defendants actions violate the IRA and IIJA because Defendants are statutorily required to carry out the congressionally mandated to obligate and distribute the funds that Congress appropriated for the grant programs.

Additionally, Plaintiffs prayer for relief requests, among other things, declaratory judgments that Defendants actions violated the Constitution, statutory provisions enacting and appropriating funds to Plaintiffs grant programs, and the APA; an injunction prohibiting Defendants from otherwise impeding, blocking, cancelling, or terminating Plaintiffs' access to their grant funds; and an order setting aside Defendants actions to freeze or terminate the grants. (*Id.* at 89-91).

Based on the Court's review of the Complaint, the Court finds that Plaintiffs' claims do not turn on the terms of a contract between the parties. None of Plaintiffs' claims are based on Defendants failure to perform obligations in the grant awards. Plaintiffs are not seeking judicial

5

review of the grant agreements between the parties. Instead, they have asked the Court to review and interpret federal laws. That Plaintiffs' action implicates agreements for federal funds does not transform the action into one for money damages. The source of the rights alleged in this action is federal law—namely the IRA, IIJA, and the Constitution—not any obligations outlined in the grant awards.

### 2. Type of Relief Sought

Defendants argue that Plaintiffs seek monetary relief because their claims are tied to Plaintiffs accessing federal funds. (Dkt. No. 56 at 11). Defendants further argue that the Court of Federal Claims could provide the Plaintiffs complete relief because Plaintiffs are requesting the monetary amounts awarded by the grants, which, in Defendants' view, are specific sums already calculated and past due.

It is now axiomatic that there is a "distinction between an action at law for damages," which provides monetary compensation, and "an equitable action for specific relief," which might nonetheless require monetary relief. *Bowen*, 487 U.S. at 893; *see Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002) ("[W]hether [restitution] is legal or equitable depends on 'the basis for [the plaintiff's] claim' and the nature of the underlying remedies sought." (quoting *Reich v. Continental Casualty Co.*, 33 F.3d 754, 756 (7th Cir. 1994) (Posner, J.))). Simply because "a judicial remedy may require one party to pay money to another" does not necessarily "characterize the relief as 'money damages.'" *Bowen*, 487 U.S. at 893. A hallmark of such equitable actions is the existence of prospective relief in ongoing relationships. *Compare Bowen*, 487 U.S. at 905 (holding the district court had jurisdiction because declaratory or injunctive relief was appropriate to clarify petitioner state's ongoing obligations under the Medicaid plan), *with Me. Cmty. Health Options v. United States*, 590 U.S. 296, 298 (2020) (holding that petitioners properly

relied on the Tucker Act to sue for damages in the Court of Federal Claims because plaintiffs were strictly concerned with "specific sums already calculated, past due, and designed to compensate for completed labors").

The Court finds *Bowen* especially instructive here. "The principal question presented [in *Bowen*] is whether a federal district court has jurisdiction to review a final order of the Secretary of Health and Human Services refusing to reimburse a State for a category of expenditures under its Medicaid program." *Bowen*, 487 U.S. at 882. The Supreme Court held the district court had subject matter jurisdiction over the suit. *Id.* at 912. The plaintiff, Massachusetts, sought prospective relief which was "important to the Commonwealth both because the . . . program [at issue was] still active and because the legal issues involved [had] ramifications that affect[ed] other aspects of the Medicaid program. What [was] at stake . . . [was] the scope of the Medicaid program, not just how many dollars Massachusetts should have received in any particular year." *Id.* at 889–90. Thus, the Supreme Court held the Court of Federal Claims was unable to provide an adequate remedy. *Id.* at 904.

Plaintiffs primary purpose in brining their claims is to seek equitable, not monetary, relief. They do not bring claims for past pecuniary harms. Rather, like the plaintiffs in *Bowen*, Plaintiffs claims are to preserve their ongoing and prospective agreements with the Government. Plaintiffs have an ongoing relationship with the government and seek declaratory and injunctive relief to confirm the Government's future obligations towards Plaintiffs under the IRA and IIJA. Plaintiffs' claims are about the process in which their grants were frozen, not the monetary awards in the grants themselves.

Additionally, the harms that Plaintiffs allege can only be remedied by specific, not monetary, relief. Plaintiffs state that the blanket IIJA and IRA funding freezes will result in lost

jobs, suspension of research and community initiatives, loss of goodwill, and harm to the Plaintiffs' reputation. Money damages will not resolve those alleged harms.

