**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| THE SUSTAINABILITY INSTITUTE, et al., <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, et al., <br><br> Defendants. | Case No. 2:25-cv-02152 |

## PLAINTIFFS' RESPONSE TO ORDER, ECF NO. 146

## INTRODUCTION

Defendants' latest filing answers any remaining question about whether they have a lawful justification for the termination of federal grants and other actions challenged in this case: they do not. Instead, their filing and the discovery produced confirms that Defendants made no individualized grant decisions and made no attempt to comply with the Administrative Procedure Act ("APA"). Rather, they abruptly froze and then terminated grants with no other reasoning than the fact the individual grants are part of grant *programs* that the Executive Branch disfavors as being contrary to the President's priorities.

Meanwhile, Plaintiffs' work to serve their communities remains at a standstill and their employees remain furloughed. *E.g.*, Dkt. No. 64-3 at ¶ 4. These communities—including those in Charleston—need and deserve the help Congress intended and that Defendant agencies previously authorized. While the Court's April 29 Order helpfully prevented the re-freezing of grants that Defendants had unfrozen following a separate preliminary injunction, a majority of grants at issue in this case remain frozen, terminated, or slated for imminent termination.

Because Defendants have now made clear that all decisions on these grants were made on a sweeping, programmatic (or higher) level, without reasoned consideration of individual grant projects or the consequences of blocking funding to them, and because Defendants have likewise confirmed that those actions were impermissibly based on disagreements with Congress, which holds power over spending, the Court should grant Plaintiffs' motion for a preliminary injunction against these broad, unlawful actions, and order that the frozen and terminated grants be unfrozen and reinstated. *See* Ex. 1 (describing the relief requested for each grant).

## **BACKGROUND**

Defendants have been given repeated opportunities to provide legitimate justifications for their actions but have failed to do so at every turn. On March 26, Plaintiffs moved for a preliminary injunction and sought expedited discovery to better understand the basis for the freeze and terminations relating to the grants at issue in this case. Dkt. Nos. 24 & 25. This Court granted that discovery request, in part, Dkt. No. 45, and Defendants produced hundreds of thousands of pages of materials (Dkt Nos. 79-133) (including some for *in camera* review) in advance of the hearing on the preliminary injunction. None of those materials, however, reflect any determination that any of the Plaintiffs in this case failed to fulfill their obligations under the grants or that somehow—contrary to a prior determination by the same agency—the grants did not fulfill the purposes Congress intended.

At the April 23 hearing, Defendants conceded they had engaged in a "broad pause based on funding," but went on to assert, "I do think the terminations were done based on a review of the grants." Ex. 2, Tr. 35:22-25.[1] The Court then had the following colloquy with Defendants' counsel:

---

[1] Excerpts from the Transcript of the April 23, 2025 hearing are attached as Exhibit 2.

2

THE COURT: . . . But you haven't given me any documents to show me that, have you?

MR. TIMMONS: I don't have all the documents that we would intend to present in this case.

THE COURT: I'm going to give you a chance to present them because I'm going to have you present them in the next week to me on every one of these grants which have been terminated and which have been – are terminations in progress. I want to see the underlying reasoning.
[. . .]
I want to see what was the reasoning behind it. What was the -- what was the stated purpose. And you're telling me they made an individual determination of why that grant should be terminated? They've made an individualized determination, are you telling me that?

MR. TIMMONS: I think the decision making in this case is always going to be it's inconsistent with priorities, and that it – it's going to be – it's going to be the same reason for all of them, yes, Your Honor.

Ex. 2, Tr. 36:2-23. Though defense counsel initially referred to documents not before the Court that might show that grants were reviewed on an individual basis, he ended by stating that "it's going to be the same reason for all of them," namely the grants' purported inconsistency with the President's "priorities." But as the Court went on to clarify,

THE COURT: . . . To say it's a different priority does not answer the question.

MR. TIMMONS: That is the explanation that the agency gave. I can't offer you a different --

THE COURT: I'm going to give you another chance to go back and get specific documents to show what that means because ***that's not good enough. That is not good enough***.

Ex. 2, Tr. 39:11-18 (emphasis added).

At the hearing, the Court again invited Defendants to produce documents explaining their reasons for freezing or terminating specific grants, noting that none of the 9,000 documents produced mentioned any grantee at issue in this case (or any other by name). Ex. 2, Tr. 71: 17-25.

3

But Defendants have now made clear that they have nothing beyond the "not good enough" generalized notion of Presidential "priorities" to rely on.

On April 29, the Court issued a written Order directing Defendants to produce any additional documents "to obtain greater specification of the reasons for the proposed termination" of Plaintiffs' grants. Dkt. No. 146 at 15. Defendants filed no additional termination documents—apparently because they have none to file. In so doing, they have conceded that they: (1) made no individualized grant determinations, (2) made no assessment about how to faithfully execute Congressional mandates, and (3) failed to follow the careful process and reasoned consideration required by the APA. Instead, Defendants have submitted declarations that merely point to documents they had previously filed with the Court regarding broad, unstudied actions to block funding on a programmatic basis—a justification the Court already stated was "not good enough."

Because Defendants have produced nothing to show they made specific decisions about individual grants or followed any of the process required by the APA, and instead have confirmed that they eliminated funding in a generalized, Executive Order-driven manner that violates their duty to faithfully execute laws passed by Congress, Plaintiffs respectfully submit that this Court has everything it needs before it to enjoins Defendants' unlawful actions and should do so as soon as possible to prevent further harm to Plaintiffs and the communities they serve.

