IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| The Sustainability Institute, *et al.*, ) | Civil Action Number: 2:25-cv-02152-RMG |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | |
| Donald J. Trump, in his official capacity ) | |
| as President of the United States, *et al.* ) | |
| ) | |
| Defendants. ) | |

## REPLY TO PLAINTIFFS' RESPONSE, ECF NO. 149

Consistent with the Court's Text Order, ECF No. 152, Defendants reply as follows.

**I.     Narrowing of the issues in dispute**

At the hearing, the Court urged the parties to find common ground and move quickly towards final judgment. **Transcript at 60 and 70**. Defendants agree that this is possible here. To that end, for purposes of this case only, Defendants do not contest judgment on the merits of Plaintiffs' APA claims (excluding those asserted against the Secretary of Agriculture regarding grants under the Partnership for Climate-Smart Commodities ("PCSC"), *see* section II below), that would require Defendants to fund or negotiate grant agreements for 32 of the 38 grant awards at issue here. Defendants maintain their jurisdictional objections, which cannot be waived and which Defendants will continue to press on appeal.[1]

---

[1] In the event the Court issues an injunction, Defendants intend to ask the Court—and, if denied, the Fourth Circuit—to stay such relief pending appeal. *See Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-1189, Doc. 29 (4th Cir. Mar. 14, 2025) (granting the government's motion to stay preliminary injunction in grant funding case); *Am. Ass'n of Colls. for Teacher Educ. v. McMahon*, No. 25-1281, Doc. 30 (4th Cir. Apr. 10, 2025) (same).

**II.    Partnerships for Climate Smart Commodities (Grant Award Nos. 27–32)**

    a.  Background

The Commodity Credit Corporation ("CCC") is a government-owned entity established by the CCC Charter Act (15 U.S.C. § 714 et seq.) and is an agency and instrumentality of the United States within the U.S. Department of Agriculture ("USDA"). *See* Stubbs, Megan (Jan. 14, 2021) The Commodity Credit Corporation (CCC), CRS Report R44606, https://www.congress.gov/crs-product/R44606 (hereafter, the "CRS Report"). Incorporated in its current form in 1948, the CCC's primary mission is to "stabilize, support, and protect farm income and prices; assist in maintaining balanced and adequate supplies of agricultural commodities; and facilitate the orderly distribution of commodities." *Id.* CCC does not have any employees but uses the employees, services, and facilities of various USDA agencies. *Id.*; *see also* 15 U.S.C. § 714i (authorizing CCC to utilize employees of the USDA). Finally, "the broad CCC authorities provided to the Secretary under the CCC Charter Act also allow USDA a level of discretion to carry out broad operations in support of U.S. agriculture." *Id.* This includes funding for "USDA priorities." *Id.*

On April 14, 2025, USDA publicly announced that it has "reformed and overhauled" the PCSC initiative, which was created by the prior Secretary of Agriculture using CCC funds and authorities.    https://www.usda.gov/about-usda/news/press-releases/2025/04/14/usda-cancels-biden-era-climate-slush-fund-reprioritizes-existing-funding-farmers (last visited May 1, 2025). The Secretary explained that USDA reviewed each partnership, which led to a concern with the high administration fees relative to the amount of funding going directly to farmers. *Id.* USDA announced that PCSC had been converted into the Advancing Markets for Producers ("AMP") initiative to reprioritize efforts so that more money goes directly to farmers. *Id.* USDA reviewed "existing grant agreements based on three Farmer First policy priorities," including a requirement

that "a minimum of 65% of federal funds must go to producers." *Id.* In consideration of these new priorities, USDA terminated some, but not all, PCSC grant awards.

USDA has issued a notice of intended termination and final termination to each affected Plaintiff. *See id.* at 8–17 (providing relevant documents). USDA found each of Plaintiffs' grant awards to be inconsistent with the priority that a minimum of 65 percent of federal funds in any grant award go directly to producers. *Id.*; *see also* 2 C.F.R. § 200.340(a)(4) (allowing for terminations "if an award no longer effectuates the program goals or agency priorities"). The termination letter invites each Plaintiff to submit a new proposal that aligns with the Farmer First policy priorities by June 20, 2025. *Id.*

### b. Plaintiffs have failed to exhaust administrative remedies, as required by law, and injunctions may not issue against the CCC's property.

