**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| The Sustainability Institute *et al.*, <br><br>    Plaintiffs, <br>    v. <br><br> Donald J. Trump, in his official capacity as President of the United States; Kevin Hassett, in his official capacity as Assistant to the President for Economic Policy and Director of the National Economic Council; United States Office of Management and Budget; Russell Vought, in his official capacity as Director of the United States Office of Management and Budget; United States Environmental Protection Agency; Lee Zeldin, in his official capacity as Administrator of the United States Environmental Protection Agency; United States Department of Agriculture; Brook Rollins, in her official capacity as Secretary of Agriculture; United States Department of Transportation; Sean Duffy, in his official capacity as Secretary of the United States Department of Transportation; United States Department of Energy; Chris Wright, in his official capacity as the Secretary of the United States Department of Energy; United States Department of Government Efficiency Service, Amy Gleason, in her official capacity as Acting Administrator of the United States DOGE Service; Elon Musk, in his official capacity as Senior Advisor of the United States DOGE Service, <br><br> Defendants. | Case No. 2:25-cv-2152-RMG <br><br><br><br><br> **ORDER** |

1

Plaintiffs, recipients of 38 federal grants, brought this action against various federal agencies and governmental officials in their official capacities alleging that the freezing and/or terminating of their grants violated their rights under the United States Constitution and the Administrative Procedures Act ("APA"). (Dkt. No. 23). Plaintiffs allege that their grants were frozen and/or terminated because they were funded by appropriations under the Inflation Reduction Act ("IRA"), the Inflation Investment and Jobs Act ("IIJA"), or other mandatory legislation which Defendants oppose. Plaintiffs filed a motion for preliminary injunctive relief on March 26, 2025, which the parties have fully briefed. (Dkt. No. 24, 56, 64).

Defendants advised the Court in a submission of May 16, 2025 that they "do not contest judgment on the merits of [Plaintiffs'] APA claims" for 32 of the 38 grants at issue in this litigation. (Dkt. No. 153 at 1).[1] The 32 grants in which Defendants no longer oppose relief under the APA were funded by the IRA, the IIJA or other mandatory congressional legislation. While Defendants do not contest the entry of judgment for the Plaintiffs in 32 of the 38 claims, they oppose injunctive relief for Plaintiffs while Defendants contest on appeal the Court's jurisdiction under the APA. (Dkt. No. 153 at 1, n. 1). As discussed below, the Court enters judgment under the APA for Plaintiffs on the 32 grants no longer contested by Defendants and then addresses Plaintiffs' prayer for equitable relief on these APA claims.[2]

---

[1] Dkt. No. 136-1 (attached as Exhibit A), which was prepared by Defendants, lists the 38 grants under challenge in this litigation. Defendants have advised the Court that they do not contest the entry of judgment regarding Grants 1-26 and 33-38.

[2] Defendants earlier advised the Court that they had restored grant funding for Grants 8, 13, 14, 15, 17, 18, 20, 21, 24, 25, 26, 34, 35, 36. (Dkt. No. 136-1; 147-4, ¶ 10). The Court thereafter entered an order directing Defendants "not to subsequently freeze or terminate these grants without notice to the Court and authorization from the Court that the freezing and/or termination may proceed." (Dkt. No. 146 at 17). This Order remains in effect until modified or rescinded by this Court or an appellate court.

The Court further addresses below Plaintiffs' assertion of nonstatutory review jurisdiction for the alleged ultra vires acts of Defendants, acting in their official capacities, in freezing and/or terminating their grants in violation of the United States Constitution. Plaintiffs assert that Defendants actions in targeting grants based on their opposition to previously adopted acts of Congress constitute a failure to "faithfully execute[]" the laws of the United States, as mandated by Article II, Section 3 of the United States Constitution. Plaintiffs point to a long line of United States Supreme Court decisions and the Fourth Circuit's recent decision in *Strickland v. United States*, 32 F.4th 311, 363-366 (2022), upholding nonstatutory review jurisdiction of the federal courts to provide parties equitable relief in actions against federal officials in their official capacities for actions taken outside their legal authority and/or in violation of the United States Constitution.

Finally, the Court addresses Plaintiffs' request for preliminary injunctive relief regarding six grants that were funded by general appropriations to the United States Department of Agriculture ("USDA"). Defendants continue to contest their liability under the APA regarding those six claims.[3]

## I.    Factual Background

On January 20, 2025, President Donald Trump issued an executive order which directed all agencies to "immediately pause the disbursements of funds appropriated through the Inflation Reduction Act of 2022 . . . or the Infrastructure Investment and Jobs Act . . . ." Executive Order 14154, 2025 WL 315844 (January 20, 2025). That directive was under a section titled "Terminating the Green New Deal." *Id.* There was initially some uncertainty within the federal

---

[3] These six claims still contested by Defendants under the APA are Grants 27-32. (Dkt. No. 136-1) (Exhibit A).

