**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

|  |  |
|---|---|
| THE SUSTAINABILITY INSTITUTE, et al., <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, et al., <br><br> Defendants. | Case No. 2:25-cv-02152-RMG |

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO**
**ENVIRONMENTAL AND CLIMATE JUSTICE BLOCK GRANT PROGRAM**
**AND MEMORANDUM IN SUPPORT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................. 1

BACKGROUND .............................................................................................................. 3

    A. Congress Creates the ECJ Program and Commands EPA to Implement It. ................ 3

    B. EPA Terminates the ECJ Program "for Policy Reasons." ............................................. 5

    C. Congress Retains the Statutory Mandate for the ECJ Program and Leaves
    Nearly $2.5 Billion to Implement It. ............................................................................... 9

LEGAL STANDARD ...................................................................................................... 10

ARGUMENT ................................................................................................................... 10

I.     ECJ Plaintiffs Have Standing to Challenge the Termination of the ECJ
     Program and Seek Its Implementation. ...................................................................... 11

II.    ECJ Plaintiffs Are Entitled to Summary Judgment as to the ECJ Program
     on their APA Claims (Counts III, IV, and VII). ......................................................... 13

    A. The Court has Jurisdiction. ......................................................................................... 14

    B. Terminating the ECJ Program Violated the APA. ...................................................... 17

III.   The Court Should Also Enter Summary Judgment as to the ECJ Program
     on ECJ Plaintiffs' Nonstatutory Review Claims (Counts I, II, and VI). ................... 19

    A. Termination of the ECJ Program is Ultra Vires. ........................................................ 20

    B. Termination of the ECJ Program is Unconstitutional. ............................................... 22

IV.   Over $2 Billion Remains Appropriated for the ECJ Program. ................................... 25

V.    The Remedy is an Order to Implement the ECJ Program as Congress Mandated. .......... 28

    A. Under the APA, the Court Must Vacate the Decision to Terminate the ECJ
    Program and Compel Defendants to Implement It. ..................................................... 28

    B. The Court Should Also Issue a Permanent Injunction. ............................................... 30

VI.   Alternatively, the Court Should Issue a Writ of Mandamus ....................................... 34

CONCLUSION .............................................................................................................. 34

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Aiken County*,
725 F.3d 255 (D.C. Cir. 2013) (majority op. of Kavanaugh, J.)..................................... *passim*

*Appalachian Voices v. Environmental Protection Agency*,
No. 25-5333 (D.C. Cir. Feb. 4, 2026) ...................................................................................8

*Association of American Universities v. National Science Foundation*,
788 F. Supp. 3d 106 (D. Mass. 2025) .................................................................................18

*Bell v. Hood*, 327 U.S. 678 (1946)........................................................................................24

*Bennett v. Spear*, 520 U.S. 154 (1997) ................................................................................14

*CC Distributors, Inc. v. United States*, 883 F.2d 146 (D.C. Cir. 1989)..................................13, 31

*Chicago v. Sessions*,
888 F.3d 272 (7th Cir. 2018), .............................................................................................23

*Child Trends, Inc. v. United States Department of Education*,
795 F. Supp. 3d 700 (D. Md. 2025)...................................................................12, 16, 21, 30

*City & County of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018) ................................23

*City of Chicago v. United States Department of Homeland Security*,
___ F. Supp. 3d ___, 2025 WL 3043528 (N.D. Ill. Oct. 31, 2025) .......................................21

*City of Houston v. Department of Housing and Urban Development*,
24 F.3d 1421 (D.C. Cir. 1994).............................................................................................35

*Climate United Fund v. Citibank N.A.*,
No. 25-5122 (D.C. Cir. Feb. 24, 2026) (en banc)............................................................. *passim*

*Clinton v. New York*, 524 U.S. 417 (1998) .................................................................................24

*Coalition of MISO Transmission Customers v. Federal Energy Regulatory
Commission*, 45 F.4th 1004 (D.C. Cir. 2022) ...............................................................12, 31

*Correctional Services Corporation v. Malesko*, 534 U.S. 61 (2001) ...........................................24

*Dalton v. Specter*, 511 U.S. 462 (1994)......................................................................................22

*Department of Education v. California*, 604 U.S. 650 (2025)......................................................15

*Department of Homeland Security v. Regents of the University of California*,
    591 U.S. 1 (2020)..................................................................................................14, 18

*Diamond Alternative Energy, LLC v. Environmental Protection Agency*,
    606 U.S. 100 (2025)..................................................................................................12, 13

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006)...........................................................31

*First Federal Savings and Loan Association of Durham v. Baker*,
    860 F.2d 135 (4th Cir. 1988) ...............................................................................14, 34

*League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ......................33

*Learning Resources, Inc. v. Trump*,
    607 U.S. __, 2026 WL 477534, slip op (Feb. 20, 2026) (Gorsuch, J.,
    concurring)..........................................................................................................24

*Long Term Care Partners, LLC v. United States*,
    516 F.3d 225 (4th Cir. 2008) ...............................................................................20

*Lucky Shoals Community Association v. Environmental Protection Agency*,
    No. 1:25-cv-07221-MLB (N.D. Ga. Mar. 6, 2026), ECF No. 6 .......................................19, 25

*Marbury v. Madison*, 1 Cranch 137 (1803) .................................................................................2

*Mayor of Baltimore v. Azar*, 973 F.3d 258 (4th Cir. 2020) (en banc) ...........................................31

*Miranda v. Garland*, 34 F.4th 338 (4th Cir. 2022) .......................................................................31

*Monsanto Company v. Geertson Seed Farms*, 561 U.S. 139 (2010)...........................................33

*National Institutes of Health v. American Public Health Association*,
    145 S. Ct. 2658 (2025)..................................................................................................15, 16

*Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004) .......................................18, 19

*Nuclear Regulatory Commission v. Texas*, 605 U.S. 666 (2025) ...................................................21

*Office of Personnel Management v. Richmond*, 496 U.S. 414 (1990)...........................................23

*Richardson v. Morris*, 409 U.S. 464 (1973) .................................................................................21

*Rochester Pure Waters District v. Environmental Protection Agency*,
    960 F.2d 180 (D.C. Cir. 1992)..................................................................................................23

*Roe v. Department of Defense*, 947 F.3d 207 (4th Cir. 2020) .......................................................32

*Shawnee Tribe v. Mnuchin*, 984 F.3d 94 (D.C. Cir. 2021).........................................................35

iii

*Sierra Club v. U.S. Army Corps of Engineers*, 909 F.3d 635 (4th Cir. 2018) ...............................29

*Solutions in Hometown Connections v. Noem,* (No. 25-1640) .....................................................16

*South Carolina v. United States*, 907 F.3d 742 (4th Cir. 2018)...................................29, 30, 33

*South Dakota v. Dole*, 483 U.S. 203 (1987) ...............................................................................23

*State of Washington v. Federal Emergency Management Agency*,
   No. 1:25-cv-12006-RGS (Dec. 11, 2025), ...............................................................................30

*Strickland v. United States*, 32 F.4th 311 (4th Cir. 2022)..................................................20, 24, 31

*Sustainability Institute v. Trump*, 165 F.4th 817 (4th Cir. 2026)........................................... *passim*

*Tootle v. Secretary of Navy*, 446 F.3d 167 (D.C. Cir. 2006) ........................................................21

*United States v. Garcia*, 855 F.3d 615 (4th Cir. 2017).....................................................................1

*Washington v. Federal Emergency Management Agency*,
   No. 25-12006-RGS, 2025 WL 3551751 (D. Mass. Dec. 11, 2025)...................................16, 30

**Statutes**

Administrative Procedure Act, 5 U.S.C. §§ 701-706 (2023)...........................................................3

Clean Air Act, 42 U.S.C. §§ 7401 et seq (2010) .................................................................. *passim*

Environmental and Climate Justice Block Grant Program, 42 U.S.C. § 7438 ...................... *passim*

Immigration and Nationality Act, 8 U.S.C. § 1252(a)(5) .......................................................21, 22

Inflation Reduction Act, Pub. L. No. 117-169, 136 Stat. 1818 (2022)................................. *passim*

Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429 (2021)......................5

One Big Beautiful Bill Act, Pub. L. No. 119-21, 139 Stat. 72 (2025)................................. *passim*

28 U.S.C. § 1491................................................................................................................15, 16

**Regulations**

2 C.F.R. § 200.341 (2025) ............................................................................................................24

**Rules**

Federal Rule of Civil Procedure 56(a) .............................................................................................9

Federal Rule of Evidence 902(5) ....................................................................................................1

**Other Authorities**

*Cabinet Meeting*, The White House (Apr. 30, 2025),
    https://www.whitehouse.gov/videos/president-trump-participates-in-a-cabinet-
    meeting-apr-30-2025/ ...............................................................................................1

*Cabinet Meeting*, The White House (July 8, 2025),
    https://www.whitehouse.gov/videos/president-trump-participates-in-a-cabinet-
    meeting-july-08-2025/ .............................................................................................33

Congressional Budget Office, Estimated Budgetary Effects of an Amendment in
    the Nature of a Substitute to H.R. 1, the One Big Beautiful Bill Act, Relative
    to CBO's January 2025 Baseline (June 27, 2025),
    https://www.cbo.gov/publication/61534.................................................................26

Ending Radical and Wasteful Government DEI Programs and Preferencing, Exec.
    Order No. 14,151, 90 Fed. Reg. 8,339 (Jan. 29, 2025)............................................5

Inspector General, *Evaluation of EPA's Review of Track I Community Change
    Grants* (Mar. 4, 2026), https://www.epa.gov/system/files/documents/2026-
    03/_epaoig_20260304-26-e-0016_cert_.pdf..........................................................4

*Preparation, Submission, and Execution of the Budget* (2024),
    https://www.whitehouse.gov/wp-content/uploads/2025/08/a11.pdf .......................25

Press Release, *Biden-Harris Administration Announces $600M to 11
    Grantmakers to Fund Thousands of Environmental Justice Projects Across
    the Nation as Part of Investing in America Agenda* (Dec. 20, 2023),
    https://www.epa.gov/newsreleases/biden-harris-administration-announces-
    600m-11-grantmakers-fund-thousands-environmental...............................................5

