**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| The Sustainability Institute, *et al.*, | ) Civil Action Number: 2:25-cv-02152-RMG |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| Donald J. Trump, in his official capacity | ) |
| as President of the United States, *et al.* | ) |
| | ) |
| Defendants. | ) |

**DEFENDANTS' PARTIAL MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT, AND RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Defendants move this Court for an order dismissing all claims against the Environmental Protection Agency ("EPA") and the United States Department of Agriculture ("USDA") in the Supplemental Complaint (Dkt. No. 203) pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction and Rule 12(b)(6) for failure to state a claim.

As a practical matter, the funds tied to Grants Nos. 13–23, 27–31, and 33–36 are available to the grant recipients as of the date of this filing. *See* Ex. A (Grant Spreadsheet), Ex. C (Abbott Decl.), Ex. D (Hall Decl.), Ex. E (Weeks Decl.), & Ex. F (Whittet Decl.).

Nevertheless, Defendants respectfully submit that Plaintiffs' claims against the EPA and USDA are subject to dismissal for the following reasons:

- The Environmental and Climate Justice Block Grant ("ECJ Block Grant Program") claims are moot because those funds have been rescinded and are no longer appropriated;

- As to any non-moot Administrative Procedures Act ("APA") claims against EPA[1] or

---

[1] Plaintiffs bring claims for three EPA grants that are not funded by the ECJ Block Grant Program. *See* Ex. A, ##13, 14, & 15. Those grants are not subject to Plaintiffs' Motion for Partial

USDA, those claims are subject to the Tucker Act (Grant Nos. 2–26; 33–36) and this Court lacks jurisdiction; *See* Ex. A, Grant Spreadsheet;

- Nonstatutory review does not save Plaintiffs' claims (Grant Nos. 2–36);

Defendants also hereby respond in opposition to Plaintiffs' Motion for Partial Summary Judgment as to ECJ Block Grant Program (Dkt. No. 204).[2]

## **INTRODUCTION**

As a threshold matter, funds are currently available for twenty of the thirty-eight grants at issue in this case. *See* Exs. A, C–F. As to grants covered by the ECJ Block Grant Program, those funds were rescinded by Congress as part of the Working Families Tax Cut Act (WFTCA), Pub. L. No. 119–21, 139 Stat. 72 (2025). Congress' rescissions are ongoing, such that once a grant is terminated and unobligated, the funds are immediately rescinded—regardless of whether the unobligation happened before or after the WFTCA's July 4, 2025 enactment date. Because Plaintiffs seek an order compelling EPA to re-obligate or otherwise make available those rescinded funds, the Court can no longer grant meaningful relief.

Plaintiffs' claims related to the EPA and USDA grants should be dismissed for lack of jurisdiction as Plaintiffs' claims are subject to the Tucker Act. Although styled as a programmatic challenge, Plaintiffs are simply reframing their previously asserted grant termination theory and thus are raising a contract dispute that must be brought in the Court of Federal Claims, not in district court. This conclusion comports with

---

Summary Judgment. The United States is moving to dismiss Plaintiffs' claims concerning those grants.

[2] The parties have agreed that Plaintiffs' claims related to Department of Energy (DOE) and Department of Transportation (DOT) should be litigated as Administrative Procedure Act claims based on their respective administrative records, which will be provided to Plaintiffs on or before June 4, 2026. Plaintiffs have agreed that the United States may only answer Complaint paragraphs 272–93 related to DOE and DOT grants, with time to answer the remaining paragraphs deferred until after the ruling on the parties' cross motions for summary judgment related to DOT and DOE claims.

recent rulings from the Supreme Court—which has now twice made clear that such grant termination claims may not be brought through the APA. Plaintiffs provide no sound basis for distinguishing those controlling authorities, nor can they evade it by recasting their statutory objections as constitutional claims. Plaintiffs' claims related to the EPA and USDA grants should be dismissed.

## STATUTORY AND REGULATORY BACKGROUND

### I. Environmental Protection Agency

In 2022, Congress enacted Section 138 of the Clean Air Act as part of a reconciliation bill that appropriated $2.8 billion for the ECJ Block Grant Program. *See* IRA, Pub. L. No. 117-169, 136 Stat. 1818, 2078 (2022) (codified at 42 U.S.C. § 7438). Congress provided that the EPA Administrator "shall use" the funds "to award grants" to eligible entities "to carry out" specified activities "that benefit disadvantaged communities, as defined by the Administrator." 42 U.S.C. § 7438(a)–(b). Eligible activities include, for example, "investments in low- and zero-emission and resilient technologies"; "mitigating climate and health risks from urban heat islands, extreme heat, wood heater emissions, and wildfire events"; "climate resiliency and adaptation"; and "facilitating engagement of disadvantaged communities in State and Federal advisory groups, workshops, rulemakings, and other public processes." *Id.* § 7438(b)(2)(A)–(E). Congress also appropriated $200 million "to provide technical assistance to eligible entities related to" the Environmental and Climate Justice Block Grant program. *Id.* § 7438(a)(2). EPA then competitively awarded hundreds of grants to eligible recipients under this program and under terms and conditions that authorized grant recipients to draw down funds for allowable costs. Plaintiffs include eight nonprofit organizations and local governments that each received one or more EPA ECJ Block Grant Program grants. Dkt. No. 204, at 9.

In January 2025, President Trump issued two Executive Orders implicating the ECJ Block Grant Program. First, Executive Order 14,154, 90 Fed. Reg. 8353 (Jan. 29, 2025), titled *Unleashing American*

*Energy*, declares the policy of the United States to encourage certain "energy exploration and production," guarantee the accessibility of "an abundant supply of reliable energy," and ensure that no federal funding is "employed in a manner contrary to principles outlined in this section, unless required by law," *id.* § 2(a), (c), (i), 90 Fed. Reg. at 8353, 8354.  This Executive Order further instructs agencies to "immediately pause the disbursement of funds" under the IRA to assess "consistency with the law and the policy outlined in" the Executive Order.  *Id.* § 7(a), 90 Fed. Reg. at 8357.  The second, Executive Order 14,151, 90 Fed. Reg. 8339 (Jan. 29, 2025), titled *Ending Radical and Wasteful Government DEI Programs and Preferencing*, directs agencies to terminate, "to the maximum extent allowed by law, all . . . 'equity-related' grants or contracts," *id.* § 2(b)(i), 90 Fed. Reg. at 8339.  The order also instructs agencies to provide the Director of the Office of Management and Budget ("OMB") with a list of all grant recipients who received funding "to provide or advance . . . 'environmental justice' programs, services, or activities." *Id.* § 2(b)(ii)(C), 90 Fed. Reg. at 8339–40.

