Exhibit F

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

THE SUSTAINABILITY INSTITUTE, et al.,

Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity
as President of the United States, et al.,

Defendants.

Case No. 2:25-cv-02152-RMG

## DECLARATION OF VICTORIA HAMILTON

I, Victoria Hamilton, hereby declare as follows:

1.     I am a Legal Administrative Assistant at the Southern Environmental Law Center, where I have been employed at all relevant times. I make the following factual statements based on my personal knowledge and belief.

2.     On March 16, 2026, I ordered from eScribers, LLC, the transcript of the oral argument in *Appalachian Voices v. EPA*, No. 25-5333 (D.C. Cir.), argued earlier that day.

3.     Attached as **Exhibit D-1** is a true and correct copy of the transcript of the argument in *Appalachian Voices v. EPA*, No. 25-5333 (D.C. Cir.), that eScribers delivered in response to my request.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed on May 11, 2026, in Washington, D.C.

Victoria Hamilton

# Exhibit D-1

1

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

- - - - - - - - - - - - - - - x
APPALACHIAN VOICES, et al.,    :
                              :
          Appellants;         :
                              :
INSTITUTE FOR SUSTAINABLE     :
COMMUNITIES,                  :
                              :    No. 25-5333
     v.                       :
                              :
ENVIRONMENTAL PROTECTION      :
AGENCY AND LEE M. ZELDIN,     :
in his official capacity as   :
Administrator of the United   :
States Environmental          :
Protection Agency,            :
                              :
          Appellees.          :
- - - - - - - - - - - - - - - x

                              Monday, March 16, 2026

                              Washington, D.C.

     The above-entitled action came on for oral argument pursuant to notice.

     BEFORE:

          CHIEF JUDGE SRINIVASAN, AND CIRCUIT JUDGES RAO
          AND WALKER

     APPEARANCES:

          ON BEHALF OF THE APPELLANTS:

          BENJAMIN GRILLOT, ESQ.

          ON BEHALF OF THE APPELLEES:

          JOHN BAILEY, ESQ.



2

# C O N T E N T S

ORAL ARGUMENT OF:                                              PAGE

    BENJAMIN GRILLOT, Esq.
    On Behalf of the Appellants                            3; 28

    JOHN BAILEY, Esq.
    On Behalf of the Appellees                                15



www.escribers.net | 800-257-0885

P R O C E E D I N G S

THE CLERK:  Case No. 25-5333, Appalachian Voices, et al., appellants, Institute for Sustainable Communities v. Environmental Protection Agency and Lee M. Zeldin, in his official capacity as Administrator of the United States Environmental Protection Agency. Mr. Grillot for the appellants and Mr. Bailey for the appellees.

JUDGE SRINIVASAN:  Good morning, Counsel.  I think it's still morning, barely.

Mr. Grillot, please proceed when you're ready.

ORAL ARGUMENT OF BENJAMIN GRILLOT, ESQ.

ON BEHALF OF THE APPELLANTS

MR. GRILLOT:  Good morning, Your Honor, just barely.  May it please the Court.  My name is Benjamin Grillot, and I'm representing the appellants in this matter.  I'd like to reserve two minutes for rebuttal. Thank you.

This case squarely challenges the elimination of an entire congressionally mandated grant program for policy reasons.  Plaintiffs properly pled both APA and constitutional claims in the district court challenging that elimination.  This Court should reverse the district court's decision to dismiss the claims and remand for further proceedings.

4

Now, this Court has recently been presented with similar issues, and we recognize that the outcome of this case may, to some extent, be guided by this Court's forthcoming en banc decisions in Climate United and NTEU. However, this case is distinct.  First, Congress created a mandatory grant program; it said EPA shall award $3 billion in grants.  Second, plaintiffs pled facts demonstrating that the Executive decided to eliminate the entire program on the program level, and third, the statutory command remains in effect; the statute has not been repealed.  And further, unlike other cases which have come up on preliminary relief, this case is here on a motion to dismiss, and plaintiffs have pled plausible APA and constitutional claims, and they should be heard in the district court, but first, this case is not moot.