Specifically, loss of goodwill and harm to Plaintiffs' reputation cannot be remedied by monetary damages. Some of the Plaintiffs here have devoted resources to build trust and relationships in the communities in which they serve, and those Plaintiffs now fear that the trust and relationships they built may be broken. For example, Plaintiff Pennsylvania Association for Sustainable Agriculture ("Pasa") is a non-profit organization that supports farmers' goals of creating economically viable, environmental sound, and community-focused farms and food systems. Pasa is largely funded by federal grants. It's largest grant award, $50 million from the Untied States Department of Agriculture Natural Resources and Conservation Service Partnership for Climate-Smart Commodities program, was frozen and is subject in this lawsuit. When applying for that award, Pasa built trust and relationships with farmers in their communities, the people Pasa endeavored to serve with the grant funds. Pasa now fears that the continued freezing of funds may force them to abandon the very farmers who entrusted them with their time and their land. Those relationships are also tested by the uncertainty surrounding federal funds caused by the funding freeze. Pasa states that, if the trust between Pasa and the farming community is broken, it is impossible to estimate how long it may take to repair those relationships. (Dkt. No. 24-13).

Even if the total grant funds could be restored by a damages award in the Court of Federal Claims, such a damage award would not alleviate the reputational harms Plaintiffs would likely suffer. The farmers, for example, may be hesitant to work with Pasa in the future in fear that an agency's funding decision may change overnight and disrupt critical operations, such as seasonal planting and harvesting. Under these circumstances, declaratory relief establishing that blanket freezes of grants done without individualized process and without legal authority are improper is

critical to provide to provide Plaintiffs effective relief. Such relief, if granted, would provide Pasa's clients with the assurance that any federal funds that they plan to rely on will only be frozen or cancelled through actual authority provided by federal laws and after the funding agency follows the lawful process. This example emphasizes that Plaintiffs' claims are about process, not damages, and are available only through the equitable powers of the district court under the APA.

Since the Court finds that the proper source of Plaintiffs' rights is federal law and because the relief sought is declaratory and injunctive in nature, the Court finds that the "essence" of the Plaintiffs' claims is not contractual in nature. Plaintiffs' claims cannot properly be brought under the Tucker Act in the Court of Federal Claims and fall plainly within the jurisdiction of this Court under the APA.

### 3. *Department of Education v. California*

Defendants contend that the Supreme Court's recent issuance of an emergency stay order in a three-page decision, issued without benefit of a record or oral argument, definitively disposes of all jurisdictional issues in this case. The Court finds Defendants' argument unpersuasive.

In *Department of Education v. California*, the Supreme Court stayed a district court's temporary restraining order pending the resolution of the appeal in the underlying case. *California*, 2025 WL 1008354, at *2. At the district court, plaintiffs sought preliminary relief enjoining the Government from terminating grant awards under programs administered by the United States Department of Education. *California v. U.S. Department of Education*, No. 25-105488-MJJ, 2025 WL 760825, at *1 (D. Mass. Mar. 10, 2025). The District Court for the District of Massachusetts granted injunctive relief against the government. *Id.* at *5. The Government appealed the district court's order and requested a stay pending the appeal. *California v. U.S. Department of Education*, No. 25-1244, 2025 WL 878431, at *1 (1st Cir. Mar. 21, 2025). The First Circuit Court of Appeals

denied the Government's request to stay the district court's order pending appeal. *Id.* at *1. The Government then filed an emergency application to the Supreme Court requesting the Court vacate the district court's temporary restraining order and immediately stay the case pending the disposition of the Government's appeal. *California*, 2025 WL 1008354, at *1. The Supreme Court granted the application and stayed the district court's order. The Court reasoned that a stay is appropriate because (1) "the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA," (2) the Government is likely to suffer irreparable harm, and (3) "respondents would not suffer irreparable harm while the TRO is stayed." *Id.*

In finding that the Government is likely to succeeded in showing the District Court lacked jurisdiction to order payment of money under the APA, the Supreme Court very briefly discussed the jurisdictional line between the APA and Tucker Act. The Supreme Court noted that the APA's waiver of sovereign immunity does not apply to claims seeking money damages, but also reaffirmed the general rule that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." *Id.* (quoting *Bowen*, 487 U.S. at 910). The Supreme Court further noted that "the APA's limited waiver of sovereign immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the [district court in *California*] ordered . . . ." *Id.* (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). Instead, the Supreme Court stated that "the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (quoting 28 U.S.C. § 1491(a)(1)).

The *California* ruling is not dispositive of the jurisdictional questions in this case for three reasons.

First, the *California* ruling was made in the context of an emergency application for a stay pending appeal. In that procedural posture, the Supreme Court relied on limited briefing and did not have the benefit of oral argument or a factual record. Additionally, the Supreme Court applied a likelihood of success standard to the Government's application for a stay, stopping well short of addressing the complex jurisdictional issues on the merits. Without a factual record, meaningfully addressing the jurisdictional issues under *Bowen* would not have been possible. Under these circumstances, the Supreme Court's brief treatment of *Bowen* and *Great-West Life* in *California* and the cursory mention of potential jurisdictional issues do not appear to definitively address the jurisdictional issues in this case. The Court therefore finds that, *Bowen*, not the emergency stay order in *California*, is the guiding compass in deciding whether the Court has jurisdiction under the APA or the Court of Claims has jurisdiction under the Tucker Act.