## **ARGUMENT**

Plaintiffs reaffirm their arguments from the opening preliminary injunction brief and continue to assert that all factors under *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), have been met. As a result of the discovery produced by Defendants, and because

of some of the changed circumstances, Plaintiffs refine some of their arguments to respond directly to Defendants' assertions. Whatever the context, though, Defendants' agency action violates the separation of powers and the APA.

## I.    Defendant EPA Illegally Terminated Grants

### A.    The Record Demonstrates Broad, Non-Individualized Determinations

In its latest filing, EPA confirms that it cancelled grant programs *en masse* without any assessment of the individual grants involved. In his declaration, EPA Assistant Deputy Administrator Travis Voyles explains that on February 25, 2025, he unilaterally, and on a single day, determined that several grant *programs* should be terminated "for policy reasons." Dkt. No. 147-4 at 2:24-25. These included *all* grants in the Environmental Justice Collaborative Problem Solving Agreement Program, Community Change Grants,[2] and the Environmental Justice Government to Government Program at issue in this case. Mr. Voyles explains how grants in these programs were initially frozen, and then subsequently terminated. Grants # 9,10,11, and 12 on Exhibit A to the Court's April 29 Order were terminated prior to this Court's April 23 hearing, and Grants #2,3,4,5,6,7, and 8 have subsequently been terminated, or will soon be terminated. *Id.* at 1:20-2:21.

While Mr. Voyles does not explain what these "policies" are (an omission that is fatal in its own right, *see infra* at 11–12), documents in the record, and the Executive Orders Mr. Voyles was responding to, paint a picture of defiance of Congressional intent. The evidence is clear that

---

[2] Attachments to Mr. Voyles declaration refer to his decision to terminate "The Environmental Justice Block Grant Program" which includes Community Change Grants, Environmental Justice Collaborative Problem Solving grants and Environmental Justice Government to Government Grants. *Inflation Reduction Act Environmental and Climate Justice Program*, EPA, https://www.epa.gov/inflation-reduction-act/inflation-reduction-act-environmental-and-climate-justice-program (last updated Mar. 27, 2025).

these "policies" included an effort to eliminate "environmental justice" and "climate change" programs. *See, e.g.*, Ex. 3, (email asking staff to search awards for the term "Environmental Justice"); Ex. 4 (email from T. Voyles ordering freeze on list of environmental and climate justice grant programs in advance of cancellation); *see also* Equity EO § 2(b) (ordering agencies to "terminate . . . all 'equity-related' grants or contracts" and to list all "Federal grantees who received Federal funding to provide or advance DEI, DEIA, or 'environmental justice' programs, services, or activities"); Energy EO § 7 (ordering agencies to "Terminat[e] the Green New Deal"). Other documents in the record suggest another policy objective may have been "taxpayer savings"—that is, *not* spending the money Congress appropriated. *See* Ex. 5 (Feb. 24, 2025 email touting "total taxpayer savings" from terminations); Ex. 6 (crafting social media post about terminations helping the American taxpayer).

While Mr. Voyles describes his review as "individualized," he admits he conducted only a review of grant *programs*, not any individual grants: he states that on February 25, 2025, "I decided that certain grant *programs* . . . should be terminated for policy reasons." Dkt. No. 147-4 at 2:24-25 (emphasis added). There is no evidence in the record that any consideration was given to the work plans or other details involved for any particular grant, including the ones at issue in this case. No reasoned decisionmaking is referenced in Mr. Voyles declaration, and none is found in the documents Defendants have produced.[3]

_____

[3] This across-the-board approach is not new. In a January 27 memo (Dkt. No. 23-8), EPA directed that all IRA and IIJA grant funding be frozen. Yet despite the fact that the Court ordered Defendants to provide "All documents prepared, received, possessed or transmitted from January 20, 2025 to the present in which Defendants were instructed and/or advised that all grants authorized by the IRA or the IIJA were to be frozen," Dkt. No. 146 at 16, Defendants' Response to this request addresses only the Office of Management and Budget, not EPA or any other Defendant. Dkt. No. 147 at 3.

**B.     The Terminations Violate Separation of Powers.**

In making this broad decision to terminate entire grant programs, EPA failed to "faithfully execute" the laws passed by Congress. U.S. Const. art. II, § 3. As Plaintiffs have explained, the grant programs at issue here were established under the "Environmental and Climate Justice Block Grant Program," which amended Section 138 of the Clean Air Act to require EPA to direct $2.8 billion in grants to programs that "benefit disadvantaged communities."[4] 42 U.S.C. § 7438.

Congress instructed that the EPA Administrator "**shall**" use the Environmental and Climate Justice Block Grant Program funds "to award grants for periods of up to 3 years to eligible entities to carry out [certain specified] activities," 42 U.S.C. § 7438(b)(1) (emphasis added), such as "community-led air and other pollution monitoring, prevention, and remediation," "mitigating climate and health risks" from various specified sources, "climate resiliency and adaptation," "reducing indoor toxics and indoor air pollution," and "facilitating engagement of disadvantaged communities in State and Federal advisory groups, workshops, rulemakings, and other public processes." *Id.* § 7438(b)(2). Congress defined "eligible entity" as "a community-based nonprofit organization," "a partnership of community-based nonprofit organizations," or a partnership between such nonprofits and "an Indian tribe, a local government, or an institution of higher education." *Id*. § 7438(b)(3).

The cancelled grants all align precisely with these statutory criteria. For example, Sustainability Institute is a "nonprofit organization." *id.* § 7438(b)(3)(B), that was awarded an

---

[4] Defendants make much of the fact that the statute directs that "disadvantaged communities" is to be defined by the Administrator. But this defining was already done when the grants were awarded. Any new definition would require a rational process, compliant with the APA. And in any event, there is no evidence in the record that the Administrator has a new definition.