As Defendants previously explained, *see* ECF No. 148 at 4 n.1, before challenging an adverse decision from USDA, Plaintiffs must "exhaust all administrative appeal procedures established by the Secretary or required by law before the person may bring an action in a court of competent jurisdiction." 7 U.S.C. § 6912(e) (emphasis added). Because Plaintiffs have not exhausted all available administrative remedies, they are not likely to succeed on their APA claim. Further, even if the Court were to set aside this statutory exhaustion requirement, federal law prevents the issuance of an injunction against the CCC or its property.

Under 7 U.S.C. § 6912(e), "[n]otwithstanding any other provision of law, a person shall exhaust all administrative appeal procedures established by the Secretary or required by law before the person may bring an action in a court of competent jurisdiction against [USDA]." Section 6912(e)'s exhaustion requirement is "mandatory, but nonjurisdictional." *Munsell v. U.S. Dep't of Agric.*, 509 F.3d 572, 581 (D.C. Cir. 2007). Indeed, "it is hard to imagine more direct and explicit language requiring that a plaintiff suing the Department of Agriculture, its agencies, or employees,

3

must first turn to any administrative avenues before beginning a lawsuit." *Montanans for Multiple Use v. Barbouletos*, 542 F. Supp. 2d 9, 15 (D.D.C. 2008), *aff'd*, 568 F.3d 225 (D.C. Cir. 2009).

This mandatory exhaustion requirement applies because an individual or entity subject to an "adverse decision" concerning the CCC's domestic programs may appeal to the National Appeals Division (NAD), 7 U.S.C. § 6991(2)(C) (including the CCC in the definition of an "agency"); 7 C.F.R. § 11.1 (same). Decisions issued by the NAD are subject to judicial review. 7 U.S.C. § 6999. However, "a party cannot bring a civil action in federal court against the Secretary of Agriculture without first exhausting all administrative appeal procedures." 7 U.S.C. § 6912(e); *see also Darby v. Cisneros*, 509 U.S. 137, 154 (1993) (discussing the "final agency action" requirement in 5 U.S.C. § 704 and noting that statutory and regulatory exhaustion requirements are "prerequisite[s] to judicial review" under the APA).

Here, Plaintiffs seek judicial review of USDA's decision to terminate their grant awards. Yet they have not alleged that they exhausted their administrative remedies by appealing their grant terminations and receiving a final decision from the NAD.

Because Plaintiffs' APA claims emerge in the context of grant decisions, and none of those claims have been properly exhausted as is statutorily required, Plaintiffs fail to state a viable APA claim. *See Munsell*, 509 F.3d at 593; *Gold Dollar Warehouse, Inc. v. Glickman*, 211 F.3d 93, 98 (4th Cir. 2000) ("Parties are required by statute to exhaust available administrative remedies before they may bring an action against the USDA in federal court."); *Ovanova, Inc. v. U.S. Dep't of Agric.*, No. CV 24-2769 (JEB), 2025 WL 343118, at *6 (D.D.C. Jan. 30, 2025) ("Plaintiffs' APA claims thus would topple on the merits for failure to exhaust.") To the extent Plaintiffs seek to generally challenge how USDA is operating the PCSC or AMP initiatives, that would be a "programmatic attack" barred by the APA's limitation of judicial review to "circumscribed,

discrete agency actions." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62, 64 (2004) (holding a plaintiff "cannot seek wholesale improvement of [a] program by court decree . . ."); 5 U.S.C. § 704 (limiting judicial review to "final agency action").

Additionally, Congress has provided that "no . . . injunction . . . shall be issued against the [CCC] or its property." 15 U.S.C. § 714b(c). Here, PCSC uses CCC funds, which are generally financed through borrowing authority and reimbursement from Congress for net realized losses. ECF No. 147-1 at ¶ 9. Plaintiffs' request for injunctive relief dictating how CCC funds must be spent runs afoul of section 714b(c).

### c. Because there are no statutes setting applicable policy, the Secretary's priorities are not contrary to law.

If Plaintiffs seek to challenge these terminations, rather than submit a new proposal, they must exhaust their administrative remedies before pursuing an APA claim. Plaintiffs have not done that; therefore, the Court should not entertain their APA claim. Regardless, Plaintiffs are unlikely to succeed on such a claim.