agencies whether the directive applied only to matters related to the Green New Deal or to all appropriations arising under the IRA and IIJA. Two Office of Management and Budget (OMB) memoranda were issued shortly after the executive order that appeared to direct all agencies of the federal government to temporarily pause all spending on IRA and IIJA appropriated projects. (Dkt. No. 1-1, 1-2). Within days, various federal agencies, including the Environmental Protection Agency (EPA) and the USDA, issued directives that that all spending of funds related to the IRA and IIJA be immediately paused. (Dkt. No. 21-2, 21-3, 21-4, 21-8). Hundreds of previously awarded and active federal grants to non-profit organizations and local governments were summarily frozen with no notice or process. Numerous lawsuits similar to this action soon followed.

The 32 grants funded by mandatory legislation were primarily funded by IRA or the IIJA. For example, many of the EPA grants at issue in this litigation were funded under the Environmental and Climate Justice Block Grants program, a $2.8 billion dollar appropriation that provided that the Administrator "shall . . . award grants for periods of up to 3 years . . . that benefit disadvantaged communities . . . ." 42 U.S.C. § 7438(a)(1), (b)(1).[4] In implementing the Administrator's instruction to eliminate all grants funded by the IRA and the IIJA, internal EPA records document that Environmental and Climate Justice Block Grants were specifically targeted for freezing and/or termination. (Dkt. Nos. 1-4, 149-3, 149-4).

The Government Defendants in this and other similar suits initially denied that the freezing of the grants was on the basis that they were funded by the IRA and IIJA. Instead, Defendants

---

[4] The Administrator was authorized to award grants under the Act for such purposes as "community-led air and other pollution monitoring," "mitigating climate and health risks," "climate resiliency," and "reducing indoor toxins and indoor air pollution." §7438(b)(2)(A).

4

claimed with little explanation that the mass freezing of federal grants was due to a change in agency priorities or policies. In a parallel action in Rhode Island, involving many of the same Government Defendants, defendants contended that there was "no singular freeze" but "thousands of individual decisions made by agencies about whether particular grants or other funding should be paused." *Woonasquatucket River Watershed Council v. United States Department of Agriculture*, C.A. No. 1:25-cv-97, Dkt. No. 31 at 31 (D.R.I. March 27, 2025). The Rhode Island Court and another district court confronted with this defense in a recent grant funding case found it "unfathomable" and "truly doubtful" that "agencies suddenly began exercising their own discretion to suspend funding across the board at the same time." *Woonasquatucket River Watershed Council v. United States Department of Agriculture*, 2025 WL 1116157 at *11 (D.R.I. April 15, 2025); *National Council of Nonprofits v. Office of Management and Budge*t, 2025 WL 597959 at *7 (D.D.C. February 25, 2025).

After similar arguments were made in this case, the Court ordered Defendants to produce all documents related to "freezing, pausing, and/or terminating of grant funds to the grant recipients who are parties to this litigation." (Dkt. No. 45 at 5-7). Defendants produced thousands of documents, not one showing any individualized review of decisions to freeze or terminate grants of the Plaintiffs in this action. (Dkt. Nos. 79-91, 95-103, 106-132).

The Defendants thereafter advised the Court that they had resumed the funding for 14 of the 38 grants at issue in this litigation, terminated four grants, and were processing the termination of six other grants. (Dkt. No. 136-1). The Court noted that these actions appeared to be a pivot by the Defendants away from freezing grants and reflected a move by Defendants toward terminating a smaller group of grants. Defendants claimed at a recent hearing that the grants were being terminated only after an individualized review of each grant. (Dkt. No. 142 at 35). To determine

the veracity of this representation, the Court ordered Defendants to produce all documents related to the termination or the proposed termination of grants at issue in this action to determine whether any such individualized review had actually been conducted. (Dkt. No. 146 at 15).

Defendants produced over 500 additional pages of documents in response to the Court's discovery order. (Dkt. No. 147-1 to 147-10). Not one document showed any individualized review of the grant of any Plaintiff in this action before the grant was terminated or designated for termination. Defendants' response included a declaration from senior EPA official Travis Voyles, claiming that on February 25, 2025 he had made an "individualized review" of an unidentified number of EPA grants, including many involved in this litigation, and determined that they were "terminated for policy reasons." (Dkt. No. 147-4). Mr. Voyles further stated that he orally communicated his termination decisions to another EPA official who then began the termination process. (*Id*. at 2-3). Not a single document was produced which evidenced any review by the EPA. The Court finds it hard to believe that numerous active federal grants, some totaling millions of dollars, were summarily terminated by a high-ranking government official without the production of a single document to detail the review and decision making process.