Press Release, *Biden-Harris Administration Announces Nearly $1.6 Billion in
    Environmental and Climate Justice Community Change Grants* (Dec. 12,
    2024), https://www.epa.gov/newsreleases/biden-harris-administration-
    announces-nearly-16-billion-environmental-and-climate.........................................5

Press Release, *Biden-Harris Administration Announces Nearly $128 Million for
    Environmental Justice Projects in Communities Across the Country as Part of
    Investing in America Agenda* (Oct. 24, 2023),
    https://www.epa.gov/newsreleases/biden-harris-administration-announces-
    nearly-128-million-environmental-justice ................................................................5

Press Release, *EPA Announces Reduction in Force, Reorganization Efforts to
    Save Taxpayers Nearly Three-Quarters of a Billion Dollars* (July 18, 2025),
    https://www.epa.gov/newsreleases/epa-announces-reduction-force-
    reorganization-efforts-save-taxpayers-nearly-three..................................................8

U.S. House of Representatives, Markup of Budge Reconciliation Transcript, at
    244:5962-64 (May 13, 2025),
    https://www.congress.gov/119/meeting/house/118261/documents/HMKP-
    119-IF00-Transcript-20250513.pdf ...................................................................................26

Unleashing American Energy, Exec. Order No. 14,154, 90 Fed. Reg. 8,353 (Jan.
    29, 2025) .............................................................................................................................5

**INTRODUCTION**

In 2022, Congress created the Environmental and Climate Justice Block Grant Program ("ECJ Program") as part of the Inflation Reduction Act and ordered the Environmental Protection Agency to award $2.8 billion in grants for environmental, public health, and resiliency projects that will "benefit disadvantaged communities." 42 U.S.C. § 7438(b)(1). Congress also imposed a deadline: EPA "shall use" the money appropriated for the ECJ Program "to award grants" by September 30, 2026. *Id.*

Instead, EPA terminated the ECJ Program last year "for policy reasons." Those are the words of the responsible EPA official, Assistant Deputy Administrator Travis Voyles, who avers that on February 25, 2025, "[he] decided that certain grant programs," including the entirety of the ECJ Program, "should be terminated for policy reasons." Decl. of Travis Voyles ¶ 3, Dkt. No. 147-4. To effectuate that decision, EPA initially froze and then began terminating every grant awarded under the ECJ Program. *See id.* ¶¶ 5–6. Within months, EPA Administrator Lee Zeldin was crowing that "the Green New Deal is dead."[1]

There can be no dispute that EPA acted unlawfully. It is a "bedrock" principle of constitutional law that "the President and federal agencies may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress." *In re Aiken County*, 725 F.3d 255, 259–60 (D.C. Cir. 2013) (majority op. of Kavanaugh, J.). Yet that is precisely what EPA has done here. On top of that original sin, EPA's slapdash termination of the ECJ Program epitomizes arbitrary and capricious decisionmaking. Over a year into this litigation, EPA has

---

[1] Remarks of Administrator Lee Zeldin at 1:14:50 in *President Trump Participates in a Cabinet Meeting*, The White House (Apr. 30, 2025), https://www.whitehouse.gov/videos/president-trump-participates-in-a-cabinet-meeting-apr-30-2025/. These remarks and other information on government websites cited in this motion are self-authenticating, Fed. R. Evid. 902(5), and proper for judicial notice, *United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017).

*never* offered a substantive defense of its decision to terminate the ECJ Program. Because none exists.

Rather than defend the indefensible, EPA has wagered everything on jurisdictional arguments that miss the forest for the trees. This case is about EPA's decision to terminate the entire ECJ Program, not just individual grants. Widening the aperture leaves no serious dispute about this Court's jurisdiction or the appropriate remedy. Just two months ago, EPA and Administrator Zeldin conceded before the full D.C. Circuit that dismantling a statutorily mandated program or flouting "a mandatory appropriation that says this money shall be spent" in a certain way would give rise to a claim, reviewable in district court, for which the remedy would be an order to "restore the program" and "spend the money" on the terms set by Congress.[2] Of course it would. Reviewing illegal executive action (or inaction) has been a quintessential function of the federal courts since the very beginning. *See, e.g.*, *Marbury v. Madison*, 1 Cranch 137 (1803).

Plaintiffs include eight nonprofit organizations and local governments who were awarded grants under the ECJ Program (collectively "ECJ Plaintiffs"), and who found themselves thrown into chaos when EPA abruptly terminated it.[3] Despite everything, ECJ Plaintiffs remain committed to the vision Congress laid out in the ECJ Program: combining federal dollars with local know-how to deliver environmental, public health, and resiliency projects that will benefit their communities.

---

[2] Transcript of Oral Argument at 51–52, 62–63 *Climate United Fund v. Citibank N.A.*, No. 25-5122 (D.C. Cir. Feb. 24, 2026) (en banc), Exhibit A-1, attached to Exhibit A, Decl. of Nicholas S. Torrey.

[3] As the Court knows, this case involves numerous grant programs and parties. ECJ Plaintiffs are Sustainability Institute, Bronx River Alliance, City of Baltimore, City of Madison, City of New Haven, CleanAIRE NC, Earth Island Institute, and Leadership Counsel for Justice and Accountability.

2

Congress remains committed too. Last summer, Congress repealed certain parts of the Inflation Reduction Act—but retained the ECJ Program. And while Congress rescinded about seventeen percent of the ECJ Program's funding, Congress left well over $2 billion appropriated for the ECJ Program, which EPA "shall use . . . to award grants." 42 U.S.C. § 7438(b)(1). The deadline Congress imposed—September 30, 2026—is less than six months away.

The Fourth Circuit remanded for this Court to consider jurisdiction, liability, and remedy for claims challenging the cancellation of entire grant programs. *Sustainability Inst. v. Trump*, 165 F.4th 817, 829 n.8, 834 (4th Cir. 2026). For the ECJ Program, the material facts are undisputed, ECJ Plaintiffs are entitled to judgment as a matter of law, and time is of the essence. Accordingly, ECJ Plaintiffs respectfully request that the Court enter summary judgment as to the ECJ Program on their Administrative Procedure Act ("APA") claims (Counts III, IV, and VII), nonstatutory review claims (Counts I, II, and VI), and mandamus claim (Count VIII) in the Supplemental Complaint. Dkt. No. 203.

## BACKGROUND

### A.     Congress Creates the ECJ Program and Commands EPA to Implement It.

In 2022, Congress enacted and the President signed into law the Inflation Reduction Act. Pub. L. No. 117-169, 136 Stat. 1818 (Aug. 16, 2022). Relevant here, the Inflation Reduction Act amended the Clean Air Act by adding Section 138 to establish a new program—the ECJ Program—for "Environmental and Climate Justice Block Grants." *Id.* § 60201, 136 Stat. at 2078 (codified at 42 U.S.C. § 7438). Congress appropriated $3 billion to EPA, "to remain available until September 30, 2026," for the agency to implement the ECJ Program: (1) $2.8 billion "to award grants" under the Program; and (2) an additional $200,000,000 "to provide technical assistance . . . related to grants awarded under" the Program. 42 U.S.C. § 7438(a)(1), (2). In

3

addition, Congress directed EPA to reserve seven percent of the ECJ Program's funding for the "administrative costs" of implementing it. *Id.* § 7438(c).

At the heart of the ECJ Program, Congress mandated that EPA "shall use" the appropriated funding "to award grants" to "eligible entities," including community-based nonprofits and local governments, "to carry out" certain environmental, public health, and resiliency projects "that benefit disadvantaged communities." 42 U.S.C. § 7438(b). Congress provided a detailed list of "eligible activities" that qualify for grants under the ECJ Program, including "reducing indoor toxics and indoor air pollution," "climate resiliency and adaptation," and "mitigating climate and health risks from urban heat islands, extreme heat, wood heater emissions, and wildfire events." *Id.* § 7438(b)(2)(B)–(E).

EPA launched several subprograms to implement the ECJ Program and fulfill its statutory mandate. EPA called these the Community Change Grants Program, the Thriving Communities Grantmaking Program, the Environmental Justice Collaborative Problem-Solving Cooperative Agreement Program, and the Government-to-Government Program.[4] Between 2022 and late 2024, EPA received thousands of applications for grants under the ECJ Program and, following a competitive process, selected just a few hundred of the most qualified applicants to receive awards, including ECJ Plaintiffs. *See, e.g.*, EPA Office of Inspector General, *Evaluation of EPA's Review of Track I Community Change Grants* at 3, 7–13 (Mar. 4, 2026), https://www.epa.gov/system/files/documents/2026-03/_epaoig_20260304-26-e-0016_cert_.pdf

---

[4] *See* Environmental Protection Agency, *Inflation Reduction Act Environmental and Climate Justice Program* (Mar. 27, 2025), https://perma.cc/3BKM-DR5D (captured June 15, 2025). EPA also solicited applications for a single grant under a subprogram the agency called the UPLIFT Climate and Environmental Community Action Grant, *see id*, but it appears EPA never issued an award under this subprogram.