After the President's Executive Orders, EPA paused the disbursement of funds to recipients of ECJ Block Grant Program grants pending a review of funding for consistency with the Administration's policy priorities. Dkt. No. 147-4, at 2, ¶ 3.  EPA subsequently terminated each grant awarded under the ECJ Block Grant Program. *See* Dkt. Nos. 189-2 through 189-9; *see also* Ex. B, Treml Decl..

On July 4, 2025, the WFTCA was signed into law.  Section 60016 (Rescission of Funding for Environmental and Climate Justice Block Grants) of the WFTCA states: "The unobligated balances of amounts made available to carry out section 138 of the Clean Air Act (42 U.S.C. 7438) are rescinded."

## II. USDA

### a. Partnership for Climate-Smart Commodities Program

In early 2022, USDA started the Partnership for Climate-Smart Commodities Program ("PCSC") grant initiative as an exercise of the agency's authority under section 5(e) of the

Commodity Credit Corporation ("CCC") Charter Act. 15 U.S.C. § 714c(e). The CCC is a government-owned entity established by the CCC Charter Act (15 U.S.C. § 714 et seq.) and is an agency and instrumentality of the USDA. *See* Stubbs, Megan (Jan. 14, 2021) The Commodity Credit Corporation (CCC), CRS Report R44606, https://www.congress.gov/crs-product/R44606 (hereafter, the "CRS Report"). The CCC's primary mission is to "stabilize, support, and protect farm income and prices; assist in maintaining balanced and adequate supplies of agricultural commodities; and facilitate the orderly distribution of commodities." *Id.* CCC does not have any employees but uses the employees, services, and facilities of various USDA agencies. *Id.*; *see also* 15 U.S.C. § 714i (authorizing CCC to utilize the employees of "any bureau, office, administration, or other agency of [USDA]").

The Natural Resources Conservation Service ("NRCS") is a congressionally authorized agency within the Farm Production and Conservation mission area of the USDA. *See* 7 U.S.C. § 6936(a). The Secretary has authority to assign NRCS jurisdiction over certain unenumerated laws and to perform "[s]uch other functions as the Secretary considers appropriate . . . ." 7 U.S.C. § 6936(b).

Plaintiffs Conservation Innovation Fund, Marbleseed, Pennsylvania Association for Sustainable Agriculture, and Organic Association of Kentucky are recipients of PCSC grants. Ex. A at # 27, 29, 30, 31. Plaintiffs Alliance for Shenandoah Valley and RAFI-USA are parties to subaward agreements with PCSC grant recipients. *Id.* at # 28 and 32. On April 14, 2025, USDA publicly announced that it has "reformed and overhauled" the PCSC initiative. https://www.usda.gov/about-usda/news/press-releases/2025/04/14/usda-cancels-biden-era-climate-slush-fund-reprioritizes-existing-funding-farmers (last visited May 5, 2026). USDA announced that PCSC had been converted into the Advancing Markets for Producers ("AMP")

initiative to reprioritize efforts so that more money goes directly to farmers. *Id.* In consideration of these new priorities, USDA terminated some, but not all, PCSC grant awards.

USDA notified recipients of each of the six PCSC grants at issue in this litigation of the termination of their awards. *See* Ex. D, Hall Decl.; at ¶ 3. The termination letters invited the affected grant recipients to submit a new proposal under the AMP initiative, which would allow for modification of their awards rather than completion of the termination and closeout processes. Five of the PCSC plaintiffs sought and received approval for modification of their PCSC grant awards into the AMP initiative. Ex. D, at ¶¶ 4–7. The last PCSC plaintiff is a "subgrantee whose prime grantee declined to join the AMP program." *Id.* at ¶ 8. Given this posture, the PCSC awards appear to fall within the set of claims that Plaintiffs "do not foresee needing to pursue" since the government voluntarily funded their activities. Dkt. No. 189 at 22. Despite this statement, allegations regarding the PCSC initiative remain in the Supplemental Complaint.

### b. Increasing Land, Capital, and Market Access Program

The Farm Service Agency ("FSA"), a congressionally authorized agency within the Farm Production and Conservation mission area of the USDA, administers the Increasing Land, Capital, and Market Access Program ("ILA")  program. *See* 7 U.S.C. § 6932(a). Plaintiffs Agrarian Land Trust and RAFI-USA are recipients of ILA grants. *See* Ex. D, Hall Decl.  Plaintiff Alliance for Agriculture is also a subrecipient of RAFI-USA's grant. Ex. A, Grant Spreadsheet, at #26. Recently, on March 23, 2026, USDA terminated grant awards to Plaintiffs Agrarian Land Trust and RAFI-USA. *See* Dkt. No. 199-1 (providing termination documents). According to the termination letters, USDA found that each of these two grant awards, like the other ILA awards, did not align with the USDA's goals and priorities in three enumerated ways. *Id.* USDA indicated that the agency will "realign the program to ensure consistency with statutory requirements, equal

protection principles, and prudent fiscal management." *Id.*

On March 26, 2026, Plaintiffs filed a Supplement to Plaintiffs' Memorandum Regarding Proceedings on Remand. *See* Dkt. No. 199. In the Supplement, Plaintiffs stated they "may wish to pursue" claims regarding the ILA program. Since that time, Plaintiffs filed a Supplemental Complaint that includes Plaintiffs' original allegations regarding ILA but not any additional allegations regarding the March 2026 terminations.

**STANDARD OF REVIEW**

### i. Federal Rule of Civil Procedure 12(b)(1)

A motion to dismiss under Rule 12(b)(1) is "a challenge to the court's subject matter jurisdiction." *Hoblick v. United States*, 526 F. Supp. 3d 130, 132 (D.S.C. 2021) (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 507 (2006)). Subject matter jurisdiction is a threshold issue that must be decided before reaching the merits of the case. *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 479-80 (4th Cir. 2005). Plaintiffs bear the burden of proving subject matter jurisdiction. *See Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995).