The statutory language here in H.R. 1, which defendants point to, is clear.  It rescinded only unobligated balances.  Now, unobligated balances is a term of art in fiscal law, and it is designed to provide certainty to the government.  The OMB circular that the government cited in their brief a few pages later describes in detail just why unobligated balances are limited to certain terms.

JUDGE RAO:  So can you just address specifically, why do the termination letters, standing



www.escribers.net | 800-257-0885

alone, in your view, make these funds, I guess, not unobligated, or why is the termination letter not sufficient to unobligate the funds?

MR. GRILLOT: Certainly. The termination letters themselves, if you look at the language of the letter, not only does it identify that -- it provides notice, which is the first step of a termination process.

So the termination letter initiates a termination process, and EPA's regulations set out, as part of that process, two important things: first, an appeal. So the notification in the letter includes the opportunity for the grantee to notify EPA that they disagree with the termination decision and to have an appeal. That in itself does not -- creates some uncertainty about whether those funds are in fact obligated or de-obligated. So that alone creates sufficient reason for why these funds were not unobligated.

And the second reason is that, as EPA explained, there's a final financial report that needs to be submitted, and that report is an accounting by which the grantee then identifies what's outstanding, EPA goes back and forth with them, and only once that amount is set do the funds become unobligated, and that's --

JUDGE RAO: Do you have any precedent for



6

suggesting -- so the government has conceded that costs that were incurred before termination and any closeout costs will be paid to the grantees and everything beyond that, although it may not be fully determined or fleshed out, is no longer obligated.  So the amount hasn't been set through the various processes, but does that -- I mean, I don't know why that would necessarily mean that those funds continue to be obligated.

MR. GRILLOT:  So Your Honor, the -- if you look at the OMB circular that the government cites, A 11, and you go to page 27, in the context of a maximum price contract, it makes the assertion that, as a general rule, the amount of obligation is the maximum liability to the federal government.  That's what's set at the time of obligation.

So let's say you have a maximum price contract and perhaps there's a downward adjustment; perhaps the vendor is able to provide it at a lower cost, and that maximum price contract needs to be adjusted.  Only once that downward adjustment is written down and there is, quote, documentary evidence that the price is reduced, only at that point does the delta become de-obligated.

So there needs to be some certainty because otherwise you could run into an Anti-Deficiency Act problem relatively quickly.  If you considered everything



de-obligated and the actual amount that was owed was more than that, you've created a liability without an obligation.  So the way that the financial system works is to keep funds obligated until they become --

JUDGE RAO:  I think that makes sense --

MR. GRILLOT:  -- final.

JUDGE RAO:  -- as a general matter, with respect to the Anti-Deficiency Act, but here Congress has specifically rescinded, and so we also have to give meaning to what happened in the OBBBA.

MR. GRILLOT:  So what H.R. 1 did and what Congress did is they rescinded unobligated balances, and this background understanding of fiscal law certainly was present, and it's understood that when asked, the chair of the Environment Committee, Representative Griffith, stated, in response to a question about what does this do to the grants that EPA has started the termination process on, so in response to that question, he answered, as of right now, that money is not available to us because it has been obligated, and he recognized, and we do not dispute, that a future act of Congress --

JUDGE RAO:  One member of Congress.

MR. GRILLOT:  Sure.  The chair of the Environment Committee, who was leading the effort to rescind these funds, said that, but it's not just his

8

word.  It's the fact that the EPA Director of the Office of the Comptroller -- an email that's cited in our briefing -- was asked by an internal employee, are we de-obligating these, and she responded, we do not process de-obligation until the final financial report is completed.  This matches EPA's regulations.  It matches this background understanding of financial law.  It matches what --

JUDGE SRINIVASAN:  Which is after the closeout process, right?

MR. GRILLOT:  After the closeout process and after the appeal process.  Those two work together, and as counsel for EPA stated in the en banc argument a few weeks ago, the funds are not technically de-obligated until the closeout process is completed, and technicalities matter here, and this is a matter of how this accounting worked. And so what Congress did, as reflected in the CBO score in July of 2025, was rescinded the balances that were unobligated on that day, which was $516 million, not the entirety of the entire grant program, and the rest of those funds remain, and importantly, Congress did not repeal the statute.  So that statutory obligation remains, and EPA is still required to comply with the effectuation of the program.