Second, the terms and conditions of the individual grants are not at issue here. In *California*, the First Circuit Court of Appeals determined that "the terms and conditions of each individual grant award" were "at issue." *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 96-97 (1st Cir. 2025). On appeal, the Supreme Court then granted the Department's application for a stay because it concluded that the district court issued an order "to enforce a contractual obligation to pay money" and "the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." *California*, 2025 WL 1008354, at *1. In this case, the terms and conditions of each individual grant are not at issue. Rather, this case deals with Defendants' implementation of a broad, categorical freeze on obligated funds pending determinations on whether it is lawful to summarily freeze or terminate disbursements of such funds. Plaintiffs here allege that the categorical funding freeze was not based on individualized

11

assessment of any particular grant terms and conditions or agreements between the Parties but, instead, was based on the grants being funded by the IRA and IIJA.

Third, there are still other factors the Supreme Court considered in ruling in *California* which are not relevant or present here. The issuance of a stay is dependent upon the circumstances of the particular case, and the Supreme Court's finding that the District Court likely lacks jurisdiction is just one of the factors it considered. The Supreme Court also considered potential harm to the parties and public interest when issuing the stay. The combination of those factors guided the Supreme Court in making its judgment. Those factors are not relevant to the Court's determination here. And even if they were relevant, they are not present in this case. For example, unlike in *California* there is no indication in this case that the Plaintiffs could not or would not pay the money back if so ordered. Additionally, Plaintiffs have provided considerable evidence of irreparable harm should they not regain access to their grant funding. This is different from *California* where the Supreme Court specifically found that the State government could fund the affected programs during the pendency of the litigation, effectively eliminating a major portion of the California plaintiffs' irreparable harm claim. *California*, 2025 WL 1008354, at *1.

In sum, considering the full record before the Court, the clear statutory authority for APA jurisdiction where a party is seeking relief from agency action other than money damages, and the well-established standards set forth in *Bowen*, the Court finds that it has jurisdiction over this matter under the APA.

**B. Agency Discretion**

Defendants argue that their actions to freeze the grant funds were committed to agency discretion by law and fall outside the scope of permissible judicial review under the APA. (Dkt. No. 56 at 14-16).

As discussed above, APA provides "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. "That language sets up a 'basic presumption of judicial review' of agency action." *Holbrook v. Tennessee Valley Auth.*, 48 F.4th 282, 287 (4th Cir. 2022) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140 (1967)). The text carves out two exceptions to that "basic principle." *Id.* First, where "statutes preclude judicial review" per § 701(a)(1); and second, where "agency action is committed to agency discretion by law" per § 701(a)(2). *Holbrook,* 48 F.4th at 287. With regard to the second, "[a]gency action is committed to the agency's discretion when no judicially manageable standards are available to assess how and when an agency should exercise its discretion such that a court would have 'no law to apply.'" *Pharm. Coal. for Patient Access v. United States*, 126 F.4th 947, 964 (4th Cir. 2025) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830–31 (1985)). Of import here, the APA's prohibition of judicial review of actions committed to agency discretion by law, and a defect related thereto, "goes to subject matter jurisdiction." *Id.* (citing *Angelex Ltd. v. United States*, 723 F.3d 500, 505–506 (4th Cir. 2013)).

Defendants primarily rely on the Supreme Court's opinion in *Lincoln v. Vigil* to support its argument on agency discretion. 508 U.S. 182 (1992). In *Lincoln*, the Court found an agency's particular use of funds from a "lump sum" grant was committed to its discretion because "the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Lincoln*, 508 U.S. at 192. That is, "a lump-sum appropriation reflects a congressional recognition that an agency must be allowed flexibility to shift funds within a

13

particular appropriation account so that the agency can make necessary adjustments for unforeseen developments and changing requirements." *Id.* at 193 (internal citation omitted).

Here, there is no indication that Congress intended to commit funding under the IRA and IIJA to the agencies' discretion. Defendants have not pointed to any evidence showing that this was Congress' intention. And this case does not involve an agency's allocation of funds under a lump-sum grant by Congress (which by its nature implies delegation of wide discretion to the agency). Because Defendants have not shown that the funds at issue here were committed to agency discretion, the Court declines to apply the 5 U.S.C. § 701(a)(2) exception to the APA's waiver of sovereign immunity here.