Environmental and Climate Justice Block grant to advance "climate resiliency and adaptation," *id.* § 7438(b)(2)(C), by building energy efficient homes and weatherizing existing homes in a "disadvantaged communit[y]." *Id.*; Dkt. No. 24-02 at ¶¶ 2, 8. Likewise, Bronx River Alliance is a "nonprofit organization," *id.* § 7438(b)(3)(B), that was awarded an Environmental Justice Collaborative Problem Solving grant for "pollution monitoring, prevention, and remediation," § 7438(b)(2)(A), in local waterways within "disadvantaged communities." *Id.* § 7438(b)(2)(E); Dkt. No. 24-06 at ¶¶ 2, 4. Similarly, the City of New Haven is a "local government," *id.* § 7438(b)(3)(A)(i), that was awarded an Environmental Justice Government to Government grant to advance "climate resiliency and adaptation", *id.* § 7438(b)(2)(C), with a "partnership of community-based organizations." *Id.* § 7438(b)(3)(C); Dkt. No. 24-19 at ¶¶ 6-7.

These grants were terminated in spite of Plaintiffs' compliance with statutory criteria, which in the case of Sustainability Institute was confirmed in writing by EPA staff on April 9, April 24, and again on May 5.[5] Worse, these grants were terminated precisely *because* they align with statutory criteria related to "environmental justice" and "climate change"—the targets of the challenged Executive Orders and agency actions implementing those orders. Dkt. No. 24-1 at 17–19, 27–28; Dkt. No. 64 at 9–10. Where Congress has set such spending priorities, a President's desire to overturn those priorities by targeting them in Executive Orders is *not* a valid reason for terminating these grants. The President "'may not decline to follow a statutory mandate or prohibition simply because of policy objections.'" *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1232 (9th Cir. 2018) (quoting *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C.

---

[5] *See* Ex. 7 at 7–9 (emails from EPA project officer, stating Sustainability Institute is an "exemplary grantee" that "has continued to promptly fulfill all requirements" and "all milestones indicated in the work plan," with no "ill findings related to the grant that would prompt such sudden suspension" or "a grant termination").

Cir. 2013)); *see also PFLAG, Inc. v. Trump*, No. CV 25-337-BAH, 2025 WL 685124, at *1 (D. Md. Mar. 4, 2025) ("The challenged provisions of the Executive Orders place significant conditions on federal funding that Congress did not prescribe. This, the Constitution simply does not allow, as '[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes.'" (quoting *Clinton v. City of New York*, 524 U.S. 417, 438 (1998)). Yet such policy objections are exactly what EPA admits it relied on here. Dkt. No. 147-4 at ¶ 3 (EPA grant "programs" were "terminated for policy reasons"); *id.* at 110 (listing "IRA grant programs which are slated to be terminated"). Accordingly, EPA's termination of Plaintiffs' grants, as part of broad program-based terminations based solely on "policy reasons" set by the Executive Orders, violates the separation of powers.

This constitutional violation is compounded because there is no plan in place to spend the resources on other programs consistent with Congressional intent. It took EPA a year and a half to identify and select the current raft of grant programs through a rigorous and competitive process, and another year to work with the grantees to develop detailed work plans. *See, e.g.,* Dkt. No. 24-09 at ¶ 6; Dkt. No. 24-10 at ¶¶ 5-6. There is no evidence, or even suggestion, that EPA has a plan in place to go through a similar process with new grantees; in fact, EPA recently announced plans to terminate all the staff working on these programs.[6] The Congressional appropriation expires next year, in 2026. 42 U.S.C. § 7438(a)(1). The record makes clear that the EPA has neither the intent nor the means to fulfill its statutory obligations relating to these programs.

---

[6] Georgina Gustin, *EPA Continues to Dismantle Environmental Justice Office, Announces Plans to Terminate Nearly 300 Employees*, Inside Climate News (Apr. 22, 2025), https://insideclimatenews.org/news/22042025/epa-announces-plans-to-terminate-nearly-300-employees/, Ex. 8 and 9.

### C.     The Terminations Violate the Administrative Procedure Act.

As Plaintiffs have explained, Congress enacted the APA to ensure stability in agency action by mandating reasoned decision-making and to guard against agencies' pursuit of a political agenda without adherence to legal process. *See N.C. Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 772 (4th Cir. 2012) (Wilkinson, J., concurring) (noting the APA prohibits policy change based on "political winds and currents" without adherence to "law and legal process"). To effectuate these goals, the APA imposes both substantive and procedural constraints on final agency action. *See Cent. Tex. Tel. Coop., Inc. v. Fed. Commc'ns. Comm'n*, 402 F.3d 205, 209 (D.C. Cir. 2005). As to the former, the APA requires courts to set aside agency action that is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A), (B), (C).

Mr. Voyles's declaration, and the record before the court, make clear that no attempt was made to comply with either of these substantive or procedural requirements. As noted above, the terminations are substantively at odds with the statutory text mandating the Environment and Climate Justice Block Grant program.

As to process, it is clear Mr. Voyles failed to engage in "reasoned decisionmaking," and his actions were the very essence of arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983). Mr. Voyles and EPA "relied on factors which Congress has not intended [EPA] to consider," *i.e.*, the lacking, totally unspecified "policy reasons" he notes in his declaration. *Id*.; Dkt. No. 147-4 at ¶ 3. For example, as discussed above, the Administration's policy is aimed at eliminating "environmental justice" and "climate change" programs, which stands directly at odds with the plain language and stated purpose of the

10

"Environmental and Climate Justice Block Grant" program established by Congress. And "taxpayer savings" was plainly not an objective of Congress when it appropriated $2.8 billion to be spent for this purpose. *See* Section I A, *supra*.