At the hearing, the Court expressed that PCSC was "a very different thing" than the other statutory programs at issue in this case. **Transcript at 52.** The Court noted that terminating PCSC grant awards does not appear to violate an act of Congress. *Id.* In response, Plaintiffs' counsel requested "more information from defendants . . . on how exactly the money flows into" PCSC. *Id.* at 56. The Court then ordered Defendants to supplement the record regarding the terminations in this initiative. ECF No. 146 at 15. In response, Defendants provided a declaration explaining how Congress did not appropriate any funds for PCSC. ECF No. 147-1 at ¶¶ 3–9.

Plaintiffs now claim that Defendants have "focus[ed]" on this funding issue. ECF No. 149 at 14. Despite requesting (and receiving) more information on funding, Plaintiffs maintain that the source of funding does not affect their APA arguments or the Executive's "duty to faithfully

execute Congressional directives." *Id.* As explained below, the Court should reject this argument.

The source of funding matters because it is the crux of Plaintiffs' case. Plaintiffs state they are seeking to restore grants under "congressionally mandated programs," claim Defendants have prevented them "from doing the work Congress directed," and allege the government has violated separation-of-powers principles and impounded Congressional appropriations. ECF No. 24-1 at 2. These arguments unravel in the context of the PCSC, an initiative created by the Secretary of Agriculture without Congressional directive or appropriations.

Nevertheless, Plaintiffs continue to argue that it was unlawful for the Secretary to terminate their grant awards. ECF No. 149 at 15. While conceding that USDA may "establish new policies going forward," Plaintiffs assert that the Secretary cannot terminate PCSC grant awards because doing so violates 15 U.S.C. § 714, which generally states CCC's purpose is to stabilize, support, and protect agricultural commodities. *Id.*

CCC's authority to implement the AMP initiative derives from 15 U.S.C. § 714c(e), and Plaintiffs have not alleged that the initiative violates that statutory provision. While section 714 provides the purpose of the CCC, it does not establish policy regarding the use of CCC funding. Thus, the Secretary's selected priorities cannot be contrary to law. Indeed, Congress placed the CCC under the "general supervision and direction of the Secretary of Agriculture." 15 U.S.C. § 714. As the Congressional Research Service has said, this grant of authority includes "discretion to carry out many broad operations," including "to fund USDA priorities." CRS Report, *supra*. Consistent with this authority, the Secretary determined that an unacceptable amount of CCC funds were going to administrative costs and established priorities to ensure more money went to producers of agricultural commodities. There is no basis for claiming such action is inherently harmful or contrary to the CCC's enabling legislation.

### d. The Secretary's policy priorities are rational.

USDA clearly explained its funding priorities and that Plaintiffs' grant awards fail to align with the priority that 65 percent of federal funds go directly to producers. The agency invoked 2 C.F.R. § 200.340(a)(4) and terminated the grant awards. Plaintiffs do not dispute that this regulation applies and allows for termination "if an award no longer effectuates the program goals or agency priorities." With no statutory requirements regarding PCSC, the agency can (and did) invoke its right to make a change in grant awards based on its enunciated agency priorities.

Plaintiffs have not demonstrated that the Secretary has violated the APA in taking this action. Under the APA, "a court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities." *Dep't of Commerce v. New York*, 588 U.S. 752, 781 (2019). There is no "heightened standard" applicable when an agency changes its position. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009). An agency may not "depart from a prior policy *sub silentio*," "disregard rules on the books," or fail to articulate "good reasons for the new policy." *Id.* at 515. But "[it] suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better . . . ." *Id.* When conducting this analysis, a court is "not to substitute its judgment for that of the agency, and should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* at 513–14.

Here, the Secretary has explained, contemporaneously with the grant award decisions, why USDA adopted the Farmer First policy priorities. She described a "thorough line by line review" of each grant award that revealed high administration costs. To remedy this concern, she issued the specific priority that USDA would not continue to expend CCC funds on projects that did not send at least 65 percent of funding directly to producers. While Plaintiffs allege this approach is

7

"irrational" and "emerged out of nowhere," ECF No. 149 at 14, the Secretary's press release explains how these changes came about and why she feels they are a better approach to grant funding. There is, thus, a "rational connection between the facts found and the choice made." *Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009) (quotations omitted).