On May 16, 2025, the last business day before the Court's oral argument on Plaintiffs' motion for preliminary injunction, Defendants informed the Court that they "do not contest judgment on the merits of Plaintiffs' APA claims" and recognized that a judgment would "require Defendants to fund or negotiate grant agreements for 32 of 38 awards . . . ." (Dkt. No. 153 at 1). Defendants excluded from this concession six grants which were reportedly funded by general appropriations to the USDA. (*Id*.). Defendants further advised the Court that in the event that the Court provided injunctive relief to the Plaintiffs on their APA claims, they intended to seek to stay

of any such relief while they continued to pursue a challenge to the Court's jurisdiction under the APA. (*Id.* at n.1).

## II.     The Uncontested APA Claims

The 32 APA claims in which Defendants no longer contest were part of the widespread agency action freezing or terminating grants that were funded by mandatory congressional legislation, primarily the IRA and IIJA. These grants were funded by legislation that mandated that the funds be expended for a specific purpose and left no discretion to agency heads to disregard the legislative mandates because current officials did not approve of the purposes of the previously appropriated programs. Plaintiffs have produced substantial, highly persuasive evidence to support their claims that their grant funds were frozen and/or terminated because Defendants disfavored previously authorized congressional appropriations and that such actions were outside of the legal authority of the agency Defendants and in violation of the Constitution's separation of powers. Plaintiffs focus their APA claims primarily on statutory provisions which prohibit agency actions which are "not in accordance with law" or which are "contrary to" any constitutional right or power. 5 U.S.C. § 706(2)(A), (B). Based on the full record and the concession of the Defendants on May 16, 2025 (Dkt. No. 153), the Court hereby enters judgment for Plaintiffs on the 32 grants no longer contested.[5]

The Court now turns to the issue of remedy. The APA provides district courts authority to "hold unlawful and to set aside agency action" found "not to be in accordance with law." 5 U.S.C.

---

[5] Judgment is rendered regarding Grants 1-26 and 33-38, (Dkt. No. 136-1) (Exhibit A). These grants involved the following agencies: EPA (Grants 2-15), USDA (Grants 16-26), United States Department of Energy ("DOE") (Grant 1), and the United States Department of Transportation ("DOT") (Grants 37-38).

§ 706(2)(A). To that end, the Court grants Plaintiffs that are recipients of Grants 1-26 and 33-38 the following relief:

   A.  A declaration that the freeze and/ or termination of Grants 1-26 and 33-38 were ultra vires acts outside the legal authority of the EPA, USDA, DOE, and DOT (hereafter the "Enjoined Agencies") and in violation of the United States Constitution, constituting unlawful agency action under 5 U.S.C. § 706(2)(A) and (B);

   B.  Sets aside the freeze and/or termination of Grants 1-26 and 33-38 and directs the Enjoined Agencies to restore Plaintiffs access to grant funds immediately;

   C.  Enjoins the Enjoined Agencies from freezing, terminating or otherwise interfering with the funding of Grants 1-26 and 33-38 without written authorization from this Court[6]; and

   D.  Directs the Enjoined Agencies to submit a certification to this Court within seven days of this Order confirming compliance with this Order.

Defendants seek a stay of this Court's injunctive relief pending appeal. A stay of relief to the losing party after judgment is certainly "not a matter of right" and involves the exercise of judicial discretion "dependent upon the circumstances of a particular case." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (citing *Virginia R. Co. v. United States*, 272 U.S. 658, 672-3 (1926)). The party requesting the stay bears the burden of persuasion. The Supreme Court in *Nken* laid out four factors to consider in addressing a motion for a stay after judgment: (1) whether the stay applicant

---

[6] The Court finds it necessary to maintain supervision over the continued functioning of the unlawfully frozen or terminated grants because Defendants in this and parallel litigation have provided shifting post hoc justifications for their actions, at times appearing to be as a means to evade court orders. To the extent Defendants have legitimate and lawful reasons to terminate or freeze grant funding, the Court will promptly give consideration to any such submission by Defendants.

has made a strong showing of likelihood of success on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether the granting of the stay will substantially injure the prevailing party; and (4) where the public interest lies. 556 U.S. at 433. The first two factors from *Nken* are the most critical. *Id.*

After carefully considering the Defendants motion to stay, the Court finds that a stay of the Court's injunctive relief is not appropriate under these circumstances. First, the Court finds that Defendants are not likely to succeed on the merits. The Court addressed in detail, in its April 29, 2025 Order, the Court's jurisdiction in this case, finding that Supreme Court precedent supports Plaintiffs' argument that their claims for declaratory and injunctive relief can properly be heard by an Article III court under the APA. (Dkt. No. 146 at 1-12). Plaintiffs' already strong jurisdictional arguments have been further strengthened by the Court's additional finding below of nonstatutory jurisdiction related to Defendants' alleged ultra vires and unconstitutional acts, since such claims are plainly beyond the jurisdiction of the Court of Claims. The only forum in which Plaintiffs may adjudicate all of their pending claims is in an Article III court.