[https://perma.cc/D4H7-5CFW]; Dkt No. 157-1 (chart listing grants awarded to ECJ Plaintiffs). In total, EPA awarded roughly $2.3 billion in grants under the ECJ Program by December 2024.[5]

**B. EPA Terminates the ECJ Program "for Policy Reasons."**

On the first day of his second term, President Trump issued two executive orders targeting the Inflation Reduction Act and the very idea of environmental justice. In *Unleashing American Energy*, the President directed agencies to immediately freeze "the disbursement of funds appropriated through the Inflation Reduction Act," and to ensure that their "programs for issuing grants" using "such appropriated funds" are consistent with the President's policy priorities. Exec. Order No. 14,154, 90 Fed. Reg. 8,353, 8,357 (Jan. 29, 2025). In *Ending Radical and Wasteful DEI Programs and Preferencing*, the President directed agencies to promptly terminate all "'environmental justice' offices and positions" and all "'equity-related' grants." Exec. Order No. 14,151, 90 Fed. Reg. 8,339, (Jan. 29, 2025). Within days, EPA froze all grants awarded under the ECJ Program and every other program funded by the Inflation Reduction Act. *See* Dkt. No. 116-6 at 26–27 (EPA_00052690 to EPA_00052691) (memorandum directing

---

[5] *See* Press Release, *Biden-Harris Administration Announces Nearly $1.6 Billion in Environmental and Climate Justice Community Change Grants* (Dec. 12, 2024), https://www.epa.gov/newsreleases/biden-harris-administration-announces-nearly-16-billion-environmental-and-climate [https://perma.cc/D4BV-8H3Y] (announcing $1.6 billion in awards under Community Change Grants Program); Press Release, *Biden-Harris Administration Announces $600M to 11 Grantmakers to Fund Thousands of Environmental Justice Projects Across the Nation as Part of Investing in America Agenda* (Dec. 20, 2023), https://www.epa.gov/newsreleases/biden-harris-administration-announces-600m-11-grantmakers-fund-thousands-environmental [https://perma.cc/AXL9-576G] (announcing $600 million in awards under Thriving Communities Grantmaking Program); Press Release, *Biden-Harris Administration Announces Nearly $128 Million for Environmental Justice Projects in Communities Across the Country as Part of Investing in America Agenda* (Oct. 24, 2023), https://www.epa.gov/newsreleases/biden-harris-administration-announces-nearly-128-million-environmental-justice [https://perma.cc/4KUL-2PDT] (announcing $128 million in awards under Environmental Justice Collaborative Problem-Solving Cooperative Agreement Program and Government-to-Government Program).

"Inflation Reduction Act and Infrastructure Investment and Jobs Act Funding Action Pause").

EPA and the Department of Government Efficiency ("DOGE") then began selecting individual

grants for cancellation. *See* Dkt. No. 118 at 1–2 (EPA_00120621 to EPA_00120622) (email with

press release about grants cancelled in the "third round of EPA cuts in partnership with DOGE").

A few weeks later, EPA went further and decided to terminate the entire ECJ Program. In

a declaration submitted to this Court, the responsible official, Assistant Deputy Administrator

Travis Voyles, detailed how the decision was made and implemented. *See* Decl. of Travis Voyles

¶ 3, Dkt. No. 147-4. On February 25, 2025, Mr. Voyles "conducted an individualized review of

EPA grant programs for consistency with Agency policy priorities. That day, [he] decided that

certain grant programs, identified by 'Assistance Number Listing,' should be terminated for

policy reasons."[6] *Id.* Mr. Voyles then "orally communicated [his] decision to Daniel Coogan,"

another EPA official, who "document[ed] the decision" later that day in an email to Mr. Voyles

and others. *Id.* Consistent with this description, the email memorializing the termination decision

identifies by Assistance Number Listing the grant programs to be terminated and includes the

entirety of the ECJ Program and its subprograms. *See* Ex. A to Decl. of Travis Voyles, Dkt. No.

147-4 (email stamped EPA_00289735 to EPA_00289736); Ex. G to Decl. of Travis Voyles at ¶ 6,

Dkt. No. 147-4 (Decl. of Daniel Coogan originally filed in another case) (identifying "IRA grant

programs which are slated to be terminated" as including "Environmental Justice Collaborative

Problem-Solving Cooperative Agreement Program," "Environmental Justice Government-to-

Government (EJG2G) Program," "Environmental Justice Thriving Communities Grantmaking

Program," and "Environmental and Climate Justice Block Grant Program"). Finally, the email

---

[6] An assistance listing number is a unique numerical identifier assigned to a federal program that
provides grants, loans, insurance, or other types of assistance. *See SAM.gov Assistance Listings*,
https://sam.gov/assistance-listings (last visited Apr. 21, 2026).

contains specific directives to EPA staff about how to implement the termination decision. *See* Ex. A to Decl. of Travis Voyles, Dkt. No. 147-4 (email stamped EPA_00289735 to EPA_00289736).

EPA moved quickly to carry out the decision to terminate the ECJ Program. First, EPA placed a "financial control" in its payment system on the programs slated for termination "to prevent any drawdowns in the time between announcement and execution." Decl. of Travis Voyles ¶ 4, Dkt. No. 147-4 (internal quotation marks omitted); *see also id.* ¶ 5 (explaining that EPA staff "executed my instructions" and "verif[ied] the programs they had subjected to the financial control, as well as a list of the individuals awards for which drawdowns had been frozen as a result"). Next, EPA began terminating individual grants under the targeted programs, including the ECJ Program and its subprograms. *Id.* ¶ 6; *see also* Voyles Decl., Ex. E (EPA_00292053 to EPA_00292077) (email and spreadsheet of grants "approved for cancellations," including under ECJ Program). EPA employed a standard operating procedure for individual grant terminations, which the agency initially developed around the same time as the first tranche of DOGE-driven cuts, and instructed EPA grant managers to copy and paste boilerplate language for each termination letter and transmittal email. *See* Dkt. No. 118-1 at 1–8 (EPA_00140861 to EPA_00140868) (updated version of "Grant Termination SOP"); *id.* at 5 (EPA_00140865) (transmittal email template); Dkt. No. 128-8 at 1–2 (EPA_00294499 to EPA_00294500) (termination letter template); *see also* Dkt. No. 118-1 at 34–35 (EPA_00142250 to EPA_00142251) (email on draft standard operating procedure). Among other things, the boilerplate termination letter informed grantees about how to dispute EPA's decision through an administrative process and specified they could request payment for allowable costs incurred prior to the effective date of the termination and for closeout costs incurred later. Dkt. No. 128-8

at 1–2 (EPA_00294499 to EPA_00294500) (termination letter template). Grant managers tasked with "the processing of grants identified for termination" were admonished that "speed is of the utmost concern." Dkt. No. 118-1 at 35 (EPA_00142251); *see also id.* ("As a gentle reminder, you may be tasked to cancel a grant within 24-48 hours. There may be upwards of 10-30 grants identified each day."). EPA claims to have sent termination letters to many ECJ Program grantees by May 2025.[7] Additionally, EPA laid off the agency staff charged with administering the ECJ Program.[8]

The timeline was different for ECJ Plaintiffs. In late April 2025, Defendants filed a court-ordered report disclosing that EPA had internally marked ECJ Plaintiffs' grants as "Closed," "Terminated," or "Termination in Progress." Dkt. No. 136-1 (chart of grant statuses). On May 20, 2025, the Court issued an order that prevented the termination of most grants awarded to Plaintiffs, including all grants awarded to ECJ Plaintiffs under the ECJ Program, and enjoined Defendants from freezing, terminating, or otherwise interfering with them. Dkt. No. 157 at 8, 20. However, the Fourth Circuit later stayed those injunctions pending appeal, Dkt. No. 166, and ultimately EPA sent boilerplate termination letters to ECJ Plaintiffs beginning in late July 2025.[9]

---

[7] *See, e.g.*, Final Brief for Appellees at 5–6, *Appalachian Voices v. EPA*, No. 25-5333 (D.C. Cir. Feb. 4, 2026). Some of the undersigned attorneys represent the plaintiffs in *Appalachian Voices*, which, like this case, challenges the termination of the ECJ Program. *Appalachian Voices* is currently on appeal from a dismissal order that focused on individual grant terminations and overlooked claims challenging the termination of the ECJ Program itself.

[8] Press Release, *EPA Announces Reduction in Force, Reorganization Efforts to Save Taxpayers Nearly Three-Quarters of a Billion Dollars* (July 18, 2025), https://www.epa.gov/newsreleases/epa-announces-reduction-force-reorganization-efforts-save-taxpayers-nearly-three [https://perma.cc/277M-R8DE].

[9] *See* Suppl. Decl. of Sarah Diefendorf ¶ 4, Dkt. No. 189-2 (Plaintiff Earth Island Institute received termination letter on July 24, 2025); Suppl. Decl. of Gerald Babao ¶ 6, Dkt. No. 189-3 (Plaintiff CleanAIRE NC received termination letter on July 28, 2025); Suppl. Decl. of Faith P. Leach ¶ 7, Dkt. No. 189-4 (Plaintiff City of Baltimore received termination letter on July 30, 2025); Suppl. Decl. of Justin Elicker ¶ 7, Dkt. No. 189-5 (Plaintiff City of New Haven received termination letter on July 29, 2025); Suppl. Decl. of Jessica Price ¶ 9, Dkt. No. 189-6 (Plaintiff

8

### C. Congress Retains the Statutory Mandate for the ECJ Program and Leaves Nearly $2.5 Billion to Implement It.

On July 4, 2025, Congress enacted and the President signed into law a budget reconciliation bill called the One Big Beautiful Bill Act ("OBBBA"). Pub. L. No. 119-21, 139 Stat. 72 (July 4, 2025). Among other things, the One Big Beautiful Bill Act repealed certain provisions of the Inflation Reduction Act and rescinded portions of certain funding appropriated under that act. *See, e.g.*, *id.* § 50402, 139 Stat. at 152 ("Section 50142 of [the Inflation Reduction Act] is repealed and the unobligated balance of amounts made available under that section . . . is rescinded.").

However, for the ECJ Program, Congress did not repeal the statutory mandate and rescinded only a subset of the $3 billion originally appropriated. The relevant provision of the One Big Beautiful Bill Act states in full:

> SEC. 60016.    RESCISSION OF FUNDING FOR ENVIRONMENTAL AND CLIMATE JUSTICE BLOCK GRANTS.
>
> The *unobligated balances of amounts* made available to carry out section 138 of the Clean Air Act (42 U.S.C. 7438) are rescinded.

OBBBA § 60016, 139 Stat. at 156 (emphasis added).