Under Rule 12(b)(1), "a defendant may challenge subject matter jurisdiction in one of two ways." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citing *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). A defendant can either (1) make a "facial challenge to subject matter jurisdiction[,]" contending that "a complaint simply fails to allege facts upon which subject matter jurisdiction can be based," or (2) raise a factual challenge "that the jurisdictional allegations of the complaint [are] not true." *Kerns*, 585 F.3d at 192 (quoting *Adams*, 697 F.2d at 1219). When the defendant makes a facial challenge, "'the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration.'" *Kerns*, 585 F.3d at 192 (quoting *Adams*, 697 F.2d at 1219). The complaint's alleged facts are "taken as true, and the motion

7

must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Id.*

### ii. Federal Rule of Civil Procedure 12(b)(6)

A Rule 12(b)(6) motion to dismiss "tests the legal sufficiency of the petition . . . ." *Walker v. Kelly*, 589 F.3d 127, 139 (4th Cir. 2009). In reviewing a motion to dismiss, the court should "take the facts in the light most favorable to the plaintiff," but "need not accept the legal conclusions drawn from the facts" and "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008) (internal citations omitted). The complaint must be dismissed if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 302 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In evaluating "plausibility," the court may not rely on mere "labels and conclusions" or plaintiff's "formulaic recitation" of the elements of a particular cause of action. *Twombly*, 550 U.S. at 555. Instead, the factual allegations must be enough to raise "a right to relief above the speculative level." *Id.* at 570.

On a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When the allegations in a complaint, however true, could not raise a claim of entitlement to relief, "this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Twombly*, 550 U.S. at 558 (citation and internal quotations omitted).

In deciding a motion to dismiss, "a court may consider documents incorporated into a complaint by reference or attached to a motion to dismiss, provided they are integral to the

8

plaintiff's claims and authentic, without converting the motion into one for summary judgment." *Loftus v. F.D.I.C.*, 989 F. Supp. 2d 483, 490 (D.S.C. 2013) (citing *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007)); *see also Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016); *Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012); *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (explaining that a court may consider documents attached to the complaint or the motion to dismiss "so long as they are integral to the complaint and authentic").

### iii. Federal Rule of Civil Procedure 56

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" concerning a material fact arises "when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). While the court must view factual evidence in the light most favorable to the nonmovant, the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. Summary judgment must be granted if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322–23.

### ARGUMENT

### I.     As a threshold matter, the majority of Plaintiffs' grants are being funded.

The overwhelming majority of grants for which Plaintiffs claim injury are active and

funding is accessible by the recipient in the Automated Standard Application for Payments ("ASAP") system. *See* Ex. A. (Grants 13–23; 27–36); *see also* Ex. C–F; Dkt. 165-1 (Zeldin Decl.), Indeed, Plaintiffs concede that the government has restored funding for certain grants, *see* Dkt. No. 189, at 9 (". . . the federal government has restored some other grants at issue in this litigation and Plaintiffs do not anticipate seeking relief from this Court as to those awards at this time without prejudice to their right to pursue them if facts change."). Accordingly, Defendants respectfully submit that there is no injury for the Court to redress as it pertains to Plaintiffs' claims for funded grants.

**II.      Plaintiffs' claims related to the Environmental and Climate Justice Block Grant program are moot.**

After EPA terminated certain Plaintiffs' grant agreements, EPA's only remaining legal obligation is to pay allowable pre-termination, termination, and closeout costs.  Indeed, for two Plaintiffs who submitted Final Financial Reports, EPA has already done so. *See* Ex. B, Treml Decl. And, for the remaining Plaintiffs with EPA grants, EPA is prepared to do so once their allowable pre-termination, termination, and closeout costs are finalized.

For amounts beyond allowable pre-termination, termination, and closeout costs, however, Congress enacted legislation that expressly and categorically rescinded all unobligated funding appropriated for the ECJ Block Grant Program. Because "[i]t is beyond dispute that a federal court cannot order the obligation of funds for which there is no appropriation," this Court cannot provide Plaintiffs with any meaningful relief. *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 184 (D.C. Cir. 1992) (citing *Reeside v. Walker*, 52 U.S. (11 How.) 272, 291 (1850)); *see also Bishop of Charleston v. Adams*, No. 22-1175, 2023 WL 4363654, at *3 (4th Cir. July 6, 2023) (concluding that the court "could not provide meaningful injunctive relief because there are no longer any funds for which Appellants could apply."). Plaintiffs' claims are thus moot. *See Bishop of Charleston*, at

*3.

Plaintiffs' ECJ Block Grant agreements had been formally terminated by August 1, 2025 and funds became unobligated at the time each grant was terminated. *See* Ex. B, Treml Decl, ¶¶ 12–19.  And there is no dispute that, Congress expressly rescinded "[t]he unobligated balances of amounts made available to carry out" the ECJ Block Grant program. H.R. 1, 119th Cong. § 60016 (2025).

The dispositive questions for mootness here are thus narrow and purely legal: whether the funds initially obligated to plaintiffs under their grant agreements became "unobligated" upon EPA's termination of the grants at issue and whether Congress' rescission reaches funds that are subsequently unobligated *after* the passage of the WFTCA.  Upon termination, the only legal obligation remaining on the grants was for any allowable pre-termination, termination, and closeout costs, as stated in the termination letters and set out in OMB regulations. *See* 2 C.F.R. §§ 200.343, 200.344, 200.472; *see also* Dkt. No. 204, at 14. Beyond those limited amounts, EPA had no continuing legal obligation—contractual or otherwise—to disburse funds to Plaintiffs. The remaining amounts initially awarded to Plaintiffs (*i.e.*, the funds plaintiffs now ask this Court to restore) were thus "unobligated" when EPA terminated the grants at issue making them subject to Congress' July rescission law.

Federal appropriations law defines "obligation" as "a legally binding agreement that will result in outlays, immediately or in the future." OMB, OMB Circular No. A-11, Preparation, Submission, and Execution of the Budget § 20.5 at 20 (2024). Thus, when an agency "award[s] a grant . . . that require[s] the Government to make payments to the public," it "incur[s] an obligation." *Id*. Of course, that obligation endures only so long as the legally binding agreement that created it remains in force. Accordingly, when an agency terminates a "legally binding

11

agreement" that obligated grant funds, *id.*, the quantum of funds that remain obligated is the amount necessary to pay recipients for "costs result[ing] from" expenditures "which were properly incurred by the recipient . . . before the effective date of . . . termination," 2 C.F.R. § 200.343(a), as well as termination and closeout costs, *see id.* § 200.472. All other remaining funds are no longer subject to any continuing legal binding agreement. The remaining portion of the award therefore necessarily becomes "unobligated" upon termination, as there is no longer any legal obligation committing those funds to the terminated grant recipient.  In short, once EPA terminated Plaintiffs' grant agreements, any funds beyond allowable pre-termination, termination, and closeout costs ceased to be legally obligated, and are thus unobligated.