JUDGE SRINIVASAN:  Can I ask you, so suppose



that we accept your submission on mootness, so that the dispute is not moot. Just assume for purposes of this question that we get past the mootness. Then is there -- and you can't obviously know what's going to happen in NTEU and Climate United -- but do you have a reason that, no matter what happens in those cases, we should still reach a conclusion in this case; or the natural course would be that -- those cases have, you acknowledge and I think everybody acknowledges, some overlap -- and the natural course would be to see what happens in those cases when those opinions are issued and then reach a conclusion as to how that affects this case?

MR. GRILLOT: I see two paths there, Your Honor. I think it may make sense, as a matter of judicial economy, to wait on this case until those are decided and then rule. I also think that it would be appropriate to send it to the district court, because we have stated a claim under a motion to dismiss standard, and then allow the district court to apply whatever decision is reached in NTEU and Climate United, but in either case, we have sufficiently met the pleading standard, and I think taking inferences -- accepting our facts as pled, we have stated a claim for the elimination of this entire grant program.

JUDGE SRINIVASAN: So even if we -- it went back to the district court, the district court wouldn't do

anything until the en banc decisions were issued.  Is that what -- is that the scenario you're hypothesizing, or are you hypothesizing something different?

MR. GRILLOT:  So for the APA claims, I believe that the district court could rule now, regardless of what happens in NTEU and Climate United, because of the distinctions in the ways that our case is different.

The district court reached its constitutional conclusions in large part relying upon the Dalton analysis that's squarely presented in NTEU and Climate United.  So I would agree that the district court wouldn't -- would not be prudent for it to rule on that at that point.

JUDGE SRINIVASAN:  And then can I ask you about the timeline and the appropriation?  So the appropriation law says that the funds remain available until September 30th, 2026.

MR. GRILLOT:  Yes, Your Honor.

JUDGE SRINIVASAN:  So that's coming up later this year --

MR. GRILLOT:  Yes, Your Honor.

JUDGE SRINIVASAN:  -- and so the question becomes, what effect does that have -- that date have -- on the future litigation of this case if in fact it continues?

MR. GRILLOT:  So that's a question for the


www.escribers.net | 800-257-0885

11

defendants, Your Honor.  That's a question for the government to -- as to how they intend to carry out their mandate here to effectuate --

JUDGE SRINIVASAN:  But what's your view about that?  I mean, you must -- you're a party that's directly affected by whatever the effect of that date would be.

MR. GRILLOT:  So EPA would be required to, in our view, obligate the funds by September 30, 2026. Whether they obligate them to our specific plaintiffs, whether they recompete for them in some new process, perhaps an expedited process, that is a question that needs to be squarely presented to the defendants, and our requirement would be that they in fact effectuate the program, but we're not -- I don't want to prejudge the outcome of what that would look like or what we would agree to.

JUDGE SRINIVASAN:  Suppose, for example, that this case -- that this case remains in suspended animation past September 30th, 2026, just where it is right now.

MR. GRILLOT:  Yes, Your Honor.

JUDGE SRINIVASAN:  Just suppose that happens. In your view, what's the effect of the September 30th date having --

MR. GRILLOT:  There's certainly case law in this circuit that -- under Castile and other doctrines -- that

12

as long as our case was filed before the lapse in appropriations deadline, that the litigation can continue, and the Court has inherent equitable power as to whether and how to proceed in that context. We're not there right now, but in our view, if this proceeded past that date, that's certainly an argument we would make.

JUDGE SRINIVASAN: That's the line of cases that you'd be drawing on?

MR. GRILLOT: Yes, Your Honor.

JUDGE WALKER: If the district court -- sorry. If the district court reached the merits of your constitutional claim before addressing standing or mootness, would it make sense under Steel Co. to send it back to the district court for the district court to address that first?

MR. GRILLOT: If this Court has questions about standing and mootness as a factual matter, then it's appropriate for the district court to evaluate those. We have strong arguments, as the complaint read in our favor, accepting it as true, that we have established both standing and mootness -- that it's not moot -- but that outcome is understood.

JUDGE WALKER: Okay.