## II. Supplementation of the Record and the Process Going Forward

When this case was initially filed on March 19, 2025, Plaintiffs alleged that their grants, totaling 38, had been frozen[1] because the funds for those grants had been appropriated under two Acts of Congress now disfavored by the present Administration: the Inflation Reduction Act (IRA) and the Infrastructure Investment and Jobs Act. (IIJA). (Dkt. No. 1 at 2). At oral argument before the Court on April 23, 2025, Defendants' counsel was unable to provide the Court any estimate of the number of grants which had been summarily frozen since January 20, 2025, but he acknowledged that grants had been frozen on a mass, not individualized, basis.[2]

In response to a recent Order directing Defendants to provide a status report on the 38 grants at issue in this litigation, Defendants submitted a chart which indicated that the funding of 13 grants had been restored, four of the grants had been terminated, and 12 of the grants had

---

[1] As used in this Order, the terms "frozen" or "freeze" have the same meaning as a "pause" in funding or any other action that disrupted the normal flow of grant funds to the grantees.

[2] This was corroborated by the fact that in the thousands of pages of records produced by Defendants relating to the freezing of grants at issue in this litigation, the Court could not locate a single document (other than four termination letters) which referenced any individual grantee.

terminations being processed. (Exhibit A). It appears to the Court that the Defendants' chart reflects a pivot away from the summary freezing of grants in mass. Defendants appear now to be turning their focus to a narrower set of grants allegedly sought to be terminated because they are allegedly not consistent with "agency policy." At the hearing of April 23, 2025, Defendants' counsel could not provide the Court any additional justification for the termination or proposed termination of any of the grants in this litigation. Questions also arose at the recent hearing regarding the status of certain grants.

In an effort to obtain greater specification of the reasons for the proposed termination of certain grants and a better understanding of the present status of several other grants, the Court orders Defendants to provide the following within seven days of this Order:

1. All documents prepared, received, possessed or transmitted from January 20, 2025 to the present relating to the termination of the grants set forth in Exhibit A at Nos. 9, 10, 11, and 12 and the proposed termination of grants set forth at Nos. 2, 3, 4, 5, 6, 7, 27, 28, 29, 30, 31, and 32.

2. All documents prepared, received, possessed or transmitted from January 20, 2025 to the present relating to the freezing of funds set forth in Exhibit A at Nos. 16, 22, and 23.

3. All documents prepared, received, possessed or transmitted from January 20, 2025 to the present relating to the decision to finalize or not to finalize the grant awards set forth in Exhibit A at Nos. 37 and 38.

4. All documents prepared, received, possessed or transmitted from January 20, 2025 to the present relating to the status of the grant set forth at Exhibit A at No. 15. Exhibit A lists No. 15 as "accessible to grantee" but Plaintiffs indicate this grantee has been

unable to access the funds. To the extent the grant remains frozen or slated for possible termination, produce all relevant documents.

5. All documents prepared, received, possessed or transmitted from January 20, 2025 to the present relating to the status of the grant set forth at Exhibit A at No. 8. Exhibit A lists this grant as "closed," and Plaintiffs assert that to their knowledge the grant is frozen. To the extent the grant remains frozen or is slated for possible termination, produce all relevant documents.

6. All documents prepared, received, possessed or transmitted from January 20, 2025 to the present in which Defendants were instructed and/or advised that all grants authorized by the IRA or the IIJA were to be frozen.

7. The Court previously gave Defendants until April 21, 2025 to supplement their privilege logs regarding the deliberative process privilege. (Dkt. No. 77). Per Defendants' request, the Court extends the time to supplement the privilege logs until 7 days following the issuance of this order and only the privilege logs of Defendants EPA and USDA need to be addressed.

In the event that any Defendant asserts any privilege in regard to any of the documents required to be produced in Paragraphs 1-7 above, such documents must be identified in an appropriately documented privilege log and must be submitted to the Court under seal and *ex parte* for *in camera* review within seven days of this Order.

Additionally, to avoid the confusion created by Defendants producing thousands of documents in response to this Court's earlier order without identifying which particular discovery request Defendants were responding to, the Court orders and directs that Defendants respond to each discovery request above separately and clearly identify which documents are responsive to

each discovery request. This directive applies both to responses to discovery requests in which no privilege is asserted as well as all documents produced *ex parte* and *in camera* based on an assertion of privilege.

Once Defendants comply with their discovery obligations to the Court above, Plaintiffs may file a response to the submitted documents and address any other issues related to the production of documents and/or their pending motion for a preliminary injunction with seven days after receipt of the Plaintiffs' responses required in Paragraphs 1-7 above.

Finally, in regard to the grants which Defendants have identified as now unfrozen in Exhibit A at Nos. 13, 14, 15, 16, 17, 18, 20, 21, 24, 25, 26, 34, 35 and 36, Defendants are ordered and directed not to subsequently freeze or terminate these grants without notice to the Court and authorization from the Court that the freezing and/or terminating of the grants may proceed.

s/ Richard Mark Gergel
Richard Mark Gergel
United States District Judge

April 29, 2025
Charleston, South Carolina