Mr. Voyles and EPA "entirely failed to consider an important aspect of the problem" when they terminated grants mandated by Congress without any regard for how Congressional objectives could be accomplished. *State Farm*, 463 U.S. at 43. The record shows that no attempt was made to examine "relevant data and articulate[] a satisfactory explanation for [the] action," *Def's. of Wildlife v. U.S. Dep't of Interior*, 931 F.3d 339, 345 (4th Cir. 2019), let alone articulate "a rational connection between the facts found and the choice made." *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (quoting *State Farm*, 463 U.S. at 43).

These errors were further compounded by the fact that EPA was not writing on a "blank slate" but instead "changing [its] position." *F.C.C. v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009). In reversing its stance, EPA was required to "provide a more detailed justification than what would suffice for a new policy. *Id*. Yet, EPA failed entirely to give "good reasons for the new policy," *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 223 (2016) (citation and quotations omitted), nor did it attempt to offer "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fox*, 556 U.S. at 516. The environmental injustices and climate change threats that these policies and grant programs were designed to address persist, yet EPA has not explained why a different approach is needed.

Moreover, in abruptly changing course and policy, EPA was required to "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy interests." *Dep't of Homeland Sec. v. Regents of Univ. of Cal*., 591 U.S. 1, 33 (2020). But nowhere in Mr. Voyles's declaration or in the record is there any

suggestion that anyone at EPA considered how these boilerplate termination notices would impact the Plaintiffs, their subgrantees, or the communities they support. *See, e.g.*, Dkt. No. 24-1 at 24–25.

## II.     Defendant USDA Illegally Froze and Terminated Grants

Defendants' filings and the documents they have produced show that USDA grants were terminated and frozen in the same arbitrary and unconstitutional manner as other agencies' grants. The filings confirm that USDA has not provided any reasoned explanation as to why it terminated and froze Plaintiffs' specific grants.

On February 13, Secretary Rollins issued Memorandum 1078–001 to USDA staff. Citing the Equity EO, this Memorandum makes the astounding claim that "'[e]quity is a concept at war with this nation's founding principles," and orders "the recission of all Diversity, Equity, Inclusion, and Accessibility (DEIA) programs," among other anti-diversity measures. Dkt. No. 147-1 at 18–19. On March 13, Secretary Rollins issued Memorandum 1078-004 to USDA staff. This Memorandum establishes the "priority" of "ensuring that the Department's grants, cooperative agreements, and other similar arrangements . . . do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives." *Id.* at 21. This Memorandum orders a review of all grants and the termination of any grants "deemed inconsistent with the Department's [DEI] priorities." *Id.* at 22.

In their May 6 filing, Defendants provided two declarations from USDA officials offering rationales for the freeze and termination of USDA grants, some of which include *post hoc* explanations nowhere offered in the contemporaneous documents produced by USDA. *See* Dkt.

Nos. 147-1, 147-2.[7] These declarations address the six Partnerships for Climate-Smart Commodities grants that have now been terminated, Dkt. No. 147-1 at ¶¶ 3–16; two other awards that were paused because they are on an unspecified "DEIA List," *id.* at ¶¶ 17–24; and a third award USDA initially claimed was paused because of the "DEIA list," Dkt. No. 136-1 at 2 (grant no. 16), but now USDA claims "is currently past its period of performance" and "has ended," Dkt. No. 147-2 at ¶¶ 4–5, having been frozen without explanation through the grant's expiration date.

"[T]he *post hoc* rationalizations of the agency . . . cannot serve as a sufficient predicate for agency action." *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 539 (1981). But even if these rationales had been offered contemporaneously, they could not save USDA's freeze and termination of grants from being arbitrary, capricious, and unconstitutional. 5 U.S.C. § 706(2). USDA's declaration claims that the agency had "discretion" to terminate Partnerships for Climate Smart Commodities grants under the Commodity Credit Corporation Charter Act, yet that statute does not allow USDA to terminate grants without a reasoned explanation and contrary to the purposes of that Act, as it has done here. As to the "DEIA" freeze, USDA's declaration addressing this issue admits that certain grants remain frozen because they contain unspecified "DEIA" terms disfavored by the Administration. Dkt. No. 147-1 at ¶¶ 17–24. USDA's conditioning of Congressional appropriations on "anti-DEIA" policies is a textbook violation of the Constitution's separation of powers and is patently arbitrary and capricious.

---

[7] For example, Karen Woodrich's analyses of the Commodity Credit Corporation Charter Act and the process leading to the "DEIA" freeze, Dkt. No. 147-1 at ¶¶ 3–9, 17–23, do not appear in the contemporaneous documents USDA has produced. *See* Dkt. No. 67-2.

### A.     USDA Illegally Terminated Climate-Smart Commodities Grants

In her declaration for USDA, Karen Woodrich focuses on the fact that the Partnerships for Climate-Smart Commodities program is not funded by the IRA or IIJA, but by the Commodity Credit Corporation Charter Act. Dkt. No. 147-1 at ¶¶ 8–9. But the source of funding does not cure the arbitrary and irrational nature of the termination of the program or absolve the agency of its duty to faithfully execute Congressional directives.