Lastly, the Secretary adequately accounted for the interests at stake. In the press release, the Secretary stated that she has "heard directly from farmers that many of the USDA partnerships are overburdened by red tape, have ambiguous goals, and require complex reporting that push farmers onto the sidelines." She, thus, considered the interests of farmers and determined that reallocating funding so that they would receive more funds was the proper approach. As to grantees, Plaintiffs suggest the Secretary should have accounted for their interests and only applied her priorities to future grants. This is easily explained by the press release, which says that no new funding is being made available. Finally, USDA is affording grantees the opportunity to align their projects with the Secretary's priorities, stating that USDA "will contact current partners individually to provide information about their future participation." This shows consideration of the grantees' interests, even though USDA found their projects, as presently constituted, to be at odds with the agency's current priorities.

### e. Preliminary relief is not warranted.

In sum, there are substantial legal issues that dictate Plaintiffs are unlikely to succeed in overturning the terminations of their PCSC grant awards, including a statutory exhaustion requirement, an anti-injunction statute, and the lack of applicable policy directives from Congress. The Court should, therefore, not enjoin the Secretary's priorities at this opening stage of litigation and instead allow the re-application or administrative appeal process to proceed.

### III. First Amendment

### a. The Court need not reach Constitutional questions when the case can be decided on APA grounds.

Reserving jurisdictional arguments, Defendants are not contesting the merits of a majority of Plaintiffs' APA claims. As to the remaining claims regarding PCSC, Plaintiffs do not plausibly assert any Constitutional violations. Therefore, to dispose of this case, and particularly to rule on Plaintiffs' request for preliminary injunctive relief, the Court need not reach Plaintiffs' Constitutional claims. *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) ("[I]f a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter."); *see also King v. Burwell*, 759 F.3d 358, 376 n.6 (4th Cir. 2014) (applying *Ashwander* and declining to reach Constitutional arguments having already decided an APA claim); *Norfolk S. Ry Co. v. City of Alexandria*, 608 F.3d 150, 161 (4th Cir. 2010) (applying *Ashwander* and declining to reach "difficult questions of federalism and constitutional law").

### b. To the extent the Court decides to reach Constitutional issues, Plaintiffs' latest First Amendment argument should be rejected because it relies on inapposite law and contrary facts.

The only case cited by Plaintiffs is one that involves Congressionally-mandated funding conditions. *See* ECF No. 149 at 23 (citing *Agency for Int'l Dev. v. Alliance for Open Society Int'l*, 570 U.S. 205, 218 (2013)) (hereinafter "*USAID*"). In *USAID*, Congress appropriated funding for nongovernmental entities to combat HIV/AIDS abroad. *Id.* at 209–10. These funds came with the condition that recipients must "have a policy explicitly opposing prostitution or sex trafficking." *Id.* at 211. The case at bar does not involve any similar mandate. Rather, as discussed previously, this case involves the Executive's authority to spend funds in a manner that is consistent with its priorities. *See* ECF No. 56 at 27-28; *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S.

9

819, 833 (1995) ("[W]hen the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes.").

Additionally, the "facts" on which Plaintiffs rely do not show that the government is suppressing constitutionally protected speech. For example, Plaintiffs again rely on the alleged "Sanitized Workplan," "Decision Tree," and "Keywords" previously submitted for the Court's consideration. *See* ECF No. 149-7 at ¶ 4 (citing ECF No. 35-5). Those documents do not show that the government is prohibiting the recipient from engaging in protected speech outside the scope of the federally funded program. *See USAID*, 570 U.S. at 217. Rather, the documents reveal a desire to highlight the current Executive's priorities. Indeed, Plaintiffs state that the goal of the agency recommendations was "to deemphasize climate and focus on job creation and increasing the tax base"—concepts consistent with the current policy priorities. *See* ECF No. 149-7 at ¶ 7.

Moreover, while Plaintiffs make much of their agency contact's decision to highlight certain terms in the workplan for Plaintiffs to consider, Plaintiffs ignore that ***no recommended revisions*** were suggested to the entirety of the workplan's Strategy 3 ("Energy-Efficient, Healthy and Resilient Housing and Buildings") (ECF No. 35-5 at 9), Project #1 ("Fixing, weatherizing, upgrading and fortifying existing homes to increase energy efficiency, reduce greenhouse gas emissions, and produce better health outcomes for all residents") (*id*. at 9-12), Project #2 ("'Project 218'- Piloting a new paradigm for energy efficient/zero-energy housing construction and affordable, resilient development") (*id*. at 12-15); Project #3 ("Construction of a 'showcase home' for outreach, demonstration and programming") (*id.* at 15), Strategy 1 ("Green Infrastructure and Nature-Based Solutions") (*id*. at 15-16), Pollution Reduction Strategies: Strategy 1 ("Indoor Air Quality and Community Health Improvements") (*id*. at 19), Performance Management Plan, Outputs/Outcomes (*id*. at 19-21), Programmatic and Managerial Capability and Resources (*id*. at

10

23-25), Past Performance (*id*. at 25), Feasibility (*id*. at 26), Sustainability (*id*.), and Program Budget Description (*id*.).