Second, Defendants cannot sustain their burden of demonstrating that they would suffer irreparable injury from the granting of injunctive relief to Plaintiffs. Indeed, Defendants have not offered any evidence to support such a claim. Third, Plaintiffs, which include many nonprofits heavily dependent on the challenged grants to sustain their mission, administrative functions, and staffing, have confronted significant challenges to their ongoing operations and experienced staff layoffs due to the abrupt freezing of grant funds. Plaintiffs have further experienced significant challenges to their good will and reputations by withdrawing services to community groups and individuals who were relying upon Plaintiffs' services and assistance. (See Dkt. No. 64-2 at 2-5). Fourth, the public interest lies in upholding the rule of law and providing an effective remedy for

9

those injured by the unlawful actions of government officials. For these reasons, Defendants' motion to stay is denied.[7]

## III.    Plaintiffs' Claims for Relief under the Court's Nonstatutory Review Jurisdiction

Plaintiffs additionally assert claims under the Court's nonstatutory review jurisdiction for equitable relief against federal officials in their official capacities on the basis that those federal officials exceeded the scope of their authority and/or acted unconstitutionally by failing to "faithfully execute[]" the laws of the United States. U.S. Const. Article II, Section 3. (Dkt. No. 23, ¶¶ 285-307). Plaintiffs expressly reference in their complaint the Fourth Circuit's recent decision in *Strickland v. United States* in support of their claim for nonstatutory review. Plaintiffs assert these claims as a second and independent basis for federal jurisdiction and seek preliminary injunctive relief on these claims. (Dkt. No. 24-1 at 16-20).

Defendants have to date focused their opposition to Plaintiffs' federal jurisdiction almost entirely on whether this Court has jurisdiction under the APA. By earlier order, the Court found that Plaintiffs have jurisdiction with this Court under the APA and that their claims were exclusively for equitable and declaratory relief. (Dkt. No. 146). The Court now turns its attention to Plaintiffs' claims referred to by *Strickland* as "nonstatutory review claims" or as "the *Larson-Dugan* exception to sovereign immunity." *Strickland* 32 F.4th at 363.

### A.  Jurisdiction:

The United States Supreme Court has long recognized nonstatutory federal jurisdiction over claims which involve (1) an action against a federal official; (2) asserted in his official capacity; (3) based on allegations that the federal official has acted beyond his statutory or

---

[7] Defendants have repeatedly argued that Plaintiffs' claims are for money damage, not equitable relief. Plaintiffs' Amended Complaint requests only equitable remedies, and the Court's remedy set forth above exclusively provides equitable relief.

constitutional authority; and (4) a request for equitable relief. *See*, *Leedom v. Kyne*, 358 U.S. 184, 188-89 (1958); *Larson v. Domestic and Foreign Commerce Corporation*, 337 U.S. 682, 689 (1949). The *Strickland* court reversed a district court decision which "mistakenly overlooked the long-established line of precedent establishing that parties can seek to enjoin federal officials in their official capacities from exceeding the scope of their authority or acting unconstitutionally." 32 F.4th at 365. *Strickland* quoted approvingly from an amicus brief submitted in that action by Professors Erwin Chemerinsky and Aziz Huq which traced the history of nonstatutory review claims back to *Marbury v. Madison*, 5 U.S. 137, 166 (1803).[8] *Strickland*, 32 F.4th at 365; *see also*, *International Refugee Assistance Project v. Trump*, 883 F.3d 233, 287-88 (4th Cir. 2018) (en banc) (J. Gregory, concurring).

Plaintiffs' Separation of Powers and ultra vires claims (Counts I and II) plainly state a claim for nonstatutory review. (Dkt. No. 23, ¶¶ 285-307). Plaintiffs have sued federal officials in their official capacities and have alleged that their actions freezing and/or terminating their grants because they were funded by now disfavored federal laws were in violation of their duty Article II, Section 2 of the United States Constitution to "faithfully execute[]" the laws of the United States. Plaintiffs seek exclusively equitable remedies, declaratory and preliminary and permanent injunctive relief. (*Id.*, ¶¶ 89-91). The Court finds that it has jurisdiction over Plaintiffs' nonstatutory review claims.

---

[8] The Court has filed the Chemerinsky and Huq amicus brief cited in the *Strickland* decision onto the docket in this case because its details the strong line of precedents supporting nonstatutory review jurisdiction. (Dkt. No. 156).

### B. Standing

Defendants have challenged Plaintiffs' standing. (Dkt. No. 56 at 17-18). After a careful review of the record and the arguments of the parties, the Court finds that Plaintiffs have standing to assert their claims.

To establish Article III standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct . . . and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Injury in fact is "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* at 339. Because Plaintiffs here seek declaratory and injunctive relief, they must establish an ongoing or future injury in fact. *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."). "An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks omitted).