---

City of Madison received termination letter on July 25, 2025); Suppl. Decl. of Bryan Cordell ¶ 6, Dkt. No. 189-7 (Plaintiff Sustainability Institute received termination letter on July 29, 2025); Suppl. Decl. of Kaylon Hammond ¶ 5, Dkt. No. 189-8 (Plaintiff Leadership Counsel for Justice and Accountability received termination letter on July 24, 2025); Suppl. Decl. of Siddhartha Sanchez ¶ 8, Dkt. No. 189-9 (Plaintiff Bronx River Alliance received termination letter on August 1, 2025, concerning its Community Change Grant). In addition, Plaintiff Bronx River Alliance was awarded a grant under the Environmental Justice Collaborative Problem-Solving Cooperative Agreement Program, for which EPA sent a termination letter on March 28, 2025. Suppl. Decl. of Siddhartha Sanchez ¶ 6, Dkt. No. 189-9.

During markup, the chair of the House subcommittee with jurisdiction over the ECJ Program explained that recission of "unobligated balances" would not touch funds for grants that had been awarded because Congress "can't rescind expenditures that have already been obligated." *Markup of Budget Reconciliation Text: Hearing on H.R. 1. Before the H. Comm. on Energy and Commerce*, 119th Congress 247–48 (May 13, 2025) (statement of Rep. Morgan Griffith, then-Chairman, Subcommittee on Environment), Exhibit B-1at 8-9, attached to Exhibit B, Decl. of Spencer Gall. If those funds later became unobligated, he continued, they could potentially be subject to a "future recission," but "for purposes of this reconciliation, [Congress] can't look at the crystal ball and decide what might happen in the future." *Id.* Consistent with that understanding, the Congressional Budget Office calculated that, of the $3 billion originally appropriated for the ECJ Program, the One Big Beautiful Bill Act rescinded approximately $516 million. *See* Congressional Budget Office, *Estimated Budgetary Effects of an Amendment in the Nature of a Substitute to H.R. 1, the One Big Beautiful Bill Act, Relative to CBO's January 2025 Baseline* (June 29, 2025), Exhibit B-2 at 2, attached to Exhibit B, Decl. of Spencer Gall.

## LEGAL STANDARD

A party may seek summary judgment on a claim in whole or part. *See* Fed. R. Civ. P. 56(a). In either circumstance, the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

## ARGUMENT

Congress could not have spoken more clearly: EPA "shall use" the funding Congress appropriated for the ECJ Program "to award grants" by the statutory deadline of September 30, 2026. 42 U.S.C. § 7438(b)(1). EPA has no constitutional or statutory authority to refuse that

10

command. By deciding to terminate the ECJ Program for policy reasons, EPA usurped a power that belongs to Congress alone. The agency acted lawlessly under any rubric and its decision cannot be allowed to stand.

To be clear, ECJ Plaintiffs challenge EPA's unlawful decision to terminate the ECJ Program itself—not their specific grants—and seek only an order that would require EPA to implement the ECJ Program on the terms mandated by Congress. Nothing more. ECJ Plaintiffs have standing to seek that relief, this Court has the power to award it, and ECJ Plaintiffs are entitled to judgment as a matter of law. Accordingly, the Court should enter summary judgment for ECJ Plaintiffs as to the ECJ Program on their claims under the APA (Counts III, IV, and VII) and their claims for nonstatutory review (Counts I, II, and VI). If necessary, the Court should issue a writ of mandamus compelling EPA and Administrator Zeldin to implement the ECJ Program (Count VIII).

I.     **ECJ Plaintiffs Have Standing to Challenge the Termination of the ECJ Program and Seek Its Implementation.**

When EPA unlawfully terminated the ECJ Program, ECJ Plaintiffs suffered immediate injuries as their grants were shut off, their work upended, and their communities deprived of the kinds of environmental, public health, and resiliency projects that Congress established the ECJ Program to provide. ECJ Plaintiffs acknowledge that, under the Fourth Circuit's opinion in *Sustainability Institute*, the appropriate remedy for the unlawful termination of the ECJ Program may not include an order enjoining EPA to reinstate individual grants. *Sustainability Inst.*, 165 F.4th at 829 n.8, 834. Here, ECJ Plaintiffs seek a different remedy—an order that would require EPA to implement the ECJ Program on the terms mandated by Congress—and they have Article III standing to seek it.

To establish Article III standing, a plaintiff must (1) "demonstrate an injury that is concrete, particularized, and actual or imminent, not speculative," (2) "show that the injury was likely caused by the defendant," and (3) "demonstrate that the injury would likely be redressed by judicial relief." *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 111 (2025) (internal quotation marks omitted).

ECJ Plaintiffs satisfy every element of Article III standing. To start, ECJ Plaintiffs have suffered overlapping concrete injuries. ECJ Plaintiffs are nonprofit organizations and local governments dedicated to serving their communities. They want to participate in the ECJ Program and enlist federal funding to deliver important environmental, public health, and resiliency benefits that will improve the lives of the people they serve, just as Congress envisioned.[10]  Beyond the four corners of any particular grant agreement, ECJ Plaintiffs have suffered concrete injuries because the unlawful termination of the ECJ Program has left them "walled off from an entire category of projects for which [they are] qualified, prepared, and eager to compete," a well-recognized form of injury in fact. *Coal. of MISO Transmission Customers v. FERC*, 45 F.4th 1004, 1016 (D.C. Cir. 2022); *see also, e.g.*, *Child Trends, Inc. v. U.S. Dep't of Educ.*, 795 F. Supp. 3d 700, 718 (D. Md. 2025) ("Plaintiffs ask for . . . only the opportunity to compete for grants and subcontracts . . . a well-established form of redressable injury." (cleaned up)).

---

[10] *See, e.g.*, Suppl. Decl. of Siddhartha Sanchez at ¶¶ 11-13, Dkt. No. 189-9; Suppl. Decl. of Kaylon Hammond at ¶¶ 8-10, Dkt. No. 189-8; Suppl. Decl. of Bryan Cordell at ¶¶ 22-24, Dkt. No. 189-7; Suppl. Decl. of Faith Leach at ¶¶ 8-11, Dkt. No. 189-4; Suppl. Decl. of Justin Elicker at ¶ 13-15 Dkt. No. 189-5; Suppl. Decl. of Jessica Price ¶ 9, Dkt. No. 189-6; Suppl. Decl. of Gerald Balboa at 10-13 ¶¶, Dkt. No. 189-3; Suppl. Decl. of Sarah Diefendorf ¶ 11-14, Dkt. No. 189-2.

As for causation and redressability, those elements are satisfied too. There can be no dispute that EPA's unlawful decision to terminate the ECJ Program is the cause of Plaintiffs' injuries. *See Diamond Alt. Energy*, 606 U.S. at 112 (causation and redressability ordinarily shown where plaintiff is "an object of the action (or foregone action) at issue"). Likewise, there can be no genuine dispute that an order requiring EPA to implement the ECJ Program as Congress mandated would satisfy the redressability requirement. At a minimum, an order requiring EPA to implement the ECJ Program would certainly redress the "constitutionally cognizable injury" that ECJ Plaintiffs have suffered from the "loss of an *opportunity to pursue a benefit*" under the ECJ Program. *CC Distributors, Inc. v. United States*, 883 F.2d 146, 150 (D.C. Cir. 1989). If they must apply anew to avail themselves of the opportunity to participate in the ECJ Program and deliver for their communities, they will. That is enough for standing. *CC Distributors, Inc.*, 883 F.2d at 150.

## II.    ECJ Plaintiffs Are Entitled to Summary Judgment as to the ECJ Program on their APA Claims (Counts III, IV, and VII).

The APA requires the Court to hold unlawful and set aside final agency actions that are arbitrary or unlawful, lack statutory authority, or violate the Constitution. 5 U.S.C. § 706(2). The APA also requires the Court to "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1). In this case, EPA's decision to terminate the statutorily mandated ECJ Program is a final agency action that violates the standards of § 706(2). And EPA's ongoing failure to implement the ECJ Program unlawfully withholds action under § 706(1) that Congress unambiguously requires by September 30, 2026. The Court has jurisdiction and ECJ Plaintiffs are entitled to summary judgment on their claims under both provisions.

13

**A.     The Court has Jurisdiction.**

This Court has jurisdiction to review APA claims challenging the elimination of the ECJ Program, which EPA has a statutory duty to implement. The grantmaking purpose of the ECJ Program does not change the jurisdictional analysis.

*First*, the decision to terminate the ECJ Program is a final agency action subject to review under the APA. *See id.* § 704. An agency action is "final" when it marks "the consummation of the agency's decisionmaking process" and produces "appreciable legal consequences." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotation marks omitted). The material facts here are undisputed and come straight from EPA. On February 25, 2025, Assistant Deputy Administrator Travis Voyles "decided that certain grant programs," including the entirety of the ECJ Program and its subprograms, "should be terminated for policy reasons." Decl. of Travis Voyles ¶ 3, Dkt. No. 147-4. Mr. Voyles "orally communicated [his] decision to Daniel Coogan," who memorialized the decision in writing that same day, along with directives on how the agency would effectuate it. *Id.*; *see also supra* pp. 6-7.

*Second*, the decision to terminate the ECJ Program is not a matter of agency discretion. *See* 5 U.S.C. § 701(a)(2). The decision does not belong to EPA at all. Congress established the ECJ Program, commanded EPA to award grants by September 30, 2026, and set parameters around the kinds of recipients and activities that are eligible for grants under the ECJ Program. 42 U.S.C. § 7438(a), (b). ECJ Plaintiffs seek review of *whether* EPA must comply with the statutory mandate to implement the ECJ Program on the terms set by Congress (the answer is yes), not *how* EPA should implement the ECJ Program within those parameters.

*Finally*, the grantmaking purpose of the ECJ Program does not affect the reviewability of ECJ Plaintiffs' claims challenging the elimination of the ECJ Program itself. Claims like these have always been reviewable under the APA. *See, e.g.*, *Dep't of Homeland Sec. v. Regents of the*

14

*Univ. of Cal.*, 591 U.S. 1, 18 (2020) ("The creation of that program—and its rescission—is an action that provides a focus for judicial review." (cleaned up)).