Plaintiffs erroneously take the position that the passage of the WFTCA on July 4, 2025, drew a line in the sand, after which, any unobligated funds could not be rescinded.  Plaintiffs misunderstand the effect of the rescission.  Rescissions of this sort, which lack a defined dollar figure, are <u>indefinite</u> in nature and there is no cap on the amount of funds that are subject to the rescission. OMB Circular No. A-11, *Preparation, Submission, and Execution of the Budget*, § 20 at 12 (August 29, 2025) (defining "unobligated balance" as "the <u>cumulative</u> amount of budget authority that remains available for obligation under law in unexpired accounts.") (emphasis added). Indeed, indefinite rescissions are typically enacted where Congress intends to eliminate or remove all available funding from a program.  When Congress enacts indefinite rescissions as in § 60016 of the WFTCA, agencies generally execute them by rescinding all unobligated balances that are *or become* unobligated in the relevant account, even if amounts that become unobligated were obligated as of the date of enactment of the rescission..

The language Congress *did not* use in § 60016 of the WFTCA is important.  Congress stated, "[t]he unobligated balances of amounts made available to carry out section 138 of the Clean

Air Act (42 U.S.C. 7438) **are** rescinded." § 60016. (emphasis added). If Congress wished to specify that funds that become unobligated subsequent to the date of enactment were exempt from rescission, it knows how to do so.  For example, the Fiscal Responsibility Act of 2023 ("FRA") (P.L. 118-5) rescinded "the unobligated balances for each applicable appropriation as of the date of enactment of this title."  This suggests that where an otherwise indefinite rescission of funds is enacted, Congress must affirmatively specify when it wants amounts to be rescinded to be limited as of a particular point in time. That Plaintiffs' ECJ Block Grant Program grant terminations occurred after July 4, 2025, is irrelevant.  That EPA's financial system may, for some grants, still temporarily reflect recorded obligations in the amounts of the full grant awards until costs are finalized and grant closeout is complete is also irrelevant.  Even if there were $2.5 billion of "obligated" funds, as Plaintiffs speculate,[3] *see* Dkt. No. 204, at 17, once the Agency elects to terminate the grants, those funds then become legally unobligated and immediately subject to rescission.

Because courts lack authority to order the obligation or payment of funds that Congress has withdrawn, no live controversy remains. A decision on Plaintiffs' claims "will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Pub. Citizen, Inc. v. FERC*, 92 F.4th 1124, 1128 (D.C. Cir. 2024).

In *W6 Rest. Grp., Ltd. v. Guzman*, the plaintiffs made a similar argument to Plaintiffs here. That case involved the Covid-19 related Restaurant Revitalization Fund funded by the American

---

[3] According to the Congressional Budget Office, "[t]he effects of a new law can vary substantially depending on how it is implemented by a federal agency or another entity involved in administering the program (such as state governments or nongovernmental organizations), which can create uncertainty in the cost estimate." Ann E. Futrell *et. al.*, CSO Describes Its Cost Estimating Process (Budget Primer), Congressional Budget Office, 10 (2023), https://www.cbo.gov/system/files/2023-04/59003-cost_estimate_primer.pdf (last visited May 5, 2026). It appears CBO's cost estimate did not account for subsequent grant terminations.

Rescue Plan Act. *Id.* at 743. By February 23, 2023, the Small Business Administration had awarded all of the $28.6 billion under that program. *Id.* Several months later, Congress enacted the FRA, which "permanently rescinded" the "unobligated balances of amounts" made available through the program. *Id.* The court reasoned that because all the funds were obligated to specific entities and distributed prior to the FRA, there would have been nothing to rescind except for returned funds, which under Plaintiffs' reading would render the FRA meaningless. *Id.* The court concluded, "plaintiffs' interpretation cannot be squared with the presumption against ineffectiveness. That presumption 'reflects the idea that Congress presumably does not enact useless laws.'" *Id.* at 752 (quoting *In re Davis*, 960 F.3d 346, 354 (6th Cir. 2020)). As such, the court concluded, "Congress essentially closed the RRF." *Id.* at 753. The same is true here. Congress essentially closed the ECJ Block Grant Program. Regardless of whether the funds were obligated at the time of passage of the WFTCA, the program was effectively closed and the money, once it became unobligated, and thus subject to rescission, must immediately return to the Treasury.

Once Congress rescinds its appropriations, courts do not have authority to claw it back. The Appropriation Clause of the United States Constitution provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." Art. 1, § 9, cl. 7. The Fourth Circuit has reaffirmed this bedrock constitutional principle, stating "if individual hardships are to be remedied by payment of Government funds, it must be at the instance of Congress." *Est. of Hunt v. United States*, 103 F. App'x 475, 477 (4th Cir. 2004) (internal quotations omitted). Here, Congress has rescinded all unobligated funding for the ECJ Block Grant Program. Plaintiffs ask the Court to reinstate and order Defendants to re-obligate budget authority which no longer exist as of July 4, 2025. *See* An Act to Provide for Reconciliation, H.R. 1, tit. VI, section

14

60016 ("The unobligated balances of amounts made available to carry out section 138 of the Clean Air Act (42 U.S.C. 7438) are rescinded."). Where Congress has clearly spoken, the Court cannot state otherwise. To the extent Plaintiffs contend that the Court can grant equitable relief despite the clear language of § 60016 of the WFTCA, equitable estoppel cannot lie against the government to require payments that would violate the Appropriations Clause. *Est. of Hunt*, 103 F. App'x at 477.