JUDGE RAO: So the grantees pressed their claims under 706(2), right, that the so-called shutdown is



13

contrary to law, but I'm wondering whether we should think about the claims more like 706(1) claims for -- or am I mixing that up?  Well --

MR. GRILLOT:  I think you have it right.  You have it right, Your Honor.

JUDGE RAO:  Yes.  Yes.  Okay, sorry.  For agency action unlawfully withheld --

MR. GRILLOT:  Right.  So --

JUDGE RAO:  -- because the withheld action is grantees want EPA to continue to provide this grant program.

MR. GRILLOT:  What EPA has done and what the heart of our 706(2) argument is, is that they have decided that they are not going to effectuate a grant program.  So they made a -- they made a directive, and it was a decision that they were, for policy reasons, going to eliminate the entire program, and so as an initial matter, what that looked like was the termination of the individual grants but has also resulted in the failure to award new grants.  They make no effort to suggest to this Court that they intend to do that --

JUDGE RAO:  So why is that not 706(1)?  Right? You're --

MR. GRILLOT:  So --

JUDGE RAO:  -- seeking to compel EPA to run a



14

grant program that you say Congress requires -- that's legally required.

MR. GRILLOT:  Our position is that they took an action, and under 706(2) we can vacate and set aside that action.  It was unlawful for them to take this action, and then as a result, the statutory mandate of 138 is incumbent upon them, and if at that point they fail to follow the law, then that's a 706(1), but we brought a 706(2) because they took a discrete action here --

JUDGE RAO:  Where's the discrete action?  Right?  So in NIH, the Supreme Court's stay opinion in NIH, there was a -- there was a separate guidance document that set out a policy.  Here there is a series of actions to terminate grants.

MR. GRILLOT:  So here there's an underlying discrete policy decision that was made in February of 2025 that was delivered verbally to -- by Deputy Administrator Voyles to his subordinate, Dan Coogan, and it was memorialized in email and said, I want you to eliminate these programs that I have identified by assistance number listing -- assistance number listing is the EPA database for the entire program; this is not talking about individual grants; it's an elimination of an entire program going forward -- and then that chain of events was attested to in a declaration that was produced in federal

eScribers
www.escribers.net | 800-257-0885

court and in response to a judge's question, saying, what happened? And so that action is -- sufficiently meets the hallmarks of Bennett v. Spear, and certainly reading the facts in the complaint in our favor, we have certainly pled a final agency action for the purposes of a motion to dismiss.

JUDGE SRINIVASAN: Okay. Make sure my colleagues don't have additional questions at this point.

We'll give you a little time for rebuttal.

MR. GRILLOT: Yes.

JUDGE SRINIVASAN: Mr. Bailey.

ORAL ARGUMENT OF JOHN BAILEY, ESQ.

ON BEHALF OF THE APPELLEES

MR. BAILEY: Good morning, Your Honors. John Bailey for the United States. May it please the Court. This Court can affirm on either of two threshold grounds. First, this case is moot. After EPA terminated these grant agreements, Congress expressly rescinded the unobligated funds appropriated for environmental and climate justice block grants. Upon termination, the only remaining legal obligations were for allowable pre-termination and closeout costs, which EPA has already agreed to reimburse. The balance of plaintiffs' awards, along with any other uncommitted funds that might be used to prospectively fund the various programs, were pulled



16

back by Congress in the One Big Beautiful Bill Act.

JUDGE RAO:  Mr. Bailey, what is your best evidence for the fact that a termination letter standing alone makes these -- de-obligates the grant funds --

MR. BAILEY:  Sure.  Your Honor, I think --

JUDGE RAO:  -- because the government hasn't offered any other evidence of what's happened with these funds in terms of moving towards de-obligation?

MR. BAILEY:  You're correct.  Our position is that it is the fact of termination, the action of termination that, in this context, makes the funds an unobligated balance in the sense of H.R. 1.

JUDGE RAO:  And why is that?  What is your support for that?  I mean, we're not budget law experts, and there's very limited briefing that the government has offered to support this position.

MR. BAILEY:  Understood, Your Honor, and we tried to find the best authoritative textual sources, and for that, we point to the OMB circular, which defines an obligation as a legally binding agreement that will result in outlays immediately or in the future, and so we think of these agreements -- those are the binding obligations that give rise to the obligation in the first instance, and so upon termination, when that legally binding agreement is no longer operative, at that point the funds



www.escribers.net | 800-257-0885

17

become unobligated within the meaning of H.R. 1.