USDA's Commodity Credit Corporation, which administers the Climate-Smart Commodities program, was founded "[f]or the purpose of stabilizing, supporting, and protecting" farming, agricultural supplies, and agricultural markets. 15 U.S.C. § 714. Established in 2022, the Partnerships for Climate-Smart Commodities program was created to, among other things, "develop markets" and "increase . . . supply and demand for . . . climate-smart commodities," which are "agricultural commodit[ies] . . . produced using agricultural . . . practices that reduce greenhouse gas emissions or sequester carbon." USDA, *Partnerships for Climate-Smart Commodities – Notice of Funding Opportunity (NFO)* at 6, Mar. 11, 2022.[8]

The *only* 'explanation' USDA has provided for its decision to terminate Plaintiffs' six Climate Smart Commodities grants is because those grants fail to meet a newly announced policy that "'a minimum of 65% of federal funds must go to producers.'" Dkt. No. 147-1 at ¶¶ 10–15. This new policy appears to have emerged out of nowhere and suffers from the same flaws as the EPA terminations.

---

[8]*Available at* https://files.simpler.grants.gov/opportunities/337878/attachments/314695/Full_Announcement_USDA-NRCS-COMM-22-NOFO0001139_Revised_03.11.2022_.pdf, (https://perma.cc/9TD2-DVGP).

**First,** while USDA may establish new policies going forward, this decision to abruptly terminate over $94 million in preexisting grants stands in direct opposition to the purpose of the Commodity Credit Corporation, i.e., "stabilizing, supporting, and protecting" farming, agricultural supplies, and agricultural markets. 15 U.S.C. § 714. The groups that receive these grants have worked tirelessly to plan and begin to implement their grants in coordination with farmers all over the country. Abruptly terminating these grants does not "stabilize" "support" or "protect" farmers. Instead, it harms and punishes them. Dkt. No. 24-8 at ¶¶ 10, 14; Dkt. No. 24-5 at ¶ 8; Dkt. No. 24-11 at ¶¶ 22, 24; Dkt. No. 24-12 at ¶¶ 21–22; Dkt. No. 24-13 at ¶¶ 28–29, 34; Dkt. No. 24-14 at ¶ 12.

**Second**, the abrupt, unexplained action also violates the APA. Just like EPA, USDA has failed to examine "relevant data and articulate[] a satisfactory explanation for [the] action," *Def's of Wildlife*, 931 F. 3d at 345, or articulate "a rational connection between the facts found and the choice made." *Dep't of Commerce*, 588 U.S. at 773.

Nowhere has USDA explained how its new 65% threshold was derived, what its impact will be, or even how it applied this arbitrary figure to Plaintiffs' grants. The new policy appears to require grantees to pass 65% of their grant through to producers as *cash payments*, ignoring the value of *services* that grantees provide to farmers well exceeding 65% percent of their grants' values. USDA does not acknowledge or justify the distinction between cash and services, or explain why providing farmers over 65% of a grant's *value* (in cash and services) would not serve USDA's new "Farmer First policy." Dkt. No. 147-1 at 8. USDA has failed entirely to engage in rational decisionmaking and the change is a clear violation of the APA. *State Farm*, 463 U.S. at 43.

As with EPA, USDA's decision is further compounded because this change was a reversal in policy which requires a more detailed justification, *Encino Motorcars*, 579 U.S. at 223, and the consideration of reliance interests. *Regents of Univ. of Cal.*, 591 U.S. at 33. Yet not only has USDA failed to articulate a detailed justification for its change in policy, it has not even attempted to consider the reliance interests of grantees and farmers before terminating their grants. Nor does USDA consider or explain why it could not apply the 65% policy to future grants without going back on its word to existing grantees. *See Regents of Univ. of Cal.*, 591 U.S. at 30 ("[W]hen an agency rescinds a prior policy its reasoned analysis must [also] consider the alternatives that are within the ambit of the existing policy.").

Finally, while USDA's declaration claims that the Partnerships program is "discretionary," Dkt. No. 147-1 at ¶ 9, the existence of agency discretion to change policy does not obviate the requirement of reasoned decisionmaking. "[A]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change . . . and consider serious reliance interests." *FDA v. Wages & White Lion Invs., LLC*, 145 S.Ct. 898, 917 (2025) (citation and quotations omitted). USDA has done nothing of the sort here, pulling the rug out from under grantees and farmers without considering reliance or explaining their policy change.

**B.    USDA's Freeze of Grants by Placing them on an Unspecified "DEIA list" Violates the Law.**

Three of Plaintiffs' other USDA grants are listed as "paused because previously identified on DEIA list." Dkt. No. 136-1 at 2–3.[9] DEIA is an acronym for diversity, equity, inclusion, and accessibility. Defendants have not provided this "DEIA list" or explained what constitutes

---

[9] Grant nos. 16, 22, and 23, which are two Equity in Conservation Outreach Cooperative Agreements and a grant under the Agricultural Marketing Service Farm and Food Worker Relief program.

"DEIA," why these three grants qualify as "DEIA," or more importantly, why being associated with "DEIA" is a rational, legal basis to freeze a grant. Like Defendants' other actions, these freezes are unconstitutional and arbitrary and capricious.

Critically, none of the statutes authorizing these grants conditions funding on a grant *not* being "DEIA" or anything resembling that concept. *See* Dkt. No. 23 at ¶¶ 126–127, 171–172 (outlining statutory authorities for Equity in Conservation Outreach Cooperative Agreements and Agricultural Marketing Service Farm and Food Worker Relief program); Dkt. No. 24-22 at 6, 22 (same). To the contrary, one of the statutes authorizing Equity in Conservation Outreach Cooperative Agreements creates an express preference for "a producer that is a limited resource, socially disadvantaged farmer or rancher." 16 USCA § 3839aa-2(d)(4)(A) (the Secretary "shall increase" payments to such producers).