Likewise, the overwhelming majority of Strategy 8 ("Workforce Development Programs for Occupations that Reduce Greenhouse Gas Emission and Air Pollutants") (*id*. at 16), Project #4 ("Expanding economic opportunity through an accredited workforce training and service-learning program focused on climate related jobs") (*id*. at 16-18), and Other Project Activities ("Providing opportunities and resources for residents to become skillfully engaged and drive the shaping of the community's future through power-building investments in leadership development and training) (*id*. at 18-19), includes no changes, other than "environmental justice" (which appears twice) and "advocacy" (which appears only once).

Other than a partial, self-serving declaration updated after the preliminary injunction hearing, Plaintiffs offer no documentary proof showing the government "is compelling a grant recipient to adopt a particular belief as a condition of funding." *USAID*, 570 U.S. at 218. Rather, the evidence shows, and Plaintiffs' submission admits, that the goal of the agency recommendations was "to deemphasize climate" and "focus on job creation and increasing the tax base," neither of which requires the grantee "to profess a specific belief." *See* ECF No. 149-7 at ¶ 7; *USAID*, 570 U.S. at 218.

While the updated declaration contends that "EPA's main focus was on the contents of our speech," Plaintiffs only have provided documents recommending changes to the workplan. Plaintiffs' "understanding" from a call with the agency contact "and from conversations with other grantees, that grants are being targeted for cancellation if grantees have expressed disfavored speech online and that our grants would likely be terminated if we didn't remove words from our website" is subjective and speculative. *See* ECF No. 149-7 at ¶¶ 8, 9. Likewise, Plaintiffs'

11

arguments regarding general statements by USDA and DOT that are unrelated to Plaintiffs do not rise above speculation. *See* ECF No. 149 at 23–24.[2] Apparently, Plaintiffs were unable to support even the vaguest allegation against DOE. As previously stated, "subjective or speculative accounts . . . of a chilling effect . . . are not sufficient." *Denham v. City of Charlotte, N.C.*, 635 F.3d 129, 135 (4th Cir. 2011) (internal quotation marks omitted).

Fundamentally, Plaintiffs have not demonstrated that their First Amendment claims are likely to succeed on the merits. *See*, *e.g.*, *Nat'l Assoc. of Diversity Officers in Higher Educ. v. Trump*, Appeal No. 25-1189, Doc. 29 (staying preliminary injunction and finding Plaintiffs not likely to succeed on merits of First Amendment claims). During this litigation, Plaintiffs have claimed the President's Executive Orders, Office of Management and Budget memorandums, proposed edits from grant officers, internal agency documents, remarks on a conference call, and statements by agency heads all violate their First Amendment rights. It is not clear how the Court could begin to fashion injunctive relief on these bases, short of ordering the Executive Branch to completely stop all efforts to implement its desired policies.

## IV.    Scope of Relief

Finally, as Defendants have previously noted, ECF No. 56 at 36 n.4, any relief entered here "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs" in this case. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)); *Labrador v. Poe by & through Poe*, 144 S. Ct. 921 (2024) (mem.) (staying the portion of a universal preliminary injunction that went beyond the plaintiffs in the case and the harms proven).

---

[2] It must be noted that the City of Nashville is the only Plaintiff with a DOT grant award, and Plaintiffs excluded Nashville and the other cities from their First Amendment claims. *See* ECF No. 23 at ¶¶ 329–339.

                                                Respectfully submitted,

                                                BRYAN P. STIRLING
                                                UNITED STATES ATTORNEY

By:    *s/Todd Timmons*
           Todd Timmons (#11254)
           Assistant United States Attorney
           1441 Main Street, Suite 500
           Columbia, South Carolina 29201
           Tel: (803) 237-9265
           Todd.Timmons@usdoj.gov

           Lee E. Berlinsky (#05443)
           Assistant United States Attorney
           151 Meeting Street, Suite 200
           Charleston, South Carolina 29401
           Tel: (843) 266-1679
May 16, 2025           Lee.Berlinsky@usdoj,gov