In a case involving multiple plaintiffs, "[a]t least one plaintiff must demonstrate standing for each claim and form of requested relief" for that claim to proceed. *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018); *see also Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) ("[T]he Supreme Court has made it clear that the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.") (internal quotation marks omitted). Consequently, once it is established that at least one party has standing to bring the claim, no further inquiry is required as to another party's standing to bring that claim. *Horne v. Flores*, 557 U.S. 433, 446–47 (2009) (declining to analyze whether additional plaintiffs had standing when one plaintiff did);

*Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981) ("Because we find [one plaintiff] has standing, we do not consider the standing of the other plaintiffs.").

Plaintiffs have offered detailed statements of organizational and reputational harm arising from the abrupt freezing and/or terminating of their grants without notice. (Dkt. Nos. 24-2, 24-3, 24-4, 24-6, 24-9, 24-10). Plaintiff Sustainability Institute stated that the funding freeze had caused "disruptions in . . . day to day operations, causing a slowdown and budgetary challenges." (Dkt. No. 24-2, ¶ 37). Plaintiff Agrarian Trust detailed "extreme distress to . . . staff members, farmers, and community partners" from the grant freeze. (Dkt. No. 24-3, ¶ 15). Other Plaintiffs have offered similar unchallenged statements or organizational injury and reputational damage from Defendants' action under challenge in this litigation. The record fully supports findings that numerous Plaintiffs have suffered injury in fact, that the injuries are fairly traceable to Defendants' challenged conduct, and that it is likely that these injuries are redressable by a favorable judicial decision. Finding that Plaintiffs have standing, the Court proceeds to consider the merits of the motion.

### C. Plaintiffs' Motion for a Preliminary Injunction:

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). To obtain a preliminary injunction, a party must make a "clear showing" that (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 21 (2008). Plaintiff bears the burden of showing that each factor supports his request for preliminary injunction. *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1991).

The Court addresses the four *Winter* factors in turn below.

**1. Likelihood of Success on the Merits:**

The record before the Court contains ample evidence that the 32 grants Defendants no longer challenge under the APA were frozen and/or terminated because they were funded by mandatory congressional legislation that the Agency Official Defendants do not favor. While Defendants have contended that the grants were individually reviewed and frozen or terminated for undefined "policy reasons," the Court-ordered discovery in this case failed to produce a single document showing any individualized review of the Plaintiffs' grants or discussion of any basis for freezing or terminating the grants other than disapproval of the purposes of the funding. (*See* Dkt. Nos. 1-1, 1-2, 21-2, 21-3, 21-4, 21-8, 149-3, 149-4). These documents provide strong support for Plaintiffs' claim that the freezing and/or termination of the 32 grants constituted a violation of the Agency Official Defendants duty to "faithfully execute[]" the laws of the United States.

It is worthwhile to note that Plaintiffs' nonstatutory review claims and Plaintiffs' APA claims which Defendants have elected not to contest are, for all practical purposes, mirror images of each other. The 32 grants no longer under challenge under the APA all were frozen and/or terminated because they were funded by now disfavored legislation. The APA claims challenged agency actions that were "not in accordance with law" and "contrary to constitutional right" based on the official actions of Defendants acting outside their authority and in violation of the Separation of Powers. 5 U.S.C. § 706(2)(A) and (B). Plaintiffs' nonstatutory review claims are based on the argument that Defendants, have failed to "faithfully execute[]" the laws and rely on the identical facts and conduct that constitute the now uncontested APA claims.

14

In sum, the Court finds that Plaintiffs have shown a likelihood of success on the merits on their nonstatutory review claims concerning the 32 grants Defendants no longer contest regarding APA liability.

### 2.  Irreparable Injury

A plaintiff seeking injunctive relief must demonstrate the presence of irreparable injury. "A showing of irreparable harm is the *sine qua non* of injunctive relief." *Northeastern Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir.1990) (citing *Frejlach v. Butler*, 573 F.2d 1026, 1027 (8th Cir.1978)). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." The second prong of the *Winter* test requires the plaintiff to make a "clear showing" that they are likely to suffer irreparable harm in the absence of preliminary relief. *Winter*, 555 U.S. at 21. Irreparable injury must be both imminent and likely; speculation about potential future injuries is insufficient. *Winter*, 555 U.S. at 22.

First, the Nonprofit Plaintiffs offer several forms of harm they face, including disruptions in their day-to-day operations, financial strain, personnel actions including dismissal and furloughs, operations being curtailed or ended, and damage to their credibility and reputation. (Dkt. No. 24-1 at 29-34).

The Government responds that: (1) Plaintiffs allegations are speculative and not sufficiently likely to occur under the *Winter* standard; and (2) Plaintiffs have failed to establish the harm they face is irreparable and could not be cured by a monetary award after judgment. (Dkt No. 56 at 31-4).