Last year, the Supreme Court issued a pair of interim orders addressing the interplay of the APA and the Tucker Act in grant-related cases. *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658 (2025); *Dep't of Educ. v. California*, 604 U.S. 650 (2025). Under those decisions, ordinary APA review is available when challenging agency actions that relate to grants, including high-level policy directives, except for certain kinds of claims implicating the Tucker Act: those "based on" specific grants or seeking "relief designed to enforce any 'obligation to pay money' pursuant to those grants." *Nat'l Insts. of Health*, 145 S. Ct. at 2659 (quoting *California*, 604 U.S. at 651). According to *California*, those claims fall within the Tucker Act, which provides the Court of Federal Claims with jurisdiction to review "any claim" that is "founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1); *see also California*, 604 U.S. at 651. And where it applies, the Tucker Act "impliedly forbids" review under the APA. 5 U.S.C. § 702.

*National Institutes of Health* confirms that claims challenging the elimination of the Program belong in this Court. The Tucker Act controls the jurisdictional inquiry only for claims "based on" specific grants or seeking "to enforce any 'obligation to pay money' pursuant to those grants," while the APA remains available otherwise. *Nat'l Insts. of Health*, 145 S. Ct. at 2659 (quoting *California*, 604 U.S. at 651). Justice Barrett, who cast the controlling vote, put it succinctly using the facts of that case: claims seeking "vacatur of internal agency guidance" under the APA are routine; the mere fact that "agency guidance discusses internal policies related to grants does not transform a challenge to that guidance into a claim 'founded ... upon' contract

15

that only the CFC can hear." *Id.* at 2661 (Barrett, J., concurring) (quoting 28 U.S.C. § 1491(a)(1)).

So too here. ECJ Plaintiffs challenge the decision to terminate the *ECJ Program*, not their specific grants, and seek an order vacating that decision and compelling EPA to implement the *ECJ Program* on the terms set by Congress—nothing more. These are heartland APA claims that seek standard APA relief, and they belong in this Court. *See Washington v. Fed. Emergency Mgmt. Agency*, No. 25-12006-RGS, 2025 WL 3551751, at *4 (D. Mass. Dec. 11, 2025) (district court has jurisdiction and Tucker Act is "inapplicable" where "claims are focused solely on whether the agency has the authority to shutter the entire [Building Resilient Infrastructure and Communities] program"); *Child Trends, Inc.*, 795 F. Supp. 3d at 719 (district court has jurisdiction and Tucker Act is inapplicable where claims challenge "the legality of the wholesale cancellation of the [Regional Education Laboratories] program," not "particular grant awards").

In fact, even the government seems to agree that claims challenging the elimination of the ECJ Program belong in this Court. On the same day the Fourth Circuit heard this case, the government volunteered in another grant-related appeal before the same panel that "a claim where there is a final, discrete agency action setting forth a policy to close a program that is statutorily mandated to exist" belongs in district court under *National Institutes of Health*.[11] Plaintiffs agree.

---

[11] Transcript of Oral Argument at 20, *Solutions in Hometown Connections v. Noem* (No. 25-1640) (4th Cir. Oct. 23, 2025), Exhibit C-1, attached to Exhibit C, Decl. of Candice Jones.

**B.          Terminating the ECJ Program Violated the APA.**

On the merits, ECJ Plaintiffs are entitled to summary judgment on their claims under both § 706(2) and § 706(1). EPA's decision to terminate the ECJ Program, and the agency's ongoing failure to implement it, cannot survive even momentary scrutiny.

*Section 706(2)*. There is no serious dispute that EPA's decision to terminate the ECJ Program violated nearly every standard in § 706(2) and must be vacated. Indeed, Defendants have already consented to judgment on the merits of the § 706(2) claims in the First Amended Complaint. After discovery revealed, among other things, that EPA terminated the entire ECJ Program for policy reasons, Defendants advised the Court on May 16, 2025, that they "do not contest judgment on the merits of Plaintiffs' APA claims." Dkt. No. 153 at 1.[12] The APA claims on which Defendants admitted liability include challenges to the high-level directives responsible for the termination of the ECJ Program. *See* Dkt. No. 23, First Am. Compl. at ¶¶ 8-9, 308–28.

ECJ Plaintiffs are entitled to summary judgment regardless of this concession. EPA has never mounted a substantive defense of its decision to terminate the ECJ Program because there is none. As detailed below, terminating the ECJ Program violates a clear mandate Congress imposed in the Inflation Reduction Act and codified in the Clean Air Act, which EPA has no statutory or constitutional authority to refuse. *See infra* 19-24. "To reiterate, the President and federal agencies may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress." *Aiken County*, 725 F.3d at 260. Under the APA, the agency's decision to terminate the ECJ Program must be set aside because it was contrary to law,

---

[12] This concession excluded claims related to certain grants from the U.S. Department of Agriculture, which are no longer at issue in this case. *See* Dkt No. 189 at 16; Dkt No. 189-11 at 4, Grant Nos. 27–32.

unsupported by any statutory authority, and unconstitutional. 5 U.S.C. § 706(2)(A)–(C). The power to make that decision belongs to Congress alone.

Even if EPA had the power to terminate the ECJ Program (and it does not), the agency's decision was arbitrary and capricious. *Id.* § 706(2)(A). The undisputed facts establish that EPA's decision to terminate the ECJ Program followed a cursory "review of EPA grant programs" in which the only consideration was "consistency with Agency policy priorities." Decl. of Travis Voyles ¶ 3, Dkt. No. 147-4. EPA never addressed the reliance interests of grantees or the disadvantaged communities who are the ultimate beneficiaries of the ECJ Program. *Regents*, 591 U.S. at 30–33; *see also, e.g.*, *Ass'n of Am. Univs. v. Nat'l Sci. Found.*, 788 F. Supp. 3d 106, 138 (D. Mass. 2025) (change in policy on reimbursements under research grants was arbitrary and insufficiently explained because agency failed to meaningfully address reliance interests under existing policy). Nor did EPA provide any explanation, much less a reasonable one, for why its all-or-nothing decision to terminate the ECJ Program was the only way to achieve "consistency with the Agency's policy priorities." Voyles Decl. ¶ 3, Dkt. No. 147-4; *see also Regents*, 591 U.S. at 30 ("When an agency rescinds a prior policy its reasoned analysis must consider the alternatives that are within the ambit of the existing policy." (cleaned up)). Each of those defects independently renders the agency's decision arbitrary and capricious. *Id.*

***Section 706(1)***. ECJ Plaintiffs are also entitled to summary judgment on their claim under § 706(1) that EPA's ongoing failure to implement the ECJ Program constitutes "agency action unlawfully withheld," which the Court must "compel." 5 U.S.C. § 706(1). A claim under § 706(1) "asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). "[W]hen an agency is compelled by law to act within a certain time period, but the manner of its action is left to the agency's

18

discretion, a court can compel the agency to act, but has no power to specify what the action must be." *Id.* at 65.

There is no doubt that EPA is legally required to take discrete actions within a certain time. Congress mandated that EPA "shall use" the funding appropriated for the ECJ Program by September 30, 2026, "to award grants" to certain "eligible entities" to "carry out" an enumerated list of activities that "benefit disadvantaged communities." 42 U.S.C. § 7438(b)(1). There is also no doubt the agency has failed. EPA's decision to terminate the ECJ Program and the agency's ongoing failure to take the actions required to implement the ECJ Program—including awarding grants on the terms set by Congress—are two sides of the same coin.

Finally, there is no dispute that EPA will not implement the ECJ Program absent a court order compelling it to. Indeed, EPA has insisted elsewhere that it *cannot* act because "Congress rescinded all funding appropriated to EPA to implement the [ECJ Program] in the One Big Beautiful Bill Act."[13] To be clear, EPA is wrong. The One Big Beautiful Bill Act retained the ECJ Program's statutory mandate and rescinded only a small fraction of its funding, leaving over $2 billion that EPA "shall use" to implement the ECJ Program. *See supra* pp.9-10; *infra* 19-24. But for now, right or wrong, EPA has made its position clear. This circumstance is tailor made for § 706(1) and the Court must compel EPA to act.

### III.    The Court Should Also Enter Summary Judgment as to the ECJ Program on ECJ Plaintiffs' Nonstatutory Review Claims (Counts I, II, and VI).

Beyond the APA, the Court should enter summary judgment for ECJ Plaintiffs on their nonstatutory review claims as to the ECJ Program. Nonstatutory review claims seek "equitable relief against federal officials in their official capacities" for "acts beyond [their] statutory or

---

[13] Mem. in support of Defs.' Mot. to Dismiss at 9, *Lucky Shoals Community Ass'n v. EPA*, No. 1:25-cv-07221-MLB (N.D. Ga. Mar. 6, 2026), ECF No. 6.

19

constitutional authority." *Strickland v. United States*, 32 F.4th 311, 363 (4th Cir. 2022). The rules governing a nonstatutory review claim depend on "whether the claimed violation is statutory"—commonly called an *ultra vires* claim—or whether "the claimed violation is . . . constitutional." *Sustainability Inst.*, 165 F.4th at 829. Under either framework, the Court should grant summary judgment for Plaintiffs as to the ECJ Program.

> A.     **Termination of the ECJ Program is Ultra Vires.**

As the Fourth Circuit explained, "whether the cancellation of a specific program is subject to *ultra vires* review requires first determining whether a statute mandates that specific program." *Id*. at 834. For the ECJ Program, the plain language of the statute makes the answer self-evident. Section 138 of the Clean Air Act, in which Congress codified the Inflation Reduction Act provision establishing the ECJ Program, both mandates the existence of the ECJ Program and commands EPA to use specific appropriations for specific purposes to implement the ECJ Program: EPA "shall use" the funding appropriated for the ECJ Program "to award grants" to "eligible entities," including community-based nonprofits and local governments, "to carry out" certain kinds of environmental, public health, and resiliency projects "that benefit disadvantaged communities"—including "mitigating climate and health risks from urban heat islands, extreme heat, wood heater emissions, and wildfire events,"  "climate resiliency and adaptation," and "reducing indoor toxics and indoor air pollution," 42 U.S.C. § 7438(b). Congress left the statutory mandate of the ECJ Program in place when subsequently enacting the One Big Beautiful Bill Act, 139 Stat. at 156, and EPA remains under an ongoing and specific congressional command to implement the ECJ Program.