A similar situation was before the D.C. Circuit in *Rochester Pure Waters District*. There, the D.C. Circuit was considering an appeal of a district court order requiring EPA to set aside funds to cover the plaintiffs' separate and ongoing litigation because Congress was expected to rescind those funds imminently. *Id.* at 182. Although the plaintiffs had received a temporary restraining order directing EPA to preserve the funds at risk of rescission, Congress nevertheless passed the bill fully rescinding the funds. *Id.* at 182–83. The plaintiffs then moved for a permanent injunction, which the court granted to "'ensure that plaintiffs will have an adequate remedy should they prevail on their administrative appeals.'" *Id.* at 183 (quoting the district court). The D.C. Circuit found that while it is permissible for a court to award an injunction to preserve funds beyond their statutory lapse date, the case of a statutory rescission is "critically different from the lapses of budget authority," because Congress had made its intent clear by rescinding the appropriation that would have covered the plaintiffs' claims. *Id.* at 184–85. Once Congress did so, "the funds reverted to the Treasury … notwithstanding the district court's temporary restraining order as that order was not, nor could it have been, binding on Congress." *Id.* at 185 (emphasis added)

By granting the requested relief in this moot case, this Court would be making the same error as the district court in *Rochester Pure Waters District*. Congress, knowing that these ECJ Block grants had been awarded, passed the WFTCA and rescinded any unobligated balances. As

in *Rochester Pure Waters District*, many of the grants in this case were terminated prior to the passage of the rescission bill and were only reinstated due to court order. *See* Dkt.157, at 20. That the funds may have been technically obligated when the WFTCA was passed underscores the importance of the continuing nature of the rescission. Once Congress rescinded the funds, it extinguished the only relief Plaintiffs seek—which, while cloaked in the narrative of seeking restoration of a "program"– is really a request to access appropriated funds. Those funds no longer exist. Because courts lack authority to order an agency to obligate (or pay) funds representing budget authority that Congress has rescinded, no live controversy remains. A decision on Plaintiffs' claims "will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Pub. Citizen*, 92 F.4th at 1128. The claims pertaining to the ECJ Block Grant Program are therefore moot and the Court should dismiss them on that basis.

**III.    This Court lacks jurisdiction over Plaintiffs' challenges to EPA's and USDA's grant terminations.**

**a.    Plaintiffs' APA Claims are barred by the Tucker Act.**

The Fourth Circuit concluded that Plaintiffs' claims were subject to the Tucker Act. *Sustainability Institute v. Trump*, 165 F.4th 817, 828 (4th Cir. 2026). With their Supplemental Complaint, Plaintiffs are careful to reframe the narrative in an attempt to distinguish the elimination of a program with the termination of the individual grants. Yet, the programs involved here do not exist outside of their grantmaking function. A creative reframing of the relief sought does not change the result here. Under the Tucker Act, Congress has vested the Court of Federal Claims with exclusive jurisdiction over claims of the sort asserted here: that the government has wrongfully terminated contracts. The grants here bear all the hallmarks of a contract. Therefore, this is a contractual dispute falling squarely within the Tucker Act's jurisdictional scheme, as the Supreme Court has recently and repeatedly made clear.

16

The federal government is immune from suit in federal court absent a clear and unequivocal waiver of sovereign immunity. *Robinson v. United States Dep't of Ed.*, 917 F.3d 799, 801–02 (4th Cir. 2019). And although the APA provides "a limited waiver of sovereign immunity for claims against the United States" seeking relief other than money damages, *id.*, that waiver does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought," *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quotation omitted). That important carve-out "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Id*.

In particular, when a party seeks to require the government to continue to perform its obligations under a contract, the proper remedy is a suit under the Tucker Act, not the APA. The Tucker Act provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). " . . . The Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Sustainability Inst. v. Trump*, 2025 WL 1587100 (4th Cir. 2025) (internal citations omitted). To determine whether "a particular action" is "at its essence a contract action" subject to the Tucker Act or instead a challenge properly brought under the APA, this Court has looked at both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982) (quotation omitted).

The Supreme Court has twice recently stayed district-court orders that purported to set aside the termination of grant agreements, concluding that the government was likely to succeed in showing that the Tucker Act grants the Court of Federal Claims jurisdiction over such suits. *See*

17

*Nat'l Insts of Health v. Am. Pub. Health Assc.*, 145 S. Ct. 2658 (2025); *Dep't of Educ. v. California*, 604, U.S. 650, 968 (2025) (per curiam). In *California*, a number of states challenged the Department of Education's termination of various education-related grants, the district court temporarily enjoined the terminations, and the First Circuit denied a motion to stay that injunction. *See California v. U.S. Dep't of Educ.*, 132 F.4th 92 (1st Cir. 2025). The Supreme Court granted the government's request for emergency relief, reaffirming that "the APA's limited waiver of immunity does not extend to orders to enforce a contractual obligation to pay money along the lines of what the District Court ordered here." *California*, 145 S. Ct. at 968 (quotation omitted).

Soon after, the Supreme Court issued a stay in *NIH*, reiterating *California*'s reasoning that the APA "does not provide [district courts] with jurisdiction to adjudicate claims based on [federal] grants or to order relief designed to enforce any obligation to pay money pursuant to those grants." *NIH*, 145 S. Ct. 2658. Twice over, the Supreme Court has made clear that challenges to agency "decisions terminating existing" contracts—including challenges brought "under the [APA]"— "belong in the Court of Federal Claims." *Id*. at 2661 (Barrett, J., concurring in the partial grant of the application for stay); *see also id*. at 2663–64 (Gorsuch, J., joined by Kavanaugh, J., concurring in part and dissenting in part) (similar).

As the Fourth Circuit recognized in this case, this Court lacks jurisdiction over Plaintiffs' claims for the same reasons. *Sustainability Inst. v. Trump*, 165 F.4th 817, 829 (4th Cir. 2026. Similar to *California* and *NIH*, Plaintiffs in this case essentially allege that the government has failed to distribute funds stemming from a contractual agreement. *California*, 145 S. Ct. at 968. Plaintiffs' Supplemental Complaint makes clear that their primary issue is that the agency unlawfully terminated and/or froze the grant agreements that funded their various activities. *See, e.g.*, Dkt. No. 203, at 5, ¶¶ 10, 22, 35, 36, 41, 48, 52, 73, 82, 92, 95, 367. And as in *California* and

18

*NIH*, the grants here were awarded by EPA and USDA to Plaintiffs from a generalized appropriation, which means that the source of their purported rights to payment can only be the grant agreements themselves, not any statute or regulation—no statute or regulation entitles these plaintiffs to public funds.