JUDGE RAO:  What about the fact that those unobligated funds -- so the grants are terminated, and the government thinks -- so the funds are unobligated but agrees that costs that were incurred before termination and any closeout costs remain obligated.

MR. BAILEY:  Correct, Your Honor.

JUDGE RAO:  And so there's some uncertain amount of unobligated funds, I mean, because it hasn't been set. Does that matter for the purposes of budget authority?

MR. BAILEY:  I don't think it does, Your Honor. I think that's right, that at the moment of termination, because we haven't completed the -- necessarily completed the reconciliation and closeout process, that the exact quantum of funds that remains obligated under the OMB regulations, it is indeterminate, but I don't think that means that Congress isn't able to rescind those funds.  It used very specific language:  unobligated balances.

And I think part of --

JUDGE SRINIVASAN:  There's no doubt that they can rescind, but the question becomes, when did they become unobligated?

JUDGE RAO:  Yes.

JUDGE SRINIVASAN:  Did they become unobligated at the moment -- I take it you don't think there's any

escribers
www.escribers.net | 800-257-0885

18

difference between unobligated and de-obligated?  It sounds to me like you're -- you think there is a difference.

MR. BAILEY:  Unfortunately, Your Honor, I think that the term --

JUDGE SRINIVASAN:  I don't know if it's unfortunate or fortunate, but I'm curious as to what your position is.

MR. BAILEY:  I think that de-obligated is unhelpful because that's not a term that I understand to be defined in any regulations, regulatory materials.  I think that's kind of a colloquial --

JUDGE SRINIVASAN:  Yes.

MR. BAILEY:  -- like, agency speak for what happens at the end of reconciliation and closeout --

JUDGE SRINIVASAN:  Right.

MR. BAILEY:  -- well, before I encountered this case, I heard of the term de-obligated, but I think we need to drill down on unobligated balance, the exact language in H.R. 1, and I think the best way to understand that is by looking to what obligation means.

So not to complicate things --

JUDGE SRINIVASAN:  So you think -- there's at least a colloquial understanding of what de-obligated is, at least -- I mean, that word is used.  It's bandied

19

about, and you think that the -- that unobligated for statutory purposes predates de-obligation?

MR. BAILEY: Oh, I think unobligated for purposes of H.R. 1 looks at whether we have a legally binding agreement that's operative --

JUDGE SRINIVASAN: Right.

MR. BAILEY: -- at the time of rescission, and so unless the Court has, as maybe -- might have been the case in some other cases before this Court, unless the Court has set aside that termination, vacated it, enjoined it, something like that, the state of the world at the time of termination, the agency took an action; it has effects, practical and legal ones, until that's disturbed by, as I said, a court order, or something, enjoining it, vacating it, setting aside, which we didn't have here.

JUDGE SRINIVASAN: I think the question is whether that legal effect amounts to an -- well, either a de-obligation or an unobligation, and to the extent you think there's a difference -- and you appear to think there is -- then whether that amounts to an unobligation, the termination alone, even though they're still working out yet to be done.

MR. BAILEY: Sure, and I think that -- we concede that it's -- at least you're factually indeterminate until, at the end of closeout, those final

financial reports need to be submitted, but I think as a functional matter, in addition to the textual reasons I just gave, I don't think it makes sense to say that, oh, well, Congress was only trying to rescind funds that were -- the reconciliation was completed and fast enough or in a certain amount of time.  I don't know why that should matter.

I think the question is whether the agency viewed these funds as still committed, and Congress said, well, if the agency has viewed these funds as committed to someone, we're not going to pull them back, we don't want to -- we don't want to disturb what the agency is doing, but when the agency has uncommitted the funds -- which our position is that termination uncommits them in the relevant sense -- well, at that point, Congress said, we're going to pull back funds that are uncommitted, and that was what the rescission was in H.R. 1.