Having conditioned funding on "anti-DEIA" policies not established by Congress— indeed, policies that directly conflict with Congress's—"there is no reasonable argument that the President has not . . . violate[d] the Constitutional principle of the Separation of Powers." *City & Cty of San Francisco*, 897 F.3d at 1234–35; *accord City of Chicago v. Barr*, 961 F.3d 882, 892 (7th Cir. 2020) ("The [agency's] use of extra-statutory conditions on federal grant awards as a tool to obtain compliance with his policy objectives strikes at the heart of . . . the separation of powers.").

Defendants' declarations also make clear that the "DEIA" freeze is arbitrary and capricious in violation of the APA. The Woodrich declaration confirms that USDA staff searched for "DEI-related" grants using "a series of [unspecified] terms or concepts." Dkt. No. 147-1 at ¶¶ 17–18. Woodrich claims that this review was "individualized." But she then explains that by this she means simply that USDA looked to see that words like "diversity" were not accidentally

17

flagged as part of "scientific phrases" like "*bio*diversity" in a grant. *Id.* ¶ 19 (emphasis added). She asserts that Plaintiffs' two Equity in Conservation Cooperative Agreements were "identified" as having "elements . . . that [USDA] believes are inconsistent with the Secretary's priorities related to DEI," with no explanation whatsoever of how those agreements were evaluated or identified as inconsistent with "priorities." *Id.* at ¶ 22. There is no evidence that she or anyone at USDA actually reviewed what the grants were intended to accomplish, let alone considered the impact of terminating them or engaged in any of the reasoned decisionmaking required by the APA. The continued freeze of these grants is arbitrary and capricious.

## III.     Defendants Must Complete the Grant Process for Plaintiffs' Outstanding DOT and DOE Grants

Defendants have suggested that the DOT and DOE grant recipients in this case are not entitled to relief because the DOT awards do not yet have signed grant agreements and the DOE award has a signed conditional grant agreement. Dkt. No. 56 at 17, 23. But as this Court recognized in its jurisdictional decision, this is not a case about grant agreements. *See* Dkt. No. 146 at 6, 9. The DOT and DOE grant recipients are entitled to relief for the same reasons the other grant recipients are entitled to relief: their inability to implement their awarded grant projects is the result of broad administrative actions that violate the APA and the separation of powers.

### A.     The Ongoing Freeze of Department of Transportation Grants Violates the Law.

As described in the declaration of Arlan Finfrock, Plaintiff Nashville's two grants awarded by DOT are on hold indefinitely because the Department of Transportation has decided to review grant "programs" to determine whether the "programs" align with administration priorities, including those announced in executive orders. Dkt. No. 147-3 at ¶¶ 4–5; *see also* Dkt.

No. 23-10 (DOT Memo, directing that signing of grant agreements be paused pending review). As the Administration has already made clear—both through the Energy EO itself and through the DOT Memo—it believes the DOT grant programs at issue in this case are inconsistent with its priorities. But these programs are not optional. They were established by Congress and DOT lacks the authority to indefinitely pause dispersal of congressionally appropriated funding merely because it disagrees with Congress's policy objectives.

Nashville's Electrify Music City project was awarded a $4.7 million grant (Grant # 38) under the Charging and Fueling Infrastructure Grant program. A final draft of the grant agreement was approved by the local FHWA office and the only step that remains is final approval from FHWA headquarters. Congress created this grant program in section 11401 of the IIJA and provided detailed instructions for implementing the program. The purpose of this grant program is to "strategically deploy publicly accessible electric vehicle charging infrastructure" and infrastructure for other alternative fuel technologies. Pub. L. 117-58 § 11401(a), 135 Stat. 546, 547 (2021). Nonetheless, the Energy EO explicitly called for a pause on disbursements of funding under this program—making it one of only two grant programs explicitly paused by the EO—and states the administration's policy of pursuing the *elimination* of incentives "that favor EVs." Energy EO §§ 2(e), 7. Defendants have not offered any evidence in the record as to why this grant does not comport with the purposes of the Act or why FHWA headquarters cannot approve, other than the President's own priorities. That is not enough.

Nashville's East Nashville Spokes project was awarded a $9.3 million grant (Grant # 37) under the Active Transportation Infrastructure Investment Program. Congress again provided detailed instructions to DOT, including directing the Secretary to consider whether a grant applicant "submitted a plan for an eligible project for the development of walking and bicycling

infrastructure that is likely to provide substantial additional opportunities for walking and bicycling;" whether there is "evidence of commitment to traffic safety, regulations, financial incentives, or community design policies that facilitate significant increases in walking and bicycling;" "[t]he extent to which the . . . the grant will address existing disparities in bicyclist and pedestrian fatality rates based on race or income level or provide access to jobs and services for low-income communities and disadvantaged communities;" and whether the grant "will advance safety for pedestrians and cyclists, accessibility to jobs and key destinations, economic competitiveness, environmental protection, and quality of life." 135 Stat. at 613. In other words, Congress designed the program to improve bicycle and pedestrian infrastructure, to facilitate equitable access to jobs and services, and to promote environmental protection. Yet the DOT Memo explicitly targets for elimination project components that relate to "bicycle infrastructure," "equity analysis," and "green infrastructure." Dkt. No. 23-10 at 3.

In short, finalization of these grant agreements is paused because the Administration disagrees with the policy decisions Congress made in the IIJA. This Court should direct DOT to proceed with finalizing the grant agreements at issue.