Plaintiffs have adequately demonstrated both the likelihood of their injury as well as its irreparability. In their Complaint, their preliminary injunction motions, and the twenty declarations

filed in support, the Plaintiffs have laid out dozens of examples of obligated funding and the harms

that the withholding thereof has caused. (Dkt. Nos. 1, 23, 24, 44). The court's analysis in *New York*

*v. Trump* is relevant:

> It is so obvious that it almost need not be stated that when money is
> obligated and therefore expected (particularly money that has been
> spent and reimbursement is sought) and is not paid as promised,
> harm follows—debt is incurred, debt is unpaid . . . services stop, and
> budgets are upended. And when there is no end in sight to the
> Defendants' funding freeze, that harm is amplified because those
> served by the expected but frozen funds have no idea when the
> promised monies will flow again.

*New York*, 2025 WL 715621, at *13 (D.R.I. Mar. 6, 2025). Indefinitely pausing funding

"unquestionably make it more difficult" for the Plaintiffs to "accomplish their primary [mission]"

and is a form of irreparable harm. *Woonasquatucket River Watershed Council*, 2025 WL 1116157,

at *22 (citing *League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016)).

Second, the City Plaintiffs submit that the pause in funding presents harms such as negative

impacts on their budget due to reliance on federal funding, an inability to honor agreements with

third parties, and delays or cancelations to projects. (Dkt. No. 64 at 18). The Government responds

that the Municipalities are sufficiently well-resourced whose projects are not "the type of activities

that establish irreparable harm to justify extraordinary relief." (Dkt No. 56 at 34-5). The

government's argument is insufficient. A few examples show the variety of irreparable harms.

Plaintiff City of San Diego has hired four employees using their USDA funding, those positions

are now at risk. (Dkt. No. 24-20, ¶ 8). Plaintiff City of Columbus would be forced to draw down

funds from other projects and divert money from other budgetary requirements, causing a ripple

effect of budgetary issues. (Dkt. No. 24-16, ¶ 19). Plaintiff City of Madison has contractual

agreements made with sub-grantees in reliance on the EPA funding and are unable to honor those

agreements. (Dkt. No. 24-17, ¶ 24).

16

Congress enacted these laws and appropriated funding to these agencies, the funding freeze unconnected to legal authorization causes significant and irreparable harms to Plaintiffs. In their Complaint and subsequent filings, Plaintiffs have demonstrated dozens of examples of obligated funding and the harms they face when those funds are withheld.

Plaintiffs have adequately demonstrated irreparable harm arising from Defendants' actions.

### 3. Balance of Equities and Public Interest

The balance of the equities and public interest weigh in favor of granting Plaintiffs' request for preliminary injunctive relief. "The[] final two factors—balance of the equities and weighing the public interest—'merge when the Government is the opposing party.'" *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. 25-1411, 2025 WL 1249608, at *63 (4th Cir. Apr. 30, 2025) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). "'Balancing the equities' when considering whether an injunction should issue, is lawyers' jargon for choosing between conflicting public interests." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 329 n.10 (1982) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 609–610 (1952) (concurring opinion)).

Here, Plaintiffs assert an interest in "[e]nsuring [that] Congressional and local priorities are achieved," "having governmental agencies abide by federal laws that govern their existence and operations" and "protecting constitutional rights," (Dkt. No. 24-1 at 36), while the Government emphasizes the potential that it will be unable to recover "millions of taxpayer dollars" disbursed pursuant to a preliminary injunction if a court later determines that the Government's decision to freeze or terminate the grants was lawful. (Dkt. No. 56 at 35). The Government also argues that "[r]equiring the Executive to financially support specific projects that may be within the statutory

parameters of a program but nevertheless at odds with the Executive's priorities negatively impacts the public interest." (*Id.*).

The Court finds that the balance of the equities tips strongly in favor of Plaintiffs. The Government "is in no way harmed by [the] issuance of a preliminary injunction which prevents the [government] from enforcing restrictions likely to be found unconstitutional" and "if anything, the system is improved by such an injunction." *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021). The Court has determined that Plaintiffs have demonstrated a substantial likelihood of success on the merits of their ultra vires claims challenging Grants 1-26 and 33-38—in other words, a substantial likelihood that Agency Official Defendants have acted unconstitutionally by encroaching upon the domain of the Legislature. And if the Court's constitutional concerns alone were not enough to tip the scales in Plaintiff's favor, the Court considers sufficient the threat to Plaintiffs' survival in the face of suddenly and inexplicably paused and/or terminated funding, culminating in their need to furlough staff and pause services to the communities whom they operate to serve. (Dkt. No. 24-1 at 2; *see generally* Dkt. No. 23). Given that the Government no longer even challenges Plaintiffs' APA claims (excluding those asserted against the Secretary of Agriculture regarding grants under the Partnership for Climate-Smart Commodities ("PCSC")), the Court finds that it would be confounding indeed to credit the Government's assertion of its interests in retaining taxpayer funds over that of Plaintiffs in receiving these congressionally-allocated funds where the Government no longer even maintains that it followed lawful procedures in freezing and terminating those funds. (Dkt. No. 153).