This Court has the power to review and remedy the unlawful elimination of the ECJ Program as an *ultra vires* claim because ECJ Plaintiffs have made a "strong and clear demonstration that a clear, specific and mandatory statutory provision has been violated." *Long*

*Term Care Partners, LLC v. United States*, 516 F.3d 225, 234 (4th Cir. 2008) (quoting *Newport News Shipbuilding & Dry Dock Co. v. NLRB*, 633 F.2d 1079, 1081 (4th Cir. 1980)). The conditions that might make *ultra vires* review unavailable—"a statutory review scheme [that] provides aggrieved persons with a meaningful and adequate opportunity for judicial review" or one "that forecloses all other forms of judicial review"—cannot insulate Defendants from accountability here. *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 666, 681 (2025) (internal quotation marks omitted)).

In this case, the only statutory review scheme that could potentially provide Plaintiffs with the ability to obtain the relief they seek, *i.e.*, an order requiring implementation of the ECJ Program, would be the APA, as discussed above. *See supra* § II (B). That remedy certainly is not available under the Tucker Act in the Court of Federal Claims, because an injunction requiring EPA to implement the ECJ Program represents quintessential equitable relief over which "the Court of Federal Claims has no power." *Richardson v. Morris*, 409 U.S. 464, 465 (1973); *see also Child Trends, Inc.*, 795 F. Supp. 3d at 719 (claims seeking restoration of cancelled programs were "not subject to the Tucker Act"); *City of Chicago v. U.S. Dep't of Homeland Sec.*, ___ F. Supp. 3d ___, ___, 2025 WL 3043528, at *12 (N.D. Ill. Oct. 31, 2025) (claims seeking equitable relief "to unfreeze" grant program sought remedy "that the CFC cannot grant").

Likewise, no statute "forecloses all other forms of judicial review" for claims challenging the termination of the ECJ Program. *Nuclear Reg. Comm'n*, 605 U.S. at 681. The Tucker Act does not encompass such claims, and "[t]here cannot be exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act." *Tootle v. Sec'y of Navy*, 446 F.3d 167, 177 (D.C. Cir. 2006). Nor do any provisions of the Inflation Reduction Act or Clean Air Act preclude other forms of review. Congress knows how to write such a provision. *See, e.g.*, 8 U.S.C.

21

§ 1252(a)(5) (provision of Immigration and Nationality Act establishing "sole and exclusive means for judicial review of an order of removal"). But Congress chose not to do so here.

Accordingly, in addition to entering summary judgment on ECJ Plaintiffs' APA claims as to the ECJ Program, the Court should enter summary judgment in the alternative on ECJ Plaintiffs' *ultra vires* claim, which is well founded in the potential absence of relief under the APA.

### B.  Termination of the ECJ Program is Unconstitutional.

The termination of the ECJ Program violates the separation of powers at the heart of our Constitution and the Presentment Clause of Article I, Section 7. On appeal, the Fourth Circuit "express[ed] no view on Plaintiffs' 'program cancellation' theory" and focused its analysis of Plaintiffs' nonstatutory review claims on arguments related to individual grant terminations. *Sustainability Inst.*, 165 F.4th at 829–32. Indeed, the Fourth Circuit did not address Plaintiffs' argument that the Executive Branch's termination of entire grant programs mandated by statute, including the ECJ Program, trespasses upon the exclusive province of Congress and violates the Presentment Clause. *See id.* These remain viable constitutional claims even though they involve—indeed, especially because they involve—a statutory mandate.[14] "Congress speaks through the laws it enacts." *Aiken Cnty.*, 725 F.3d at 260. "It is no overstatement to say that our constitutional system of separation of powers would be significantly altered if . . . executive and independent agencies [were allowed] to disregard federal law in the manner" that Defendants have with respect to the ECJ Program. *Id.* at 267.

---

[14] To the extent the Court concludes the Fourth Circuit decided even a claim challenging the elimination of a statutorily mandated program must be treated as an *ultra vires* claim, rather than a constitutional one, under its application of *Dalton v. Specter*, 511 U.S. 462 (1994), Plaintiffs take the position that the Fourth Circuit's application of *Dalton* was wrong and reserve the right to seek further review in any future appeal.

As Plaintiffs have explained, the Spending and Appropriations Clauses of the Constitution. art. I, § 8, cl. 1; art. I, § 9, cl. 7, grant Congress—not the President—"exclusive" power over the Nation's purse, *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992), including the power to "attach conditions on the receipt of federal funds." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). The Constitution assigned Congress power over the purse "to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents. . . ." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427–28 (1990).

By eliminating entire grant programs and not reallocating the funding, Defendants have failed to fulfill this mandate and violated their constitutional obligations—not merely their statutory ones. *E.g.*, *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1234–35 (9th Cir. 2018) ("Because the Executive Order directs Executive Branch administrative agencies to withhold funding that Congress has not tied to compliance with [the President's policy], there is no reasonable argument that the President has not . . . . violate[d] the constitutional principle of the Separation of Powers."); *Chicago v. Sessions*, 888 F.3d 272, 277 (7th Cir. 2018) ("[T]he power of the purse rests with Congress, which authorized the federal funds at issue and did not impose any [of the President's] conditions on the receipt of such funds."), *vacated in part on other grounds*, No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018); *Aiken Cnty.*, 725 F.3d at 261 n.1 ("'With respect to the suggestion that the President has a constitutional power to decline to spend appropriated funds, we must conclude that existence of such a broad power is supported by neither reason nor precedent.'") (quoting Memorandum from William H. Rehnquist, Assistant Attorney General, Off. of Legal Couns., to Edward L. Morgan, Deputy Couns. to the President (Dec.1, 1969)).

23

As EPA admitted at argument before the D.C. Circuit, nothing in the Constitution gives the Executive Branch the power to entirely disregard a congressional mandate to spend a directed appropriation. Exhibit A-1, *Climate United Fund* Tr. at 51–52, 62–63. Indeed, to do so would effectively write the Spending and Appropriations Clauses out of the Constitution, giving the President unfettered power over the Nation's purse contrary to the Founders' designs. *See Learning Res., Inc. v. Trump*, 607 U.S. __, 2026 WL 477534, slip op at \*20 (Feb. 20, 2026) (Gorsuch, J., concurring) ("[W]hen it comes to legislative power, Congress is the principal and executive officials are the agents" charged with "seeing that Congress's laws are faithfully executed."). It would also be analogous to a line-item veto, which our Constitution does not allow. *Clinton v. New York*, 524 U.S. 417, 447–49 (1998) (striking down the line-item veto as unconstitutional because Article I, section 7 of the Constitution makes clear that the Executive Branch cannot cancel a law, or any part of it, without Congress's express authorization).

As the Fourth Circuit observed, such constitutional claims are not subject to the same restrictions under the *ultra vires* review framework discussed above. *Sustainability Inst.*, 165 F.4th at 829–30. Instead, the Court has jurisdiction to enjoin such unconstitutional actions without considering whether there is an alternative venue for relief. *Strickland*, 32 F.4th at 363 ("[A] plaintiff can obtain injunctive relief against an individual officer or agent of the United States in his official capacity for acts beyond his . . . constitutional authority because such actions 'are considered individual and not sovereign actions.'"). "[I]njunctive relief has long been recognized as the proper means for preventing [government] entities from acting unconstitutionally." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001). "[I]t is the established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution." *Bell v. Hood*, 327 U.S. 678, 684 & n.4 (1946) (collecting

cases). In any event, as discussed above, there is no alternative forum that could provide ECJ Plaintiffs with the relief they seek in the form of an order to implement the ECJ Program. Accordingly, the Court should enter summary judgment on ECJ Plaintiffs' constitutional claims as to the ECJ Program.

### IV.    Over $2 Billion Remains Appropriated for the ECJ Program.

Of the $3 billion that Congress initially appropriated for the ECJ Program, over $2 billion remains after the One Big Beautiful Bill Act, which rescinded only some of the original funding. *See* 42 U.S.C. § 7438(a) (original appropriation); OBBBA § 60016, 139 Stat. at 156 (recission of "unobligated balances"). EPA has claimed the One Big Beautiful Bill Act rescinded *all* funding for the ECJ Program, zeroing it out and mooting claims about the Program, but the agency is wrong. *See* Dkt. No. 200 at 1.[15]

While EPA began a termination process before July 2025, the initiation of that process did not immediately render the funds "unobligated" and thus rescinded by the One Big Beautiful Bill Act. To understand why not, a brief overview of federal fiscal law principles is instructive here. First, when EPA issues a grant agreement, those funds—in the parlance of fiscal law— become "obligated." *See* OMB Circular No. A-11 § 20.5(a), *Preparation, Submission, and Execution of the Budget* (2024), https://www.whitehouse.gov/wp-content/uploads/2025/08/a11.pdf [https://perma.cc/4YZJ-SZG8] (defining "obligation" as a "legally binding agreement" incurred against existing budget authority).

In the event the grant is terminated, those funds remain obligated until the completion of the closeout process. This is because EPA's termination of grants is controlled by long-standing

---

[15] *See also* Mem. ISO Defs.' Mot. to Dismiss at 9, *Lucky Shoals Community Ass'n v. EPA*, No. 1:25-cv-07221-MLB (N.D. Ga. Mar. 6, 2026), ECF No. 6 ("Congress rescinded all funding appropriated to EPA to implement the [ECJ Program] in the One Big Beautiful Bill Act.").

regulations incorporated into the terms and conditions of the grant agreements. These regulations require, first, that EPA provide "written notification" of the termination to the recipient. 2 C.F.R. § 200.341. EPA must then "provide the recipient with an opportunity to object and provide information challenging" the termination—and must offer the recipient an administrative proceeding to hear the objection. *Id.* § 200.342. Only if the termination decision is upheld may EPA then close the grant award through a closeout process that involves the recipient submitting a final financial report and making "necessary adjustments to the Federal share of costs." *Id.* § 200.344.