Well before *California* and *NIH*, courts have been reticent to allow plaintiff to dress their claims in statutory or constitutional garb. In *Ingersoll-Rand Co. v. United States*, the government terminated a contract for convenience pursuant to a regulation incorporated into the contract. 780 F.2d 74, 75 (D.C. Cir. 1985). The plaintiff challenged that termination as arbitrary and capricious and contrary to multiple regulations. *See id*. The D.C. Circuit determined that, notwithstanding those statutory and regulatory allegations, "the essential rights at stake . . . [were] contractual." *Id*. at 77. The Court explained that "it [was] possible to conceive of [the] dispute as entirely contained within the terms of the contract." *Id*. at 78. The fact that "the termination also arguably violate[d] certain other regulations" and that plaintiff "allege[d] only a violation of the regulations" did not "change the essential character of the action." *Id*. And the plaintiff's request for "an order reinstating the original award of the contract" similarly sounded in contract. *Id*. at 79–80. That court concluded, the "essential rights at stake here are contractual" despite plaintiffs' "efforts to cast its complaint otherwise." 780 F.2d at 77. Put another way, the heart of Plaintiffs' Supplemental Complaint, when "[s]tripped of its equitable flair," seeks one thing: an order requiring "the Government to keep paying up" pursuant to its contractual obligations under the grants. *U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*, 770 F. Supp. 3d 155, 163 (D.D.C. 2025).

### b. Plaintiffs' Counterarguments are Unpersuasive

Plaintiffs have simply bundled together EPA's and USDA's discrete actions and crafted their claims as programmatic challenges instead of challenges to the individual grant terminations.

19

And Plaintiffs may not evade the Tucker Act by styling their suit as a programmatic challenge to the agencies' decision(s) to terminate grants "en masse" as opposed to individually.

Plaintiffs contend that in *NIH* the Supreme Court ratified the concept that a programmatic challenge belongs in district court. *See* Dkt. No. 204, at 22. Yet, nothing in Justice Barrett's concurrence in *NIH* suggests this. There, Justice Barrett distinguished between (1) challenges to the government's termination of grant agreements, which belong in the Court of Federal Claims, and (2) challenges to "internal guidance documents describing [agency] priorities," which could proceed under the APA. *NIH*, 145 S. Ct. at 2661 (Barrett, J., concurring). That distinction offers Plaintiffs no help here. Unlike in *NIH*, any alleged "policy guidance" is not a freestanding agency action. It is inseparable and indistinct from EPA's (and USDA's) decisions to terminate certain grant agreements. Dkt. No. 203, at 73, ¶ 265.

Plaintiffs seek an Order to implement the ECJ Block Grant Program. But that is the same flawed reasoning that the First Circuit relied on in *NIH*, as to which the Supreme Court subsequently granted a stay. The First Circuit concluded that the Supreme Court's decision in *California* was distinguishable because the district court "did not award past due sums, but rather provided declaratory relief" and issued relief "under the APA independent of any contractual language." *Am. Pub. Health Ass'n v. National Insts. of Health*, 145 F.4th 39, 50, 52 (1st Cir. 2025). In issuing a stay, the Supreme Court thus made clear that the distinction between past and future payments and the mere invocation of the APA, as opposed to contract conditions, make no difference to the applicability of the Tucker Act. That conclusion controls this case. The relevant point is that the dispute sounds in contract because the grant agreements create the asserted right to payment in the first instance and any obligation to continue making payments would have to come from the grant terms.

20

In *Portsmouth Redevelopment and Housing Authority v. Pierce*, the Fourth Circuit rejected a plaintiff's similar attempt to amend its complaint into district court jurisdiction by excluding a request for specific monetary relief.  706 F.2d 471, 473 (4th Cir. 1983).  The court found that the plaintiff's "primary objective in this action is to recover money allegedly wrongfully withheld by the federal government" and "[a]lthough the [plaintiff's] amended complaint rephrases its request for money as a request for equitable relief, ***Claims Court jurisdiction cannot be avoided by framing an essentially monetary claim in injunctive or declaratory terms***."  *Id.* at 474 (emphasis added).  Accordingly, the Tucker Act applied, and the case was dismissed for lack of subject matter jurisdiction.  *Id.* at 475.  Similarly, in *U.S. Conf. of Catholic Bishops v. U.S. Dept. of State*, Case No. 25-cv-00465-TNM, 2025 WL 763738 (D.D.C. Mar. 11, 2025), another grant termination case, the court held that the Tucker Act applied.  In considering the relief requested, the court explained:

> Stripped of its equitable flair, the requested relief seeks one thing:  The Conference wants the Court to order the Government to stop withholding the money due under the Cooperative Agreements.  In even plainer English:  The Conference wants the Government to keep paying up.  Thus the Conference 'seeks the classic contractual remedy of specific performance.' . . . But this Court cannot order the Government to pay money due on a contract. . . . Such a request for an order that the government 'must perform' on its contract is one that 'must be resolved by the Claims Court.'

*Id.* at *5 (citations omitted).  As in *Portsmouth* and *Catholic Bishops*, Plaintiffs here cannot manufacture subject matter jurisdiction in federal district court through artful pleading.

In this case, it is only the relevant contractual instruments, not any statute, that entitle any particular plaintiff to receive federal funds (which is the only relief that would remedy the injuries actually alleged).

### c.  The termination of the grant funding program(s) does not constitute a discrete agency action subject to judicial review.

District courts lack subject matter jurisdiction over APA claims "if the plaintiff fails to challenge a particular 'agency action' that is fit for review."  *City of New York v. U.S. Dep't of*

21

*Defense*, 913 F.3d 423, 430 (4th Cir. 2019).  The APA defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13).  Under this definition, agency action "is limited to those acts that are 'circumscribed' and 'discrete.'"  *City of New York*, 913 F.3d at 431 (quoting *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 62 (2004)).  When challenging agency action, the plaintiff must "identify specific and discrete governmental conduct, rather than launch a 'broad programmatic attack' on the government's operations."  *Id.*  Thus, the APA distinguishes between "***discrete acts, which are reviewable, and programmatic challenges, which are not***."  *Id.* (emphasis added).  Otherwise, "courts would be forced to enter a disfavored 'obey the law' injunction, [] or to engage in day-to-day oversight of the executive's administrative practices."  *Id.*

Applying these principles here, Plaintiffs' purported programmatic attack against Defendants is not the kind of "circumscribed" and "discrete" agency action that is subject to judicial review.  The relief sought in Plaintiffs' Supplemental Complaint makes the nature of their claims in this regard clear.  Plaintiffs seek broad injunctive relief in the form of requiring EPA and Administrator Zeldin to implement the ECJ Block Grant Program, *see* Dkt. No. 204, at 39, or to "prohibit Defendants from otherwise impeding, blocking, cancelling, or terminating Plaintiffs' access to their funds awarded under such program(s)" Dkt. No. 203, at 108.