JUDGE RAO:  Mr. Bailey, can you point to any either court case or executive branch practice or regulation that suggests that the technical term unobligated balances could be an indeterminate amount, right, because usually when you talk about balances, that's a kind of accounting term of art, suggests maybe that something -- like a balance has been determined, specific amount of the balance?  So I'm just wondering if

there's anything you can point to that suggests you could have an unobligated balance in that technical sense that is not yet settled.

MR. BAILEY: I'm afraid I probably don't have a particularly satisfying answer for you, Judge Rao, but I do think that --

JUDGE RAO: Just wondering if it's part of executive branch practice that unobligated balances may sometimes not be determinate. I mean, I don't know.

MR. BAILEY: Well, I think this is related to the interplay between the Recording Act and the Anti-Deficiency Act, where agencies, as a matter of practice, are going to have sums over-recorded on their books while this reconciliation or closeout process plays out --

JUDGE RAO: Yes.

MR. BAILEY: -- and so for that reason, your -- you might not look at a pot of money as de-obligated until the end of the process, but at least as a legal matter, those funds are uncommitted to -- as far as the agency is concerned; they just are trying to figure out the exact quantum that they need to --

JUDGE RAO: And so the rescission that Congress enacted of unobligated balances would apply to that indeterminate amount?


www.escribers.net | 800-257-0885

22

MR. BAILEY: Yes, Your Honor, I believe that -- as I said --

JUDGE RAO: But you can't point to any either executive branch regulation or case that suggests that understanding, or both?

MR. BAILEY: No, and I don't believe that my colleague on the other side has pointed to one that said that that would foreclose this reading.

JUDGE RAO: Right.

MR. BAILEY: It's a tough textual question, but I mean, we have to -- we have to -- ultimately, the courts will have to answer what was Congress doing here and what exactly were they pulling back, and I don't think we can say, oh, well, it really wasn't doing anything because it just wasn't clear what exactly -- who the money belonged to.

I think Congress was really looking at, were these funds committed to -- has the agency committed these funds, and if so, we're not going to disturb that, but for the pot of money that is uncommitted, is unobligated, we're going to pull that back, and I think that that doesn't turn necessarily on whether that quantum has -- whether the 120 days has passed that would allow final financial report to calculate that exact sum.

JUDGE SRINIVASAN: And this is a question along


www.escribers.net | 800-257-0885

23

the same lines.  So the grant agreements themselves talk about re-obligation where there's been a de-obligation.

MR. BAILEY:  Yes.

JUDGE SRINIVASAN:  And so is the way you understand the world that the language says de-obligate uncommitted funds and re-obligate them by an award to another grantee?  And so the way you would understand the way these terms all get juxtaposed is that even though the re-obligation happens after the de-obligation of uncommitted funds -- which requires the process that would unfold to identify the amount that would then be re-obligated -- that an unobligation has already occurred before any of that happens.

MR. BAILEY:  I would say that an unobligation occurs upon termination, and then I would say there's a closeout that allows the full -- or the determinant amount to be de-obligated, as the agencies say.  At that point, now the agencies know, okay, we're not going to violate the Anti-Deficiency Act if we go ahead and re-obligate to a new grantee.

So I see it as unobligation at point of termination; we go through closeout, and now agencies say --

JUDGE SRINIVASAN:  De-obligation --

MR. BAILEY:  -- we have de-obligation; now we



www.escribers.net | 800-257-0885

24

have an --

JUDGE SRINIVASAN: -- and then re-obligate.

MR. BAILEY: -- identifiable amount to re-obligate.

JUDGE SRINIVASAN: I see.

MR. BAILEY: Yes.

JUDGE SRINIVASAN: Unobligation, then de-obligation, then re-obligation is the way you would --

MR. BAILEY: Yes, Your Honor.

JUDGE SRINIVASAN: -- you would reconcile these various terms that are in the statute and in the grant instruments?

MR. BAILEY: Yes, and to my understanding, I don't think that de-obligation is a word that appears in other regulatory materials or statutory materials. That's why I think it's most helpful to hone in on obligation in the OMB regulation.

JUDGE SRINIVASAN: Yes. It's in the grants, but it's -- but I understand your point about the regulations in the statute.

MR. BAILEY: Yes, Your Honor.