### B. The Ongoing Freeze of the Department of Energy Grant Violates the Law

Plaintiff Baltimore has a signed grant agreement with the Department of Energy for its Assistance for the Adoption of the Latest and Zero Building Energy Codes grant (Grant # 1). But before Baltimore can begin to draw down the grant funding, DOE must sign off on a Statement of Project Objectives ("SOPO"). This Statement was nearly finalized as of January 2025, but DOE has since provided no meaningful communication regarding the grant. DOE's decision to put Baltimore's funding on hold appears to result from the DOE Memo and/or DOE's implementation of the Energy EO, but Defendants have not provided any further explanation for

the hold. At minimum, DOE's decision to pause funding under this grant program is arbitrary and capricious because the Agency has entirely failed to provide any justification for its decision. Furthermore, although the Energy EO suggests the Administration may disfavor energy efficiency efforts, *see* Energy EO § 2(f), Congress made clear in section 50131 of the IRA that the Secretary of Energy "shall use" this grant funding to assist state and local governments in adopting energy codes that meet specific ambitions standards. By refusing to disperse funding allocated by Congress for Executive Branch policy reasons, DOE is violating the separation of powers. This Court should direct DOE to finalize Baltimore's grant process, including the SOPO, and release its hold on the grant funding.

## IV.   **Defendants Must Keep the Currently Accessible Grants Active**

Defendants' May 9, 2025, filing sheds no additional light on the four grants listed as "paused due to IRA funding" but presently flowing due to the *Woonasquatucket* injunction, Dkt. No. 136-1 at 3–4 (Grants #20, 24, 25, 26), or the ten grants listed as "accessible to grantee" or as "working . . . on process for unfreezing the award." *Id.* at 2–5 (Grants #13, 14, 15, 17, 18, 21, 33, 34, 35, and 36). In its April 29 Order on Jurisdiction, the Court ordered that these unfrozen grants remain unfrozen absent notice to and authorization from the Court for any further freeze or termination of these grants. Dkt. No. 146 at 17. The Court issued this order "to stop this yo-yo situation," where grants are "turned on, turned off, turned on, [and] turned off again." Ex. 2., Tr. 33:5–10.

With nothing in the discovery materials to alter the conclusion that the freeze of all IRA grants is arbitrary, capricious, and unconstitutional, the Court should reaffirm its Order that these grants remain unfrozen absent authorization from the Court.

Plaintiffs respectfully request that Grant #33 be added to the Court's list, as Defendants have noted that the "[g]rant manager [is] working with [the] program manager on [the] process for unfreezing the award." Dkt. No. 136-1 at 5. Plaintiffs also request that grant number 19 be added to the Court's list of grants to remain unfrozen. This grant was mistakenly listed by Defendants as "closeout completed" and "no longer active as of 11/14/24." Dkt No. 136-1 at 3. In fact, this grant runs until 03/30/2026, *see* Dkt. No. 24-4 at 124, and Plaintiff RAFI-USA reports that grant funds are currently flowing. Plaintiffs can also confirm that the grant to Alliance for Shenandoah (Grant #15) has now been unfrozen. Plaintiffs request that it stay unfrozen like the other grants.

## V.    Defendants Must Not Coerce Plaintiffs in Violation of the First Amendment

Beyond the immediate grant termination issue itself, additional documents and declarations confirm and expand the scope of Defendants' use of grant termination threats to coerce Plaintiffs' speech. Plaintiff Sustainability Institute was pressured to alter not only its work plan, but also its website if it hoped to avoid the termination of its grant. Sustainability Institute Supp. decl., Ex. 7, ¶ 8. EPA pressured the Sustainability Institute to remove terms like "climate change" and "equitable" from its website and online mission statement, which had been developed through a thorough a process "by the board and staff to identify and reflect [the] organization's goals and values, central to which is equity," and which described the organization's work as well as its "sincerely-held beliefs." *Id.* at ¶ 9. EPA also directed Sustainability Institute to modify its website and work plan to "deemphasize climate and instead focus on job creation and increasing the tax base." *Id.* at ¶ 7.

Similarly, EPA told CleanAIRE NC to remove terms such as "advocacy", "minorities", "disproportionate," "historical exclusion," and "underserved" from its work plan. CleanAIRE

NC understood that its grant was at risk of being terminated by EPA unless it removed these words and other references to climate change and environmental justice from its workplan. CleanAIRE Supp. decl., Ex. 10, ¶¶ 2-3.

By requiring the Sustainability Institute and CleanAIRE NC to remove terms like "environmental justice," "climate change," and "equity" from their grant materials, and suppressing how groups speak about their own work externally, the EPA is effectively forcing grantees to reframe their work in a manner that contravenes their organizational missions, as well as the grants' original purpose, or face termination.

Furthermore, by compelling both the Sustainability Institute and CleanAIRE NC to "sanitize" their workplans, and the Sustainability Institute to modify its online presence and communications, EPA creates a chilling effect that extends beyond a single grant. When the government coerces grantees into self-censorship under the threat of losing federal grant funding, *see Agency for International Development v. Alliance for Open Society Int'l*, 570 U.S. 205, 218 (2013), it undermines their ability to engage in public discourse and address the very challenges faced by the communities they serve. Forcing nonprofits to, for example, frame their grant project in economic terms, or erase historical and environmental injustices because these views are currently disfavored, is antithetical to First Amendment protections and stifles public discourse on these complex issues.

If the Court grants Plaintiffs' requested relief and reinstates these grants, Plaintiffs respectfully request that the Court also prohibit Defendants from coercing Plaintiffs' speech in these ways. While EPA has engaged in the most direct coercion, other Defendants make clear that they will discriminate based on viewpoint as well. For example, USDA has stated it is targeting grants for termination based on grantees' speech outside of the grant program by

seeking to ensure that USDA grants "do not support . . . *organizations* [not just grant activities] that promote or take part in diversity, equity, and inclusion ("DEI") initiatives. . ." Dkt. No. 147-1 at 21 (emphasis added). DOT has issued the unconstitutionally vague pronouncement that grantees will face enforcement actions if they engage in any policy, program or activity that advances "DEI" goals, which DOT has asserted presumptively violate federal civil rights laws.[10] This vague and coercive approach not only violates free speech safeguards but threatens these organizations' very missions.