"The Government is not harmed where an order requires them to disburse funds that Congress has appropriated and that Agencies have already awarded, . . . . [a]nd an agency is not harmed by an order prohibiting it from violating the law." *Woonasquatucket River Watershed*

*Council*, 2025 WL 1116157, at *23. "On the other hand, without injunctive relief to pause the categorical freeze of IIJA and IRA funds, the funding that the Nonprofits are owed (based on the Agencies' own past commitments) creates an indefinite limbo." *Id.* "Because the public's interest in not having trillions of dollars arbitrarily frozen cannot be overstated," the Court finds that the balance of equities tips indisputably in Plaintiffs' favor on their ultra vires claims. *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-cv-239, 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025)

The public interest also favors a preliminary injunction. The perpetuation of unlawful agency action is contrary to the public interest, and there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations. *See League of Women Voters of United States*, 838 F.3d at 12. "Government actions in contravention of the Constitution are always contrary to the public interest." *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 386 (D.D.C. 2020). Given the Court's finding that Plaintiffs are likely to succeed on the merits of their constitutional claims, a preliminary injunction here ensures that the agencies do not act in excess of their authority or in violation of the Constitution. Preserving fairness, accountability, and balance of power in governance serves the public interest and granting Plaintiffs preliminary injunctive relief does just that.

Defendants argue that they are serving the public interest by protecting and seeking to recover "millions of taxpayer dollars." But the relief Plaintiffs seek only allows them to access funds that have been appropriated by Congress; obligated prior to this suit; can only be used for specific, approved purposes; and will only be released as the Plaintiffs implement their grant program plans. Sufficient procedures have already taken place or are already in place to protect taxpayer dollars.

Because Plaintiffs have made clear showing under the four *Winters* factors, the Court grants Plaintiffs motion for preliminary injunction on Claims I and II as to Grants 1-26 and 33-38. The Court orders the following relief:

    A. Enjoins Lee Zeldin, in his official capacity as Administrator of the EPA, Brook Rollins, in his official capacity as Secretary of USDA, Sean Duffy, in his official capacity as Secretary of the Secretary of DOT, and Chris White, in his official capacity as Secretary of DOE (hereafter "Enjoined Individual Defendants") from freezing and/or terminating Grants 1-26 and 33-38 and directs that Plaintiffs access to funding for these grants be immediately restored;

    B. Enjoins the Enjoined Individual Defendants from freezing, terminating or otherwise interfering with the funding of Grants 1-26 and 33-38 without written authorization from the Court[9];

    C. Directs the Enjoined Individual Defendants to submit a certification to this Court within seven days of this Order confirming compliance with this Order.

**D. Bond**

Plaintiffs urge this Court to set a nominal bond of zero dollars in this case. (Dkt. No. 24 at 3). Plaintiffs cite recent decisions by other district courts that have considered the issue with respect to nonprofits contesting the freezing of grant funds. *See, e.g.*, *Maryland v. United States Dep't of Agric.*, No. 25-cv-0748, 2025 WL 800216, at *26 (D. Md. Mar. 13, 2025) ("it would be prohibitive to require plaintiffs to bear up front the total cost of the alleged governmental wrongdoing"); *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-cv-333, 2025 WL 573764, at *29

---

[9] See Footnote 6 for further explanation regarding this condition of the preliminary injunction.

(D. Md. Feb. 21, 2025) (setting a nominal bond of zero dollars because requested bond "would essentially forestall [the] [p]laintiffs' access to judicial review").

Rule 65 provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). A district court "retains the discretion to set the bond amount as it sees fit or waive the security requirement." *Pashby v. Delia*, 709 F.3d 307, 331-332 (4th Cir. 2013) (*abrogated on other grounds as recognized by Stinnie v. Holcomb*, 37 F.4th 977 (4th Cir. 2022)). "In some circumstances, a nominal bond may suffice." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999) (citing *International Controls Corp. v. Vesco*, 490 F.2d 1334 (2d Cir.1974)). District courts often waive the bond requirement in public interest cases, recognizing that the failure to do so could prevent certain plaintiffs from obtaining meaningful judicial review. *See Defenders of Wildlife v. U.S. Fish and Wildlife Service*, 530 F. Supp. 3d 543, 560 (D.S.C. 2021) (collecting cases).