It is only once the closeout process is complete that these funds cease to incur any "obligation" on EPA and thus become "unobligated." As EPA's director of the Office of the Controller explained, EPA "doesn't process a deobligation until we get the final financial report." EPA_00000864. In the *Climate United Fund* en banc oral argument before the D.C. Circuit, counsel for EPA further confirmed that grant funds remain obligated until the completion of the closeout process:

> MR. ROTH: Usually the money is in a government account and there's closeout. . . . It sits there until -- it doesn't get technically deobligated until closeout is done. So it's there and available for closeout purposes.
>
> THE COURT: But still obligated until the closeout process is complete?
>
> MR. ROTH: That's how the regs are supposed to work, yes.

Exhibit A-1, *Climate United Fund* Tr. at 80:1–14.

When Congress passed the One Big Beautiful Bill Act in July 2025, Congress rescinded only "unobligated balances" of the funding appropriated for the ECJ Program. OBBBA § 60016, 139 Stat. at 156. At the time the bill became law, ECJ Plaintiffs in this case had not yet received any notice of termination and so their grants were unaffected. *See supra* pp. 8-10. And while other ECJ Program grant recipients (but not all) had received notice beginning the termination

26

process, that process was far from complete. Many of those recipients subsequently contested their terminations through the administrative process required by the regulations and detailed in their termination notices. *See, e.g.* Dkt. No. 189-3 at ¶ 6 (CleanAIRE NC disputed termination). Few, if any, had closed out their grants, including submitting their final financial reports. Consequently, all of these funds for the grants that had not completed closeout—the vast majority—remained "obligated" and were not part of the recission. *See, e.g.*, Dkt. No. 189-7 at ¶ 16 (Plaintiff Sustainability Institute has not yet closed out).

Congress was well aware of these standard fiscal practices and terms of art when it enacted the One Big Beautiful Bill Act. In particular, Congress knew that, by rescinding only "unobligated balances," it would not rescind the funding tied to grants like those awarded to ECJ Plaintiffs. This reality is reflected by the Congressional Budget Office estimate that the provision rescinding certain funding for the ECJ Program would affect just $516 million, a figure the CBO provided before enactment and which neither political party disputed. *See* Exhibit B-2 at 2, *CBO Estimate of One Big Beautiful Bill Act*'s *Budgetary Effects*. That amount is a fraction of the $3 billion originally appropriated for the ECJ Program.

The congressional debate on the One Big Beautiful Bill Act confirms that understanding. During a markup hearing before the House Committee on Energy and Commerce, Representative Morgan Griffith—proponent of the OBBBA and then-Chair of the Subcommittee on Environment—was asked about the effect of EPA's efforts to terminate grants on the rescission proposal. He explained that if a "grant was already given, as far as this bill is concerned, then that would still be going forward." Exhibit B-1 at 5, Excerpts of Budget Markup Hearing Transcript (244:5963-64). This is because "[Congress] can't rescind expenditures that are already obligated." *Id.* at 8-9 (247:6055-248:6057).

27

Specifically, Rep. Griffith made clear that whatever proceedings were happening with EPA with regard to awarded grants, those proceedings did not impact the legislation, noting that "as of tonight, as of right now, that money is not available to us because it has been obligated," *id.* at 9 (248:6067-6069), and explaining that "this action that we take does not impact that action that may or may not be going on in the administration," *id.* at 7 (246:6011-6016). Rep. Griffith further explained that if any awarded funds were later successfully de-obligated, their rescission would need to be addressed in a "future rescission." *Id.* at 8 (247:6056). In short, Congress chose the term "unobligated balances," with all its attendant limits, on purpose.

### V. The Remedy is an Order to Implement the ECJ Program as Congress Mandated.

The Court should order Defendants to implement the Program as Congress commanded by fully obligating all appropriated funding before the statutory deadline of September 30, 2026. To reiterate, ECJ Plaintiffs are not seeking an order compelling EPA or any other Defendant to restore their specific grants—only to implement the ECJ Program on the terms set by Congress. As discussed below, this relief is warranted under both the APA and the Court's equitable authority. Either way, Defendants should find the scope of this relief unobjectionable. In the D.C. Circuit two months ago, EPA's counsel insisted that, for a claim alleging EPA terminated a statutorily mandated program, "the remedy would be [to] restore the program." Exhibit A-1, *Climate United Fund* Tr. at 63:2–3.[16] This Court should hold EPA to its word.

### A. Under the APA, the Court Must Vacate the Decision to Terminate the ECJ Program and Compel Defendants to Implement It.

---

[16] *See also* Exhibit A-1, *Climate United Fund* Tr. at 17:22–24 ("You can't dismantle a congressionally created program. All right. So the remedy for that is restore it."); *id.* at 10:5–9 ("At most, the remedy for that type of claim . . . would [be] something like, you've got to restore the program consistent with the discretion that you have under the statute.").

EPA's decision to terminate the ECJ Program violated the APA. The agency's ongoing failure to implement the ECJ Program means EPA is continuing to behave unlawfully. The Court must vacate the decision to terminate the ECJ Program and compel EPA to act. The APA directs the Court to "hold unlawful and set aside agency action" that violates the standards of 5 U.S.C. § 706(2). When an agency action is contrary to law, it should be "vacate[d] . . . in [its] entirety." *Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635, 655 (4th Cir. 2018).[17]

The APA also requires the Court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Although an order under § 706(1) is an injunction, "the general rules for injunctive relief, derived from equity, do not control relief under § 706(1)." *South Carolina v. U.S.*, 907 F.3d 742, 761 (4th Cir. 2018). Instead, faced with an agency action that has been unlawfully withheld, "the court must enter an appropriate order and secure the agency's compliance with the law . . . . regardless of equitable or policy considerations." *Id.* at 756. As for the terms of the order, "a reviewing court must compel the unlawfully withheld agency action but is not entitled to dictate the means by which the agency must undertake the action." *Id.* at 762 (citing *S. Utah Wilderness All.*, 542 U.S. at 65). However, the Court enjoys "broad discretion" when crafting an injunction under § 706(1) to ensure the "precise relief that it order[s] [will] be tailored to the circumstances." *Id.*

ECJ Plaintiffs are entitled to both remedies under the APA. First, under § 706(2), the decision to terminate the ECJ Program must be vacated because it was arbitrary and capricious, contrary to law, and unconstitutional. *Sierra Club*, 909 F.3d at 655. Vacatur would restore the

---

[17] The same is true for agency actions found to be "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(B), (C). These are fatal flaws. *See Sierra Club*, 909 F.3d at 655 (ordering vacatur under § 706(2)(A) where agency decision was "legally deficient" because it "exceeded [the agency's] statutory authority").

29

lawful status quo in which EPA has an ongoing statutory obligation to implement the Environmental and Climate Justice Block Grant Program on the terms mandated by Congress. That remedy is the minimum in § 706(2) cases when a court concludes an agency unlawfully terminated a statutorily mandated grant program. *Child Trends, Inc.*, 795 F. Supp. 3d at 731 (vacating decision to terminate education grant programs and restoring "'status quo' . . . encompassing the restoration of the [programs] in general" without "restoring any specific grants"); *State of Washington v. Fed. Emergency Mgmt. Agency*, ___ F. Supp. 3d ___, ___, 2025 WL 3551751, at *4–5, 7 (D. Mass. Dec. 11, 2025) (holding unlawful decision to terminate a disaster preparedness grant program and issuing permanent injunction); *see also* Order, *State of Washington v. Fed. Emergency Mgmt. Agency*, No. 1:25-cv-12006-RGS, at 2 (Dec. 11, 2025), ECF No. 130 ("The court vacates and sets aside the termination of the [disaster preparedness grant] program pursuant to 5 U.S.C. § 706(2).").

Vacatur alone should be sufficient to require EPA to implement the ECJ Program, which the agency is under an ongoing statutory mandate to do. However, EPA's liability under § 706(1) means the Court must also compel EPA to implement the ECJ Program, regardless of equitable considerations. *South Carolina*, 907 F.3d at 756. In this case, the decision to terminate the ECJ Program and EPA's actions to unlawfully withhold it are two sides of the same coin. Accordingly, "the court must enter an appropriate order and secure the agency's compliance with the law" by enjoining EPA and Administrator Zeldin to implement the ECJ Program on the terms set by Congress. *South Carolina*, 907 F.3d at 756.

### B.  The Court Should Also Issue a Permanent Injunction.

In addition to the APA's statutory remedies, the Court should enter a permanent injunction requiring EPA and Administrator Zeldin to implement the ECJ Program on the terms mandated by Congress. This is an equitable remedy that is available equally for ECJ Plaintiffs'

APA and nonstatutory review claims. *See* 5 U.S.C. § 703 (APA encompasses "actions for . . . writs of prohibitory or mandatory injunction"); *Mayor of Baltimore v. Azar*, 973 F.3d 258, 266 (4th Cir. 2020) (en banc) (affirming permanent injunction on APA claims); *Strickland*, 32 F.4th at 365 (noting availability of injunctions for non-statutory review claims).

To obtain a permanent injunction, a plaintiff must win on the merits and also demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). The last two factors merge when the government is the defendant. *See Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (merging factors in context of preliminary injunction).

In this case, every factor weighs in favor of an injunction requiring EPA and Administrator to implement the ECJ Program. As to the first two factors, ECJ Plaintiffs are suffering irreparable injuries for which money damages cannot provide adequate compensation. EPA currently is depriving ECJ Plaintiffs of the opportunity to obtain awards under the ECJ Program by unlawfully refusing to implement it. Regardless of whether ECJ Plaintiffs are "certain to receive" an award, *CC Distributors, Inc.*, 883 F.2d at 150, they are suffering cognizable harm because they have been "walled off from an entire category of projects for which [they are] qualified, prepared, and eager to compete." *MISO Transmission*, 45 F.4th at 1016. This harm is irreparable because the appropriations that fund ECJ Program will expire unspent unless EPA is compelled to implement the ECJ Program fully before the statutory deadline of September 30, 2026, or any equitable extension of that deadline.