### d. Plaintiffs lack standing to assert a challenge to the termination of the grant funding program.

To the extent Plaintiffs claim that they are merely asking the Court to require Defendants to comply with the Appropriations Acts, they lack standing to assert such an "undifferentiated, generalized grievance about the conduct of government."  *Lance v. Coffman*, 549 U.S. 437, 442 (2007).  The Supreme Court has long held that "[a] citizen may not sue" in federal court "based only on an 'asserted right to have the Government act in accordance with the law.'"  *FDA v. All.*

22

*for Hippocratic Med.*, 602 U.S. 367, 381 (2024) (citation omitted).

On remand, Plaintiffs attempt to refashion the remedy altogether. Plaintiffs claim to seek vacatur of the program termination.  Yet the only way for a vacatur to address Plaintiffs' alleged injury would be to reinstate funds to existing grants.  This Court cannot require EPA to award new ECJ Block Grants or otherwise require that Plaintiffs be permitted to compete for new awards because the funds are out of this Court's reach. *See supra*, Section II.  Similarly, a vacatur of hypothetical guidance would not undo the grant terminations or restore funding. *See NIH*, 145 S. Ct. at 2661 (Barrett, J., concurring).

The only live dispute here is whether Plaintiffs are entitled to the full award amount of the terminated grant agreements, or only to their allowable pre-termination, termination, and closeout costs. That dispute is fundamentally contractual.

Even if Plaintiffs could sufficiently allege an Article III injury, they fail to plausibly allege that such an injury "is 'likely' to be 'redressed by judicial relief'" here. *Haaland v. Brackeen*, 599 U.S. 255, 292 (2023).  As explained, the Appropriations Acts do not confer any rights upon Plaintiffs; they merely appropriate funds to remain available until a certain date.  *See supra*, Section II at 15.  Setting aside the challenge afforded by the recission of funding, the proper remedy would be an injunction requiring EPA and USDA to *reobligate* the grant funds in accordance with Plaintiffs' interpretation of the applicable statutes, *not* to *reinstate* Plaintiffs' specific grants. *See Widakuswara v. Lake*, No. 25-5145, 2025 WL 1288817, at *4 (D.C. Cir. May 3, 2025).  ("plaintiffs overread the governing statutes, which do not give the networks an unqualified right to the appropriated funds," and if the appropriations acts "created any entitlement for the [plaintiffs] at all, they at most would require [the agency] to enter grants obligating the appropriated amounts to

23

the networks").[4]  Yet granting that limited remedy here would not result in the restoration of funding to Plaintiffs.  The various injuries that Plaintiffs have allegedly suffered as a result of the grant freezing or termination—having to cancel programs (Dkt. No.203, at 28, ¶ 73; at 39, ¶ 99) and lay off staff, incur costs, (Dkt. No. 203, at 9, ¶ 26; at 22, ¶ 59, at 21, ¶ 57;) as well as reputational injury (Dkt. No. 203, at 8, ¶¶ 11, 21; 11; at 17, ¶  45; at 18, ¶ 47)—would thus go wholly unaddressed.  That absence of a redressable injury fails to satisfy Article III's standing requirements.  *Haaland*, 599 U.S. at 294.

### e.  Funding decisions are committed to agency discretion and are not subject to arbitrary and capricious review.

Even if Plaintiffs' claims were not subject to the Tucker Act, Plaintiffs are unlikely to succeed on their APA claims because they challenge funding decisions that are committed to the agency's discretion by law.  5 U.S.C. § 701(a)(2).  Although the APA presumes that agency action can be judicially reviewed, "under § 701(a)(2), agency action is not subject to judicial review 'to the extent that' such action 'is committed to agency discretion by law.'"  *Lincoln v. Vigil*, 508 U.S. 182, 190–91 (1993).

In *Lincoln*, the Supreme Court held that the "allocation of funds from a lump-sum appropriation" is an "administrative decision traditionally regarded as committed to agency discretion," and thus such a decision is not reviewable under the APA.  *Id.* at 192.  The Court noted, however, that "an agency is not free simply to disregard statutory responsibilities: Congress

---

[4] *See also U.S. Conf. of Catholic Bishops*, 2025 WL 763738, at *7 ("The relief the Conference seeks in its preliminary injunction—reinstatement of contracts terminated by the Government—is beyond the power of this Court," finding that "while the Executive has an obligation to spend appropriated funds, 'laws have traditionally afforded the Executive discretion on *how* to spend' that money. . . . As a result, the court could not order the Government to revive specific contracts.") (citing *AIDS Vaccine Advoc. v. Dep't of State*, 2025 WL 752378, at *23 (D.D.C. Mar. 10, 2025)).

may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes . . . ." *Id*. at 193. But as long as the agency abides by the relevant statutes (and whatever self-imposed obligations may arise from regulations or grant instruments), the APA "gives the courts no leave to intrude" via arbitrary-and-capricious review. *Id*.

Although *Lincoln* involved lump-sum appropriations, in *Milk Train, Inc. v. Veneman*, 310 F.3d 747 (D.C. Cir. 2002), the D.C. Circuit extended its logic to more specific appropriations, holding that where Congress "left to the Secretary the decision about how the moneys" appropriated for a particular program "could best be distributed consistent with" the governing statute, such decisions were not subject to judicial review under the APA. *Id*. at 751–52. *See also Pol'y & Rsch., LLC v. U.S. Dep't of Health & Human Servs*., 313 F. Supp. 3d 62, 75–76 (D.D.C. 2018) (Jackson, J.) ("*Milk Train* thus makes quite clear that even funding decisions relating to a specific appropriation for a specific program can be properly deemed committed to agency discretion."). Accordingly, the challenged decision to terminate a grant is reviewable—at most— only for compliance with the terms of the governing statutes, regulations, and funding instruments. Such termination decisions are not subject to arbitrary-and-capricious review as funding decisions are actions committed to agency discretion by law.

### f. Plaintiffs cannot circumvent these limitations on review by invoking nonstatutory review.

The Fourth Circuit has already held that "Plaintiffs' attempt to cast their claims as constitutional, not statutory, fails under Supreme Court precedent." *Sustainability Inst. v. Trump*, 165 F.4th 817, 829 (4th Cir. 2026). In doing so, the Court accepted the government's argument that *Dalton v. Specter*, 511 U.S. 462, 473 (1994), makes clear that allegations that an official has acted in opposition to a statute are statutory claims—not "'constitutional' claims" that can be asserted through a direct cause of action. *Id.* at 831–32. Therefore, any purported claims based on

the Presentment Clause or Separation of Powers must be dismissed pursuant to the Fourth Circuit's decision.