JUDGE WALKER: I think you -- I think you may have just said this, but normal situations, when an agency terminates a contract, the agency is not able to instantly re-obligate some of those funds?


www.escribers.net | 800-257-0885

25

MR. BAILEY: I don't know -- I think as a practical matter, I think, yes. As a practical matter, they're not able to immediately re-obligate from that same pot of money because they don't yet know how much of that pot of money has to go to the initial grantee for allowable pre-termination and closeout costs.

So as a practical matter, you need to allow the closeout process to play out and then that, at that -- so I understand that de-obligation term to be like, well, now, as a practical matter, we can go out and re-obligate, but at least for purposes of H.R. 1, I think the unobligated versus obligated is going to come down to whether you have that legally binding agreement in effect.

JUDGE SRINIVASAN: And then can I ask a question about -- unless there's further questions along these lines -- on the timing question raised with counsel on the other side? So what is the government's view about the effect of the September 30th, 2026, date on the litigation? And I'll just give you one scenario to hypothesize. I don't know -- you can't know what the scenario is going to be, but suppose this case stays in its current status as of September 38th -- September 30th -- 2026. At that time, what is the government's position on what happens to this case?

MR. BAILEY: Well, unfortunately, I think that



www.escribers.net | 800-257-0885

does turn on whether a court agrees with the EPA's understanding of unobligated balance, because EPA's position right now is that there is just no money left to fund -- no money left that it may obligate to new grantees to -- which to run the program, understanding that other amounts are over-recorded for reasons we just talked about, closeout is still playing out, but EPA's position is that there is no more funds that could be re-obligated to new grantees or to new projects.  So if EPA's position is right, we would say that that deadline is a nullity, because either before or after it, there's no money left to draw from.

I think that --

JUDGE SRINIVASAN:  And does that -- and then I'm curious, of course, as to your thought if that argument's not -- doesn't carry the day -- but on -- but before we go there, does that argument just collapse into the mootness argument?  In other words -- or is there a delta? -- so does that -- acceptance of that argument would necessarily mean the case is -- the case is moot anyway, or is there something else coming?

MR. BAILEY:  I mean, I think there could be a distinction, Your Honor, and one that I've thought of is, even if we say that the balance of plaintiffs' awards were not rescinded -- and so there's some money left available

27

to the agency until at least this deadline -- as you may have -- as you've maybe seen, the statute reserves 7 percent of funds for administrative costs. EPA's position is that those funds have all been pulled back, and so it's unclear how the program would necessarily operate prospectively going forward, even if you believe that the balance of plaintiffs' awards still -- are still able to be obligated, so not necessarily mooting their -- one version of their claims, but yes, they are related.

JUDGE SRINIVASAN: Okay.

MR. BAILEY: And I think to the second part of your question, assuming there is some quantum of funds that is left around as we approach the September 2026 deadline, I think at a certain point, we'd probably appreciate being able to submit supplemental briefs on exactly what the right remedy or effect would be. At this point, it's hard to know exactly what our position would be once that deadline rolls around.

JUDGE SRINIVASAN: Okay.

MR. BAILEY: And --

JUDGE SRINIVASAN: Make sure my colleagues don't have additional questions for you at this point.

MR. BAILEY: And if the Court has no further questions, I'll concede my time, which I can see I'm well out of, so -- thank you.

28

JUDGE SRINIVASAN:  Thank you, Counsel.

Mr. Grillot, will give you the two minutes you asked for for rebuttal.

REBUTTAL ARGUMENT OF BENJAMIN GRILLOT, ESQ.

ON BEHALF OF THE APPELLANTS

MR. GRILLOT:  Thank you, Your Honor.  At the outset, I want to point out that Congress can't rescind an unknown amount of money; so it had to be a finite fixed sum at the time of H.R. 1, and it's important to have this finality.  Funds are obligated until they're not.

So calling it de-obligation, calling it unobligation, it can't be a Schrodinger's cat situation. Funds are either obligated or they're not, and for all the reasons that we've described, they were not unobligated balances at the time that H.R. 1 acted, and to read H.R. 1 in the way that the government is suggesting here would essentially be a repeal by implication, because what it would do -- what it would have done is have repealed all of Section 138, and that didn't happen.  The statute remains on the books today, and --

JUDGE RAO:  What is your best authority for the fact that an unobligated balance has to be determinate or specified, that it can't be in the process of being determined and then rescinded?