## <u>SUMMARY AND CONCLUSION</u>

In sum, Defendants' recent filings and the discovery they have provided all confirm that Defendants' abrupt freeze and subsequent termination of federal grant programs mandated by Congress was done without regard for the Executive Branch's duty to faithfully execute the laws passed by Congress, in violation of the separation of powers and the First Amendment, and in disregard of the requirements of the APA.

Accordingly, Plaintiffs respectfully request the Court to grant their motion for preliminary injunction and specifically to:

- o Reinstate all grants that have been terminated (Grants #9-12)

- o Order that grants slated for termination remain active (Grants #2-8). If those grants have since been terminated, order the grants to be reinstated.

- o Order Defendants to continue finalizing the grant agreements for Grants 37 and 38 and the SOPO for Grant 1, and release any holds on grant funding; and

- o Order Defendants to continue the grant process for Grants 37 and 38

- o Continue to prevent Defendants from freezing, disrupting, or terminating currently unfrozen grants (Grants 13-15, 17-21, 24-26, 33-36).

---

[10] U.S. Department of Transportation, *Trump's Transportation Secretary Sean P. Duffy: Follow the Law* (Apr. 24, 2025), https://www.transportation.gov/sites/dot.gov/files/2025-04/Follow%20the%20Law%20Letter%20to%20Applicants%204.24.25.pdf

In addition, Defendants have now made clear that the decision to terminate grants under the Environmental and Climate Justice Block Grant program and the Climate Smart Commodities program was made on a programmatic basis. Dkt. No. 147-4 at ¶ 3 & p. 110 ¶ 6; Dkt. No. 147-1 at ¶ 16 & p. 8. As such, Defendants' illegal actions swept away all grantees with the same broad stroke. Plaintiffs therefore request this Court issue a declaration that the freeze and subsequent termination of these programs was unlawful and issue an order reinstating all grants awarded under the Environmental and Climate Justice Block Grant program and the Climate Smart Commodities program and preventing the further freezing or termination of grants in these programs. *See, e.g.*, *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[T]he scope of injunctive relief is dictated by the extent of the violation established."); *S.C. Coastal Conservation League v. Pruitt*, 318 F. Supp. 3d 959, 968 (D.S.C. 2018) (quoting and applying the same point of law in *Califano*); *PFLAG, Inc.*, 2025 WL 685124, at *30–32 (issuing broad preliminary injunction based on "the extent of the violation established" in case where federal grants were conditioned on President's policies in violation of the separation of powers and federal statutes).

Respectfully submitted, this 12th day of May, 2025,

/s/ Carl T. Brzorad
Carl T. Brzorad (S. C. Bar No. 105413)
SOUTHERN ENVIRONMENTAL LAW
CENTER
525 East Bay Street, Suite 200
Charleston, SC 29403
Telephone: (843) 720-5270
Facsimile: (843) 414-7039
cbrzorad@selc.org

/s/ Kimberley Hunter
Kimberley Hunter (N. C. Bar No. 41333)
Irena Como (N. C. Bar No. 51812)

Nicholas S. Torrey (N. C. Bar No. 43382)
Benjamin J. Grillot (DC Bar No. 982114)
(Pro Hac Vice granted)
SOUTHERN ENVIRONMENTAL LAW
CENTER
136 East Rosemary Street, Suite 500
Chapel Hill, NC 27514
Telephone: (919) 967-1450
Facsimile: (919) 929-9421
kmeyer@selc.org
icomo@selc.org
ntorrey@selc.org
bgrillot@selc.org

*Counsel for Plaintiffs The Sustainability Institute, Agrarian Trust, Alliance for Agriculture, Alliance for the Shenandoah Valley, Bronx River Alliance, CleanAIRE NC, Conservation Innovation Fund, Earth Island Institute, Leadership Counsel for Justice and Accountability, Marbleseed, Organic Association of Kentucky, Pennsylvania Association of Sustainable Agriculture, and Rural Advancement Foundation International - USA*

/s/ Graham Provost
Graham Provost (DC Bar No. 1780222)
(Pro Hac Vice granted)
Elaine Poon (VA Bar No. 91963)
(Pro Hac Vice granted)
Jon Miller (MA Bar No. 663012)
(Pro Hac Vice granted)
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609
Telephone: (510) 738-6788
graham@publicrightsproject.org

*Counsel for Plaintiffs Baltimore, Maryland, Columbus, Ohio, Madison, Wisconsin, Nashville, Tennessee, New Haven, Connecticut*

/s/ Mark Ankcorn
Mark Ankcorn, Senior Chief Deputy City Attorney
(CA Bar No. 166871)
(Pro Hac Vice pending)
1200 Third Avenue, Suite 1100
San Diego, California 92101-4100
(619) 533-5800
mankcorn@sandiego.gov

*Counsel for Plaintiff City of San Diego*

**CERTIFICATE OF SERVICE**

I certify that on May 12, 2025, I electronically filed the foregoing with the Clerk of the

Court by using the Court's CM/ECF system.

<div style="margin-left: 40%">

/s/ Carl T. Brzorad
Carl T. Brzorad (S. C. Bar No. 105413)
SOUTHERN ENVIRONMENTAL LAW CENTER
525 East Bay Street, Suite 200
Charleston, SC 29403
Telephone: (843) 720-5270
Facsimile: (843) 414-7039
cbrzorad@selc.org

</div>