The Government contests Plaintiffs' request for the imposition of nominal bond and "request[s] that the Court require Plaintiffs to post security . . . for any taxpayer funds distributed during the pendency of the Court's Order," citing a presidential memorandum opposing the waiver of injunction bonds. White House memorandum states that "it is the policy of the United States to demand that parties seeking injunctions against the [government] must cover the costs and damages incurred if the [g]overnment is ultimately found to have been wrongfully enjoined or restrained." (Dkt. No. 56 at 36) (citing Presidential Memorandum, Ensuring the Enforcement of Federal Rule of Civil Procedure 65(c), available at https://www.whitehouse.gov/presidential-actions/2025/03/ensuring-the-enforcement-of-federal-rule-of-civil-procedure-65c/ (Mar. 11,

2025)). This Court is not bound by the memorandum and declines to adopt any policy that would have the effect of blocking opponents of the government from the courts. *See, e.g.*, *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-CV-333, 2025 WL 573764, at *30 (D. Md. Feb. 21, 2025) (setting a nominal bond of zero dollars because granting the defendants' request "would essentially forestall [the] [p]laintiffs' access to judicial review"). This Court agrees with the District of Rhode Island that, "[i]n a case where the Government is alleged to have unlawfully withheld large sums of previously committed funds to numerous recipients, it would defy logic— and contravene the very basis of this opinion—to hold the Nonprofits hostage for the resulting harm." *Woonasquatucket River Watershed Council*, 2025 WL 1116157, at *24. The Court thus imposes a nominal bond of zero dollars.

## IV.    Plaintiffs' Claims for Relief Regarding Grants Funded by General Appropriations of the USDA

The six grants which Defendants continue to contest arise were administered by the USDA and were funded under the Commodity Credit Corporation, an entity under the control of the USDA. The grants were awarded under a program titled Partnerships for Climate Smart Commodities. ("PCSC"). Defendants have represented to the Court PCSC funding derived exclusively from the general appropriations of the USDA. Defendants assert that the USDA Secretary has broad discretion in the use of these funds, which differs from appropriations under the IRA, IIJA, or other mandatory congressional legislation. (Dkt. No. 142 at 42-43).

Defendants have informed the Court that that "PCSC has been converted into the Advancing Markets for Producers" to "reprioritize efforts so that more money goes directly to farmers." (Dkt. No. 153 at 2). As part of this new program, USDA has imposed a requirement that 65% of the federal funds must go to the producers. (*Id*. at 2-3). Six grants of Plaintiffs (Exhibit A, Grants 27-32) have been terminated because they allegedly do not meet the newly imposed 65%

22

requirement. (*Id.* at 3). The termination notices invite Plaintiffs to submit new proposals under the redesigned program by June 20, 2025. (*Id.*). Plaintiffs challenge the termination of the six USDA grants on the basis that the newly adopted program with the 65% requirement "emerged out of nowhere" and USDA provided "no explanation how its new 65% threshold was derived." (Dkt No. 149 at 14-15).

There is a very limited record before the Court on the termination of Grants 27-32. Plaintiffs assert that these six grants were summarily terminated at or about the time of the other 32 grants with no notice or reasoned explanation. According to Defendants, the funding of these grants was exclusively from generally appropriations and were not part of any mandatory legislation.[10] Thus, the challenges to the termination of these grants are based on an alleged failure to follow proper APA procedures, rather than a violation of USDA's duty to "faithfully execute[]" the laws. Further, the explanation provided by USDA officials for the termination of the six grants was not based on an undifferentiated attack on the purposes set forth in congressional legislation but on an effort to reduce administrative costs so that producers receive a greater share of the benefits of the federal funds. Moreover, affected Plaintiffs are invited to submit applications under the revised grant program.

Under the *Winter* factors, a threshold, critical issue is whether Plaintiffs can carry the burden of showing a likelihood of success on the merits to entitle them to the "extraordinary remedy" of preliminary injunctive relief. *Winter*, 555 U.S. at 20. On this record, the Court finds that Plaintiff cannot meet this standard. It may be with a fuller record and with further

---

[10] The Plaintiffs stated in the Amended Complaint that "upon information and belief," a portion of the PCSC grants was funded by the IRA. (Dkt. No. 23). Based on the present information before the Court, this appears not to be correct.

developments Plaintiffs establish a basis for an APA claim but at this time preliminary injunctive relief is not appropriate.

## V. Conclusion

Based on the foregoing, the Court has ruled as follows:

A.  Under Section II, the Court enters judgment for Plaintiffs regarding the uncontested APA claims (Exhibit A, Grants 1-26, 33-38). Plaintiffs are provided declaratory and permanent injunctive relief. Defendants' motion to stay is denied.

B.  Under Section III, The Court finds that it has jurisdiction over Plaintiffs' nonstatutory review claims and that Plaintiffs' have standing to assert those claims. The Court further grants Plaintiffs preliminary injunction for Grants 1-26 and 33-38 regarding the nonstatutory review claims.

C.  Under Section IV, the Court denies Plaintiffs preliminary injunctive relief regarding Grants 27-32.

 s/ Richard Mark Gergel
Richard Mark Gergel
United States District Judge

May 20, 2025
Charleston, South Carolina

24