31

The remaining equities also favor a permanent injunction requiring EPA and Administrator Zeldin to implement the ECJ Program. The balance of harms tips sharply towards ECJ Plaintiffs, who have already been forced to endure significant hardship and now face the impending threat of irrevocably losing their opportunities to obtain funding under the ECJ Program if EPA are allowed to run out the clock while the appropriated funding expires unspent. In contrast, Defendants would experience no cognizable harm from an injunction to implement the ECJ Program on the terms set by Congress, which would simply ensure that EPA and Administrator Zeldin comply with their existing statutory duties. Indeed, that is precisely the remedy they recently told the D.C. Circuit would be proper in this circumstance. *See* Exhibit A-1, *Climate United Fund* Tr. at 17:22–24 ("You can't dismantle a congressionally created program. All right. So the remedy for that is restore it.").

As for the public interest, Congress created the ECJ Program to benefit the American people by enlisting governments and nonprofit organizations working in disadvantaged communities throughout the United States to tackle priorities like "reducing indoor toxics and indoor air pollution." 42 U.S.C. § 7438(b)(2)(D). An injunction requiring EPA and Administrator Zeldin to implement the ECJ Program would protect the public's interest in receiving the environmental and public health benefits that Congress decided the American people deserve. An injunction would also vindicate the rule of law and our constitutional order. In terminating the ECJ Program for policy reasons, Defendants usurped a power that is not theirs. Congress—the people's elected representatives—created the ECJ Program and commanded EPA to implement it. The Executive Branch "may not decline to follow a statutory mandate or prohibition simply because of policy objections." *Aiken County*, 725 F.3d at 259. At bottom, the public interest favors an injunction requiring Defendants to abide by the law. *See, e.g.*, *Roe v. Dep't of Def.*, 947

32

F.3d 207, 230–31 (4th Cir. 2020) (affirming "the public undoubtedly has an interest in seeing its governmental institutions follow the law" (internal quotation marks omitted)); *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (explain that there is "no public interest in the perpetuation of unlawful agency action").

Here, where Defendants have violated the APA, the Inflation Reduction Act, the Clean Air Act, and the Constitution, the equities overwhelmingly favor a permanent injunction for the reasons discussed above. For Plaintiffs' non-statutory review claims, nothing more is required to warrant an injunction. And for their APA claim under § 706(1), an injunction would be mandatory regardless of the equities. *South Carolina*, 907 F.3d at 756. In the event this Court determines Plaintiffs may obtain relief only under § 706(2), where vacatur is the starting point for relief, the Court should also enter a permanent injunction because vacatur alone may not provide complete redress under the circumstances here. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010) (injunction not warranted if "partial or complete vacatur" would be "sufficient to redress [the] injury"). Unlike *Monsanto*, this is not a case involving a garden variety regulatory decision. Defendants could not be clearer about their policy-based animus towards the ECJ Program or their boast that "at the Trump EPA, the Green New Deal is dead." *Supra* n.1. Nor could they be clearer about overreading the One Big Beautiful Bill Act— in which Congress chose a scalpel to rescind less than twenty percent of the Program's funding, *supra* pp. 9-10—as taking a "sledgehammer to the Green New Scam."[18] Under the circumstances, Defendants are poised to run out the clock on the Program unless they are enjoined to fully implement it before the statutory deadline of September 30, 2026. If the

---

[18] Remarks of Administrator Lee Zeldin at 1:10:02 in *President Trump Participates in a Cabinet Meeting*, The White House (July 8, 2025), https://www.whitehouse.gov/videos/president-trump-participates-in-a-cabinet-meeting-july-08-2025/.

appropriated funding is allowed to expire, without an equitable extension from the Court, the opportunity for ECJ Plaintiffs to obtain awards under the ECJ Program could be lost for good.

**VI.    Alternatively, the Court Should Issue a Writ of Mandamus.**

If the Court concludes there are no other means of awarding relief on ECJ Plaintiffs' claims under the APA or for non-statutory review, the Court should enter a writ of mandamus compelling Defendants to implement the ECJ Program as Congress commanded by fully obligating all appropriated funding before the statutory deadline of September 30, 2026.

A writ of mandamus may issue where "(1) the petitioner has shown a clear right to the relief sought; (2) the respondent has a clear duty to do the particular act requested by the petitioner; and (3) no other adequate remedy is available." *First Fed. Sav. & Loan Ass'n of Durham v. Baker*, 860 F.2d 135, 138 (4th Cir. 1988). Here, Defendants have an unambiguous duty to implement the ECJ Program on the terms set by Congress and to obligate the funds Congress appropriated for grantmaking under the Program before the statutory deadline of September 30, 2026. Just like *Aiken County*, mandamus is warranted in this case "to correct transparent violations of a clear duty to act." 725 F.3d at 258-59.

### CONCLUSION

For the foregoing reasons, the Court should enter summary judgment for ECJ Plaintiffs as to the ECJ Program on their claims under the APA (Counts III, IV, and VII) and their claims for nonstatutory review (Counts I, II, and VI). In particular, the Court should:

1.    Declare that the decision to terminate the ECJ Program was unlawful under 5 U.S.C. § 706(2), *ultra vires*, and unconstitutional;

2.    Vacate the decision to terminate the ECJ Program under 5 U.S.C. § 706(2);

3.    Enter an order under 5 U.S.C. § 706(1) enjoining EPA and Administrator Zeldin to fully implement the ECJ Program by September 30, 2026 (Count VII);

34

4.     Enter an injunction based on ECJ Plaintiffs' nonstatutory review *ultra vires* claim ordering EPA and Administrator Zeldin to fully implement the Program by September 30, 2026, in the event relief under the APA is subsequently deemed unavailable;

5.     Enter an injunction based on ECJ Plaintiffs' nonstatutory review constitutional claims ordering EPA and Administrator Zeldin to fully implement the Program by September 30, 2026;

6.     If necessary, enter a writ of mandamus requiring EPA and Administrator Zeldin to fully implement the ECJ Program by September 30, 2026 (Count VIII); and

7.     Order EPA and Administrator Zeldin to publicly file a status report within fifteen days that (1) describes the status of the funding that was appropriated for the ECJ Program by Congress in 2022, and (2) describes how EPA and Administrator Zeldin will implement the ECJ Program and ensure all appropriated funding is obligated by the statutory deadline of September 30, 2026.

Under the circumstances, this Court has the equitable authority to extend the expiry of funding appropriated for the ECJ Program beyond the statutory deadline if necessary. *City of Houston v. Dep't of Hous. and Urb. Dev.*, 24 F.3d 1421, 1426 (D.C. Cir. 1994) ( noting the existence of an "equitable doctrine, however, that permits a court to award funds based on an appropriation even after the date when the appropriation lapses, so long as 'the lawsuit was instituted *on or before that date.*'"); *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 98 (D.C. Cir. 2021). However, the government has raised constitutional objections in other recent grant-related cases. Accordingly, ECJ Plaintiffs respectfully request that the Court issue an order on a timeline that would allow the parties and the Court to avoid unnecessary litigation over this issue.

35

Respectfully submitted, this 21st day of April, 2026.

/s/ Carl T. Brzorad
Carl T. Brzorad (S.C. Bar No. 105413)
SOUTHERN ENVIRONMENTAL LAW
CENTER
525 East Bay Street, Suite 200
Charleston, SC 29403
Telephone: (843) 720-5270
Facsimile: (843) 414-7039
cbrzorad@selc.org


/s/ Kimberley Hunter
Kimberley Hunter (N.C. Bar No. 41333)
Irena Como (N.C. Bar No. 51812)
Nicholas S. Torrey (N.C. Bar No. 43382)
Ben Grillot (D.C. Bar No. 982114)
Spencer Gall (VA Bar No. 95376)
SOUTHERN ENVIRONMENTAL LAW
CENTER
136 East Rosemary Street, Suite 500
Chapel Hill, NC 27514
Telephone: (919) 967-1450
Facsimile: (919) 929-9421
kmeyer@selc.org
icomo@selc.org
ntorrey@selc.org
bgrillot@selc.org
sgall@selc.org

*Counsel for Plaintiffs The Sustainability
Institute, Agrarian Trust, Alliance for
Agriculture, Alliance for the Shenandoah
Valley, Bronx River Alliance, CleanAIRE
NC, Conservation Innovation Fund, Earth
Island Institute, Leadership Counsel for
Justice and Accountability, Marbleseed,
Organic Association of Kentucky,
Pennsylvania Association of Sustainable
Agriculture, and Rural Advancement
Foundation International - USA*

/s/ Graham Provost
Graham Provost (DC Bar No. 1780222)
Elaine Poon (VA Bar No. 91963)

Jon Miller (MA Bar No. 663012)
Cassie Crawford (NC Bar No. 45396)
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609
Telephone: (510) 738-6788
graham@publicrightsproject.org

*Counsel for Plaintiffs Baltimore, Maryland;
Columbus, Ohio; Madison, Wisconsin;
Nashville, Tennessee; New Haven,
Connecticut; and San Diego, California*

/s/ Julie Rau
Julie Rau, Lead Deputy City Attorney
(CA Bar No. 317658)
1200 Third Avenue, Suite 1100
San Diego, California 92101-4100
(619) 533-5800
jrau@sandiego.gov

*Counsel for Plaintiff City of San Diego*

36

**CERTIFICATE OF SERVICE**

I certify that on April 21, 2026, I electronically filed the foregoing with the Clerk of the

Court by using the Court's CM/ECF system.


/s/ Carl T. Brzorad
Carl T. Brzorad (S.C. Bar No. 105413)
SOUTHERN ENVIRONMENTAL LAW CENTER
525 East Bay Street, Suite 200
Charleston, SC 29403
Telephone: (843) 720-5270
Facsimile: (843) 414-7039
cbrzorad@selc.org