The only remaining issue regarding Plaintiffs' so-called nonstatutory claims is whether Plaintiffs can invoke the narrow "implied nonstatutory exception for claims alleging that a federal actor has violated a federal statute". *See id.* at 830. This ultra vires review "applies only when an agency has taken action entirely in excess of its delegated powers and contrary to a *specific prohibition* in a statute." *Id.* (internal citations omitted). Further, "[a] plaintiff invoking ultra vires review also must demonstrate that no other statutory scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review, and that no statute forecloses all other forms of judicial review." *Id.* (internal citations omitted). An ultra vires claim has been called a "Hail Mary pass" because it rarely succeeds. *Id.*

Plaintiffs' attempt to invoke ultra vires review here fails for two reasons. First, no action taken by the EPA or USDA is contrary to a specific prohibition. The relevant statute provides that the EPA Administrator "shall use amounts made available under [42 U.S.C. § 7438(a)(1)] to award grants." 42 U.S.C. § 7438(b)(1). Subsection (a)(1), in turn, lists the amounts "appropriated to the Administrator for fiscal year 2022" that "remain available until September 30, 2026, to award grants." The Fourth Circuit has already said that this sort of language does not prohibit the government from freezing or terminating grants. *Id.* at 834. And, for jurisdictional purposes, there is no meaningful difference between an allegation that an agency terminated one grant agreement or all of them. The point is that Congress did not specifically prohibit grant terminations, which—at bottom—is the only agency action involved here.

Second, since Plaintiffs have other "meaningful and adequate means of vindicating" their asserted right to grant funds, *see Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502

26

U.S. 32, 43–44 (1991), the Tucker Act provides a remedy for any alleged unlawful grant terminations. That being the case, this case falls outside the "limited" and "extremely narrow" basis for invoking nonstatutory review jurisdiction." *See Long Term Care Partners, LLC v. United States*, 516 F.3d 225, 233 (4th Cir. 2008); *Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel*, 437 F.3d 1256, 1263 (D.C. Cir. 2006). While Plaintiffs might prefer sweeping injunctive relief, that does not mean that the Tucker Act does not provide a "meaningful and adequate opportunity for judicial review." *Sustainability Inst.*, 165 F.4th at 830 (quotations omitted). Thus, even if Plaintiffs could identify a specific statutory prohibition, their ultra vires claim would still fail given the availability of other remedies. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) ("[T]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others.").

IV.    **Since Plaintiffs Have Not Demonstrated a Concrete and Particularized Injury, Plaintiffs Lack Standing to Assert a First Amendment Claim.**

Plaintiffs' First Amendment claim also should be dismissed for lack of subject matter jurisdiction because the Supplemental Complaint fails to plead that Plaintiffs suffered a concrete, traceable, and redressable injury such that Plaintiffs have standing.

To establish the first element of standing, Plaintiffs must demonstrate that they suffered an injury in fact that is "concrete and particularized" and "actual or imminent." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Standing requirements are somewhat relaxed in First Amendment cases. *See Nat'l Assoc. of Diversity Officers in Higher Educ. v. Trump*, 167 F.4th 86, 96 (4th Cir, 2026) (citing *Edgar v. Haines,* 2 F.4th 298, 310 (4th Cir. 2021)).  In such cases, "the injury-in-fact element is commonly satisfied by a sufficient showing of self-censorship, which occurs when a claimant is chilled from exercising his right to free expression." *Id*. Here, Plaintiffs have not alleged that they engaged in self-censorship. *See generally* Dkt. No.203.

27

While "allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm," Plaintiffs' Supplemental Complaint does not even allege a chilling effect related to the "Program Freezing and Termination Actions." *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972). Fundamentally, the Supplemental Complaint does not allege that the "Program Freezing and Termination Actions" prohibit Plaintiffs from engaging in or have caused Plaintiff not to engage in specific, planned, and protected First Amendment conduct. *See* Dkt. No. 203 at ¶¶ 385–95. Instead, the Supplemental Complaint focuses on Plaintiffs' alleged inability to access grant funding. *See generally* Dkt. No. 203.

The Supplemental Complaint's vague and unsupported allegation that "[t]he Program Freezing and Termination Actions violate the First Amendment by restricting Plaintiffs' constitutionally protected speech based on its content" does not save Plaintiffs' First Amendment claim. *Id*. at ¶ 395. Rather, it completely ignores the requirement for a First Amendment plaintiff to establish a threat of a specific future harm "with respect to each of the provisions it seeks to challenge . . . ." *Rock for Life-UMBC v. Hrabowski*, 411 F. App'x 541, 547 (4th Cir. 2010) (unpublished) (citing *Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 429–30) (4th Cir. 2007)). The Supplemental Complaint does not move the First Amendment allegations from the realm of "subjective or speculative." Because a claimed chilling effect cannot be based on subjective or speculative accounts, Plaintiffs' Supplemental Complaint fails to satisfy the standing requirements. *See Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011).

Additionally, because the Supplemental Complaint fails to allege a concrete injury, Plaintiffs cannot satisfy the other two elements of the standing inquiry that flow from the concrete injury requirement. *See*, *e.g*., *Frank Krasner Enters., Ltd. v. Montgomery Cty*., 401 F.3d 230, 234 (4th Cir. 2005) (explaining traceability is satisfied when "a causal connection between the injury

28

and the conduct complained of . . . is fairly traceable, and not the result of the independent action of some third party not before the court" and redressability is satisfied when there is "a non-speculative likelihood that the injury would be redressed by a favorable judicial decision.") (emphasis and internal quotation marks omitted). For these reasons, Plaintiffs lack standing to assert the First Amendment claim and the Court lacks subject matter jurisdiction over the claim.

## CONCLUSION

For these reasons, Defendants respectfully ask this Court to deny Plaintiffs' Motion for Partial Summary Judgment and to grant Defendants' Partial Motion to Dismiss, or alternatively, grant Defendants' Motion for Partial Summary Judgment.

Respectfully submitted,

BRYAN P. STIRLING
UNITED STATES ATTORNEY

By:        *s/Joanna B. Stroud*
Joanna B. Stroud (#11245)
Assistant United States Attorney
151 Meeting Street, Suite 200
Charleston, SC 29401
Telephone:  (843) 266-1676
Email: Joanna.Stroud@usdoj.gov

*s/Beth C. Warren*
Beth C. Warren (#11360)
Assistant United States Attorney
1441 Main Street, Suite 500
Columbia, SC 29201
Telephone: (803) 929-3000
Email: Beth.C.Warren@usdoj.gov

May 5, 2026

29