MR. GRILLOT:  I think there's two, Your Honor --

first is the OMB circular, which sets out that the amount of an obligation is the maximum liability and gives this example of a maximum price contract that then gets reduced. Secondly, even going to the letters, which is the only thing that the government points at for this assertion, there is, as recognized, an appeal process, and so in our view, the government has this process backwards.

So the first thing that happens is a letter gets sent, and that notifies the recipient of the termination, and that's 200.341, notification. 342 is the opportunity to object and have a hearing and contest the grounds for terminating the award, and so in a world in which it's possible that the hearing officer would decide that the termination was in error, it would be inappropriate for the obligation -- or unobligation -- to have occurred already. And then after 342 --

JUDGE RAO: That just means that those funds wouldn't be an unobligated balance under the meaning of OBBBA.

MR. GRILLOT: Right. So this process was in play --

JUDGE RAO: But that doesn't tell me why, when Congress used the term unobligated balance, it has to be a determinate amount and --

MR. GRILLOT: Ah.


www.escribers.net | 800-257-0885

30

JUDGE RAO:  -- not an amount that is, like, in process of being determined.  So they want to say things that are unobligated are rescinded.  That's what the --

MR. GRILLOT:  Because --

JUDGE RAO:  -- that's what the statute says.

MR. GRILLOT:  Unless Congress acts -- the way that H.R. 1 works, or a rescission bill works, is that on the date that it passes, it looks at what's unobligated on that date.  If it wanted to have a future effect, if it wanted to go to futurity, then it could have written something like that, but it didn't.  It would have to use specific terminology, like, for example, we're not going to allow raises going forward under this compensation statute.  That would be a situation in which that would have future effect.  This is a situation in which it has -- is a snapshot in time of July 2025.

JUDGE RAO:  And your view is it can't be unobligated unless the amount is -- has been specified and all the appeals have run out and the closeout process is finished?

MR. GRILLOT:  And that comports with both long-standing EPA practice, EPA regulations, EPA statements, statements of counsel at argument, the general background of the OMB circular, the Red Book, the nuances of fiscal law.

31

JUDGE SRINIVASAN:  You don't dispute that the funds become uncommitted on termination?

MR. GRILLOT:  I do dispute that they -- I do dispute that, Your Honor, because (a) there's, first of all, an appeal process.  So it would not be appropriate for me to take my daughter's allowance unless I've checked with my wife first, and so there's an appeal process that works first, and then secondly, there's the closeout process about identifying the precise quantum.

I do not dispute, however, that once the closeout process is finished and that accounting is done, that those remaining funds then become de-obligated, unobligated, and become available to be awarded to some new grantee --

JUDGE SRINIVASAN:  I was trying to introduce a different term of uncommitted because counsel --

MR. GRILLOT:  Sure.

JUDGE SRINIVASAN:  -- was using that term and it's in the grant agreements also, and you think uncommitted is the same as de-obligated?

MR. GRILLOT:  For funds to be uncommitted, there needs to be some finality around it, and I think that what matters for this purpose is what Congress meant with unobligated balances.

I'm also going to add in the fact that when H.R.



www.escribers.net | 800-257-0885

32

1 passed in July of 2025, there were still some grants that had not yet even been terminated, that didn't yet have a termination notice sent out for them, and certainly in that context, you -- there's no question that H.R. 1 didn't affect them, because they haven't even been notified; and what that does is it creates some redressability, because those grant funds were certainly untouched by H.R. 1 and, as a result, some quantum of funds, regardless of the size, that gives us an opportunity to compete is enough.

JUDGE SRINIVASAN:  Make sure my colleagues don't have additional questions.

Thank you, Counsel.

Thank you to both counsel.  We'll take this case under submission.

(Whereupon, the proceedings were concluded.)



33

## DIGITALLY SIGNED CERTIFICATE

I certify that the foregoing is a correct transcription of the electronic sound recording of the proceedings in the above-entitled matter.


*Wendy Campos*

_____     March 21, 2026
Wendy Campos                       Date

eScribers, LLC

escribers
www.escribers.net | 800-257-0885